FILED
2017 Apr-20  PM 05:12
U.S. DISTRICT COURT
N.D. OF ALABAMA

# EX. 02

# Deposition Transcript of Jimmy Fazekas (w/o exhibits)

**Jimmy Fazekas**                                                    1 (1 - 4)

| | Page 1 |
|---|---|
| 1 | IN THE UNITED STATES DISTRICT COURT |
| 2 | FOR THE NORTHERN DISTRICT OF ALABAMA |
| 3 | MIDDLE DIVISION |
| 4 | |
| 5 | |
| 6 | CASE NUMBER:  4:15-cv-1152-VEH |
| 7 | |
| 8 | |
| 9 | MICHELLE LEE HELM, |
| 10 | Plaintiff, |
| 11 | |
| 12 | vs. |
| 13 | |
| 14 | RAINBOW CITY, ALABAMA, et al., |
| 15 | Defendants. |
| 16 | |
| 17 | |
| 18 | |
| 19 | DEPOSITION OF JIMMY FAZEKAS |
| 20 | DATE TAKEN:  November 11, 2016 |
| 21 | |
| 22 | |
| 23 | |

| | Page 2 |
|---|---|
| 1 | In accordance with Rule 5(d) of The |
| 2 | Alabama Rules of Civil Procedure, as |
| 3 | amended, effective May 15, 1988, I Beth C. |
| 4 | Word, am hereby delivering to Mr. H. Gregory |
| 5 | Harp the original transcript of the oral |
| 6 | testimony taken on the 11th day of November |
| 7 | 2016, along with exhibits. |
| 8 | |
| 9 | Please be advised that this is the |
| 10 | same and not retained by the Court Reporter, |
| 11 | nor filed with the Court. |
| 12 | |
| 13 | |
| 14 | |
| 15 | S T I P U L A T I O N S |
| 16 | IT IS STIPULATED AND AGREED by and |
| 17 | between the parties through their counsel, |
| 18 | that the deposition of JIMMY FAZEKAS may be |
| 19 | taken before Beth C. Word, Commissioner, at |
| 20 | the offices of Stubbs, Sills & Frye, 1724 |
| 21 | South Quintard Avenue, Anniston, Alabama, on |
| 22 | the 11th day of November 2016. |
| 23 | |

| | Page 3 |
|---|---|
| 1 | IT IS FURTHER STIPULATED AND AGREED |
| 2 | that the signature to and the reading of the |
| 3 | deposition by the witness is waived, the |
| 4 | deposition to have the same force and effect |
| 5 | as if full compliance had been had with all |
| 6 | laws and rules of Court relating to the |
| 7 | taking of depositions. |
| 8 | |
| 9 | IT IS FURTHER STIPULATED AND AGREED |
| 10 | that it shall not be necessary for any |
| 11 | objections to be made by counsel to any |
| 12 | questions except as to form or leading |
| 13 | questions, and that counsel for the parties |
| 14 | may make objections and assign grounds at |
| 15 | the time of the trial, or at the time said |
| 16 | deposition is offered in evidence, or prior |
| 17 | thereto. |
| 18 | |
| 19 | IT IS FURTHER STIPULATED AND AGREED |
| 20 | that the notice of filing of the deposition |
| 21 | by the Commissioner is waived. |
| 22 | |
| 23 | |

| | Page 4 |
|---|---|
| 1 | APPEARANCES |
| 2 | |
| 3 | FOR THE PLAINTIFF: |
| 4 | |
| 5 | GREGORY HARP, LLC |
| 6 | BY:  Mr. H. Gregory Harp and |
| 7 | Mr. Moses Stone |
| 8 | ADDRESS:  459 Main Street |
| 9 | Suite 101-266 |
| 10 | Trussville, Alabama 35173 |
| 11 | (205) 544-3132 |
| 12 | |
| 13 | |
| 14 | FOR THE DEFENDANT: |
| 15 | |
| 16 | FORD, HOWARD & CORNETT, P.C. |
| 17 | BY:  Mr. H. Edward Howard |
| 18 | ADDRESS:  140 South Ninth Street |
| 19 | Gadsden, Alabama 35901 |
| 20 | (256) 546-5432 |
| 21 | |
| 22 | |
| 23 | |

**Jimmy Fazekas**                                                    **2 (5 - 8)**

Page 5

1    STUBBS, SILLS & FRYE, P.C.
2    BY:  Mr. C. David Stubbs
3    ADDRESS:  1724 South Quintard Avenue
4    Anniston, Alabama 36201
5    (256) 835-5050
6
7
8    F&B LAW FIRM, P.C.
9    BY:  Mr. Allen L. Anderson
10   ADDRESS:  213 Greene Street
11   Huntsville, Alabama 35801
12   (256) 536-0095
13
14
15
16
17
18
19
20
21
22
23                    INDEX

Page 6

1
2    EXAMINATION BY:              PAGE NUMBER:
3    Mr. Harp                  8
4
5
6
7    EXHIBITS:
8    PX-1 - Use of Force Report         21
9    PX-2 - SOP Policy            25
10   PX-3 - Statement of Fazekas       43
11   PX-4 - Secondary Employment Request  100
12   PX-5 - Employee Warning Report      102
13   PX-6 - Accident Report          104
14   PX-7 - Resignation Letter        105
15   PX-8 - Statement of Gilliland      107
16   PX-9 - Taser X26 Certification      131
17
18
19
20
21
22
23

Page 7

1        I, BETH C. WORD, a Court Reporter of
2    Gadsden, Alabama, acting as Commissioner,
3    certify that on this date, as provided by
4    the Alabama Rules of Civil Procedure and the
5    foregoing stipulation of counsel, there came
6    before me at the offices of Stubbs, Sills &
7    Frye, 1724 South Quintard Avenue, Anniston,
8    Alabama, beginning at 12:00 p.m., JIMMY
9    FAZEKAS, witness in the above cause, for
10   oral examination, whereupon the following
11   proceedings were had:
12
13
14        THE COURT REPORTER:  Usual
15   stipulations?
16        MR. HARP:  Yes.
17        MR. ANDERSON:  Yes.
18        MR. STUBBS:  Yes.
19        MR. HOWARD:  Yes.
20
21
22
23        JIMMY FAZEKAS,

Page 8

1    being first duly sworn, was
2        examined and testified as follows:
3
4
5        EXAMINATION BY MR. HARP:
6        Q.  Mr. Fazekas, my name is Greg Harp.
7    This is Moses Stone.  We represent the
8    minor, TBH and her mother, Michelle Helm, in
9    this lawsuit.  Have you ever given a
10   deposition before?
11        A.  No, sir.
12        Q.  Let me go over a couple of ground
13   rules.  Your attorney may have gone over
14   them with you.  I'm going to be asking some
15   questions.  The court reporter will take
16   down everything that we say.  Okay?
17        A.  Uh-huh (affirmative response).
18        Q.  It's important that we do not talk
19   over each other.  And I will endeavor to let
20   you answer the question before I start a new
21   one.  Okay?
22        A.  Uh-huh (affirmative response).
23        Q.  The thing that you're doing right

Page 9

1  now saying uh-huh, she's going to fuss at
2  you if you do that. And she is not being
3  mean. She needs you to say either yes or no
4  if one of those are applicable. She
5  can't --
6      A.  No nods either.
7      Q.  No nods either.
8      A.  Okay.
9      Q.  If at any time you need to take a
10 break, I understand you were working late
11 last night, so anytime you need to take a
12 break, just let me know. I don't think
13 we'll be here too long today. So are you
14 aware that you were sued in this
15 litigation?
16     A.  Yes, sir.
17     Q.  Okay. What is your full name?
18     A.  Robert James Fazekas, Junior.
19     Q.  And where do you currently
20 reside?
21     A.  Foley, Alabama.
22     Q.  How long have you resided in
23 Foley?

Page 10

1      A.  One year.
2      Q.  So you moved to Foley in November
3  of last year?
4      A.  October.
5      Q.  October of 2015?
6      A.  Yes, sir.
7      Q.  And prior to residing in Foley,
8  where did you reside?
9      A.  In Southside, Alabama.
10     Q.  How long did you reside in
11 Southside?
12     A.  I would say twelve years.
13     Q.  So that was from 2003 until about
14 2015?
15     A.  Yes, sir.
16     Q.  And where did you reside just
17 prior to Southside?
18     A.  Glencoe.
19     Q.  How long did you reside in
20 Glencoe?
21     A.  Four years, I think.
22     Q.  Four years?
23     A.  Yes.

Page 11

1      Q.  So 1999 until 2003?
2      A.  Yes.
3      Q.  Where did you reside prior to
4  Glencoe?
5      A.  East Gadsden.
6      Q.  What street in East Gadsden?
7      A.  Chandler Street.
8      Q.  Chandler?
9      A.  Uh-huh (affirmative response).
10     Q.  How long did you reside in East
11 Gadsden on Chandler Street?
12     A.  From probably eight years old
13 until close to twenty maybe, something like
14 that.
15     Q.  So what year were you born?
16     A.  '76.
17     Q.  So that would put you from '84
18 until '99; is that right, or did you live
19 somewhere between East Gadsden and
20 Glencoe?
21     A.  Repeat that for me.
22     Q.  Okay. You said you resided in
23 Glencoe from about eight years old forward,

Page 12

1  right? Until you moved to East Gadsden.
2      A.  East Gadsden from eight up, eight
3  years old.
4      Q.  Oh, I'm sorry. East Gadsden from
5  eight years old.
6      A.  Until I was twenty.
7      Q.  Okay. And then where did you move
8  to?
9      A.  That was Glencoe.
10     Q.  Glencoe. Okay. And then you were
11 born in New Jersey?
12     A.  Easton, Pennsylvania.
13     Q.  Okay. Did you ever live in New
14 Jersey?
15     A.  No, sir.
16     Q.  And where are you currently
17 employed?
18     A.  RJ's Seamless Gutters.
19     Q.  What is your job title there?
20     A.  General manager.
21     Q.  Do you own that company?
22     A.  No, sir.
23     Q.  Who owns that company?

**Jimmy Fazekas**                                    **4 (13 - 16)**

Page 13

1    A.   Tim Robertson.
2    Q.   And how long have you worked at
3  RJ's Seamless Gutters?
4    A.   October 1st, 2015 to currently.
5    Q.   So that's located in Foley?
6    A.   Yes, sir.
7    Q.   Where did you reside (sic) just
8  prior to RJ's Seamless Gutters?
9    A.   Repeat that.  Where did I reside?
10   Q.   I'm sorry.  Not reside.  Where did
11 you work prior to RJ's Seamless Gutters?
12   A.   Rainbow City Police Department.
13   Q.   How long did you work for the
14 Rainbow City Police Department?
15   A.   Approximately five years.
16   Q.   And you started out as an officer
17 there, patrol officer?
18   A.   Yes.
19   Q.   How long did you work as a patrol
20 officer?
21   A.   Approximately three years.
22   Q.   What year did you start with the
23 Rainbow City Police Department?

Page 14

1    A.   2010.
2    Q.   So in 2013, what job title did you
3  change to?
4    A.   Detective.
5    Q.   And you worked there until October
6  of 2015?
7    A.   September 30th.
8    Q.   September 30th.  Did you have a
9  partner as a detective at the Rainbow City
10 Police Department?
11   A.   Yes.
12   Q.   What was your partner's name?
13   A.   Detective Gilliland.
14   Q.   Is that Justin Gilliland?
15   A.   Yes.
16   Q.   How long did you work with Justin
17 Gilliland in either capacity, as a patrol
18 officer or detective at the Rainbow City
19 Police Department?
20   A.   Close to five years.
21   Q.   Was Mr. Gilliland a patrol officer
22 during some of the same years you were?
23   A.   Yes.

Page 15

1    Q.   Were you two promoted to detective
2  around the same time?
3    A.   Yes.
4    Q.   Were there any other detectives --
5  let me ask you this way.  In 2015, were
6  there any other detectives for the Rainbow
7  City Police Department besides yourself and
8  Justin Gilliland?
9    A.   Chase Jenkins.
10   Q.   And Mr. Jenkins was a detective?
11   A.   Yes.
12   Q.   What rank did Mr. Jenkins hold?
13   A.   Captain.
14   Q.   When is the last time you have
15 spoken to Chase Jenkins?
16   A.   Approximately a year ago.
17   Q.   Around the time you left the
18 police department?
19   A.   Yes.
20   Q.   Was Mr. Jenkins still employed
21 with the Rainbow City Police Department the
22 last time you spoke with him?
23   A.   Yes.

Page 16

1    Q.   When is the last time you have
2  spoken to Justin Gilliland?
3    A.   I would say it's probably been
4  three months ago.
5    Q.   And what was the occasion for you
6  speaking with Justin Gilliland three months
7  ago?
8    A.   He called just checking on me,
9  small talk.
10   Q.   Did you guys discuss this lawsuit
11 at all?
12   A.   No, sir.
13   Q.   Did you discuss Mr. Gilliland
14 leaving the Rainbow City Police
15 Department?
16   A.   No, sir.
17   Q.   Did you know that Mr. Gilliland
18 had left the Rainbow City Police
19 Department?
20   A.   Yes, sir.  He talked to me about
21 another job.
22   Q.   When he talked to you about
23 another job, did you ask him if he was still

**Jimmy Fazekas**                                       **5 (17 - 20)**

Page 17

1  employed with Rainbow City?
2     A.  No.
3     Q.  Did you already know Mr. Gilliland
4  wasn't employed?
5     A.  Yes.
6     Q.  How did you find out Mr. Gilliland
7  was no longer employed by the Rainbow City
8  Police Department?
9     A.  Another officer.
10    Q.  Which officer was that?
11    A.  Scott Holderfield.
12    Q.  And tell me about the
13  circumstances that led to Mr. Holderfield
14  informing you that Justin Gilliland was no
15  longer employed by the Rainbow City Police
16  Department.
17    A.  He was working at the bank, at
18  Family Savings.  And I went in there because
19  I bank there.  And he just started talking
20  about it.
21    Q.  Did he tell you why Mr. Gilliland
22  was no longer employed by the Rainbow City
23  Police Department?

