FILED

2017 Apr-20  PM 05:12
U.S. DISTRICT COURT
N.D. OF ALABAMA

# EX. 06

# Deposition Transcript of Michelle Helm (w/o exhibits)

Page 1

1    IN THE UNITED STATES DISTRICT COURT

2    FOR THE NORTHERN DISTRICT OF ALABAMA

3            MIDDLE DIVISION

4

5    CASE NO.:  4-15-CV-01152-VEH

6

7    MICHELLE LEE HELM,

8          Plaintiff,

9          vs.

10   RAINBOW CITY, ALABAMA, et al.,

11         Defendants.

12

13            DEPOSITION

14               OF

15         MICHELLE LEE HELM

16

17   S T I P U L A T I O N S

18

19       IT IS STIPULATED AND AGREED by

20   and between the parties through their

21   respective counsel, that the deposition of

22   MICHELLE LEE HELM may be taken before

23   ELIZABETH LAW LANKFORD, Commissioner, at 140

Page 2

1    South Ninth Street, Gadsden, Alabama, on the

2    8th day of June 2016.

3        IT IS FURTHER STIPULATED

4    AND AGREED that it shall not be necessary for

5    any objections to be made by counsel to any

6    questions except as to form or leading

7    questions, and that counsel for the parties

8    may make objections and assign grounds at the

9    time of the trial, or at the time said

10   deposition is ordered in evidence, or prior

11   thereto.

12       IT IS FURTHER STIPULATED

13   AND AGREED that the notice of filing of the

14   deposition by the Commissioner is waived.

15

16           APPEARANCES

17

18       HARP LAW, LLC, By Mr. H. Gregory

19   Harp, 7124 Crown Lane, Trussville, Alabama,

20   35173, appearing on behalf of the Plaintiff.

21       STONE LAW FIRM, by Mr. Moses O.

22   Stone, 2015 1st Avenue North, Birmingham,

23   Alabama, 35203, appearing on behalf of the

Page 3

1    Plaintiffs.

2        FORD, HOWARD & CORNETT, by

3    Mr. H. Edgar Howard, 140 South Ninth Street,

4    Gadsden, Alabama, 35901, appearing on behalf

5    of the Defendants.

6        STUBBS, SILLS & FRYE, by Mr. C.

7    David Stubbs, 1724 South Quintard Avenue,

8    Anniston, Alabama, 36202, appearing on behalf

9    of the Defendants.

10       F&B Law Firm, by Ms. Allison B.

11   Chandler, 213 Greene Street, Huntsville,

12   Alabama, 35801, appearing on behalf of the

13   Defendants.

14

15           INDEX

16

17   EXAMINATION BY:                PAGE NUMBER:

18   Mr. Howard                          5

19   Mr. Stubbs                        176

20   Ms. Chandler                      240

21

22       (Whereupon, no exhibits were

23   marked in said deposition.)

Page 4

1        I, ELIZABETH LAW LANKFORD, a

2    Court Reporter of Southside, Alabama, acting

3    as Commissioner, certify that on this date, as

4    provided by the Federal Rules of Civil

5    Procedure and the foregoing stipulation of

6    counsel, there came before me at the Law

7    Offices of Ford, Howard & Cornett, 140 South

8    Ninth Street, Gadsden, Alabama, beginning at

9    9:11 a.m., MICHELLE LEE HELM, witness in the

10   above cause, for oral examination, whereupon

11   the following proceedings were had:

12

13       MICHELLE LEE HELM,

14   being first duly sworn was examined and

15   testified as follows:

16

17       THE COURT REPORTER:  Usual

18   stipulations?

19       MR. HARP:  That's fine.  She'll

20   read and sign.

21

22       EXAMINATION

23   BY MR. HOWARD:

Page 5

1    Q.    Would you please state your
2 name?
3    A.    Michelle Jorge Helm.
4    Q.    How do you spell Jorge?
5    A.    J-O-R-G-E.
6    Q.    Ms. Helm, my name is Ed Howard.
7 I met you a moment ago.  I represent the City
8 of Rainbow City in this lawsuit.
9         The point of your being here
10 today and our being here is for me and others
11 to get information from you.  So that's the
12 whole idea.
13         If at any time you don't
14 understand what I'm asking or I lose you
15 somewhere, just please bring that to my
16 attention.  All right?
17    A.    Yes.
18    Q.    She'll remind you, but you do
19 need to answer out yes.  And it's easy to get
20 caught up in saying uh-huh and nodding our
21 heads because you and I know what we are
22 talking about but it's hard for her to write
23 it down.  So bear that in mind, and you will

Page 6

1 probably get corrected a few times.  All
2 right?
3    A.    Yes.
4    Q.    If at any time you want to take
5 a break, just say so.  This is not meant to be
6 an endurance battle, but it is our opportunity
7 to get some information from you.
8         So, Ms. Helm, what's your
9 birthday?
10    A.    ▓▓▓▓▓▓▓▓▓
11    Q.    Where do you live?
12    A.    ▓▓▓▓▓▓▓▓▓▓▓▓ -- or ▓▓▓▓
13 Gadsden.
14    Q.    That's up on Noccalula Mountain,
15 right?
16    A.    Yes, sir.
17    Q.    About how long have you lived
18 there?
19    A.    Since November of last year.
20    Q.    Who lives with you at that
21 address?
22    A.    My daughter ▓▓▓▓▓, my
23 daughter ▓▓▓▓, and my daughter TDH and my

Page 7

1 grandson ▓▓.
2    Q.    Who's -- let's see.  I should
3 know from yesterday, but who is ▓▓'s mom?
4    A.    ▓▓▓▓.
5    Q.    ▓▓▓▓.  Okay.  Are you married?
6    A.    No.
7    Q.    Have you been married?
8    A.    Yes.
9    Q.    Who were you married to?
10    A.    Claude Stewart, Larry Hamilton,
11 Daniel Helm, Tony Flemming.
12    Q.    My understanding -- any more?  I
13 sort of stopped you.
14    A.    One more.  Eric Redmond.
15    Q.    From what I have found out
16 yesterday and previously, Mr. Helm died in
17 2002 or 2003?
18    A.    2000.
19    Q.    2000.  Did the other marriages
20 end in divorces?
21    A.    Yes.
22    Q.    Were those divorces in Etowah
23 County?

Page 8

1    A.    Yes.
2    Q.    To your knowledge, do these men
3 still live in the north Alabama area?
4    A.    I do not recall.
5    Q.    Fair enough.
6         Besides the three daughters you
7 mentioned a minute ago, do you have other
8 children?
9    A.    Yes.
10    Q.    Who are they?
11    A.    ▓▓▓▓▓ Helm.
12    Q.    ▓▓▓▓▓▓▓N?
13    A.    Yes.
14    Q.    Anybody else?
15    A.    ▓▓▓▓▓
16    Q.    Is that spelled with Cs?
17    A.    It's actually ▓▓▓▓▓▓▓▓▓.
18    Q.    ▓▓▓▓▓▓▓n?
19    A.    Yes, sir.
20    Q.    Anyone else?
21    A.    No.
22    Q.    Is there a Mr. Anderson?
23    A.    Yes.

1   Q.   That ██████ is married to?
2   A.   Yes.
3   Q.   What's his first name?
4   A.   Nick.
5   Q.   Where do they live?
6   A.   Southside.
7   Q.   Where does Aaron Helm live?
8   A.   Southside.
9   Q.   Does he live with them?
10  A.   Yes.
11  Q.   Did Aaron Helm live in Georgia
12  for some period of time in the past couple of
13  years?
14  A.   Yes.
15  Q.   Where?
16  A.   Actually, no.
17  Q.   Okay.
18  A.   I apologize.
19  Q.   The reason I ask that is in
20  something, probably a Facebook post or
21  something, I had the idea that he was in
22  Buford, Georgia. Does that ring any bells?
23  A.   Yes.

1   Q.   How come?
2   A.   He lived there more than two
3   years ago.
4   Q.   Okay. Do you know if he was
5   living in Buford on the date of the incident
6   made the basis of this lawsuit, January 16,
7   2015?
8   A.   I don't recall.
9   Q.   Okay. Where were you living on
10  January 16, 2015?
11  A.   Palace Avenue.
12  Q.   Rainbow City?
13  A.   Yes.
14  Q.   About how long did you live at
15  Palace Avenue in Rainbow City?
16  A.   Approximately two years.
17  Q.   And then did you move from there
18  to the ██████████ location?
19  A.   Yes, sir.
20  Q.   Where did you live before living
21  on Palace Avenue?
22  A.   Hampton Road -- oh, wait. Let
23  me back up. I don't recall the name of the

1   road.
2   Q.   Right. Before Monte Vista? No,
3   excuse me. Before Palace Avenue?
4   A.   Correct.
5   Q.   Okay. Was it Southside?
6   A.   No -- I think it is.
7   Q.   Okay.
8   A.   Whorton Bend. I just don't
9   remember the road.
10  Q.   What part of Whorton Bend?
11  A.   Right at the -- by Whorton Bend
12  Road.
13  Q.   Well, yeah. Whorton Bend Road
14  runs through the whole bend, as it were?
15  A.   Oh, it does, doesn't it?
16  Q.   It's got the Rainbow City end
17  and then the skating rink end and then the
18  fields and so forth.
19  A.   Across the pasture.
20  Q.   Across the pasture from what?
21  Do you know where the little churches are?
22       MR. HARP: Was it on Lasseter?
23       THE WITNESS: No.

1        MR. HARP: Is that when -- is
2   that where you were living when TDH was hit by
3   the car?
4        THE WITNESS: No.
5        MR. HARP: So you were living at
6   a different location? I'm sorry. I'm just
7   trying to move this along.
8        MR. HOWARD: Sure.
9        THE WITNESS: I just don't
10  remember the name of the road. It was in
11  Whorton Bend.
12       MR. HARP: Okay.
13  Q.   (By Mr. Howard) I can help you
14  because I'm a Whorton Bend person.
15       Was it toward -- down toward --
16  more toward the skating rink?
17  A.   No.
18  Q.   More down toward the other end?
19  A.   Correct.
20  Q.   Do you know if it was actually
21  in Rainbow City? You know, part of that is?
22  A.   I think my address was Gadsden.
23  Q.   Okay. And do you remember -- do

1 you remember if it was near the fire station?

2     A.    No.

3     Q.    Okay.  Was it near the big house

4 that burned?  Do you know what I'm talking

5 about?

6     A.    As soon as you pass Tracy Js and

7 you come down past the marina --

8     Q.    Right.

9     A.    Whorton Bend Road is on the

10 right.

11     Q.    Right.

12     A.    It was the third house on the

13 right from there.

14     Q.    I know exactly where you are

15 talking about.

16          There was a house there that

17 Dr. Somebody built right there in the -- at

18 the end of a slough.  Does that make --

19     A.    I don't know.

20     Q.    Were you on Whorton Bend Road or

21 one of the side streets?

22     A.    I don't know.

23     Q.    But if I'm hearing you right,

1 it's after Whorton Bend goes to the right?

2     A.    Correct.

3     Q.    Okay.  Believe me.  I drive past

4 there all the time.  That's why I'm asking.

5          Okay.  About how long did you

6 live at that Whorton Bend address?

7     A.    I don't recall.  A very short

8 time.

9     Q.    Okay.  Was there a time between

10 Palace Avenue and Monte Vista that you lived

11 in Southside?

12     A.    No.

13     Q.    Before Whorton Bend did you live

14 in Southside?

15     A.    Correct.

16     Q.    Was that the Lasseter address,

17 or do you remember what street it was?

18     A.    Hampton.

19     Q.    I'm working backward in time,

20 but it's my recollection that your daughter

21 TDH or TDH was struck by a car in 2012.  Does

22 that jive with your memory?

23     A.    Yes.

1     Q.    And according to what she said

2 yesterday, y'all were living on Lasseter at

3 that time.  Is that correct?

4     A.    No.

5     Q.    Okay.  Were y'all living on

6 Hampton at that time?

7     A.    Yes.

8     Q.    Okay.  Before living on Hampton

9 in Southside, where did you live?

10     A.    Miller Drive.

11     Q.    Where is that?

12     A.    Southside.

13     Q.    We have now worked back to some

14 time before 2012.

15          What other places have you lived

16 since let's say 2000?

17     A.    I don't recall.

18     Q.    Okay.  Are there others, I

19 guess, working back from Miller Drive?

20     A.    I don't --

21     Q.    Okay.  A moment ago, when you

22 gave me your husbands' names, was that in

23 order chronologically?

1     A.    Yes.

2     Q.    Okay.  When did the marriage to

3 Mr. Redmond end?

4     A.    I don't recall.

5     Q.    When did the marriage to

6 Mr. Flemming end?

7     A.    I don't recall.

8     Q.    Okay.  The marriage to Mr. Helm

9 obviously ended when he died, correct?

10     A.    Yes.

11     Q.    And by what you said a minute

12 ago, Flemming and Redmond were after 2000?

13     A.    Correct.

14     Q.    And then when did the marriage

15 to Larry -- I have got H period.  I don't know

16 why I didn't write his name.

17          MR. STUBBS:  Hamilton.

18          MR. HARP:  Hamilton.

19     Q.    Hamilton.  When did that end?

20     A.    I don't recall.

21     Q.    And the marriage to Mr. Claude

22 Stewart, when did that end?

23     A.    I don't recall.

1    Q.    At the time of the incident that
2  made the basis of the lawsuit, January 16,
3  2015, were you married?
4    A.    No.
5    Q.    At the time you were at the
6  Hampton Road address, correct?  Did I get that
7  right?
8    A.    Repeat that.
9    Q.    At the time TDH went to the
10  concert and all these things happened, you
11  were living on Hampton Road?
12    A.    No.
13    Q.    Where were you living?
14    A.    Palace.
15    Q.    Oh, you told me that.  I
16  apologize.
17          Okay.  At that time who was
18  living with you at Palace Avenue?
19    A.    _____, TDH and _____.
20    Q.    _____'s son had not been born
21  yet?
22    A.    Correct.
23    Q.    Did Mr. Redmond ever reside at

1  Palace Avenue?
2    A.    No.
3    Q.    Did Mr. Redmond ever reside at
4  Whorton Bend?
5    A.    No.
6    Q.    Did Mr. Redmond ever reside at
7  Southside, Hampton?
8    A.    No.
9    Q.    Same question, Southside, Miller
10  Drive?
11    A.    Yes.
12    Q.    Okay.  Did you and Mr. Redmond
13  live together anywhere else besides Miller
14  Drive?
15    A.    No.
16    Q.    Okay.  Do you remember where you
17  and Mr. Tony Flemming lived?
18    A.    Yes.
19    Q.    Where?
20    A.    Miller.
21    Q.    Okay.  And Daniel Helm, where
22  were you living when he died?
23    A.    Goodyear Avenue.

1    Q.    Okay.  What was the reason for
2  moving from Goodyear to Miller?
3    A.    Excuse me.
4    Q.    Sure.
5    A.    I bought a house.
6    Q.    Okay.  At Goodyear, you had not
7  owned?
8    A.    No.
9    Q.    Okay.  Has -- well, let's say up
10  to -- up to January of 2015 had TDH always
11  made her home with you?
12    A.    Yes.
13    Q.    And since January of 2015 has
14  TDH made her home with you?
15    A.    Yes.
16    Q.    She described to us yesterday --
17  I will represent to you -- a plan she had for
18  moving to Albertville.  Do you recall such a
19  thing?
20    A.    I don't.
21    Q.    Pardon me?
22    A.    No, I don't.
23    Q.    Okay.  Do you recall her working

1  in Albertville?
2    A.    Yes.
3    Q.    Okay.  But you don't recall her
4  having an idea of working in Albertville and
5  living with a friend of hers in an apartment?
6    A.    No.
7    Q.    Do you recall any occasions
8  where she lived with her sister _____ at
9  their house?
10    A.    No.
11    Q.    Do you work anywhere outside of
12  the home, Ms. Helm?
13    A.    Yes.
14    Q.    Where do you work?
15    A.    Kingdom Cleaning.
16    Q.    Is this a housekeeping business?
17    A.    Yes.
18    Q.    Are you the proprietor?
19    A.    Yes.  Excuse me.
20    Q.    Is it just a sole
21  proprietorship, or are you incorporated in any
22  way?  Just sole?
23    A.    Correct.

Page 21

1    Q.    Do you have any partners?

2    A.    No.

3    Q.    How long have you done business

4 as Kingdom Cleaning?

5    A.    I don't recall.

6         MR. HARP:  Give him your best

7 estimate.

8    A.    Three years.

9    Q.    Okay.  Thank you.  That will

10 save me a few questions.

11       So at the time of January 2015

12 you were doing that business?

13   A.    Correct.

14   Q.    Okay.  Is that geared towards

15 residences, or do you have any work for any

16 businesses too?

17   A.    Residential.

18   Q.    Before having your Kingdom

19 Cleaning business, for give or take three

20 years, did you have other work outside the

21 home?

22   A.    Correct.

23   Q.    Where did you -- what sort of

Page 22

1 occupation did you have before Kingdom

2 Cleaning?

3    A.    Before?

4    Q.    Uh-huh (indicating yes).

5    A.    I don't recall, but, yeah.  I

6 don't recall.

7    Q.    Were you working for yourself,

8 or would you have been working for somebody

9 else?

10   A.    Somebody else.

11   Q.    And I understand you may not

12 know the name, but do you know what the nature

13 of that work was?

14   A.    Restaurant business.

15   Q.    Locally?

16   A.    Yes.

17   Q.    What was your function, hostess,

18 waitress?

19   A.    Server.

20   Q.    Owner?  Server?

21   A.    Uh-huh (indicating yes).

22   Q.    Do you remember now what that

23 place was, the name?

Page 23

1    A.    There were several.

2    Q.    Okay.  Tell me what you

3 remember.

4    A.    Mango's.  I opened that

5 restaurant.

6    Q.    That's over there on the river,

7 correct, wasn't it?

8    A.    It was.

9    Q.    In that very voluminous building

10 there next to Chili's?

11   A.    Uh-huh (indicating yes).

12   Q.    Correct?

13   A.    Yes.

14   Q.    Okay.  What other restaurant

15 businesses?

16   A.    Velocity on Rainbow Drive.

17   Q.    Sure.

18   A.    I opened that.

19   Q.    When you use the term "opened,"

20 what do you mean?

21   A.    When they're opening the

22 restaurant.

23   Q.    Okay.  Meaning that you were

Page 24

1 there and working there when it opened?

2    A.    Correct.

3    Q.    But, again, not meaning you had

4 an ownership?

5    A.    No.

6    Q.    Okay.  Same sort of thing,

7 serving or --

8    A.    Correct.

9    Q.    Okay.  Now, Velocity's opening

10 was in the last couple of years, was it not?

11   A.    I don't recall.

12   Q.    When you opened Velocity, who

13 was the proprietor?

14   A.    I don't recall.

15       MR. HARP:  Can we take a break?

16       MR. HOWARD:  Sure.

17       (Whereupon, a brief recess was

18 taken.)

19       MR. HOWARD:  We are back on.

20   Q.    (By Mr. Howard) I was just

21 asking you about Velocity because I know that

22 -- I remember some time it opening in the

23 last -- well, I can remember it.

Page 25

1      So who would you have been
2  working for, the main person running that?
3      A.    I believe her name is -- it was
4  Chef -- I want to say Becky, but I could be
5  wrong.  Vicki.
6      Q.    Vicki or Becky, something like
7  that?
8      A.    Correct.
9      Q.    How long did you work at
10 Velocity?
11     A.    Maybe six months.
12     Q.    Were you doing your cleaning
13 business and working at Velocity at the same
14 time?
15     A.    Yes.
16     Q.    I mean, I could see how you
17 might be able do that, yeah.
18     A.    Yeah.
19     Q.    Okay.  Any other restaurants
20 that you worked at besides Mango's and
21 Velocity?
22     A.    I think I worked at the
23 Courtyard a long time ago.

Page 26

1      Q.    Okay.
2      A.    And Western Sizzlin one day.  I
3  tried that for a day.  I was searching around.
4      Q.    Was Marty the proprietor at the
5  Courtyard when you were there?  Do you
6  remember him?
7      A.    I really don't.
8      Q.    Any others where you stayed for
9  any length of time, enough to draw a few
10 checks, I guess?
11     A.    I think that's it.
12     Q.    Okay.  Now, I want to make sure
13 I cover it.
14     Any other places that you have
15 had an occupation in this community in the
16 last 10, 15 years?
17     A.    I worked for Jackson Hewitt.
18     Q.    Is that doing income tax?
19     A.    Correct, yes.
20     Q.    Was it at a storefront in
21 particular here?
22     A.    Yes.
23     Q.    Where is that?

Page 27

1      A.    At Gadsden Mall and the Centre
2  location.
3      Q.    Do you and your family have any
4  sort of connection to Centre?
5      A.    No.
6      Q.    The reason I ask is I believe
7  one of the doctors that TDH mentioned
8  yesterday was somebody who was at Cherokee
9  something something?
10     A.    Yes.
11     Q.    Do you know who that is, a
12 Dr. Kelly?
13     A.    Yes.
14     Q.    Do you know how it was that -- I
15 think she said her sister had been there when
16 she was -- maybe it was when she was pregnant.
17 Maybe not.  I should have asked, and I didn't.
18     Any particular way your family
19 got to Dr. Kelly?
20     A.    He was on the Medicaid list.
21     Q.    Okay.  But it's not because you
22 happened to be working at Jackson Hewitt, at
23 that location at the time?

Page 28

1      A.    No.
2      Q.    Okay.  Any other places of
3  occupation that you can think of in the last
4  -- since 2000, let's say?
5      A.    I believe I gave it all.
6      Q.    Okay.  If you come up with any,
7  you can always bring them back up.
8      A.    Yes, sir.
9      Q.    Did you grow up in Etowah
10 County?
11     A.    No.
12     Q.    Where did you grow up?
13     A.    California and Cincinnati.
14     Q.    Okay.  Were you born in
15 California?
16     A.    Yes.
17     Q.    And at what point in your
18 childhood did you move to Cincinnati?
19     A.    Approximately 12 or 13.
20     Q.    Did you go to high school in
21 Cincinnati?
22     A.    Northern Kentucky.  I'm sorry.
23     Q.    Northern Kentucky?

Page 29

1    A.    Yes.
2    Q.    Was that Covington?  No?
3    A.    Yes.
4    Q.    Yes, it is Covington.  Did you
5  go to high school in Covington?
6    A.    No, I didn't.
7    Q.    In the area?
8    A.    In the area, in Northern
9  Kentucky.
10    Q.    And did you graduate?
11    A.    GED.
12    Q.    At some point a few years later
13  you got your GED?
14    A.    No, immediately.
15    Q.    Have you had any further
16  schooling since your GED?
17    A.    Yes.
18    Q.    What have you had?
19    A.    I went to Northern Kentucky
20  University.  I went to a beauty school.  I
21  went to --
22    Q.    Where was the beauty school?
23    A.    Florence, Kentucky.  I went to

Page 30

1  Gadsden State.
2    Q.    Anywhere else?
3    A.    I think that's it.
4    Q.    Okay.
5    A.    Oh, my Jackson Hewitt
6  certification.
7    Q.    Okay.  You know, I've heard of
8  Western Kentucky and Eastern Kentucky.  I have
9  never heard of Northern Kentucky.  Is it in
10  that Covington area?
11    A.    Yes.
12    Q.    Did you obtain -- how long did
13  you go to NKU?
14    A.    I don't remember.
15    Q.    Okay.  Did you get any sort of
16  degree from that?
17    A.    No.
18    Q.    And did the beauty school or
19  cosmetology school, did you get -- did that do
20  enough for you to get a license or a
21  certification?
22    A.    No.
23    Q.    And at Gadsden State did you

Page 31

1  receive a two-year degree?
2    A.    No.
3    Q.    Have you had any further -- or
4  do you hold like any licenses or
5  certifications from the State of Alabama?
6    A.    No.
7    Q.    Okay.  Like cosmetology?
8    A.    No.
9    Q.    After living in Northern
10  Kentucky, was the next place for you to live
11  in Gadsden?
12    A.    No.
13    Q.    Where did you live after
14  Northern Kentucky?
15    A.    Ft. Lauderdale, Florida.
16    Q.    And was the next place after
17  that Gadsden?
18    A.    Ballplay.
19    Q.    Ballplay.  After you moved from
20  Ft. Lauderdale to Ballplay did you remain in
21  the Etowah County area?
22    A.    No.
23    Q.    Living?  Where did you live

Page 32

1  after Ballplay?
2    A.    I went back to Northern
3  Kentucky.
4    Q.    Okay.  And after that where did
5  you live next, after going back to Northern
6  Kentucky after Ballplay?
7    A.    Came back here.
8    Q.    Okay.  And after that have you
9  been here since?
10    A.    Correct.
11    Q.    Okay.  You moved -- I guess you
12  moved from California to Northern Kentucky
13  with your folks, correct?
14    A.    My father.
15    Q.    Your father?  Then how did you
16  -- what led you to go from Northern Kentucky
17  to Ft. Lauderdale?
18    A.    My husband and I.
19    Q.    Okay.  Would that have been
20  Mr. Stewart or Mr. Hamilton?
21    A.    Mr. Helm.
22    Q.    Mr. Helm.  Okay.  What brought
23  y'all back to Ballplay or to Ballplay?

