# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
### MIDDLE DIVISION

| | | |
|---|---|---|
| MICHELLE LEE HELM, | ] | |
| | ] | |
| Plaintiff, | ] | |
| | ] | |
| v. | ] | Civil Action No.: |
| | ] | 4:15-cv-1152-VEH |
| RAINBOW CITY, ALABAMA, et al. | ] | |
| | ] | |
| Defendants. | ] | |

## PLAINTIFF'S RESPONSE IN OPPOSITION TO DEFENDANT GREG CARROLL'S, JAMES FAZEKAS'S AND TIMOTHY KIMBROUGH'S MOTION FOR SUMMARY JUDGMENT

*/s/ H. Gregory Harp*
H. Gregory Harp (asb-0904-t75h)
GREGORY HARP LLC
459 Main Street Ste. 101-266
Trussville, Alabama 35173
(205) 544.3132 (Phone)
gh@gregoryharplaw.com

Moses O. Stone
STONE LAW FIRM, LLC
205 20th St North
Birmingham, Alabama 35203
(205) 714.3800
mosesostone@gmail.com

ATTORNEYS FOR PLAINTIFF

# TABLE OF CONTENTS

**TABLE OF AUTHORITIES** ................................................................................................ iv

**INTRODUCTION** ............................................................................................................. vi

**RESPONSE TO MOVANT'S STATEMENTS** .................................................................. vi

**ADDITIONAL UNDISPUTED FACTS** ........................................................................... xiii

   A.  Justin Gilliland's Statements of Fact. ........................................................ xiii

   B.  Timothy Kimbrough Statements of Fact. .................................................... xv

   C.  James Fazekas Statements of Fact. .............................................................. xv

   D.  George Morris Statements of Fact ............................................................. xvi

   E.  Greg Carroll Statement of Facts. ............................................................... xxi

   F.  T.D.H. Statement of Facts ........................................................................ xxii

   G.  Plaintiff Helm's Statement of Facts .......................................................... xxv

   H.  D.H. Statement of Facts ........................................................................... xxxi

**ARGUMENT** ..................................................................................................................... 1

   I.  **Standard of Review** ...................................................................................... 1

   II.  **Summary Judgment Is Not Appropriate In Regards To The Plaintiff's Claims Against Morris.** ............................................................................... 1

      A.  The Severity of T.D.H.'s Alleged Crimes. .................................................. 3

        1.  Under the Plaintiff's Version of Facts T.D.H. Had Committed No Crime. ................................................................................................... 3

2.  Any Alleged Crime Committed Under the Movant's Version of Facts Was Minor. ............................................................................. 5

3.  T.D.H. Was Not a Threat To Anyone Prior To Being Tased By Morris. 9

B.  T.D.H. was not attempting to evade arrest when Morris used his Taser on her. ...................................................................................... 12

C.  "Clearly Established" Law Regarding Taser Use on January 16, 2015 Prevents Qualified Immunity From Applying ............................... 13

D.  Morris's Plainly Incompetent Actions Prohibits Qualified Immunity. ...... 18

A.  Kimbrough's, Fazekas, and Carroll's Failure to Intervene and Stop Morris's Acts Against T.D.H. ........................................................ 21

1.  Facts Most Favorable to Plaintiff Helm. .................................... 25

2.  The Unconstitutional use of a Taser on Plaintiff Helm ............... 25

B.  The Failure of Fazekas To Intervene in The Use of The Taser Against Plaintiff Helm. .............................................................................. 27

1.  Fazekas's Failure to Intervene ................................................... 27

VI.  Plaintiff's False Imprisonment Claims Survive Summary Judgment. 27

A.  Plaintiff Helm's False Imprisonment Claims ............................. 28

B.  T.D.H.'s False Imprisonment Claims Against Morris ............... 29

CONCLUSION ..................................................................................... 29

CERTIFICATE OF SERVICE ............................................................ 31

# TABLE OF AUTHORITIES

## CASES

*Anderson v. Creighton*, 483 U.S. 635, 638-39 (1987) ............................................. 18

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249, (1986) .................................. 1

*Bailey v. Kennedy*, 349 F.3d 731, 743-44 (4th Cir. 2003) ..................................... 3

*Bell v. Wolfish*, 441 U.S. 520, 559 (1979) ............................................................ 2

*Brendlin v. California*, U.S. 249, 254 (2007) ........................................................ 29

*Cannon v. Macon County*, 1 F.3d 1558, 1562-63 (11th Cir. 1993) ........................ 28

*Case v. Eslinger*, 555 F.3d 1317, 1330 (11th Cir. 2009) ....................................... 28

*Davis v. Williams*, 451 F.3d. 759, 765 (11th Cir. 2006) ........................................ 6

*Ensley v. Soper*, 142 F.3d 1402 (11th Cir. 1998) ................................................... 27

*Fundiller v. City of Cooper City*, 777 F.2d 1436, 1441-42 (11th Cir. 1985) .......... 24

*Graham v. Connor*, 490 U.S. 386, 388 (1989) ..................................................... 1, 2

*Groman v. Township of Manalapan*, 47 F.3d 628, 636 (3d Cir. 1995) .................. 28

*Hadley v. Gutierrez*, 526 F.3d 1324, 1331 (11th Cir. 2008) ................................. 24

*Holloman ex rel. Holloman v. Harland*, 370 F.3d 1252, 1277 (11th Cir. 2004) .... 14

*Kesinger ex rel. Estate of Kesinger v. Herrington*, 381 F.3d 1243, 1249 (11th Cir. 2004) ............................................................................................................. 19

*Oliver v. Fiorino*, 586 F.3d 898 (11th Cir. 2009) ................................................. 15

*Ortega v. Christian*, 85 F.3d 1521, 1525 (11th Cir. 1996) .................................... 28

iv

*Perez v. Suszczynski*, 809 F.3d 1213, 1218 (11th Cir. 2016) ................................. 14

*Powell v. Haddock*, 366 Fed. Appx 29 (11th Cir. 2010) ............................................ 6

*Priester v. City of Riviera Beach, Fla.*, 208 F.3d 919, 924 (11th Cir. 2000) ......... 24

*Reeves v. City of Jackson*, 608 F.2d 644 (5th Cir. 1979) ....................................... 28

*Skrtich v Thornton*, 280 F.3d 1295 (11th Cir. 2002) ............................................... 22

*Thornton v. City of Macon*, 132 F.3d 1395, 1400 (11th Cir. 1998) ...................... 20

*Tolan v. Cotton*, ___ U.S. ___, 134 S.Ct. 1861, 1866 (2014) ................................ 14

*Tolan v. Cotton*, 134 S.Ct. 1861, 1865 (2014) ......................................................... 1

*Turmon v. Jordan*, 405 F.3d 202, 207 (4th Cir. 2005) .............................................. 3

*United States v. Lanier*, 520 U.S. 259, 269, (1997) ................................................ 14

*Valderrama v. Rousseau*, 780 F.3d 1108, 1112 (11th Cir. 2015) .......................... 14

*Velazquez v. City of Hialeah*, 484 F.3d 1340, 1341 (11th Cir. 2007) .................... 24

**STATUTES**

Ala. Code § 13A-10-41(a) .......................................................................................... 28

## INTRODUCTION

Plaintiff Helm, individually and on behalf of her minor daughter T.D.H, brings claims against Defendants Morris, Fazekas, Carroll and Kimbrough pursuant to 42 U.S.C. § 1983, *et seq*., for redress of violations of her and her daughter's constitutional rights. On January 16, 2015 while attending a concert at Center Stage in Rainbow City, Alabama, T.D.H., who on January 16, 2015 was a sixteen (16) year old girl with a history of grand mal seizures; experienced at least two grand mal seizures as well as pseudo seizures. Defendant Morris committed excessive force against T.D.H.

Defendant Fazekas and Kimbrough first assisted in rendering aid to T.D.H; but then failed to intervene when Morris committed violations of T.D.H.'s constitutionally protected rights. Defendant Carroll, who was present for part of Morris acts describe *infra*, though then the Chief of Rainbow City, and therefore had supervisor control likewise failed to intervene to stop Morris.

Here, genuine issues of material fact are so prevalent to leave no option but for the Court to allow a jury to pass judgment on them.

## RESPONSE TO MOVANT'S STATEMENTS

1.  **Disputed**. The concert was orderly and normal for a music concert (D.H. Dec. pg. 2, ¶¶ 12-13);

2.     Undisputed.

3.     **Disputed**.  Plaintiff disputes that George Morris ("Morris"), Justin Gilliland ("Gilliland"), Jimmy Fazekas ("Fazekas"), Gary Morgan ("Morgan"), Timothy Kimbrough ("Kimbrough"), Greg Carroll ("Carroll"), and Camp Yancey ("Yancey") were working the concert at Center Stage on a volunteer basis. Viewed in a light most favorable to Helm, those officers were on duty and acting in their capacity as Rainbow City police officers representing Rainbow City (Morris Dep. 152:15-153:8; Gilliland Dep. 100:21-101:17.)

4.     Undisputed.

5.     Undisputed.

6.     **Disputed**.   T.D.H. awoke from her second seizure and "kept asking [officers] what's going on. "Y'all let me go.  I don't know what's going on but I cannot breathe."   The officers told T.D.H. to "shut up", to keep her "mouth shut". She then had another seizure. (T.D.H. Dep 75:6-14.)

7.     **Disputed**.   T.D.H. testified that she knew, not believed that the Rainbow City police department tased her mother because she heard her mother scream after she heard the Taser.  T.D.H. was then grabbed by the neck and then slid her back. The police officers then put their knees in her stomach and she was then tased again and lost consciousness (T.D.H. Dep. 75:15-76:6.)

8.  **Disputed**.  Plaintiff disputes this listed alleged undisputed fact because it contains argument of the Movants' counsel.  Plaintiff disputes this alleged fact also because T.D.H. testified that although she was being held down by Rainbow City police officers, she was still surprised that she got tased (T.D.H. Dep. 84:10-14.)