Page 18

1     A.  No, sir.
2     Q.  Well, what did he talk about?
3     A.  He just said Justin is no longer
4  with Rainbow City.  And then we talked about
5  my job.
6     Q.  Mr. Holderfield was working off
7  duty at the bank?
8     A.  Family Savings, yes.
9     Q.  Family Savings.  Have you heard
10  from any other person or persons why
11  Mr. Gilliland left the Rainbow City Police
12  Department?
13    A.  No.
14    Q.  Do you know sitting here today why
15  Mr. Gilliland left the Rainbow City Police
16  Department?
17    A.  I do not know, no, sir.
18    Q.  Were you ever called as part of
19  any investigation into Justin Gilliland's
20  conduct at the Rainbow City Police
21  Department?
22    A.  Never, no.
23    Q.  Was Justin Gilliland your partner

Page 19

1  the entire time you were a detective at
2  Rainbow City?
3     A.  Except for possibly one or two
4  months.
5     Q.  And who was --
6     A.  Justin McGlaughn.
7     Q.  Justin McGlaughn?
8     A.  Uh-huh (affirmative response).
9     Q.  Do you know why Justin McGlaughn
10  was your partner during those one to two
11  months instead of Mr. Gilliland?
12    A.  I think it was summertime, and he
13  was out of school because he was an SRO.
14    Q.  To your knowledge, has Justin
15  Gilliland, during the time that you worked
16  with Mr. Gilliland, was he ever suspended
17  from the Rainbow City Police Department?
18    A.  Not to my knowledge.  I do not
19  know.
20    Q.  Do you know Greg Carroll?
21    A.  Yes.
22    Q.  How do you know Greg Carroll?
23    A.  He was my chief.

Page 20

1     Q.  Was he your Chief of Police the
2  entire time you worked for Rainbow City?
3     A.  No, sir.
4     Q.  Did Allen Ragan serve as your
5  chief for a period of time?
6     A.  Yes, sir.
7     Q.  Any other chiefs besides Mr. Ragan
8  and Mr. Carroll?
9     A.  Rick Hill.
10    Q.  Rick Hill?
11    A.  Yes, sir.
12    Q.  Put those in order for me.  We
13  know Mr. Carroll was your chief when you
14  left, correct?
15    A.  Yes.
16    Q.  And who was your chief just prior
17  to Mr. Carroll?
18    A.  Rick Hill.
19    Q.  And then prior to that?
20    A.  Allen Ragan.
21    Q.  Allen Ragan.  Okay.  Let me show
22  you what I will mark as Plaintiff's Exhibit
23  Number 1 to your deposition.  And by way of

Page 21

1 further identification, it is Bate stamped
2 Rainbow City document 000018.
3
4
5     (Plaintiff's Exhibit Number 1 was
6 marked for identification and same is
7 attached hereto.)
8
9     Q.   When you have had a chance to look
10 at that, just let me know.
11     A.   (Witness reviewing document.)  I
12 have, yes, sir.
13     Q.   Do you recognize that document?
14     A.   Yes.
15     Q.   What is that document?
16     A.   It's a use of force.
17     Q.   And who uses that document to your
18 knowledge?
19     A.   The officers fill it out.
20     Q.   And those would be Rainbow City
21 officers?
22     A.   Yes.
23     Q.   And when would this form be filled

Page 22

1 out by an officer?
2     A.   After a use of force incident.
3     Q.   And would that include the use of
4 a chemical agent?
5     A.   Yes.
6     Q.   Or a Baton?
7     A.   Yes.
8     Q.   PPCT?
9     A.   Yes.
10     Q.   A Taser?
11     A.   Yes.
12     Q.   Or a firearm.
13     A.   Yes.
14     Q.   Have you ever filled out one of
15 these use of force forms during the time you
16 were a Rainbow City police officer?
17     A.   Yes.
18     Q.   Approximately how many times have
19 you had to fill out a use of force form?
20     A.   Approximately three times.
21     Q.   If you would, tell me about the
22 times to the extent that you recall them
23 that you had to fill out a use of force

Page 23

1 form.  What were the situations that led to
2 you having to fill out these forms?
3     A.   One incident was a gentleman we
4 had arrested for possession.  And he took
5 off running prior to that, so I chased him
6 down and tased him.
7     Q.   What year did that occur?
8     A.   I don't recall that date.
9     Q.   Were you a patrol officer or
10 detective during that time?
11     A.   Patrol.
12     Q.   So somewhere between 2010 and
13 2013?
14     A.   Correct.
15     Q.   Okay.  What about the other times
16 that you had to use a use of force form?
17     A.   I'm not a hundred percent on that.
18 I would think it was at a gas station with a
19 gentleman on a theft third charge.
20     Q.   Did you tase him?
21     A.   No.
22     Q.   What type of force did you use on
23 him that required a form to be filled out?

Page 24

1     A.   Strong hand.  I brought him to the
2 ground, PPCT.
3     Q.   Were you a patrol officer at that
4 time?
5     A.   Yes.
6     Q.   What about the other time that you
7 recall that you had to fill out a use of
8 force form?
9     A.   I said approximately three times.
10 I don't remember anymore offhand.
11     Q.   So sitting here today, you
12 remember the tasing and the PPCT.
13     A.   Those two are the ones that I
14 remember a little bit on.
15     Q.   Okay.  Was there an official
16 policy during the time that you worked at
17 Rainbow City regarding filling out the use
18 of force report?
19     A.   The sergeants always helped us.
20 And there was a policy, yes.
21     Q.   Let me show you what I will mark
22 as Plaintiff's Exhibit Number 2 to your
23 deposition.  And this is going to be further

**Jimmy Fazekas**                                              **7 (25 - 28)**

Page 25

1  identified as Rainbow City documents 000001
2  through 000017.
3
4        (Plaintiff's Exhibit Number 2 was
5  marked for identification and same is
6  attached hereto.)
7
8
9        Q.   Okay.  Take a look at that.
10       A.   (Witness reviewing documents.)
11       Q.   Are you ready?
12       A.   Yes.
13       Q.   Okay.  You became a police officer
14  in Rainbow City in 2010, correct?
15       A.   Yes, sir.
16       Q.   In 2010, were you given a copy of
17  the standard operating procedures of the
18  Rainbow City Police Department?
19       A.   Yes.
20       Q.   In 2010 when you were given those
21  standard operating procedures, did those
22  standard operating procedures include a use
23  of force policy?

Page 26

1        A.   Yes.
2        Q.   Is the document that I have marked
3  Plaintiff's Exhibit Number 2 a true and
4  correct copy of the use of force policy in
5  the Rainbow City standard operating
6  procedures?
7        A.   It looks similar, to my
8  knowledge.
9        Q.   To your knowledge, sitting here
10  today, did you ever have a different use of
11  force policy other than the one that we have
12  marked as Plaintiff's Exhibit Number 2?
13       A.   I don't remember anything
14  different.
15       Q.   Okay.  If you will look at the
16  effective date, it says 11-14-2005,
17  correct?
18       A.   I see that.
19       Q.   And that was five years prior to
20  when you began working at the Rainbow City
21  Police Department, right?
22       A.   Correct.
23       Q.   But when you started working at

Page 27

1  the Rainbow City Police Department in 2010,
2  this is the version of the use of force
3  policy that you received, correct?
4        A.   I can't say for sure a hundred
5  percent.
6        Q.   Well, do you recall ever having
7  received a different version of the use of
8  force policy?
9        A.   I would have to go back and look.
10       Q.   Where would you go to look?
11       A.   I think I still have a book at
12  home.
13       Q.   You think you still have the
14  SOP?
15       A.   Yes.
16       Q.   And does that SOP that you have at
17  home contain the use of force policy?
18       A.   Yes.
19       Q.   Looking at Plaintiff's Exhibit
20  Number 2 -- and I will represent to you that
21  when we requested a copy of Rainbow City's
22  use of force policy, this is what we were
23  given.  And you may have something

Page 28

1  different; is that right?
2        A.   I couldn't tell you either way
3  without looking.
4        Q.   If you would, turn with me over to
5  the Bate stamp page number eight.  And it's
6  going to be on the lower right-hand corner.
7  Are you there?
8        A.   Yes, sir.
9        Q.   Sitting here today, are you
10  familiar with the taser procedures for the
11  Rainbow City Police Department to the extent
12  they existed at the time you left?
13       A.   I've forgotten a lot of things,
14  but for the most part.
15       Q.   And you have not worked as a
16  police officer since October 2015; is that
17  right?
18       A.   Correct.
19       Q.   Are you still APOST certified?
20       A.   One year left, yes, or less than a
21  year.
22       Q.   Do you plan to try to retain your
23  certification?

**Jimmy Fazekas**                                                    **8 (29 - 32)**

Page 29

1    A.   No.
2    Q.   As a detective for the Rainbow
3 City Police Department, did you carry a
4 taser?
5    A.   Certain times.
6    Q.   When you were not carrying a
7 taser, where did it stay?
8    A.   In my car.
9    Q.   Is the taser that you carried as a
10 detective the same taser you carried as a
11 patrol officer?
12    A.   Yes.
13    Q.   Or was it?  I guess we're going to
14 speak past tense because when you left, you
15 turned that taser in, correct?
16    A.   Yes.
17    Q.   What model was it?
18    A.   I don't recall.
19    Q.   Does X26 sound familiar?
20    A.   That's right.
21    Q.   How often did you have to get
22 certified on that taser?
23    A.   When I became a patrol officer, we

Page 30

1 got tased to become certified.
2    Q.   So you were certified when you
3 became a patrol officer in 2010?
4    A.   Yes.
5    Q.   Now, was that before or after you
6 went to the academy?
7    A.   Before.
8    Q.   Who tased you?
9    A.   Chase Jenkins, I believe.
10    Q.   Was Mr. Jenkins in charge of
11 certification of tasers at that time?
12    A.   Yes.
13    Q.   Did you receive any additional
14 training on the use of tasers at the
15 academy?
16    A.   I don't recall.
17    Q.   After you came back from the
18 academy and went to work again at the
19 Rainbow City Police Department, did you
20 receive any additional training on the use
21 of tasers?
22    A.   We went over the policy.
23    Q.   When you say we, who are you

Page 31

1 referring to?
2    A.   Sergeant.
3    Q.   Which sergeant?
4    A.   Holderfield.
5    Q.   When did that occur?
6    A.   I'm sorry.  It was Bryant,
7 Sergeant Bryant.
8    Q.   John Bryant?
9    A.   Yes.
10    Q.   Was he your shift supervisor at
11 some point?
12    A.   At some point, he was, and so was
13 Holderfield.
14    Q.   And that's when you were a patrol
15 officer, right?
16    A.   Yes.
17    Q.   So John Bryant went over the
18 policy along with Mr. Scott Holderfield?
19    A.   I believe it was just John
20 Bryant.
21    Q.   Okay.  How many times did
22 Mr. Bryant go over the use of force related
23 to tasers or the taser policy?

Page 32

1    A.   I'm thinking it was yearly.
2    Q.   When John Bryant went over the
3 policy with you regarding taser use, do you
4 know what he was using as instructional
5 material?
6    A.   No, sir.
7    Q.   Do you recall whether or not he
8 was using the Rainbow City Police Department
9 use of force as instructional material?
10    A.   No, sir.  I don't recall.
11    Q.   Do you have any relatives who
12 currently live in Etowah County?
13    A.   Yes.
14    Q.   And who are they?
15    A.   My children.
16    Q.   What are their names?  Well,
17 before you tell me that, are they over the
18 age of nineteen?
19    A.   One is.
20    Q.   What's their name?
21    A.   Megan Fazekas.
22    Q.   Do you know if she's employed in
23 Etowah County?

**Jimmy Fazekas**                                    **9 (33 - 36)**

Page 33

1    A.   She is.

2    Q.   Where is she employed?

3    A.   Guthrie's.

4    Q.   And I always like to tell people

5  why I ask these questions.  I just want to

6  make sure that none of your relatives end up

7  on the jury if we end up at trial.

8    A.   Okay.

9    Q.   And it's really more than Etowah

10  County because this is a Federal case, but

11  I'm just going to limit my questions to your

12  relatives in Etowah County right now.  Okay?

13    A.   Okay.

14    Q.   So other than your daughter, do

15  you have any other relatives in Etowah

16  County?

17    A.   I've got an aunt that lives in

18  Attalla.

19    Q.   And what is her name?

20    A.   Faye Fazekas.

21    Q.   Are you married?

22    A.   No, sir.

23    Q.   Have you ever been married?

Page 34

1    A.   Yes, sir.

2    Q.   And what is your ex-wife's name?

3  Well, I assume she's your ex.

4    A.   She is in Etowah County also with

5  my children.  And her name is Jamie

6  Patterson.

7    Q.   Has she remarried, or is that her

8  maiden name?

9    A.   That's her maiden name.

10    Q.   Does her family reside in Etowah

11  County?

12    A.   Yes.

13    Q.   Is that the Pattersons of

14  Patterson's Grocery there on 411?

15    A.   No, sir.

16    Q.   All right.  You were working at

17  Center Stage on the night of January 16,

18  2015, correct?

19    A.   Yes.

20    Q.   And can you tell me why you were

21  working at Center Stage on the night of

22  January 16, 2015?

23    A.   For some extra money.

Page 35

1    Q.   So you were working extra shifts?

2  Tell me how you came to work there on that

3  night.  Did someone just call you and say

4  hey, do you want to work here?

5    A.   Yes.

6    Q.   Who was that?

7    A.   Greg Carroll.  Chief Carroll.

8    Q.   Tell me how that conversation went

9  the best you can recall.

10    A.   He always asked me and Justin to

11  volunteer if we wanted to work any concerts

12  for extra money.  And I told him yes.

13    Q.   So that was not the first time

14  that you had worked at Center Stage; is that

15  correct?

16    A.   No, sir.

17    Q.   How many times prior to January

18  16, 2015 would you say you worked at Center

19  Stage?

20    A.   Approximately ten times.

21    Q.   And on each of those ten

22  occasions, were you always asked by Chief

23  Carroll if you wanted to work at Center

Page 36

1  Stage?

2    A.   Yes.

3    Q.   Now, when you were working at

4  Center Stage -- so eleven times total you

5  worked there, correct?

6    A.   Approximately.

7    Q.   Approximately ten times before and

8  then on the night of January 16, 2015.

9    A.   Yes.

10    Q.   So the eleven times prior when you

11  worked there, were you working in the

12  capacity of a Rainbow City Police Officer?

13    A.   Yes.

14    Q.   And when you were working at

15  Center Stage, did you have arrest powers?

16    A.   Yes.

17    Q.   And when you were working at

18  Center Stage on those eleven times, were you

19  there to make sure that the laws of Alabama

20  were carried out?

21    A.   Yes.

22    Q.   And that none of those laws were

23  broken?