Page 33

1    A.    We just wanted to raise our kids
2  here.
3    Q.    Sure.  Was he from this area?
4    A.    No.  He had a brother that lived
5  here.
6    Q.    Okay.  That was kind of the
7  connection and the reason for moving?
8    A.    Yes.
9    Q.    What business was he in that he
10 could move from Ft. Lauderdale to here, I
11 guess?
12   A.    You mean Dan?
13   Q.    Yes.
14   A.    He was a carpenter.
15   Q.    So that -- in other words,
16 moving here didn't pose a big problem for him?
17   A.    No.
18   Q.    He had a skill?
19   A.    (Witness nods head
20 affirmatively.)
21   Q.    And then why did you go to
22 Northern Kentucky, and why did you come back
23 to Gadsden -- back to Northern Kentucky from

Page 34

1  Hokes Bluff -- I'm sorry.  Am I right?
2          You said you left Hokes Bluff to
3  go to --
4    A.    We moved here, and then we moved
5  back to Northern Kentucky.  When I got
6  pregnant with▮▮▮▮▮▮, I wanted to be by my
7  mom.
8    Q.    Was he from Northern Kentucky?
9    A.    That's where we met.
10   Q.    I gotcha.  And then y'all moved
11 back to Gadsden?
12   A.    Correct.
13   Q.    Okay.  Did Dan have any sort of
14 -- was he the proprietor of any business?
15   A.    Yes.
16   Q.    Just his own --
17   A.    Correct.
18   Q.    -- contracting or
19 subcontracting?
20   A.    Yes.
21   Q.    But just by his name?
22   A.    Yes.
23   Q.    And did he have any sort of

Page 35

1  place of business, or was he able to do it
2  from home?
3    A.    From home.
4    Q.    And since you moved back with
5  Mr. Helm I guess following the birth of your
6  daughter, since that time you have remained in
7  Gadsden or Etowah County?
8    A.    Yes.
9    Q.    Okay.  Other than the family
10 members you have told me about, do you have
11 any other reasonably close family members,
12 people that you like to see in north Alabama?
13   A.    No, sir.
14   Q.    Have you ever given a deposition
15 before?
16   A.    Yes.
17   Q.    How many times?
18   A.    No, I haven't.
19   Q.    I bet you attended one?
20   A.    That's why.
21   Q.    But you weren't the actual
22 witness?
23   A.    Correct, yes, sir.

Page 36

1    Q.    That would have been of TDH?
2    A.    Yes.
3    Q.    In her pedestrian accident?
4    A.    Yes, yes.
5    Q.    No other times have you given a
6  deposition?
7    A.    No.
8    Q.    Are there any other times you
9  attended a deposition?
10   A.    Yes.
11   Q.    In what?
12   A.    My husband's death.
13   Q.    Was there some sort of legal
14 proceeding that arose from his death?
15   A.    Yes.
16   Q.    What kind?
17   A.    Wrongful death suit.
18   Q.    And I don't need to go into it a
19 great deal, but what had happened that led to
20 the wrongful death suit?  I mean, I understand
21 he died, but what had --
22   A.    Specifically?
23   Q.    Yeah.

Page 37

1    A.    He was electrocuted on the job.
2    Q.    Many times when people die on
3 the job there's a workers' compensation part
4 of the case, and then sometimes there's also
5 another lawsuit against somebody else besides
6 the employer.
7          Do you remember about whether
8 there was two parts of your husband's death
9 case?
10    A.    No, I do not.
11    Q.    Did that get filed here in
12 Etowah County?
13    A.    Yes.
14    Q.    Who was your lawyer?
15    A.    Tom Davis was my local attorney.
16    Q.    Okay.
17    A.    And our Georgia attorney, I
18 don't recall at the moment.
19    Q.    Was your husband in Georgia at
20 the time of his death?
21    A.    Well, Rome.
22    Q.    Yeah.
23    A.    Is that Georgia?

Page 38

1    Q.    Yeah.
2    A.    Okay.
3    Q.    I mean, I'm kind of figuring
4 since there was a Georgia lawyer involved.
5    A.    Yeah.
6    Q.    Okay. Do you remember how long
7 -- I understand your husband died in 2000.
8          Do you remember how long it was
9 after that that y'all concluded the case?
10    A.    Maybe a couple of years.
11    Q.    Did it go to trial, or did it
12 settle?
13    A.    Settled.
14    Q.    As a result of that, were any --
15 were there any separate provisions to the
16 children where a certain amount was placed in
17 a trust or an account?
18          MR. HARP: Don't get into your
19 settlement. She is not going to get into
20 that.
21          MR. HOWARD: Well, I want to
22 know about TDH's -- I'm finding out about TDH.
23 That's the only reason I'm asking that.

Page 39

1          MR. HARP: I understand why you
2 want to know, but I'm going to instruct her
3 not to discuss a confidential settlement.
4    Q.    Was the settlement confidential?
5    A.    Yes, sir.
6    Q.    Okay. Aside from that case,
7 have you given any other depositions?
8    A.    Not to my knowledge.
9    Q.    Have you ever been a witness in
10 a court case?
11    A.    Did I witness?
12    Q.    Well, were you called to the
13 witness stand in a court case?
14    A.    No.
15    Q.    Were there any occasions where
16 you were interviewed as a witness for some
17 sort of criminal proceeding about somebody
18 else?
19    A.    I'm just thinking about the --
20 TDH's car accident. We did depositions for
21 that.
22    Q.    The car accident?
23    A.    So that's where I -- you know --

Page 40

1    Q.    Sure. Right. There was a
2 hearing where you had to go up with the judge
3 to get the settlement approved, something like
4 that, for TDH?
5    A.    Yes.
6    Q.    And that's what I'm talking
7 about. That would have been a court
8 appearance, correct?
9    A.    Correct.
10    Q.    Other than that, you don't
11 recall any other times --
12    A.    Correct.
13    Q.    -- to court?
14          MR. HARP: Again, I wasn't
15 coaching. I was trying to -- with the head
16 nod, I was trying to move this along.
17          MR. HOWARD: No problem.
18    Q.    Aside from the -- well, on the
19 night of the concert, January 15 -- January
20 16, 2015, were you arrested?
21    A.    Yes.
22    Q.    I'm going to come back to that.
23          Aside from that arrest, have you

1 ever been arrested before that or since?

2    A.    Yes.

3    Q.    Tell me when and what for.

4    A.    I don't recall when, the date.

5    Q.    Okay.

6    A.    It had something to do with an

7 old boyfriend, and I was intoxicated. It was

8 a long time ago.

9    Q.    Okay. Some sort of squabble

10 between you and an old boyfriend?

11        MR. HARP: Object to the form.

12    A.    No. I was just -- I wasn't

13 supposed to be where I was.

14    Q.    Okay. Had you been told not to

15 be where you were?

16    A.    When I got there, yeah.

17    Q.    Okay.

18    A.    That I can recall.

19    Q.    And I understand you can't

20 recall the exact date. Can you give me a

21 ballpark?

22    A.    Eight years ago, nine years ago.

23    Q.    Okay. Was the boyfriend any of

1 your husbands later?

2    A.    No.

3    Q.    And do you remember -- I mean, I

4 understand you were somewhere you weren't

5 supposed to be.

6        Do you remember what you were

7 actually charged with?

8    A.    No.

9    Q.    Okay. What city or jurisdiction

10 made that arrest?

11    A.    It was Rainbow City.

12    Q.    Do you remember where you were

13 living at the time?

14    A.    Miller.

15    Q.    So I'm guessing you were not at

16 home when the arrest was made because you were

17 living -- Miller is in Southside, right?

18    A.    Yes.

19    Q.    Okay. So you were not at home?

20    A.    Correct.

21    Q.    What became of whatever it was

22 you were charged with? What became of that?

23    A.    I really don't recall. I don't

1 remember.

2    Q.    Do you remember if you had to

3 pay a fine?

4    A.    I don't.

5    Q.    That's okay.

6    A.    I don't remember. It's been a

7 long time.

8    Q.    Believe me. I'm just asking you

9 for what you remember.

10    A.    Yeah.

11    Q.    Because that's all you can

12 testify to. But sometimes I do ask you

13 follow-up questions to help you remember.

14    A.    (Witness nods head

15 affirmatively.)

16    Q.    Did you have to appear before a

17 judge? And if you don't remember, that's

18 fine.

19    A.    I really don't remember the

20 specific details about it.

21    Q.    Okay.

22    A.    Really.

23    Q.    Well, the reason I asked you, a

1 lot of times you may not remember some things

2 but you may remember -- I don't know -- being

3 in front of a judge or going to a building or

4 something.

5        In any event, you don't

6 remember?

7    A.    Correct.

8    Q.    And you don't remember having to

9 serve any sort of probation where you had

10 to --

11    A.    No.

12    Q.    And I ask that because you said

13 you were intoxicated.

14        Do you know if it was an

15 intoxication charge?

16        MR. HARP: Object to the form.

17 This is information already within the purview

18 of the defendants in this case.

19        MR. HOWARD: Well, you know as

20 well I do that's not -- you can object to

21 that, but that's not a discovery objection.

22 I'm just asking her. I mean, it may not be in

23 our records. Who knows? Our records may be

Page 45

1  lousy.

2  MR. HARP: They seem to be

3  pretty succinct. She just described exactly

4  what your records say.

5  MR. HOWARD: Okay. Well, good.

6  Then she has a good memory.

7  Q. (By Mr. Howard) Any others --

8  any other arrests?

9  A. The night of the concert.

10  Q. Yeah. Okay. So the night of

11  the concert and the one that involved an old

12  boyfriend. Any others besides Jim?

13  A. No. I said cheating boyfriend.

14  Q. Okay. Was that sort of what led

15  to the alter --

16  A. No.

17  MR. HARP: Object to the form.

18  Q. Was that what led to this

19  situation?

20  MR. HARP: I'm just objecting to

21  the form. You can answer the question.

22  Q. Was that what led to the

23  situation?

Page 46

1  A. Yes.

2  Q. Do you know now who any of the

3  Rainbow City officers that arrested you on

4  that old occasion were?

5  A. Say it again.

6  Q. Yeah. Do you now -- as we sit

7  here today, do you know who it was of the

8  Rainbow City police officers that arrested you

9  on this older time?

10  A. No.

11  Q. And I think you just said two

12  arrests, and that's all you can remember?

13  A. Correct.

14  Q. And that's not just Rainbow

15  City, but that's anywhere, correct?

16  A. Correct.

17  Q. Have you ever filed for

18  bankruptcy?

19  A. Yes.

20  Q. When and what kind of

21  bankruptcy?

22  A. I believe it was 2011 maybe.

23  Q. Chapter 13, where you make

Page 47

1  payments; or Chapter 7, where they wipe it

2  clean?

3  A. Chapter 7.

4  Q. And was that locally?

5  A. Yes.

6  Q. Did a lawyer represent you?

7  A. Yes.

8  Q. Who?

9  A. Millican.

10  Q. Jacob?

11  A. Yes.

12  Q. Just the one bankruptcy?

13  A. Yes.

14  Q. You know, I asked you about

15  witnessing or deposing, but I didn't actually

16  ask you this: Have you ever sued anybody

17  before this lawsuit and other than your

18  husband's wrongful death suit?

19  A. Yes.

20  Q. Who?

21  A. The car accident.

22  Q. Oh, yeah. You were suing as

23  TDH's mom, right?

Page 48

1  A. Correct.

2  Q. Besides that, any others?

3  A. No.

4  Q. And have you ever been sued?

5  A. No.

6  MR. HARP: Can you ask that

7  question again?

8  MR. HOWARD: Yeah.

9  Q. Have you ever been sued?

10  MR. HARP: Think about your

11  answer, and then answer his question.

12  And I assume he is talking about

13  credit card debt or anything.

14  Q. Yeah, for anything, where you

15  got served with a summons and complaint?

16  A. Yes.

17  Q. Who sued you?

18  A. Yes. The -- I mean, there is a

19  list of -- on the bankruptcy thing.

20  Q. Right.

21  A. But I don't have that in front

22  of me. I can't recall specifically.

23  Q. Fair enough.

Page 49

1    A.    Who all was involved.
2    Q.    On the bankruptcy list you are
3  talking about --
4    A.    Uh-huh (indicating yes).
5    Q.    Were there a --
6    A.    Yes.
7    Q.    -- number of suits that had been
8  brought against you?
9    A.    I'm assuming, yes.
10   Q.    Okay.  Do you remember who any
11 of those suing creditors were?
12   A.    No.
13   Q.    And what you're talking about is
14 people suing you for unpaid money?
15   A.    Correct.
16   Q.    Okay.  Aside from those types,
17 have you been sued in any other way, aside
18 from being sued for unpaid money like --
19   A.    I don't know.
20   Q.    Ms. Helm, in the last, let's
21 say, five, six years, have you had any
22 particular health conditions?
23   A.    Yes.

Page 50

1    Q.    What kind?
2    A.    I had hemorrhoid surgery.
3    Q.    And I want to say that TDH
4  indicated, I believe, that at the time -- that
5  in January of 2015 you were -- you had
6  recently had that kind of surgery?
7    A.    Yes.
8    Q.    Have you had that only once?
9    A.    Yes.
10   Q.    Excuse me.  Have you had that
11 surgery only once?
12   A.    Yes.
13   Q.    Any other surgeries in the last
14 five or six years?
15   A.    No.
16   Q.    Okay.  Are you under any
17 medication today that might affect your
18 memory?
19   A.    No, no.
20   Q.    In January 2015 were you under
21 any medication or were you under any
22 medication that might affect your memory or
23 perception?

Page 51

1    A.    No.
2    Q.    Were you under any medication?
3    A.    Ibuprofen.
4    Q.    Okay.  But otherwise, insofar as
5  any other systemic issues like an ulcer or
6  diabetes or arthritis, do you have any of
7  those kinds of things?
8    A.    No.
9    Q.    Do you have a general physician
10 that you go see for aches, pains, flu?
11   A.    Yes.
12   Q.    Is it Dr. Kelly?
13   A.    Yes.
14   Q.    Do you remember if y'all were
15 seeing -- you and your family -- well, let's
16 just say you -- were seeing Dr. Kelly in that
17 way back in 2015?
18   A.    It was -- we started going to
19 see him close to that time, so it might be
20 right after or right before.
21   Q.    If there was someone before him,
22 who would that have been?
23   A.    I believe we went to Quality of

Page 52

1  Life.
2    Q.    Okay.  Out here on -- out there
3  in East Gadsden on the --
4    A.    Uh-huh (indicating yes).
5    Q.    Piedmont Highway?
6    A.    Yes.
7    Q.    After January 2015, when you
8  were arrested at Center Stages, after that,
9  did you see any health care provider for
10 anything related to that night?
11   A.    Have I?
12   Q.    Yes.
13   A.    Yes.
14   Q.    Okay.  Was it Dr. Kelly?
15   A.    Yes.
16   Q.    Okay.  And for what kind of
17 things?
18   A.    Anxiety.
19   Q.    Okay.  More -- less physical,
20 more mental, emotional?
21   A.    Yes.
22   Q.    Okay.  Before 2000 -- before
23 January 16, 2015, had you seen any medical or

Page 53

1 health care provider for anxiety?
2     A.    I don't think so.
3     Q.    Okay.  Has Dr. Kelly prescribed
4 you any medication about your anxiety -- for
5 your anxiety?
6     A.    Yes.
7     Q.    What has he prescribed?
8     A.    Xanax.
9     Q.    To take as needed?
10    A.    Yes.
11    Q.    And is -- do you attribute the
12 anxiety that you have told Dr. Kelly about to
13 the incident in January 2015?
14    A.    Yes.
15    Q.    Describe the anxiety.  What
16 happens to you?
17    A.    It's different.  Sometimes it
18 happens in the middle of the night and like I
19 will have nightmares, night terrors kind of
20 thing.  It would be cold sweating.  And then
21 sometimes it will be, you know, in a large --
22 like at Walmart.
23    Q.    Right.

Page 54

1     A.    Just got to get out of there for
2 no apparent reason.  You know there's nothing
3 wrong, but I just have to get out of there.
4     Q.    Okay.
5     A.    Different things like that.
6     Q.    So other than the -- other than
7 that feeling overcoming you, I've got to get
8 out of here, do you have any other physical
9 manifestations?
10    A.    As far as my anxiety?
11    Q.    Yeah.  Like does it give you
12 headaches or make you faint?
13    A.    Yeah.  It makes me cry sometimes
14 uncontrollably for, you know -- like no
15 patience, like --
16    Q.    Agitated?  Is that what you were
17 about to say?
18    A.    Just no patience.  That's all I
19 know to say.  It's not -- it doesn't
20 necessarily mean I'm agitated.  It just
21 means --
22    Q.    You just have no patience?
23    A.    I just need to walk away from

Page 55

1 this for a minute.
2     Eating, like my eating is really
3 bad.  Sometimes I can go a couple of weeks
4 without eating food.
5     Q.    Okay.  The manifestation is the
6 suppressing of your appetite?
7     A.    Yes.
8     Q.    It doesn't make you eat too
9 much?
10    A.    No.  It's the opposite.
11    Q.    But it doesn't make you throw
12 up?
13    A.    I have thrown up.
14    Q.    From that?
15    A.    From --
16    Q.    From anxiety?
17    A.    Yeah, from feeling just over --
18 like I said, it's just an overwhelming
19 feeling.  It just manifests differently
20 depending on the situation or what the trigger
21 is.  Do you know what I mean?
22    Q.    Sure.  And that's why I'm
23 asking.  I just want to make sure I know

Page 56

1 everything you might say at trial about what
2 happens to you that you attribute to the
3 events of that night.
4     A.    Yeah.
5     Q.    I don't want to suggest things
6 to you, but you haven't developed a nervous
7 tic because of it, correct?
8     MR. HARP:  Object to the form.
9     Q.    Anything else physical?  And I
10 was saying that tongue in cheek.
11     But anything physical that you
12 see happening to yourself from the anxiety
13 that you're talking about?
14    A.    Do you want me to describe my --
15 like every symptom I have or --
16    Q.    As many as you can.
17    A.    I pick my face bad.  I pick my
18 skin, whether it be a mark -- wherever the
19 mark is, and I pick it, pick it, pick it,
20 nervously.
21    Q.    With your fingernails?
22    A.    Yeah.  And then the other things
23 I told you.

Page 57

1    Q.    Right.

2    A.    No eating.  Sometimes no

3 sleeping.  Then sometimes I can sleep -- I

4 can't wake myself up.

5    Q.    Right.

6    A.    Overwhelming feeling, you know?

7 And then I get a little emotional, and I don't

8 like that.

9    Q.    Do you mean emotional when you

10 think you really ought not to be that

11 emotional in that situation?

12   A.    Yeah.

13   Q.    Okay.

14   A.    Hopelessness many times.

15 Suicidal at moments.  Depression like, you

16 know -- like hopeless, you know, like you just

17 -- I really have to work hard personally to,

18 you know, stay positive, keep my head up.

19   Q.    Sure.

20   A.    Set an example.

21   Q.    And I always say that not that

22 that's not enough, but is there anything else?

23       Again, I'm just making sure I

Page 58

1 know what you might say at trial.

2    A.    I have a real phobia of the

3 police.

4    Q.    Have you had any interactions

5 with any police since that incident?

6    A.    I don't think so, no.

7    Q.    And I understand not necessarily

8 where you called them or something.  Just

9 where they got in your immediate presence?

10   A.    Well, you know, getting my

11 license or, you know -- you know, where I

12 would run into them at a restaurant and them

13 coming in the store, you know, or --

14   Q.    Right.

15   A.    You know, things like that.

16   Q.    Have there been any -- have any

17 of those occasions been -- had a negative

18 outcome or negative effect on you?

19   A.    What do you mean?

20   Q.    Like when they came in the

21 store?

22   A.    Yes.  Like immediate -- I want

23 to get away, like leave -- I have put things

Page 59

1 down in a line and turned around and put them

2 down and walked out.  That's what you are

3 talking about?

4    Q.    Sure.  That's what I'm talking

5 about.  What store?

6    A.    Like Walmart or wherever.  I

7 don't recall specific.

8    Q.    Have you --

9    A.    I have left restaurants.

10   Q.    Are these a reaction to men in

11 uniform or policemen in uniform?

12   A.    Yes.

13   Q.    Or is it just Rainbow City or

14 just Gadsden?

15       MR. HARP:  Object to the form.

16   Q.    Go ahead.  That's what I'm

17 asking.

18   A.    What question?

19   Q.    Anybody that looks like a police

20 officer?

21   A.    Police, yes.

22   Q.    I mean, I'm assuming you

23 identify them because they are in some sort of

Page 60

1 a uniform?

2    A.    Correct.

3    Q.    But you haven't been stopped by

4 anybody?

5    A.    I don't recall that.

6    Q.    I mean, a vehicle stop?

7    A.    They had a check on Noccalula

8 mountain, and, you know, I have drove through

9 those before.

10   Q.    Right.

11   A.    Check your insurance.

12   Q.    Before January of 2015 did you

13 have any of the same kind of symptoms that you

14 have just told me about?

15   A.    Yes, to a small degree,

16 manageable.

17   Q.    Do you know what -- was there

18 anything in particular they stemmed from?

19   A.    It was very far in between.

20   Q.    Do you know what medications TDH

21 takes, if any?  Presently, let's say?

22   A.    No.

23   Q.    Okay.  And I ask you that

Page 61

1  because frankly she didn't know, so I thought
2  you as her mom might know.
3     A.    Uh-huh (indicating yes).
4     Q.    Do you know whether she takes
5  any regularly now?
6     A.    No.
7     Q.    You don't know?
8     A.    I do not.
9     Q.    Do you have a -- I take it if
10  she is prescribed something -- let's say in
11  the last four or five years -- you would be
12  the one to get that filled?
13     A.    Correct.
14     Q.    Correct?  Where do you usually
15  do your prescription filling?
16     A.    Super B and Walgreens.
17     Q.    Super B in Rainbow City?
18     A.    Uh-huh (indicating yes).
19     Q.    And Walgreens in Rainbow City?
20     A.    Yes, sir.
21        MR. HARP:  Are you doing okay?
22  Do you need a break?
23        THE WITNESS:  That would be

Page 62

1  good.
2        MR. HARP:  Can we take a break?
3        MR. HOWARD:  Yeah.
4        (Whereupon, a recess was
5  taken.)
6     Q.    (By Mr. Howard) Ms. Helm, I want
7  to ask you now about your daughter's seizure
8  issues.
9     A.    Okay.
10     Q.    Do you recall the first time you
11  were made aware of your daughter having
12  seizures?
13     A.    Yes.
14     Q.    Where was it, or what had
15  happened?
16     A.    I got a phone call.  She was at
17  a barbecue and had a seizure at the barbecue.
18     Q.    TDH said this was about a year
19  or so after her pedestrian accident.
20     A.    Close.
21     Q.    Does that fit with your --
22     A.    It's close, give or take a
23  couple of months.

Page 63

1     Q.    What did -- what did you do when
2  you went and got her?  I mean, did you go to a
3  hospital or doctor or anything?
4     A.    I can't remember if we went to
5  the hospital that particular time.
6     Q.    Right.
7     A.    I hate when I do that.  I can't
8  remember.
9     Q.    Sure.  Let me ask it this way.
10     A.    The second time, yes.
11     Q.    Okay.  Do you remember the
12  circumstances of the second time?
13     A.    She was in a vehicle and had one
14  in the vehicle, and they had to pull over and
15  call an ambulance.
16     Q.    Was she driving?
17     A.    No.  She was a passenger.
18     Q.    She was a passenger?
19     A.    Yeah.
20     Q.    Was she like with her friends?
21     A.    She was with an adult, a friend
22  of mine.
23     Q.    Okay.  And your adult friend

Page 64

1  pulled over and called --
2     A.    She's a mother.  Yeah, she --
3     Q.    She figured out --
4     A.    Immediately.
5     Q.    Figured it out fast?
6     A.    Yes.
7     Q.    What hospital?
8     A.    I believe it was Gadsden
9  Regional.
10     Q.    Okay.  Do you know what if
11  anything they did?
12     A.    They referred us to a
13  neurologist.
14     Q.    In town, here in town?
15     A.    Yes.
16     Q.    Would that have been
17  Dr. Bogdanova or something like that?
18     A.    Something like that, yes.
19  Bogdanova.
20     Q.    Bogdanova.  But anyway, it's
21  local.  It begins with a B?
22     A.    Yes, sir.
23     Q.    To your knowledge have you ever

Page 65

1 had seizures?
2     A.    Not to my knowledge.
3     Q.    And do you have any information
4 about TDH's father, if he ever had any?
5     A.    No.
6     Q.    To your knowledge has TDH had
7 any -- do y'all say TDH or TDH?
8     A.    It's TDH, like the crown of
9 jewels.
10     Q.    Right.  But it's pronounced like
11 a capital T, capital R --
12     A.    TDH.
13     Q.    That you know of has TDH had a
14 seizure since the night of the concert in
15 January 2015?
16     A.    I don't recall.
17     Q.    At Gadsden Regional, when you
18 took her on that second occasion, did they --
19 other than refer you, did they just stabilize
20 her and check her out?
21     A.    Yes.
22     Q.    She didn't have to be admitted?
23     A.    No.

Page 66

1     Q.    And did you take her to
2 Dr. Bogdanova, whatever her name is?
3     A.    Yes.
4     Q.    Did you attend the sessions?
5     A.    Yes.
6     Q.    Do you know how long a period of
7 time -- how long a period of time did TDH see
8 Dr. Bogdanova?
9     A.    She went to maybe two or three
10 appointments.
11     Q.    Was it sort of an ongoing, come
12 every three months unless you have a problem
13 type setup?
14     A.    Yes, yes.
15     Q.    Did Dr. Bogdanova place her on
16 any medication?
17     A.    Yes.
18     Q.    Do you know what?
19     A.    Topamax.
20     Q.    Had you ever, before that time,
21 had any experience or familiarity with
22 Topamax?
23     A.    No.

Page 67

1     Q.    Had you -- before this, before
2 your daughter starting having seizures, did
3 you have any familiarity or particular
4 knowledge about seizures?
5     A.    No, sir.
6     Q.    Have any of your other children
7 had any seizures?
8     A.    No, sir.
9     Q.    Other than Dr. -- well, strike
10 that.
11           Other than the trip to Gadsden
12 Regional on occasion number two where she
13 was -- where TDH was in the company of your
14 friend, other than that have there been any
15 other hospital visits because of the seizures?
16     A.    Yes.
17     Q.    When?
18     A.    I'm not sure of the date, but
19 she had a seizure in a field on Palace Avenue
20 and was found by a passerby that called an
21 ambulance, and she was taken to Children's.
22     Q.    Were you at home on that
23 occasion?