9.  **Disputed**.  T.D.H. testified that she fell asleep on the way to the hospital after crying out and trying to get answers to her questions.  The medics who transported T.D.H. to the hospital did not take T.D.H.'s vitals on the way to the hospital.  Her vitals were not taken by the Rainbow City police officers before she was placed in the nine-point restraint harness, had her mouth duct taped shut, and placed in the ambulance (T.D.H. Dep. 99:4-100:18.)  T.D.H.'s mouth was taped shut barely enough for her to "get any air out" during the trip from Center Stage to the hospital.  The medics acted has if T.D.H. was "invisible" (T.D.H. Dep. 216:12-23.)  At the hospital T.D.H. asked the Rainbow City police officers who accompanied her to the hospital if she could call her mother.  A Rainbow City police officer told T.D.H. that she could "sit her ass right there", and that she "needed to be quiet".  And that she was "going to Mountain View[1] because she was "crazy" (T.D.H. Dep. 220:12-221:2.)

---

[1] Mountain View Hospital is a private, specialized psychiatric hospital serving children through senior adults.  http://www.mtnviewhospital.com/about-us/

10.	**Disputed**.  T.D.H.'s experienced <u>two</u> different types of seizures; (1) grand mal seizures, and (2) pseudo seizures brought on by the stress of being pinned down and tased (T.D.H. Dep. 36:22-40:4.)

11.	Undisputed.

12.	Undisputed.

13.	Undisputed.

14.	Undisputed.

15.	Undisputed.

16.	**Disputed**.  T.D.H. did not "snap out of it", rather, T.D.H. "begged them to tell me what was going on and for them to let me go, and I couldn't breathe and to at least let me sit up so I could catch a breath.  None of them would tell me their names.  I didn't even know what was going on.  They wouldn't even tell me what was going on.  I couldn't move.  I was pinned down so tight." (T.D.H. 76:7-77:20.)

17.	**Disputed**.  T.D.H. did not become "angry" and "irate," and started cursing and yelling, saying, "Let me go, you stupid mother fuckers."  Instead, T.D.H. begged the Rainbow City officers holding her down to let her go and asked what was going on (D.H. Dec. ¶¶ 37, 45);

18.	**Disputed in part**.  Plaintiff does not dispute that Gilliland told T.D.H. to stop fighting; however, T.D.H. was not fighting (D.H. Dec. ¶¶ 42-43);

19.   **Disputed**. T.D.H. was not trying to bite or spit on Gilliland or the other officers (D.H. Dec. ¶ 44);

20.   **Disputed**.  Plaintiff disputes that Morris appeared "on the scene 'seconds later'" (D.H. Dec. ¶ 20);

21.   **Disputed**.  Plaintiff disputes that T.D.H. stated "Tase me, motherfucker." Before she was tased by Morris the first time.  T.D.H. was only asking what was going on before she was first tased by Morris via a drive stun[2].  T.D.H never called Morris a "motherfucker" (D.H. Dec. ¶ 45);

22.   **Disputed**.  Plaintiff disputes that T.D.H. said, "fuck you, pig" after Morris Tased her the first time (D.H. Dec. ¶ 45). Gilliland inform Morris that Gilliland had witnessed T.D.H. have two seizures.   Morris testified that several minutes elapsed between the time T.D.H. came out of her seizure and him tasering T.D.H. the first time (Morris Dep. 142:21-143:20.)

23.   **Disputed**.  Plaintiff disputes that Morris was not told T.D.H. was having a seizure.   When Morris arrived, he asked Gilliland what was happening and Gilliland told Morris that T.D.H. was having seizures (D.H. Dec. ¶¶ 20-21);

24.   **Disputed**.  Plaintiff objects to this entire alleged undisputed statement of fact.   The alleged statement of fact is nothing more than inadmissible opinion

---

[2] The is no such procedure known as a "dry stun".  There are two modes in which the X-26 Taser, carried by Morris on January 16, 2015 can be used: (1) the "drive stun mode" and (2) the "dart" mode.  Morris used the Taser on T.D.H. on January 16, 2015 in the drive stun mode, whose only purpose, according to its maker is the infliction of pain without incapacitation. *https://help.axon.com/hc/en-us/articles/235821707-Drive-stun-backup.*

testimony.  Further, T.D.H. testified that after each seizure and subsequent tasering by Morris, she was exhausted.

25.  **Disputed**.  Plaintiff disputes this alleged fact.  T.D.H. suffered physical and unseen injuries after each Taser use on her by Morris (T.D.H. Photos)

26.  **Disputed**.  Plaintiff disputes this alleged fact.  The listed alleged fact is speculative in nature and is not pertinent to the summary judgment motion.

27.  **Disputed**. Plaintiff also objects to the arguments contained in the so-called fact section.  T.D.H. was not being violent when she was tased, and did not attempt to kick any officer pinning her down (D.H. Dec. pg. 6, ¶ 42);

28.  **Disputed**.  T.D.H. was having seizures and was not cursing, or attempting to break free. (D.H. Dec. pg. 6, ¶¶ 42-45);

29.  **Disputed**.  T.D.H. was not cursing everyone out.  Plaintiff disputes that Morris should have tased T.D.H. (D.H. Dec. pg. 6, ¶ 45);

30.  **Disputed**.  Plaintiff disputes that T.D.H. was aggressive in any way on January 16, 2015 prior to being tased by Morris.  Plaintiff disputes that T.D.H. was "flopping around and carrying on, screaming and cussin." (D.H. Dec. pg. 6, ¶¶ 42-45);

31.  Undisputed.

32.  **Disputed**.  Plaintiff disputes that she made physical contact with Fazekas prior to being tackled, handcuffed and tased.  Plaintiff denies having any

communication with any police officer. Plaintiff disputes that Plaintiff ran toward T.D.H. and the officers. Plaintiff was recovering from hemorrhoid surgery (D.H. Dec. ¶¶ 32-34);

33.  **Disputed**. Plaintiff Helm never interacted with Gilliland prior to being tackled, handcuffed and tased (D.H. Dec. ¶¶ 32-36, 47);

34.  **Disputed**. Plaintiff disputes that Fazekas attempted to grab Plaintiff Helm to "pull her out of the way". Plaintiff Helm was tackled immediately upon telling the officers inside Center Stage that T.D.H. was having seizures (Helm Dep. D.H. Dec. pg. 5, ¶¶ 32-34). Plaintiff disputes that Plaintiff Helm was trying to pull away or wiggle and not present her hands. Plaintiff Helm's hands were placed behind her back after she was tackled and then she was tased.

35.  Undisputed.

36.  Undisputed.

37.  **Disputed**. Plaintiff disputes that T.D.H. was very angry, cursed and spit at the paramedics. T.D.H. was strapped down to the gurney with gauze in her mouth and tape over the gauze (D.H. Dec.pg. 6, ¶ 45);

38.  **Disputed**. Plaintiff does not dispute that Morris was the only officer who deployed a Taser against T.D.H. Plaintiff disputes that T.D.H. was "disorderly." T.D.H. was having a seizure when she was tased by Morris (D.H. Dec. pg. 4, ¶ 30). Plaintiff disputes that she attempted to physically intervene with Gilliland and

disputes that she obstructed government operations. Plaintiff Helm never made it to the inside of Center Stage and was tackled outside the door away from where Gilliland and the other officers were holding down T.D.H. (D.H. Dec. pg. 5, ¶ 34, pg. 6, ¶ 47);

## ADDITIONAL UNDISPUTED FACTS

### A. Justin Gilliland's Statements of Fact.

39. Prior to Morris's use of the Taser on T.D.H., Gilliland believed T.D.H. was having a seizure (Gilliland Dep. pg. 63:18 - 64:2; p. 145:20-146:6);

40. Prior to Morris's use of the Taser in Gilliland's presence, someone informed Gilliland that T.D.H. was having seizures (Gilliland Dep. 61:17-62:2);

41. Despite knowing that T.D.H. was having seizures prior to Morris tasering T.D.H. in Gilliland's presence the first time, Gilliland never tried to stop Morris from tasering T.D.H. (Gilliland Dep. 64:17-21);

42. Prior to observing Morris's use of the Taser on T.D.H. the first time, Gilliland informed Fazekas that T.D.H. was having a seizure and he needed to make sure that T.D.H. did not harm herself (Gilliland Dep. 70:1-7);

43. Gilliland "absolutely" does not think it is a good idea to use a Taser on someone having a seizure (Gilliland Dep. 62:11-17);

44. Gilliland heard Morris tell T.D.H. that he was going to use a Taser on her prior to the first use of the Taser by Morris in T.D.H. (Gilliland Dep. 65:19-23);

45.     Gilliland did not try to stop Morris from using a Taser on T.D.H. because she was having seizures when he heard Morris tell T.D.H. he was going to use a Taser on her (Gilliland Dep. 66:1-5);

46.     Gilliland witnessed Morris drive stun T.D.H. the first time while he and other officers were holding T.D.H. down (Gilliland Dep. 70:8-12);

47.     Gilliland witnessed Morris drive stun T.D.H. a second time while she was being held down at the head and feet (Gilliland Dep. 72:19-23; 73:1-9);

48.     Gilliland does not believe T.D.H. had committed a crime at the time Morris used his Taser on T.D.H. the first time (Gilliland Dep. 90:7-10);

49.     Gilliland did not believe T.D.H. was a threat to Morris at the time Morris used his Taser on T.D.H. when Morris was standing above T.D.H. while she was lying on the ground with Gilliland holding her head (Gilliland Dep. 91:4-19);

50.     Gilliland is "on duty twenty-four, seven"; and was on duty when he did not try to stop Morris from using a Taser on T.D.H. (Gilliland Dep. 100:8-14);

51.     When Gilliland first encountered T.D.H. on the concert hall floor, she was shaking and it appeared to Gilliland that T.D.H. "was having a seizure." (Gilliland Dep. 120:22–121:7);

52.     Gilliland was concerned that T.D.H. was having a seizure when he first encountered her and held her head to make sure she didn't harm herself (Gilliland Dep. 122:6-8);

53.    After paramedics had been called and before Morris used his Taser the first time on T.D.H., Gilliland observed T.D.H. start seizing again while she was sitting in a chair in the lobby of Center Stage (Gilliland Dep. 125:8-17);

### B.    Timothy Kimbrough Statements of Fact.

54.    Kimbrough observed T.D.H., prior to her being tasered, being carried to the lobby of Center Stage by a black male and placed into a chair (Kimbrough Sta. ¶ 1);

55.    Kimbrough observed T.D.H. almost fall out of the chair at which point he and "several other officers" grabbed T.D.H. and laid her on the floor and called the medics (*Id*. at ¶ 2);

### C.    James Fazekas Statements of Fact.

56.    Prior to T.D.H. being tasered by Morris the first time Fazekas observed Gilliland holding T.D.H.'s head to keep it from hitting the concrete floor in the concert hall (Fazekas Sta. ¶ 6);

57.    Prior to T.D.H. being tasered by Morris the first time Fazekas observed a black male pick T.D.H. up from the concert floor and take her to the "front of the building near the front doors." (*Id*.);

58.    Prior to T.D.H. being tasered by Morris the first time Fazekas observed Gilliland call for medical attention for T.D.H. (*Id*.)