**Freedom Court Reporting, Inc**                    **877-373-3660**

Page 37

1    A.   Yes.
2    Q.   Who actually paid you for your
3 work at Center Stage?
4    A.   A man named Jeremy.  I can't
5 remember his last name.
6    Q.   Reeves?
7    A.   Yes.
8    Q.   You would receive your payment
9 directly from Jeremy Reeves?
10   A.   Yes.
11   Q.   Even though you were working in
12 the capacity of a Rainbow City Police
13 Officer?
14   A.   I received my pay from Jeremy
15 Reeves.
16   Q.   How did he pay you?
17   A.   Cash.
18   Q.   How much were you paid each time
19 you worked at the Center Stage?
20   A.   It varied on money.
21   Q.   What would be the highest amount
22 you recall being paid by Jeremy Reeves?
23   A.   Probably a hundred and eighty in

Page 38

1 one night.
2    Q.   And what would be the least amount
3 you recall being paid by Jeremy Reeves for
4 your work at Center Stage?
5    A.   Approximately a hundred.
6    Q.   So you averaged around a hundred
7 and twenty dollars each time you worked
8 there, a hundred and thirty dollars?
9    A.   It varied.
10   Q.   You said you worked there with
11 Mr. Gilliland, correct, at Center Stage?
12   A.   At some of them.
13   Q.   Sometimes.  Okay.  Who are some
14 other officers you can recall being at
15 Center Stage when you would work security?
16   A.   All of the officers that was in
17 our department has been there before, either
18 patrolling and coming by or working, you
19 know, at Center Stage.
20   Q.   Did you work at Center Stage
21 during the time you were a patrol officer?
22   A.   Yes.
23   Q.   And when you worked at Center

Page 39

1 Stage during the time that you were a patrol
2 officer, were you ever paid by Jeremy
3 Reeves?
4    A.   Yes.
5    Q.   Do you know how the other officers
6 were offered the chance to work at Center
7 Stage on those security jobs?
8    A.   I do not know.
9    Q.   When Greg Carroll would come to
10 you -- strike that.  Tell me what manner
11 Greg Carroll would use to come to you to ask
12 if you wanted to work at Center Stage.
13 Would he call you?  Would he send you an
14 email?
15   A.   Call or talk to me by coming to my
16 office.
17   Q.   Come to your office at the Rainbow
18 City Police Department?
19   A.   Yes.
20   Q.   During the hours that you were
21 actually on shift?
22   A.   Yes.
23   Q.   Did Jeremy Reeves provide you with

Page 40

1 a 1099 at the end of the year?
2    A.   No, sir.
3    Q.   Did he provide you with any type
4 of document to allow you to be able to pay
5 taxes on the money you received for working
6 security?
7    A.   Less than nine hundred a year, you
8 didn't have to pay any.
9    Q.   So you made less than nine hundred
10 a year?
11   A.   Uh-huh (affirmative response).
12   Q.   Did you make less than six hundred
13 a year?
14   A.   I would have to go back and follow
15 up on that.  I can't say for sure.
16   Q.   And it would be impossible to look
17 at any records to see because you didn't
18 keep records of that, did you?
19   A.   No, sir.
20   Q.   Was there any type of paperwork
21 that you had to fill out with the Rainbow
22 City Police Department in order to work at a
23 venue like Center Stage?

**Jimmy Fazekas**                                    **11 (41 - 44)**

Page 41

1    A.   I don't recall.
2    Q.   You don't recall having ever
3  filled out any document?
4    A.   Not for Center Stage.
5    Q.   What about for other locations?
6    A.   Family Savings.
7    Q.   Was there some difference between
8  you working -- I assume you were working
9  security at Family Savings?
10   A.   Yes, sir.
11   Q.   Was there some difference between
12 you working security at Family Savings as
13 opposed to Center Stages?
14   A.   I don't understand the question.
15   Q.   Well, you were working security at
16 Family Savings, right?
17   A.   Yes.
18   Q.   Were you working security at
19 Center Stage?
20   A.   Yes.
21   Q.   So the question is, was there some
22 difference between the type of security you
23 were providing at Family Savings that would

Page 42

1  have required you to fill out that form?
2    A.   No, sir.
3    Q.   But you do recall filling out a
4  form to work at Family Savings as security,
5  right?
6    A.   I believe we had to fill out a
7  form, to my knowledge.
8    Q.   But you don't recall having to
9  fill out a form to work at Center Stage; is
10 that right?
11   A.   I don't recall any form for Center
12 Stage.
13   Q.   Do you know what happened to the
14 forms that you would have to fill out when
15 you worked at Family Savings?
16   A.   No, sir.
17   Q.   Would that go into your personnel
18 file?
19   A.   I've never seen my personnel
20 file.
21   Q.   You've never seen your personnel
22 file?
23   A.   No.  I've seen some of my

Page 43

1  personnel file, yes.  I take that back.
2    Q.   When you saw some of your
3  personnel file, did you see anything about
4  the forms you had to fill out in order to
5  work security?
6    A.   I did not.
7    Q.   Let me show you what I will mark
8  as Plaintiff's Exhibit Number 3 to your
9  deposition.  It's a three-page document.
10 And there is no Bate stamp on it, but by way
11 of further identification, it states at the
12 top, Statement of Jimmy Fazekas.
13
14       (Plaintiff's Exhibit Number 3 was
15 marked for identification and same is
16 attached hereto.)
17
18   Q.   I'll let you take a look at that
19 and just let me know when you're ready.
20   A.   (Witness reviewing document.)
21 Okay.  I'm ready.
22   Q.   Do you recognize that document?
23   A.   Yes.

Page 44

1    Q.   What is this document?
2    A.   It's a statement I made.
3    Q.   When did you make this
4  statement?
5    A.   I do not recall.
6    Q.   And it's undated, correct?
7    A.   That's correct.
8    Q.   Did you type this statement up
9  yourself?
10   A.   I did.
11   Q.   Did you type this on a Rainbow
12 City Police Department computer?
13   A.   Yes.
14   Q.   Did you type this up on your
15 computer that was in the detective office?
16   A.   Yes.
17   Q.   And you shared an office with
18 Mr. Gilliland, correct?
19   A.   I did not.
20   Q.   You had your own office?
21   A.   We had separate offices.
22   Q.   Okay.  Did Mr. Gilliland assist
23 you in writing your statement?

Page 45

1    A.  No, sir.

2    Q.  Did he assist you in any of the

3  recollections that you made in writing your

4  statement?

5    A.  I don't understand.

6    Q.  Did you say hey, do you remember

7  if a certain thing happened and he filled in

8  a missing gap for you?  Did he offer you any

9  assistance at all?

10    A.  No.

11    Q.  So this statement would be your

12  words and your words only, correct?

13    A.  That's right.

14    Q.  And it would be based completely

15  on your recollection.

16    A.  Yes.

17    Q.  At the time that you typed it.

18    A.  Yes.

19    Q.  Okay.  Do you see anything in this

20  statement that looks different than when you

21  first typed your statement?

22    MR. STUBBS:  Object to the form.

23  Go ahead.

Page 46

1

2    Q.  Sometimes I'm going to ask what he

3  perceives to be a bad question so he will

4  object to the form, but you can still

5  answer.

6    A.  Repeat the question.

7    Q.  Sure.  Do you see anything in this

8  statement you have in front of you that's

9  marked Plaintiff's Exhibit Number 3 that

10  looks differently than your statement when

11  you first typed it and printed it out?

12    A.  I don't remember a first statement

13  that you're talking about.

14    Q.  Well, is this the same statement

15  that you wrote back when you first wrote

16  it?

17    A.  This statement is the original

18  statement, yes.

19    Q.  Okay.  This is the original

20  statement.  Who did you give this statement

21  to after you typed it up?

22    A.  I don't recall.

23    Q.  Who asked you to type the

Page 47

1  statement?

2    A.  Captain Jenkins, I think.

3    Q.  And how soon after January 16,

4  2015 were you asked to type this

5  statement?

6    A.  I don't recall.

7    Q.  Did you ever meet with anyone

8  about your statement?

9    A.  No, sir.

10    Q.  Did you have a discussion with --

11    A.  I think I did meet one time, I

12  think, with him, but not necessarily about

13  the statement, just meeting with him

14  (indicating).

15    Q.  You're not talking about your

16  lawyer now.  You're talking about

17  Mr. Howard, right?

18    A.  No.  We didn't meet.  He was just

19  in the office with Gilliland, I think.

20    MR. HOWARD:  I did meet with you

21  if that's what you're asking me.

22    THE WITNESS:  Okay.

23

Page 48

1    Q.  Okay.  So you met with Mr. Howard

2  and Mr. Gilliland in an office.

3    A.  It's not in an office.  Just like

4  in our detective division, I saw them.

5    Q.  Okay.  And did he ask you any

6  questions?

7    A.  (Witness shakes head negatively.)

8    Q.  Do you know why he was up there?

9    MR. HOWARD:  Hold on.  Wait a

10  minute.  I'm just going to put on the

11  record, at the time, I had been assigned to

12  represent Mr. Fazekas.  It was before it

13  came to my attention that there could be a

14  possible conflict of interest or the

15  appearance of one.  So I'm going to object

16  to him talking about with you what we talked

17  about.

18

19    Q.  Did you talk about anything with

20  him?

21    A.  I don't recall.

22    MR. HARP:  He said he just saw

23  you.

**Jimmy Fazekas**                                          13 (49 - 52)

Page 49

1    MR. HOWARD:  Well, I'll tell you.
2  The truth is, after this lawsuit was filed,
3  I spoke with Mr. Fazekas as well as
4  Mr. Gilliland as well as the other officers.
5  And that's how I was able to find out that
6  there could be a possible conflict of
7  interest between them and the City.  So
8  whether he remembers it or not --
9
10   A.  I don't recall.  I remember seeing
11 his face.
12   Q.  Okay.  So you don't recall having
13 an actual conversation with him.
14   A.  I do not.
15   Q.  But you recall Mr. Howard meeting
16 with Mr. Gilliland?
17   A.  Well, he was up there.  He just
18 said he saw everybody, so I guess that's why
19 he was up there.
20   Q.  But you don't know what he talked
21 about with Mr. Gilliland?
22   A.  I do not know, no.
23   Q.  And it was after you had been

Page 50

1  served with the lawsuit?
2    A.  I believe it would be, yes.
3    Q.  Well --
4    A.  I mean, before the lawsuit, it
5  wouldn't --
6    Q.  I just wondered if it was before
7  or after you had actually been served by a
8  process server with the lawsuit.
9    A.  Are you talking about it being
10 mailed to me?
11   Q.  Was it mailed to you?
12   A.  I believe it was.
13   Q.  Okay.  And that was after you had
14 received the complaint in the mail that you
15 saw Mr. Howard?
16   A.  I don't know.
17   Q.  And all of this was spawned by me
18 asking you if you had discussed your
19 statement with anyone.  And so let me go
20 back to that question.  Have you discussed
21 this statement with anyone outside of
22 Mr. Stubbs who is your attorney?
23   A.  That statement, no.

Page 51

1    Q.  Okay.  So you just typed this
2  statement and gave it to Captain Jenkins?
3    A.  Yes.
4    Q.  And you never heard anymore about
5  it?
6    A.  No.
7    Q.  Have you looked at this statement
8  at all since you gave it to Captain
9  Jenkins?
10   A.  No.  Yes.  I got an email, yes,
11 with it on an email.
12   Q.  All right.  Who did that email
13 come from?
14     MR. STUBBS:  I'm going to limit
15 the answer.  I sent the email.
16
17   Q.  Okay.  So when you typed this,
18 were the events of January 16, 2015 fresh in
19 your mind?
20   A.  When I wrote it?
21   Q.  Yes, sir.
22   A.  Pretty much, yes.
23   Q.  Would you defer to what you have

Page 52

1  written here as your recollection about what
2  happened on the night of January 16, 2015 at
3  Center Stage?
4    A.  Yes.
5    Q.  Okay.  Let's go down to the third
6  paragraph.  It starts when the concert
7  finally began.  Do you see that?
8    A.  Yes.
9    Q.  You said, when the concert finally
10 began, I noticed numerous people walking up
11 on stage and standing around the DJ table;
12 is that right?
13   A.  Yes.
14   Q.  If you go down to the fourth full
15 paragraph, it starts, before the concert
16 started, it was announced that the concert
17 area was a smoke free zone, but there was a
18 room in the back of the hall where people
19 were allowed to smoke in.  Did you write
20 that?
21   A.  Yes.
22   Q.  Was that your recollection at the
23 time?

**Freedom Court Reporting, Inc**                          877-373-3660

**Jimmy Fazekas**                                                     **14 (53 - 56)**

Page 53

1     A.   Yes.

2     Q.   Then you say, during the concert,

3   I noticed numerous people lighting up

4   something and smoking it.  At one point, I

5   had a brief -- I think you meant smell, but

6   it says a brief small of a marijuana like

7   odor coming from the large group of people

8   near my station.  Did you write that?

9     A.   Yes.

10    Q.   Was it correct when you wrote

11  it?

12    A.   Yes.

13    Q.   The area I was manning, I told a

14  half dozen people to stop smoking and showed

15  them where the smoking room was.  Did you

16  write that?

17    A.   Yes.

18    Q.   Did you mean that when you wrote

19  it?

20    A.   Yes.

21    Q.   So you smelled an odor of

22  marijuana and you told the people they

23  couldn't smoke it there, to go to the

Page 54

1   smoking room?

2         MR. STUBBS:  Object to the form.

3         MR. HOWARD:  Object to the form.

4         MR. ANDERSON:  Object to the form.

5

6     Q.   You can answer.

7     A.   I meant cigarette smoke.

8     Q.   What do you mean?

9     A.   Not marijuana.  Not smoking

10  marijuana in the smoking room.  Cigarettes.

11    Q.   You meant cigarettes when you

12  wrote what?

13    A.   To stop smoking and showed them

14  where the smoking area was.

15    Q.   Oh, okay.  So when you say, the

16  area I was manning, I told a half dozen

17  people to stop smoking, they were smoking

18  cigarettes.

19    A.   Yes.

20    Q.   Did you ever investigate where the

21  marijuana smell was coming from?

22    A.   We couldn't find it.  I did,

23  yes.

Page 55

1     Q.   You did?

2     A.   Yes.

3     Q.   And you didn't put that in your

4   statement, right?

5     A.   It's not in there.

6     Q.   Okay.  Turn the page, if you

7   would.  In the first full paragraph there,

8   to paraphrase, the first sentence says you

9   saw a black male rapper jump off the stage

10  into the crowd with his bodyguards; is that

11  right?

12    A.   That's correct.

13    Q.   And then you got a little

14  concerned because they were just pushing the

15  large crowd around and walking around; is

16  that right?

17    A.   Yes.

18    Q.   And you saw a lot of people being

19  pushed down during that time, right?

20    A.   Yes.

21    Q.   And you became worried about the

22  safety of the people in the crowd; is that

23  right?