Page 68

1     A.    Yes.
2     Q.    I understand she was off walking
3 down the street, correct?
4     A.    Correct.
5     Q.    Okay.  And do you recall any
6 other trips to the hospital for seizures?
7           Well, aside from the night of
8 this incident, when she was taken there by an
9 ambulance, any other trips besides that?
10     A.    After January?
11     Q.    Well, first, before, and then I
12 will say after.
13     A.    I'm unsure of how many hospital
14 visits we had, actually.
15     Q.    Okay.
16     A.    Honestly.  And then after I
17 don't recall her going to a hospital after
18 that.
19     Q.    Okay.
20     A.    After that for a -- for
21 specifically a seizure.
22     Q.    Okay.
23     A.    Yeah.

1      Q.     And as far as seizures, then,
2  what I'm hearing is you think there was only
3  one trip to Children's?
4      A.     Yes.
5      Q.     And you think there was only one
6  trip to Gadsden Regional, or is that the one
7  you're unsure about?
8      A.     Correct.  Between, I mean,
9  Riverview and Gadsden, I get them mixed up.
10     Q.     Right.  But you don't have any
11 specific memory of Riverview either, do you?
12     A.     I don't.
13     Q.     For going for a seizure?
14     A.     Correct.  I remember being at
15 the hospital, but I don't --
16     Q.     You have three who might have
17 been in the hospital, right?
18     A.     Yeah.
19     Q.     Okay.  On the -- I will
20 represent to you that we -- we apparently
21 determined yesterday that -- that December --
22 that January 16, 2015, was a Friday.
23            And assuming that's the case,

1  TDH said she had had a seizure on that day?
2      A.     Uh-huh (indicating yes).
3      Q.     At the school?
4      A.     Yes.
5      Q.     I think on the way out to the
6  soccer field, something at the beginning of
7  soccer practice?
8      A.     At soccer practice.
9      Q.     Does that sound right?
10     A.     Yeah, at soccer practice, yes,
11 sir.
12     Q.     That didn't result in a trip to
13 the hospital?
14     A.     No.
15     Q.     Did they call you?
16     A.     Yes.
17     Q.     Okay.  And you were home?
18     A.     And an ambulance, yes.
19     Q.     So they did call -- well, when
20 you say ambulance, I sort of think about
21 transporting to the hospital.  But that's not
22 what we are talking about, is it?  Are you
23 talking about more of a paramedic?

1      A.     Yes.
2      Q.     Where they gave her some
3  treatment and observation on the scene?
4      A.     Yes.
5      Q.     But didn't have to take her to a
6  hospital?
7      A.     Right.
8      Q.     And you didn't take her to the
9  hospital?
10     A.     They had an IV, hooked her up to
11 an IV, and she -- they had her propped up and,
12 you know, just taking good care of her.
13     Q.     Right.  Do you recall on that
14 occasion any descriptions by anybody that was
15 given to you about how long she had been
16 blacked out and seizing?
17     A.     I don't recall an amount of
18 time.  And TDH is always very disoriented and
19 doesn't have a recollection.
20     Q.     Right.
21     A.     She is very confused.  I don't
22 remember them giving me an exact minute.
23     Q.     Sure.  Who called you, if you

1  remember?
2      A.     I believe --
3      Q.     The coach, or do you know?
4      A.     I don't remember.
5      Q.     Okay.  She would have been at
6  Southside High School?
7      A.     Yes, sir.
8      Q.     The old one or the new one?
9      A.     They practice at the old field.
10     Q.     Okay.
11     A.     The new high school, old field.
12     Q.     New high school, old field?
13     A.     Correct.
14     Q.     And at the time you were at
15 Palace Avenue?
16     A.     Yes.
17     Q.     Do you remember, Ms. Helm,
18 whether when they called you her seizure was
19 over or not?
20     A.     I do not recall.
21     Q.     When you got there, she was
22 propped up with an IV in her?
23     A.     Yes.

Page 73

1    Q.    So the paramedics beat you to
2  the scene?
3    A.    Oh, yeah.
4    Q.    Was it Southside paramedics?
5    A.    I'm not sure.  I'm assuming so,
6  but I'm not sure.
7    Q.    Right.  Okay.
8         And from your recollection was
9  it just one paramedic vehicle, or did it look
10 like half of the fire department showed up?
11   A.    You know, I was so zoned in on
12 my child, like I --
13   Q.    Sure, sure.
14   A.    Like everything on the outside
15 -- I wasn't paying attention.
16   Q.    Tunnel vision?
17   A.    Maybe, yeah.
18   Q.    Sure.  But they -- when we are
19 talking about the old field, we are talking
20 about the old football field, correct?
21   A.    Actually, the soccer field --
22 there is a football field, and then the soccer
23 field is on the other side.

Page 74

1    Q.    Sort of on the back of the
2  property?
3    A.    Correct.  Closer to McDonald's.
4    Q.    When you came to the scene,
5  observed her with an IV in the arm and sitting
6  up, was she coherent yet?
7    A.    She was still disoriented, a
8  little confused, and it took her a minute.
9  Even when I got there, she was still trying to
10 put together what happened.
11   Q.    Was she talking -- let me get --
12 I sort of -- and if so, is that what led you
13 to say she was confused, or could you just
14 tell that she was confused because you're her
15 mom?
16   A.    No.  She -- when I approached
17 her, she was very -- you know, physically you
18 could tell that she was very flustered and not
19 herself.
20   Q.    Right.
21   A.    And then she was just trying to
22 articulate like, mom, what's going on, you
23 know, and she was confused about like what

Page 75

1  actually just happened -- like she lost a
2  minute.
3    Q.    Okay.
4    A.    You know, she was confused by --
5  yeah, she was trying to verbally find out what
6  was happening.
7    Q.    Okay.  So what I'm hearing is --
8  and you tell me if this is right or not -- she
9  was trying to articulate, not doing a real
10 good job of it?
11   A.    Right.
12   Q.    Okay.  But enough to where you
13 realized she -- she wasn't just babbling
14 incoherently, correct?
15   A.    No.  The coach and the medical
16 people were the ones that were telling me what
17 happened.
18   Q.    Right.
19   A.    She was just listening and
20 trying to explain whatever.  She was just
21 trying to figure it out.
22   Q.    Okay.
23   A.    You know, like, mom, what's

Page 76

1  happening?
2    Q.    Right.  Looking at you, looking
3  at them?
4    A.    Yeah, just, you know --
5    Q.    Sure.
6    A.    Everybody looking at her.
7    Q.    Sure.  How long after you
8  arrived there -- about how long did you stay
9  at the scene?
10   A.    Maybe half an hour, for lack of
11 --
12   Q.    I mean, I assume --
13   A.    I didn't look at my watch or
14 anything.  When she -- it took her, you know,
15 a little while to -- they were just very
16 courteous about making sure she was coherent.
17   Q.    Right.
18   A.    And understood what day it was
19 and what actually happened and so on and so
20 forth.
21   Q.    Do you remember if the other
22 players resumed practice?
23   A.    No, they didn't.

Page 77

1    Q.    Did the coach make them go back
2  out there?
3    A.    No.
4    Q.    They stopped?
5    A.    Yeah.
6    Q.    And did y'all -- did you and
7  your daughter and the coaches and paramedics
8  stay in that one place until you left?
9    A.    Yes.
10    Q.    Y'all didn't have to go inside
11  to the locker room or something like that?
12    A.    She was --
13         MR. HARP:  Just answer his
14  question.
15         THE WITNESS:  What did you say?
16    Q.    I don't know what the weather
17  was.  I can imagine a situation where you
18  moved to some other sheltered location --
19    A.    No.
20    Q.    -- before you left?
21    A.    No.  She -- from my
22  understanding, it was right where it happened.
23    Q.    Okay.

Page 78

1    A.    We stayed exactly at that spot.
2    Q.    And y'all stayed at that spot?
3    A.    At that spot.
4    Q.    What if anything did the
5  paramedics tell you about what to do from that
6  point forward?
7    A.    Just to keep her from harming
8  herself and holding her, cradling her head.
9    Q.    But I mean by time they left,
10  was she on her feet?
11    A.    No -- oh, I'm trying to think
12  when she stood up.
13         She sat down the whole time with
14  the IV until, like I said, she, you know,
15  was -- knew what day it was and all that.
16    Q.    Right.
17    A.    And was feeling -- whatever.
18  And when she got up, we immediately left.
19    Q.    I guess what I'm getting to is
20  I'm assuming the paramedics would have been
21  the ones to take out the IV?
22    A.    Yeah.
23    Q.    Right.

Page 79

1    A.    Yes, sir.
2    Q.    And I guess I was asking if
3  y'all left and the paramedics left at about
4  the same time, if you remember?
5    A.    I don't recall.
6    Q.    Okay.
7    A.    Yeah.
8    Q.    Did they make any suggestion to
9  you about getting her further medical
10  treatment that evening?
11    A.    We just discussed -- they asked
12  me her medicals, what's been going on with
13  her.
14    Q.    Right.
15    A.    And I explained to them that
16  this was -- she'd had them before and we were
17  under a doctor's care.
18    Q.    Right.
19    A.    They just said to follow up with
20  her neurologist, and if she felt, you know,
21  ill after that point --
22    Q.    Right.
23    A.    -- to go directly to the

Page 80

1  emergency room.
2    Q.    And at that time she was still
3  under Dr. Bogdanova's care?
4    A.    No.
5    Q.    Had she moved to another doctor?
6    A.    Yes.
7    Q.    Who?
8    A.    Dallas.
9    Q.    She said Russell.
10    A.    That's it, Dallas Russell.
11    Q.    Dallas Russell.
12    A.    His first name seems like a last
13  name so I get it confused.
14    Q.    There is another Dallas doctor
15  in town also; interestingly enough.
16         And to your knowledge at the
17  time was she continuing to be under the -- on
18  the Topamax medication?
19    A.    Yes.
20    Q.    Is that something that she took
21  every day?
22    A.    Yes.
23    Q.    It's an everyday kind of thing?

Page 81

1   A.   Yes.
2   Q.   To your knowledge had she taken
3 her dose of Topamax that day?
4   A.   To my knowledge, yes.
5   Q.   So did y'all then go home?
6   A.   Yes. I think we stopped and got
7 something to drink, you know, and then went
8 home.
9   Q.   Sure.
10   A.   She want to bed.
11   Q.   We have mentioned a couple of
12 occasions of her seizures, and you were
13 actually called to the scene.
14          Were there other occasions where
15 you were present when she went into her
16 seizure?
17   A.   No.
18   Q.   Okay. Were there any other
19 occasions --
20   A.   Except the night of the concert.
21   Q.   Except the night of the concert.
22   A.   I witnessed her doing that.
23   Q.   Before the concert, were there

Page 82

1 any other occasions where you got to the scene
2 and she was still in the midst of a seizure?
3   A.   Yes.
4   Q.   Besides the concert?
5   A.   Yes.
6   Q.   Okay. Is what you told me
7 about, like at the soccer field, do you
8 consider that to be in the midst of a seizure?
9   A.   No.
10   Q.   Okay. What did you see? Where
11 were you and so forth?
12   A.   It was the time that she had the
13 seizure in the field and the ambulance was
14 called to take her to Children's.
15   Q.   Right.
16   A.   When the people found her, and
17 then when I got there she was seizing. And
18 she seized for literally 20 minutes. Like I
19 didn't watch my clock, but I was so concerned
20 that I thought I didn't -- I have never
21 experienced it so --
22   Q.   Right.
23   A.   I was very, very disturbed about

Page 83

1 how long her seizure was lasting. It was un
2 -- I didn't -- I thought it was something like
3 a faint, you know?
4   Q.   Supposed to happen --
5   A.   Happen and be over with.
6   Q.   Right.
7   A.   And, no. She was seizing a long
8 time.
9   Q.   On that occasion was she still
10 seizing when the medics came?
11   A.   Yes, yes.
12       MR. HARP: You are anticipating,
13 and that's fine.
14       THE WITNESS: Okay.
15       MR. HARP: Let him finish so
16 we'll have a clean record, okay?
17   Q.   Okay. They came, and she was
18 still seizing on that occasion?
19   A.   Yes.
20   Q.   What if anything did you see
21 them do insofar as directing their actions
22 towards her seizing body? What measures did
23 you see them take, if any?

Page 84

1   A.   I just remember them getting
2 equipment out of the back of the -- and asking
3 me a lot of questions, getting the gurney out.
4 I don't specifically remember what steps they
5 did.
6   Q.   Right.
7   A.   I just remember them getting the
8 equipment out and gurney out, and they came to
9 her. And she had, you know, spit --
10   Q.   Foaming and so forth?
11   A.   Foaming, yeah. And she was --
12 you know, she had dirt all over her. So I
13 don't -- there was a lot going on.
14   Q.   Sure. And here is why I'm
15 asking: The length of her seizure was
16 disturbing to you?
17   A.   Yeah.
18   Q.   Right.
19   A.   As a mother, yes.
20   Q.   Sure. And as a father, I can
21 imagine, for example, that if I were sitting
22 there watching my son have a seizure and the
23 paramedics came up and didn't make everything

Page 85

1  right, the way they do -- the paramedics show
2  up and everything is great.  And they show up
3  -- if this would have happened to me, I would
4  think it would -- it would be odd.
5          Do you have that recollection of
6  the paramedics coming up and perhaps telling
7  you we have just got to let her sit there,
8  anything to that effect?
9          MR. HARP:  Object to the form.
10  You can answer.
11      Q.    It's a bad question, but if you
12  understand, you can answer.
13      A.    Say it again.
14      Q.    In other words, do you have a
15  recollection that the paramedics arrived and
16  then the seizing continued despite the
17  paramedics arriving?
18      A.    Oh, yeah.  Them being there, not
19  there, her seizure continued.  They were just
20  letting her -- you know, you just have to
21  allow it.  There's nothing you can do about
22  like trying to stop it.
23      Q.    Stop it, right.

Page 86

1      A.    No.  You just have to ride the
2  ride.
3      Q.    And did you see them, for
4  example, cradle her head?
5      A.    I did that.
6      Q.    You were already doing that?
7      A.    Yes, sir.
8      Q.    And I know this is an obvious
9  question, but why were you doing that?
10      A.    Well, when I got there one of
11  the neighbors was trying to -- they were
12  yelling do this -- she is going to swallow
13  her -- everybody was saying -- they were
14  strangers, and I told everybody to back up and
15  let her breathe because she was, you know,
16  moving and --
17      Q.    Right.
18      A.    I just wanted her to have some
19  air.  And I sat there and was talking to her,
20  trying to call her back.  Her eyes were wide
21  open, and she was not there.  Like, I don't
22  know.  It's almost like a zombie kind of -- do
23  you know what I mean?  It's just a weird

Page 87

1  experience.
2      Q.    Like she is staring off into
3  space?
4      A.    Correct.  And she was just not
5  there.  Her eyes were open.  And foam was
6  coming out, and she was breathing really
7  labored, very -- it was really scary.
8      Q.    Audible, like you could really
9  hear the breathing?
10      A.    Yeah.  It was scary.
11      Q.    When you arrived on that scene
12  was she in what I would call a fetal type
13  position, on the side, arms crouched up?
14      A.    Well, I don't want to -- know
15  what position, what you would call it.  But
16  she was -- I just remember her hands, and her
17  legs would try to come, you know -- she was
18  just contorted (indicating).
19      Q.    Contorted?
20      A.    For lack of a better word.
21      Q.    Was she flat on her back, or do
22  you remember?
23      A.    She was on her side or her back,

Page 88

1  one.
2      Q.    In any event, you got there and
3  cradled head?
4      A.    She was covered in dirt by the
5  time I got there.
6          MR. HARP:  Did you understand
7  his question?  His question was when you got
8  there did you cradle her head?
9          THE WITNESS:  Yes, when I got
10  there.
11      Q.    And did you see dirt on her?
12      A.    Yes.
13      Q.    How do you think the dirt got on
14  her?  Was the dirt on her face?
15      A.    It seemed to be like she was
16  just -- it was everywhere, you know, was --
17      Q.    As if she had rolled in dirt?
18      A.    Yeah, like a dog when they get
19  in the dirt?
20      Q.    Yes.
21      A.    Kind of like that.
22      Q.    And I guess what I'm getting
23  to is --

1    A.    She was in the dirt, not the
2 grass.
3    Q.    Oh, okay.
4    A.    She was in a dirt -- where the
5 cars come through.
6    Q.    Yeah.
7    A.    There was no grass there.  So
8 she was in like dirt, dusty dirt.
9    Q.    Hard dirt?
10    A.    No.  It was dusty.
11    Q.    Dusty dirt?
12    A.    Yeah.
13    Q.    And from what you said, I'm
14 assuming there was dirt on her front and her
15 back; is that correct?
16    A.    I just remember thinking -- you
17 know, noticing dirt, her being dirty.  I don't
18 -- it wasn't like is it on the foot, is it on
19 the finger, is it on the forehead, you know.
20    Q.    Sure.
21    A.    I wasn't -- you know, I was just
22 concerned about her -- you know, what was
23 happening.

1    Q.    Sure.
2    A.    I just remember it being dirty
3 -- dusty dirt.
4    Q.    And when you began cradling her
5 head, she was still convulsing?
6    A.    Yes.
7    Q.    Including her head?
8    A.    No.
9    Q.    Is that because you were holding
10 it?
11        MR. HARP:  Object to the form.
12    Q.    You can answer.
13    A.    I'm not sure why.  You know, I
14 just noticed that her extremities were moving.
15    Q.    Uh-huh (indicating yes).
16    A.    And her head was just doing that
17 (indicating).  Like, it wasn't thrashing.  It
18 was doing this kind of movement.  But her body
19 was doing this (indicating).
20    Q.    A lot of movement?
21    A.    Not a -- like it would do it,
22 and then she would do this (indicating).
23    Q.    She would flail and then draw up

1 and then flail?
2    A.    Yeah.  There was no, like,
3 rhythm to it or anything.  It was just an odd
4 -- just a very odd experience, unnatural.
5    Q.    I understand you were
6 reassuring.  Doing what a mother would do,
7 it's going to be all right, honey, that sort
8 of thing, caressing her hair, talking to her?
9    A.    I was just talking to her.
10    Q.    Sure.
11    A.    Calling her name over and over.
12    Q.    Did she talk back?
13    A.    No.
14    Q.    Did she make any noises, like
15 talking?
16    A.    Sometimes, yeah.
17    Q.    Did you think she was --
18    A.    Like mumbling.  Like, you know,
19 like she was -- she would -- yeah.
20    Q.    Yeah, that's what I'm asking.
21        Are we talking mumbling the way
22 people do in their sleep sometimes?
23        MR. HARP:  Object to the form.

1    A.    I don't --
2    Q.    Or rather, did you think she was
3 actually trying to communicate with you?
4    A.    I don't think it was -- I don't
5 know.  I'm not a doctor.
6    Q.    I'm asking a mother.
7    A.    She was just making noises.  And
8 I was calling her name because I wanted her to
9 know I was there.
10    Q.    Right.
11    A.    She was just really at a loss of
12 what was happening, you know?  I just remember
13 being -- calling her name over and over and
14 telling her, like you said, it was okay and
15 the paramedics were coming.
16    Q.    Did you get the impression that
17 she was hearing you?
18    A.    No.  She was in -- not that, you
19 know -- no, she wasn't.
20    Q.    Or if not hearing you,
21 understanding you?
22    A.    Yeah.  It was like -- I don't --
23 I can't speak for her, and we didn't discuss

Page 93

1  it. So I don't know if she heard me.
2      Q.    Right. But your impression is
3  what I'm asking for?
4      A.    I have no clue.
5      Q.    Okay. To be more specific, did
6  you have any -- did you yourself recognize any
7  of her verbalizing as being communicating with
8  you?
9          MR. HARP:  Object to the form.
10     Q.    You can answer.
11     A.    After the body stopped shaking?
12     Q.    Right.
13     A.    She just started to blink, and
14 she couldn't -- she tried to talk, but it was
15 mumbling. Like, it took her, you know -- and
16 she still wasn't like coherent or anything
17 when the paramedics got there. And she wasn't
18 talking or -- I mean, like we are talking
19 here.
20     Q.    Correct.
21     A.    She was making noises but not --
22     Q.    But whether she was actually
23 trying to speak or not, you don't know?

Page 94

1      A.    Yeah, I have no clue. I don't
2  know.
3      Q.    Okay. I'm asking this way --
4  I'm asking what I'm about to ask this way
5  because of what you just said.
6      A.    Called it a catatonic state.
7          MR. HARP:  Is there a question
8  pending?
9          MR. HOWARD:  You can tell her.
10         (Whereupon, a discussion was
11 held off the record.)
12     Q.    (By Mr. Howard) I'm asking you
13 this for this reason: When you said something
14 about when the paramedics got there -- and it
15 sounded like to me there was a sequence
16 element here, that she had stopped physically
17 convulsing by the time the paramedics got
18 there.
19     A.    After.
20     Q.    Is that right?
21     A.    After.
22     Q.    Okay. It was after.
23         Other than -- well, other than

Page 95

1  the paramedics arriving, getting the gurney
2  out and so forth, did you see them tend to her
3  body in any way? Like an IV or --
4      A.    That's what I'm thinking about
5  but --
6      Q.    Okay.
7      A.    I don't recall if it happened on
8  the ground or in the -- once they got her up.
9      Q.    Right.
10     A.    I don't remember.
11     Q.    You don't remember an IV either
12 way? I don't know if they put one --
13     A.    I don't know.
14     Q.    But you don't remember one is
15 what I'm getting to?
16     A.    No, I don't remember.
17     Q.    That was the field occasion
18 y'all went on to Children's, correct?
19     A.    Yes.
20     Q.    Did y'all go directly to
21 Children's, or did you go to Gadsden Regional
22 first?
23     A.    Directly to Children's.

Page 96

1      Q.    Okay. Via that same paramedic,
2  or do you know?
3      A.    I don't remember.
4      Q.    Up to that point, Ms. Helm, had
5  you received any instructions or guidelines,
6  things to do if you come up -- if she is
7  seizing?
8      A.    I did. I'm just trying to
9  figure out if it was verbally or with
10 paperwork.
11     Q.    Right, right.
12     A.    You know, like the care --
13     Q.    When they discharge you from the
14 hospital, they give you some papers?
15     A.    I just didn't know which one it
16 is, but I --
17     Q.    A minute ago you said something
18 -- when you got there you cleared people out,
19 let her breathe, and you had said they were
20 saying something about her swallowing her
21 tongue?
22     A.    Yeah. Some woman was saying you
23 need to put a spoon in her mouth. And I said

Page 97

1 everybody just back up.

2     Q.    Right. And at that time, you

3 knew better than that, correct, or did you?

4         MR. HARP: Object to the form.

5     A.    I can't recall.

6     Q.    That's what I'm asking. Did you

7 know if -- did you know that, no, a spoon in

8 the mouth is not a good idea?

9     A.    I believe I did know that.

10     Q.    Well, you didn't put a spoon in

11 her mouth, did you?

12     A.    No.

13     Q.    You didn't make her bite a stick

14 or anything?

15     A.    Correct.

16     Q.    Like I said, you had had no

17 prior experience with seizures before your

18 child started?

19     A.    Correct.

20     Q.    Do you remember if any of those

21 instructions, either verbally or on paper, had

22 mentioned preventing her from hitting her head

23 backwards?

Page 98

1     A.    Yes.

2     Q.    Okay. Are there any other

3 occasions -- were there any other occasions

4 when arrived and the seizure was still

5 ongoing?

6     A.    This concert.

7     Q.    The concert. Okay. But other

8 than concert and field, you don't think there

9 are any others?

10     A.    Correct.

11     Q.    Okay. Now, there were other

12 occasions when she had had a seizure, right?

13     A.    Yes, sir.

14     Q.    Okay. I sort of departed from

15 where I had asked you about the day of -- the

16 day of the concert. And we were at the point

17 where y'all went home from the Southside

18 soccer field?

19     A.    Yes.

20     Q.    Okay. Obviously, she went to

21 the concert later because that's what

22 happened. We know that.

23         So tell me about the time period

Page 99

1 between y'all going home and her going to the

2 concert.

3     A.    What do you want to know?

4     Q.    Well, I didn't know how to ask a

5 better question than to say: What did you do

6 when you got home? Did you put her to bed?

7 Did you go to bed? Did y'all eat?

8     A.    I was already -- still, you

9 know, in bed, you know, healing or whatever.

10 So we got home, and we got her to take a nap.

11     Q.    Okay.

12     A.    To relax.

13     Q.    That was from your surgery,

14 hemorrhoid surgery?

15     A.    Yes, sir.

16     Q.    Do you remember how long before

17 -- this was January 16.

18         Do you remember how long before

19 this you had had that surgery?

20     A.    In December.

21     Q.    Like during the holidays?

22     A.    Yeah.

23     Q.    That's when a lot of people have

Page 100

1 stuff.

2     A.    It was before the holidays.

3     Q.    Okay. As far as you know was

4 your recuperation from that surgery normal,

5 typical?

6         MR. HARP: Object to the form.

7     Q.    Normal and typical are difficult

8 but --

9     A.    I have no clue, but it was

10 horrible.

11     Q.    Well, I'm sure.

12     A.    I wouldn't recommend it.

13     Q.    Who was your physician for that?

14     A.    One of the Newman brothers.

15     Q.    And was there another doctor who

16 sent you to the Newmans to actually do the

17 surgery, a gastroenterologist or --

18     A.    I don't recall. I don't recall

19 how they were referred to me.