59.     Prior to T.D.H. being tasered by Morris the first time Fazekas observed that "after a short time sitting in the chair", T.D.H. "started having seizures again and fell in the floor." (Fazekas Sta. ¶ 7);

60.     Prior to T.D.H. being tasered by Morris the first time, Fazekas and "four or five police officers and one employee of Center Stage" were holding T.D.H. down to keep her from bouncing off the concrete floor (*Id*.)

61.     Fazekas left T.D.H. and went to assist in an arrest inside the concert hall. When he returned "the medics were still working on the female [T.D.H.} that was having the seizures." (Fazekas Sta. ¶ 11.)

### D.     George Morris Statements of Fact

62.     Morris first observed T.D.H. when she was lying on the ground in the lobby of Center Stage "by the ticket counter."  (Morris Sta. ¶ 1);

63.     Morris believed T.D.H. to be "having some type of a seizure" when he first encountered T.D.H. (Morris Sta. ¶ 2);

64.     When Morris first observed T.D.H., "several officers" were holding her down to keep her from "flopping around on the ground and possibly hurting herself" (*Id*.);

65.     Morris was ordered to work security at Center Stage by Greg Carroll, Rainbow City's police Chief (Morris Dep. 23:4-6);

66.     Morris felt like he had to work at Center Stage on January 16, 2015 because the Chief was telling him to (*Id.* 24:10-12);

67.     When Morris used the Taser on T.D.H. Carroll, Gilliland, Kimbrough and "a bunch of other people" were present (*Id*. 46:9-15);

68.     When Morris first encountered T.D.H. he was not told by Gilliland or other officers that T.D.H. was having seizures but he would have used the Taser on T.D.H. even if he had known that (*Id*. 48:19-22, 49:2-6);

69.     Morris did not arrest T.D.H. (*Id*. 54:6-7);

70.     Morris wrote a statement about T.D.H. because he knew or someone knew the lawsuit was coming (*Id*. 54:8-21);

71.     Morris admits that when he wrote in his own handwriting on January 21, 2015, he wrote that T.D.H. appeared to be having some type of seizure and several officers were holding her arms and legs to keep her from flopping around on the ground and possibly hurting herself (*Id*. 55:18-23, 56:1-3);

72.     Morris believes officers were holding T.D.H.'s arms and legs (*Id*. 56:19-22);

73.     Morris argued to John Bryant, a fellow police officer that he did not know T.D.H. was a juvenile (*Id*. 59:3);

74.     Morris does not feel badly about using a Taser on T.D.H. on January 16, 2015 (*Id*. 59:14-19);

75.     Morris admits that T.D.H. never touched him and he never felt threatened by T.D.H. on January 16, 2015 (*Id*. 61:10-17);

76.     When a Taser is used on a person the Taser leaves two red marks (*Id*. 63:10-12);

77.     Morris did not write in his January 21, 2015 statement that he thought T.D.H. was faking the seizures (*Id*. 64:2-11);

78.     At the time Morris first used the Taser on T.D.H., her arms and legs were physically being held down (*Id*. 80:8-11, 81:11-16);

79.     T.D.H. was being held down before and after Morris used the Taser on her (*Id*. 82:1-6);

80.     Morris has no remorse about his actions on January 16, 2015 (*Id*. 84:2-4);

81.     Morris would use a Taser on his own son (*Id*. 84:7-23, 85:1-2);

82.     Morris's body camera started recording right before he used the Taser on T.D.H. (*Id*. 88:3-10);

83.     Morris's body camera footage from January 16, 2015 is now "missing" (*Id*. 90);

84.     Morris's decision to use a Taser on T.D.H. was not a "split second decision" but rather was made with deliberation over the course of several minutes (*Id*. 96:4-13);

85.     Kimbrough never told Morris to not use the Taser on T.D.H. after Morris stated his intention to do so (*Id*. 101:16-20);

86.     Gilliland never told Morris to not use the Taser on T.D.H. after Morris stated his intention to do so (*Id*. 101:21-23, 101:1);

87.     Carroll never told Morris to not use the Taser on T.D.H. after Morris stated his intention to do so (*Id*. 102:2-5);

88.     Carroll and Morris did not have any conversation while T.D.H. was being held down (*Id*. 101:13-17);

89.     The last time prior to January 16, 2015 that Morris received training on the use of a Taser was in 2007 when he was originally issued the Taser (*Id*. 106:1-9);

90.     At some point on January 16, 2015, Morris was also holding or assisting in holding T.D.H. down (*Id*. 111:3-8);

91.     At the time that T.D.H. was first being held down, she had not committed any crimes in Morris's belief (*Id*. 114:5-11);

92.     Morris does not know that a Conductive Electrical Weapon is a Taser (*Id*. 123:12-17);

93.     Carroll was present when Morris used the Taser on T.D.H. (*Id*. 128:4-8);

94.     When Morris used his Taser on T.D.H. she was being restrained by police officers; her legs and arms were being held down by the officers (*Id*. 131:20-23, 132:1-5);

95.    Before Morris used a Taser on T.D.H. she was not a flight risk (*Id*. 132:6-11);

96.    Morris used his Taser on T.D.H. in the presence of other Rainbow City police officers (*Id*. 132:12-15);

97.    Morris has no remorse about using the Taser on T.D.H. even though she was being restrained at the time he used the Taser on T.D.H. (*Id*. 132:20-22);

98.    It was several minutes after T.D.H. stopped seizing before Morris used a Taser on T.D.H. (*Id*. 144:21-23);

99.    Morris admits that T.D.H. was not moving her arms at the time he used a Taser on her because her arms were being held down (*Id*. 145:2-7);

100.   Morris admits that T.D.H was not moving her legs at the time he used a Taser on her because her arms were being held down (*Id*. 145:8-10);

101.   Morris admits that T.D.H. was not moving her head at the time he used a Taser on T.D.H. because Gilliland was holding her head (*Id*. 145:11-16);

102.   No part of T.D.H.'s body was a threat to Morris prior to him using a Taser on her (*Id*. 146:14-19);

103.   No part of T.D.H.'s body was a threat to Carroll prior to him using a Taser on her (*Id*. 146:20-23);

104.   No part of T.D.H.'s body was a threat to Gilliland prior to Morris's use of the Taser on T.D.H. (*Id*. 147:1-5);

105.   No part of T.D.H.'s body was a threat to Kimbrough prior to Morris's use of the Taser on T.D.H. (*Id*. 147:6-10);

106.   No part of T.D.H.'s body was a threat to the general public prior to Morris's use of the Taser on T.D.H. (*Id*. 147:11-15);

107.   T.D.H. was not a threat to Morris (*Id*. 148:8-9);

108.   T.D.H. was not a threat to the general public (*Id*. 148:17-19);

109.   T.D.H. was being held down at the time Morris used a Taser on her (*Id*. 148:17-19);

110.   Morris did not assert in his statement that T.D.H. kicked Kimbrough (*Id*. 149:1-19);

111.   Gilliland did not assert that T.D.H. kicked Kimbrough prior to Morris using a Taser on T.D.H. (*Id*. 150:4-6);

112.   Kimbrough did not assert that he was kicked by T.D.H. prior to Morris using a Taser on T.D.H. (*Id*. 150:7-16);

113.   Morris believes he was acting under the color of state law in his capacity as a police officer of Rainbow City when he used a Taser on T.D.H. (*Id*. 152:15-23, 153:1-8);

**E.     Greg Carroll Statement of Facts.**

114.   Carroll became police chief in Rainbow City in August 2012 (Carroll Dep. 27:14-16);

115.   As police chief, Carroll had supervisory authority over everyone on the Rainbow City police force (*Id*. 28:18-23);

116.   Carroll knows Jeremy Reeves as the person over Center Stages and someone who would call Carroll whenever Center Stage needed security (*Id*. 33:6-11);

117.   Carroll and then Captain Chase Jenkins made the decision to not investigate Morris's use of a Taser on T.D.H. because they "didn't feel the need in it." (*Id*. 63:11-21);

118.   Carroll witnessed Morris use his Taser on T.D.H. (*Id*. 80:10-12);

119.   T.D.H. was being held down when Carroll witnessed Morris use his Taser on T.D.H (*Id*. 81:2-5);

120.   Carroll witnessed T.D.H. being held down by Kimbrough and "some Center Stage workers" while Morris was using the Taser on her (*Id*. 81:6-18);

### F.   T.D.H. Statement of Facts

121.   T.D.H. was struck by a car while walking on the side of the road in November of 2012 (T.D.H. Dep. 23:5-16);

122.   T.D.H. began having seizures after being struck by the car (*Id*. 28:10-29:4)

123.   T.D.H. began seeing Dr. Russell in Birmingham, Alabama for treatment of her seizures (*Id*. 32:19-33:2);

124.   Dr. Russell prescribed T.D.H. Topamax for treatment of her seizures (*Id*. 33:19-34:4);

125.   T.D.H. consulted with Dr. Russell and his partner about what happened to her on January 16, 2015 (*Id*. 38:16-19);

126.   Dr. Russell and his partner explained to T.D.H. that she was having two different types of seizures on January 16, 2015, grand mal seizures and pseudo seizures brought on by stress (*Id*. 38:20-40:4);

127.   When T.D.H. wakes up from a grand mal seizure she does not know where she is (*Id*. 54:5-8);

128.   T.D.H. has been told by people who have observed her seizures that while she is blacked out she will growl, spit, bite her tongue, bite her lip, bang her head, make weird noises and roll her eyes (*Id*. 58:13-59:3);

129.   January 16, 2015, the night of the incident was "very, very traumatic, terrifying" for T.D.H. (*Id*. 68:1-12);

130.   The last thing T.D.H. recalls before her first seizure at Center Stage was dancing to music then falling to the floor (*Id*. 69:3-17);

131.   The next thing T.D.H. recalls after falling to the floor is waking up on her back in the lobby of Center Stage (*Id*. 69:21-70:3, 71:13-17);