Page 56

1     A.   I did, yes.

2     Q.   And after about ten minutes, the

3   rapper went back to the stage with his

4   bodyguards; is that right?

5     A.   Yes.

6     Q.   And then you saw Detective

7   Gilliland flashing his flashlight.  And that

8   was already a predetermined signal between

9   you and Detective Gilliland, right?

10    A.   That was.

11    Q.   And the reason you had that signal

12  was why?

13    A.   If we needed help or assistance.

14    Q.   So when you saw Detective

15  Gilliland flashing his flashlight, you knew

16  he needed assistance, right?

17    A.   Yes.

18    Q.   And did you ever go to Detective

19  Gilliland, where he was?

20    A.   We met in the center in the

21  floor.

22    Q.   And when you got there, you saw a

23  white female laying on the ground, right?

**Jimmy Fazekas**                                        **15 (57 - 60)**

Page 57

1    A.   Yes.  With a crowd around her,
2  yes.
3    Q.   And you say, upon arrival through
4  the crowd, I noticed a white female laying
5  on the ground possibly having a seizure; is
6  that right?
7    A.   Yes.
8    Q.   So at the point that you got to
9  her and you saw the white female laying on
10  the ground, had anyone told you she may be
11  having a seizure?
12    A.   No.
13    Q.   You just thought she was possibly
14  having a seizure on your own, correct?
15    A.   Yes.
16    Q.   And what made you believe she may
17  have been having a seizure when you got
18  there?
19    A.   She was shaking.
20    Q.   Shaking?
21    A.   Uh-huh (affirmative response).
22    Q.   Was she conscious?
23    A.   No, not to my knowledge.

Page 58

1    Q.   Okay.  What happened after you got
2  there and you saw her shaking on the
3  ground?
4    A.   I tried to move the crowd back to
5  give her some air.
6    Q.   And then it looks like Detective
7  Gilliland was holding the female's head; is
8  that right?
9    A.   Yes.
10    Q.   And you believe he was holding it
11  so she would not hit the concrete floor with
12  her head?
13    A.   Yes.
14    Q.   And that's because you guys
15  thought she was having a seizure, right?
16    A.   Yes.
17    Q.   Now, then you say, I was trying to
18  keep the crowd back, just like you just
19  said, when you noticed a black male come up
20  to help.  Do you know who that black male
21  was?
22    A.   No, sir.
23    Q.   Was he a Rainbow City police

Page 59

1  officer?
2    A.   No, sir.
3    Q.   Do you know if he worked security
4  for Center Stage?
5    A.   No, sir.
6    Q.   Okay.  He picked up the white
7  female, put her over his shoulder and
8  carried her to the front of the building
9  near the front doors.  He placed her in the
10  chair beside the door and Detective
11  Gilliland called for medical attention for
12  the female.  Now, did you witness Detective
13  Gilliland call for medical attention?
14    A.   I think we heard it over the
15  radio.
16    Q.   So a call went out --
17    A.   Somebody went over the radio.  I
18  believe it was Detective Gilliland, but it
19  could have been somebody else.
20    Q.   Okay.  So you guys were wearing
21  your radios.
22    A.   We had our radios, yes.  It was
23  real loud in there though.

Page 60

1    Q.   But those are Rainbow City issued
2  police radios, right?
3    A.   Yes.
4    Q.   And you heard a call go out over
5  that radio from someone that you believe to
6  be Detective Gilliland call for medical
7  attention for this white female, right?
8    A.   Yes.
9    Q.   Now, your next paragraph says,
10  after a short time sitting in the chair, the
11  female started having seizures again and
12  fell in the floor.  Now, did you believe she
13  was having seizures at that point that night
14  on January 16, 2015?
15    A.   I just said seizures.  She was
16  having something going on with her.
17    Q.   But you wrote seizures, right?
18    A.   I know.
19    Q.   Is that right?
20    A.   Yes, I did write that.
21    Q.   And you wrote this statement
22  sometime after January 16, 2015, right?
23    A.   Yes.

**Freedom Court Reporting, Inc**                    **877-373-3660**

**Jimmy Fazekas**                                              **16 (61 - 64)**

Page 61

1   Q.   And according to your earlier
2  testimony, we can use this as a record of
3  your recollection of what happened that
4  night, right?
5      A.   Yes.
6      Q.   Because you would agree that your
7  memory was better days after the concert
8  than it is now about what happened that
9  night, right?
10     A.   Definitely.
11     Q.   So you wrote that she was having
12  seizures in your statement that you wrote
13  shortly after January 16, 2015.  And she
14  fell in the floor; is that right?
15     A.   Yes.
16     Q.   And medical attention had been
17  called because you heard it go out over the
18  radio, right?
19     A.   Yes.
20     Q.   And you knew that medical
21  attention had been called by a Rainbow City
22  police officer because it went out over a
23  Rainbow City issued radio, right?

Page 62

1      A.   Yes.
2      Q.   Would anyone else have access to
3  that channel that you guys operate on?
4      A.   I don't understand the question.
5      Q.   Well, could anyone else besides a
6  Rainbow City police officer have made that
7  call that that female needed medical
8  attention?
9      A.   That would be our department.
10     Q.   Okay.  And I am reading again.
11     A.   Okay.
12     Q.   By that time, there were four or
13  five police officers and one employee of
14  Center Stage helping the female from
15  bouncing off the concrete floor and holding
16  her down.  Did you witness that yourself?
17     A.   Yes.
18     Q.   So you witnessed the female
19  literally having to be held down because she
20  was bouncing up and down on the floor.  And
21  why were those police officers and that one
22  Center Stage guy helping the female?  Why
23  were they holding her down; do you know?

Page 63

1      MR. STUBBS:  Object to the form.
2
3      Q.   You can answer.
4      A.   To keep her from getting hurt.
5      Q.   Okay.  Did it appear to you at
6  that point that she could control her body
7  movements?
8      A.   No.
9      Q.   Okay.  Next you say, I, Detective
10  Fazekas, was standing over the female
11  holding her hips from bouncing off the
12  ground.  Were you physically holding the
13  female down?
14     A.   Yes.
15     Q.   And why were you holding her down
16  at that point?
17     A.   She was still shaking.
18     Q.   And you felt she was having a
19  seizure, right, according to what you wrote
20  here?
21     A.   According to that, yes.
22     Q.   And this is our record, right?
23     A.   Yes.

Page 64

1      Q.   When the female came out of the
2  seizures -- you used that word again -- she
3  became irate, cussing and yelling at the
4  officers.  How do you know that she had come
5  out of the seizure?
6      A.   Because she quit shaking and her
7  eyes opened up and she was very irate.
8      Q.   And what was she saying?
9      A.   She was yelling and cussing.  I
10  remember that, because at one point, she was
11  cussing at all of us.  I mean, that's what I
12  have on the statement.
13     Q.   Okay.  But you don't remember what
14  she was saying?
15     A.   When she first came out of it, no.
16     Q.   And you didn't write down what she
17  was saying, right?
18     A.   Not on here, no.
19     Q.   Okay.  Now, you said officers
20  tried talking with the female numerous
21  times, but she kept getting loud and cussing
22  at all of us; is that right?
23     A.   Uh-huh (affirmative response).

**Freedom Court Reporting, Inc**                        **877-373-3660**

**Jimmy Fazekas**

Page 65

1  Q.  Now, you said it was loud in
2  there.  Was it still loud in the concert
3  venue at that time?
4  A.  Yes.
5  Q.  So you said she kept getting loud,
6  but it was already loud in the concert --
7  A.  We were in the lobby.  The doors
8  were closed.
9  Q.  So you guys were in the lobby.
10  A.  Yes.
11  Q.  Away from the crowd.
12  A.  There was a crowd coming out
13  checking.
14  Q.  And what were they checking?
15  A.  Taking pictures and running camera
16  phones and all and seeing what was going on
17  with her.
18  Q.  Do you remember another female
19  being in the lobby with you guys during that
20  time, a young teenage girl?
21  A.  I do not, no.
22  Q.  Do you remember a female ever
23  telling Detective Gilliland, that's my

Page 66

1  sister, she's having a medical emergency?
2  A.  I do not.
3  Q.  Do you recall a female being there
4  saying she's having seizures?
5  A.  No.
6  Q.  Okay.  Now, the next paragraph
7  says, when she stopped seizing, you went and
8  stood at the front doors because you opened
9  them for her to have fresh air; is that
10  right?
11  A.  That's correct.
12  Q.  Why did you open the doors for her
13  to have fresh air?
14  A.  Because it was hot in there.
15  Q.  And you thought she was having a
16  medical emergency, right?
17  A.  Yes.
18  Q.  At that point, numerous people
19  were standing outside the doors filming with
20  their camera phones, just like you said,
21  right?
22  A.  Right.
23  Q.  You told those people to move away

Page 67

1  from the door so the medics could get
2  through.  So at the point that you told the
3  people to move away from the doors, the
4  medical personnel had not arrived yet, had
5  they?
6  A.  No.
7  Q.  Do you know how long after it was
8  that you told the people to move away from
9  the door after you opened the door for fresh
10  air that the medical personnel arrived?
11  A.  I do not.
12  Q.  And then it says, I told the
13  people standing outside numerous times --
14  well, we just read that.  Let me start at
15  the next sentence.  All of a sudden, I had
16  this white female knock me back off my feet
17  trying to get past me.  Now, did you write
18  this?
19  A.  Yes.
20  Q.  And is that your recollection of
21  what happened?
22  A.  Yes.
23  Q.  So there was a white female who

Page 68

1  knocked you off of your feet.
2  A.  Yes.
3  Q.  Are you saying literally off your
4  feet?
5  A.  Almost knocked me down, yes.
6  Q.  Well, there may be a distinction
7  there.  Were you knocked down, or did the
8  female bump into you?
9  A.  Knocked down, are you talking
10  about laying on the ground?  Is that what
11  you're asking?
12  Q.  Yes, sir.  When I think of knocked
13  off of my feet, I'm no longer on my feet.
14  I'm on the ground.  Did you ever go to the
15  ground?
16  A.  No, sir.
17  Q.  So when you say, she knocked me
18  back off of my feet, she didn't actually
19  knock you to the ground, did she?
20  A.  I didn't fall on the ground, no,
21  sir.
22  Q.  Tell me how you recall falling.
23  Did you fall at all?  Did you stumble?

**Jimmy Fazekas**                                                18 (69 - 72)

Page 69

1    A.   Yes.  Stumbled back, yes.
2    Q.   Stumbled back?
3    A.   Yes.
4    Q.   Okay.  Was your back to the door,
5  or were you facing the door?
6    A.   I was outside trying to get the
7  crowd to step back.
8    Q.   Yes, sir.  But when you were
9  outside, you were near the front door,
10 right?
11   A.   I was right in the doorway just
12 about.
13   Q.   But which way were you facing,
14 into the lobby or out toward the parking
15 lot?
16   A.   Out toward the parking lot.
17   Q.   Out toward the parking lot.
18   A.   Yes.
19   Q.   Okay.  And was there a huge crowd
20 around?
21   A.   Yes.
22   Q.   How big was the lady that hit
23 you?

Page 70

1    A.   I don't recall her being a certain
2  size.  Smaller than me.
3    Q.   Smaller than you?
4    A.   Yes, sir.
5    Q.   Were you about the same size then
6  as you are now?
7    A.   Yes, sir.
8    Q.   How tall are you?
9    A.   Six, three.
10   Q.   How much do you weigh?
11   A.   Two hundred.
12   Q.   So on January 16, 2015, you were
13 six, three, two hundred pounds and a female
14 knocked you, as you say, back off my feet
15 trying to get past you; is that right?
16   A.   Yes.  I wrote that.
17   Q.   Is there anything about that you
18 want to change?
19   A.   She knocked me back.  I mean,
20 that's kind of the way I wrote it.
21   Q.   Well, I know.  That's why I'm
22 giving you the opportunity to change it,
23 because I know that's the way you wrote it

Page 71

1  here, but you stand by that statement.
2    A.   I didn't fall on the ground.
3    Q.   Okay.
4    A.   That's just a term I used, knocked
5  me off my feet back.  I didn't land on the
6  ground.
7    Q.   Okay.  And then you say, I grabbed
8  the female by the arm to stop her from
9  passing the doorway; is that right?
10   A.   Yes.
11   Q.   Is that what you recall?
12   A.   Uh-huh (affirmative response).
13   Q.   I advised the lady that I was a
14 police officer and I was protecting the area
15 from people entering; is that right?
16   A.   Yes.
17   Q.   Why did you advise the lady that
18 you were a police officer and you were
19 protecting the area from people entering?
20   A.   The way she ran into me trying to
21 knock me back.
22   Q.   But was there a crime being
23 committed?