20     Q.    I guess it could have been from

21 QHC. You don't how you got to the Newmans?

22     A.    I don't recall really.

23     Q.    The reason I ask that is

Page 101

1  typically they are cutters, but they are
2  usually cutters when somebody sends -- I mean,
3  an internal problem, I would not think they
4  were your number one doctor for your internal
5  problem. They are just cutters. So I'm
6  asking you if you know who the number one
7  doctor was?
8      A.   No.
9      Q.   Okay. Did Newman -- whoever
10 Newman prescribe you medication following that
11 surgery?
12     A.   Yes.
13     Q.   Do you remember what it was?
14     A.   It was a pain medicine.
15     Q.   Do you remember whether you were
16 still taking that pain medicine on the night
17 of the concert?
18     A.   I don't believe so.
19     Q.   During the time -- during that
20 time period, which would have been, let's say,
21 the Christmas season of '14 -- November,
22 December, and early January '15, were you
23 doing your housekeeping business?

Page 102

1      A.   No.
2      Q.   During that time were you
3  working at any of the other locations you told
4  me about?
5      A.   No.
6      Q.   So in other words, you didn't
7  have to take off from work for the surgery?
8      A.   No.
9      Q.   When did you first become aware
10 that TDH intended to go to that concert?
11     A.   Say that again.
12     Q.   Yeah. When did you first become
13 aware that TDH had the intention of going to
14 the -- is it Christopher Gates, Chris Gates?
15         MR. STUBBS: Kevin Gates.
16     Q.   Kevin Gates concert?
17     A.   I don't know exactly the time.
18 Just later we discussed it after she rested.
19     Q.   Okay. Did you know who Kevin
20 Gates was?
21     A.   No.
22     Q.   Were you made aware of the
23 general details, like where it was, what time

Page 103

1  it was going to be and so forth?
2      A.   Yes.
3      Q.   Did you give your permission for
4  her to go?
5      A.   Yes.
6      Q.   Were you aware of how she was
7  been transported to it?
8      A.   Yes.
9      Q.   How was that?
10     A.   With her friends.
11     Q.   Was it ____, or do you remember?
12 I don't know.
13         MR. HARP: Object to the form.
14     Q.   Do you know who the friends
15 were?
16     A.   Yes.
17     Q.   Who were they?
18     A.   ____ and ____
19     Q.   Was ____'s boyfriend?
20     A.   Yes.
21     Q.   Did ____ -- to your knowledge,
22 did ____ and ____ know that she had a
23 seizure earlier that day?

Page 104

1      A.   Yes.
2      Q.   And was the plan at that time
3  for TDH to come home after the concert?
4      A.   Yes.
5      Q.   Did you have any concern about
6  the environment of the concert and its effect
7  on TDH?
8      A.   Explain that.
9      Q.   Well, did you know Kevin Gates
10 was a rapper?
11     A.   No.
12     Q.   Did you expect for -- you knew
13 this was going to be at Center Stages?
14     A.   Yes.
15     Q.   Have you ever been to a program
16 at Center Stages?
17     A.   I have been there one time.
18     Q.   Was it for a musical
19 performance?
20     A.   I can't remember if it was
21 church -- yeah, I don't know.
22     Q.   Did you consider that the music
23 would be being played very loudly at the

Page 105

1  concert?
2      MR. HARP:  Object to the form.
3      Q.    You can answer.
4      A.    I would assume all concerts are
5  loud.
6      MR. HARP:  I don't want you to
7  assume.  Do you know?
8      Q.    Have you been to concerts
9  before?
10      A.    I have been to a concert, and it
11  was loud.
12      Q.    You were aware of how big Center
13  Stages was?
14      A.    No.
15      Q.    You knew it wasn't a stadium?
16      A.    Yes.
17      Q.    And you knew it was an enclosed
18  hall, music hall?
19      A.    I don't know what that means.
20  What you consider a music hall either.
21      Q.    Sure.  You had been there
22  before?
23      A.    Yes.

Page 106

1      Q.    But you don't remember for what?
2      A.    I had been there before, but I
3  don't remember if it was before they turned it
4  into Center Stages, because it was something
5  else, right?  And I'm just kind of like -- I
6  can't remember exactly.
7      Q.    Sure.  Fair enough.
8      A.    They had remodeling done so I
9  don't remember.
10      Q.    You had been in the building
11  before?
12      A.    Correct.
13      Q.    Okay.  Did it concern you that
14  there would be flashing lights?
15      MR. HARP:  Object to the form.
16      Q.    You can answer.
17      A.    That didn't -- I didn't think
18  about that.
19      Q.    Did her going to the concert
20  give you any concern about her having a
21  seizure at the concert?
22      A.    As a mother, I was concerned
23  because we didn't know what was triggering --

Page 107

1  you know, I didn't understand what -- there
2  was -- I didn't understand why she was having
3  them.  You know what I mean?
4      Q.    Sure.  Before you gave your
5  permission for her to go, was there any
6  argument between you about whether she would
7  go or not?
8      A.    No.
9      Q.    Or about -- in other words, did
10  she have to argue you into it?
11      MR. HARP:  Object to the form.
12      Q.    You can answer.
13      A.    An argument, no, but we did
14  discuss it.  We had one back and forth about,
15  you know, my concerns and I'm -- you know, we
16  talked it out.
17      Q.    Okay.  Is it fair to say that
18  there was initial disagreement as to her
19  going?
20      A.    I don't want to say
21  disagreement.  It was just I had concerns
22  about -- yeah, I wanted to make sure she was
23  okay.

Page 108

1      Q.    After they departed, what did
2  you do?
3      A.    Stayed in the bed.
4      Q.    Okay.  And did you stay in bed
5  until at some point you were made aware of
6  what was going on at Center Stages?
7      A.    Yes, sir.
8      Q.    And what made you aware of what
9  was going on at Center Stages?
10      A.    I got a phone call.
11      Q.    Do you know from whom?
12      A.    I do not remember.
13      Q.    On your land line or on a cell
14  phone?
15      A.    On my cell phone.
16      Q.    Do you know whether it was
17  someone that you would expect to have your
18  cell phone number, like your daughter or
19  somebody, or was it a stranger?
20      A.    That wasn't even -- I didn't
21  think about that.
22      Q.    I understand.
23      A.    I just got a phone call, she's

Page 109

1  having a seizure at the concert, can I just --
2  I didn't think twice about.
3      Q.   In any event, you don't know who
4  it was?
5      A.   I don't recall.
6      Q.   Okay.  That's fair enough.
7          What if anything did you do
8  next?
9      A.   Got my keys and my slippers and
10 went and got in the car and went across the
11 highway.
12     Q.   How were you dressed at the
13 time?
14     A.   Pajamas.
15     Q.   Was the weather cold?
16         Let me back up.  Did you have to
17 put on a coat?
18     A.   I did not have a coat.
19     Q.   Do you have any recollection
20 from that evening of the weather being cold or
21 you being cold?  Does that stand out in your
22 mind at all?
23     A.   That's not even a thought of

Page 110

1  mine.
2      Q.   I understand.  Palace Avenue is
3  not very far from Center Stages, correct?
4      A.   Correct.
5      Q.   Yeah.  Okay.  When you got
6  there, where did you park and what did you see
7  when you walked up?
8      A.   I pulled over to the right,
9  right before Center Stage in the front.
10     Q.   Right.
11     A.   And proceeded to walk to the
12 front, to the entrance.  And she was -- I saw
13 her at a distance.
14     Q.   Right.
15     A.   And she was having a seizure on
16 the floor.
17     Q.   Could you see that -- well, let
18 me back up.  Was there a crowd of people
19 around her?
20     A.   Yes.  Not around her.  A crowd
21 -- I wasn't -- it was just a lot of people.
22     Q.   Sure.  Here is why I'm asking:
23 I can imagine seeing -- coming up on a

Page 111

1  situation and seeing a definite group of
2  people and thinking to myself that must be my
3  daughter because I know she is having a
4  seizure here and -- or were you able to
5  actually see her body?
6          MR. HARP:  Object to the form.
7      Q.   You can answer.
8      A.   First, all I -- when I came
9  towards the lobby, I just saw a crowd of
10 officers on top of her and her seizing.
11     Q.   Could you -- I know that we know
12 now that was definitely her, right?
13     A.   Uh-huh (indicating yes).
14         MR. HARP:  Yes?
15         THE WITNESS:  Yes.  I'm sorry.
16         MR. HARP:  That's okay.
17     Q.   And it's very logical to
18 conclude that if somebody has told me my
19 daughter is having a seizure and I come and
20 see officers holding somebody on the ground
21 that that's my daughter.  Do you follow me?
22     A.   Yeah, I guess.
23     Q.   Do you follow what I'm saying,

Page 112

1  anyway?
2      A.   Yeah, I can see that.
3      Q.   Is that what you concluded, or
4  were you able to actually see that, yes,
5  that's my daughter?
6      A.   I could tell it was my daughter
7  because --
8      Q.   Right.
9      A.   I know what she looks like.
10     Q.   Okay.
11     A.   Her feet, her -- what she was
12 wearing.
13     Q.   Sure.
14     A.   And, yeah.
15     Q.   Okay.  So, I mean, there was a
16 visible identification in your mind, oh, yeah,
17 that is my daughter?
18     A.   Yeah.
19     Q.   Okay.
20     A.   Her feet.
21     Q.   What was happening with her?
22     A.   I saw her legs and feet moving.
23     Q.   Moving, like a convulsing,

Page 113

1 seizing moving?
2     A.     Yes, an unnatural way, you know,
3 like -- say that again?
4     Q.     I think you answered.  And there
5 were -- did you see men holding on to her?
6     A.     Yeah, holding her down.
7     Q.     Holding her down?
8     A.     Like physically on top of her.
9 They weren't holding her like (indicating).
10 They were on -- actually, body, knees in her
11 body.
12     Q.     In such a way as to be using
13 their weight to push her downward?
14     A.     Correct, correct.
15     Q.     Okay.  Do you know how many
16 there were?
17     A.     Yes.
18     Q.     How many?
19     A.     Two.  One on each leg.
20     Q.     Okay.
21     A.     In the middle, on each side, and
22 each had her like this (indicating).
23     Q.     Arms outward?

Page 114

1     A.     Yes, sir.  And on her neck.
2     Q.     Okay.  Two on legs, two on arms,
3 one at neck?
4     A.     Then two in the middle too.
5 Like, they were holding her body down
6 (indicating).
7     Q.     Okay.  By count, I'm counting
8 seven.  Is that accurate?
9         MR. HARP:  Object to the form.
10     A.     Yes.  I'm sorry.
11     Q.     Could you hear her say anything
12 or trying to say anything?
13         MR. HARP:  Object to the form.
14     A.     Like, she wasn't talking.  I
15 just heard noises, and I heard them yelling --
16 the officers were yelling so loud.  You know,
17 they were yelling.
18     Q.     Right.
19     A.     Telling her to -- I don't know
20 what they were -- they were just yelling.  And
21 I -- I didn't get that far in, you know.
22     Q.     Right.
23     A.     Because they knocked me to the

Page 115

1 ground so quickly.
2     Q.     Right.  And that's -- in other
3 words, you were sort of -- your view of the
4 situation -- your observing of it was
5 interrupted?
6     A.     Yes.
7         MR. HARP:  Object to the form.
8     Q.     And what was it interrupted by?
9     A.     An officer knocked me to the
10 ground.
11     Q.     Did you see it coming?
12     A.     No.
13     Q.     Do you have any recollection
14 that you had seen that -- the person who
15 knocked you down before being knocked down?
16     A.     No.  I was focused, looking at
17 my daughter.
18     Q.     Sure.  Okay.  Other than the
19 officers pinning her to the ground -- is that
20 fair?  Well, holding -- pushing her down on
21 the ground is what you said a moment ago.  Can
22 we use that term?
23     A.     Yeah.

Page 116

1     Q.     Okay.  Other than that and other
2 than hearing those officers loudly yelling at
3 her, did you see them do anything else before
4 you got knocked to the ground?
5     A.     She -- I called -- I said that's
6 my daughter, she's having a seizure.  And when
7 I got to the word seizure, that's when they --
8 the officer knocked me down.
9     Q.     Okay.
10     A.     And when I -- they pulled my
11 arms like this (indicating).
12     Q.     Right.
13     A.     And my face went to the ground,
14 and I was this way (indicating).  And I saw
15 her --
16     Q.     Your head was turned away?
17     A.     Towards that direction.
18     Q.     Towards that direction?
19     A.     Yeah.  But it happened so
20 quickly.  It was very fast.  And I saw her
21 like attempt to kind of --
22     Q.     Raise up?
23     A.     Like her neck -- like trying to

1  do this (indicating), because whatever -- and
2  then the officer tased her right in the
3  stomach. And then by that time I wasn't
4  looking anymore, and then he did it again.
5      Q.   How do you know he did it again?
6      A.   Because I heard it.
7      Q.   Okay.
8      A.   And she was out. Like, she was
9  out, unconscious. And then he did it again.
10     Q.   Were you off the ground yet when
11 you heard these tasings?
12     A.   The first one -- I want to say
13 by the time the third one was, yes, maybe.
14 Yeah, I think so.
15     Q.   Yes, maybe or yes?
16     A.   Yes.
17     Q.   Okay.
18          MR. HARP: So is your answer
19 yes?
20          THE WITNESS: Yes.
21     Q.   After you heard the third
22 tasing, you said you were off the ground by
23 that time, you think, correct?

1          MR. HARP: She didn't know. She
2  was qualifying that answer.
3          MR. HOWARD: She is now with the
4  facial features, she is qualifying.
5      A.   What was the question?
6      Q.   The question is: Are you sure
7  you were off the ground when you heard the
8  third tasing?
9      A.   I don't recall.
10     Q.   Fair enough. No problem.
11          Now, in any event, after you
12 heard tasing number three, did you hear or see
13 anything else regarding your daughter?
14     A.   I sat -- they sat me on the
15 ground so I could see, but I could not see
16 what was happening.
17     Q.   Okay.
18     A.   Like -- yeah.
19     Q.   I mean, other than a group of
20 people over there next to her?
21     A.   All I could see is the police on
22 top of her.
23     Q.   Okay.

1      A.   That's all I could see the whole
2  time.
3      Q.   Including when you were -- when
4  they had sat you on the ground handcuffed?
5      A.   Yeah. They were still on top of
6  her.
7      Q.   Okay. Then do you know how long
8  it was you were sitting on the ground?
9      A.   I had urinated on myself, and
10 they were -- I was just trying to be -- what
11 they needed.
12     Q.   When did you urinate on
13 yourself?
14     A.   When he tased me.
15     Q.   What part of the sequence of
16 events that we have just talked about did the
17 tasing happen?
18     A.   When they had me on the ground
19 and my hands -- they tased me in the back
20 (indicating).
21     Q.   I understood that you got
22 knocked to the ground when you were on your
23 way to where your daughter was, right?

1      A.   Uh-huh (indicating yes).
2      Q.   And were you on the ground when
3  you were tased?
4      A.   Yes.
5      Q.   Where on your body did they
6  apply the taser?
7      A.   On my lower back (indicating).
8      Q.   Lower back to the right side or
9  just --
10     A.   Just lower back area
11 (indicating).
12     Q.   Were you tased once?
13     A.   Yes.
14     Q.   And that's it?
15     A.   Yes.
16     Q.   Not that that's not enough, but
17 that's it?
18     A.   Yes.
19     Q.   And do you know whether you were
20 cuffed yet by the time they tased you?
21     A.   Yes.
22     Q.   You say you were?
23     A.   I believe so, yes.

1    Q.    Were the officers saying
2 anything to you, or did they say anything to
3 you after you were knocked to the ground?
4    A.    Yes.
5    Q.    I'm assuming you became first
6 conscious of an officer on the way to the
7 ground, right?  I mean, you weren't aware --
8    A.    It was unexpected.  It was a
9 medical situation, yeah.
10    Q.    Right.  In other words, you
11 didn't know you were about to be tackled?
12    A.    No.
13    Q.    And you didn't hear anybody --
14 did you hear anybody try to say anything to
15 you before you got tackled?
16    A.    No.
17    Q.    Do you recall anybody -- any
18 officer specifically saying stop, no -- in
19 other words, telling you not to go over where
20 your daughter was?
21        MR. HARP:  Object to the form.
22    Q.    That's a bad question, but you
23 can answer it if you understand it.

1    A.    Say it again.
2    Q.    You were on your way to see your
3 daughter, right?
4    A.    Yes.
5    Q.    And do you hear anyone tell you
6 not to do that?
7    A.    No.
8    Q.    Or to stop where you are?
9    A.    No.
10    Q.    Anything like that?
11    A.    No.
12    Q.    And probably an obvious
13 question, but did you -- other than telling
14 them that was your daughter and she's having a
15 seizure -- was something you said, correct?
16    A.    Yes.
17    Q.    And you were on your way to do
18 that?
19    A.    Yes.
20    Q.    I mean, you were on your way to
21 your daughter when you said that?
22    A.    Yes.
23    Q.    And that was before you got

1 knocked down?
2    A.    Yes.
3    Q.    Or was it?
4    A.    It happened -- like, I said
5 that's my daughter, she's having a -- like I
6 said seizure, and that's exactly when I got --
7 they caught me off guard and --
8    Q.    Seizure is coming out -- you
9 just finished saying the word seizure?
10    A.    Yeah.
11    Q.    And you are slammed to the
12 ground?
13    A.    That I can recall, yes.
14    Q.    After you were on the ground did
15 you say anything further to the officers?
16    A.    I don't think so, no.
17    Q.    Did you hear any officer issue
18 you any commands?
19    A.    I just -- I remember one -- they
20 were behind me, but one officer said get her.
21 Whatever that meant.
22    Q.    Was that before or after you
23 were tased?

1    A.    Before.
2    Q.    Specifically, do you remember an
3 officer ordering you to be still?
4        MR. HARP:  Before or after she
5 was tased?
6        MR. HOWARD:  Before she was
7 tased.
8    A.    No.
9    Q.    Specifically, do you recall an
10 officer ordering you to not resist before you
11 were tased?
12    A.    No.
13    Q.    Specifically, do you recall an
14 officer telling you to stop struggling before
15 you were tased?
16    A.    No, no.
17    Q.    Specifically, do you recall an
18 officer ordering you to give us your arms
19 before you were tased?
20    A.    No, no.  They had my arms.  I
21 remember being asked to sit up.
22    Q.    Were you still on your belly at
23 the time you were asked to sit up?

Page 125

1    A.    No.

2    Q.    Were you on your back?

3    A.    Yes.

4    Q.    So somehow you had, what, gotten

5 rolled over to your back?

6         MR. HARP:  Object to the form.

7    Q.    You said before you were on the

8 ground looking with your head going to one

9 side, right?

10    A.    Oh, yes.

11    Q.    And somehow from there you got

12 to the point of being on your back?

13    A.    They pulled me across the

14 courtyard and put me down on the ground, and I

15 remember asking to sit up.

16    Q.    Okay.

17    A.    He told me to.

18    Q.    What did he tell you?

19    A.    Sit the F-ing down.  No --

20    Q.    Anything else that he told you?

21    A.    (Witness shakes head

22 negatively.)

23    Q.    Is that a no?

Page 126

1    A.    No.

2    Q.    While I'm at that point, any

3 other words exchanged between you and any

4 officers that you hadn't told me about, from

5 getting knocked down to getting put outside?

6         MR. HARP:  Object to the form.

7 She never said she was inside.

8    Q.    Well, were you ever inside?

9    A.    No.

10    Q.    When I say inside, I mean in a

11 roofed area?

12    A.    No.

13    Q.    Was your daughter in a roofed

14 area?

15    A.    Yes.

16    Q.    So you never opened the door to

17 enter the lobby?

18    A.    The doors were open.

19    Q.    Okay.  Did you cross the

20 threshold?

21    A.    No.

22    Q.    So you're seeing all this

23 activity with your daughter through the

Page 127

1 windows or open doors of Center Stages?

2         MR. HARP:  Object to the form.

3    Q.    You can answer.

4    A.    There was nothing there.  It

5 was -- the doors were -- there was no doors or

6 anything there.  It was just an opening, the

7 entrance -- there was no door there.

8    Q.    Okay.  And it's been a while

9 since I've been down.

10         So there were actually -- you

11 didn't actually pass through a doorway?

12    A.    No.

13    Q.    Between you and your daughter?

14    A.    No.

15    Q.    Okay.  I guess it's maybe like a

16 carport where it's roofed but not -- no doors.

17 Does that sound right?

18    A.    The front of that place is all

19 glass doors.

20    Q.    Right.

21    A.    Like a movie theater.  You know

22 what I mean?

23    Q.    Right.

Page 128

1    A.    And the doors were open, two

2 double doors were open.  And she was inside

3 the lobby on the ground on the left.

4    Q.    Okay.

5    A.    And I approached and got knocked

6 before I got to the entrance.

7    Q.    Okay.  So when they dragged you

8 somewhere, was it further out?

9    A.    It was a concrete retaining

10 wall.

11    Q.    Wall, retaining wall?

12    A.    They pulled me to that point.

13    Q.    Okay.  Now, before the proper

14 objection, I had asked you if there were any

15 other words exchanged between you and

16 officers, any officers, from the time you got

17 knocked down until the time they took you to

18 the retaining wall and you asked to be sat up

19 and they said what you said they said.

20 Anything else?

21    A.    I don't recall.

22    Q.    Okay.  And at that point, other

23 than seeing the officers still over on your

Page 129

1  daughter, did you see anything else with your
2  daughter?
3      A.    (Witness shakes head
4  negatively.)
5      Q.    No?
6      A.    No.
7            MR. HOWARD:  Let's do lunch.
8  This is a good cutoff.
9            (Whereupon, a brief recess was
10 taken.)
11     Q.    (By Mr. Howard) How many --
12 well, do you know the person who tackled you?
13     A.    No.
14     Q.    Okay.  Can you describe what
15 they were wearing?
16     A.    Police uniform.
17     Q.    Okay.  And by police uniform, do
18 we mean someone -- the classic patrolman
19 uniform with all the -- you know, black or
20 dark with a name plate and typical cop-looking
21 stuff?
22           MR. HARP:  Object to the form.
23     Q.    You can answer.

Page 130

1      A.    The officer that arrested me had
2  a uniform on.  The one that knocked me to the
3  ground, I did not see him from the side.
4      Q.    Fair enough.
5      A.    He was behind me.  I know he had
6  dark clothes on, but I'm unsure whether it was
7  a uniform or just dark clothing.
8      Q.    But you're -- you're talking in
9  terms of two persons -- two officers handling
10 you?
11     A.    Yeah, it was two officers for
12 sure, yeah.
13     Q.    Right.  And have you come to
14 know who they are?
15     A.    Yes.
16     Q.    By virtue of the lawsuit?
17     A.    No.  If you show me a picture.
18     Q.    Okay.  You didn't -- did you
19 otherwise know those guys beforehand?
20     A.    No.
21     Q.    Did you know any Rainbow City
22 officers before this happened?
23     A.    No, I don't have a personal --

Page 131

1  no.
2      Q.    And besides knowing them, did
3  you recognize them in any way, the guy who --
4  in uniform or the other one who was in dark
5  clothes?  Did you recognize him in any --
6            MR. HARP:  Wait.  Did you say
7  besides knowing them?
8            MR. HOWARD:  Well, I said -- I
9  meant besides knowing them personally.
10     Q.    Was there any recognition to you
11 that you had seen either of these guys
12 whenever?
13           MR. HARP:  I thought she said
14 she didn't know them personally.
15     Q.    Well, you can not know somebody
16 and know who they are, is what I'm asking.
17 But that's a no?
18     A.    No.
19     Q.    Okay.  I know who a lot of
20 people are.  That doesn't mean I know them.
21 That's why I'm asking.
22           MR. HARP:  I wasn't quibbling
23 with you over it.  I was objecting to the form

Page 132

1  of it.
2      Q.    Okay.  Are you sitting now --
3  where we are in the sequence of events, are
4  you sitting with your back to the retaining
5  wall?
6      A.    Yes.
7      Q.    Or are you sitting on it?
8      A.    Sitting with my back to it.
9      Q.    Okay.  With your rear end on the
10 ground?
11     A.    Yeah.
12     Q.    Okay.  What happens next?
13     A.    I'm kind of -- asked to sit up.
14 So I must have been laying on my side.
15     Q.    Right.
16     A.    Because I wanted to sit.  But
17 after that, they just lifted me up to the wall
18 and took me to the police car.
19     Q.    All right.  Two of them or one
20 of them?
21     A.    I don't recall how I got up over
22 the --
23     Q.    Right.

Page 133

1      A.     If it was one or two, but one
2  walked me to the car.
3      Q.     Okay.  Anything said between you
4  and the one who walked you to the car?
5      A.     I don't recall.
6      Q.     And was it the uniformed guy?
7      A.     Yes.
8      Q.     Did he put you in the police
9  car?
10      A.     Yes.
11      Q.     And you were taken eventually --
12  I mean, you were taken to the Etowah County
13  jail?
14      A.     Yes.
15      Q.     On the way was there any
16  discussion between you and the officer?
17      A.     I don't recall.  I was saturated
18  in urine and the seat was not like a normal
19  seat.  I didn't know what kind of seat it was.
20  It was like a hard seat, like there was no --
21  like something you would see in a park.
22      Q.     Oh, more of a wheel bench --
23      A.     Like a fiberglass kind of seat.