132.   T.D.H. recalls that her little sister was beside her and was playing with T.D.H.'s hair holding her down (*Id*. 71:19-23);

133.	When T.D.H. woke up in the lobby of Center Stage, she heard her little sister (D.H.) tell a person that T.D.H. had a seizure. The person asked T.D.H.'s little sister T.D.H.'s age and then T.D.H. had another seizure (*Id.* 72:1-5);

134.	T.D.H. knows that her sister was speaking to an officer because of the uniform worn by the person her little sister was speaking to (*Id.* 73:18-74:1);

135.	When T.D.H. came to after her second seizure, she recalls loud noise, being on her back, unable to move because she was being pinned down. One police officer had her by the neck, two officers had her pinned by each arm, and two officers had her pinned by each leg (*Id.* 74:8-23);

136.	After she came to from the second seizure, T.D.H. asked the officers what was happening and they told her to stay still and stop moving. She could not breathe (*Id.* 75:6-11);

137.	T.D.H. blacked out again while being pinned down by the police officers (*Id.* 75:12-14);

138.	T.D.H. awoke, heard her mother's voice, heard a Taser, perceived that her mother had been tased, heard her mother scream, tried to sit up, a police officer grabbed her by her neck and "scooted" her back, knees were put into her stomach and she was tased again, then blacked out again (*Id.* 75:15-76:6);

139.   T.D.H. told the police officers to tell her what was going on and that she could not breathe, and asked to sit up so that she could catch her breath because she was "pinned down so tight" (*Id.* 76:13-20);

140.   T.D.H. was being held down by five people at the time a Taser was used on her mother (*Id.* 79:12-19);

141.   The night at Center Stage was the first time T.D.H. awoke from a seizure and found herself being held down (*Id.* 88:5-89:5);

142.   Morris tased T.D.H. two times, with the second use of the Taser being longer.  As Morris came down for the third and final use of the Taser on T.D.H>, she passed out (*Id.* 93:11-23);

143.   Morris was standing on his feet and T.D.H. was on her back on the ground when Morris tased her (*Id.* 94:1-95:5);

144.   After Morris used his Taser on T.D.H. the last time, she recalls waking up strapped to a gurney in Center Stage lobby (*Id.* 95:17-96:1);

145.   T.D.H. recalls the Gilliland had her in a choke hold.  Later, Gilliland forced her mouth open so that gauze could be stiffed into her mouth (Id. 265:5-16);

### G.     Plaintiff Helm's Statement of Facts

146.   T.D.H. began having seizures about one year after she was hit by an automobile (Helm Dep. 62:10-23.)

147. T.D.H. had a seizure on the soccer field on January 16, 2015 the day of the concert (Helm Dep. 69:19-70:11.)

148. Plaintiff Helm describes T.D.H.'s body movements when T.D.H. has seizures. T.D.H.'s arms and legs flail and then draw up and then flail again (Helm Dep. 90:23-91:4.)

149. On January 16, 2015, Plaintiff Helm was still recovering from hemorrhoid surgery (Helm Dep. 99:4-22.)

150. Plaintiff Helm received a phone call from someone who informed her that T.D.H. was having a seizure at Center Stage (Helm Dep. 108:8-109:2.)

151. After she received the call, Plaintiff Helm, dressed in pajamas and slippers got into her car and drove across the highway to Center Stage (109:7-18.)

152. When Plaintiff Helm arrived at Center Stage's lobby, she observed a "crowd of officers" on top of T.D.H. and observed T.D.H. seizing (Helm Dep. 111:8-10.)

153. Plaintiff Helm is sure that it was T.D.H. she saw on the ground with the officers on top of her (Helm Dep. 111:11-15.)

154. Plaintiff Helm observed seven men holding T.D.H. down, physically on top of her, using their weight to press down on T.D.H. (Helm Dep. 113:4-14.)

155. There were two men holding down each of T.D.H.'s legs, two holding her arms, two men holding down her middle section, and one holding her neck (Helm Dep. 113:15-114:10.)

156.   T.D.H. was not talking while Plaintiff Helm observed her being held down, but the police officers were yelling "so loud" (Helm Dep. 114:14-21.)

157.   Plaintiff Helm did not get into the lobby of Center Stage because she was knocked to the ground by a police officer.  Plaintiff Helm never saw it coming (Helm Dep. 115:1-12.)

158.   Just before she was knocked to the ground by the officer, Plaintiff Helm called and said "that's my daughter, she's having a seizure."  When Plaintiff Helm got to the word "seizure" that is when the officer knocked her down (Helm Dep. 116:5-8.)

159.   When Plaintiff Helm was knocked to the ground by the police officer, her arms were pulled behind her back and she was face first into the ground turned toward the direction where T.D.H. was being pinned down (Helm Dep. 116:10-18.)

160.   Plaintiff Helm observed Morris tase T.D.H. "right in the stomach" and then tase her again (Helm Dep. 116:23-117:4.)

161.   Plaintiff Helm heard the second tase of T.D.H. (Helm Dep. 117:5-6.)

162.   Plaintiff Helm saw T.D.H. go unconscious after Morris tased T.D.H. the second time but heard Morris tase T.D.H. a third time (Helm Dep. 117:10-118:9.)

163.   Plaintiff Helm urinated on herself when she was tased.  Plaintiff Helm was on the ground with her hands handcuffed behind her back when tased. (Helm Dep. 119:7-20.)

164.   She was tased in her lower back on the right side once (Helm 120:5-18.)

165.   Being knocked to the ground and tased was unexpected by Plaintiff Helm because it was a medical situation with T.D.H. (Helm Dep. 121:1-9.)

166.   No one said anything to Plaintiff Helm before she got tackled.  She did not hear anyone tell her not to go over to her daughter or to stop where she was (Helm Dep. 121:13-123:10);

167.   Plaintiff Helm heard someone say "get her" before she was tased (Helm Dep. 123:17-21);

168.   No officer told Plaintiff Helm to be still before she was tased (Helm Dep. 124:2-8);

169.   No officer told Plaintiff Helm no to resist before she was tased (Helm Dep. 124:9-12);

170.   No officer told Plaintiff Helm to stop struggling before she was tased (Helm Dep. 124:13-16);

171.   No officer ordered Plaintiff Helm to give them her arms before she was tased because they already had her arms before she was tased (Helm Dep. 124:17-21);

172. After she was tased, Plaintiff Helm was dragged across the courtyard at Center Stage and she asked to sit up (Helm Dep. 125:11-15). When she asked to sit up the police officer told her to "sit the f-ing down." (Helm Dep. 125:17-126:1);

173. Plaintiff Helm never made it to the inside of Center Stage where T.D.H. was being pinned down and tased before Plaintiff Helm was knocked down and tased (Helm Dep. 126:2-129:6; D.H. Dec. ¶ 47);

174. Plaintiff Helm did not see what the officer who tackled her was wearing because he tackled her from behind (Helm Dep. 130:1-7);

175. Plaintiff Helm was taken to a patrol car by a uniformed officer after being tased (Helm Dep. 132:19-133:10);

176. Plaintiff Helm was sitting in the patrol car saturated in urine (Helm Dep. 133:17-21);

177. T.D.H. saw doctors including her neurologist after she was tased by Morris on January 16, 2015 (Helm Dep. 149:2-15020);

178. Although Plaintiff Helm was charged with some crime on January 16, 2015, the charges were dismissed by Rainbow City (Helm Dep. 163:14-164:6);

179. T.D.H. was brought to the hospital after being tased in a nine-point harness with gauze in her mouth. She was told that she was going to be put into Mountain View (Helm Dep. 223:4-15);

180. D.H. also attended the concert at Center Stage on the night T.D.H. was tased by Morris (Helm Dep. 228:15-21);

181. Plaintiff Helm is sure that she was handcuffed at the wrist when she was tased (Helm Dep. 230:19-231:3);

182. D.H. witnessed T.D.H. having a seizure in the concert hall; D.H. informed officers that T.D.H. was having a seizure (Helm Dep. 246:7-14);

183. D.H. witnessed T.D.H. being tased three times (Helm Dep. 247:3-5);

184. D.H. saw the officer knock Plaintiff Helm to the ground and saw Plaintiff Helm urinate "all over". D.H. saw Plaintiff Helm get tased. D.H. observed Plaintiff Helm being dragged to the concrete wall after being tased (Helm Dep. 247:6-14);

185. When Plaintiff Helm arrived at Center Stage after receiving a call, she saw a crowd of officers on top of T.D.H. inside the lobby at Center Stage. Plaintiff Helm was just outside the doorway and T.D.H. was being pinned down in the lobby (Helm Dep. 248:15-249:13);

186. After Plaintiff Helm was tased she urinated and her legs "were not working right." While she was being dragged to the concrete wall, she could still see T.D.H.'s body (Helm Dep. 252:6-20);

187.  Plaintiff Helm saw the first tasering of T.D.H. by Morris.  Plaintiff Helm could see that T.D.H.'s body was not moving when she heard the Taser the second and third time (Helm Dep. 254:1-4);

188.  Plaintiff Helm was tased before T.D.H. was tased the first time (Helm Dep. 254:8-13);

189.  T.D.H. stayed at her friend's house in Gadsden after being released from the hospital because she was terrified to go back to Rainbow City (Helm Dep. 257:7-258:12);

190.  Plaintiff Helm was tackled by Fazekas before she made it to the inside of Center Stage (Helm Dec. ¶ 4);

191.  Fazekas was present when the Taser was used on Plaintiff Helm; however, Fazekas never attempted to stop the use of the Taser on Plaintiff Helm (Helm Dec. ¶¶ 6-8);

**H.    D.H. Statement of Facts**

192.  T.D.H. began having seizures after she was hit by a car while walking down the road (D.H. Dec. ¶ 4);

193.  D.H. attended the same concert as T.D.H. on January 16, 2015 (*Id*. at ¶ 7);

194.  While attending the concert, D.H. observed T.D.H. begin to have a seizure and fell to the floor in the Center Stage concert hall floor (D.H. Dec.¶ 8-9);

195.    D.H. told Gilliland, whom she knew to be a police officer, that T.D.H. was having a seizure (D.H. Dec ¶¶ 11-13);

196.    After suffering the seizure in the concert hall, T.D.H. was picked up and taken to the lobby of Center Stage by a black male (D.H. Dec. ¶14);

197.    D.H., Gilliland and another police officer followed the black male carrying T.D.H. to the lobby of Center Stage (D.H. Dec. ¶14);