Page 72

1    A.   A crime being committed?
2    Q.   Right.  I just want to know why
3  you were protecting the area.
4    A.   Because we had a lady on the
5  ground.
6    Q.   That you thought was having a
7  medical emergency, right?
8    A.   Yes.
9    Q.   And so you were trying to keep
10 people from getting to that area?
11   A.   Yes.
12   Q.   The lady stated, quote, I don't
13 care, that is my daughter, and I am going to
14 her.  Now, you have this in quotes.  Is that
15 exactly -- usually when people put things in
16 quotes, that's exactly what the person said.
17 At the time that you wrote this, were you
18 saying that's exactly what she said?
19   A.   That's what I wrote, yes.
20   Q.   And you didn't write that she said
21 anything else, right?
22   A.   I don't have it in there, no.
23   Q.   And you were the one that was face

Page 73

1 to face with that lady, right?
2    A.   When she ran into me and knocked
3 me back, she went ahead and tried to go
4 around and I grabbed her, so I wasn't like
5 this (indicating).
6    Q.   But you could hear what she said.
7    A.   Yes.
8    Q.   Because you put it in quotes,
9 right?
10    A.   Yes.
11    Q.   And so the extent of what you
12 heard her say is, I don't care, that's my
13 daughter and I'm going to her, right?
14    A.   Yes.
15    Q.   Now, then you have, the female,
16 later identified as Michelle Helm, pulled
17 away from me and ran toward her daughter and
18 the other police officers.  Do you recall
19 that?
20    A.   Yes.
21    Q.   Is that what happened?
22    A.   Yes.
23    Q.   At what point did you identify

Page 74

1 this female as Michelle Helm?
2    A.   Probably later on when she was
3 arrested that night.
4    Q.   That night?
5    A.   Yeah.
6    Q.   Okay.  Officer Morgan grabbed the
7 female to tell her to get back, and she
8 cussed at him and pulled away.  Who is
9 Officer Morgan?
10    A.   He worked as a patrol officer for
11 the Rainbow City PD.
12    Q.   Was Officer Morgan still a patrol
13 officer at the time you left the Rainbow
14 City Police Department?
15    A.   I don't recall.
16    Q.   When is the last time you spoke to
17 Officer Morgan?
18    A.   Probably six months ago.
19    Q.   What was the occasion for you
20 speaking to Officer Morgan six months ago?
21    A.   To fix my electrical in a house in
22 Southside.
23    Q.   Do you still own a house in

Page 75

1 Southside?
2    A.   Yes.
3    Q.   Who did Officer Morgan work for
4 that you knew to call him?
5    A.   An electrical company.
6    Q.   What's the name of that electrical
7 company?
8    A.   I do not know.
9    Q.   Did you pay that electrical
10 company when he fixed your electrical?
11    A.   He didn't have to fix it.
12    Q.   Did he come out?
13    A.   Yes.
14    Q.   Were you charged at all?
15    A.   No.
16    Q.   Did you call and ask specifically
17 for Gary Morgan?
18    A.   I just called his cell.
19    Q.   You called his cell?
20    A.   Yes.
21    Q.   What is Officer Morgan's cell
22 number?
23    A.   I don't know.  I would have to

Page 76

1 look it up.
2    Q.   Do you have your phone?
3    A.   Yes.
4    Q.   Do you have it on you?
5    A.   Yes.
6    Q.   Can you look it up for me?
7    A.   It's ▬▬▬▬▬▬
8    Q.   Did you have any conversations
9 with Officer Morgan about six months ago
10 about this lawsuit?
11    A.   No.
12    Q.   Did you tell Officer Morgan you
13 had been sued as a result of what happened
14 at Center Stage?
15    A.   We didn't talk about it.
16    Q.   You didn't talk about it?
17    A.   No.
18    Q.   Okay.  So I'm back to your
19 statement.  I then noticed Officer Morgan
20 drive stun Michelle Helm with his taser; is
21 that right?
22    A.   Yes.
23    Q.   So you actually witnessed Officer

Page 77

1 Morgan drive stun Michelle Helm; is that
2 right?
3    A.   Yes.
4    Q.   I then tried to detain Michelle
5 Helm on the ground to place her in cuffs to
6 take control of the situation; is that
7 right?
8    A.   Yes.
9    Q.   Michelle Helm continued to pull
10 way and wiggle, so I could not get her
11 hands.  And Detective Gilliland came over to
12 help and pulled her away from the area where
13 her daughter was having seizures for safety
14 reasons; is that right?
15    A.   Yes.
16    Q.   Now, you say here that her
17 daughter was having seizures.  Was she
18 having seizures at the time Michelle Helm
19 was drive stunned by Officer Morgan?
20    A.   That's what I wrote.
21    Q.   And this is our record, right?
22    A.   Yes.
23    Q.   This is your best recollection,

Page 78

1 what's contained in this document, right?
2    A.   Yes.
3    Q.   And in this document, you wrote
4 that her daughter was having seizures at the
5 time that Michelle Helm was drive stunned,
6 right?
7    A.   Yes.
8    Q.   Okay.  When you say you tried to
9 detain Michelle Helm, did you try to detain
10 her after she was tased?
11    A.   I tried to grab her hands to put
12 her in cuffs.
13    Q.   After she was tased.
14    A.   Yes.
15    Q.   And where was she tased?
16    A.   I don't recall.
17    Q.   What was she wearing?
18    A.   I don't recall.
19    Q.   Do you recall whether or not she
20 urinated on herself?
21    A.   I didn't know about that.
22    Q.   Okay.  Then we go to the next
23 paragraph.  I continued to stand near the

Page 79

1 door not letting people come in and out and
2 could still hear the female that had the
3 seizures on the floor still cussing at
4 medics and being irate.  So at some point,
5 the medics arrived; is that right?
6    A.   That's right.
7    Q.   And did you see any interaction
8 between the medics and the female on the
9 ground?
10    A.   Yes.
11    Q.   What was the interaction?
12    A.   She was cussing at them and
13 spitting.
14    Q.   What was she saying?
15    A.   I don't recall the words, but I
16 remember her cussing and being very angry.
17    Q.   And do you know why she was
18 angry?
19    A.   I don't know.
20    Q.   Was she still being held down by
21 police officers?
22    A.   I believe at that time, the
23 medics.

Page 80

1    Q.   You believe the medics were
2 holding her down?
3    A.   Yes, at that time.
4    Q.   Okay.  Now, turn with me to your
5 last page of your statement.  You say, so
6 time later.  Did you mean sometime later?
7    A.   Yes.
8    Q.   Okay.  Sometime later, I was
9 yelled at by some people inside the building
10 stating some officers needed assistance.
11 What people yelled to you?
12    A.   The crowd.  Somemore people in the
13 crowd just saying there was something going
14 on.
15    Q.   Okay.  But you and your other
16 police officers there had your radios,
17 right?
18    A.   Yes.
19    Q.   But you didn't hear a call go out
20 over the radio about officer needs
21 assistance?
22    A.   I didn't hear anything, no.
23    Q.   Okay.  You say, I and Detective

**Page 81**

1 Gilliland took off towards where the
2 incident was taking place and noticed
3 Officer Roberts on the ground with a white
4 male. Roberts was putting cuffs on the
5 white male when we arrived. At that point,
6 Detective Gilliland left the area to chase
7 the other suspect involved in the incident.
8 What did you do?
9     A. I just came to the situation, saw
10 it was under control and started, I guess,
11 to walk back.
12     Q. And then it says, after gathering
13 both suspects up, Officer Roberts carried
14 his suspect to his patrol car, and we talked
15 with the other suspect about what happened.
16 Police eventually let the second suspect go
17 because he was just trying to defend himself
18 in a fight. Does that refresh your
19 recollection as to what you did after you
20 got to where Officer Roberts was?
21     A. We went back to the side and then
22 talked to somebody about that.
23     Q. Okay. You left and you went back

**Page 82**

1 to the front of the concert hall, right?
2     A. I don't recall that.
3     Q. Well, your last paragraph here
4 says, while walking back up to the front of
5 the concert hall, medics were still working
6 on the female that was having the seizures.
7 Do you see that?
8     A. Oh, okay. Yes.
9     Q. The female was still cussing at
10 the medical staff, and I heard one of them
11 state, she spit on me. You never saw her
12 spit on that person though, did you?
13     A. Not to my knowledge.
14     Q. Well, you didn't write it here,
15 right? You said you heard one of them state
16 she spit on me, right?
17     A. I heard, right.
18     Q. But you didn't actually see it.
19     A. No, sir.
20     Q. Finally the medics got the female
21 strapped down and started to wheel her out
22 and she continued cussing the medics and
23 cuss myself and Detective Gilliland.

**Page 83**

1     At that point, we were talking
2 with an individual named Mr. Palmer about
3 the incident. And a female recognized him
4 and yelled to Mr. Palmer, fuck them mother
5 fuckers up. After that, officers went back
6 into Center Stage and was paid by Jeremy
7 Reeves for our services. Did I read that
8 correctly?
9     A. Yes.
10     Q. Is that the extent of your
11 statement on what happened on January 16,
12 2015?
13     MR. STUBBS: Object to the form.
14
15     A. Yes.
16     Q. Do you have anything to add to
17 your statement that we have marked as
18 Plaintiff's Exhibit Number 3?
19     A. I do not.
20     Q. So are you aware that in this
21 lawsuit, it is contended that George Morris
22 tased the female while she was on the
23 ground?

**Page 84**

1     A. Explain contended.
2     Q. Do you know who George Morris
3 is?
4     A. Yes.
5     Q. Who is George Morris?
6     A. A sergeant at Rainbow City.
7     Q. I think he's a lieutenant now.
8     A. Okay.
9     Q. But yeah, he's the same guy.
10     A. Okay.
11     Q. Did you know that he was accused
12 of tasing this female while she was held
13 down by officers?
14     MR. STUBBS: Object to the form.
15
16     A. I did.
17     Q. When did you first learn about
18 that?
19     A. In the lawsuit.
20     Q. In the lawsuit, that's the first
21 time you had heard that George Morris had
22 tased the female.
23     A. Yes.

**Jimmy Fazekas**                                                     **22 (85 - 88)**

Page 85

1    Q.   Is when you saw a copy of the
2   lawsuit.
3    A.   Oh, I'm sorry.  I don't recall
4   that, no.  I don't remember.  That wouldn't
5   be correct.  I don't remember
6    Q.   So you may have heard it before
7   the lawsuit was filed; is that right?
8    A.   I don't recall.
9    Q.   Do you recall after this happened
10   on January 16, 2015, it being discussed in
11   the Rainbow City Police Department at all?
12    A.   I don't recall that.  I mean, it
13   could have happened, yes.  I mean, people
14   talk about stuff.
15    Q.   But you don't recall any
16   conversations about what happened?
17    A.   I didn't even know the lawsuit
18   even existed.  I mean, it just kind of
19   popped up.
20    Q.   Well, that was a bad night, right?
21   I mean, according to your statement, during
22   my time as security at Center Stages of
23   Rainbow City, I have never witnessed a crowd

Page 86

1   as wild and rambunctious as the crowd that
2   night.
3    A.   Correct.
4    Q.   But you don't recall any
5   conversations at the Rainbow City Police
6   Department after the concert about that
7   night?
8    A.   (Witness shakes head negatively.)
9    Q.   Is that a no?
10    A.   No, sir.
11    Q.   Okay.  Have you ever had any
12   conversation with George Morris about what
13   happened at Center Stage?
14    A.   No, sir.
15    Q.   When is the last time you had a
16   conversation with George Morris?
17    A.   Over a year ago.
18    Q.   While you were still employed at
19   Rainbow City?
20    A.   Yes.
21    Q.   After this lawsuit was filed, is
22   it your testimony sitting here under oath
23   that you haven't had any conversation with

Page 87

1   George Morris about what happened on January
2   16, 2015?
3    A.   Yes.
4    Q.   Did you have any conversations
5   with Greg Carroll about what happened on
6   January 16, 2015?
7    A.   No, sir.
8    Q.   Did you have any conversations
9   with Chase Jenkins about what happened on
10   January 16, 2015?
11    A.   No, sir.  But that's close to a
12   year ago.  I guess I talked to him.
13    Q.   Talked to who?
14    A.   Chase.
15    Q.   You talked --
16    A.   About this incident, no.  Just
17   talking to him.
18    Q.   Okay.  What did you talk to Chase
19   Jenkins about?  I think you told me that
20   earlier.
21    A.   Just small talk, but not about
22   this case.
23    Q.   Are you aware that Chase Jenkins

Page 88

1   and Greg Carroll were supposed to
2   investigate the actions of the officers that
3   night?
4       MR. HOWARD:  Object to the form.
5
6    A.   Repeat that.  I don't understand.
7    Q.   Are you aware that Chase Jenkins
8   and Greg Carroll were supposed to be the
9   ones who investigated the actions of the
10   Rainbow City police officers that night?
11       MR. HOWARD:  Object to the form.
12
13    A.   I wasn't aware.
14    Q.   Have you ever had a conversation
15   with Justin Gilliland about this lawsuit?
16    A.   Yes.
17    Q.   Tell me about the conversation you
18   had with Justin Gilliland about this
19   lawsuit.
20    A.   I mean, just basic talk.  I don't
21   know.  Just can't believe it's even a
22   lawsuit.
23    Q.   And why can't you believe it's

**Jimmy Fazekas**                                      23 (89 - 92)

Page 89

1 even a lawsuit?
2     A.   Because there was nothing
3 unjustified in the case.  I mean, it was
4 standard procedure.
5     Q.   Well, how do you know it was
6 standard procedure for George Morris to
7 taser the female if you didn't even know he
8 had tased her until after you got served
9 with the lawsuit?
10     MR. ANDERSON:  Object to the form.
11
12     A.   Repeat that.
13     Q.   You said you can't believe there
14 is a lawsuit because everything that
15 happened was standard procedure, right?
16     A.   Uh-huh (affirmative response).
17     Q.   So how do you know that George
18 Morris' actions were standard procedure if
19 you didn't even know he had tased the minor
20 until after you were served with the
21 lawsuit?     MR. ANDERSON:  Object to the
22 form.
23

Page 90

1     Q.   You can answer.
2     A.   Because I thought it was
3 justified.
4     Q.   Well, tell me what you know about
5 the actions of George Morris on the night of
6 January 16, 2015 to lead you to believe that
7 it was justified.
8     A.   Well, if somebody is irate, you go
9 through the procedures, you know.  I mean --
10     Q.   What procedures -- were you
11 finished?
12     A.   Yes.
13     Q.   What procedures did George Morris
14 go through on the night of January 16,
15 2015?
16     A.   Our standard procedures we use.
17     Q.   And how do you know that?
18     A.   By the use of force.
19     Q.   No.  How do you know he went
20 through those standard procedures that you
21 use?
22     A.   I mean, it's the standard.  I
23 mean, that's what you do.

Page 91

1     Q.   But you have no independent
2 knowledge sitting here today that George
3 Morris followed the procedures, do you?
4 Because if you do, we need to talk about it.
5     Do you have any independent
6 knowledge sitting here today that George
7 Morris followed the standard procedures in
8 his interactions with the minor on January
9 16, 2015?
10     A.   I don't understand that question.
11     MR. HARP:  All right.  Let's take
12 a break.  I'll try to think of a better way
13 to ask it.  And then we'll come back and
14 we'll take another stab at it.  Okay?
15     THE WITNESS:  Okay.
16
17     (Whereupon, a brief recess was
18     taken.)
19
20     Q.   Okay.  We're back on the record
21 after a break.  Mr. Fazekas, is there
22 anything about your testimony thus far after
23 the break that you would like to clarify?

Page 92

1     A.   No, sir.
2     Q.   Okay.  Now, before we took a
3 break, I was trying and failing miserably to
4 ask you a question.  You haven't had any
5 conversations with George Morris about this
6 lawsuit, correct?
7     A.   No, sir.
8     Q.   And you haven't had any
9 conversations with George Morris about what
10 occurred on January 16, 2015?
11     A.   No, sir.
12     Q.   And you haven't had any
13 conversations with anyone else about George
14 Morris' actions on January 16, 2015?
15     A.   No, sir.
16     Q.   So because you haven't spoken to
17 George Morris and because you haven't spoken
18 with anyone else about George Morris'
19 actions, how do you know George Morris was
20 acting correctly on January 16, 2015?
21     A.   Acting correctly?
22     Q.   At the point that he interacted
23 with the minor child and tased her.