Page 134

1      Q.     Okay.
2      A.     And I was -- sliding everywhere.
3      Q.     Because of your wet pants, wet
4  pajama pants?
5      A.     Yeah, yeah.  So I don't -- yeah,
6  that was --
7      Q.     Otherwise, when you first got
8  put in the car, did it appear to be a regular
9  car, like a black and white patrol car?
10      A.     Yeah, yes, sir.
11      Q.     What time -- excuse me.  That's
12  not the question.
13             What occurred when you got to
14  the Etowah County jail?
15      A.     We pulled in and he came around
16  and got me out and walked me into some room
17  with other -- a lot of other people.  It was
18  pretty -- a good many people in there.
19      Q.     Right.  Did you go through a
20  booking process?
21      A.     I was the very last person.
22  Like I said, I was there for hours, hours.
23  Everybody even that came after me got

Page 135

1  processed before me.  I asked the lady maybe
2  twice -- or just once because they were --
3  told me to be quiet, told me to shut the fuck
4  up.
5      Q.     Who told you that?
6      A.     The officer that was standing
7  there.
8      Q.     Like behind the desk?
9      A.     I can't recall if inside that
10  room if there was a desk or if it was glass
11  and -- because I just was sitting down being
12  quiet.
13      Q.     Sure.
14      A.     But I wanted to find -- ask them
15  to call the hospital to find out, you know,
16  what was going on with my daughter.
17      Q.     Okay.
18      A.     And they told me to -- the lady
19  that answered me -- the man said shut the fuck
20  up.  And then the officer -- which I don't
21  know his name -- he told me that, you know, I
22  basically deserved it because I let my kids
23  run wild.

Page 136

1      Q.     Was the -- when you say the
2  officer, was that the one who transported you?
3      A.     I don't recall because there was
4  a lot of people in there and a lot of officers
5  like in the same small space.
6      Q.     Right.  And a lot of them are
7  similarly dressed, are they not?
8             MR. HARP:  Object to the form.
9      Q.     Are there similarly-dressed cops
10  in there?
11      A.     I only saw uniformed police
12  officers.
13      Q.     That's what I'm saying.  I mean,
14  as to what jurisdiction, they may have been
15  Gadsden, Rainbow City, Hokes Bluff or
16  whatever.  It's hard to tell the difference
17  between them.
18             MR. HARP:  Object to the form.
19      Q.     Is that fair to say?
20      A.     I didn't look for that.
21      Q.     Okay.  And that's what I'm
22  trying to get to, is:  The one who told you
23  about deserving it for letting your kids run

1  wild, you don't know who that was?  Is that
2  no?
3      A.    I'm sorry.  No.
4      Q.    And the one who told you to shut
5  the fuck up, was that a deputy?
6      A.    I don't know the difference.
7      Q.    They typically dress in brown
8  versus the cops?
9      A.    I don't recall.
10     Q.    Okay.  So you don't know if that
11 was a jail person or just some law enforcement
12 person?
13         MR. HARP:  Object to the form.
14     A.    I don't know.
15     Q.    And one of the people you talked
16 to was a lady?
17     A.    I didn't speak to anybody
18 individually.
19     Q.    Yeah.
20     A.    It was a request.  And, yeah,
21 she was the dispatcher.
22     Q.    Okay.
23     A.    In front of me.

1      Q.    Was the request made to --
2  directly to you, or was it made to everybody
3  in there?
4      A.    She answered my question.
5      Q.    Okay.  At some point your
6  waiting period ended, right?
7      A.    Yeah, after they processed
8  everyone, whatever that means -- going from
9  that room.
10     Q.    Right.
11     A.    To a cell.
12     Q.    Right.
13     A.    And I went in there with two
14 other females.  They gave us this piece of
15 paper so we could use the phone.  And my piece
16 of paper -- the code on it would not go
17 through, like the phone would not operate.
18 And so I asked them numerous times -- you
19 know, tapped on the thing, like going like
20 this, trying to get their attention, telling
21 them that -- speaking through the door that my
22 -- there is something wrong with the phone
23 (indicating).

1      Q.    Right.
2      A.    And he just told me to keep
3  trying.  So I did for a while, a long while.
4  And then I was like (indicating), could you --
5  and he said let me see your paper.  And I
6  showed him my paper.  And they gave me
7  something incorrect.
8      Q.    Did they correct that mistake?
9      A.    They did.
10     Q.    And you were allowed to make a
11 phone call?
12     A.    Then the phone worked, yes.
13     Q.    Then the phone did work?
14     A.    Yes.
15     Q.    Who did you call?
16     A.    The bonding company, I think.  I
17 can't remember who I called.
18     Q.    Okay.  At some point during the
19 process had you been made aware that you would
20 need to have a bond?
21     A.    Yes.
22     Q.    Was there a monetary amount to
23 it?

1      A.    Yes.
2      Q.    Do you know how much?
3      A.    No.
4      Q.    Okay.  Did you have to pay a
5  bondsman?
6      A.    No.
7      Q.    Okay.  Were you allowed to sign
8  your own bond like on your own recognizance?
9      A.    No.  I had to be bonded out, I
10 think, if I remember correctly.
11     Q.    Sometimes a homeowner, for
12 example, might be able to be a homeowner so
13 they will let you go because they know you
14 have got a home?
15     A.    That was not the circumstances.
16     Q.    That was not the case.  Okay.
17 When did you leave the jail?
18     A.    A time?
19     Q.    Yeah, as best you can.
20     A.    If I had to guess, between 4:00
21 and 5:00.
22     Q.    And I will help you here.  was
23 it daylight yet?

1    A.    It was like early dawn. You

2  know, you could tell it was -- the night was

3  over.

4    Q.    You could tell night was over

5  and daybreak was coming?

6    A.    It was coming.

7    Q.    Right in that period of time?

8    A.    Yeah, somewhere, yeah.

9    Q.    And how did you get home?

10    A.    My friend. But when I came out,

11  it was my daughter, my son, my friend and my

12  daughter's husband was there to pick me up.

13    Q.    I'm gathering from that you had

14  called a friend about coming to get you?

15    A.    I'm not sure if I called my

16  friend or if I called one of my kids. I have

17  two adult children. So I don't remember

18  exactly because they were all there. So I'm

19  kind of confused on how that happened.

20    Q.    Right. That would have been

21  ███████ or ████████?

22    A.    Yeah.

23    Q.    Your two adult children?

1    A.    Yes.

2    Q.    Who is the friend?

3    A.    Jaymon Palmer.

4    Q.    Okay. To your knowledge had

5  Jaymon Palmer been to the concert that night?

6    A.    I saw him at the concert.

7    Q.    But you had not called him to

8  come to the concert?

9    A.    No. I had no -- I had no idea.

10    Q.    Best you knew, he was already

11  there?

12    A.    I didn't know he was going to

13  the -- I hadn't spoke to him in -- I didn't

14  know -- I had no clue.

15    Q.    That what I'm saying. You said

16  you saw him at the concert?

17    A.    Yes.

18    Q.    At the location or outside or

19  inside Center Stages?

20    A.    It was outside when I was there.

21    Q.    Fair enough. Do you have any

22  reason to believe that he was called to that

23  scene because of what was happening with you?

1    A.    No.

2    Q.    Okay.

3    A.    I don't.

4    Q.    What I'm hearing from you is --

5  as far as you know, he was there and you

6  assume he went to the concert?

7    A.    Correct.

8    Q.    Okay. And it may have been

9  Jaymon or one of your two adult children that

10  you called to transport you away from the

11  jail?

12    A.    Yeah. I'm not -- yes.

13    Q.    Not quite sure which one?

14    A.    Correct.

15    Q.    And then they all three showed

16  up along with Nick? Is that the husband?

17    A.    My son-in-law, my daughter and

18  my son and Jaymon were all there outside the

19  gate waiting.

20    Q.    Your daughter ████?

21    A.    Correct.

22    Q.    Okay. Is Nick sometimes called

23  Nicholas?

1    A.    No.

2    Q.    Is that -- okay.

3    If it were ████ or ████ that

4  you had called -- if it were them, do you know

5  how it was that Jaymon would also have come?

6    A.    When I was arrested and put in

7  the vehicle, Jaymon -- that's when I saw

8  Jaymon. He came to the window and was telling

9  the police officer that I was her mother.

10    Q.    Her mother?

11    A.    Yes. And that my daughter was

12  having a seizure. She had a medical

13  condition. And he was trying to tell the

14  police officer -- you know, fill them in. And

15  that's when I saw him there. So he was aware

16  that I was being arrested.

17    Q.    Okay.

18    A.    But I didn't ask him or call

19  him.

20    Q.    Sure.

21    A.    Yeah.

22    Q.    Have you talked with him since

23  the incident about the incident?

Page 145

1   A.   No.
2   Q.   Do you have any reason to
3 believe that he came to the jail and waited
4 for hours rather than coming at the time when
5 you were to be released?
6   A.   I have no idea how long any of
7 them waited.
8   Q.   Would ████ or ████ have known
9 Jaymon well enough to call him?
10      MR. HARP:  Object to the form.
11  Q.   If you know?
12  A.   I don't know.
13  Q.   Okay.  I mean, I don't know how
14 close a friend you're saying.
15      Is he a friend that your
16 daughter and son would know to call?
17  A.   No.
18      MR. HARP:  Close friend of who?
19      MR. HOWARD:  Of her, yeah.
20  Q.   That's what I'm getting to.  If
21 you didn't call Jaymon, do you know how it was
22 he came there?
23      MR. HARP:  I think she has

Page 146

1 already said three times that she doesn't
2 know.
3   Q.   You don't know.  Okay.
4      Where did you go after being --
5 after being released?
6   A.   Home.
7   Q.   When did you next -- what did
8 you do when you got home?
9   A.   I really don't recall.
10  Q.   Okay.  When did you next see or
11 hear about your daughter?
12  A.   Sunday.
13  Q.   Okay.  When you saw Jaymon and
14 ████ and A████, did they fill you in about
15 your daughter in any way?
16  A.   ████ did.
17  Q.   Okay.  He was aware of what had
18 gone on with TDH after you left?  I mean, he
19 knew she was alive and so forth, right?
20  A.   Yes.
21  Q.   Okay.  Do you know whether he
22 had accompanied TDH or met her at the
23 hospital?

Page 147

1   A.   I don't know.
2   Q.   And when you said you either --
3 on Sunday did you have contact with TDH?
4   A.   Yes.
5   Q.   Okay.  Face to face?
6   A.   Yes.
7   Q.   Okay.  So she came home, or did
8 you go see her?
9   A.   I went to her.
10  Q.   And where was she?
11  A.   At her friend's father's house.
12  Q.   ████'s dad's house?
13  A.   Uh-huh (indicating yes), yes.
14  Q.   Besides ████ telling you, you
15 know, that morning that she was okay and
16 filling you in, did you speak with anybody
17 else on Saturday about what had happened with
18 your daughter?
19  A.   No, that I recall.
20  Q.   I assume at some point after
21 your long night you got some sleep, correct?
22  A.   Yes.
23  Q.   At what point -- did you seek

Page 148

1 any -- I sort of asked you this earlier.
2      Did you seek any medical
3 treatment following this?
4   A.   No.
5   Q.   Were there other people at home
6 with you on that Saturday?
7   A.   I don't recall.
8   Q.   Do you know when TDH next came
9 home?
10  A.   Monday.
11  Q.   Did you take TDH to any follow-
12 up medical care?
13  A.   Follow -- repeat that.
14  Q.   Yeah.  And the reason I'm asking
15 is --
16  A.   Follow up from where?
17  Q.   From -- okay.  Aside from a
18 normal every three month appointment with
19 Dr. Russell, for example, aside from that, did
20 you take her to any follow-up care or any care
21 that was brought on -- any medical treatment
22 that was brought on by this incident?
23  A.   I'm still not sure about the

Page 149

1  question.  I'm sorry.
2      Q.      Yeah.  Do you know whether TDH
3  received any medical treatment after -- we
4  understand she went to the hospital that
5  night.
6          After that did you take her --
7  or did she have any medical treatment?
8          MR. HARP:  Object to the form.
9      Q.    Did she have any medical
10 treatment after that?
11     A.    Yes.
12     Q.    Who and what?
13     A.    I'm not sure about the -- what
14 doctor she saw first.
15     Q.    Okay.
16     A.    But she saw the neurologist.
17     Q.    By now Dr. Russell?
18     A.    Yeah.
19     Q.    No longer Bogdanova?
20     A.    Correct.
21     Q.    Okay.
22     A.    Because she was having a hard
23 time.  Anyway, Dr. -- I remember seeing

Page 150

1  Dr. Russell and Dr. Kelly.
2      Q.    I mean, I'm assuming if she
3  went, you took her?
4      A.    Yes.
5      Q.    Is that fair?
6      A.    Yes.
7      Q.    Okay.  Do you know how long it
8  was before she tried to go back to school?
9      A.    I don't remember exactly.
10     Q.    Do you remember at some point
11 her attempt to go back to school?
12     A.    Yes, uh-huh (indicating yes).
13     Q.    Tell me about what you remember
14 about leading up to that and what happened and
15 going to school and --
16     A.    She was pretty wore out and --
17 physically and mentally, you know, she was
18 exhausted.
19     Q.    Right.
20     A.    So I don't remember exactly how
21 long.  Maybe -- I don't want to speculate.
22     Q.    Okay.
23     A.    But when she was up to it, we

Page 151

1  took her.  And she went one day and had a --
2  some kind of meltdown, and I had to come pick
3  her up.  And she didn't want to go back after
4  that.
5      Q.    Okay.
6      A.    She was --
7      Q.    And that's what I mean -- that's
8  what I was asking about.  So --
9      A.    I mean, literally.
10         MR. HARP:  Let's wait for his
11 question.
12         THE WITNESS:  Okay.
13     Q.    I'm getting to the point where I
14 guess you were at home and received a phone
15 call from the school -- or did you receive a
16 phone call from her?
17     A.    I don't remember.
18     Q.    In any event, somebody made you
19 aware that you needed to come to the school?
20     A.    Yes.
21     Q.    And I suppose -- did you have to
22 check her out?
23     A.    I really don't remember what the

Page 152

1  process was.
2      Q.    Okay.
3      A.    She was quite upset.
4      Q.    Do you remember what all she
5  said to you about what she experienced that
6  day?  Or tell me what you do recall?
7      A.    I just recall that she attempted
8  to go to school and that the -- everybody
9  knew.  Everybody witnessed, you know, what
10 happened, and she was bombarded with a lot of,
11 you know, questions, maybe, and inquiries, and
12 she didn't want to discuss anything.  And, you
13 know, remarks, you know.  I mean --
14     Q.    A lot of gossiping and that sort
15 of thing?
16     A.    Just a lot of -- yeah.
17     Q.    Do you know whether she talked
18 to any of the school personnel about this
19 going on that day?
20     A.    If I remember correctly, TDH was
21 not open to, you know, discussing the
22 situation as much as she was just trying to
23 handle her emotions, you know.

Page 153

1    Q.    Okay.  And I don't know what I'm
2 thinking -- in other words, you don't know if
3 she went to a counselor or favorite teacher
4 maybe?
5    A.    I do not know.
6    Q.    She did not return to school for
7 the rest of that year, correct?
8    A.    Correct.
9    Q.    I'm assuming you discussed that
10 with her at some point; is that right?
11    A.    Yes.
12    Q.    How did you arrive at your
13 decision to -- well, did you approve of her
14 not going back to school?
15    A.    As a mother, you want your
16 children to finish school.  But under the
17 circumstances, I tried to encourage her to
18 stay in, but she was overwhelmed with being
19 humiliated and the pressure from the peers and
20 the gossip and, you know, people making
21 remarks about the situation.  You know, I mean
22 I urinated -- you know what I'm saying -- it
23 was done in front of everybody.

Page 154

1        So the pressure, she just had to
2 avoid it, in her mind.
3    Q.    Sure.  I understand.  I'm
4 judging -- I figured she told you these
5 things.  That's how you would know, right?
6    A.    Well, I experienced them myself.
7    Q.    Let me ask you something.
8        When this thing happened and you
9 got tased and you urinated on yourself, from
10 that point forward were you made aware that
11 the people there surrounding knew it?
12    MR. HARP:  Object to the form.
13    Q.    Knew that you had peed in your
14 pants?
15    A.    It was all over the ground.
16    Q.    Okay.
17    A.    It was --
18    Q.    I mean, I don't -- I wasn't
19 there so I'm asking.
20        So in other words, it was
21 something that would have been noticed?
22    A.    Yes, it was obvious.
23    Q.    Okay.  Did you later have people

Page 155

1 making remarks about that?
2    A.    Yes.
3    Q.    In what context?
4    A.    I mean, people we don't even
5 know.
6        One particular time I went to
7 Hannah's Closet -- I guess it's that little
8 place -- and a woman just approached us and
9 said that she heard what happened and, you
10 know, were we okay and, you know, it was
11 tragic.  Her daughter, you know -- and I just
12 -- we just -- both of us are very -- didn't
13 want to -- we wanted to remove ourselves from
14 those kinds of situations, you know.
15    Q.    Sure.  I can appreciate that.
16    A.    So we just -- it was just stuff
17 like that.
18    Q.    I understand.  And I would
19 imagine, if it were me, that it would be
20 uppermost in my mind when this nice little old
21 lady or nice lady comes up and asks you about
22 this event that's really none of her business.
23        But did she say anything to you

Page 156

1 where she indicated that she knew you had peed
2 in your pants?  I'm not saying that to be
3 flippant.
4    A.    That one, no.
5    Q.    Did anybody?
6    A.    What do you mean?
7    Q.    Well, I can imagine -- and
8 here's what -- you asked me -- I can imagine
9 that you see people and they asked about the
10 incident or they say, oh, I'm sorry this
11 happen, blah, blah, blah.  But did someone
12 make specific questions or remarks about
13 peeing in your pants?
14    A.    I don't ever recall somebody
15 saying -- specifically I saw you pee in your
16 pants.
17    Q.    Or I heard that and we -- Okay.
18 That's why I'm asking you.  You'd probably
19 remember that, don't you think?
20    MR. HARP:  Object to the form,
21    Q.    But in any event, you don't
22 remember that, right?
23    A.    No, sir.

Page 157

1    Q.    Were there other occasions where
2  people you didn't know asked you about or made
3  remarks to you about the incident, either
4  asking or telling, however you want to say it?
5    A.    I have heard people -- people
6  have made remarks to us, but I don't remember
7  specific dates or anything like that.
8    Q.    Right.
9    A.    Or their names -- you know, it
10 was something I don't know.
11   Q.    And if --
12   A.    Sometimes it would be just like
13 I hope y'all are okay, you know, encouragement
14 words.
15   Q.    Right.  There were people who in
16 addition -- in addition to those who
17 referenced it in an encouraging sense, were
18 there people who asked you about details?
19   A.    No.
20   Q.    Did anybody ask you to write out
21 what happened?
22   A.    It's possible that the therapist
23 did but --

Page 158

1    Q.    Nobody like -- nobody on
2  Facebook or --
3    A.    No.
4    Q.    News reporters or anybody like
5  that?
6    A.    (Witness shakes head.)
7    Q.    No?
8    A.    No.
9    Q.    Do you have a Facebook account?
10   A.    Yes.
11   Q.    Were there any postings made on
12 your Facebook account by you or anyone else
13 about this incident?
14   A.    What do you mean?
15         MR. HARP:  Object to the form.
16   Q.    As far as you know, on your page
17 did either you write something and post it on
18 your page or have somebody else post it on
19 your page, if they can?
20         MR. HARP:  Object to the form.
21   Q.    Do you know what I'm talking
22 about?
23         MR. HARP:  Object to the form.

Page 159

1    A.    Say it again.
2    Q.    Yeah.  Do you have a Facebook
3  page?
4    A.    I do.
5    Q.    Do you post things on it
6  sometimes?
7    A.    Yes.
8    Q.    And are those -- do you post
9  things that you yourself write, comments and
10 remarks and so forth?
11   A.    Yes.
12   Q.    I'm assuming you post pictures
13 or meems on occasion too?
14   A.    Yes.
15   Q.    And if you are a Facebook friend
16 of someone, can they go to your page and write
17 on your wall?
18   A.    I think that's how it works,
19 yeah.
20   Q.    I mean, unless you chose not to.
21 But okay.
22   A.    Yeah.
23   Q.    So did either you or anyone else

Page 160

1  write on your wall anything about this
2  incident?
3          MR. HARP:  Object to the form.
4    Q.    I don't even know what he's
5  objecting to.
6          MR. HARP:  Because of the way
7  that you're asking the question, it doesn't
8  give her an opportunity to answer yes to one
9  or the other.  If you want to break it up into
10 two different questions, that's fine.
11   Q.    Did you write anything and post
12 it on your wall?
13         MR. HARP:  Object to the form.
14 About what?
15   Q.    About this incident?
16   A.    I don't recall.
17   Q.    Okay.  Did anyone else post
18 something about this incident on your wall?
19   A.    I'm not sure about what the wall
20 means.
21   Q.    Uh-huh (indicating yes).
22   A.    I know that I witnessed -- I saw
23 things posted about this incident.  There was

Page 161

1 a lot of posts made by a lot of people. It
2 was like the -- you know, the buzz of the town
3 for a good minute.
4     Q.    Sure. I understand.
5     A.    You know what I mean? As to who
6 made the post, what they said, what they
7 particularly said, I don't recall.
8     Q.    Right. Because you would
9 typically -- you typically see posts that your
10 Facebook friends put up, right?
11    A.    Yes.
12    Q.    Right.
13    A.    If you are following them.
14    Q.    Yeah, right, right.
15          At any time since this incident
16 have you consciously deleted anything from
17 Facebook about this incident?
18    A.    No.
19    Q.    To your knowledge, at any time
20 since this incident has your daughter TDH
21 deleted anything from her Facebook account?
22    A.    I have no idea.
23    Q.    At any time after TDH did not go

Page 162

1 back to school that year -- and she did not go
2 back the following year, correct?
3     A.    Correct.
4     Q.    Okay. At any time during either
5 the rest of that year or the beginning of the
6 next year, did you have any communication with
7 the Southside High School -- any Southside
8 High School official about her returning to
9 school?
10    A.    Oh, I'm sure I did.
11    Q.    Do you know who you talked to?
12    A.    Uh-uh (indicating no), no.
13    Q.    Do you remember what if anything
14 you were told by whoever it was you talked to?
15    A.    No, I don't recall.
16    Q.    Did you remember what the
17 purpose of your talking to them was?
18    A.    To whom?
19    Q.    The person whoever you say you
20 talked to at Southside High School?
21    A.    Say it one more time. I'm
22 sorry.
23    Q.    Yeah. I believe you said I'm

Page 163

1 sure I did talk to someone at Southside High
2 School?
3     A.    Well, you have to talk to
4 somebody to withdraw your child.
5     Q.    Okay. Fair enough. And that
6 was a poor question by me.
7          I guess you officially withdrew
8 TDH?
9     A.    At some point, yes.
10    Q.    At some point. Did you have any
11 further contact with Southside about
12 reenrolling her?
13    A.    I don't recall.
14    Q.    Okay. Were you charged with any
15 crime or violation from your arrest?
16          MR. HARP: Object to the form.
17    Q.    Your arrest -- did your arrest
18 turn into a criminal charge?
19    A.    Yes.
20    Q.    And I'm talking about the one on
21 the night of January 15 -- January 16, 2015?
22    A.    Yeah.
23    Q.    Do you know what you were

Page 164

1 charged with?
2     A.    Specifically, no.
3     Q.    Okay. What became of that
4 charge?
5     A.    They dismissed -- I don't -- I
6 don't recall how that ended.
7     Q.    Okay. It seems to have gone
8 away in some way?
9     A.    Yes, yes, sir.
10    Q.    Did you have an attorney
11 handling that criminal situation?
12    A.    No.
13    Q.    Did you speak with the -- like
14 the city prosecutor?
15    A.    I filled out a paper for an
16 attorney to speak with me, and that's who I
17 spoke with, whoever that was.
18    Q.    But was he somebody that was
19 representing the actual City?
20    A.    I can't recall if he was for me
21 or for them.
22    Q.    Okay.
23    A.    Actually.

Page 165

1    Q.    Did you ever have any contact
2 with anyone from the Rainbow City police
3 department about this event?
4    A.    Say that again.
5    Q.    Yeah.  Did you ever have any
6 contact with anyone in the Rainbow City police
7 department about what had happened to either
8 TDH or to you on that night?
9    A.    I still don't get the question.
10    Q.    Did you call and talk to anybody
11 at the police department about what had
12 happened to you?
13    A.    No, I don't --
14    Q.    Okay.  And did you communicate
15 with anybody else from the City of Rainbow
16 City about what had happened to TDH and you?
17    A.    No.
18    Q.    You didn't call up the mayor and
19 tell him about it?
20    A.    Oh, no.
21    Q.    That's what I'm asking about.
22    A.    No, sir.
23    Q.    Okay.  While you were at the

Page 166

1 jail, were you allowed to change out of your
2 pajama bottoms?
3    A.    No, sir.
4    Q.    So I take it the first time you
5 were able to get out of those was when you
6 went home?
7    A.    Correct.
8    Q.    Aside from your attorneys, have
9 you spoken with anyone outside your immediate
10 family?
11    A.    No.
12    Q.    About the events of that night?
13    A.    Doctors.
14    Q.    Doctors.  Dr. Kelly,
15 Dr. Russell, right?
16    A.    Uh-huh (indicating yes), yes,
17 sir.
18    Q.    Dr. Russell doesn't treat you
19 for anything, correct?
20    A.    No, no.
21    Q.    Just your daughter?
22    A.    Yes.
23    Q.    Okay.  Other than what you have

Page 167

1 told me about, the anxiety and such -- we
2 talked about that pretty good.
3          Other than that, what changes in
4 you, your situation, your life do you
5 attribute to the events of that night?
6    A.    Well, I was a little social, and
7 I just retreated and have no social -- I was
8 unable to socialize like I was before.
9    Q.    Okay.
10    A.    And withdrew from a lot of
11 friends, acquaintances.  It really changed my
12 attitude towards my younger children, my
13 younger daughter, about her going out and
14 different things, you know.
15    Q.    Are you finding yourself being
16 more protective?
17    A.    Yes.
18    Q.    Is that what you are talking
19 about?
20    A.    Yes, sir.
21    Q.    And are you finding yourself
22 being what you would otherwise think
23 overprotective because of this?