198.    The black male sat T.D.H. in a chair in the lobby and T.D.H. began "coming out" of the first seizure and asked D.H. what happened (D.H. Dec. ¶ 16);

199.    D.H. told T.D.H. she suffered a seizure (D.H. Dec. ¶17);

200.    T.D.H. began having another seizure in the presence of D.H., Gilliland and other Rainbow City police officers (D.H. Dec. ¶18);

201.    D.H. told Gilliland that T.D.H. was having another seizure (D.H. Dec. ¶ 18);

202.    Approximately two minutes after T.D.H. started having her second seizure, Morris showed up in the lobby of Center Stage (D.H. Dec. ¶ 20);

203.    Morris began yelling at T.D.H. while she was having the second seizure. Morris was standing at T.D.H.'s feet telling her she had better calm down (D.H. Dec. ¶ 22);

204.    While she was having the second seizure, Morris threatened to tase T.D.H. if she did not calm down (D.H. Dec. ¶ 24);

205. When Morris threatened to tase T.D.H., she was being held to the ground by five police officers (D.H. Dec. ¶ 25);

206. None of the officers holding T.D.H. to the ground tried to stop Morris after he threatened to tase T.D.H. (D.H. Dec. ¶ 26);

207. Morris took out his Taser and waved it in front of the still seizing T.D.H. and again threatened to use the Taser on T.D.H. (D.H. Dec. ¶ 27);

208. Morris used the Taser on T.D.H. while she was having the seizure and held to the ground by the five police officers (D.H. Dec. ¶¶ 29-30);

209. When Morris used the Taser on T.D.H., she screamed while still having a seizure (D.H. Dec. ¶ 30).

## ARGUMENT

### I.      Standard of Review

Summary judgment is appropriate only if the trial court determines there is no genuine dispute as to any material fact. Fed. R. Civ. P. 56(a).) "[T]he judge's 5function is not [] to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249, (1986); *see also First Nat. Bank of Ariz. Cities Service Co.*, 391 U.S. 253, 289 (1968) (the question at summary judgment is whether a jury should "resolve the parties' differing version of truth at trial") . A genuine factual issue is one that "properly can be resolved only by a finder of fact because [it] may reasonably be resolved in favor of either party." *Anderson* at 250.

"In making this determination, the court must review all evidence and make all reasonable inferences in favor of the party opposing summary judgment." *Chapman v. AI Transport*, 229 F.3d 1012, 1023 (11th Cir. 2000) (*en banc*) (quoting *Haves v. City of Miami*, 52 F.3d 918, 921 (11th Cir. 1995).

### II.      Summary Judgment Is Not Appropriate In Regards To The Plaintiff's Claims Against Morris.

Plaintiff Helm's and her daughter T.D.H.'s claims of excessive force by Morris examined through the Fourth Amendment. *Tolan v. Cotton*, 134 S.Ct. 1861, 1865 (2014); *Graham v. Connor*, 490 U.S. 386, 388 (1989). The excessive force

claims are subject to an "objective reasonableness" standard. *Graham*, 490 U.S. at 397 ("[T]he question is whether the officers' actions are "objectively reasonable" in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation.") (citations omitted). The Supreme Court has explained that the Fourth Amendment's test for reasonableness is not capable of a "precise definition or mechanical application. *Bell v. Wolfish*, 441 U.S. 520, 559 (1979). The Supreme Court has counseled that the test "requires a careful balancing of the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake." *Graham*, 490 U.S. at 396. Helpfully, the *Graham* Court enumerated three factors to guide the balancing of those competing interest. Under *Graham*, examination should first be made into to "the severity of the crime at issue[3]" that was allegedly committed by T.D.H. Next, an examination should be made into the extent to which "[T.D.H.] poses an immediate threat to the safety of the officers or others". *Id.* Lastly, under the *Graham* balancing test, consideration should be given to "whether [T.D.H] [was] actively resisting arrest, or attempting to evade arrest by flight." *Id.* (alteration supplied).

---

[3] It is undisputed that T.D.H. was not an "arrestee" at the time she was tasered by Morris on January 16, 2015 (Morris Dep. 54:5-7). T.D.H. was in fact not charged with any crime related to January 16, 2015 (*Id*. 79:6-90 and 112:8-114:4; Gilliland Dep. 88:9-90:13; Carroll Dep. 194:16-17). However, even under the more tainted facts of an arrest of T.D.H., Morris's actions toward T.D.H. were nevertheless clearly unconstitutional.

When viewed in a light most favorable to the Plaintiff as the nonmoving party, the facts and circumstances of this case show that Morris's actions against T.D.H. were unreasonable, unconstitutional, and excessive.

## A.    The Severity of T.D.H.'s Alleged Crimes.

### 1.    Under the Plaintiff's Version of Facts T.D.H. Had Committed No Crime.

The first *Graham* factor weighs heavily in the favor of T.D.H.  As noted *supra,* the facts viewed in a light most favorable to the Plaintiff as the non-moving party clearly show that T.D.H. had not committed a crime prior to Morris's use of a Taser[4] on her on January 16, 2015 (Gilliland Dep. 89:17-21, 90:7-10, 102:21-23, 103:22-23, 104:1-2).  Because T.D.H. " ha[d] not committed any crime, this factor weighs heavily in [T.D.H's] favor." *Bailey v. Kennedy*, 349 F.3d 731, 743-44 (4th Cir. 2003); *see also Turmon v. Jordan*, 405 F.3d 202, 207 (4th Cir. 2005) ("[T]he severity of the crime cannot be taken into account because there was no crime.").

Setting forth a jury question, the Movants counter the Plaintiff's claims of T.D.H.'s lawful behavior on January 16, 2015 by alleging that T.D.H. was somehow being disorderly as she was pinned to the ground by five to seven[5] police

---

[4]  "Taser", as used herein will refer to the model X-26 conducted electrical weapon ("CEW"). The Taser derives its name as an acronym for **T**homas **A**. **S**wift's **E**lectric **R**ifle by which the inventor of the Taser paid homage to his childhood hero Tom Swift, the protagonist in early 20th century comic books. L*angton, Jerry (December 1, 2007). "The dark lure of `pain compliance'". Toronto Star. Retrieved December 1, 2007.*
[5]  There is some confusion as to whether five or seven officers restrained T.D.H. during Morris's use of the Taser; however, it is undisputed that T.D.H. was being restrained by at least five

officers while having seizures. However, assuming only for the sake of addressing why the Movants' claims that T.D.H. was being disorderly, the Eleventh Circuit has made it clear that the repeated tasering of disorderly subjects is unconstitutional. In *Vinyard v. Wilson*, 311 F.3d 1340, 1347 (Cir. 2002), the Eleventh Circuit explained, "crimes [of] disorderly conduct and obstruction were of minor severity." The *Vinyard* Court also noted that ""more force is appropriate for a more serious offense and less force is appropriate for a less serious one." *Id.* (quoting *Lee v. Ferraro*, 284 F.3d 1188, 1198 (11th Cir. 2002)).

Viewed in a light most favorable to the Plaintiff and T.D.H., the facts show that T.D.H., was not committing any crime much less a more serious one just prior to being tased three times by Morris:

> Q. In your belief, had T.H.[6] committed a crime at the time George Morris Tased her the first time?
>
> A. I did not arrest her for any crime at that point.
>
> . . .
>
> Q. And so if T.H. had committed a crime worthy of arrest, you could have arrested her that night, correct?
>
> A. If I had seen a crime being committed.

___

officers. Whether five or seven officers pinned T.D.H. down during Morris's repeated use of the Taser on T.D.H. does not change the analysis regarding Morris's unlawful use of force.

[6] In certain deposition transcripts in the case, the minor T.D.H. is referred to by the shortened "T.H."

. . .

Q.   And you didn't arrest her.

A.   I didn't see it from every angle.

Q.   Well, you saw it from the angle of her head you were holding, correct?

A.   Correct.

Q.   So from the angle of her head where you were holding it, did you see her commit a crime?

A.   No.

Q.   Yet George Morris Tased her, correct?

A.   Correct.

(Gilliland Dep. 89:3-90:13).

Additionally, D.H. who was an eyewitness to the entirety of the events involving T.D.H and her mother testifies that T.D.H. was not committing any acts that could be viewed as disorderly at best, and criminal at worst. (D.H. Dec. ¶¶ 44, 45, 52). Viewed in a light most favorable to Plaintiff Helm, the facts show that T.D.H. was not cursing, screaming, spitting or doing anything other than having seizures. (*Id*).

### 2.   Any Alleged Crime Committed Under the Movant's Version of Facts Was Minor.

Even assuming *arguendo*, and without waiving the factual argument that T.D.H. had not committed a crime before Morris used a Taser on her, under the

Movants' version of events, the only "crime" identified by Morris and the other Movants as justification for Morris's repeated use of the Taser on T.D.H. was minor in nature:

> Q.    Okay.  But she had not committed a crime at the time she was Tasered, right?
>
> A.    She had committed a crime.  She was disorderly.

(Morris Dep. 78:20-23).

The only alleged crime committed by T.D.H. that Morris could articulate was one of disorderly conduct[7].  In the state of Alabama disorderly conduct is a Class C misdemeanor.  Ala. Code § 13A-11-7(b).  Disorderly conduct is considered a minor crime in this Circuit.  It was clearly established in this Circuit on January 16, 2015 that even arrestees accused of committing minor crimes should not be subjected to unconstitutional repeated Taser use by a police officer. *Powell v. Haddock*, 366 Fed. Appx. 29 (11th Cir. 2010).   In *Powell*, a case involving the use of a Taser on an individual when the deputy claimed probable cause to arrest for resisting an officer without violence because the plaintiff allegedly failed to follow instructions, the Court explained, "words alone did not rise to the level of resisting an officer." *Id.* at 31 (citing *Davis v. Williams*, 451 F.3d. 759, 765 (11th Cir. 2006).

---

[7] Plaintiff Helm does not, in pointing out that even the alleged crime that Morris names to justify his action was minor in nature, waive her argument that no crime was committed by T.D.H. prior to Morris's use of the Taser on T.D.H.

Further, *Powell*, which was decided more than four years before January 16, 2015 placed Morris on notice before he used force on T.D.H. that the force he intended to use "cannot constitutionally be used against a non-threatening suspect when the alleged crime of the suspect is a minor offense." *Id.* at 31.