Page 93

1      A.   The lawsuit papers, I'm
2  guessing.
3      Q.   Which lawsuit papers would lead
4  you to believe that he acted correctly?
5      A.   Acted correctly?
6      Q.   Yes, sir.
7      A.   I mean, I would do the same thing,
8  give verbal commands and then tase somebody
9  because I know how she was acting.  She was
10  irate.  She was cussing.  And that's a
11  justifiable way to do that.
12      Q.   Did you see him tase her?
13      A.   No.
14      Q.   Did you hear her cussing while he
15  tased her?
16      A.   No.
17      Q.   Did you hear George Morris give a
18  verbal command to the minor before he tased
19  her?
20      A.   No.
21      Q.   So how do you know he gave a
22  verbal command?
23      A.   Just because he's a good officer.

Page 94

1  I mean, that's the proper way to do
2  things.
3      Q.   Right.  I understand that's the
4  proper way to do things.  How do you know
5  George Morris did things properly on January
6  16, 2015?
7      A.   Because he's a law enforcement
8  officer.  I wouldn't think any different.
9      Q.   So you think every law enforcement
10  officer always does things the right way
11  every time.
12          MR. STUBBS:  Object to the form.
13
14      Q.   Is that correct?
15      A.   I would hope so.
16      Q.   You would hope so, but do you have
17  proof that --
18      A.   It depends on the situation.  I
19  mean, that could go all the way around.  I
20  don't know.
21      Q.   So sitting here today, you would
22  have to agree with me that it's possible
23  George Morris did not act correctly; isn't

Page 95

1  that right?
2          MR. STUBBS:  Object to the form.
3
4      A.   I don't agree with that.
5      Q.   You don't.  You're just going to
6  take George Morris' side regardless.
7      A.   I believe he acted correctly.
8      Q.   So you're just going to take
9  George Morris' side regardless; is that
10  right?
11          MR. STUBBS:  Object to the form.
12          MR. HOWARD:  Object to the form.
13          MR. ANDERSON:  Object to the form.
14
15      A.   Take his side?
16      Q.   Yes.  His version of events,
17  you're going to accept, correct?
18      A.   I believe he's justified in what
19  he did.
20      Q.   Right.  I understand that.  You've
21  said that.  My question is, are you going to
22  accept George Morris' version of events as
23  to what happened even though you didn't

Page 96

1  witness any of it?
2      A.   I'm just saying that -- yes.  If
3  he did it properly, yes.
4      Q.   If he did it properly.
5      A.   Yes.
6      Q.   Okay.  That's still not the answer
7  to the question though.  My question is,
8  sitting here today, are you going to accept
9  George Morris' version of events even though
10  you didn't witness it?  And a simple yes or
11  no will --
12      A.   Yes.
13      Q.   Okay.  So you're going to believe
14  him over the minor's version of events
15  regardless.
16      A.   By what I saw.
17      Q.   Right.  And you didn't see the
18  interaction between George Morris and the
19  minor, right?
20      A.   I saw her cussing and kicking and
21  yelling.
22      Q.   Did you see George Morris standing
23  over the minor?

**Jimmy Fazekas**                                    **25 (97 - 100)**

Page 97

1    A.   He was over there near her, yes.

2    Q.   Did you see him give her a verbal

3  command?

4    A.   No.

5    Q.   Did you hear him give her a verbal

6  command?

7    A.   No.

8    Q.   So you don't have any proof that

9  he gave her a verbal command, do you?

10    A.   No, I don't.

11    Q.   But you're still going to believe

12  him over her, correct?

13    A.   Yes.

14    Q.   Would you believe George Morris

15  over Justin Gilliland?

16       MR. HOWARD:  Object to the form.

17

18    Q.   You can answer.

19    A.   I don't understand that question,

20  what you're asking.

21    Q.   Well, I want you to assume that

22  George Morris says he tased the minor one

23  time.

Page 98

1    A.   Okay.

2    Q.   I want you to assume Justin

3  Gilliland says that George Morris tased the

4  minor more than one time.  Who do you

5  believe?

6       MR. HOWARD:  Object to the form.

7       MR. ANDERSON:  Object to the form.

8       MR. STUBBS:  Same objection.

9

10    A.   George because he was there.

11    Q.   So you would believe George Morris

12  over Justin Gilliland.

13    A.   Because he was the one in

14  action.

15    Q.   Well, what if Justin was also

16  present holding the minor's head at the time

17  George Morris was in action?

18       MR. HOWARD:  Object to the form.

19

20    Q.   Would you still believe George

21  over Justin?

22    A.   If that's what George said, yes.

23    Q.   What is it about George that makes

Page 99

1  you believe him more than you would believe

2  Justin Gilliland?

3       MR. ANDERSON:  Object to the form.

4

5    A.   You're just asking me questions I

6  don't know.

7    Q.   Well, these are questions that are

8  being spurred by your responses because

9  you've already testified you weren't present

10  at the time George Morris used his taser,

11  right?

12    A.   Correct, yes.

13    Q.   But you still believe his version

14  of events, right?

15    A.   Yes.

16    Q.   And that's because he's a police

17  officer, right?

18    A.   I mean, he's an honest police

19  officer, yes.

20    Q.   Okay.  Do you know if Justin

21  Gilliland has ever been disciplined by the

22  Rainbow City Police Department?

23    A.   I've heard it, but I don't know

Page 100

1  personally.

2    Q.   What have you heard?

3    A.   I've heard he's been suspended

4  before.

5    Q.   For what?

6    A.   I don't know.  Nobody ever knew.

7  They just knew he was gone a week and it

8  wasn't vacation.

9    Q.   Have you ever been disciplined by

10  the Rainbow City Police Department?

11    A.   I believe I was wrote up maybe one

12  time for missing court on a court transport,

13  day court.

14    Q.   Let me show you what I will mark

15  as Plaintiff's Exhibit Number 4 to your

16  deposition.  And by way of further

17  identification, it's Bate stamped Rainbow

18  City 000399.

19

20

21       (Plaintiff's Exhibit Number 4 was

22  marked for identification and same is

23  attached hereto.)

**Freedom Court Reporting, Inc**                    **877-373-3660**

Page 101

1
2    Q.   See if you recognize that
3  document.
4    A.   (Witness reviewing document.)  I
5  do, yes.
6    Q.   And what type of document is that?
7    A.   It's for secondary employment.
8    Q.   And when we were visiting earlier
9  about Family Savings Credit Union, this is
10 the document you were referencing when you
11 said you would have to fill out a document,
12 right?
13   A.   Yes.
14   Q.   And when you fill out this
15 document with the Rainbow City Police
16 Department, they ask questions such as
17 whether or not alcoholic beverages are going
18 to be consumed, right?
19   A.   Yes.
20   Q.   And then they ask whether they
21 have liability insurance, the secondary
22 employer, right?
23   A.   Yes.

Page 102

1    Q.   And you don't recall having to
2  fill out a document like this those eleven
3  times you worked at Center Stage; is that
4  right?
5    A.   I don't remember, no, sir.
6    Q.   How did Family Savings Credit
7  Union pay you?
8    A.   A check.
9    Q.   And did you get any type of tax
10 documentation at the end of the year from
11 Family Savings?
12   A.   Yes.
13   Q.   You got a 1099?
14   A.   Yes.
15   Q.   Okay.  I'm going to mark as
16 Plaintiff's Exhibit Number 5 to your
17 deposition what's Bate stamped Rainbow City
18 document 000394.
19
20     (Plaintiff's Exhibit Number 5 was
21 marked for identification and same is
22 attached hereto.)
23

Page 103

1    Q.   I think you just mentioned that
2  you were wrote up for not showing up at the
3  court detail; is that right?
4    A.   Yes.
5    Q.   And is this the document that
6  reflects that write-up?
7    A.   Yes.
8    Q.   And that happened in 2014?
9    A.   Yes.
10   Q.   You were a detective at that time,
11 right?
12   A.   Yes.
13   Q.   Now, who was your supervisor,
14 Sergeant Spurling?
15   A.   Captain Jenkins.
16   Q.   Is that Captain Jenkins' signature
17 where it says supervisor, manager there?
18   A.   That's Tommy Spurling's signature.
19   Q.   So was Tommy Spurling your
20 supervisor, or was Captain Jenkins --
21   A.   He was over the court detail.  He
22 was a sergeant over the court detail.
23   Q.   Okay.  Let me show you what I will

Page 104

1  mark as Plaintiff's Exhibit Number 6 to your
2  deposition.
3
4
5     (Plaintiff's Exhibit Number 6 was
6  marked for identification and same is
7  attached hereto.)
8
9    Q.   At one point, did you wreck a
10 Crown Vic in the Western Sizzlin parking
11 lot?
12   A.   Yes, sir.
13   Q.   And Detective Gilliland was with
14 you at that time, right?
15   A.   Yes.
16   Q.   Had you and Detective Gilliland
17 been drinking that night?
18   A.   It was at daytime.  I was on
19 shift.
20   Q.   But had you been drinking?
21   A.   No.
22   Q.   What led to the accident?
23   A.   I just didn't see a pole and just

**Jimmy Fazekas**                                                    **27 (105 - 108)**

Page 105

1 backed into it. I believe we were eating at
2 Western Sizzlin for lunch.
3    Q. Do you know if Detective Gilliland
4 was ever suspended for drinking and getting
5 into a Rainbow City police vehicle?
6    A. I don't know about that, no.
7    Q. Okay. I'm going to mark this as
8 Plaintiff's Exhibit Number 7 to your
9 deposition. And by way of further
10 identification, it's Rainbow City 000381.
11
12
13    (Plaintiff's Exhibit Number 7 was
14 marked for identification and same is
15 attached hereto.)
16
17    A. (Witness reviewing document.)
18    Q. That's your letter of resignation,
19 correct?
20    A. Yes.
21    Q. And you are informing them that
22 you are resigning as of -- your last day
23 would be October 1st, 2015, right?

Page 106

1    A. Yes.
2    Q. Have you had the opportunity to
3 read Justin Gilliland's statement in this
4 matter?
5    A. Sir?
6    Q. Have you ever read the statement
7 given by Justin Gilliland in this matter?
8    A. I don't recall. No, sir.
9    Q. Are you aware that he gave a
10 statement in this matter?
11    A. Yes.
12    Q. How are you aware that he gave a
13 statement in this matter?
14    A. Because somebody asked us to write
15 statements, so I figured he had to write a
16 statement if I had to write one.
17    Q. All right. Has it come back into
18 your recollection who asked you to write
19 this statement?
20    A. I don't recall. No, sir.
21    Q. All right. Let me show you what I
22 will mark as Plaintiff's Exhibit Number 8.
23 That's an un-Bate stamped document produced

Page 107

1 in the initial disclosures. And that's the
2 statement of Justin Gilliland.
3
4
5    (Plaintiff's Exhibit Number 8 was
6 marked for identification and same is
7 attached hereto.)
8
9    A. (Witness reviewing document.)
10    Q. Is this the first time you're
11 seeing this statement?
12    A. Yes.
13    Q. Have you ever read this statement
14 before today?
15    A. No, sir.
16    Q. This is the first time you've ever
17 seen this statement?
18    A. Yes.
19    Q. If you would, go down with me to
20 the fourth paragraph on the first page. It
21 starts with just as the concert was ending.
22    A. Okay.
23    Q. And I want to pick up with, I then

Page 108

1 motioned Detective Fazekas with my
2 flashlight. And when Detective Gilliland
3 wrote this, you testified earlier that he
4 did motion you with his flashlight, right?
5 You saw Detective Gilliland at some point
6 motion you with his flashlight.
7    A. Yes, sir.
8    Q. And that was your predetermined
9 signal that you needed help or that one of
10 the officers needed help.
11    A. That's right.
12    Q. And then if you go down with me to
13 the third line from the bottom in the last
14 full paragraph, as I was holding the
15 female's head, Detective Fazekas finally
16 made his way down to me. Do you see that?
17    A. Yes.
18    Q. I immediately stated to Detective
19 Fazekas that the female was having a
20 seizure. So at that point, Mr. Gilliland
21 told you that he felt the female was having
22 a seizure, right?
23    A. I don't recall hearing that. I

**Jimmy Fazekas**                                                    **28 (109 - 112)**

Page 109

1 mean, the music was going.
2     Q.   Okay.  If he says he told you,
3 would you have any reason to dispute this?
4     A.   No.
5     Q.   And then we needed to make sure
6 she -- and I'm reading on the second page --
7 did not harm herself; is that right?  That's
8 what he has written here?
9     A.   Yes, sir.
10    Q.   All right.  Look at this left-hand
11 side over here.  And go down to the line
12 that starts with trying.  Do you see that?
13    A.   Yes.
14    Q.   Trying to bite me.  Now, the next
15 full sentence after that starts, at that
16 time, I witnessed Sergeant George Morris
17 advise the subject that if she did not
18 wanted (sic) to be tased, then she should
19 stop fighting the officers.  Do you see
20 that?
21    A.   Yes.
22    Q.   Did you hear Officer Morris tell
23 the female if she did not want to be tased,

Page 110

1 she should stop fighting the officers?
2     A.   No.
3     Q.   Okay.  The next sentence says, the
4 female subject kept fighting the officers
5 and then stated to Sergeant Morris, yeah, go
6 ahead and tase me, mother fucker.  Did you
7 hear her say that?
8     A.   No.
9     Q.   Were you still there at that
10 point?
11    A.   I was out at the front trying to
12 clear everybody.
13    Q.   Were you within communication
14 distance with Detective Gilliland?
15    A.   Probably ten feet.
16    Q.   Could you hear him?
17    A.   Could I hear him, no.  Not at that
18 point, no.
19    Q.   Okay.  Well, let's keep reading.
20 I then witnessed Sergeant Morris drive stun
21 the female subject for a few seconds.  But
22 you didn't witness that, right?
23    A.   No, sir.

Page 111

1     Q.   Do you have any reason to dispute
2 what Detective Gilliland says when she says
3 he saw Sergeant Morris drive stun her?
4     A.   No, sir.
5     Q.   After Sergeant Morris drive
6 stunned the female, she looked at him and
7 said, yeah, tase me again, mother fucker.
8 Do you see that?
9     A.   Yes.
10    Q.   Did you hear the female say
11 that?
12    A.   No.
13    Q.   Did you see Sergeant Morris then
14 advise the female subject that if she would
15 stop fighting, he would not tase her
16 anymore?  Did you see that?
17    A.   No.
18    Q.   Were you looking at the female at
19 all during the time this would have
20 occurred?
21    A.   There was a lot of officers over
22 there, so I --
23    Q.   What were the officers doing?