Page 168

1    A.    Yes, sir.
2    Q.    What else, not that that's not
3 enough, but what else?
4          MR. HARP:  Object to the form.
5    Q.    It's okay.  You can testify.
6    A.    Ask me again, please.
7    Q.    What other things?
8    A.    That --
9    Q.    That have been caused to -- that
10 have happened to you because of the events of
11 that night?
12    A.    Like I said, just basically, you
13 know, not associating with -- it's just like a
14 withdrawal.  You know what I mean?  And
15 feeling really bad just about -- just about
16 everything, you know.  A lot of changes.
17    Q.    Do you have any --
18    A.    A lot of trust issues.
19    Q.    A lot of trust issues.  I
20 understand.
21          Have you had any interactions
22 with any police officer -- well, you told me
23 about seeing some of them like in a Walmart or

Page 169

1 something. But have you had any -- well,
2 strike that. You testified about that.
3          Do you have any regular hobbies,
4 interests that you are active in?
5      A.    A few.
6      Q.    Okay. Are they things that you
7 were active in before this happened?
8      A.    Yes.
9      Q.    What are they?
10     A.    Working out.
11     Q.    Okay. Do you belong to a gym?
12     A.    Yes.
13     Q.    I think TDH mentioned Absolute.
14 Is that where you belong?
15     A.    No.
16     Q.    Where do you belong or have you
17 belonged?
18     A.    We did belong to Absolute, but
19 we don't go there anymore.
20     Q.    Do you go somewhere else?
21     A.    We joined Planet Fitness. But
22 just the anxiety of -- don't laugh, but just
23 being stared at, like you just -- you think

Page 170

1 it's about you, but it really isn't. You know
2 what I'm saying? It's just something you have
3 got to work out in your head.
4      Q.    You have an instinctive
5 reaction?
6      A.    Yeah.
7      Q.    I gotcha.
8      A.    Yes. I'm sorry.
9      Q.    You can say yeah. It just has
10 to be a response.
11          And that's the kind of thing I
12 was looking for. Working out there, did you
13 regularly participate in any races, weight-
14 lifting competitions?
15     A.    No.
16     Q.    Did you regularly attend church
17 before this incident, and do you regularly
18 attend church since?
19     A.    I have a very big issue of being
20 in crowds.
21     Q.    I understand.
22     A.    So I don't --
23     Q.    And no one here is trying to

Page 171

1 imply that you are supposed to go to church
2 ten times a week or something like that.
3          Were you regularly going to
4 church before this happened?
5      A.    No.
6      Q.    I mean, right before, in the
7 year before?
8      A.    No.
9      Q.    Did you have a fear of crowds
10 before this happened?
11     A.    No.
12     Q.    Have you been caused to miss any
13 particular events because of your fear of
14 crowds?
15     A.    I have declined on many
16 invitations to do things socially, yes.
17 Christmas was horrible.
18     Q.    Are we talking about more in the
19 nature of small gatherings or --
20          MR. HARP: Object to the form.
21     Q.    Or are we talking more in the
22 nature of ball games where there are huge
23 crowds of people?

Page 172

1      A.    It's just -- it was very
2 irregular.
3      Q.    Okay. I understand Christmas
4 was horrible. And you responded with that.
5 So what was it about the crowd phenomenon that
6 made Christmas bad?
7      A.    Crowd phenomenon?
8      Q.    Yeah. I sort of associated --
9 you may not have meant for me to associate
10 that when you answered.
11     A.    I didn't.
12     Q.    Okay. I guess -- yeah, any
13 other specific occasions that you can recall
14 where you didn't go because of the crowds?
15     A.    I don't recall.
16     Q.    I have a client who had to stop
17 going to Alabama football games for something
18 in her case. That's the kind of thing I'm
19 asking.
20          So nothing in particular that
21 you recall?
22     A.    Like I said, we stayed home all
23 the time. So it could be grandchildren's ball

1  games, events -- birthday parties or whatever.
2  I don't know specifics. If I was invited
3  somewhere, I declined.
4      Q.    Other people's grandchildren's
5  ball games?
6      A.    My grandson's ball games.
7      Q.    What grandsons do you have
8  besides Troy?
9      A.    I have two other grandchildren.
10     Q.    Oh.
11     A.    I have five grandchildren.
12     Q.    Whose kids are they?
13     A.    Nicole's.
14     Q.    Oh, I'm sorry. How old are
15  they, approximately?
16     A.    Cyrus is 11, and Cooper is 4.
17     Q.    Harris, did you say?
18     A.    Cyrus.
19     Q.    Does he go to Southside?
20     A.    Yes, elementary.
21     Q.    Or Rainbow Middle?
22     A.    He goes to Southside Elementary.
23     Q.    Yeah. I apologize. I forgot

1  those.
2          And that's exactly why I asked
3  that question, so I know what you are going to
4  say on the stand about missing children's ball
5  games.
6          Any other kind of things like
7  that?
8      MR. HOWARD: My initial direct
9  is concluded subject to being able to talk
10  about anything that comes up on other people's
11  direct.
12     MR. HARP: I don't think that's
13  how that rule works.
14     MR. HOWARD: It is in court.
15         So just out of curiosity, it
16  would be Mr. Harp's position that you only get
17  a chance to ask one series of questions; and
18  once you're done, you cannot ask any questions
19  that are brought up by the examination or
20  cross-examination of others?
21     MR. HARP: No, sir. You said
22  subject to any of their questioning. If I
23  choose to question her and I bring something

1  that piques more curiosity from you, then
2  certainly you are allowed to go into that,
3  just as you would be in court.
4      MR. HOWARD: Right.
5      MR. HARP: However, once you
6  pass the witness and there's no further
7  questions from -- or there are no questions
8  from our side, you don't get the chance to go
9  back and take another shot at the witness
10  because you thought of something you wanted to
11  ask.
12     MR. HOWARD: So that would be
13  your position if it's something that they
14  bring up that wasn't brought up on my
15  examination?
16     MR. HARP: That would absolutely
17  be my position, yes, sir.
18     MR. HOWARD: I hear you. You
19  may be right. That's why I'm asking.
20         Anyway, I don't have anything
21  else that I can think of now.
22     MR. STUBBS: Can we take a quick
23  break before we start?

1      MR. HARP: Sure.
2          (Whereupon, a brief recess was
3  taken.)
4
5          EXAMINATION
6  BY MR. STUBBS:
7      Q.    Good afternoon, Ms. Helm. I've
8  introduced myself earlier. I am David Stubbs,
9  and I represent numerous police officers who
10  were named as defendants in this lawsuit.
11         I'm going to go through just a
12  couple of normal routine questions I always
13  ask of witnesses.
14         Do you realize you are under
15  oath here today when you are giving your
16  testimony just like you were in court?
17     A.    Yes.
18     Q.    All right. I'm going to ask for
19  your forgiveness because being the second or
20  third in line in the questioning of a witness,
21  I'm trying to piecemeal in some information.
22  So my questions will be inconsistent as far as
23  what happened. I'm just trying to fill in

1 some gaps in my own mind anyway.

2       But if at any time I ask

3 something and you don't understand my

4 question, will you tell me you don't

5 understand it so I will have an opportunity to

6 correct or rephrase the question? Is that

7 fair?

8     A.    Yes.

9     Q.    Okay. Ms. Helm, you were --

10 when we started this deposition this morning,

11 you were talking about your marriages.

12       I know in the complaint you are

13 listed as Michelle Lee Helm. Is Lee your

14 maiden name?

15    A.    No.

16    Q.    What is your maiden name?

17    A.    Jorge, J-O-R-G-E.

18    Q.    Michelle Jorge. Do you have a

19 middle name?

20    A.    I do not have a birth middle

21 name. That was -- no.

22    Q.    Okay. What are the last four

23 digits of your social security number? I

1 don't want to put your full Social Security

2 number on the record. That's why I'm asking

3 for the last four digits.

4     A.    Okay. ████.

5     Q.    When you were married to Claude

6 Stewart, it being my understanding he was your

7 first husband, did you go by the name Michelle

8 Stewart?

9     A.    Yes, sir.

10    Q.    Did you ever hold a driver's

11 license in the name of Michelle Stewart?

12    A.    I don't recall.

13    Q.    Okay. I'm going to go through

14 this whole thing. When you were married to

15 Larry Hamilton, did you go by Michelle

16 Hamilton?

17    A.    Yes.

18    Q.    And what about -- obviously when

19 you were married to Daniel Helm you went by

20 Michelle Helm?

21    A.    Yes, sir.

22    Q.    When you were married to Tony

23 Flemming, did you go by Michelle Flemming?

1     A.    Yes, sir.

2     Q.    When you were married to Eric

3 Redmond, did you go by Michelle Redmond?

4     A.    I don't recall.

5     Q.    Okay. Do you know -- I know

6 it's taking you back numerous years, but do

7 you recall having held a driver's license in

8 any of your married names?

9     A.    Yes.

10    Q.    Do you distinctly remember which

11 ones?

12    A.    No.

13    Q.    Other than the State of Alabama,

14 have you held a driver's license in any other

15 state?

16    A.    Yes.

17    Q.    Would that be Kentucky and

18 Florida?

19    A.    I believe so, yes.

20    Q.    Any other States?

21    A.    I don't recall.

22    Q.    And I know you were born in

23 California and then moved the Cincinnati and

1 then moved to Kentucky.

2       Have you lived in any other

3 States other than California, Ohio, Kentucky,

4 Florida and Alabama?

5     A.    I think that's -- yes. No.

6     Q.    Once again, forgive me if I

7 didn't catch this earlier.

8       Did you have any children when

9 you were married to Claude Stewart?

10    A.    Yes.

11    Q.    Who were those children?

12    A.    N████.

13    Q.    So ████'s maiden name is

14 Nicole Stewart?

15    A.    Yes, sir.

16    Q.    When you were married to Larry

17 Hamilton, did you have any children?

18    A.    Yes.

19    Q.    Who is that child?

20    A.    ████████

21    Q.    Is that still ███████ Hamilton?

22    A.    No.

23    Q.    What does ██████ go by now?

Page 181

1  A.  Helm.
2  Q.  Did Daniel Helm adopt ▓▓▓▓▓▓ at
3 some point?
4  A.  No.
5  Q.  Did ▓▓▓▓ change his name?
6  A.  Yes.
7  Q.  Okay.  Do you know what led to
8 ▓▓▓▓▓changing his name from ▓▓▓▓ Hamilton to
9 ▓▓▓▓ Helm?
10  A.  Because he -- Daniel is his dad
11 to him.
12  Q.  I understand.  Daniel was
13 basically the father figure that ▓▓▓▓ had; is
14 that correct?
15  A.  The only father figure that he
16 had, yes.
17  Q.  So Larry Hamilton really wasn't
18 involved in ▓▓▓▓'s life very much?
19  A.  Correct.
20  Q.  So you have ▓▓▓▓ born during
21 your marriage to Claude Stewart.  Aaron was
22 born during your marriage to Larry Hamilton.
23 And then your three daughters -- you had three

Page 182

1 daughters with Daniel?
2  A.  Yes, sir.
3  Q.  And no children in your marriage
4 to Tony Flemming; is that correct?
5  A.  Correct.
6  Q.  And no children with your
7 marriage to Eric Redmond?
8  A.  Correct.
9  Q.  I just wanted to get that
10 straight.
11    Did you -- obviously you know
12 your daughter was deposed yesterday, correct?
13  A.  Yes.
14  Q.  Did you have any conversation
15 with TDH between the time her deposition ended
16 and when you started yours today about what
17 she was questioned about?
18  A.  No.
19  Q.  No conversation at all about
20 that?
21  A.  None.
22  Q.  When Daniel was electrocuted and
23 died, it's my understanding that TDH was three

Page 183

1 years old.  Is that your memory?
2  A.  He died in 2000.  She was born
3 in 1997, so, yes.
4  Q.  How old were your other children
5 at the time, if you remember?
6  A.  ▓▓▓▓▓ was 10 months old.  I
7 was breast feeding her.  And ▓▓▓▓ was going
8 on five.
9  Q.  Okay.  And then ▓▓▓▓ and ▓▓▓▓
10 were in their teen years?
11  A.  Yes.
12  Q.  All right.
13  A.  He died on my son's birthday.
14 ▓▓▓▓ was twelve.
15  Q.  He died on ▓▓▓▓'s birthday?
16  A.  Yes.
17  Q.  Did any of your children receive
18 counseling as a result of Daniel's death?
19  A.  No.  They were too young at the
20 time.
21  Q.  Has TDH ever spoken about having
22 any memory of her dad's death?
23  A.  No.  She wasn't there.

Page 184

1  Q.  I didn't mean about the actual
2 electrocution.  I mean, just remembering when
3 he passed away?
4  A.  She has memories of that time
5 frame.  But specific, I couldn't tell you.
6  Q.  All right.  One of your
7 marriages ended when your husband passed,
8 Daniel, correct?
9  A.  Correct.
10  Q.  And the other four ended in
11 divorce.
12    The four that ended in divorce,
13 did you file for the divorce or did they or is
14 it a combination?
15  A.  Me.
16  Q.  All right.  So as to your
17 divorce from Mr. Stewart, Mr. Hamilton,
18 Mr. Flemming and Mr. Redmond, you filed for
19 divorce?
20  A.  I believe so, yes.
21  Q.  Did any of those actually go to
22 trial?
23  A.  No.

Page 185

1    Q.    They were all resolved through
2 settlement?
3    A.    Yes.
4    Q.    All right.  Have you ever had to
5 file a restraining order against anyone?
6    A.    Yes.
7    Q.    Tell me about that.
8    A.    Larry Hamilton.
9    Q.    Approximately what year would
10 that have been in?
11    A.    I don't recall.
12    Q.    Do you recall approximately what
13 year you were married to -- was it during your
14 marriage or during the divorce proceedings?
15    A.    I don't recall.
16    Q.    What led to the circumstances of
17 filing a restraining order against -- or
18 having a restraining order entered against
19 Larry Hamilton?
20    A.    I -- really just harassment.
21    Q.    Okay.
22    A.    It's 27 years ago so it's pretty
23 -- behind me.

Page 186

1    Q.    And I'm not trying to stir up
2 bad memories, but I have a duty to my client
3 to ask certain questions.
4         Have you ever been the victim of
5 a crime, assaults or anything like that?  Has
6 anybody ever assaulted you?
7    A.    Yes.
8    Q.    Do you recall who assaulted you?
9    A.    Larry.
10    Q.    Larry Hamilton?
11    A.    Yes.
12    Q.    Did you -- did he -- was he
13 charged criminally as a result of the assault?
14    A.    No.
15    Q.    Anyone other than Larry ever
16 physically assault you?
17    A.    No.
18    Q.    Is that the only time you recall
19 being the victim of a crime or criminal
20 activity?
21    A.    I really don't recall.
22    Q.    Prior to the events of January
23 the 16th of 2015 -- and instead of me

Page 187

1 repeating that date over and over, can we just
2 say the day of concert?  Can we have an
3 understanding if I say the day of the concert
4 we are talking about January 16, 2015; is that
5 fair?
6    A.    Yes.
7    Q.    Prior to the concert, had you
8 ever sought treatment from a mental health
9 care professional, period, question mark?
10         Have you ever sought -- prior to
11 the concert had you ever sought treatment from
12 a mental health care professional?
13    A.    I believe, yes.
14    Q.    Do you know who treated you or
15 counseled you?
16    A.    I don't recall.
17    Q.    Do you know what led to your
18 seeking such treatment?
19    A.    My husband dying.
20    Q.    Okay.  You can't recall who you
21 sought treatment from as a result of your
22 husband dying?
23    A.    No, not -- no, I don't.

Page 188

1    Q.    When you were going through any
2 of your -- the four divorces did you seek
3 mental health professional care when you were
4 going through those proceedings?
5    A.    Nope.
6    Q.    Since the concert, have you been
7 married?
8    A.    No.
9    Q.    Do you recall the last year --
10 the year that you and Mr. Redmond divorced?
11    A.    I do not recall.
12    Q.    Did TDH ever -- has she
13 always -- I think Ed asked you this.  Has she
14 always resided with you, TDH?
15    A.    Yes.
16    Q.    So at the times of your
17 marriages she always lived with you as well?
18    A.    Yes.  When she was born.  She
19 wasn't born the first --
20    Q.    I understand.  During your
21 marriage to Daniel, Tony and Eric she lived
22 with you?
23    A.    Yes.

Page 189

1    Q.    Has TDH been a recipient of
2  Medicaid since the time she was born?
3    A.    No.
4    Q.    At what point in time did she
5  become a recipient of Medicaid benefits?
6    A.    I don't recall.
7    Q.    Was she a young child when that
8  happened?
9    A.    No.
10    Q.    Does TDH have any other health
11  insurance available to her other than through
12  Medicaid?
13    A.    At this time?
14    Q.    Correct.
15    A.    No.
16    Q.    Has she had medical benefits
17  available to her other than Medicaid at other
18  times?
19    A.    Yes.
20    Q.    Through your husband -- through
21  your marriages, maybe your husband's
22  employment?
23    A.    No.  We had Blue Cross Blue

Page 190

1  Shield for many years.
2    Q.    All right.  Was that through --
3  was that provided through an employer of yours
4  or through an employer of your husband?
5    A.    Private pay.
6    Q.    Why did -- to try to expedite
7  matters, was TDH a Medicaid recipient at the
8  time of the concert?
9    A.    Yes.
10    Q.    And has that been uninterrupted
11  Medicaid coverage from the time of the concert
12  to present day?
13    A.    Yes.
14    Q.    Once again, I told you I would
15  skip around.
16        As far as the night of the
17  concert, when TDH went to the hospital, did
18  you ever get billed by the hospital for
19  anything?
20    A.    I don't recall.
21    Q.    Please correct me if I'm wrong,
22  but it's my understanding TDH was taken to
23  Gadsden Regional after the concert.  Is that

Page 191

1  your understanding?
2    A.    I was in jail, arrested.  I
3  don't know what hospital.  I don't recall.
4    Q.    You never made any inquiry as to
5  what hospital your daughter was taken to after
6  the concert?
7    A.    I believe it was Gadsden
8  Regional.
9    Q.    Have you ever spoken with anyone
10  at Gadsden Regional Medical Center about what
11  happened that night?
12    A.    No.
13    Q.    Did you ever make any inquiry
14  through someone else as to whether or not your
15  daughter received treatment at Gadsden
16  Regional Medical Center the night of the
17  concert?
18    A.    I think just through my
19  attorney.
20    Q.    Please don't tell me anything
21  you and your attorneys have discussed.
22        The place where you live now, do
23  you own that home?

Page 192

1    A.    Yes.
2    Q.    All right.  Is there a mortgage
3  on the home?
4    A.    Yes, sir.
5    Q.    Who do you owe your mortgage
6  payments to?
7    A.    Guild Mortgage.
8    Q.    Are you the only person on the
9  deed?
10    A.    Yes, sir.
11    Q.    To that home?
12        And in addition to the home you
13  own right now, which I think is in
14  Southside -- is that right?
15    A.    No.
16    Q.    I'm sorry.  Where do you live
17  now?
18    A.    Gadsden.
19    Q.    Gadsden.  Other than the home
20  you currently own in Gadsden, have you ever
21  owned another home?
22    A.    Yes.
23    Q.    Where were those homes where you

Page 193

1 have owned, where you were on the deed?
2    A.    Miller.
3    Q.    What street, Miller Street?
4    A.    Miller Drive.
5    Q.    Okay.  Any others?  I know you
6 have discussed earlier that you have lived in
7 numerous places throughout the years, and you
8 have told me you owned two of the homes.  You
9 own the one you are in now and the one on
10 Miller Drive?
11    A.    Yes, sir.
12    Q.    Did you have landlords at the
13 other places where you were renting?
14    A.    Actually, I had two because I
15 was naive.  Yeah, they were landlords.
16    Q.    Have you ever been evicted from
17 any place where you lived?
18    A.    I don't recall that, no.
19    Q.    You don't recall receiving any
20 kind of notice from the landlord saying time
21 to get out?
22    A.    No.
23    Q.    Or going to court over any kind

Page 194

1 of eviction?
2    A.    No.
3    Q.    I know it's been a long day for
4 you.  You have mentioned two restaurants where
5 you recall working in the past, and then you
6 own your own business now where you clean
7 house.
8          Approximately how many regular
9 clients do you have in your current business?
10    A.    It fluctuates because of the
11 times of the month and different times.  You
12 know, holidays, of course, are more.  And last
13 year it was -- you know, because of the
14 situation, it dwindled very low.  So I keep --
15 I do very little at the moment.
16    Q.    Other than the money you derive
17 or obtain from cleaning houses, do you have
18 any other source of income?
19    A.    I work for Jackson Hewitt during
20 the tax season.
21    Q.    You still do that job during the
22 tax season?
23    A.    I have done that two years in a

Page 195

1 row.
2    Q.    Any other source of income other
3 than from Jackson Hewitt and cleaning houses?
4    A.    No.
5    Q.    Does anyone assist you in
6 cleaning houses?  Do you have any employees?
7    A.    No.
8    Q.    You do that by yourself?
9    A.    Yes.
10    Q.    As you have had time to sit here
11 today and think, can you think of any other
12 employers you have had in the past ten years
13 other than the ones you have already
14 mentioned?
15    A.    No.
16    Q.    Do you receive Social Security
17 benefits arising out of your husband's death?
18    A.    Yes.
19    Q.    You still get that as well?
20    A.    My daughter does.
21    Q.    Which one?
22    A.    The youngest one, ██████.
23    Q.    ██████.  Thank you.  Does

Page 196

1 ██████, TDH, and ██████?
2    A.    It's ██████, ██████, TDH and
3 ██████.
4    Q.    I'm sorry.  I'm talking about
5 the ones from your marriage to Daniel.
6    A.    (Witness nods head.)
7    Q.    So your youngest daughter still
8 receives Social Security benefits arising out
9 of her dad's death?
10    A.    Yes.
11    Q.    Is there any reason why TDH
12 doesn't receive those benefits that you're
13 aware of?
14    A.    She doesn't -- no.  I don't
15 understand.
16    Q.    Has TDH ever received Social
17 Security benefits relating to her dad's death?
18    A.    Yes.
19    Q.    Do you know why those were
20 terminated?
21    A.    Isn't it that her age --
22          MR. HARP:  If you know.
23          THE WITNESS:  I don't know.

Page 197

1    Q.    Do you know when they stopped?
2    A.    Last year.
3    Q.    How old is TDH now, 18?
4    A.    Yes.
5    Q.    I cannot recall if you answered
6  this or not.
7          Do you recall TDH ever living
8  with ████ for any period of time?
9    A.    No.
10   Q.    Have you ever told TDH that she
11  needs to find another place to live?
12   A.    I'm sure I have.
13   Q.    Okay.  During those times did
14  she go find somewhere to stay temporarily?
15   A.    Like move her stuff out, no.  Go
16  stay at her friend's for a couple of days or
17  ████'s or ████'s when he had his
18  apartment -- I mean, yeah, we have taken
19  breaks before.
20   Q.    Do you know what the longest
21  break you have ever taken was?
22   A.    I don't recall.
23   Q.    Would it have been more than a

Page 198

1  month?
2    A.    I don't think so.
3    Q.    Do you know how many times
4  that's happened where you may have needed a
5  break from her or she needed a break from you
6  and she moved somewhere else temporarily?
7    A.    I don't have -- taking a break
8  from each is what I meant.
9    Q.    I apologize, then.
10   A.    I meant take a break from
11  whatever the issue was at the moment.
12   Q.    Okay.  What kind of issues, to
13  the best of your memory, developed which led
14  to her temporarily moving somewhere else?
15   A.    She -- teenage daughters, I
16  mean, you're grounded, take your phone away or
17  something like that.
18   Q.    Okay.  I understand.  I have a
19  teenager.  But do you recall how many times
20  that's happened where maybe she didn't exactly
21  accept your punishment and decided to live
22  somewhere else for a while?
23   A.    Four daughters, I couldn't tell

Page 199

1  you.
2    Q.    Has that happened with all of
3  your daughters?
4    A.    I'm --
5          MR. HARP:  Just yes or no.  Just
6  answer his question.
7    A.    Yes.
8    Q.    Have there been any times in the
9  past -- let me break that down.
10        Prior to the concert were there
11  any times you have ever called for police
12  assistance to your home?
13   A.    Yes.
14   Q.    How many times?
15   A.    I don't recall.
16   Q.    Do you recall if you have ever
17  called for the assistance of Rainbow City
18  police officers to come to your house?
19   A.    Yes.
20   Q.    Do you know how many times?
21   A.    Do you want me to guess?
22        MR. HARP:  Nope.
23   Q.    No.

Page 200

1    A.    Then no, I don't know how many
2  times.
3    Q.    Would it have been more than
4  five times?
5    A.    No.
6    Q.    More than three times?
7    A.    I don't know.
8    Q.    Do you recall the circumstances
9  in which you felt the need to call the Rainbow
10  City police department for assistance?
11   A.    The specific circumstances, no.
12  But as a single mom, I mean, I would call
13  for -- I just thought that I could call them
14  for assistance because I was alone.
15   Q.    The times you called -- let's
16  just say Rainbow City for a moment.
17        The times you called the Rainbow
18  City police department for assistance, was it
19  related to you being a victim of a crime, the
20  breaking in of your house or your car?
21   A.    I have had that happen before,
22  but I don't specifically know if that was one
23  of the reasons.