Even under the hotly disputed facts put forth by the Movants, facts in *Powell* were so like the facts in the instant case to place Morris and other Rainbow City officers on notice regarding the use of a Taser when minor offenses, if any are involved. In *Powell*, the deputy first administered his Taser to the chest area of the plaintiff after he encountered her and the plaintiff told the deputy to "get [his] hands off [her]." *Id*. at 30. Morris encountered T.D.H. when Gilliland and other Rainbow City police officers were holding her down to the ground by her arms and her legs as she had just recovered from the second seizure. (Gilliland Dep. 137:3-22, 139:3-13; Morris Dep. 139:10-21, 141:22-144:9).

The deputy in *Powell* proceeded to inform the plaintiff that if she did not obey him, he would use his Taser on her. *Id*. Morris likewise informed T.D.H. that he would use his Taser if she didn't "settle down" (Morris Dep. 141:19-21). When the *Powell* plaintiff further inquired what the deputy intended to do after telling him to remove his hands from her, the deputy deployed his Taser into the chest area of the plaintiff. *Id*. Here, T.D.H., after coming to and who had committed no crime, asked what was happening and to be let go. Instead, Morris

waited "several" minutes and then repeatedly deployed his Taser on T.D.H.'s chest area. (Morris Dep. 143:3-11).

While the *Powell* plaintiff was on the ground, the deputy deployed his Taser into her a second time, then arrested the "bleeding and hurt" plaintiff on charging of resisting arrest. Likewise, after using his Taser on T.D.H. who, at the time was being held to the ground by five to seven men, Morris deployed his Taser on T.D.H. a second time, while the other Rainbow City police officers were still holding her to the ground. (Gilliland Dep. 147:9-148:13; T.D.H. Dep. 82:12-17, 83:11-14, 93:5-23, 193:11-15, 203:4-17). The *Powell* plaintiff was never convicted. Here there is more, as T.D.H. was not only not convicted, she was not arrested nor charged, much less convicted with any crime on January 16, 2015. (Rainbow City Dep. 264:4-265:6).

"Even in a case in which the plaintiff ha[s] committed a crime, when the offense [i]s a minor one, we have found that the first *Graham* factor weigh[s] in plaintiff's favor . . . .". *Jones v. Buchanan*, 325 F.3d 520, 528 (4th Cir. 2003).

Even had T.D.H. engaged in the "disorderly" conduct alleged in the Movants' version of the facts; Morris's use of force in response to the conduct he deemed disorderly was "plainly excessive, wholly unnecessary, and, indeed, grossly disproportionate under *Graham*." *Lee*, 284 F.3d at 1198.

### 3. T.D.H. Was Not a Threat To Anyone Prior To Being Tased By Morris.

Since 2009, the clearly established case law in this Circuit has been that police officers simply should not repeatedly use a Taser on individuals who are not a threat. *Oliver v. Fiorino*, 586 F.3d 898 (Cir. 2009) (holding that the repeated tasering of in individual into complete physical capitulation was grossly disproportionate to any threat posed and unreasonable under the circumstances). The facts in *Oliver*, decided some five years before January 16, 2015 are eerily similar to the instant case. The *Oliver* plaintiff "was not accused of or suspected of any crime, and indeed was not threatened with arrest or apprehension at any time prior to (or after) the use of force. The plaintiff posed no immediate threat of danger to officers beyond the moment of struggle [.]" *Oliver*, 586 F.3d at 906

Here, like the *Oliver*, Plaintiff, T.D.H. the recipient of Morris's repeated use of the Taser, was not accused or suspected of any crime. (Gilliland Dep. 89:3-90:13).

Analogous to the *Vinyard* Court's findings that the plaintiff did not pose a threat and thus the use of force exceeded what was necessary, Morris himself admits that factually, T.D.H.'s involuntary body movements posed no threat prior to his repeated deployment of the Taser on her:

> Q. My question was, what part of [T.D.H.'s] body that was moving and bucking and thrashing as you described was a threat to you?

A.    None.

Q.    What part of [T.D.H.'s] body that was moving and bucking and thrashing as you described was a threat to Chief Carroll?

A.    None.

Q.    What part of [T.D.H.'s] body that was moving and bucking and thrashing as you described was a threat to Officer Gilliland?

A.    None.

Q.    What part of [T.D.H.'s] body that was moving and bucking and thrashing as you described was a threat to Officer Kimbrough?

A.    None.

Q.    What part of [T.D.H.'s] body that was moving and bucking and thrashing as you described was a threat to the general public?

A.    None.

Q.    Then why did you Tase [T.D.H.]?

A.    To get her to comply with my commands to settle down, calm down.

Q.  That's the only reason.

A.  That's the reason.

(Morris Dep. 146:15 – 147:20).

10

Here, even assuming the Court ignored Rule 56's requirement that inference by given to the non-movant's version of facts and accepted the Movants' version, that T.D.H. was being "disorderly", Morris's repeated use of the Taser on T.D.H. would nevertheless be unconstitutional. *Vinyard*, *supra*.

However, the Movants' version of events is contradicted by both Morris's own words, and testimony from other witnesses at the scene. As shown above, Morris readily admits that T.D.H. posed no threat to anyone on January 16, 2015 before he applied a Taser to her. Yet inexplicably, Morris used a Taser three (3) times on T.D.H. in the presence of Rainbow City officers restraining T.D.H.; none of who attempted to stop Morris's unconstitutional act. Additionally, D.H.'s testimony, which must be taken as true by the Court, shows that T.D.H. was not acting belligerently or in a threatening manner prior to her being tased by Morris. (D.H. Dec., *supra*).

At the very least, the two-competing versions of events leading up to Morris's use of a Taser on T.D.H. sets up the classic "swearing contest". Thus, questions of fact remain for determination by the jury regarding whether T.D.H. was "disorderly" prior to her being tased. *See*, *Joassin v. Murphy*, 661 Fed. Appx. 558 (11th Cir. 2016) (The summary judgment evidence reveals a genuine dispute [.] Therefore, summary judgment was inappropriate."); *Jackson v. West*, 787 F.3d 1345, n. 6 (11th Cir. 2015) ("One cannot " refute" a witness's statements using

another witness's statements at summary judgment; such a swearing contest is one for the jury to resolve.").

The second *Graham* factor would still favor T.D.H even had the Rainbow City police officers' seizure, and Morris's subsequent use of excessive force on T.D.H was converted to a criminal arrest for disorderly conduct had T.D.H allegedly failed to obey Morris's lawful orders.

The Plaintiff's fact show that T.D.H. did engage in the conduct Morris described, his use of force in response to the conduct he deemed disorderly was plainly excessive, wholly unnecessary, and, indeed, grossly disproportionate under *Graham*." *Lee*, 284 F.3d at 1198.

### B. T.D.H. was not attempting to evade arrest when Morris used his Taser on her.

Likewise, the third *Graham* factor weighs heavily in T.D.H.'s favor when the evidence is viewed in a light most favorable to the Plaintiffs. Because T.D.H. had not committed a crime, as confirmed by Gilliland, and because there was not arrest of T.D.H, it is axiomatic that T.D.H. was not attempting to evade arrest. Tellingly, T.D.H. was not placed under arrest before or after Morris's use of the Taser on her (Morris Dep. 54:6-21; Gilliland Dep. 89:3-21). Additionally, D.H.'s testimony shows that T.D.H. was not being "disorderly", the only charge that Morris believes could have been leveled against T.D.H. Gilliland himself testifies

that as a sworn APOST certified police officer, had he observed T.D.H. commit a crime, he would have arrested her for the crime (Gilliland Dep. 89:3-90:13).

Regarding the last *Graham* factor, T.D.H. could not have been actively resisting arrest, or evading arrest because T.D.H. had not committed a crime. *Turmon* 405 F.3d at 207.

Because all the *Graham* factors weigh so heavily and obviously in favor of T.D.H., Morris's repeated use of the Taser on T.D.H. was unconstitutional because (1) T.D.H was having a medical emergency and was being restrained by Gilliland, Kimbrough, Carroll and other Rainbow City police officers; (3) she was not a threat to Morris or the general public nor other police officers, and (4) she was not actively resisting arrest or attempting to flee. Morris's actions were clear violations of T.D.H.'s constitutional rights.

All of the *Graham* factors weigh heavily in T.D.H.'s favor as to Morris's use of force on T.D.H while she was being restrained by Rainbow City police officers. These facts preclude summary judgement in favor of the Movants.

**C.    "Clearly Established" Law Regarding Taser Use on January 16, 2015 Prevents Qualified Immunity From Applying.**

To determine whether qualified immunity applies to Morris's actions against T.D.H., a two-step inquiry must be conducted: (1) do the facts alleged, construed in the light most favorable to T.D.H, establish that a constitutional violation occurred; and (2) was the violated constitutional right of T.D.H. clearly established

on January 16, 2015. *Perez v. Suszczynski*, 809 F.3d 1213, 1218 (11th Cir. 2016).

Under either of the step, "courts may not resolve genuine disputes of fact in favor

of the party [Morris, Kimbrough, Carroll and Fazekas] seeking summary

judgment." *Tolan v. Cotton*, ___ U.S. ___, 134 S. Ct. 1861, 1866, (2014).

A right may be "clearly established" by an existing decision of the Supreme

Court, the Eleventh Circuit, or Alabama's highest court. *Valderrama v. Rousseau*,

780 F.3d 1108, 1112 (11th Cir. 2015). "There need not be a case on all fours, with

materially identical facts"; rather, there can be "notable factual distinctions"

between the precedent, and the case before the Court for a right to be clearly

established. *Holloman ex rel. Holloman v. Harland*, 370 F.3d 1252, 1277 (11th

Cir. 2004) (quotations omitted). On January 16, 2015, Morris need only have had

"reasonable warning" that his conduct violated constitutional rights. *Id*. As the

*Holloman* Court explained:

> "While officials must have fair warning that their acts
> are unconstitutional, there need not be a case "on all
> fours," with materially identical facts, before we will
> allow suits against them. A principle of constitutional
> law can be "clearly established" even if there are"
> notable factual distinctions between the precedents
> relied on and the cases then before the Court, so long as
> the prior decisions gave reasonable warning that the
> conduct at issue violated constitutional rights."

*Holloman*, 370 F.3d at 1277 (quoting *United States v. Lanier*, 520 U.S. 259, 269,

(1997)).