Page 112

1     A.   Just around her, I guess.  And I
2 was at the door trying to keep the crowd
3 away.
4     Q.   Were the officers that were around
5 the female on the floor, were they standing
6 or kneeling?
7     A.   For the most part, she was on the
8 ground so they would be kneeling.
9     Q.   Okay.  So you had a lot of
10 officers kneeling around the female on the
11 ground, right?  This is the same female that
12 you had seen brought to the lobby,
13 correct?
14    A.   Yes.
15    Q.   And this is the same female that
16 you assumed when you saw her in the crowd,
17 you assumed she was having a seizure,
18 correct?
19    A.   Yes.
20    Q.   And this is the same female that
21 when you saw her in the lobby, she fell out
22 of the chair and had another seizure,
23 right?

| Page 113 |
|---|

1    A.  Yes.

2    Q.  Based upon your written

3  recollection.  And then you say there were a

4  lot of officers around this same female whom

5  you guys have held down to keep her from

6  hurting herself, correct?

7    A.  Yes, sir.

8    Q.  All right.  Do you see where it

9  says, fuck you, pig right there?

10    A.  Yes, sir.

11    Q.  Okay.  And it says, I then

12  witnessed Sergeant Morris drive stun the

13  female again.  While Sergeant Morris was

14  tasing the female the second time, I felt

15  something pushing me in the back.  Now,

16  remember, these are Detective Gilliland's

17  words.  Okay?

18    A.  Okay.

19    Q.  While holding the female's head so

20  she couldn't bite, I turned and looked

21  behind me and an older female subject was

22  yelling stop, stop tasing her.  Did you see

23  or hear this older female?

| Page 114 |
|---|

1    A.  Did I hear her saying that to --

2    Q.  To Morris who was tasing her.

3    A.  No.

4    Q.  Okay.  I then heard an officer

5  tell the older female that we were trying to

6  help the younger female subject and she

7  needed to get back and get out of the way.

8  Do you know who that other officer that

9  Mr. Gilliland is talking about here was?

10    A.  I do not know who it could be.  I

11  mean, it wasn't me.

12    Q.  Okay.  You know it wasn't you.

13    A.  It wasn't me.

14    Q.  At that point, the older female

15  subject kept getting in my way, and I

16  realized I could no longer hold the younger

17  female's head and defend myself against the

18  older female.  Now, keep in mind, Detective

19  Gilliland has written in his statement that

20  he's at the female and he's holding her

21  head, correct?

22    A.  Yes.

23    Q.  You've testified today that you

| Page 115 |
|---|

1  were about ten feet away from the female on

2  the floor, correct?

3      MR. STUBBS:  At what point in

4  time?

5      MR. HARP:  At any point in time

6  after he went to the doors to secure the

7  area.

8

9    Q.  Right?

10    A.  Yes.  I mean, approximate.  I

11  didn't measure it.

12    Q.  I understand.  But you were far

13  enough away that you couldn't hear Detective

14  Gilliland, right?

15    A.  It depends on what tone of voice.

16  I mean, I --

17    Q.  Well, do you recall hearing

18  Detective Gilliland at all that night?

19    A.  No, not then.  Not on that.  I

20  didn't hear that.

21    Q.  Okay.  So Mr. Gilliland says, at

22  that point, the older female subject kept

23  getting in my way, and I realized that I

| Page 116 |
|---|

1  could no longer hold the younger female's

2  head and defend myself against the older

3  female.  Do you see that?

4    A.  Yes.

5    Q.  Okay.  I then turned to Detective

6  Fazekas and yelled for him to get the older

7  female off my back.  Do you see that?

8    A.  Yes.

9    Q.  At what point did that happen in

10  your narrative?

11    A.  When she probably got away from me

12  from her arm, I guess.  After I grabbed her

13  arm, she got away from me.

14    Q.  Well, now, if you go back to your

15  statement, which is Plaintiff's Exhibit

16  Number 2, go with me to the second page.

17    A.  Okay.

18    Q.  We're going down to the third

19  paragraph and go over to the line that

20  starts with don't care on the left-hand

21  side.  Do you see that?

22    A.  Okay.

23    Q.  It says, the female, later

Page 117

1  identified as Michelle Helm, pulled away
2  from me and ran toward her daughter and the
3  other police officers. Now, those are your
4  words, right?
5      A. Yes.
6      Q. Officer Morgan grabbed the female
7  to tell her to get back, and she cussed at
8  him and pulled away. Do you see that?
9      A. Yes.
10     Q. I then noticed Officer Morgan
11 drive stun Michelle Helm with his taser.
12 Did I read that right?
13     A. Yes.
14     Q. I then tried to detain Michelle
15 Helm on the ground and place her in cuffs to
16 take control of the situation. Do you see
17 that?
18     A. Yes.
19     Q. Michelle Helm continued to pull
20 away and wiggle so I could not get her
21 hands. And Detective Gilliland came over to
22 help pull her away from the area where her
23 daughter was having seizures for safety

Page 118

1  reasons. Do you see that?
2      A. Yes.
3      Q. Now, in your statement, do you
4  ever say that the older female that you
5  later identified as Michelle Helm was on
6  Detective Gilliland's back?
7      A. No. That's not in my statement.
8      Q. In your statement, do you mention
9  that Detective Gilliland turned and yelled
10 to you to get her off your back?
11     A. No.
12     Q. In your statement, do you see
13 anywhere -- strike that. Let's go back to
14 Detective Gilliland's statement on the
15 second page. And we're down to the fourth
16 line from the bottom. The sentence starts
17 with at that time.
18     A. Yes.
19     Q. At that time, I witnessed
20 Detective Fazekas try to grab the older
21 female's arm and pull her back out of the
22 way. Do you see that?
23     A. Yes.

Page 119

1      Q. Now, did you ever get closer to
2  Detective Gilliland where he was with the
3  female lying on the ground and he was
4  holding her head than the approximate ten
5  feet that you testified to earlier?
6      MR. STUBBS: Object to the form.
7
8      A. If she was trying to run from me,
9  yes, I probably moved in closer.
10     Q. And when you moved in closer, did
11 you ever have to get her off of Detective
12 Gilliland's back?
13     A. I don't remember. No, I don't
14 recall that.
15     Q. Because you would have put that in
16 your statement if that had happened, right?
17     A. Uh-huh (affirmative response).
18     Q. Because you were a detective on
19 January 16, 2015, right?
20     A. Yes.
21     Q. And you knew that if you were
22 writing a narrative on an official police
23 record, it's important to put all the

Page 120

1  details in the narrative, correct?
2      MR. HOWARD: Object to the form.
3
4      Q. Is that right?
5      A. Yes.
6      Q. And you would agree that it would
7  have been a pretty significant detail if you
8  had witnessed Michelle Helm on a police
9  officer's back, correct?
10     A. Yes.
11     Q. And the reason that would have
12 been a pretty significant detail if you had
13 witnessed that is what?
14     A. Repeat that.
15     Q. Well, if Michelle Helm had jumped
16 on Detective Gilliland's back, would that
17 have been a crime?
18     A. Oh, yes.
19     Q. And that's something that you
20 would have put in your narrative, right?
21     A. Yes.
22     Q. What would that crime have been on
23 January 16, 2015?

**Jimmy Fazekas**                                                     **31 (121 - 124)**

Page 121

1   A.  If she jumped on his back?
2   Q.  Yes, sir.
3   A.  An assault.
4   Q.  Of?
5   A.  A police officer.
6   Q.  And that's an elevated assault,
7   correct?
8   A.  Yes.
9   Q.  That's not just Mr. Stone
10  assaulting me.  That's assaulting a police
11  officer, right?
12  A.  Yes.
13  Q.  That's felonious, right?
14  A.  Yes.
15  Q.  And that's something you would
16  have put in your report if you had seen
17  that, correct?
18  A.  Yes.
19  Q.  And that's something she should
20  have been charged with if that had happened,
21  correct?
22      MR. STUBBS:  Object to the form.
23

Page 122

1   A.  Should have been charged?
2   Q.  Yes.  I mean, she went to jail,
3   right?
4   A.  Yes.
5   Q.  But she didn't go to jail for a
6   felony, right?
7   A.  No, she didn't.
8   Q.  She went to jail for disorderly
9   conduct; is that right?
10  A.  Yes.
11  Q.  Okay.  Now, go back to Detective
12  Gilliland's statement.  When I saw that
13  Detective Fazekas could not get ahold -- I'm
14  on the third line from the bottom.  When I
15  saw that Detective Fazekas could not get
16  ahold of the older female and move her away
17  from the situation, I immediately let go of
18  the younger female's head.  I immediately
19  told the older female subject that she
20  needed to move away from the officers and
21  let us tend to the younger female.  Did I
22  read that correctly?
23  A.  Yes.

Page 123

1   Q.  The older female refused and began
2   yelling let me go.  At that point, I got
3   behind the female subject and grabbed her
4   under the armpits.  I pulled her backwards
5   and escorted the female subject out the door
6   and to the front of the building.  Do you
7   see that?
8   A.  Yes.
9   Q.  Now, do you see any mention in
10  what I just read of your actions during that
11  time?
12  A.  Yes.
13  Q.  Okay.  When he says he pulled the
14  female out of the door to the front of the
15  building, that complies with what you wrote
16  about Detective Gilliland coming over and
17  pulling her away from the area, right?  Go
18  back to the second page, the third
19  paragraph, the second to the last sentence.
20  A.  Yes.
21  Q.  Okay.  So you two are on the same
22  page about Detective Gilliland pulling the
23  female out of the building, right?

Page 124

1   A.  Yes.
2   Q.  After she was stunned, drive
3   stunned by Officer Morgan, right?
4   A.  Yes.
5   Q.  And then Detective Gilliland, or
6   Justin Gilliland now, says, at no time did
7   I, Detective Gilliland, place the older
8   female under arrest.  I'm sorry.  We're back
9   on the last page of Detective Gilliland's,
10  the first paragraph, the third from the last
11  line.  Do you see that?
12  A.  Okay.
13  Q.  So did Michelle Helm ever knock
14  you off your feet?
15  A.  She knocked me back.
16  Q.  Did she ever knock you off your
17  feet?
18  A.  I never landed on the ground,
19  no.
20  Q.  Okay.  Had you identified yourself
21  as a police officer at the point that
22  Michelle Helm bumped into you initially?
23      MR. STUBBS:  Object to the form.

**Jimmy Fazekas**                                    **32 (125 - 128)**

Page 125

1
2      Q.   You can answer.
3      A.   No.
4      Q.   Were you wearing a uniform that
5  night?
6      A.   A detective's uniform, yes.
7      Q.   Were you wearing a jacket over
8  that uniform?
9      A.   No, sir.
10     Q.   Are you sure?
11     A.   Yes.  A Polo.  I'm pretty sure I
12  had a Polo on.
13     Q.   You didn't have on a jacket that
14  night?
15     A.   Most of the time, we didn't wear
16  jackets with our detective gear.
17     Q.   Could it have been a North Face
18  jacket?  Did you own a North Face jacket?
19     A.   Yes.  I did have a black jacket.
20     Q.   Were you wearing that jacket that
21  night?
22     A.   I believe I was, yes.
23     Q.   And were you wearing it over your

Page 126

1  Polo?
2      A.   Yes.
3      Q.   And does the North Face jacket
4  have a police badge on it?
5      A.   No, sir.
6      Q.   If you were wearing that jacket
7  that night, would there have been any way
8  for Michelle Helm to tell from your physical
9  appearance that you were a police officer
10  before she bumped into you?
11     A.   If I had a jacket covering the
12  badge?  Is that what you're asking?
13     Q.   Yes, sir.
14     A.   Not if it's covering the badge, I
15  wouldn't guess.
16     Q.   Okay.  So you didn't identify
17  yourself as a police officer before she
18  bumped into you; is that right?
19        MR. STUBBS:  Object to the form.
20
21     Q.   Is that right?
22     A.   I didn't.
23     Q.   And if you were wearing a jacket

Page 127

1  that was covering the badge on your police
2  Polo, she wouldn't have been able to see the
3  badge, right?
4      A.   Right.
5      Q.   All right.  Did you know Jamon
6  Palmer before January 16, 2015?
7      A.   I knew of him, yes.
8      Q.   How did you know of him?
9      A.   A traffic stop and just all
10  around, just knew who he was.
11     Q.   Did you ever see Greg Carroll
12  around the minor female while she was being
13  held down by the other police officers?
14        MR. STUBBS:  Object to the form.
15
16     Q.   You can answer.
17     A.   No.
18     Q.   Did you ever see Greg Carroll in
19  the lobby of Center Stage?
20     A.   Yes.
21     Q.   That's a bad question.  Did you
22  ever see Greg Carroll in the lobby of Center
23  Stage after the female who was having

Page 128

1  seizures was brought to the lobby?
2      A.   Yes.
3      Q.   Did you see Greg Carroll in the
4  lobby of Center Stage between the time the
5  female was brought to the lobby and between
6  the time that Michelle Helm was pulled out
7  of the lobby by Detective Gilliland?
8      A.   Yes.
9      Q.   And what was Greg Carroll doing?
10     A.   He was around the female.
11     Q.   The female who was on the ground.
12     A.   Yes.
13     Q.   The female who was being held down
14  by the officers; is that correct?
15        MR. STUBBS:  Object to the form.
16        MR. HOWARD:  Object to the form.
17        MR. ANDERSON:  Object to the form.
18
19     A.   Yes.
20     Q.   Did you ever hear Greg Carroll
21  tell George Morris not to tase the female?
22     A.   No.
23     Q.   At the time that the female was

**Jimmy Fazekas**                                                    **33 (129 - 132)**

Page 129

1  brought to the lobby, did you recognize that
2  the female was a minor?
3      A.  No, I did not.
4      Q.  If you had known that the female
5  was a minor, would you have taken some
6  different course of action related to her
7  treatment and care?
8      A.  Not the way she was acting, no.
9      Q.  Okay.  Well, I'm talking about
10  when she was having a seizure.
11      A.  Oh, treatment and care is what
12  you're asking.
13      Q.  Yes.
14      A.  No.
15      Q.  So you say, not because of the way
16  she was acting.  What do you mean by that?
17      A.  I thought you were asking if she
18  was a minor as far as the tasing procedure.
19      Q.  So if you had been in George
20  Morris' position and you believed George
21  Morris' version of events, you would have
22  done the exact same thing?
23      A.  Yes.