Page 201

1    Q.    I may not be asking good
2 questions.
3          Tell me what you can recall
4 about the circumstances wherein you have had
5 to call for the assistance of the Rainbow City
6 police department?
7    A.    The sisters arguing and --
8    Q.    Your daughters arguing?
9    A.    Yeah.
10    Q.    Okay.
11    A.    And wanting to leave without
12 permission.  And I think I called because, you
13 know, I wanted them to know that I didn't
14 approve of that, you know, she wasn't allowed
15 to leave.
16    Q.    You said she --
17    A.    Whatever -- whatever child at
18 the moment, like -- you know what I mean?  I
19 don't remember specifically.  But when I did
20 call them, it was to help me with just that
21 kind of situation.
22    Q.    Okay.  And did a police officer
23 or officers respond to that call and come to

Page 202

1 your house?
2    A.    Yes.
3    Q.    How were you treated during
4 those occasions?
5    A.    It depended on the officer.
6    Q.    Do you recall any bad
7 experiences?
8    A.    Define bad.
9    Q.    Well, do you recall any times
10 where a police officer in Rainbow City came to
11 your house and treated you inappropriately?
12          MR. HARP:  Just when she called
13 or in general?
14    Q.    When you called for their
15 assistance?
16    A.    Define inappropriate.
17    Q.    That is hard for me to do.
18 That's very subjective.
19    A.    Exactly my point.
20    Q.    All right.  Let me start back
21 over.
22          Have there been any times to the
23 best of your memory any of your children have

Page 203

1 called for the assistance of the Rainbow City
2 police department in the past?
3    A.    Not to my knowledge.
4    Q.    Have there been any times where
5 the Rainbow City police department officers
6 have come to your house without you calling?
7    A.    Maybe.
8    Q.    All right.  In other words, are
9 you aware of anyone else ever making a call to
10 the police department for them to respond to
11 your house?
12    A.    I recall one time a neighbor --
13 they showed up at my house.  And it was the
14 chief of police, after the concert, and
15 another officer.  And I answered the door, and
16 I was kind of confused on what was going on.
17 He said that there was a -- they got a call to
18 come here.  I said I'm sorry, you must have
19 the wrong house.  I thought they were --
20 because they are across the street.  There was
21 a commotion across the street.  And so he
22 stood -- they stood in the yard.  And he
23 called on a walkie talkie to find out who

Page 204

1 called.  And they said a neighbor.  And they
2 didn't know why they were there so --
3    Q.    Had there been any kind of
4 arguing going on?
5    A.    No.
6    Q.    Prior to that?
7    A.    No.
8    Q.    Did you ever find out --
9 anything about why they came to your house
10 that time?
11    A.    No.  And then the chief of
12 police said I know who you are and if you are
13 lying I will arrest you.
14    Q.    Okay.
15    A.    And I was -- that's all I know.
16    Q.    All right.  This was after the
17 concert?
18    A.    Uh-huh (indicating yes).
19    Q.    Is that yes?
20    A.    Yes, sir.
21    Q.    So the police chief, who are you
22 referring to?  Do you know his name?
23    A.    I believe it's Carroll.

Page 205

1    Q.    Was there anyone else with Chief
2  Carroll when he came to your house?
3    A.    Yes, sir.
4    Q.    Do you know the name of that
5  officer or officers?
6    A.    No, no.
7    Q.    And so you -- you received a
8  knock on the door or the door bell rang?
9    A.    Uh-huh (indicating yes).
10   Q.    And he said someone had called?
11   A.    He said do you need assistance,
12 and I said -- I think that's what he said.
13 And I said no, sir.  And he said -- I said
14 why, is there a problem?  And he said -- let
15 me think.  It was just kind of confusion of
16 they didn't understand -- I didn't know what
17 was going on.  I didn't understand why they
18 were there.  So we kind of like in the yard --
19 or on the front porch, and I was just -- I
20 don't know why you are here.  What's the
21 issue?  And that's when the chief of police
22 told him to find out what is going on, like
23 who made the phone call, what was the

Page 206

1  information on the call.  And he called, did a
2  thing right here (indicating), and they just
3  said it was a neighbor and nothing else.
4    Q.    Okay.
5    A.    So then he said -- made that
6  statement, and then they just left.
7    Q.    All right.  So they took no
8  action?
9    A.    No.
10   Q.    Okay.
11   A.    There was nothing wrong.
12   Q.    Did you ever ask your neighbors
13 if they had made a call complaining about you?
14   A.    Yes.
15   Q.    What did they say?
16   A.    No.
17   Q.    Did you ask all your neighbors?
18   A.    Well, the neighbors that I spoke
19 to at the time, yes.
20   Q.    So is that the only time after
21 the concert that Rainbow City police officers
22 have been at your house?
23   A.    I believe so, yes.

Page 207

1    Q.    Prior to that, prior to the
2  concert, do you know of any times where
3  someone else called for the Rainbow City
4  police department officers to come to your
5  house?
6    A.    I do not recall, no.
7    Q.    The times that the Rainbow City
8  police officers did come to your house, were
9  any arrests made?
10   A.    No.
11   Q.    Did they offer assistance to you
12 -- let me back that up.
13        The times you called for
14 assistance, did they speak with your daughters
15 about what was going on?
16   A.    Yes.
17   Q.    All right.  Did it seem to solve
18 the problem for the moment?
19        MR. HARP:  Object to the form.
20   Q.    Did it seem to resolve the
21 differences that your children may have been
22 having which led to your call?
23   A.    Say it again.

Page 208

1    Q.    Sure.  The times that the police
2  officers of Rainbow City came to your house,
3  wherein you made the call, did their
4  assistance in arriving at your home help you
5  deal with the crisis at the moment?
6    A.    No.
7    Q.    Why not?
8    A.    Because they are limited.  They
9  can't -- there's nothing that -- there wasn't
10 a serious enough issue for them to do
11 anything.  It was more of a mother-daughter --
12 you know what I mean?  Like an argument.
13 There was no crime or a law broken, so to
14 speak.  It was more of a personal mother-
15 daughter thing.
16   Q.    Okay.
17   A.    So there was nothing.
18   Q.    Prior to the concert did TDH
19 ever threaten to leave home where you said you
20 are not leaving home?
21   A.    I'm sure, yeah.
22   Q.    Is that one of the occasions or
23 more than one of the occasions when you called

Page 209

1  the police?

2  MR. HARP: Object to the form.

3  Q.  You can answer.

4  A.  Say it again, please.

5  Q.  Sure. I believe you said that

6  you felt sure that there were times prior to

7  the concert where TDH threatened to leave

8  home. Is that correct?

9  A.  Most -- yeah.

10  Q.  On one or more of those

11  occasions, when TDH threatened to leave, did

12  you tell her she could not leave?

13  A.  Yes.

14  Q.  Are any of those occasions when

15  you called the police?

16  A.  I thought I already answered

17  that.

18  Q.  You may have, and I apologize.

19  Is that -- do you recall calling

20  the police because of a situation where TDH

21  wanted to leave home and you didn't want her

22  to leave home?

23  A.  I don't recall specifically why

Page 210

1  -- why --

2  Q.  Okay.

3  A.  But --

4  Q.  Has any -- I believe you

5  mentioned your other daughters too.

6  Have you had to call the police

7  regarding any issue you were having with your

8  other two daughters who were at home?

9  A.  I believe I have.

10  Q.  Do you know the circumstances

11  surrounding that?

12  A.  ████. There was an issue with

13  her at one time.

14  Q.  What was the issue?

15  A.  Her and TDH. I don't really

16  recall.

17  Q.  Have ████ and TDH ever gotten

18  into a physical altercation where you had to

19  call the police?

20  A.  Fist fight, no. A shoving match

21  and calling each other names, yes.

22  Q.  Okay. The time that you were

23  talking about years ago where you were

Page 211

1  arrested -- you said you were intoxicated. It

2  had something to do with a cheating boyfriend;

3  is that right? I don't want to

4  mischaracterize your testimony. When you were

5  arrested before. Where was that arrest made?

6  A.  Which one?

7  Q.  Years ago.

8  A.  The one --

9  Q.  Prior to the concert, where you

10  were arrested -- you said you were intoxicated

11  and it had something do with an old boyfriend.

12  A.  Yeah, uh-huh (indicating yes).

13  Rainbow City.

14  Q.  Who made that arrest, which

15  department?

16  A.  Rainbow City, I would imagine.

17  Q.  You were living in Rainbow City

18  at the time?

19  A.  No. I lived in Southside.

20  Q.  I'm sorry. You have already

21  answered that.

22  MR. HARP: Yes, she has.

23  Q.  So were you taken to the Etowah

Page 212

1  County jail on that occasion?

2  A.  I don't recall.

3  Q.  Do you recall being

4  incarcerated, being put in a cell?

5  A.  I don't recall.

6  Q.  Do you recall having a booking

7  photo made?

8  A.  I just remember the incident,

9  but I don't remember like the charge or

10  anything, like the specifics, because it was

11  like nine years ago.

12  Q.  Do you recall being transported

13  in a police vehicle?

14  A.  I was intoxicated and -- I mean,

15  I just don't remember the specifics.

16  Q.  That's the only other time you

17  have ever been arrested other than the night

18  of the concert?

19  A.  I believe so, yes.

20  Q.  What about in -- not just by

21  Rainbow City but by any other law enforcement

22  agency, whether it was in Kentucky or Florida

23  or Alabama? Have you ever been arrested?

Page 213

1   A.    I don't recall being arrested
2  before.
3   Q.    Was TDH prior to the concert
4  already being treated by Dr. Kelly?  It's Jay
5  Kelly, isn't it, Dr. Jay Kelly?
6   A.    I'm not sure.
7   MR. HARP:  What are you not sure
8  about, whether his name is Jay Kelly or
9  whether she was being treated prior to the
10 concert by Jay Kelly?
11  THE WITNESS:  Both.
12  Q.    What led to the change in her
13 neurologist?  I think there was a doctor here
14 in Gadsden she was seeing, a neurologist, and
15 then later she started seeing Dr. Russell.
16 What led to that change?
17  A.    Dr. Russell was referred by
18 Children's.
19  Q.    All right.  So after the
20 incident where your daughter was -- had a
21 seizure in that field and was taken to
22 Children's, at that point forward she only
23 went to see Dr. Russell regarding her

Page 214

1  seizures?
2   A.    Correct.
3   Q.    When is the last time to your
4  knowledge that TDH has seen Dr. Russell?
5   A.    I don't recall.
6   Q.    Ms. Helm, do you recall
7  receiving any correspondence from Medicaid
8  after the concert wherein they are asking you
9  to reimburse them for any money they have paid
10 for TDH's medical treatment?  Have you
11 received any such correspondence asking for
12 reimbursement to Medicaid?
13  A.    I --
14  Q.    You are not aware of that?
15  A.    No, no.
16  Q.    Have you ever had a restraining
17 order entered against you?
18  A.    I don't think so.
19  Q.    And the reason I ask that is I
20 believe you testified during that incident
21 where you were arrested years ago -- you said
22 you were at a place you were not supposed to
23 be.  Had you been ordered not to be in a

Page 215

1  certain place?
2   A.    No.  They -- it's when I was
3  there.  It was the other woman's -- we
4  followed him to this woman's house.
5   Q.    You caught the cheating
6  boyfriend at his girlfriend's house?
7   A.    Right.  And the girlfriend asked
8  me to leave.
9   Q.    The bankruptcy you filed in
10 2011, have you received a discharge from that
11 bankruptcy?
12  A.    Yes, sir.
13  Q.    Other than calling for the
14 assistance of the Rainbow City police officers
15 in prior occasions, have you had to call on
16 the assistance of any other law enforcement
17 agency to come to your home for any reason?
18  A.    No.
19  Q.    So the only time you have ever
20 had to call the police related to something
21 with your daughters is when you were living in
22 Rainbow City?
23  MR. HARP:  Object to the form.

Page 216

1   A.    I don't recall specifically.
2   Q.    Do you know if TDH has ever been
3  suspended from school?
4   A.    Yes.
5   Q.    Do you know the circumstances --
6   MR. HARP:  Whoa, whoa.  Has she
7  been suspended from school, or do you know
8  whether or not she has been suspended?
9   THE WITNESS:  She has.
10  MR. HARP:  Okay.
11  Q.    What were the circumstances
12 surrounding that?
13  A.    I don't recall.
14  Q.    And what school was it?
15  A.    Southside High School.
16  Q.    Okay.  You don't recall what it
17 was for?
18  A.    No.
19  Q.    Has she ever been expelled from
20 any school?
21  A.    No.
22  Q.    Do you know how many days she
23 was suspended the time that you do remember?

Page 217

1     A.     In-school suspension, no.
2     Q.     Do you know if she has ever been
3 in fights in school that led to a suspension?
4     A.     I do not recall that.
5     Q.     Correct me if I'm mistaken, if
6 I'm remembering incorrectly, but I think you
7 said you witnessed TDH having a seizure in the
8 field near your home; is that correct?
9     A.     Yes.
10    Q.     This time she had dirt on her?
11    A.     Yeah, yes.
12    Q.     Other than that occasion and the
13 concert, have you ever seen her in the middle
14 of a seizure?
15    A.     No.
16    Q.     Have you spoken with others who
17 have witnessed her having a seizure in the
18 past?
19    A.     Yes.
20    Q.     Do you know if she has ever been
21 able to speak and verbalize and carry on a
22 conversation with someone during her seizure
23 activity?

Page 218

1     A.     I don't recall what they said
2 about -- if she spoke, because we didn't --
3 that wasn't like -- I mean -- who cares?
4 Like, we -- you know --
5     Q.     I'm just asking if you know.
6     A.     No, I have no clue, no.
7     Q.     I know you testified that you
8 were tased one time in the lower back on the
9 night of the concert.
10          Did you have anyone take
11 photographs of any markings resulting from
12 that tase -- tasing?
13    A.     I think so, yes.
14    Q.     Who took the photographs?
15    A.     I don't recall.
16    Q.     Do you still have the
17 photographs?
18    A.     I'm not sure.
19    Q.     Do you recall having turned them
20 over to your attorneys?
21    A.     I believe so, yes.
22          MR. HARP:  I'm going to go ahead
23 and go on the record and say I don't have any

Page 219

1 photographs of her tasing.
2     Q.     Do you know if those photographs
3 still exist?
4     A.     I do not.
5     Q.     Do you know if they were taken
6 on your phone -- by your phone?
7     A.     Not my phone I have currently
8 but whatever phone I had back at that time.
9     Q.     Do you still have that phone?
10    A.     I have no clue.
11    Q.     You don't recall who took the
12 photographs?
13    A.     No.
14    Q.     Do you recall when they were
15 taken?
16    A.     The specific day, no.
17    Q.     Have you seen any videos that
18 were taken by anyone on the night of the
19 concert?
20    A.     No.
21    Q.     You were talking about earlier
22 some of your hobbies -- I think you used the
23 plural word hobbies instead of hobby.  This is

Page 220

1 why I'm asking this.
2          You work out in a gym; is that
3 correct?
4     A.     I wouldn't go that far.  I like
5 to be active.
6     Q.     Do you still go to that Planet
7 Fitness?
8     A.     No.
9     Q.     Are you still a member there?
10    A.     No.  I think -- no.
11    Q.     When was the last time you
12 recall having a membership at Planet Fitness?
13    A.     I think we just canceled it.
14    Q.     Being this year?
15    A.     This month.
16    Q.     June of 2016?
17    A.     Yes.
18    Q.     Other than having gone to Planet
19 Fitness at some point in the past, do you have
20 any other hobbies outside of the home?
21    A.     No.
22    Q.     Are you currently dating anyone?
23    A.     No.

1    Q.    Have you dated anyone
2  romantically since the time of the concert?
3    A.    No.
4    Q.    Does TDH have any restrictions
5  on her driver's license concerning her seizure
6  activity?
7    A.    At the moment, no.
8    Q.    Has her license -- has her
9  driver's license been revoked in the past or
10 suspended because of medical reasons?
11      MR. HARP:  If you know.
12   A.    I don't know.
13   Q.    I'm only asking that because I'm
14 aware of someone who has had seizures, and
15 they had their license suspended until they
16 got a clearance by a doctor.  Has that ever
17 happened to TDH?
18   A.    The doctor told her she couldn't
19 drive.  But I'm not sure if it went -- like
20 suspension of the license or anything.  She
21 was just restricted by the doctor not to drive
22 until she was cleared.
23   Q.    I'm sorry.  Which doctor?

1    A.    I believe that was Dr. Dallas --
2  I mean --
3    Q.    Dr. Russell?
4    A.    Uh-huh (indicating yes).
5    Q.    Is that yes?
6    A.    Yes.
7    Q.    So to the best of your memory he
8  restricted TDH's driving for a period of time
9  and ultimately released her from that
10 restriction?
11   A.    I don't really recall the
12 details.
13   Q.    During that time when
14 Dr. Russell told her she should not be
15 driving, did she drive?
16   A.    No.
17   Q.    Currently, in June of 2016, does
18 she have any restrictions you're aware of from
19 her physicians about her driving?
20   A.    No.
21   Q.    Has anyone told you what
22 happened at the hospital the night of the
23 concert when TDH was taken to the hospital?

1    A.    She told me.
2    Q.    What did she tell?
3    A.    What she remembers.
4    Q.    Tell me what she told you about
5  her experience at the hospital.
6    A.    She was brought in in a nine-
7  point restraint with gauze in her mouth.  And
8  she was experiencing in the hallway -- she
9  asked to see me or to call me and they told
10 her -- the police officers told her that --
11 they laughed at her and told her that she
12 would not be getting me because they were
13 going to put her in Mountain View and I was
14 already arrested and in jail and I was going
15 to sit there.
16   Q.    Anything else?
17   A.    I don't really recall.  I don't
18 think she remember -- I don't remember her
19 telling me specifics about, you know, the
20 doctor did this or the doctor did that.  I
21 just remember her -- her explaining that to me
22 and that they released her.
23   Q.    Did you ever attempt to get a

1  copy of the medical records associated with
2  that night in the hospital?
3    A.    Via my attorney, I believe.
4    Q.    Did you ever call anyone at the
5  hospital and ask what happened that night?
6    A.    No.
7    Q.    Or what treatment was provided
8  to TDH?
9    A.    No.
10   Q.    I know you testified earlier
11 that -- we know from looking at the calendar
12 the concert was on Friday, and you didn't see
13 TDH until Sunday; is that correct?
14   A.    Correct.
15   Q.    All right.  Any particular
16 reason why you didn't see her Saturday?
17   A.    She was asleep.
18   Q.    Okay.  Did you ever -- and then
19 Sunday you went to ████'s boyfriend's dad's
20 house; is that right?  Am I saying that
21 correctly?
22   A.    ████'s father's house.
23   Q.    ████'s father's house, right.

Page 225

1 Sunday you went to his house?

2 A. Yes.

3 Q. What is Emma's father's name?

4 A. Debo.

5 MR. HARP: What is his real

6 name?

7 THE WITNESS: Dan Fells.

8 Q. Okay. After the concert did you

9 make any special appointment for TDH to see a

10 medical doctor -- let me strike that.

11 After the concert, do you recall

12 calling a doctor or making a special

13 appointment for TDH?

14 A. Say it again.

15 Q. Sure. Let me preface it with

16 this: It's my understanding that TDH was

17 seeing Dr. Russell periodically for checkups

18 every three months, I think is what TDH told

19 us.

20 Do you recall calling

21 Dr. Russell and asking for an expedited

22 appointment after the concert?

23 A. Yes, I don't really.

Page 226

1 Q. Or any doctor even if it's not

2 Dr. Russell?

3 A. I mean, I took her for medical

4 treatment to both of them.

5 Q. And do you know -- that's what

6 I'm trying to get at. Do you know when?

7 A. No.

8 Q. The first time she saw them?

9 A. No. That's what I don't recall,

10 what day it was.

11 Q. Would it have been the same

12 week, the week following the concert?

13 A. It would be safe to say it was

14 very close.

15 Q. When you were at the Etowah

16 County jail and you said were placed in the

17 cell with two other women, did anything bad

18 happen to you in the cell?

19 MR. HARP: Object to the form.

20 A. No.

21 Q. Were you harmed in any way while

22 you were in the cell?

23 A. No.

Page 227

1 Q. Did you ever have to go to court

2 after your arrest to answer to any charges

3 which had been levied against you?

4 A. No.

5 Q. I'm confused about something.

6 Do you recall -- you said you recall speaking

7 with someone but you didn't know if they

8 represented Rainbow City or you. Was that at

9 court or --

10 A. What are you talking about?

11 Q. I believe you were testifying

12 earlier about you recall speaking with someone

13 about the criminal charges. You didn't know

14 if they were for Rainbow City or for you. Was

15 that an attorney you were speaking with?

16 A. The piece of paper that tells

17 you the date to come to court in Rainbow City.

18 I went there and filled out the paper for an

19 attorney because they -- the judge tells you

20 to -- whoever has an attorney to come forward

21 and whoever needs one, whatever.

22 Q. Right.

23 A. And he came out in the hallway

Page 228

1 and told me that he -- I don't recall what he

2 exactly said. But it was basically he did not

3 understand what was the problem with my

4 particular situation, that he would -- for me

5 just to -- I don't remember how that went. I

6 just remember they let me go.

7 Q. Was that at municipal court,

8 like Rainbow City municipal court?

9 A. Yes.

10 Q. On one occasion?

11 A. Correct.

12 Q. And you were just told by

13 someone that you could leave?

14 A. Yes, and that -- yes.

15 Q. Other than TDH, did one of your

16 other daughters go to the concert that night?

17 A. Yes.

18 Q. Was it ███?

19 A. No.      ███

20 Q. ███?

21 A. Yes.

22 Q. Did you know ███ was going

23 to the concert as well?

1  A.  Yes.

2  Q.  Do you know how she got to the

3 concert?

4  A.  I don't recall.

5  Q.  All right.  Was she already

6 driving age at that time?

7  A.  No.

8  Q.  Since the concert, are you aware

9 of TDH having gone to any sporting events or

10 concerts?

11  A.  Not to my knowledge.

12  Q.  Since the concert, has there

13 been any period of time where TDH has stayed

14 with someone else for more than a week other

15 than your own home?

16  A.  I don't recall longer than that.

17  Q.  Since the concert, have there

18 been any times where you have asked TDH to go

19 stay somewhere else for a while?

20  A.  I don't recall.

21  Q.  Since the concert, has TDH ever

22 told you she was going to stay somewhere else

23 for a while?

1  MR. HARP:  Object to the form.

2 Could you quantify a while?

3  MR. STUBBS:  I'm sorry?

4  MR. HARP:  Could you quantify a

5 while?  She has already stated it hadn't been

6 longer than a week.

7  Q.  Since the concert, has TDH ever

8 told you she was going to stay with a friend

9 or with her older sister or anyone else for a

10 few days?

11  A.  Yes.

12  Q.  What led to that?

13  A.  I don't --

14  Q.  I mean, was it an agreeable I'm

15 just going to go stay somewhere else for a few

16 days or I need to get out of the house for a

17 few days?

18  A.  It was agreeable.

19  Q.  When you were being tased,

20 Ms. Helm, are you sure the handcuffs were on

21 your wrists?

22  A.  Yes.

23  Q.  You have no doubt that you were

1 already in handcuffs -- you felt the handcuffs

2 at the time you were tased?

3  A.  Yes.

4  Q.  Have you ever given a statement,

5 other than to your attorneys, about that to

6 anyone else?

7  A.  No.

8  Q.  How is it that you have come to

9 know or came to know -- Jaymon Palmer?

10  A.  Yes.

11  Q.  How do you know him?  When did

12 you first meet Jaymon Palmer?

13  A.  My husband was alive, so I don't

14 recall the exact time.

15  Q.  Was he a friend of Daniel's?

16  A.  No.  We went to the same church.

17 Our families went to the same church.

18  Q.  What church was that?

19  A.  Cross Point.

20  Q.  Where is that located?

21  A.  Black Creek Highway.

22  Q.  What city?  I'm not familiar

23 with --

1  A.  Gadsden.

2  Q.  I interrupted you earlier.  I

3 didn't mean to.  You said that there were --

4 you recall a time where your house was broken

5 into?  Did I hear that correctly?  Has your

6 house been broken into before?

7  A.  No.

8  Q.  What about your vehicle?  Has it

9 been broken into before?

10  A.  I don't recall.  Wait.  Yes, my

11 house has.  I'm sorry.

12  Q.  Where were you living when your

13 house was broken into?

14  A.  Miller Drive.

15  Q.  And were things stolen?

16  A.  Yes.

17  Q.  Do you know what year that was?

18  A.  '08.

19  Q.  I'm so sorry I keep asking the

20 same questions.  Miller Drive is where,

21 Southside?

22  A.  Yes, sir.

23  Q.  Southside?

Page 233

1    A.    Yes, sir.

2    Q.    Did the Southside police respond

3 to that?

4    A.    I don't recall if it was

5 Southside or Glencoe.

6    Q.    On the night of the concert you

7 were transported by police vehicle to the

8 Etowah County jail. What happened to your

9 car? How did you get it home, the car you

10 drove to the concert in?

11   A.    I don't recall.

12   Q.    When you arrived -- when you got

13 home that morning, after being released from

14 jail, was your car there?

15   A.    I don't recall if it was my

16 older children handled that or -- you know, I

17 was pretty distraught, you know. I don't

18 remember who handled the car.

19        MR. HARP: His question was when

20 you got home after you were released from jail

21 was your car there.

22        THE WITNESS: I don't recall.

23 I'm sorry.

Page 234

1        MR. HARP: Are you to -- close

2 to finishing or to a stopping point? If it's

3 a compound question, I will be objecting --

4        MR. STUBBS: I don't have a

5 whole lot more. Do you need to take a quick

6 break?

7        MR. HARP: I think she is

8 getting tired. Do you need to take a break?

9        THE WITNESS: Yeah.

10        MR. STUBBS: I know Allison has

11 got some questions too.

12        MR. HARP: Okay.

13        (Whereupon, a brief recess was

14 taken.)

15   Q.    (By Mr. Stubbs) Prior to the

16 concert, had you ever been prescribed Xanax

17 for anything else?

18   A.    No.

19   Q.    Have you ever been prescribed

20 Zoloft for anything prior to the concert?

21   A.    Possibly -- maybe.

22   Q.    Do you recall being prescribed

23 anything for anxiety or depression prior to

Page 235

1 the concert?