On January 16, 2015, it was (and remains) clearly established law in the Eleventh Circuit that it is unreasonable for a police officer to repeatedly use a Taser on an individual who (1) was not accused of any crime, (2) was not a flight risk, and (3) did not pose an immediate threat to the officers or others. *Oliver*, *supra*.

When Morris tasered T.D.H. at least two times while she was being physically restrained by five Rainbow City police officers, Morris violated clearly established law.

Like the facts surrounding the use of force in *Oliver*, the justification for Morris's repeated use of the X-26 Taser on T.D.H. who had suffered at least two seizures and was being restrained by her arms, legs and neck by police officers was nonexistent. *Oliver* 586 F.3d at 906. T.D.H posed no immediate threat to Morris or the other officers before she was tased by Morris. (Morris Dep. 148:4-19; Gilliland Dep. 90:17-91:19). Like the use of force in *Oliver*, Morris's repeated tasering of T.D.H. "was grossly disproportionate to any threat posed and unreasonable under the circumstances. *Oliver,* 586 F.3d at 907.

At least five years prior to January 16, 2015, the Eleventh Circuit, in deciding *Oliver,* made a clear pronouncement that when a person who has not been accused, not suspected of, and indeed, not committed any crime, let alone a violent one, and made no effort to flee, the repeated use of a Taser on that person is "so

utterly disproportionate to the level of force reasonably necessary that any reasonable officer would have recognized that his actions were unlawful." *Oliver*, 586 F.3d at 908.

In *Oliver,* the Eleventh Circuit held that "it would be clear to every reasonable officer, even in the absence of case law, that . . . repeatedly tasering . . . over a two-minute period without warning . . . was excessive under the circumstances." *Id*.   In the instant case, Morris testifies that his tasering of T.D.H. likewise covered a period of minutes; rather than it being a situation in which Morris had to make split second decisions:

> Q.    So you didn't try to make her stop.  You gave her a
>        threat that you would Tase her, correct?
>
> MR. STUBBS:  [].
>
> A.    Yes, I did.  I told her.  Yes, I told her I would Tase
>        her.
>
> Q.    And she had just come out of a seizure, according
>        to what you wrote in your report; is that right?
>
> A.    Yes.
>
> Q.    And according to what you put on your use of
>        force report --
>
> A.    Yes.
>
> Q.    -- she had just come out of a seizure.
>
> A.    Yes.

Q. And when she came out of that seizure, she was being held down by police officers by her arms and legs on her back, correct?

A. Yes.

Q. And how long **after** she came out of her seizure was it before you Tased her?

A. Several minutes.

Q. Several minutes.

(Morris Dep. 141:22-143:20) (emphasis added).

Prior to his use of a Taser on T.D.H., Morris was on full notice on January 16, 2015 through prior precedent that if he used the Taser on T.D.H, his actions would be unconstitutional. Nevertheless, he persisted. The Eleventh Circuit issued its ruling in *Oliver* despite at the time, no decision had clearly established that disproportionate repeated tasering was excessive force because any reasonably acting officer would have known so. *See Id*. at 907 ("[T]he force employed was so utterly disproportionate to the level of force reasonable necessary . . . any officer would have recognized that his actions were unlawful."). *Id*. Given that the *Oliver* decision was established case law in this Circuit on January 16, 2015, a reasonable officer in Morris's situation should have known that utilizing a Taser on an incapacitated 17 year old child in the manner he did, constituted excessive force under Circuit precedents.

Given that both *Oliver* and *Powell* decisions were established case law at the time of the incident, a reasonable officer in the Rainbow City officers' situation should have known that utilizing a Taser in the manner Morris did against T.D.H. constituted excessive force under Circuit precedent.

### D. Morris's Plainly Incompetent Actions Prohibits Qualified Immunity.

Morris is not entitled to qualified immunity regarding his actions toward T.D.H. on January 16, 2015. The purpose of qualified immunity is to allow officials to carry out their discretionary duties without the fear of personal liability or harassing litigation, *Anderson v. Creighton*, 483 U.S. 635, 638-39 (1987). However, qualified immunity should not be extended to "the plainly incompetent or one who is knowingly violating the federal law." *Lee* 284 F.3d at 1194 (internal citation and quotation marks omitted).

Viewed in a light most favorable to the Plaintiffs, Morris's actions on January 20, 2015 were, at best plainly incompetent, and at worst, a knowing violation of clearly established federal law. Morris testifies that he never felt or perceived that he or others were in danger at the restrained hands of T.D.H. Nor, according to Morris and Gilliland, was T.D.H. ever a threat to Morris; the officers holding T.D.H. down while she was being tasered by Morris; or the general public (Morris Dep. 147:16 -150:16; Gilliland Dep. 91:4-9.) Notably, both Morris and Gilliland make the factual observation that T.D.H. was not a threat "from the

18

perspective of a reasonable officer on the scene, rather than with the 20/ 20 vision of hindsight." *Kesinger ex rel. Estate of Kesinger v. Herrington*, 381 F.3d 1243, 1249 (11th Cir. 2004). Gilliland testifies:

> Q.      So at the time George Morris Tased her the first time, in your opinion as a seasoned police officer, was T.H. a threat to George Morris?
>
> . . .
>
> Q.      You can answer.
>
> A.      That would be an opinion.
>
> Q.      Well, in your opinion, at the time that George Morris Tased T.H. the first time when he was standing above her and she was lying on the ground and you were holding her head, was T.H. a threat to George Morris?
>
> A.      No.
>
> Q.      But he Tased her anyway, correct?
>
> . . .
>
> Q.      You can answer.
>
> A.      T.H. was not a threat to George Morris.
>
> Q.      But he Tased her anyway, correct?
>
> A.      Correct.

(Gilliland Dep. 90:17-91:19).

Morris likewise makes clear that T.D.H. was not a threat:

Q.  You didn't Tase her because she was a threat to you, correct?

A.  Correct.

Q.  You didn't Tase her because she was a threat to the general public, correct?

A.  I didn't know that at that time.

Q.  At the time you Tased her, she was being held down, correct?

A.  She was being held down.

Q.  She wasn't a threat to the general public at that time, was she?

A.  That's correct, at that time.

(Morris Dep. 148:4-19).

Whether the force used is reasonable turns on "the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Thornton v. City of Macon*, 132 F.3d 1395, 1400 (11th Cir. 1998) (quoting Graham, 490 U.S. at 396). Here Morris's use of force was clearly unreasonable because, in a light most favorable to the Plaintiffs, T.D.H. was simply not a threat and certainly not evading arrest or attempting flight.

Jerry Staton ("Staton") explains that, when viewed through the eyes of a reasonable officer at the scene, the use of the Taser on T.D.H. by Morris was completely unjustified. (Staton Rpt. pg. 5 at ¶ 02). Staton explains that because T.D.H. was restrained by five adult male police officers, a reasonable officer at the scene should have known that T.D.H. was not a threat to anyone. *Id.* In fact, Morris's fellow police officer Gilliland, who was present at the scene on January 16, 2015 did not believe that T.D.H.'s actions even if true rose to the level of Taser use being warranted:

> Q.    Well, in Rainbow City, Alabama on January 16, 2015, was it a crime?
>
> A.    That could be disorderly conduct, yes, it could be.
>
> Q.    Does it rise to the level of the use of a Taser?
>
> . . .
>
> A.   Not in my opinion.

(Gilliland Dep. 144:1-9).

## A.    Kimbrough's, Fazekas, and Carroll's Failure to Intervene and Stop Morris's Acts Against T.D.H.

Because Morris's actions against T.D.H. – the repeated use of a Taser on a restrain minor – were unconstitutional; Kimbrough, Fazekas, and Carroll, like Morris, were on notice that Morris's acts violated clearly established law *See e.g. Oliver* 586 F.3d at 907. Kimbrough, Fazekas and Carroll are liable to the Plaintiff

for their failures to intervene and stop Morris. *Priester v. City of Riviera Beach, Fla.*, 208 F.3d 919, 924 (11th Cir. 2000).

It is not necessary that Plaintiff Helm show that Kimbrough, Fazekas and Carroll themselves used force on T.D.H.; only that they failed intervene and stop Morris's unconstitutional use of force. *Id* at 924-25. The *Priester* Court explained "that a police officer had a duty to intervene when he witnessed the use of excessive force and had the ability to intervene was clearly established in February 1994. *Priester*, 208 F.3d at 927 (quoting *Byrd v. Clark*, 783 F.2d 1002, 1007 (11th Cir. 1986) ("If a police officer, whether supervisory or not, fails or refuses to intervene when a constitutional violation […] takes place in his presence, the officer is directly liable under Section 1983."). "It is not necessary that a police officer actually participate in the use of excessive force to be held liable under Section 1983." *Skrtich v Thornton*, 280 F.3d 1295 (11th Cir. 2002). Here, there is more. Not only did Kimbrough and Carroll fail to intervene against Morris, they actively assisted in Morris's carrying out of the unconstitutional acts against T.D.H.'s person be pinning her to the ground.

Viewed in a light most favorable to Plaintiff Helm, the evidence shows that Kimbrough, Fazekas, and Carroll were each able to intervene and stop Morris's unconstitutional tasering of T.D.H. yet failed in that duty to intervene. Morris

testifies that at the time he tased the compliant T.D.H., Kimbrough, Fazekas Gilliland[8], and Carroll were present:

> Q.     So you're saying that both Gilliland and Carroll were present when you drive stunned T.H.
>
> A.     Yes.  To the best of my recollection, he was there, Gilliland.   The Chief was there, and Officer Kimbrough was there and a bunch of other people.
>
> Q.     Were those people police officers?
>
> A.     Fazekas was there for a moment.  And then they had something going on outside.

(Morris Dep. 46:9-21).

Carroll's testimony also confirms that at the time of Morris's unconstitutional use of the Taser T.D.H., he and Kimbrough were not only present, but were holding down T.D.H.'s legs.  (Carroll Dep. 81:6-14, 186:21-187:1). Carroll himself was also present, yet failed to intervene during the minutes that the tragedy unfolded (Carroll Dep. 80:2-81:1).

It is undisputed that at the time that Morris used his Taser on the restrained T.D.H., Fazekas was present and able to intervene.  (Gilliland Dep. 56:22-57-11). Yet, Fazekas also failed to attempt to intervene and stop Morris from using his Taser on T.D.H. (Gilliland Dep. 69:7-19).   This is true even though Gilliland

---

[8] Gilliland's failure to intervene during the events of January 16, 2015 will be addressed in depth in the Plaintiff's response to Gilliland's motion for summary judgment.

informed Fazekas prior to Morris's first use of the Taser on T.D.H. that she was having seizures. (Gilliland Dep. 70:1-7).