Page 130

1      Q.  Is that the policy of Rainbow
2  City?
3      A.  Verbal commands and then tase if
4  they're not complying.
5      Q.  Now, did you go through taser
6  training?
7      A.  Yes.
8      Q.  When you went through taser
9  training, did you get any instruction on
10  when you should use a taser on an
11  individual?
12      A.  When they're not following verbal
13  commands, that would be the next step.
14      Q.  And who gave you that training?
15      A.  Chase Jenkins and Bryant.
16      Q.  So the only training you have on
17  the taser regarding the use of tasers and
18  when they're not following a verbal command
19  came from two Rainbow City police officers,
20  right?
21      A.  Right.
22      Q.  And you received certification for
23  that, right?

Page 131

1      A.  Right.
2      Q.  And that was in 2010?
3      A.  I believe so, yes.
4      Q.  I'm going to mark this as
5  Plaintiff's Exhibit Number 9.  It's Bate
6  stamped Rainbow City document 000495.
7
8
9      (Plaintiff's Exhibit Number 9 was
10  marked for identification and same is
11  attached hereto.)
12
13
14      Q.  Do you recognize that document?
15      A.  Yes.
16      Q.  What is that document?
17      A.  It's a taser training certificate.
18      Q.  Who is that certificate issued
19  to?
20      A.  Me.
21      Q.  And who is the instructor there?
22      A.  Chase Jenkins.
23      Q.  So is that 2010 document the only

Page 132

1  training you've had on the use of a taser
2  since you've been a Rainbow City police
3  officer?
4      MR. STUBBS:  Object to the form.
5
6      Q.  You can answer.
7      A.  And Bryant.
8      Q.  I'm sorry.  Besides John Bryant.
9  Was that a different training than this
10  training in 2010?
11      A.  It's more of a review is what I
12  would call it.
13      Q.  That's right.  And you don't
14  remember what material he used to give that
15  review?
16      A.  No, sir.
17      Q.  Okay.  So is it your testimony
18  then that on January 16, 2015, it was the
19  policy of Rainbow City in regards to the use
20  of a taser that you could use that taser on
21  someone if they are not complying with
22  verbal commands?
23      A.  Yes.

**Jimmy Fazekas**                                    **34 (133 - 136)**

Page 133

1  Q.   How many verbal commands would
2  they have to not comply with before you
3  could use the taser?
4      A.   I don't recall what the policy
5  stated.
6      Q.   What is level three or higher
7  resistance?
8      A.   I don't remember.
9      Q.   You don't remember the levels?
10     A.   It would probably be possibly soft
11 hand, hard hand or verbals, soft hand and
12 then possibly --
13     Q.   So knowing what you know about the
14 situation, what crime, if any, had the minor
15 committed on January 16, 2015 at the time
16 she was tased by George Morris?
17     A.   Disorderly conduct.
18     Q.   Was she charged with disorderly
19 conduct?
20     A.   I do not know.
21     Q.   Now, you said disorderly conduct.
22 When did she become disorderly?
23     A.   When she was screaming and yelling

Page 134

1  and cussing.
2      Q.   Had you ever seen anyone have a
3  seizure before?
4      A.   No, sir.
5      Q.   How do you know -- you're not a
6  medical doctor, right?
7      A.   No, sir.
8      Q.   Have you ever been to medical
9  school?
10     A.   No, sir.
11     Q.   Have you ever had any kind of
12 medical training?
13     A.   No, sir.
14     Q.   EMT or anything?
15     A.   No, sir.
16     Q.   How do you know that the actions
17 of the minor on January 16, 2015 were not
18 related to the seizure?
19     A.   How do I know they were not?
20     Q.   Yes, sir.
21     A.   I don't know that.
22     Q.   So you don't know whether or not
23 she was intentionally being disorderly or

Page 135

1  whether or not she was just having effects
2  of a seizure, right?
3      A.   I believe she was being disorderly
4  by what I saw.
5      Q.   Well, you believe that, but you
6  don't know that, right?
7          MR. HOWARD:  Object to the form.
8
9      A.   I'm not a medical doctor.
10     Q.   Right.  You believe that, so you
11 don't know that, right?
12     A.   I believe that, yes.
13     Q.   But you don't know that.
14         MR. HOWARD:  Object to the form.
15
16     Q.   You can answer.
17     A.   I don't know that for sure, no.
18     Q.   If the effects of the seizure was
19 what was causing the minor to act the way
20 that she was acting, that she is alleged to
21 have been acting, do you still believe
22 George Morris was justified in tasing her?
23         MR. HOWARD:  Object to the form.

Page 136

1          MR. STUBBS:  Object to the form.
2          MR. ANDERSON:  Object to the form.
3
4      A.   By what I saw and the way she was
5  acting, she knew what she was doing by what
6  I saw.
7      Q.   Did you have a conversation with
8  her?
9      A.   No.  I could just tell by her
10 face.  I mean, I've been around a lot of
11 folks that's been disorderly.
12     Q.   So from ten feet away when she was
13 surrounded by police officers, you could
14 tell that she knew what she was doing.
15     A.   I wasn't always ten feet away.
16     Q.   Well, when were you closer?
17     A.   At the beginning when she first
18 was in there and she had the seizure and she
19 came out when I was holding her hips.
20     Q.   Right.  What was she doing?
21     A.   Cussing and yelling.  When she
22 came out --
23     Q.   Was it against the law to cuss in

Page 137

1 Rainbow City on January 16, 2015?
2     A.   Disorderly, yes.
3     Q.   Was it against the law to cuss?
4     A.   Being disorderly, yes, in a
5 crowd.
6     Q.   Well, that was the same crowd that
7 you had smelled marijuana smoke, correct?
8     A.   Yes.
9     Q.   That was the same crowd where
10 there was a rapper on the stage using
11 explicit lyrics, correct?
12     A.   Yes.
13     Q.   That was the same crowd that you
14 testified was the most rambunctious, I
15 believe is the word that you used, crowd
16 that you had ever seen at Center Stage,
17 right?
18     A.   Yes.
19     Q.   So did you hear other cuss words
20 that night, or was that the only cuss words
21 you heard, coming from the minor?
22     A.   Besides from the minor?  Is that
23 what you mean?

Page 138

1     Q.   Besides the minor, did you hear
2 any other cursing that night?
3     A.   On stage, for sure.
4     Q.   What about off stage?
5     A.   It was so loud, I didn't get to
6 hear hardly anything.
7     Q.   What about the two subjects who
8 were rolling around on the floor fighting,
9 were they being disorderly when you and
10 Detective Gilliland left the minor and
11 on the floor having seizures and went back
12 into the concert hall?
13     MR. STUBBS:  Object to the form.
14
15     A.   When I got there, it was already
16 over with.
17     Q.   Would it be considered disorderly
18 conduct to fight?
19     A.   Yes.
20     Q.   Were they tased to your
21 knowledge?
22     A.   To my knowledge, they were not.
23     Q.   Was anyone else tased that night

Page 139

1 to your knowledge besides Michelle Helm and
2 her daughter?
3     A.   No, not to my knowledge.
4     Q.   So the only two people who were
5 tased were the mother who was trying to get
6 to her daughter, correct?
7     A.   Uh-huh (affirmative response).
8     Q.   Who bumped into you and didn't
9 know you were a police officer; is that
10 right?
11     MR. STUBBS:  Object to the form.
12     MR. ANDERSON:  Object to the form.
13     MR. HOWARD:  Object to the form.
14
15     Q.   Is that right?
16     MR. STUBBS:  Same objection.
17
18     A.   Are you asking if she was tased?
19     Q.   Yes, sir.
20     A.   Yes.
21     Q.   And then the daughter who you
22 believed and wrote in your report at least
23 seven times, you believed she was having a

Page 140

1 seizure or coming out of a seizure, she was
2 tased, correct?
3     MR. STUBBS:  Object to the form.
4
5     A.   I didn't see it.
6     Q.   You didn't see it.  You saw George
7 Morris standing there, right?
8     A.   Or kneeling.  He was around her.
9     Q.   But you never saw him tase her.
10     A.   No.
11     Q.   And you never put that in your
12 report.
13     A.   No.
14     Q.   And Detective Gilliland says he
15 saw the tasing, right?  That's what his
16 report says.
17     A.   Yes.
18     Q.   And I understand you believe
19 Morris over Gilliland, but do you have any
20 reason to dispute --
21     A.   I didn't really say I believe him
22 over in any way.  I mean, you asked me a
23 question about at that time, that one

Page 141

1  question.
2      Q.   Well, if George Morris says he
3  tased her once and Gilliland's report says
4  he tased her multiple times, who do you
5  believe?
6          MR. STUBBS:  Object to the form.
7
8      A.   The one that did the action.
9      Q.   So you believe Morris.
10     A.   Yes.  He was there.  He was right
11 there.
12     Q.   And you understand Gilliland was
13 there holding her neck while Morris was
14 tasing her.
15     A.   I didn't see him there.
16     Q.   You didn't see Gilliland there?
17     A.   Holding her neck, no.  I mean, not
18 while the tasing was going on because I
19 wasn't looking that way.
20     Q.   How do you know the female was
21 cussing at Morris before he tased her?
22     A.   How do I know she was cussing at
23 Morris?

Page 142

1      Q.   Yes.
2      A.   I didn't hear her cussing at
3  Morris.
4      Q.   You never heard her --
5      A.   I heard her cussing and yelling,
6  but not at Morris.
7      Q.   Okay.  How do you know it was the
8  female?
9      A.   Because I saw it come out of her
10 mouth.  I was around before --
11     Q.   I'm talking about at the point
12 that Morris tased her.
13     A.   How did I know it was her?
14     Q.   Yes.
15     A.   I don't know when Morris tased
16 her, so I don't know at what point that
17 would be.
18     Q.   So you don't know whether or not
19 she was the one even cussing; is that right?
20     A.   Do I know if she was yelling and
21 cussing?
22     Q.   Before she got tased by Morris.
23     A.   She was yelling and cussing before

Page 143

1  she got tased.  Now, I don't know at what
2  point --
3      Q.   I know you say she was yelling and
4  cussing at the time you were there.
5      A.   Yes.
6      Q.   But Morris wasn't there when you
7  were there, right?  Morris had not tased her
8  when you were there, right?
9      A.   That's correct.
10     Q.   You never heard Morris tell her to
11 stop, behave or I'm going to tase you,
12 right?
13     A.   No.  I never heard that.
14     Q.   So you don't know what was said to
15 Morris right before he tased her, right?
16     A.   That's right.
17     Q.   Okay.  Have you heard that Justin
18 Gilliland was terminated, or resigned in
19 lieu of termination because he was sending
20 pictures of his penis to other officers?
21         MR. ANDERSON:  Object to the form.
22
23     A.   No.  I did not know that.

Page 144

1      Q.   As a detective, did you have a
2  police issued cell phone?
3      A.   Yes.
4      Q.   Were you wearing a body camera the
5  night of the concert that this tasing
6  occurred?
7      A.   No, sir.
8      Q.   Do you recall any other officers
9  wearing a body camera the night of the
10 tasing?
11     A.   I believe some of the patrol guys
12 had them.
13     Q.   Were you ever able to view any of
14 the footage from any body cameras from the
15 night of January 16, 2015?
16     A.   We had to pull them up at one
17 point, yes.
18     Q.   Who pulled them up?
19     A.   I did, to get them on a CD, I
20 think.
21     Q.   When did you pull them up?
22     A.   I don't know when.
23     Q.   Did you have your own password?

**Jimmy Fazekas**                                    **37 (145 - 148)**

Page 145

1    A.  No.  It was whatever Justin
2  McGlaughn had done, I think.
3    Q.  You used his password?
4    A.  I'm pretty sure I did.
5    Q.  What website did you go to to pull
6  them up?
7    A.  The taser website.  We had access
8  since we were detectives.
9    Q.  And you pulled those up and put
10  them on a CD?
11    A.  Yes.
12    Q.  Who did you give the CD to?
13    A.  I don't recall.
14    Q.  Well, did you give it to someone
15  in the police department?
16    A.  Yeah.  It would have probably been
17  Chase or the Chief, one of them.
18    Q.  And were you asked by either Chase
19  or the Chief to pull them up?
20    A.  Yes, because they didn't know
21  how.
22    Q.  Did George Morris ever ask you to
23  pull up any of the video?

Page 146

1    A.  No.
2    Q.  Are you aware of whether or not
3  any video was ever deleted from that
4  night?
5    A.  No.
6    Q.  No, you're not aware, or no, you
7  don't know?
8    A.  No, I'm not aware.  I don't think
9  you can delete a video.
10    Q.  Do you know how the process for
11  uploading taser information worked in
12  2015?
13    A.  Yes.
14    Q.  How did that work?
15    A.  You stick it in a docking station,
16  and it uploaded it to, I guess, a Cloud or
17  something like that.
18    Q.  Are you aware as to whether or not
19  George Morris' taser information was ever
20  uploaded?
21    A.  Are you asking if his camera or
22  his taser?
23    Q.  Both.

Page 147

1    A.  I don't know if he had a camera
2  on.  His taser, I don't know that.
3    Q.  I'm sorry.  His camera, his body
4  camera.
5    A.  I wasn't aware -- well, I would
6  have been aware at the time, but I don't
7  remember.  I mean, I would have saw it if we
8  were pulling video.
9    Q.  Okay.  So just so I'm clear, your
10  best recollection is the information
11  contained in your statement, correct?
12    A.  Statement for what?
13    Q.  Your statement as to the events
14  that occurred on January 16, 2015 at Center
15  Stage.
16    A.  Yes.
17    Q.  And that statement was made at or
18  near the time of January 16, 2015; is that
19  right?
20    A.  Somewhere around there, yeah.
21    Q.  And that statement was made as a
22  result of in your official capacity as a
23  police officer for Rainbow City?

Page 148

1    A.  Yes.
2    Q.  And that's an official record?
3    A.  Yes.
4    MR. HARP:  That's all I have.
5    MR. HOWARD:  No questions.
6    MR. STUBBS:  No questions.
7    MR. ANDERSON:  No questions.
8    MR. HARP:  Thank you for your
9  time.
10
11
12
13    FURTHER DEPONENT SAITH NOT
14    ENDING TIME:  5:00 p.m.
15
16
17
18
19
20
21
22
23

Page 149

```
 1              CERTIFICATE
 2
 3   STATE OF ALABAMA
 4   ETOWAH COUNTY
 5
 6        I hereby certify that the above and
 7   foregoing deposition was taken down by me in
 8   stenotype and the questions and answers
 9   thereto were transcribed by means of
10   computer-aided transcription, and that the
11   foregoing represents a true and correct
12   transcript of the testimony given by said
13   witness upon said hearing.
14        I further certify that I am neither
15   of counsel, nor of kin to the parties to the
16   action, nor am I in anywise interested in
17   the result of said cause.
18
19           /s/Beth Word
20           BETH WORD
21           ACCR #:  376
22           EXPIRES: 9/30/2017
23
```