2    A.    Yes.

3    Q.    Do you know which doctor

4 prescribed that?

5    A.    No.

6    Q.    Do you have a twitter account?

7    A.    No.

8    Q.    You mentioned having seen

9 numerous Facebook posts related to the

10 incident at the concert. Out of the ones that

11 you read, did you read anything negative, that

12 you perceived to be negative towards you or

13 your daughter?

14   A.    I really don't recall.

15   Q.    Did you print any of those off?

16   A.    No.

17   Q.    Did you save any of them in any

18 way?

19   A.    No.

20   Q.    Were you ever contacted by a

21 reporter concerning the incident at the

22 concert, by a newspaper reporter?

23   A.    Yes.

Page 236

1    Q.    Did you speak with him or her?

2    A.    I did.

3    Q.    And were you quoted in the

4 newspaper about any conversations you had with

5 that reporter?

6    A.    No, I don't think so, no.

7    Q.    Did you ever read a newspaper

8 article concerning the incident?

9    A.    No.

10   Q.    Do you know which newspaper or

11 media source this reporter worked for?

12   A.    I think -- no, I don't remember.

13   Q.    Do you know what -- was it a

14 male or a female?

15   A.    A male.

16   Q.    What did you tell him? What do

17 you recall telling that reporter?

18   A.    I don't know exactly what we

19 said.

20   Q.    Do you know generally what you

21 said?

22   A.    I don't want to speculate.

23   Q.    Do you know how soon after the

Page 237

1  concert you were contacted by a reporter?
2     A.    No, I wasn't contacted by a
3  reporter.  I misunderstood the question in the
4  first place.  Sorry.  Let's back up.
5     Q.    Have you spoken with a reporter
6  from the newspaper --
7     A.    No.
8     Q.    -- concerning this incident at
9  the concert?
10    A.    No, no.
11    Q.    Other than the attorneys with
12 whom you have spoken, have you given a
13 statement to anyone, be it verbal or written,
14 about what happened at the concert?
15    A.    No.
16    Q.    Do you recall if you have been
17 quoted by anyone concerning the events of the
18 concert?
19    A.    No.
20    Q.    Did you ever read any article in
21 any newspaper concerning what happened at the
22 concert?
23    A.    No.

Page 238

1     Q.    Has it ever been given to you, a
2  copy of that?
3     A.    No.
4           MR. HARP:  Object to the form.
5     Q.    This was a bad question.
6           Has anyone ever told you there
7  was a newspaper article about what happened at
8  the concert?
9     A.    No.
10    Q.    To your knowledge has TDH sought
11 to enroll in any other school since the time
12 that she left Southside?
13          MR. HARP:  High school or any
14 school?
15    Q.    Any school?
16    A.    Yes.
17    Q.    Where?
18    A.    Job Corps.
19    Q.    Okay.  Anything other than job
20 Corps?
21    A.    Not to my -- no.
22    Q.    Do you know if anyone from your
23 family or any of your friends went to the

Page 239

1  hospital on the night of the concert to see
2  TDH?
3     A.    I don't recall.
4     Q.    You don't recall anybody telling
5  you that they were there and witnessed
6  anything --
7     A.    ███████.
8     Q.    -- at the hospital?
9     A.    My son.
10    Q.    Do you think █████ went to the
11 hospital?
12    A.    Yes.
13    Q.    What did █████ tell you about
14 what he witnessed at the hospital?
15    A.    We didn't discuss it.
16    Q.    Just a couple more.  When you
17 arrived at the Center Stages that night of the
18 concert -- I believe you testified earlier
19 that you said that's my daughter, she is
20 having a seizure.
21          Who were you speaking to when
22 you made that statement?
23    A.    The police officers and -- that

Page 240

1  were on top of her.
2     Q.    All right.
3     A.    It was directed to them.
4  Whether they could hear me or not, I have no
5  clue.
6     Q.    So it wasn't directed to anyone
7  who was trying to restrain you at that moment?
8     A.    No, no.
9           MR. STUBBS:  I think that's all
10 I have.  I appreciate it.
11          THE WITNESS:  Thank you.  And my
12 swollen feet thank you.
13          MS. CHANDLER:  I have just a
14 few, but really, really brief.
15
16          EXAMINATION
17 BY MS. CHANDLER:
18    Q.    Ms. Helm, my name is Allison
19 Chandler, and I represent Detective Justin
20 Gilliland in this lawsuit.  And I just have a
21 couple of follow-up questions for you just for
22 my own clarification.  And I appreciate your
23 patience with us throughout this afternoon.

Page 241

1 You said earlier that you and
2 Mr. Helm moved to north Alabama because his
3 brother lived here; is that correct?
4 A.   That wasn't the reason.
5 Q.   He lived here at the time you
6 moved here?
7 A.   Correct.
8 Q.   Does he still live in north
9 Alabama?
10 A.   I have no clue.
11 Q.   And Mariah's son is named ████,
12 is that correct?
13 A.   Yes.
14 Q.   Does ████'s father live in north
15 Alabama?
16 A.   I don't know.
17 Q.   Okay.  What is his name, if you
18 know?
19 A.   Whose name?
20 Q.   ████'s father.
21 A.   Dayton McCoy.
22 Q.   And you're not aware if he lives
23 in north Alabama or not?

Page 242

1 A.   I'm unaware of where he lives.
2 Q.   Okay.  Do you have any
3 photographs of TDH's body after the concert?
4 A.   No.
5 Q.   You said earlier, I believe, and
6 correct me if I'm wrong, that you have not
7 contacted anybody with Rainbow City or the
8 Rainbow City police department regarding what
9 happened at the concert to you and TDH; is
10 that correct?
11 A.   Yes.
12 Q.   Has anyone other than your
13 attorney to your knowledge done so on your
14 behalf?
15 A.   No.
16 Q.   Or about the incident at the
17 concert at all?
18 A.   Not to my knowledge, no.
19 Q.   Okay.  And the night of the
20 concert, before you went to Center Stages, you
21 were at your home on Palace Avenue?
22 A.   Yes.
23 Q.   Had you consumed any alcohol

Page 243

1 that night?
2 A.   No.
3 Q.   Had you taken any drugs that
4 night?
5 A.   No.
6 Q.   After the incident at the
7 concert, TDH saw Dr. Russell and Dr. Kelly?
8 A.   Correct.
9 Q.   Correct?
10 A.   Yes.
11 Q.   Has she seen any other doctors
12 or other medical providers for any injuries
13 that she sustained at the concert?
14 A.   Physical?
15 Q.   Well, let's start with physical.
16 Has she seen any other doctors?
17 A.   No, no.
18 Q.   What about any emotional or
19 behavioral, psychological issues?
20 A.   Stephanie Huey.
21 Q.   Okay.  Anyone else?
22 A.   I don't recall.  That's it.
23 Q.   And after the incident at the

Page 244

1 concert, I believe you testified that you saw
2 Dr. Kelly for treatment; is that correct?
3 A.   Yes.
4 Q.   Have you seen anyone else after
5 the concert for any physical injuries you
6 suffered?
7 A.   No.
8 Q.   Have you seen anyone -- medical
9 providers for any emotional or psychological
10 injuries that you have suffered?
11 A.   No.
12 Q.   Dr. Kelly is the only person
13 that you have seen?
14 A.   Yes.
15 Q.   At the time of the concert, you
16 were working at your business at Kingdom
17 Cleaning?
18 A.   Actually, I was on medical leave
19 for the operation.
20 Q.   Right.  Did you -- but you had
21 that business at the time of the concert even
22 though you weren't -- you were on medical
23 leave?

Page 245

1     A.    Yes.

2     Q.    How long did that medical leave

3 last during your -- for your surgery?

4     A.    I don't recall.

5     Q.    You don't remember when you

6 began cleaning houses again after that?

7     A.    No.

8     Q.    You worked as a server at

9 Mango's restaurant?

10     A.    Yes.

11     Q.    What were the circumstances that

12 you left your job at Mango's?

13     A.    They went bankrupt.

14     Q.    And what about Velocity? What

15 were the circumstances that you left that

16 position at Velocity?

17     A.    I don't recall, really.

18     Q.    Has ▒▒▒▒▒ told you anything

19 about what she may have witnessed at the

20 concert?

21     A.    Yes.

22     Q.    What has she told you?

23     A.    Basically what we told you.

Page 246

1     Q.    Anything else other than what

2 you have told us today?

3     A.    Not to my knowledge.

4     Q.    Did she -- from what she has

5 told you, did she -- what did she witness

6 happened to TDH?

7     A.    She witnessed her having a

8 seizure in the concert -- in the other side, I

9 guess, and being brought to the back and then

10 officers approaching and her telling them that

11 she was having a seizure. And they asked her

12 -- I don't specifically remember what they

13 specifically asked her, just that she

14 witnessed the whole situation.

15     Q.    Did she witness TDH being tased

16 at any time?

17     A.    Yes.

18     Q.    Which time did she witness TDH

19 being tased?

20     A.    You will have to ask her.

21     Q.    You are not sure?

22     A.    I don't want to speculate.

23     Q.    She didn't tell you how many

Page 247

1 times she saw TDH be tased?

2     A.    She has.

3     Q.    How many times did she tell you

4 that she saw TDH tased?

5     A.    Three.

6     Q.    Has she told you anything about

7 what she witnessed with respect to what

8 happened to you?

9     A.    Yes.

10     Q.    What has she told you?

11     A.    She told me she saw them knock

12 me to the ground. She saw me pee all over.

13 She saw them drag me to the concrete wall and

14 put me in the car. She saw all of it.

15     Q.    Did she tell you that she saw

16 you tased?

17     A.    Yes.

18     Q.    When you received the phone call

19 that night -- I know you said you can't

20 remember -- or don't know who it was. When

21 you received the phone call informing you that

22 something was going on with TDH at the

23 concert, what did that caller say to you?

Page 248

1     A.    TDH is having a seizure, come to

2 the concert.

3     Q.    Anything else?

4     A.    No.

5     Q.    Did you say anything to that

6 person --

7     A.    No.

8     Q.    -- who called?

9     A.    Or if I did, I don't recall.

10     Q.    Okay. You may have said

11 something. You just don't recall?

12     A.    Like I'm on my way or could have

13 said something like that, but I just don't

14 recall.

15     Q.    Okay. When you got to Center

16 Stages and you saw what you have described, I

17 believe, as a crowd of officers on top of TDH,

18 how far away were you from TDH and those

19 officers on top of her? And I don't want you

20 to guess. Just if you have a judgment.

21     A.    I really don't know how to do

22 that. Like, I can't measure two feet, five

23 feet, nothing like that.

Page 249

1    Q.    Okay.

2    A.    I was just on the outside of the

3  doorway, and she was inside the lobby.

4    Q.    Were you within your arm's

5  length of the doorway?

6    A.    I don't think so.

7    Q.    You were further back from the

8  doorway?

9    A.    Yes.

10   Q.    Do you know how far TDH and the

11 officers that were on top of her were past the

12 doorway?

13   A.    No, I don't recall.

14   Q.    Do you wear glasses or contacts?

15   A.    No.

16   Q.    When you saw the officers on top

17 of TDH -- I believe you testified that they

18 were yelling or you heard officers yelling at

19 that point?

20   A.    Yes.

21   Q.    What were they yelling?

22        MR. HARP:  Object to the form.

23   Q.    What were the officers yelling?

Page 250

1    A.    I don't recall.

2    Q.    Were they yelling -- if you

3  know, were they yelling at TDH?

4    A.    Yeah, they were yelling -- yes.

5    Q.    Whatever statements or yells

6  they were making were directed towards TDH?

7    A.    Yes.

8    Q.    Were they yelling or making any

9  statements towards any members of the crowd,

10 any what we are going to call civilians?

11   A.    I don't recall.

12   Q.    While you were on the ground

13 with your arms behind your back or handcuffed,

14 did any members of the crowd say anything to

15 the officers who were with you?

16   A.    I don't recall.

17   Q.    Did any members of the crowd say

18 anything to you at any point?

19   A.    I don't recall that.

20   Q.    Did anyone try to step in and

21 say, hey, don't do that to her, that's her

22 daughter, something to that effect?

23   A.    Jaymon was at the door of the

Page 251

1  police officer when I was put in the vehicle,

2  and he was telling the officer that I was the

3  mother and that was my daughter and that she

4  had a seizure condition.

5    Q.    Did the officer respond to

6  Jaymon?

7    A.    He said I can't unarrest her, I

8  think it was.

9    Q.    Did anyone else from the crowd

10 say anything to an officer at any other point

11 that you know of?

12   A.    I was totally distracted by what

13 was going on with my personal experience.

14   Q.    So no one tried to step in and

15 say, hey, don't do that to TDH or do that to

16 you?

17   A.    I don't know.

18   Q.    Okay.  Before you were -- you

19 said you were pulled back or dragged out to

20 the courtyard near the retaining wall?

21   A.    Yes.

22   Q.    How were you dragged?  What part

23 of -- how were the officers holding on to you

Page 252

1  -- officer are officers?

2    A.    I don't know if they had me on

3  the side.  I don't remember.

4    Q.    Were you still -- your whole

5  body on the ground?

6    A.    Yes, because when they -- they

7  tased me, and after I urinated my legs were

8  not working right, like I couldn't work them.

9  It was almost like a temporary, you know,

10 like, feet are asleep, you know, you can't

11 walk when you stand up, that kind of feeling.

12   Q.    When you were dragged back could

13 you still see TDH's actual body?

14   A.    Yes.

15   Q.    And then after that you were

16 taken to the patrol car?

17   A.    Yes.

18   Q.    Is that the last time that you

19 saw TDH at Center Stages?

20   A.    Yes.

21   Q.    Did you see TDH while she was on

22 a gurney at any point?

23   A.    No.

Page 253

1    Q.    Did you see any interaction
2 between TDH and any paramedics or medical
3 staff?
4    A.    No.
5    Q.    Did you see TDH placed in an
6 ambulance?
7    A.    No.
8    Q.    I believe your testimony was --
9 and please correct me if I'm wrong -- that you
10 saw TDH being tased the first time.  You
11 visualized that?
12    A.    Yes.
13    Q.    And then the other two times you
14 heard the tase?
15    A.    Yes.
16    Q.    The taser?
17    A.    I saw her body, but the police
18 had blocked the officer doing -- you know what
19 I mean?  Like, I couldn't see the second or
20 third one, but I could just see her body.
21    Q.    Okay.  You didn't see her
22 actually get tased.  You just heard what you
23 perceived to be the taser --

Page 254

1    A.    I saw the first tase.  But then
2 the second one and third, the police were --
3 because of my position, the police blocked it.
4 I could just see her body being -- not moving.
5    Q.    When in relation to what was
6 happening with TDH were you tased?
7    A.    Explain.
8    Q.    Were you tased before TDH was
9 tased any of the times she was tased?
10    A.    Yes.
11    Q.    You were tased first before she
12 was ever tased?
13    A.    Yes.
14    Q.    Were you -- you said there were
15 two officers near you?
16    A.    They were on top of me.
17    Q.    On top of you?
18    A.    Yes.
19    Q.    The one in kind of a regular
20 police uniform; is that correct?
21    A.    There were two police officers
22 in police uniforms.
23    Q.    They both had -- I think you

Page 255

1 said that one had, you know, the full police
2 uniform on and you weren't sure what the other
3 one was wearing?
4        MR. HARP:  No.  That's not what
5 she said.
6    Q.    What were each of the officers
7 who were on top of you wearing?
8    A.    They were behind me.  So the
9 only officer that I saw exactly what he was
10 wearing was the one that arrested me.
11    Q.    He was wearing a full --
12    A.    Patrol uniform.
13    Q.    -- uniform?
14    A.    Yes, sir -- ma'am.
15    Q.    That's okay.  And you didn't see
16 what the other officer was wearing?
17    A.    He was an officer, but I didn't
18 see like what -- I wasn't even -- who cared?
19 I didn't care what he was wearing.
20    Q.    Okay.  And could you -- did you
21 happen to see anything about his -- about his
22 person other than what he was wearing, his
23 hair color, his skin color, that type of

Page 256

1 thing?
2    A.    Yeah, I saw his face.  I could
3 identify him in a picture.
4    Q.    What color hair did he have?
5    A.    Brown.
6    Q.    And this is the officer that --
7 not the one that arrested you, the other one?
8    A.    Yes.
9    Q.    Okay.
10    A.    He was kind of bald, so I don't
11 know.  Like, it was shadowed -- like, I don't
12 how to explain it.  It was just dark.  It
13 would be -- I mean --
14    Q.    Did you say anything to the
15 officers who were near you after you were
16 tased?
17    A.    I don't recall.
18    Q.    Did they say anything to you
19 immediately after you were tased?
20    A.    I just remember asking to sit
21 up.  They told me to sit the fuck down or
22 something like that.  As far as us having a
23 conversation, we did not.  I don't remember

1 having a conversation with them.

2    Q.    Okay.  So you were -- you had

3 been tased, and you were still in the same

4 location where you had been tased while you

5 witnessed the first time TDH was tased?

6    A.    Yes.

7    Q.    Okay.  Why did TDH not come home

8 until Monday from her friend Emma's dad's

9 house?

10         MR. HARP:  Object to the form.

11    A.    What?

12    Q.    I believe you said that TDH

13 stayed at ████'s -- friend ████'s dad's house,

14 she was there on Saturday and she was also

15 there on Sunday and she did not come back home

16 with you until Monday; is that correct?

17    A.    Yes.

18    Q.    Why is that?

19    A.    She was petrified.

20    Q.    To go back home?

21    A.    To come to Rainbow City.

22    Q.    Because -- okay.  Because ████

23 lives in Southside?

1    A.    No.

2    Q.    Where does ████ live?

3         MR. HARP:  She meant --

4    A.    At that time?

5    Q.    Yeah, where was her dad's house?

6    A.    In Tidmore Bend.

7    Q.    Where is that?  I'm sorry.  I'm

8 not from here.

9    A.    Gadsden over here.  I'm not from

10 here either, so I'm like --

11    Q.    But more into Gadsden?

12    A.    It was in Gadsden.

13    Q.    In Gadsden.  Okay.

14         Did she tell you that she did

15 not want to come home to Rainbow City?

16    A.    Yeah.

17         (Whereupon, a discussion was

18 held off the record.)

19    Q.    (By Ms. Chandler) I just want to

20 ask you about a couple of people that have

21 identified to the defendants as people who may

22 have information about what happened to you

23 and TDH at the concert or shortly thereafter.

1 So I just kind of want to ask you what you

2 know about what any of these people may know.

3 Okay?

4    A.    Okay.

5    Q.    Who is ████████████████?

6    A.    Don't know.

7    Q.    Do you have any idea what

8 information she would know regarding what

9 happened to you and TDH at the concert?

10    A.    No, ma'am.

11    Q.    What about ████████?

12    A.    No.

13    Q.    ████████?

14    A.    No.

15    Q.    ████████?

16    A.    No, ma'am.

17    Q.    ████████?

18    A.    No.

19    Q.    Have you told us everything

20 you -- and just what you know -- that Jaymon

21 Palmer may have possibly seen or knows what

22 happened to you and TDH?

23    A.    Ask me again.

1    Q.    Have you told us everything, as

2 far as what you know, about what Jaymon knows?

3    A.    Yes, yes.

4    Q.    Where does Jaymon live?

5    A.    I don't know.

6    Q.    Do you have a cell phone number

7 or any phone number for him?

8    A.    I'm not sure.

9    Q.    Even if it's saved in your cell

10 phone?

11    A.    Possibly, yes.

12    Q.    Does ████████ still live with

13 her dad?

14         MR. HARP:  He committed suicide.

15    Q.    I'm sorry.  At that residence

16 that she lived at at the time of the concert?

17 Does she still live at that residence?

18    A.    No, I don't know.  I don't know

19 where she lives.

20    Q.    You don't know where she lives?

21    A.    Yes, ma'am.

22    Q.    Do you have her -- or have

23 access to her telephone number?

Page 261

1   A.    Yeah.  I think so, yeah.

2   Q.    Okay.  Do you know who ███████

3   ███████ is?

4   A.    No.

5   Q.    Do you know who ███████████ is?

6   A.    Yes.

7   Q.    Who is that?

8   A.    A friend of my daughter's.

9   Q.    Of TDH's?

10  A.    ███████'s.

11  Q.    Of ███████'s?

12  A.    Yes.

13  Q.    What if anything does she know

14  about what happened to you or what happened to

15  TDH at the concert?

16  A.    I have not discussed it with

17  her.

18  Q.    Was she present at the concert,

19  if you know?

20  A.    I don't recall.

21  Q.    Do you have access to her

22  telephone number?

23  A.    Yes.

Page 262

1   Q.    Do you know ███████████?

2   A.    No.

3   Q.    Do you know ███████████?

4   A.    No.

5   Q.    Did your daughter -- your

6   daughter Nicole, does she go by Nicci

7   sometimes?

8   A.    Yes.

9   Q.    Has she ever gone by the name

10  Nicci Hamilton?

11  A.    Yes.

12  Q.    But she -- she now goes by

13  Nicole Anderson?

14  A.    I'm not sure if she changed her

15  name yet.  She -- they just got married.

16  Q.    When did they get married?

17  A.    I don't know the date.

18  Q.    Has it been in 2016?

19  A.    It was recent.  Last 30 days.

20  Q.    Within the last month?

21  A.    Yes.

22  Q.    Okay.  What was her name before

23  Anderson?

Page 263

1   A.    Hamilton.

2   Q.    Hamilton?

3   A.    Yes, ma'am.

4   Q.    Okay.  Who is ███████████?

5   A.    A friend of the girls.

6   Q.    Of TDH's and ███████'s?

7   A.    Yes.

8   Q.    Was she present at the concert

9   that night?

10  A.    I don't recall, really.

11  Q.    Do you know if she would have

12  any information regarding what happened to you

13  or TDH at the concert?

14  A.    I have not discussed it with

15  her.

16  Q.    Do you know Nicole Smith?

17  A.    That's my daughter.

18  Q.    Has she gone by the last name

19  Smith at times?

20  A.    Yes.

21  Q.    Okay.  But she doesn't go by

22  that name anymore?

23  A.    No.

Page 264

1   Q.    Have you made any postings or

2   comments on Instagram regarding the incident

3   at the concert?

4   A.    No.

5   Q.    Do you know a ███████ or a

6   ███████████?

7   A.    I don't know her personally, but

8   she's on Facebook.

9   Q.    Have you been in contact with

10  her via Facebook?

11  A.    Contact, meaning what?

12  Q.    Have you -- have either of you

13  exchanged Facebook messages or --

14  A.    Personal messages, no.  Have we

15  commented on each other's posts, I believe so.

16  Q.    Okay.

17  A.    Yes.

18  Q.    Have you had any other contact

19  with her?

20  A.    No.

21  Q.    The posts or comments that

22  you've made on ███████████' Facebook, did

23  those have to do with this incident?

Page 265

1    A.    I believe in the very beginning
2  she posted a -- her -- she is an opinionated
3  kind of person, and she posted a -- made some
4  kind of post about the situation. And I can't
5  recall if I responded -- I think I might have
6  said thank you or -- I don't know what I said.
7  I don't remember what my comment was, if I did
8  make one.
9    Q.    Did you view any video that she
10 posted to Facebook or YouTube of her talking
11 about what happened to you or TDH?
12   A.    No, uh-uh (indicating no).
13   Q.    Are you seeking any money from
14 the defendants regarding to the time that you
15 were not working at your cleaning business?
16        MR. HARP: Object to the form.
17 Do you understand the question?
18        THE WITNESS: No.
19   Q.    Let me rephrase it. I know you
20 had a period of leave during your surgery that
21 you were not working at your cleaning
22 business; is that correct?
23   A.    Yes.

Page 266

1    Q.    Did you have to take any further
2  time off from your cleaning business apart
3  from that medical leave for your surgery?
4    A.    Oh, yes.
5    Q.    To deal with any of your
6  injuries from this?
7    A.    Yes, yes, yes.
8    Q.    How long was that? How long did
9  you have to take off apart from your medical
10 leave from your surgery?
11   A.    I -- huh. Well, I don't know if
12 I added up all the days, because I still do to
13 this day. Like, I -- yeah. Like, you know, I
14 feel bad so I can't go in, you know.
15   Q.    Do you have --
16   A.    I have to reschedule or just
17 forget it.
18   Q.    So there's times that you
19 haven't been able to go clean a residence
20 because of --
21   A.    Do anything, really. Just stay
22 home.
23   Q.    Because of what you suffered

Page 267

1  during the concert?
2    A.    Yeah, yes, ma'am.
3        MS. CHANDLER: Okay. Thank you,
4  Ms. Helm. I don't have any further questions.
5        THE WITNESS: Thank you.
6        MR. HARP: I think you're done.
7        MR. HOWARD: You're done.
8        (Whereupon, the deposition
9  concluded at 4:01 p.m.)
10       (FURTHER DEPONENT SAITH NOT)
11
12
13
14
15
16
17
18
19
20
21
22
23

Page 268

1        C E R T I F I C A T E
2
3  STATE OF ALABAMA )
4  ETOWAH COUNTY   )
5        I hereby certify that the above
6  and foregoing proceeding was taken down by me
7  by stenographic means, and that content herein
8  was produced in transcript form by computer
9  aid under my supervision, and that the
10 foregoing represents, to the best of my
11 ability, a true and correct transcript of the
12 proceedings occurring on said date at said
13 time.
14       I further certify that I am
15 neither of counsel, nor of kin to the parties
16 to the action; nor am I in any way interested
17 in the result of said cause.
18
19       /s/ Elizabeth Law Lankford
20       Elizabeth Law Lankford, CCR
         Court Reporter and Commissioner
21       ACCR#: 214, Expires: 9-30-2016
         Commission Expires: 11-4-2017
22
23