Kimbrough, Fazekas and Carroll all failed in their duty as sworn police officers to protect T.D.H from Morris's unconstitutional acts. *Velazquez v. City of Hialeah*, 484 F.3d 1340, 1341 (11th Cir. 2007) ("[A]n officer who is present at the scene and who fails to take reasonable steps to protect the victim of another officer's use of excessive force, can be held liable for his nonfeasance."). As explained by Morris himself, Morris's use of a Taser on T.D.H. were not unfolding quickly; but rather, several minutes went by between Morris's arrival and his use of the Taser on T.D.H. (Morris Dep. 142:21-143:11).

Because Kimbrough, Fazekas and Carroll failed "to take reasonable steps to protect [T.D.H.] [from Morris's] use of excessive force, each can be held liable for his nonfeasance." *Fundiller v. City of Cooper City*, 777 F.2d 1436, 1441-42 (11th Cir. 1985). Kimbrough, Fazekas, and Carroll were all able to intervene and stop Morris's unconstitutional use of force on T.D.H.; yet failed to do so, *Hadley v. Gutierrez*, 526 F.3d 1324, 1331 (11th Cir. 2008). Because the law was clearly established on January 16, 2015 with regards to both the unlawfulness of repeated deployment of a Taser into a restrain suspect, as well as the duty of bystander officers to intervene against such unlawful actions, Fazekas, Kimbrough and Carroll all liable under Section 1983 for their failures to intervene.

### 1. Facts Most Favorable to Plaintiff Helm.

Viewed in a light most favorably to Plaintiff Helm received a call from someone who told her that her minor daughter T.D.H. was having seizures. Plaintiff Helm, dressed in only pajamas and slippers drove across the highway to Center Stage. Plaintiff Helm exited her vehicle, and started toward the lobby door of Center Stage. Before she made it to the inside of the lobby, Plaintiff Helm observed T.D.H. being pinned to the ground by seven (7) adult male police officers. When she first saw her daughter, T.D.H. was not saying anything. Plaintiff Helm called out that T.D.H. was having seizures. Just as she got the word seizure out, Plaintiff Helm was tackled from behind by a police officer. Plaintiff Helm's hands were handcuffed behind her back and she was then tased at which time she urinated on herself. After Plaintiff Helm was tased, she saw T.D.H. being tased once and heard her being tased two more times. Plaintiff Helm was then dragged across the courtyard to a concrete wall. Plaintiff Helm was then placed in a patrol car, taken to the Etowah County Detention Center and arrested for disorderly conduct. The charges against Plaintiff Helm were later dropped by Rainbow City.

### 2. The unconstitutional use of a Taser on Plaintiff Helm

Plaintiff Helm had committed no crime at the time that she was tased by a Rainbow City police officer. Plaintiff Helm was tased before she entered the

immediate vicinity where her daughter was being held down by other Rainbow City police officers (Helm Dep. 126:2-21; D.H. Dec.¶ 33-35).  Helm was not combative toward any officer of the public at large, and was not causing a disturbance (D.H. Dec.¶ 46-49, 52).

The Eleventh Circuit has been clear and consistent that the use of a Taser on a compliant subject is excessive in nature.  *Boynton v. City of Tallahassee*, 650 Fed. Appx. 654 (11th Cir. 2016) ("In 2009 this Court considered the reasonableness of an officer's repeated use of a [T]aser on an individual who was not accused of any crime; who did not pose an immediate threat to the officer or others; who was not belligerent or aggressive; and who was not trying to flee or evade arrest.") (quoting *Oliver,* 586 F.3d at 906-07.) (alteration added).  The evidence before the Court is that Plaintiff Helm was tackled by Fazekas after she arrived at Center Stage, prior to her even entering the lobby area at which Morris was carrying out the sadistic use of the Taser on her minor daughter (Helm Dep. 126:2-21; D.H. Dec.¶ 33-35).

Plaintiff Helm was not being combative nor was she being "disorderly", the catch-all charge used by Morris and the other Movants in a misguided attempt to justify their unconstitutional actions (D.H. Dec. 52).  There was no need to apply the level of force that was applied to Plaintiff Helm, and such application was unconstitutional.

**B.    The Failure of Fazekas To Intervene in The Use of The Taser Against Plaintiff Helm.**

Fazekas, was in a position to intervene and prevent the unconstitutional use of a Taser on Plaintiff Helm on January 16, 2015.  Viewed in a light most favorable to Plaintiff Helm, she never interfered with the sadistic use of the Taser on her daughter by Morris.

### 1.  Fazekas's Failure to Intervene

Plaintiff Helm was tackled by Fazekas before she made it to the lobby of Center Stage (Helm Dec. ¶ 5).  Helm never resisted police or acted in a disorderly manner (Helm Dec. ¶ 12).  Despite these facts, Helm was tased by a Rainbow City police officer while she was face down on the ground with her hands were handcuffed behind her back (Helm. Dec. ¶¶ 6-7).

Viewed in a light most favorable to Plaintiff Helm, the facts show that Fazekas was in a position to intervene yet failed in his duty to intervene the use of the Taser on Plaintiff Helm (Helm Dec. ¶ 6, 8).    *Ensley v. Soper*, 142 F.3d 1402 (11th Cir. 1998) (An officer is liable for failing to stop police brutality when in a position to intervene.).

## VI.    Plaintiff's False Imprisonment Claims Survive Summary Judgment.

A Section 1983 false imprisonment claim arises where the common-law elements of false imprisonment are accompanied by a Fourteenth Amendment due process violation. *See Cannon v. Macon County*, 1 F.3d 1558, 1562-63 (11th Cir.

1993). "A detention on the basis of a false arrest presents a viable [section] 1983 action." *Ortega v. Christian*, 85 F.3d 1521, 1525 (11th Cir. 1996) (citing *Reeves v. City of Jackson*, 608 F.2d 644 (5th Cir. 1979)). "Where a police officer lacks probable cause to make an arrest, the arrestee has a claim under section 1983 for false imprisonment based on a detention pursuant to that arrest." *Id.* at 1526 (citing *Groman v. Township of Manalapan*, 47 F.3d 628, 636 (3d Cir. 1995)).

Under Alabama law, "[a] person commits the crime of resisting arrest if he intentionally prevents or attempts to prevent a peace officer from affecting a lawful arrest of himself or of another person." Ala. Code § 13A-10-41(a).

### A. Plaintiff Helm's False Imprisonment Claims

The facts in the instant case show that no probable cause existed to detain, tase and imprison Plaintiff Helm on January 16, 2015. Plaintiff Helm was arrested and booked into the Etowah County Detention Center for allegedly interfering with the unconstitutional acts of Rainbow City police officers. A reasonable jury could conclude that the facts viewed in a light most favorable show that Plaintiff Helm had committed no crime, and there was not even arguable probable cause for the wrongful arrest. *Case v. Eslinger*, 555 F.3d 1317, 1330 (11th Cir. 2009). Plaintiff Helm's and D.H.'s testimony show that questions of fact remain for determination by a jury regarding whether Plaintiff Helm did in fact interfere, and whether the

imprisonment was false. Therefore, summary judgment is due to be denied as to Plaintiff's section 1983 false imprisonment claim.

**B. T.D.H.'s False Imprisonment Claims Against Morris**

Morris assistance in restraining T.D.H. to the floor of Center Stage without probable cause worked to create a violation of T.D.H.'s Fourteenth Amendment due process rights. Morris's action effected a seizure under the Fourteenth Amendment. "A person is seized by the police and thus entitled to challenge the government's action under the Fourth Amendment when the officer, 'by means of physical force or show of authority, through means intentionally applied." *Brendlin v. California*, U.S. 249, 254 (2007) (internal citations and quotations omitted).

**CONCLUSION**

The genuine issues of material fact are so numerous in this case that summary judgment is simply not appropriate. It is the role and function of the jury to resolve the facts. Like so many of these types of cases, the police officers have their version of the facts. The aggrieved Plaintiff and her daughter T.D.H. have a completely different version of the facts. Notably, the police officers involved even differ in their versions of the facts. Gilliland claims to have saw Morris use his Taser on T.D.H. twice. Carroll claims to have saw Morris use the Taser once, but does not dispute Gilliland's recollection. The police officers claim T.D.H. was being difficult, and therefore somehow deserving of repeated tasing at the hand of

Morris. Plaintiff Helm and her presented facts vigorously dispute those claims. The police claim that Plaintiff Helm interfered with the use of the Taser on T.D.H. Plaintiff Helm and her factual testimony vigorously dispute that. What is not in dispute is that T.D.H. was suffering from seizures on the night of January 16, 2015. No video exists of the actual use of the Taser on either Plaintiff Helm or T.D.H., as the body cameras worn by the police officers mysteriously captured only the aftermath. Thus, the jury, as the trier of fact is left to weight the credibility and believability of the competing versions of fact and render a decision.

WHEREFORE, PREMISES CONSIDERED, the Plaintiff prays that the Honorable Court DENY, the summary judgment motion, as filed by Fazekas, Morris and Kimbrough in its entirety.

Respectfully submitted,

s/ H. Gregory Harp
H. Gregory Harp (asb-0904-t75h)
GREGORY HARP LLC
459 Main Street Ste. 101-266
Trussville, Alabama 35173
(205) 544-3132
gh@gregoryharplaw.com

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on Thursday, May 11, 2017, I did cause a copy of the

forgoing to be served on the following counsel of record using the CM/ECF Filing

System:

Howard Edgar Howard, Esq.
FORD HOWARD & CORNETT PC
PO Box 388
Gadsden, Alabama 35902
1-256-546-5432
Email: ed@fordhowardcornett.com

C. David Stubbs, Esq.
STUBBS, SILLS & FRYE, P.C.
1724 South Quintard Avenue
Post Office Box 2023
Anniston, Alabama 36202-2023
Phone:(256) 835-5050
david-ssf@cableone.net

Allen L. Anderson, Esq.
Allison B. Chandler, Esq.
F&B LAW FIRM, P.C.
213 Greene Street
Huntsville, Alabama 35801
Anderson@fb-pc.com
achandler@fb-pc.com