FILED

2017 May-11 PM 08:29
U.S. DISTRICT COURT
N.D. OF ALABAMA

1  IN THE UNITED STATES DISTRICT COURT
2  FOR THE NORTHERN DISTRICT OF ALABAMA
3      MIDDLE DIVISION
4
5
6  CASE NUMBER:  4:15-cv-1152-VEH
7
8
9  MICHELLE LEE HELM,
10     Plaintiff,
11
12     vs.
13
14 RAINBOW CITY, ALABAMA, et al.,
15     Defendants.
16
17
18
19     DEPOSITION OF JUSTIN GILLILAND
20        DATE TAKEN:  May 19, 2016
21
22
23

1      In accordance with Rule 5(d) of The
2  Alabama Rules of Civil Procedure, as amended,
3  effective May 15, 1988, I Beth C. Word, am
4  hereby delivering to Mr. H. Gregory Harp the
5  original transcript of the oral testimony
6  taken on the 19th day of May 2016, along with
7  exhibits.
8
9      Please be advised that this is the
10 same and not retained by the Court Reporter,
11 nor filed with the Court.
12
13
14      S T I P U L A T I O N S
15      IT IS STIPULATED AND AGREED by and
16 between the parties through their counsel,
17 that the deposition of JUSTIN GILLILAND may
18 be taken before Beth C. Word, Commissioner,
19 at the Law Office of Clark Hall, 750 Forrest
20 Avenue, Gadsden, Alabama, on the 19th day of
21 May 2016.
22
23

1      IT IS FURTHER STIPULATED AND AGREED
2  that the signature to and the reading of the
3  deposition by the witness is waived, the
4  deposition to have the same force and effect
5  as if full compliance had been had with all
6  laws and rules of Court relating to the
7  taking of depositions.
8
9      IT IS FURTHER STIPULATED AND AGREED
10 that it shall not be necessary for any
11 objections to be made by counsel to any
12 questions except as to form or leading
13 questions, and that counsel for the parties
14 may make objections and assign grounds at the
15 time of the trial, or at the time said
16 deposition is offered in evidence, or prior
17 thereto.
18
19      IT IS FURTHER STIPULATED AND AGREED
20 that the notice of filing of the deposition
21 by the Commissioner is waived.
22
23

1      APPEARANCES
2
3  FOR THE PLAINTIFF:
4
5      GREGORY HARP, LLC
6      BY:  Mr. H. Gregory Harp and
7      Mr. Moses Stone
8      ADDRESS:  459 Main Street
9      Suite 101-266
10     Trussville, Alabama 35173
11     (205) 544-3132
12
13
14 FOR THE DEFENDANT:
15
16     FORD, HOWARD & CORNETT, P.C.
17     BY:  Mr. Edward Howard
18     ADDRESS:  140 South Ninth Street
19     Gadsden, Alabama 35901
20     (256) 546-5432
21
22
23

Page 5

1  STUBBS, SILLS & FRYE, P.C.
2  BY:  Mr. C. David Stubbs
3  ADDRESS:  1724 South Quintard Avenue
4  Anniston, Alabama 36201
5  (256) 835-5050
6
7
8  F&B LAW FIRM, P.C.
9  BY:  Ms. Allison B. Chandler
10  ADDRESS:  213 Greene Street
11  Huntsville, Alabama 35801
12  (256) 536-0095
13
14
15
16
17
18
19
20
21
22
23        INDEX

Page 6

1
2  EXAMINATION BY:          PAGE NUMBER:
3  Mr. Harp                    8
4
5
6
7  EXHIBITS:
8  PX- 1 - Notice of Deposition       21
9  PX- 2 - Amended Complaint          55
10  PX- 3 - Statement of Gilliland     105
11  PX- 4 - Photo           105
12  PX- 5 - Morgan Use of Force Form   165
13  PX- 6 - Photo           185
14  PX- 7 - Photo           191
15  PX- 8 - Taser Information       193
16  PX- 9 - Statement of Morris        204
17  PX-10 - Synopsis Use of Force Form  210
18
19
20
21
22
23        I, BETH C. WORD, a Court Reporter of

Page 7

1  Gadsden, Alabama, acting as Commissioner,
2  certify that on this date, as provided by the
3  Alabama Rules of Civil Procedure and the
4  foregoing stipulation of counsel, there came
5  before me at the Law Office of Clark Hall,
6  750 Forrest Avenue, Gadsden, Alabama,
7  beginning at 9:00 a.m., JUSTIN GILLILAND,
8  witness in the above cause, for oral
9  examination, whereupon the following
10  proceedings were had:
11
12
13        THE COURT REPORTER:  Usual
14  stipulations?
15        MR. HARP:  Yes.
16        MS. CHANDLER:  Yes.
17        MR. STUBBS:  Yes.
18        MR. HOWARD:  Yes.
19
20        JUSTIN GILLILAND,
21        being first duly sworn, was
22        examined and testified as follows:
23        EXAMINATION BY MR. HARP:

Page 8

1        Q.  Sir, would you state your full name
2  for the record?
3        A.  Justin Wayne Gilliland.
4        Q.  Okay.  Mr. Gilliland, my name is
5  Greg Harp.  And I am the attorney for
6  Michelle Helm and her minor daughter.  And
7  we're going to refer to the daughter as much
8  as I can without mistake as T.H. throughout
9  the course of your deposition.  Can we have
10  the understanding that we're referring to the
11  minor daughter of Michelle Helm if I refer to
12  T.H.
13        A.  Right.
14        Q.  Okay.  And have you ever given a
15  deposition before?
16        A.  No, sir.
17        Q.  Okay.  What will happen is, Madam
18  Court Reporter will take down everything that
19  is said in the room today while we're on the
20  record.  And so one of the things that you
21  and I need to do is make sure that I get to
22  finish my question before you start your
23  answer.  And I'll try not to step on your

1  answer with another question.  Okay?
2      A.  Okay.
3      Q.  And you're doing a great job right
4  now of answering out loud, but she cannot
5  take down head nods, so you will need to
6  verbally express your answer even if it's
7  just yes or no.  Okay?
8      A.  Okay.
9      Q.  All right.  Can you tell me where
10  you are employed?
11      A.  I am employed at the Rainbow City
12  Police Department in Rainbow City, Alabama.
13      Q.  And how long have you been employed
14  at the Rainbow City Police Department?
15      A.  November 16th of this year will be
16  six years.
17      Q.  So you started in 2010; is that
18  right?
19      A.  Yes, sir.
20      Q.  When you started at the Rainbow
21  City Police Department in 2010, what was your
22  job title?
23      A.  I started out as just an officer.

1      Q.  A patrol officer?
2      A.  Yes, sir.
3      Q.  How long did you work as a patrol
4  officer?
5      A.  Probably maybe a year, year and a
6  half.
7      Q.  So that puts it somewhere in the
8  2011 range, or actually 2012?
9      A.  Possibly.
10      Q.  If you started there in November of
11  2010 and you worked as a patrol officer for a
12  year and a half, that would put it somewhere
13  around 2012, right?
14      A.  2011, 2012.
15      Q.  Okay.  And what was your next job
16  title?
17      A.  I became a school resource
18  officer.
19      Q.  And you became an SRO at what
20  school?
21      A.  Rainbow Middle School.
22      Q.  And where is that located?
23      A.  In Rainbow City.

1      Q.  Did you work as an SRO at any other
2  school?
3      A.  No, sir.
4      Q.  And how long did you work as an
5  SRO?
6      A.  Almost two years.
7      Q.  So somewhere around 2014; is that
8  right?
9      A.  Yes, sir.
10      Q.  And after you left the SRO duty,
11  what was your job title?
12      A.  I went back to patrol.
13      Q.  How long did you remain on patrol
14  during that period of time?
15      A.  Almost a year.
16      Q.  So somewhere around 2015, early
17  2016?
18      A.  Yes, sir.
19      Q.  And in early 2016, late 2015, what
20  was your job title changed to?
21      A.  I became a detective
22  investigator.
23      Q.  Detective investigator.  Prior to

1  becoming a patrol officer in 2010, you
2  attended the police academy, correct?
3      A.  Correct.
4      Q.  Where did you attend the police
5  academy?
6      A.  Northeast Alabama Police Academy in
7  Jacksonville, Alabama.
8      Q.  Is that an eight week course?
9      A.  It is a twelve week course.
10      Q.  Twelve week course?
11      A.  Yes, sir.
12      Q.  And what year did you attend
13  that?
14      A.  2010.
15      Q.  Okay.  So you left the academy and
16  you came straight to the Rainbow City Police
17  Department, or were you working there prior
18  to?
19      A.  Working there prior.
20      Q.  Okay.  Prior to going to the
21  academy, how long had you worked for the
22  Rainbow City Police Department?
23      A.  Approximately a month.

1     Q.   Did you have an FTO during that
2 month period that you worked at Rainbow City
3 Police Department?
4     A.   I did.
5     Q.   And who was that?
6     A.   I had a couple.
7     Q.   And who were they?
8     A.   John Hall and Phillip Braswell.
9     Q.   Okay.
10     A.   I'm trying to think if I had
11 anybody else.   Brian Rush.
12     Q.   Brian Rush.
13     A.   And Gerry Lyons, with a "G".
14     Q.   At the time that John Hall was your
15 Field Training Officer, do you know what his
16 rank was?
17     A.   Sergeant.
18     Q.   And just to short circuit this,
19 were all of your Field Training Officers
20 Sergeants?
21     A.   All but one.
22     Q.   Which one was not?
23     A.   Brian Rush.

1     Q.   What was he?
2     A.   Patrol officer.
3     Q.   So within the span of a month, you
4 had four different FTOs.   Did you have a
5 different one every week?   Is that how it
6 worked?
7     A.   I believe so.
8     Q.   Did any of those FTOs instruct you
9 in any way on the use of force policy for the
10 Rainbow City Police Department?
11     A.   I believe they went over it a
12 couple of times.
13     Q.   Which ones?
14     A.   Gerry Lyons and Brian Rush.
15     Q.   Okay.   And as another housekeeping
16 matter, anytime you need to take a break
17 today, just let me know and we'll take a
18 break.   This is not an endurance test.
19     A.   Okay.
20     Q.   Now, you say you believe that Gerry
21 Lyons and Brian Rush went over the use of
22 force policy.   What exactly did they go over
23 as it relates to Rainbow City's use of force

1 policy?
2     A.   When I worked with both of them, I
3 worked the night shift, so you had a lot of
4 time probably after 12:00 o'clock at night.
5 And we would go back to the police station
6 and just go over the SOP.
7     Q.   Was the use of force policy at that
8 time, prior to you going to the academy, was
9 the use of force policy for the Rainbow City
10 Police Department contained within the SOP?
11     A.   I'm not sure.
12     Q.   Well, you testified in response to
13 my question about what exactly they went over
14 related to the use of force, you said that
15 you would go back to the station on night
16 shift and go over the SOP.
17     A.   Right.
18     Q.   So was the use of force policy in
19 the SOP?
20     A.   I don't remember.
21     Q.   When you went over the use of force
22 policy with Lyons and Rush during that month
23 period before you went to the police academy,

1 did they show you papers containing the use
2 of force policy for Rainbow City?
3     A.   I don't remember that.
4     Q.   Have you ever seen the written
5 policy on use of force for Rainbow City
6 Police Department?
7     A.   I have a long time ago.
8     Q.   How long ago is a long time?
9     A.   Probably when they showed me.
10     Q.   And that would have been a month
11 before you started the police academy,
12 correct?
13     A.   Yes, sir.
14     Q.   Have you seen the use of force
15 policy for Rainbow City Police Department
16 since you have been a detective?
17     A.   No.
18     Q.   Have you seen the use of force
19 policy for Rainbow City Police Department --
20 strike that.   Did you see the use of force
21 policy for the Rainbow City Police Department
22 during the time you were a patrol officer in
23 2014?

Page 17

1    A.  No.

2    Q.  Did you see the use of force policy

3 for the Rainbow City Police Department during

4 the time you were a SRO, or School Resource

5 Officer, in 2012 to 2014?

6    A.  No.

7    Q.  Have you seen the use of force

8 policy for the Rainbow City Police Department

9 since you have been out of the police academy

10 and back at the Rainbow City Police

11 Department?

12    A.  I believe they went over it at --

13 well, not the Rainbow City Police Department,

14 but just the overall at the police academy.

15 But actually Rainbow City, no.

16    Q.  And as a police officer and as a

17 detective and a member of the police force,

18 do you understand that each police department

19 has its own use of force policy?

20    A.  Yes.

21    Q.  And you understand that the use of

22 force policy that the City of Birmingham may

23 employ would not be the same use of force

Page 18

1 policy necessarily that Rainbow City would

2 employ.

3    A.  Correct.

4    Q.  And would you agree with me, and

5 you may not, but isn't it true that at the

6 academy, you got a general overview of the

7 use of force a police officer should use?

8    A.  Correct.

9    Q.  And if you have not seen since 2010

10 prior to going to the academy the use of

11 force policy for the Rainbow City Police

12 Department, have you seen the use of force

13 policy for Taser weapons as it relates to the

14 Rainbow City Police Department?

15    A.  Rephrase that for me, please.

16    Q.  Sure.  You haven't seen the use of

17 force policy at the Rainbow City Police

18 Department in the six years you've worked

19 there, correct?

20    A.  I believe I watched a video and was

21 instructed when I was certified with the

22 Taser at Rainbow City.

23    Q.  Isn't it true that the video you

Page 19

1 would have watched when you were certified on

2 the Taser at Rainbow City was actually a

3 video that was produced by Taser

4 International?

5    A.  That I'm not sure about.

6    Q.  When were you certified on the

7 Taser by the Rainbow City Police

8 Department?

9    A.  It was before I went to the police

10 academy.

11    Q.  So that would have been prior to

12 2010, right?

13    A.  That would have been, I believe, if

14 I'm correct, that would have been December of

15 2010.

16    Q.  Is when you went to the police

17 academy.

18    A.  No.  I went to the police academy

19 January, I believe it was 13, 2011.

20    Q.  January 13, 2011?

21    A.  Yes, sir.

22    Q.  So you believe in December of 2010,

23 you were certified on the Taser at the

Page 20

1 Rainbow City Police Department.

2    A.  Yes.

3    Q.  And when you were certified on the

4 Taser at the Rainbow City Police Department

5 in December of 2010, that would have been the

6 X-26 Taser, correct?

7    A.  The one I carry now, yes.

8    Q.  Well, is that what you carry now?

9    A.  I would have to look.  I've had the

10 same one since I started here.

11    Q.  Right.  But you understand that

12 X-26 is a model of the Taser.  Do you know

13 that?

14    MR. HOWARD:  Object to the form.

15

16    A.  Say it one more time.

17    Q.  Do you know what the X-26 is?

18    A.  I don't know every little detail

19 about it, but I know the one I carry.

20    Q.  Have you got your Taser today?

21    A.  Yeah.

22    Q.  Where is it at?

23    A.  It's in the car.

Page 21

1  Q.  Can you go get it?

2  A.  Yeah.

3  MR. HARP:  Okay.  Let's go off the

4 record so you can go get your Taser.

5  THE WITNESS:  Okay.

6

7  (Whereupon, a brief recess was

8  taken.)

9

10  (Plaintiff's Exhibit Number 1 was

11 marked for identification and same is

12 attached hereto.)

13

14  Q.  Mr. Gilliland, we're back on the

15 record after we took a short break.  I'm

16 going to show you what I have marked as

17 Plaintiff's Exhibit Number 1 to your

18 deposition.

19  And when I mark these things, I'm

20 going to slide them across to your attorney

21 to look at first.  This is the notice of

22 deposition for Justin Gilliland.  And I will

23 ask you to take a look at that and see if

Page 22

1 you've ever seen it before.

2  A.  (Witness reviewing document.)  Yes,

3 I have.

4  Q.  Okay.  Now, before we went on

5 break, we were talking about the Taser that

6 you carry.  And you said you needed to go get

7 it because we were talking about the model

8 number.  Can you tell me what model number

9 your Taser is?  And can we make sure the

10 safety is on?

11  A.  I'm going to take the front of it

12 off so it don't shoot somebody.  Okay?

13  Q.  That's fine.

14  MR. HOWARD:  That would be nice.

15

16  A.  It looks like an X-26.

17  Q.  Okay.  It's actually written right

18 on the side of the weapon, right?

19  A.  Yes.

20  Q.  Okay.  And those weapons, the X-26

21 model can actually be used two different

22 ways, correct?

23  MS. CHANDLER:  Object to the form.

Page 23

1

2  Q.  Do you understand what I'm saying?

3 Your attorney is going to object to some of

4 my questions because sometimes I ask bad

5 questions.  Sometimes I don't think they are

6 bad, but they may.

7  So when she objects, unless she

8 instructs you not to answer because of

9 privilege, I'll probably say you can still

10 answer if you understand the question.

11  And that leads me to another rule.

12 If you don't understand anything that I ask,

13 just ask me to rephrase it and I will do it.

14 Okay?

15  A.  Okay.  Can you rephrase that?

16  Q.  Sure.  Let me break the question

17 down.  That weapon, the X-26, can be used

18 with prongs, correct?

19  A.  Correct.

20  Q.  That's a cartridge that has the

21 prongs.

22  A.  Correct.

23  Q.  But there is another way that you

Page 24

1 can use the X-26, and that's called a drive

2 stun, correct?

3  A.  Correct.

4  Q.  And that's what I meant by two

5 different ways.

6  A.  Okay.

7  Q.  Now, have you ever fired your X-26

8 at an individual?

9  A.  For training.

10  Q.  For training.  And when was that?

11 Would that have been at the academy?

12  A.  No.  That was after I got out of

13 the academy.  We hired a new police officer,

14 and he wasn't Taser certified.  So we all

15 have to get shot with the Taser before we can

16 carry one, so I was told to Tase him to

17 certify him.

18  Q.  And who instructed you to Tase that

19 officer?

20  A.  Chase Jenkins.

21  Q.  And who is Chase Jenkins?

22  A.  A former Captain at the Rainbow

23 City Police Department.

Page 25

1   Q.   Do you know why he is a former
2   Captain at the Rainbow City Police
3   Department?
4       A.   Speculations.  I only know rumors.
5       Q.   Do you know whether or not Chase
6   Jenkins was arrested?
7       A.   Yes, he was.  I believe so.
8       Q.   Do you know why he was arrested?
9       A.   I just read it on the website, on
10  the Etowah County jail website, that it was
11  for sodomy.
12      Q.   When is the last time you have
13  spoken with Chase Jenkins?
14      A.   Possibly three months ago.
15      Q.   Is that when Chase Jenkins was
16  still employed by the Rainbow City Police
17  Department?
18      A.   No.
19      Q.   So you spoke to Chase Jenkins after
20  he had been terminated from the Rainbow City
21  Police Department?
22      A.   Yes.
23      Q.   Have you ever spoken to Chase

Page 26

1   Jenkins concerning the events that led to
2   this lawsuit?
3       A.   Not in detail.
4       Q.   When you say not in detail, tell me
5   what you have spoken with Chase Jenkins about
6   this lawsuit.
7       A.   Things we have read on the Gadsden
8   Times.
9       Q.   What sort of things did you read on
10  the Gadsden Times that you spoke to Chase
11  Jenkins about?
12      A.   A younger female was Tased at
13  Center Stage during a concert.
14      Q.   When you read that article on it,
15  was it a news article?
16      A.   It was.
17      Q.   You read it on the website?
18      A.   Yes.
19      Q.   Was Chase Jenkins sitting there
20  with you when you read that news article?
21      A.   No.
22      Q.   Well, how is it that you came to
23  speak to Chase Jenkins about the news article

Page 27

1   about the young female being Tased?
2       A.   He did not work the concert.  I
3   believe Monday morning when I came in, he
4   asked me, were you down there working when
5   all that happened.  And I said, yes.  And
6   that's all I believe I said to him.
7       Q.   Now, I want to make sure I'm clear.
8   You read an article on the Gadsden Times
9   website.  And then the following Monday is
10  when Chase Jenkins asked you about that?
11      A.   He asked me about that on Monday.
12      Q.   The Monday after the incident.
13      A.   The Monday after the incident.
14      Q.   After the concert.
15      A.   He said, were you down there.  And
16  I said, yes, I was.  And I believe it was to
17  the point of, yeah, man, that was crazy down
18  there, all that.
19      Q.   But you had not read an article on
20  the Gadsden Times about the --
21      A.   Correct.  Let me go back.
22      Q.   Okay.
23      A.   When all the stuff started coming

Page 28

1   out in the newspaper.
2       Q.   You mean after the lawsuit was
3   filed?
4       A.   I'm not sure.  When it all came out
5   in the newspaper, I believe I was passing him
6   through the detective division at Rainbow
7   City.  And I think I said something like,
8   have you seen all the stuff in the paper
9   going on about what happened.  And I think he
10  said, yeah, man, it's crazy.
11      Q.   Were those his words?
12      A.   I don't really know.  I think it
13  was something to that effect, like it was
14  wild down there, it was crazy down there that
15  night.
16      Q.   But he would not have known that
17  personally, right, because he didn't work the
18  concert, correct?
19      A.   He must have known it from someone.
20  He didn't get it from me.
21      Q.   Other than the one time that you
22  Tased the new hire at the Rainbow City Police
23  Department, have you ever used your Taser?

Page 29

1    A.  Never.
2    Q.  Never?
3    A.  Never.
4    Q.  How often do you have to be
5 certified on the use of that Taser that you
6 carry?
7    A.  I believe just once.
8    Q.  And where do you get that belief
9 from, that you only have to be certified
10 once?
11    A.  Well, nobody has told me I had to
12 go to retraining for it.
13    Q.  So you've never been instructed by
14 anyone at the Rainbow City Police Department
15 to be retrained on the use of the Taser?
16    A.  No, sir.
17    Q.  Do you know who the primary Taser
18 instructor is for the Rainbow City police
19 Department?
20    A.  When I was trained and certified, I
21 was certified by Chase Jenkins.
22    Q.  Do you know who assumed that role
23 after Mr. Jenkins was terminated?  And that

Page 30

1 role being the instructor for Tasers.
2    A.  I'm not sure.
3    Q.  Can you tell me what the Rainbow
4 City Police Department's use of force policy
5 is as it relates to the X-26 Taser?
6    MR. HOWARD:  Object to the form.
7
8    A.  No.
9    Q.  And why not?
10    A.  I haven't studied up on it in a
11 while.
12    Q.  Were you ever mandated -- strike
13 that.  Let me start over.  In the six years
14 that you have been a police officer at the
15 Rainbow City Police Department, has the Chief
16 of Police ever mandated you to attend a class
17 on the use of force as it relates to the
18 Rainbow City Police Department's policy on
19 Tasers?
20    MR. HOWARD:  Object to the form.
21
22    Q.  You can still answer.
23    MR. HOWARD:  And compound too.

Page 31

1
2    Q.  It was compound.  And that's a well
3 stated objection.  Let me ask you the
4 question again.  Who is the Chief of Police
5 for the Rainbow City Police Department?
6    A.  Right now?
7    Q.  Sure.
8    A.  You got me.
9    Q.  You don't know, do you?
10    A.  Jonathan Horton.
11    Q.  Are you sure?
12    A.  No.
13    Q.  As a detective in the Rainbow City
14 Police Department, who is your next immediate
15 supervisor?
16    A.  Right now as we speak, Jonathan
17 Horton.
18    Q.  And what is his title?
19    A.  Deputy Chief, I believe.
20    Q.  You believe he's a Deputy Chief?
21    A.  I believe.
22    Q.  And you are familiar with the ranks
23 within the Rainbow City Police Department,

Page 32

1 correct?
2    A.  Yes, sir.
3    Q.  Would patrol officer be the low man
4 on the totem pole?
5    A.  Correct.
6    Q.  And then next, you would have
7 Sergeant?
8    A.  Correct.
9    Q.  And then you would have detective,
10 or would you have Captain?
11    A.  We would have -- it goes like
12 this.
13    Q.  Okay.  Go ahead.
14    A.  Patrol, Sergeant, Lieutenant,
15 Captain.  And we just now received a Deputy
16 Chief.  As long as I've been there, we've
17 never had a Deputy Chief.  Some things have
18 went on in the past week, weeks, before this
19 to where that I have no knowledge about,
20 about who the Chief at Rainbow City is.  I
21 just answer to the next person that I'm
22 supposed to answer to.
23    Q.  And who is that?

Page 33

1    A.  Jonathan Horton.

2    Q.  Who does he answer to?  Jonathan

3 Horton.

4    A.  I have no idea.

5    Q.  Have you guys had any meetings

6 about the hierarchy at the Rainbow City

7 Police Department?

8    A.  Not that I have been involved in.

9    Q.  Okay.  Now, the X-26 Taser that you

10 have, you said you've never had to use it in

11 the line of duty, correct?

12    A.  I have drawn it, but never used

13 it.

14    Q.  How many times have you drawn it?

15    A.  If I'm making a guess --

16    Q.  That's Greg's rule number five,

17 don't guess.

18    A.  Okay.  I have no idea.

19    Q.  More than once?

20    A.  Yes.

21    Q.  More than twice?

22    A.  Yes.

23    Q.  More than five times?

Page 34

1    A.  Yes.

2    Q.  More than six times?

3    A.  Yes.

4    Q.  More than ten times?

5    A.  Yes.

6    Q.  We'll start going in multiples of

7 five.  More than fifteen times?

8    A.  Yes.

9    Q.  More than twenty times?

10    A.  Yes.

11    Q.  More than twenty-five times?

12    A.  Yes.

13    Q.  More than thirty times?

14    A.  Yes.

15    Q.  Let's start tens.  More than forty

16 times?

17    A.  I'm not sure.

18    Q.  Okay.  So somewhere between thirty

19 and forty times, you've drawn that X-26 in

20 the line of duty; is that correct?

21    A.  Correct.

22    Q.  And in those thirty to forty times

23 that you've drawn the X-26, you've drawn that

Page 35

1 weapon not having known the use of force

2 policy for the Rainbow City Police Department

3 as it relates to a Taser, correct?

4        MS. CHANDLER:  Object to the form.

5

6    Q.  You can answer.

7    A.  I've drawn it with an overall

8 remembrance of certification.  Let's just say

9 that.

10    Q.  Certification by whom?

11    A.  Chase Jenkins.

12    Q.  And that happened?

13    A.  2010.

14    Q.  2010.  So in the thirty to forty

15 times that you've drawn the X-26 in the line

16 of duty, you have drawn it with an overall

17 remembrance of the use of force policy as it

18 relates to a Taser in the Rainbow City Police

19 Department that you were taught in 2010.  Yes

20 or no?

21        MS. CHANDLER:  Object to the form.

22

23    Q.  You can answer.

Page 36

1        MR. HOWARD:  Object to the form.

2

3    Q.  You can still answer.

4    A.  Correct.

5    Q.  When you were issued the X-26 Taser

6 by the Rainbow City Police Department, did

7 you receive an instruction booklet with it?

8    A.  I don't believe so.

9    Q.  Do you know whether or not Taser

10 International requires that police

11 departments issue instruction booklets to any

12 law enforcement officer that is issued the

13 X-26?

14    A.  I do not.

15    Q.  When you were certified on the X-26

16 Taser, do you recall whether or not you

17 received a booklet at that time?

18    A.  Say that again.

19    Q.  Sure.  Let me ask it this way.

20 Have you ever seen an instruction manual for

21 the X-26 Taser?

22    A.  I don't believe so.

23    Q.  When the use of force policy as it

1 relates to Taser use in the Rainbow City
2 Police Department was taught to you in 2010,
3 did you receive any instruction material from
4 Chase Jenkins at that time?
5     A.   Just the video, I believe.
6     Q.   Just the video?
7     A.   Just the video.
8     Q.   No paper copy?
9     A.   Now that I think back about it, I
10 believe there was a small book.  It was a
11 binder, I believe.  A binder.
12     Q.   Was it blue?
13     A.   I don't recall.  It was a binder
14 though.
15     Q.   Do you still have that binder?
16     A.   Possibly.
17     Q.   Where would it be located?
18     A.   Home.
19     Q.   When is the last time you reviewed
20 that binder that you possibly received and
21 possibly have?
22     A.   The day I received it.
23     Q.   Which would have been sometime in

1 2010.
2     A.   Correct.
3     Q.   Probably around December.
4     A.   Correct.
5     Q.   2010.
6     A.   Correct.
7     Q.   When is the last time that you've
8 reviewed the SOP manual at the Rainbow City
9 Police Department?
10     A.   Off and on just flipping through it
11 every now and then.
12     Q.   Every now and then?
13     A.   Yes.
14     Q.   When you have reviewed the SOP
15 manual -- and that's the SOP manual for the
16 Rainbow City Police Department, just flipping
17 through it, do you recall seeing anything on
18 use of force in that manual?
19     A.   The times that I've looked at it,
20 it's not been for that.  I believe it's been
21 for structure, rank, pay, those kind of
22 things.
23     Q.   So within the SOP manual, are

1 things such as structure included in the
2 manual?
3     A.   Like rank, yes.
4     Q.   And currently that would be
5 somewhat influx because we don't know whether
6 or not there is a Chief of Police at Rainbow
7 City right now, right?
8         MR. HOWARD:  Object to the form.
9
10     Q.   You can answer.
11     A.   Correct.
12     Q.   So that would be outdated material
13 in the SOP manual.
14     A.   Let me say this.  I don't know if
15 it's outdated material.  There is people
16 above me that don't tell me things of what's
17 going on.  So the Chief situation right now,
18 there may be an answer to it.  I just don't
19 know.
20     Q.   You just don't know.
21     A.   I just don't know.
22     Q.   So the people above you that don't
23 necessarily tell you things, would those be

1 your higher ranking personnel?
2     A.   Correct.
3     Q.   Such as Captains?
4     A.   We don't have one right now, but
5 that would be right.
6     Q.   Have you gone to Jonathan Horton
7 within the last two weeks and asked who the
8 Chief of Police is?
9     A.   No.  It's not my business.
10     Q.   Well, you are an employee of the
11 Rainbow City Police Department, right?
12     A.   I come to work, work cases and go
13 home.
14     Q.   Did you know Chief Carroll?
15     A.   Before?
16     Q.   When he was Chief Carroll.
17     A.   I knew him as Chief Carroll.
18     Q.   Okay.  And did you have any
19 conversations with Chief Carroll about your
20 work?
21         MS. CHANDLER:  Object to the form.
22
23     Q.   You can answer.

1    A.  Like what kind of work?

2    Q.  Your detective work.

3    A.  Absolutely.  He was a former

4 detective.

5    Q.  Chief Carroll was a former

6 detective.

7    A.  Right.

8    Q.  Did you have any conversations with

9 Chief Carroll about the events that occurred

10 on January 16, 2015 at Center Stage?

11    A.  Chief Carroll was working that

12 night down there, but outside of work, I've

13 never spoke with him about this.  I have

14 talked to him before, not in detail, about

15 getting camera footage for him off of

16 everybody's body cam.  And that's the only

17 thing I've talked to him about.

18    Q.  Now, why was Chief Carroll talking

19 to you about getting camera footage off of

20 everybody's cameras?

21    A.  I'm not the IT guy at Rainbow City,

22 but I know a little bit about computers.  And

23 we used to have an IT guy for the Rainbow

1 City Police Department.  When he left, it

2 kind of got handed down to me.  I wasn't

3 certified.  But it's basically just uploading

4 and downloading stuff and saving it to a

5 file.

6    Q.  When you had the conversation with

7 Chief Carroll about downloading body cam

8 footage -- and when I say body cam, I'm

9 referring to the cameras that officers wear

10 on their chest.  Okay?

11    A.  Yes.

12    Q.  When you had the conversation about

13 downloading body cam footage with Chief

14 Carroll, what did he ask for exactly?

15    A.  I believe he just came up to me in

16 my office one day, and he said, hey, I need

17 all the video from all of the people who was

18 wearing body cams down there that night.

19    Q.  Did he give you a list of people

20 who were wearing body cameras?

21    A.  No.

22    Q.  How did you know who all were

23 wearing body cameras that night?

1    A.  I believe I asked around.

2    Q.  Did anyone volunteer that they were

3 wearing cameras that night?

4    MR. HOWARD:  Object to the form.

5

6    Q.  Did anyone volunteer to you that

7 they had body cameras on that night?

8    A.  Like just come up and say hey, I

9 had a camera on that night?

10    Q.  No.  You said you asked around,

11 right?

12    A.  Yes.

13    Q.  When you asked, did anyone say

14 yeah, I was wearing a camera that night?

15    A.  Yes.

16    Q.  Who?

17    A.  I believe Gary Morgan.  I'm not

18 certain, but I believe George Morris.  And

19 that's all I remember asking.

20    Q.  Do you recall asking John Bryant

21 whether or not he was wearing a body camera

22 that night?

23    A.  I can't remember.

1    Q.  Did you obtain any footage from

2 Gary Morgan's body camera?

3    A.  I can't remember.

4    Q.  Did you obtain any footage from

5 George Morris' body camera?

6    A.  I can't remember specifically his.

7    Q.  Did you obtain any footage at

8 all?

9    A.  Yes, I did.

10    Q.  And who did you obtain that footage

11 from?

12    A.  A long time ago, but I believe I

13 wrote down who may have been working that

14 night.  And then I went into the system and

15 downloaded their videos.  I can't remember

16 specifically doing one person each time, but

17 I just remember I --

18    Q.  What is the name of the system that

19 you went into to download the body cam

20 footage?

21    A.  I believe it's called -- it's

22 either Taser or Axon.

23    Q.  A-x-i-o-n?

1    A.   A-x-o-n, I believe.
2    Q.   Okay.  So you think that Taser --
3    A.   Wait a minute.  I do remember now.
4  I think it's a website that we use.  And it's
5  called evidence dot com.
6    Q.   Evidence dot com.  And you've been
7  to that website, correct?
8    A.   Correct.
9    Q.   And that website, does it require
10 log-in credentials?
11   A.   Correct.
12   Q.   And when you log in to that
13 website, you are able to access footage?
14   A.   Other officers are allowed to
15 access their footage.  Myself and two other
16 people are administrators.
17   Q.   And so as an administrator, you can
18 access anyone's footage, correct?
19   A.   Correct.
20   Q.   You have kind of a super user
21 authority, right?
22   A.   Correct.
23   Q.   Who are the other administrators

1  for that website?
2    A.   Detective Camp Yancey.
3    Q.   Camp Yancey?
4    A.   Yes, Y-a-n-c-e-y.
5    Q.   Camp Yancey is a detective now?
6    A.   Yes.
7    Q.   When did Camp Yancey become a
8  detective for the Rainbow City Police
9  Department?
10   A.   I believe six months ago.
11   Q.   How long has Camp Yancey been
12 employed by the Rainbow City Police
13 Department?
14   A.   I'm not sure.  We talk on and off,
15 and I believe he said he's getting close to
16 five years.
17   Q.   Okay.  And who is the other
18 administrator?
19   A.   George Morris.
20   Q.   Okay.  So you went on to evidence
21 dot com at the request of Chief Carroll to
22 download video footage, correct?
23   A.   Correct.

1    Q.   When you logged on to evidence dot
2  com, did you download any footage?
3    A.   Yes.
4    Q.   And when you downloaded that
5  footage, did you download the complete
6  footage for that certain officer for the
7  night of January 16, 2015?
8    A.   Correct.  It doesn't let you -- as
9  far as I know, it doesn't let you like record
10 like what you want.
11   Q.   So you can't just download, say, a
12 three minute clip.
13   A.   Like if the video is five minutes,
14 you can't download like two minutes and fifty
15 seconds and leave the rest.  You have to
16 download the whole video.
17   Q.   Okay.  Do you recall how long the
18 videos were that you downloaded?
19   A.   I do not.
20   Q.   Would they have been more than two
21 minutes?
22   A.   Everybody should have, yes.
23   Q.   Now, you worked as a patrol officer

1  in 2014?  Is that when you went back to
2  patrol?
3    A.   Yes, sir.
4    Q.   Now, by 2014, you would have been
5  issued a body cam as a patrol officer,
6  right?
7    A.   I believe at the time that I went
8  back to patrol out of the school, we did not
9  have the body cams that we have now.
10   Q.   Okay.  I'm not talking about when
11 you came out of the academy.
12   A.   Out of the school.
13   Q.   You meant the school resource
14 officer.
15   A.   Right.  Out of the middle school.
16   Q.   So do you have a body camera now?
17   A.   Yes.
18   Q.   What kind of body camera do you
19 have now?
20   A.   Axon body cam.
21   Q.   Did you buy that body cam, or were
22 you issued that by the Rainbow City Police
23 Department?

Page 49

1  A. I was issued that.

2  Q. Is that the same model of body cam
3  that all Rainbow City Police Department
4  officers are issued?

5      MS. CHANDLER: Object to the form.

6

7  Q. You can answer.

8  A. As far as I know.

9  Q. And that camera works when you have
10 it clipped to your chest, and it works by you
11 tapping a button, correct?

12 A. You have to turn it on. When you
13 turn it on, you wait for a green blinking
14 light. And then you double tap twice to
15 actually start recording.

16 Q. Okay. Did you ever have a
17 conversation with George Morris about
18 downloading video footage from the night of
19 January 16, 2015?

20 A. The only conversation I've had with
21 George about downloading video is George
22 contacted me I believe it was about two or
23 three weeks ago and said hey, you need to

Page 50

1  call my attorney. He needs the video.

2      I don't think they could get ahold
3  of me. I was out of the office. I took a
4  vacation. And then I got really busy one
5  week. But he said, you need to contact my
6  lawyer. I think he's wanting some video from
7  the Center Stage incident. And I said, okay.

8  Q. And did you do that?

9  A. No.

10 Q. May I ask you why not?

11 A. I was busy.

12 Q. How long does that video remain on
13 evidence dot com after it's uploaded?

14 A. I'm not sure.

15 Q. Are you allowed to delete video
16 from evidence dot com if you have
17 administrative rights?

18 A. Yes. Never have.

19 Q. No. I'm not accusing you --

20 A. Okay. Yes, yes.

21 Q. No, absolutely not.

22 A. Yes. Yes, you can.

23 Q. I'm just asking you if it's

Page 51

1  possible to delete video.

2  A. Yes, you can.

3  Q. Can you edit video on evidence dot
4  com if you are an administrator?

5  A. I have no idea.

6  Q. Have you had any conversations with
7  Detective Camp Yancey about video footage
8  from the night of January 16, 2015?

9  A. No.

10 Q. So does Camp Yancey have
11 administrative rights because he's a
12 detective?

13 A. Yes.

14 Q. Do you know why George Morris would
15 have administrative rights to evidence dot
16 com?

17 A. George Morris came to me about two
18 months ago and said Chief Carroll had taken
19 some sick time off. And I believe Chief
20 Carroll, while he was the Chief, placed
21 George Morris in charge of the police
22 department while he was out on sickness.

23 Q. I just want to make sure I have

Page 52

1  that right. You said Chief Carroll took some
2  sick time about two months ago?

3  A. I'm not sure of the time, but I do
4  remember that Chief Carroll took some sick
5  time. And just around from other officers, I
6  believe I asked someone one day -- I believe
7  it was Camp Yancey -- who is in charge? And
8  he said Lieutenant George Morris.

9      George Morris came up to me. I
10 couldn't tell you when. It was probably a
11 month, two months ago. And he said, can you
12 make me an administrator on the computer.
13 And he actually told me why. He said, with
14 the Chief gone, there was a lady who had
15 called and complained about a ticket, about
16 one of the officers.

17     Lieutenant Morris was in charge.
18 So he wanted to look at the video and see the
19 complaint that the woman had made on a
20 traffic stop. So he needed to get in and
21 look at the video. And I took orders from
22 him. Basically he said, hey, I need to be
23 made an administrator. And with him being a

1 Lieutenant, I made him an administrator.

2   Q.  You did what you were told because

3 he was the higher ranking officer.

4   A.  Right.  Correct.

5   Q.  But isn't it true that had

6 Lieutenant Morris just asked you for the

7 video, you would have given him that video?

8   A.  Correct.

9   Q.  So it was not necessary for

10 Lieutenant Morris to be made an administrator

11 for evidence dot com to get that video he

12 wanted, right?

13     MR. HOWARD:  Object to the form.

14     MS. CHANDLER:  Object to the form.

15

16   Q.  You can answer.

17   A.  I could have gotten it for him.

18   Q.  Now, you said this happened two

19 months ago?

20   A.  I'm not sure on the time.  It might

21 have been a month ago.

22   Q.  Was it before or after George

23 Morris came to you and told he needed

1 video to get to his lawyer?

2   A.  It was before.

3   Q.  So you made him administrator

4 before he came to you and said I need you to

5 get video for my lawyer?

6   A.  Yes.

7   Q.  But at the point he came to you to

8 say I need you to get video for my lawyer, he

9 could have gotten that video himself,

10 right?

11   A.  I know what happened.  He had been

12 asking me, hey, make me an administrator,

13 make me an administrator, make me an

14 administrator.  And I had put it off because

15 I stayed busy.  One day I'm down there by his

16 office.  And he says hey, can you make me an

17 administrator right now.  And I said yes.

18     So I went in his office and

19 actually made him an administrator in his

20 office.  And there I witnessed him watch the

21 video that he was talking about that the lady

22 had complained of on the patrol video.

23   Q.  Okay.  So was that before Chief

1 Carroll went on sick leave?

2   A.  I believe that was while Chief

3 Carroll was on sick leave.

4   Q.  But you said he had been coming to

5 you saying make me an administrator.

6   A.  Yes.

7   Q.  All right.  Let me show you what

8 I'm going to mark as Plaintiff's Exhibit

9 Number 2 to your deposition.  And by way of

10 further identification, it's titled first

11 amended complaint in this lawsuit filed

12 September 10th, 2015.  Take a look at that

13 and let me know when you're ready and we'll

14 visit about it.

15

16     (Plaintiff's Exhibit Number 2 was

17 marked for identification and same is

18 attached hereto.)

19

20   A.  (Witness reviewing document.)

21 Okay.

22   Q.  Have you seen a copy of this

23 document prior to today?

1   A.  I believe so.

2   Q.  Okay.  Do you know how many volts

3 of electricity that X-26 Taser produces when

4 it's used?

5   A.  No idea.

6   Q.  Were you taught that in your class

7 by Chase Jenkins?

8   A.  I can't remember.

9   Q.  So if you were to employ that Taser

10 weapon, you have no idea how many volts of

11 electricity would come out at the end of that

12 Taser?

13   A.  Not at all.

14   Q.  Did you observe George Morris use a

15 Taser at Center Stage on the night of January

16 16, 2015?

17   A.  Yes, I did.

18   Q.  On whom did you observe George

19 Morris use a Taser on the night of January

20 16, 2015?

21   A.  T.H.

22   Q.  When you observed George Morris use

23 a Taser on T.H. on the night of January 16,

Page 57

1 2015, were there any other Rainbow City
2 police officers present?
3     MS. CHANDLER:  Object to the form.
4
5     Q.  You can answer.
6     A.  Yes, there was.
7     Q.  Who were those officers?
8     A.  I'm not completely sure.
9     Q.  Well, tell me the ones you do know
10 of.
11     A.  Jimmy Fazekas.  I know there were
12 other officers around.  I don't know who.  I
13 can't remember.
14     Q.  Was Chief Carroll around?
15     A.  I don't remember him being
16 around -- now, what incident are we talking
17 about?  When George Morris Tased T.H.?
18     Q.  Yes.
19     A.  I don't remember seeing him around
20 the room.
21     Q.  That's fair.  And I'll represent to
22 you that Chief Carroll testified he doesn't
23 remember seeing you near T.H. when George

Page 58

1 Morris Tased her.  But you are certain that
2 you saw George Morris use a Taser on T.H.,
3 correct?
4     A.  Correct.
5     Q.  Did you see him use it more than
6 once?
7     A.  Yes, I did.
8     Q.  How many times did you see George
9 Morris Tase T.H.?
10     A.  Twice.
11     Q.  Did he use the drive stun method,
12 or did he use the prongs?
13     A.  The drive stun.
14     Q.  Do you have any independent
15 knowledge as to which produces a stronger
16 jolt, the drive stun or the prongs?
17     A.  I have no idea.
18     Q.  You don't?
19     A.  I have no idea.
20     Q.  Did you know T.H. before the night
21 of -- strike that.  Did you know of T.H.
22 prior to January 16, 2015?
23     A.  Yes, I did.

Page 59

1     Q.  She had actually been a student in
2 the schools in which you were a School
3 Resource Officer, correct?
4     A.  Correct.
5     Q.  Were you aware that T.H. suffered
6 from a medical condition of grand-mal
7 seizures prior to that night of January 16,
8 2015?
9     A.  Not at all.
10     Q.  On the night of January 16, 2015,
11 were you made aware that T.H. was suffering
12 from seizures?
13     A.  Yes.
14     Q.  And how were you made aware on the
15 night of January 16, 2015 that T.H. was
16 suffering from seizures?
17     A.  I believe when she was being rolled
18 out by the medics, someone yelled she has
19 seizure problems.
20     Q.  Were you aware that T.H. was
21 suffering from seizures before George Morris
22 Tased T.H.?
23     A.  No, sir.

Page 60

1     Q.  Are you sure?
2     A.  I'm positive.
3     MS. CHANDLER:  Can we take a quick
4 bathroom break?
5     MR. HARP:  Sure.  That's fine.
6     MS. CHANDLER:  I'm sorry.  We can
7 wait for a good stopping point.
8     MR. HARP:  No.  That's a good
9 stopping point right there.
10
11     (Whereupon, a brief recess was
12      taken.)
13
14     Q.  All right.  We are back on the
15 record after a short break, Mr. Gilliland.
16 Now, before we went on break, I was asking
17 you about the night of January 16, 2015 and
18 whether or not anyone had told you prior to
19 you seeing George Morris Tase T.H. the first
20 time that she was suffering from a medical
21 emergency.  And you told me that you were not
22 aware of that; is that right?
23     MS. CHANDLER:  Object to the form.

Q. You can answer.

A. I'm not understanding what you're saying.

Q. Sure. Prior to you observing George Morris Taser T.H., did anyone at Center Stage tell you that T.H. was suffering from seizures?

A. I'm just going to ask. I'm asking how you're asking this question. Are you asking me was I aware that she had a medical condition?

Q. Do you consider a seizure a medical condition?

A. Yes. If you have them all the time, yes.

Q. Okay. Well, let's assume that that's what I'm asking you. No, that is what I'm asking. Had anyone told you that T.H. was having a medical condition prior to you seeing George Morris Taser T.H.?

A. Someone in the crowd told me there was someone having a seizure, but I did not

know if she had a medical condition or a medical history of seizures.

Q. Is there a distinction in your mind between having a seizure one time versus having them, as you say, all the time?

A. You go to a ball game and you get hit in the head with a baseball and you have a seizure, I mean, you don't have a medical condition. I mean, you got hit in the head with a baseball. You know what I'm saying?

Q. I think so. Do you think it's a good idea to Tase someone that's having a seizure?

MR. HOWARD: Object to the form.

Q. You can answer.

A. Absolutely not.

Q. You said that someone in the crowd said that someone was having a seizure, right?

A. Yes.

Q. Okay. And at any point before George Morris Tased -- is it Tasered or

Tased?

A. You can say Tased. That's what I say.

Q. Okay. At any point before George Morris Tased T.H. for the first time, did you tell George Morris that she was having a seizure?

MS. CHANDLER: Object to the form.

A. I don't remember.

Q. You don't remember?

A. I don't remember.

Q. Do you remember ever informing George Morris that you had learned that someone was having a seizure and it may be T.H.?

A. I don't remember.

Q. At any point before George Morris Tased T.H., did you believe T.H. was having a seizure?

A. Yes.

Q. So before you saw George Morris Tase T.H. the first time, you believed she

was having a seizure.

A. Correct.

MS. CHANDLER: Object to the form.

Q. Is that a yes?

A. That's a yes.

Q. And you previously testified that it's absolutely not a good idea to Tase someone that's having a seizure, correct?

MS. CHANDLER: Object to the form.

Q. Was that your previous testimony?

A. Correct.

Q. But you did not tell George Morris not to Tase T.H., correct?

A. Say that again.

Q. You did not tell George Morris to not Tase T.H., right? Wait. That's a triple negative. Let me try this again. Did you ever tell George Morris, don't Tase T.H.?

A. I did not.

Q. Did you ever tell George Morris, that's not a good idea to Tase T.H.?

Page 65

1   A. I did not.
2   Q. Did any Rainbow City police officer
3   present when George Morris Tased T.H. try to
4   stop George Morris from Tasing T.H.?
5   A. I don't recall.
6   Q. When you went to the academy, were
7   you instructed on constitutional rights of
8   suspects?
9   A. Yes.
10   Q. Were you instructed that as a
11   police officer, you have a duty to make sure
12   other officers do not inflict harm
13   unnecessarily on people?
14   MR. HOWARD: Object to the form.
15   MS. CHANDLER: Object to the form.
16
17   Q. You can answer.
18   A. I believe so.
19   Q. But when you saw George Morris --
20   or strike that. Let me ask you this way.
21   Did you hear George Morris tell T.H., I'm
22   going to Tase you?
23   A. I did.

Page 66

1   Q. And when you heard George Morris
2   tell T.H., I'm going to Tase you, you did not
3   say you can't do that, she's having a
4   seizure, did you?
5   A. No.
6   Q. And you did not try to stop George
7   Morris from Tasing T.H. even though you knew
8   she was having a seizure, correct?
9   MR. STUBBS: Object to the form.
10   MR. HOWARD: Object to the form.
11   MS. CHANDLER: Object to the form.
12
13   Q. You can answer.
14   A. At the time George Morris Tased
15   her, I don't believe she was having a
16   seizure.
17   Q. But you believed she had had a
18   seizure, correct?
19   A. Correct.
20   Q. So even though she wasn't having a
21   seizure at the time that he Tased her, you
22   knew that she had had a seizure that night.
23   MR. STUBBS: Object to the form.

Page 67

1
2   A. I mean, I'm going to say this, and
3   you tell me -- she was being very violent.
4   So I mean --
5   Q. At the time that George Morris
6   Tased T.H., were her arms free?
7   A. I don't recall.
8   Q. Isn't it true that at the time
9   George Morris Tased T.H. the first time, her
10   arms were being held down?
11   A. I don't remember.
12   Q. Isn't it true that at the time
13   George Morris Tased T.H. the first time, her
14   legs were being held down?
15   A. I don't remember.
16   Q. Isn't it true that at the time
17   George Morris Tased T.H. the first time, you
18   were holding T.H.'s head?
19   A. Correct.
20   Q. At the time you were holding T.H.'s
21   head at the time George Morris Tased T.H. the
22   first time, where was George Morris in
23   relation to her body, T.H.'s body?

Page 68

1   A. I remember him standing in front of
2   her below her feet.
3   Q. Standing in front of her below her
4   feet.
5   A. Yes, sir.
6   Q. Was there anyone -- strike that.
7   Was there a police officer to the left of
8   T.H. when George Morris was standing below
9   her feet?
10   A. I don't remember.
11   Q. Was there a police officer to the
12   right of T.H. when George Morris was standing
13   at her feet?
14   A. I don't remember.
15   Q. Do you know Timothy Kimbrough?
16   A. Yes.
17   Q. Who is Timothy Kimbrough?
18   A. He is an officer with the Rainbow
19   City Police Department.
20   Q. Was Timothy Kimbrough present at
21   Center Stage on the night of January 16,
22   2015?
23   A. I believe so.

Page 69

1    Q. Was Timothy Kimbrough present when
2 George Morris Tased T.H. the first time?
3    A. I'm not sure.
4    Q. Was Timothy Kimbrough present when
5 George Morris Tased T.H. the second time?
6    A. I'm not sure.
7    Q. Was Jimmy Fazekas present when
8 George Morris Tased T.H. the first time?
9    A. I believe so.
10    Q. Do you recall Jimmy Fazekas
11 attempting to stop George Morris from Tasing
12 T.H. the first time?
13      MR. HOWARD: Object to the form.
14
15    A. I do not.
16    Q. Do you recall Jimmy Fazekas
17 attempting to stop George Morris from Tasing
18 T.H. the second time?
19    A. I do not.
20    Q. Do you recall Camp Yancey being
21 present at Center Stage on the night of
22 January 16, 2015?
23    A. I do not.

Page 70

1    Q. Do you recall telling Detective
2 Fazekas, or Jimmy Fazekas, on the night of
3 January 16, 2015 prior to George Morris
4 Tasing T.H. the first time that she was
5 having a seizure and that you needed to make
6 sure she did not harm herself?
7    A. Yes.
8    Q. So you witnessed Sergeant Morris
9 drive stun T.H. for a few seconds the first
10 time, correct?
11    A. I don't remember how long it was,
12 but yes, I did witness it.
13    Q. And what did T.H. say in response
14 to being Tased?
15    A. I believe the only thing I heard
16 her say was Tase me mother fucker.
17    Q. And did Sergeant Morris comply with
18 that?
19      MS. CHANDLER: Object to the form.
20      MR. STUBBS: Object to the form.
21      MR. HOWARD: Object to the form.
22
23    Q. You can answer. Did he Tase her

Page 71

1 again?
2    A. Yes, sir.
3    Q. At the time that he Tased her the
4 second time, were you still holding her
5 head?
6    A. Yes.
7    Q. At the time that he Tased her the
8 second time, do you recall officers holding
9 T.H.'s feet?
10    A. Yes.
11    Q. Who were those officers?
12    A. I don't remember.
13    Q. So were they holding T.H.'s feet
14 before George Morris Tased T.H. the second
15 time?
16    A. I believe they held her feet after
17 the first Tase had happened.
18    Q. So after the first Tase happened,
19 T.H.'s feet were being held by two police
20 officers, correct?
21    A. From what I remember, she didn't
22 comply with --
23    Q. That wasn't my question.

Page 72

1    A. Okay. Go ahead.
2    Q. My question was, after George
3 Morris Tased T.H. the first time, T.H.'s feet
4 were being held by two police officers,
5 correct?
6    A. After she got Tased the first time,
7 her feet were being held.
8    Q. And were her feet still being held
9 when George Morris Tased T.H. the second
10 time?
11    A. I don't remember. Afterwards? Are
12 you saying afterwards?
13    Q. Between the first Tase and the
14 second Tase, were the officers still holding
15 T.H.'s feet?
16    A. After the first Tase, they began to
17 hold her feet. When she was Tased the second
18 time, I don't know if they let go.
19    Q. You don't know if they let go
20 before she was Tased the second time?
21    A. I believe they were being held
22 while she was Tased the second time.
23    Q. T.H.'s feet were being held while

Page 73

1 she was Tased the second time, correct?
2    A. Correct.
3    Q. And they were being held by two
4 Rainbow City police officers, correct?
5    A. I don't know if it was two.
6    Q. Well, they were being held by at
7 least one Rainbow City police officer,
8 right?
9    A. Correct.
10    Q. Who was that officer?
11    A. I don't remember. Everything
12 happened so fast.
13    Q. Was it a patrol officer?
14    A. I have no idea.
15    Q. Was he in uniform?
16    A. Yes.
17    Q. Do detectives wear Class A
18 uniforms?
19    A. No.
20    Q. Who wears Class A uniforms?
21    A. Patrol officers, Sergeants,
22 Lieutenants. That's about it at Rainbow
23 City.

Page 74

1    Q. So was it George Morris holding
2 T.H.'s feet while he Tased her?
3    A. I don't remember.
4    Q. Did you ever tell George Morris,
5 you shouldn't Tase her because her feet are
6 being held?
7    A. No.
8    Q. Did any Rainbow City police officer
9 present at the second Tase tell George
10 Morris, you shouldn't Tase her because her
11 feet are being held?
12    A. I don't remember.
13    Q. As an officer who has gone through
14 the police academy, you are APOST certified,
15 correct?
16    A. Yes, sir.
17    Q. In all of your APOST training, have
18 you ever been taught it's okay to Tase a
19 person who is being restrained?
20      MR. STUBBS: Object to the form.
21      MR. HOWARD: Object to the form.
22      MS. CHANDLER: Object to the form.
23

Page 75

1    Q. You can answer.
2    A. I don't understand your definition
3 of restrained because sometimes we restrain
4 people and they still fight.
5    Q. Well, tell me how T.H. was
6 fighting. Was she kicking?
7    A. Kicking.
8    Q. Even though her feet were being
9 restrained?
10    A. After the first time, she was
11 kicking. That's why they held her feet the
12 second time.
13    Q. Okay. Let's focus on that second
14 Tase.
15    A. Okay.
16    Q. Was she kicking at the time that
17 she was Tased the second time?
18    A. Trying to.
19    Q. Was she?
20      MR. HOWARD: Object to the form.
21
22    Q. You can answer.
23    A. Yes.

Page 76

1    Q. So a grown man was holding this
2 seventeen-year-old girl's feet and she was
3 kicking. Is that your testimony?
4    A. Trying to kick, yes.
5    Q. Well, was she kicking, or was she
6 trying to kick?
7      MR. HOWARD: Object to the form.
8
9    Q. You can answer.
10    A. Yes.
11    Q. Is it possible -- let me ask you
12 this way. What medical training do you have
13 as it relates to someone having seizures?
14    A. No certifications.
15    Q. Have you ever seen anyone have a
16 seizure outside of January 16, 2015?
17    A. Yes.
18      MR. HOWARD: Object to the form.
19      MR. STUBBS: Object to the form.
20
21    Q. And who was that?
22    A. Patients at a hospital.
23    Q. At a hospital. And that's in a

1 controlled setting, in a controlled
2 environment?
3    A.  Yes.
4    Q.  And are those patients restrained
5 when they are having those seizures?
6    A.  Define restrained.
7    Q.  Are they held so that they don't
8 hurt themselves?
9    A.  Yes.
10    Q.  And why is that?
11    A.  From what I've been told, so they
12 can't knock themselves out while they're
13 moving their head around, don't break
14 anything by hitting up against an object,
15 arms slinging, legs --
16    Q.  Kicking?
17    A.  Kicking.  So they won't get hurt.
18    Q.  So you've been told -- well, who
19 told you that a patient having a seizure
20 would be kicking?
21    A.  Nobody has told me.  I've witnessed
22 it.
23    Q.  You've witnessed patients having

1 seizures who would be kicking, correct?
2    A.  Correct.
3    Q.  So why is it that you say T.H. was
4 being violent because she was kicking when
5 you had also been told that she was having a
6 seizure?
7    A.  At that time?
8    Q.  Yes, sir.
9    A.  Because she was cursing.
10    Q.  So do you know --
11    A.  Working at the hospital, I've never
12 seen anybody curse having seizures.
13    Q.  But you don't know if that happens
14 or not.
15    A.  Absolutely not.
16    Q.  So it could happen, correct?
17       MS. CHANDLER:  Object to the form.
18       MR. STUBBS:  Object to the form.
19       MR. HOWARD:  Object to the form.
20
21    Q.  You don't know one way or the
22 other.
23    A.  I could die in a car wreck out

1 here, man.  Anything is possible.
2    Q.  Right.  So it's possible that the
3 cursing that you heard was a result of the
4 seizures, correct?
5       MS. CHANDLER:  Object to the form.
6       MR. STUBBS:  Object to the form.
7       MR. HOWARD:  Object to the form.
8
9    Q.  You can answer.  You said anything
10 is possible, so that's possible, correct?
11       MS. CHANDLER:  Object to the form.
12       MR. STUBBS:  Object to the form.
13       MR. HOWARD:  Object to the form.
14
15    A.  Correct.
16    Q.  And it's possible that the kicking
17 that you saw was a result of the seizures,
18 correct?
19       MS. CHANDLER:  Object to the form.
20       MR. STUBBS:  Object to the form.
21       MR. HOWARD:  Object to the form.
22
23    Q.  Is that correct?

1    A.  Possibly.
2    Q.  But rather than taking an objective
3 wait and see approach until the medics got
4 there, George Morris decided to go ahead and
5 Tase T.H. because he felt she was not
6 compliant, correct?
7       MR. STUBBS:  Object to the form.
8       MS. CHANDLER:  Object to the form.
9       MR. HOWARD:  Object to the form.
10
11    Q.  You can answer.
12       MS. CHANDLER:  To the extent you
13 know.
14       MR. HARP:  That's a touchy
15 question, I guess.
16
17    Q.  You can answer.
18       MS. CHANDLER:  You can testify as
19 to what you know, but you can answer his
20 question.
21       MR. HOWARD:  Triple objection.
22
23    A.  Ask me again.

1     Q.   Did George Morris explain to T.H.
2   why he was going to Tase her?
3     A.   Yes.
4     Q.   And what did George Morris say by
5   way of explanation to T.H. as to why he was
6   going to Tase her?
7     A.   I believe it was something along
8   the lines, if you don't stop fighting, you're
9   going to get Tased again.
10    Q.   So what did you take that to mean
11  when you heard George Morris tell T.H.
12  that?
13    A.   That if you don't stop biting and
14  kicking and cursing, you will be Tased
15  again.
16    Q.   Well, who did T.H. bite?
17    A.   She was trying to bite me.
18    Q.   Did she bite you?
19    A.   She attempted to.
20    Q.   Did she bite you?
21       MR. HOWARD:  Object to the form.
22
23    Q.   You can answer.

1     A.   No, she did not.
2     Q.   Who else did she attempt to bite?
3     A.   I have no idea.
4     Q.   And why do you think she attempted
5   to bite you?
6       MS. CHANDLER:  Object to the form.
7       MR. HOWARD:  Object to the form.
8       MR. STUBBS:  Object to the form.
9
10    Q.   You can answer.
11    A.   Because I was holding her head.
12    Q.   And why were you holding her
13  head?
14    A.   So she couldn't bite.
15    Q.   I thought you were holding her head
16  because you thought she was having a seizure.
17    A.   Earlier.
18       MS. CHANDLER:  Object to the form.
19       MR. HOWARD:   Object to the form.
20       MR. STUBBS:  Object to the form.
21
22    Q.   So you started holding her head
23  because you felt she was having a seizure,

1   right?
2     A.   This was at different places.
3     Q.   Did you start holding T.H.'s head
4   because you felt she was having a seizure?
5   Yes or no.
6     A.   There is two separate incidences.
7     Q.   I'm talking about the first time
8   you started holding her head.
9     A.   The first time I ever held her
10  head.
11    Q.   Yes.
12    A.   I held her head because I believed
13  she was having a seizure, yes.
14    Q.   Okay.  Did anything change your
15  mind about whether or not T.H. was having a
16  seizure?
17    A.   Yes.
18    Q.   What?
19    A.   The cursing and the fighting and
20  the aggression, just being violent.
21    Q.   Do you know whether or not patients
22  having seizures react in a violent manner?
23    A.   Say it again.

1     Q.   Sure.  To your knowledge, is it
2   possible for someone having a seizure to act
3   in a violent manner?
4     A.   I have no idea.
5     Q.   So it's possible because you have
6   no idea that the violent manner you say you
7   observed from T.H. was a result of the
8   seizure, isn't it?
9       MR. HOWARD:  Object to the form.
10       MR. STUBBS:  Object to the form.
11       MS. CHANDLER:  Object to the form.
12
13    Q.   You can answer.
14    A.   I have no idea.
15    Q.   But it's possible.
16       MS. CHANDLER:  Object to the form.
17       MR. STUBBS:  Object to the form.
18       MR. HOWARD:  Object to the form.
19
20    A.   Correct.
21    Q.   And have you ever read anything in
22  the Taser manual that indicates to you that
23  people having seizures could react in a

1 violent manner?

2     A.  I have not.

3     Q.  As a matter of fact, you think the

4 last time you've ever even seen a Taser

5 manual would have been when you were first

6 certified, right?

7     A.  Correct.

8     Q.  And that would have been in what

9 year?

10     A.  2010.

11     Q.  So six years ago, you read the

12 Taser manual for the first and last time.

13 Did you read anything at that time that

14 indicated that patients having seizures could

15 react in a violent manner and you should be

16 careful about employing a Taser on them?

17     A.  I don't remember.

18     Q.  When you downloaded the footage

19 from the body cams that night, did you

20 download any footage that showed T.H. being

21 Tasered by George Morris?

22     A.  I don't remember.

23     Q.  Should George Morris have been --

1 should his body camera have been running at

2 the time that he Tased T.H. the first time?

3     MS. CHANDLER:  Object to the form.

4     MR. STUBBS:  Object to the form.

5     MR. HOWARD:  Object to the form.

6

7     Q.  You can answer.

8     A.  I don't know.

9     Q.  What is the policy at the Rainbow

10 City Police Department on the use of body

11 cams?

12     MS. CHANDLER:  Object to the form.

13     MR. STUBBS:  Object to the form.

14     MR. HOWARD:  Object to the form.

15

16     Q.  And if you don't know, just tell

17 me.

18     A.  I don't know.

19     Q.  Have you ever been instructed by

20 anyone at Rainbow City Police Department on

21 the proper use of body cams?

22     A.  Like a class?  Is that what you're

23 asking?  Like a certification?

1     Q.  I'm asking in any way.

2     A.  No.

3     Q.  So when you were issued the body

4 camera by the Rainbow City Police Department,

5 were you just handed the camera and were told

6 to wear this?

7     A.  I don't remember.

8     Q.  And when were you issued the body

9 camera from the Rainbow City Police

10 Department again?

11     A.  I'm not sure.  It was a year, year

12 and a half ago.

13     Q.  How do you know as a police officer

14 for the Rainbow City Police Department, how

15 do you know when to turn your body cam on?

16     A.  I turn my camera on every time I'm

17 about to go to a call or interview someone.

18     Q.  But is that just something you do

19 on your own, or is that a written policy

20 within the Rainbow City Police Department?

21     A.  I've verbally been told before to

22 have it on every time that you interact with

23 someone.

1     Q.  Who told you that?

2     A.  Chase Jenkins.

3     Q.  When did he tell you that?

4     A.  When he issued the cameras.

5     Q.  So Chase Jenkins issued the camera

6 to you and told you to turn this on every

7 time you're interacting with a person?

8     A.  Yes.

9     Q.  At the time that George Morris

10 Tased T.H. the first time, had she committed

11 a crime?

12     A.  Say that again.

13     Q.  At the time that George Morris

14 Tased T.H. the first time, had she committed

15 a crime?

16     A.  Possibly.

17     Q.  Well, either she had or she had

18 not.  Had she committed a crime?

19     MS. CHANDLER:  Object to the form.

20     MR. STUBBS:  Object to the form.

21     MR. HOWARD:  Object to the form.

22

23     Q.  You can answer.

Page 89

1    A.  I believe that's officer
2  discretion.
3    Q.  In your belief, had T.H. committed
4  a crime at the time George Morris Tased her
5  the first time?
6    A.  I did not arrest her for any crime
7  at that point.
8    Q.  Because you did not believe -- and
9  you have arrest powers, correct?
10   A.  Correct.
11   Q.  You're APOST certified, correct?
12   A.  Correct.
13   Q.  So you have arrest powers within
14  the boundaries of the State of Alabama,
15  correct?
16   A.  I do.
17   Q.  And so if T.H. had committed a
18  crime worthy of arrest, you could have
19  arrested her that night, correct?
20   A.  If I had seen a crime being
21  committed.
22   Q.  And you were present when T.H. was
23  Tased the first time, correct?

Page 90

1    A.  Correct.
2    Q.  And you didn't arrest her.
3    A.  I didn't see it from every angle.
4    Q.  Well, you saw it from the angle of
5  her head you were holding, correct?
6    A.  Correct.
7    Q.  So from the angle of her head where
8  you were holding it, did you see her commit a
9  crime?
10   A.  No.
11   Q.  Yet George Morris Tased her,
12  correct?
13   A.  Correct.
14   Q.  And George Morris was standing and
15  T.H. was laying on the ground, correct?
16   A.  Correct.
17   Q.  So at the time George Morris Tased
18  her the first time, in your opinion as a
19  seasoned police officer, was T.H. a threat to
20  George Morris?
21       MS. CHANDLER:  Object to the form.
22       MR. HOWARD:  Object to the form.
23       MR. STUBBS:  Object to the form.

Page 91

1
2    Q.  You can answer.
3    A.  That would be an opinion.
4    Q.  Well, in your opinion, at the time
5  that George Morris Tased T.H. the first time
6  when he was standing above her and she was
7  lying on the ground and you were holding her
8  head, was T.H. a threat to George Morris?
9    A.  No.
10   Q.  But he Tased her anyway, correct?
11       MS. CHANDLER:  Object to the form.
12       MR. STUBBS:  Object to the form.
13       MR. HOWARD:  Object to the form.
14
15   Q.  You can answer.
16   A.  T.H. was not a threat to George
17  Morris.
18   Q.  But he Tased her anyway, correct?
19   A.  Correct.
20   Q.  At the time George Morris Tased
21  T.H. the second time when a Rainbow City
22  police officer was holding her feet, was
23  George Morris still standing?

Page 92

1    A.  I believe so.
2    Q.  So at the time that George Morris
3  Tased T.H. the second time when a Rainbow
4  City police officer was holding her feet,
5  were you still holding her head?
6    A.  Yes.
7    Q.  So at the time that George Morris
8  Tased T.H. the second time when a Rainbow
9  City police officer was holding her feet and
10  you were holding her head, was T.H. a threat
11  to George Morris in your opinion?
12   A.  Not from his position.
13   Q.  Do you know what the anti-felon
14  confetti is in the X-26?
15   A.  I have no idea.
16   Q.  You don't?
17   A.  Say it again.
18   Q.  Do you know what the anti-felon
19  confetti is in the X-26?
20   A.  I do not.
21   Q.  You're not aware that if that Taser
22  is discharged, confetti comes out to mark
23  when that Taser was discharged?

1    A.   Now that you say that, I've heard
2  that it's got a date and time recorded, yes.
3  I just didn't know what you were asking.
4    Q.   When you finish with that Taser at
5  the end of your shift, what happens to that
6  Taser?
7    A.   After you Tase someone or --
8    Q.   No, sir.  Just when you finish your
9  shift, what do you do with your Taser?
10    A.   I put it in a lock box in my car.
11    Q.   Do you ever charge your Taser?
12    A.   They have batteries.  I have to
13  change out -- you have to change out
14  batteries when they get so low.
15    Q.   Is your Taser charged now?
16    A.   Yes.
17    Q.   Do you ever put your Taser in a
18  docking station?
19    A.   Never.
20    Q.   Did you know there was a docking
21  station?
22        MS. CHANDLER:  Object to the form.
23

1    Q.   You can answer.
2    A.   Explain docking station.  To like
3  download material or --
4    Q.   Yes.
5    A.   I know that you can hook a USB up
6  to that, yes.
7    Q.   Is there a policy within the
8  Rainbow City Police Department that those
9  Tasers are supposed to be placed on a docking
10  station at the end of your shift?
11    A.   I have no idea.
12    Q.   Well, you don't do that with your
13  Taser, right?
14    A.   No.
15    Q.   And you would do it if there was a
16  policy for you to do that, right?
17        MR. HOWARD:  Object to the form.
18        MS. CHANDLER:  Object to the form.
19        MR. STUBBS:  Object to the form.
20
21    A.   Correct.
22    Q.   Okay.  So after George Morris Tased
23  T.H. the second time, what did George Morris

1  do at that point?
2    A.   I don't remember at that point.  I
3  don't remember what he done after that.
4    Q.   What did you do after he Tased her
5  the second time?
6    A.   The second time?
7    Q.   Yes, sir.
8    A.   The next thing I remember after
9  holding her head after she was Tased the
10  second time was someone pushing into my
11  back.
12    Q.   Who was it?
13    A.   I don't know.
14    Q.   Did you ever see the person pushing
15  into your back?
16    A.   From behind, yes.
17    Q.   From behind?
18    A.   I saw their back side.
19    Q.   Describe that person.
20    A.   It appeared to be a woman with long
21  hair.
22    Q.   And you're saying that a woman with
23  long hair pushed into your back after T.H.

1  was Tased by George Morris the second time.
2    A.   Yes.
3    Q.   Was the woman who you say pushed
4  into your back, did she ever say anything?
5    A.   I don't remember.
6    Q.   Is it possible that she said stop,
7  stop Tasing her?
8    A.   Possibly.
9    Q.   And after she possibly said that,
10  what's the next thing you remember?
11    A.   The next thing I remember is the
12  female kept trying to -- I felt like I was
13  still getting bumped from behind in my back.
14    Q.   Well, were you still getting
15  bumped, or did you just feel that?
16    A.   Yes.  Yes, I was.
17    Q.   Do you have any independent
18  knowledge that it was this female who said
19  stop, stop Tasing her that was bumping you in
20  your back?
21    A.   No.
22    Q.   So you don't know who was bumping
23  you in the back.

Page 97

1   A.  I have no idea.
2   Q.  It could have been another Rainbow
3 City police officer for all you know,
4 correct?
5   A.  Until I turned around, yes.
6   Q.  Well, when you turned around, you
7 were no longer being bumped in the back,
8 correct?
9   A.  I had just been bumped in the back.
10   Q.  But you don't know who did that.
11   A.  No.  I don't know a name.
12   Q.  Well, your back was turned,
13 correct?
14   A.  Correct.  I'm still on the floor.
15   Q.  And you were bumped in the back.
16   A.  Correct.
17   Q.  So you don't know who bumped you in
18 the back, correct?
19   A.  Correct.
20   Q.  Because at the time it happened, by
21 the laws of physics, you were facing the
22 other way, right?
23   A.  Correct.

Page 98

1   Q.  So how do you know it was the older
2 female that bumped you in the back?
3   A.  As soon as I felt the second bump,
4 I turned around.  And by the law of physics,
5 that was the only person standing at my
6 back.
7   Q.  But you never saw her bump you, did
8 you?
9       MS. CHANDLER:  Object to the form.
10
11   Q.  That's not the law of physics, by
12 the way.  That's the law of probability,
13 right?
14       MS. CHANDLER:  Object to the form.
15       MR. HOWARD:  Object to the form.
16       MR. STUBBS:  Object to the form.
17
18   Q.  Possibility.
19       MR. HOWARD:  There are no physics
20 or probability experts in here.
21
22   A.  Tell me what you're asking me
23 again.

Page 99

1   Q.  You didn't see who bumped you in
2 the back, did you?
3       MS. CHANDLER:  Object to the form.
4
5   A.  Not bump me in the back, no.
6   Q.  And when you turned around, there
7 was an older female standing there,
8 correct?
9   A.  Correct.
10   Q.  Who you did not see actually bump
11 you in the back, correct?
12       MS. CHANDLER:  Object to the form.
13 Asked and answered.  You may answer.
14
15   A.  Correct.
16   Q.  And when you turned around and you
17 saw that female standing there, what did you
18 do?
19   A.  When I turned around and looked at
20 this female, I did not see a face.  The
21 female began trying to, it looked like, make
22 her way towards the girl.
23   Q.  That's it?  She was just trying to

Page 100

1 make her way towards the girl?
2   A.  If I remember right, she was
3 screaming.
4   Q.  Is that a crime in the City of
5 Rainbow City to scream?
6   A.  No.
7   Q.  Okay.  So she was screaming.  She
8 was trying to make her way toward the girl.
9 And the girl wasn't under arrest, correct?
10   A.  Correct.
11   Q.  So at that point, the older female
12 had not committed a crime, correct?
13       MS. CHANDLER:  Object to the form.
14
15   Q.  To your knowledge.
16   A.  Possibly, yes.
17   Q.  What was that crime?
18   A.  Obstruction.
19   Q.  Of?
20   A.  Governmental operations.
21   Q.  Were you on duty that night?
22   A.  I'm on duty twenty-four, seven.
23   Q.  So during all of this stuff that

1 happened with T.H. and you not stopping
2 George Morris from Tasing T.H., you were on
3 duty.
4      MR. STUBBS: Object to the form.
5      MS. CHANDLER: Object to the form.
6
7   A.  Say that again.
8   Q.  You said you are on duty
9 twenty-four, seven, right?
10   A.  Yes.
11   Q.  So at the point that you did not
12 try to stop George Morris from Tasing T.H.,
13 did you consider yourself to be on duty?
14   A.  Yes.
15   Q.  And who do you work for?
16   A.  The Rainbow City Police
17 Department.
18   Q.  So what justice was the older
19 female whose face you did not see
20 obstructing?
21      MR. HOWARD: Object to the form.
22      MS. CHANDLER: Object to the form.
23      MR. STUBBS: Object to the form.

1
2   Q.  I'm sorry.  You said obstruction of
3 a governmental operation.
4   A.  I did mean to say obstruction of
5 justice.  I'm sorry.
6   Q.  Okay.  So what justice was the
7 older female whose face you did not see, who
8 you did not see bump you, what justice was
9 she obstructing?
10   A.  Trying to involve herself in a
11 police matter.
12   Q.  And what was the police matter?
13   A.  The police were dealing with a
14 person.
15   Q.  Who had not committed a crime,
16 correct?
17   A.  Not by my opinion.
18   Q.  Okay.  So if she had not committed
19 a crime, what justice was the older female
20 obstructing?
21   A.  She had just been Tased.
22   Q.  Who had?
23   A.  T.H.

1   Q.  Okay.  But she had not committed a
2 crime by your opinion.
3   A.  Not by my opinion.
4   Q.  Okay.  So what justice was the
5 older female whose face you did not see
6 obstructing?
7   A.  Interfering.
8   Q.  With?
9   A.  A police matter.
10   Q.  What was the police matter?
11   A.  Trying to calm down a situation.
12   Q.  What situation were the police
13 trying to calm down?
14   A.  The T.H. situation.
15   Q.  What was the T.H. situation?
16 Because T.H. had not committed a crime,
17 correct?
18      MS. CHANDLER: Object to the form.
19
20   Q.  You can answer.
21   A.  Not at that point, no.
22   Q.  Well, she had already been Tased
23 twice.  So at the point she had been Tased

1 twice, she had not committed a crime?
2   A.  Not in my -- now, say it again.
3   Q.  Okay.  I asked you what justice the
4 older female whose face you did not see was
5 obstructing.  And your response was, trying
6 to calm down the situation, right?  And I
7 said, what situation?  And you said the T.H.
8 situation.
9   A.  Yes.
10   Q.  What was the T.H. situation?
11   A.  Trying to get T.H. to -- how do I
12 word this?  Comply to orders.
13   Q.  What orders were you giving T.H.?
14   A.  I wasn't giving any orders.
15   Q.  What orders was George Morris
16 giving T.H.?
17   A.  To calm down and stop fighting.
18   Q.  How was T.H. fighting if her legs
19 were being held down by the police officer at
20 the second time she was Tased?
21   A.  I believe while her feet were being
22 held the second time -- I don't know how to
23 explain it, but she was just -- let me see

Page 105

1 how to word this.  When you're fighting
2 someone, they can get loose.  She was trying
3 to jar loose is what I'm saying.
4     Q.  Did she jar loose?
5     A.  I believe so.
6     MR. HARP:  All right.  Let's go off
7 the record while I take this call.
8
9     (Whereupon, a brief recess was
10     taken.)
11
12     (Plaintiff's Exhibit Number 3 was
13 marked for identification and same is
14 attached hereto.)
15
16
17     (Plaintiff's Exhibit Number 4 was
18 marked for identification and same is
19 attached hereto.)
20
21     Q.  All right.  We're back on the
22 record, Mr. Gilliland.  Let me show you what
23 I've marked as Plaintiff's Exhibit Number 3

Page 106

1 to your deposition.  And by way of further
2 identification, Number 3 is the statement of
3 Justin Gilliland.
4     And you can take that and just
5 glance at it and then lay it to the side
6 because I want to visit with you about
7 Plaintiff's Exhibit Number 4 that I'm going
8 to enter into the record.  And by way of
9 further identification, it is a photograph of
10 T.H.  And those were produced to the
11 Defendants' counsel in our initial
12 disclosures.  Mr. Gilliland, do you
13 recognize the person depicted in that
14 photograph?
15     A.  Yes.
16     Q.  And who is that person?
17     A.  That appears to be T.H.
18     Q.  And does that appear to be the same
19 individual that was Tased by George Morris
20 two times in your presence on January 16,
21 2015?
22     A.  Yes.
23     Q.  Okay.  Now, if you would, pick up

Page 107

1 Plaintiff's Exhibit Number 3 now.  Have you
2 ever seen this document before?
3     A.  I have.
4     Q.  And what is that document we're
5 looking at?
6     A.  That document is the statement that
7 I typed and signed.
8     Q.  And when did you type this
9 document?
10     A.  I don't remember.  It was shortly
11 after the incident had happened.
12     Q.  When did you sign this document?
13     A.  It says 1-22-15.
14     Q.  Did you sign the document the same
15 day you typed it?
16     A.  Yes, I believe so.
17     Q.  Did you give the document to anyone
18 to review before you signed it?
19     A.  I don't believe so.
20     Q.  Is this the document -- strike
21 that.  As this document exists as Plaintiff's
22 Exhibit Number 3, are there any other
23 versions of this document that exist?

Page 108

1     A.  No.
2     Q.  So this is the only statement
3 you've ever typed out related to the events
4 that occurred on January 16, 2015; is that
5 correct?
6     A.  I believe so.
7     Q.  And where did you type this
8 document?  Where were you when you typed this
9 document?
10     A.  In my office.  My previous
11 office.
12     Q.  At the Rainbow City Police
13 Department?
14     A.  Yes.
15     Q.  And you typed that on a computer?
16     A.  Yes.
17     Q.  Do you still have a copy of --
18 strike that.  Did you save the file that you
19 used to type this document?
20     A.  I believe I did.
21     Q.  Do you recall the name of the file
22 that this document is saved under?
23     A.  It was either statement of Justin

¹ Gilliland or statement of Center Stage
² incident.
³    Q.   Is that document still on your
⁴ computer at the Rainbow City Police
⁵ Department?
⁶    A.   I believe it's still on Camp
⁷ Yancey's computer.
⁸    Q.   So the computer that this statement
⁹ was typed on is now used by Camp Yancey?
¹⁰    A.   Correct.
¹¹    Q.   Is there a policy within the
¹² Rainbow City Police Department about the
¹³ preservation of statements made by
¹⁴ officers?
¹⁵    A.   Not that I'm aware of.
¹⁶    Q.   If that policy existed, that policy
¹⁷ would be contained in the SOP, correct?
¹⁸       MR. HOWARD:  Object to the form.
¹⁹
²⁰    Q.   You can answer.
²¹    A.   I'm not sure.
²²    Q.   So does this appear to be the
²³ statement in the same form that you typed and

¹ signed on January 22nd, 2015?
²    A.   It does.
³    Q.   Do you see anything that's been
⁴ changed about this statement from when you
⁵ typed and signed it on January 22nd, 2015?
⁶    A.   I would have to read every bit of
⁷ it, but I don't believe so.
⁸    Q.   Okay.  Well, I'll give you time to
⁹ do that.
¹⁰    A.   Okay.  (Witness reviewing
¹¹ document.)
¹²    Q.   Okay.   After having an opportunity
¹³ to read the entirety of Plaintiff's Exhibit
¹⁴ Number 3, does that statement appear to be
¹⁵ the same statement that you signed on January
¹⁶ 22nd, 2015?
¹⁷    A.   It does.
¹⁸    Q.   And at the time that you signed
¹⁹ this statement on January 22nd, 2015, were
²⁰ the events as you recalled them fresh in your
²¹ mind?
²²    A.   Yes.
²³    Q.   So how did you end up working

¹ security on the night of January 16, 2015 at
² Center Stage?
³    A.   I was asked by Chief Carroll.
⁴    Q.   When Chief Carroll asked you about
⁵ working security at Center Stage, how did
⁶ that conversation go?
⁷    A.   I had previously worked security
⁸ before at concerts at Center Stage.  And I
⁹ believe he came up to me and said, hey, we've
¹⁰ got another one Saturday night, do you want
¹¹ to work.  He always came to me and Fazekas
¹² and asked us first.  And we agreed to work
¹³ security.
¹⁴    Q.   Were you at the police station when
¹⁵ he asked you that?
¹⁶    A.   I don't remember where we were.
¹⁷    Q.   You don't remember where you were
¹⁸ when you were asked?
¹⁹    A.   We might have been at lunch, the
²⁰ police station.
²¹    Q.   All right.  Now, your statement
²² says that Chief Greg Carroll advised you
²³ where you would be working.  Was that

¹ correct?
²    A.   Correct.
³    Q.   So was Chief Carroll in charge of
⁴ dictating where people worked security at
⁵ Center Stage?
⁶       MR. HOWARD:  Object to the form.
⁷
⁸    Q.   You can answer.
⁹    A.   I'm not sure, but he's the Chief of
¹⁰ Police.  I just followed orders.
¹¹    Q.   So because that order came from
¹² Chief Carroll to go work in the VIP section,
¹³ you followed that order, correct?
¹⁴       MR. STUBBS:  Object to the form.
¹⁵
¹⁶    Q.   You can answer.
¹⁷    A.   Correct.
¹⁸    Q.   So you were in the VIP section,
¹⁹ right, working security?
²⁰    A.   I was below the VIP section
²¹ starting to go up the stairs.
²²    Q.   So you were at the stairs section,
²³ where the stairs start leading up to the VIP

1 section, correct?

2    A.  Correct.

3    Q.  And at some point, you smelled

4 marijuana; is that right?

5    A.  Yes.  You could smell marijuana the

6 whole night.

7    Q.  Did you ever try to investigate the

8 source of that?

9    A.  I did multiple times.

10    Q.  Did you put that in your report?

11    A.  No, I didn't.

12    Q.  But I see that you said Jeremy

13 Reeves had told you that no one was allowed

14 to smoke in the concert hall, right?

15    A.  Inside the concert hall, no one was

16 allowed to smoke.  I was told that.

17    Q.  And that would include marijuana

18 too, I assume.

19    A.  Yes, any smoke.

20    Q.  Did you ever find the source of the

21 marijuana?

22    A.  I never found the source of the

23 marijuana.

1    Q.  But you did tell people who were

2 smoking that they had to go to the smoking

3 room; is that right?

4    A.  Correct.

5    Q.  But you didn't see anyone smoking

6 the marijuana.

7    A.  No.

8    Q.  And then later, around 9:00 o'clock

9 that evening, Jimmy Fazekas flashed his

10 flashlight at you, right?  Is that right?

11    A.  Correct.

12    Q.  And that was a predetermined signal

13 between you and Fazekas that if one of you

14 got in trouble and needed help, that you

15 would flash your flashlight to the other one,

16 correct?

17    A.  Correct.

18    Q.  So there was a fight that had

19 broken out; is that right?

20    A.  Yes, sir.

21    Q.  And the fight was between two male

22 subjects, right?

23    A.  Yes.

1    Q.  Did you pull your Taser to break up

2 that fight?

3    A.  I believe I did not.

4    Q.  Did you pull your Taser even after

5 you had been pushed in the chest by one of

6 the male subjects?

7    A.  Come to think of it, I don't even

8 believe I had the Taser.

9    Q.  You were not carrying the Taser?

10    A.  I was not carrying the Taser.

11    Q.  So is it mandatory to carry that

12 Taser?

13    A.  I don't believe so.  I know the

14 detectives don't.

15    Q.  The detectives do not have to carry

16 Tasers.

17    A.  Unless we get out like at someone's

18 house or something.  We just don't carry them

19 around daily.  We keep them in our cars.

20    Q.  All the time?

21    A.  Until we get out at a residence, if

22 we're going to serve a warrant or something

23 like that.

1    Q.  When you say your cars, I assume

2 you mean Rainbow City Police Department's

3 vehicles.

4    A.  Yes.

5    Q.  And do you drive that vehicle

6 home?

7    A.  Yes.

8    Q.  And is that Taser kept in your

9 vehicle at home?

10    A.  Inside my garage in a locked --

11 inside the vehicle, I have a safe inside the

12 back of my Tahoe.

13    Q.  A gun safe?

14    A.  Yes.  Well, it's a safe.

15    Q.  Just a safe?

16    A.  Yes.  I leave it in there.  And I

17 also have a back-up weapon I leave in

18 there.

19    Q.  You leave it in your safe?

20    A.  Yes.

21    Q.  Okay.  And I'm not going to ask the

22 combination or anything like that.

23    A.  You're not getting it.

Page 117

1  Q.  I wouldn't expect that I would.
2  But that Taser that you have issued to you,
3  does it ever stay at the police station?
4       MS. CHANDLER:  Object to the form.
5
6  A.  Mine, no.
7  Q.  Okay.  It stays in your vehicle.
8  Does it stay locked in that safe until you go
9  to serve a warrant or something like that?
10  A.  Yes.
11  Q.  So that night you were not carrying
12  your Taser.  And that night being January 16,
13  2015.
14  A.  I was not.
15  Q.  Do you know if Jimmy Fazekas was
16  carrying his Taser?
17  A.  I have no idea.
18  Q.  Okay.  So you broke up the fight.
19  And one of the male subjects pushed you in
20  your chest; is that right?
21  A.  Yes.
22  Q.  And he didn't realize you were a
23  police officer.  And then he apologized after

Page 118

1  he realized you were a police officer,
2  right?
3  A.  Correct.
4  Q.  But you could have arrested him if
5  you had wanted to arrest him, right?
6  A.  Absolutely.
7  Q.  Because he struck a police officer,
8  right?
9  A.  Absolutely.
10  Q.  And it didn't matter whether he
11  knew you were a police officer.  The fact
12  that he struck a police officer means that
13  you could have arrested him had you chose to,
14  right?
15  A.  Correct.
16  Q.  That was in your discretion; is
17  that right?
18  A.  Correct.
19  Q.  But you did not arrest him.  You
20  escorted him outside and told him he had to
21  leave, right?
22  A.  Correct.
23  Q.  And that was a guy that had been

Page 119

1  involved in a fight in the middle of the
2  concert hall, right?
3  A.  Correct.
4  Q.  After that, just as the concert was
5  ending -- do you know why the concert was
6  ending?
7  A.  I do not.
8  Q.  Have you subsequently heard that
9  the concert ended because the rapper who was
10  on the stage jumped off the stage and started
11  a stampede in the crowd?
12  A.  I heard that as a rumor, but I just
13  thought his act was up.  I thought he was
14  finished.
15  Q.  All right.  But as it was ending, a
16  high school student came to you, right?
17  A.  Yes.
18  Q.  And they said, Officer Gilliland,
19  T█ is passed out in the middle of the
20  crowd.  And you typed that into your
21  statement, right?
22  A.  Correct.
23  Q.  So at that point, you had a name

Page 120

1  for the female that was passed out in the
2  crowd, right?
3  A.  A first name, yes.
4  Q.  And you knew that that first name
5  was T█, right?
6  A.  I did.
7  Q.  And earlier you testified that you
8  knew of Ti█ prior to January 16, 2015,
9  right?
10  A.  Correct.
11  Q.  And so you would recognize T█ if
12  you saw her, correct?
13  A.  I would.
14  Q.  Okay.  You made your way through
15  the crowd, right?
16  A.  Yes.
17  Q.  You got Jimmy Fazekas and you guys
18  made your way through the crowd.
19  A.  I made my way through the crowd.
20  Q.  Okay.
21  A.  I could not find him.
22  Q.  Okay.  So when you made your way
23  through the crowd, you came up on a female

1  lying on the floor; is that right?

2  A.  Yes.

3  Q.  Was she passed out at that time?

4  A.  I believe she was shaking.

5  Q.  And what did it appear to you was

6  happening to that female?

7  A.  That she was having a seizure.

8  Q.  In fact, that's what you typed in

9  your statement, right?

10  A.  Correct.

11  Q.  And you also typed that I have

12  always heard when someone is having a seizure

13  that you are supposed to hold their head and

14  body to make sure they do not harm

15  themselves.  Do you recall typing that?

16  A.  I do.

17  Q.  And when you typed that, was that

18  truthful?

19  A.  That was truthful.

20  Q.  Okay.  So then you went to the

21  subject that you knew to be who?

22  A.  T███.

23  Q.  You knew to be Ti███.

1  A.  Yes.

2  Q.  And you started holding her head

3  making sure she didn't slam it up and down on

4  the floor, right?

5  A.  I did.

6  Q.  And is that because you were

7  concerned she was having a seizure?

8  A.  Absolutely.

9  Q.  And you wanted to make sure she

10  didn't harm herself.

11  A.  Absolutely.

12  Q.  Because you had always heard that

13  if someone was having a seizure, you should

14  hold their head, right?

15  A.  Absolutely.

16  Q.  And that's what you were doing.

17  A.  Yes.

18  Q.  All right.  So at some point,

19  someone just came out of the crowd and picked

20  Ti██ up, right?

21  A.  Yes.

22  Q.  And you refer to her in your

23  statement as the female subject, but it was

1  actually T███, right?

2  A.  Yes.

3  Q.  And why do you refer to her in your

4  statement as a subject?

5  A.  I guess I just forgot to put the

6  name.

7  Q.  But at that point, she wasn't a

8  subject or anything like that, was she?

9  A.  Oh, no.  I guess I just forgot to

10  type her name.

11  Q.  Okay.  And it was a black male that

12  started towards the front of the concert hall

13  with Tiara on his shoulders, right?

14  A.  It was.

15  Q.  Then you got behind the person

16  carrying T███ make sure that he could get

17  through the crowd; is that right?

18  A.  Yes.

19  Q.  And you started shining your

20  flashlight because at that point, Fazekas was

21  also there.  So you and Fazekas started

22  shining your flashlights to let the crowd

23  know that police officers were coming

1  through.

2  A.  Exactly.

3  Q.  Okay.  But there is nothing special

4  about your flashlight that would let the

5  crowd know that those flashlights belonged to

6  police officers, right?  They're just

7  flashlights?

8  A.  Really bright flashlights, yes.

9  Q.  Right.  But I mean, they don't emit

10  like a bat signal that says police or

11  anything like that.

12  A.  Correct.

13  Q.  They're just flashlights.

14  A.  Correct.

15  Q.  Okay.  So the black male and I came

16  to the front entrance of the concert hall.

17  Now, was Fazekas also there?

18  A.  I don't remember.

19  Q.  Okay.  And it says, I then advised

20  other officers to call the paramedics.  Tell

21  me who you advised to call the paramedics.

22  A.  I have no idea who those officers

23  were.  I just remember police officers being

1  up there.
2      Q.   Were they Rainbow City police
3  officers --
4      A.   Yes.
5      Q.   -- or were they officers from
6  another city?
7      A.   Rainbow City police officers.
8      Q.   All right.  So while waiting for
9  the paramedics to get there to -- and you say
10 the female subject, but we're talking about
11 T█, right?
12     A.   Right.
13     Q.   You said she started seizing again
14 while sitting in the chair; is that right?
15     A.   Yes.
16     Q.   And you observed that.
17     A.   Yes.
18     Q.   And so now you had observed her
19 doing it once on the floor, right?
20     A.   Correct.
21     Q.   In the concert hall.  And then
22 after she is carried from the concert hall to
23 the front entrance and sat in a chair, you

1  saw her doing it again, right?
2      A.   Correct.
3      Q.   So that's two that you have
4  witnessed; is that right?
5      A.   At that point, yes.
6      Q.   And that's two that you had
7  witnessed before George Morris Tased T.H. the
8  first time, right?
9      A.   Correct.
10     Q.   And that's two that you had
11 witnessed before George Morris Tased T█
12 the second time, right?
13     A.   Correct.
14     Q.   And at this point, you truly
15 believe that she is suffering from those
16 seizures, correct?
17     A.   Correct.
18     Q.   All right.  So much so that you
19 tell the other officers that you needed to
20 get her on the floor and hold her down,
21 right?
22     A.   Yes.  So she couldn't hurt
23 herself.

1      Q.   Exactly.  So who were those other
2  officers?
3      A.   I have no idea.
4      Q.   You don't recall?
5      A.   I really don't remember.
6      Q.   Have you ever made an independent
7  investigation to find out who those officers
8  were that helped you get her out of the chair
9  onto the floor and hold her down?
10     A.   I have not.
11     Q.   You say we.  And when you say we,
12 do you mean the other officers and
13 yourself?
14     A.   I do.
15     Q.   Okay.  So you and the other
16 officers placed the female subject, which we
17 now know to be T█, onto the floor and you
18 started holding her so she couldn't harm
19 herself, right?
20     A.   Correct.
21     Q.   And you held her for about how
22 long?
23     A.   I believe I wrote one minute.

1      Q.   Okay.  That's sixty seconds,
2  right?
3      A.   Correct.
4      Q.   And you say you held her for one
5  minute and then she immediately stopped
6  seizing.  What do you mean when you say
7  that?
8      A.   She wasn't shaking.
9      Q.   She just kind of snapped out of it,
10 right?
11     A.   Yes.
12     Q.   And then she became what?
13     A.   I say angry.
14     Q.   Well, you typed irate.
15     A.   Irate, angry, yes.
16     Q.   And then she started cursing and
17 yelling, let me go, right?
18     A.   Let me go you stupid mother
19 fuckers, yes.
20     Q.   All right.  Did you let her go?
21     A.   No, I did not.
22     Q.   Did the other officers let her
23 go?

Page 129

1    A.  I don't remember.
2    Q.  Well, did she get up?
3    A.  She did not get up.
4    Q.  And could she walk away?
5    A.  I'm not her at that point.  I don't
6  know.
7    Q.  Well, you were holding her neck.
8        MS. CHANDLER:  Object to the form.
9
10   Q.  Were you holding her head?
11   A.  Slightly at that point.  Just
12 enough to not move it around.
13   Q.  Demonstrate to me how you were
14 holding her.
15   A.  This is her head.  It wasn't like
16 that (indicating).
17   Q.  I would hope not.
18   A.  It was kind of like just a firm
19 hold so she couldn't -- like in case she
20 started seizing again.
21   Q.  Were you holding her face on each
22 side?
23   A.  Yes, with my palms.

Page 130

1    Q.  With your palms out.
2    A.  With my palms.
3    Q.  And you were actually holding under
4  the groove of her jaw?
5    A.  Kind of like you're giving somebody
6  a massage.
7    Q.  Sure.  And you were holding her
8  that way, right?
9    A.  Yes.
10   Q.  And she was saying let me go.
11   A.  You mother fuckers.
12   Q.  Let me go -- actually, I think she
13 called you stupid mother fuckers.
14   A.  Yeah.  Let me go you stupid mother
15 fuckers.
16   Q.  Right.  But you guys didn't let her
17 go.
18   A.  No.
19   Q.  In fact, you told her, calm down
20 and stop fighting; is that right?
21       MS. CHANDLER:  Object to the form.
22
23   A.  Correct.

Page 131

1    Q.  And again, officers advised the
2  subject, who we now know to be Ti███ that you
3  saw seizing twice, to calm down and stop
4  fighting.  At that point, did you tell the
5  officers, well, I've seen her have two
6  seizures, so she's not fighting, she's having
7  seizures?
8        MS. CHANDLER:  Object to the form.
9
10   Q.  Did you tell the officers that?
11   A.  I did not.
12   Q.  Did you notify the officers that
13 she had had those two medical episodes, one
14 in the concert hall and one in the chair?
15   A.  I did not.
16   Q.  And the officers were actually
17 present in the front entrance when she had
18 the second one, right, while she was sitting
19 in the chair?
20       MR. STUBBS:  Object to the form.
21
22   A.  Some officers, yes.
23   Q.  Some officers.  And they saw what

Page 132

1  was happening.
2        MS. CHANDLER:  Object to the form.
3
4    Q.  Is that right?  Were they looking
5  at Ti███ when she had those seizures?
6        MS. CHANDLER:  Object to the form.
7
8    A.  I don't know what they were looking
9  at.  I know what I was looking at.
10   Q.  Yes.  Whether they were looking at
11 her or not, you notified them what was
12 happening, correct?
13   A.  Yes.
14   Q.  Okay.  Now, it says, female began
15 spitting and trying to bite me and the other
16 officers; is that right?
17   A.  That is correct.
18   Q.  And that's after she had said let
19 me go; is that right?  You stupid mother
20 fuckers.
21   A.  Correct.
22   Q.  And that's before Morris had Tased
23 her the first time.

1 A. Correct.

2 Q. And that's before Morris had Tased

3 her the second time.

4 A. Correct.

5 Q. But you write, I then grabbed the

6 female's head and placed her into a rear neck

7 restraint hold.

8 A. Correct.

9 Q. And when you typed that, was that

10 accurate?

11 A. Correct.

12 Q. Explain to anyone who may read this

13 later what a rear neck restraint hold is.

14 A. In plainest terms, it would

15 probably be a headlock. Take your arm around

16 somebody's head like this, grab your hand

17 like this and just hold that position.

18 Q. What is that called? What level of

19 force in the force continuum is that known

20 as?

21 A. I have no idea.

22 Q. You don't?

23 A. I don't.

1 Q. Do you know what the force

2 continuum is?

3 MS. CHANDLER: Object to the form.

4

5 Q. You can answer.

6 A. I do not.

7 Q. Maybe I'm saying it wrong.

8 A. Maybe.

9 Q. Continuum. Continuum. Do you know

10 what the force continuum is?

11 MS. CHANDLER: Object to the form.

12

13 A. No.

14 Q. I think I'm saying it right. Do

15 you know what the levels of force -- how

16 force is escalated by a police officer?

17 A. Yes.

18 Q. Okay. Tell me.

19 A. Explain to me what you want me to

20 explain to you.

21 Q. I want you to explain to me how you

22 get from -- I want you to explain to me how

23 you get to the point that you can put someone

1 into a rear neck restraint hold.

2 MS. CHANDLER: Object to the form.

3

4 A. How I do it?

5 Q. How does that escalate from you

6 being present at a scene to the point that

7 you have someone in a rear neck restraint

8 hold?

9 A. Someone biting and spitting at

10 me.

11 Q. All right. So you go straight to

12 the rear neck restraint hold.

13 A. After I've tried to hold her the

14 other way, yes.

15 Q. And after she's told you to let her

16 go in the strongest language possible.

17 MS. CHANDLER: Object to the form.

18

19 Q. Is that right?

20 A. Let me go you stupid mother fucker,

21 yes.

22 Q. So this is after she's told you to

23 let her go; is that right?

1 A. Yes.

2 Q. And this is after you have seen her

3 having these seizures where there is nothing

4 illegal about having a seizure, is there?

5 A. No.

6 Q. All right. So after she told you

7 to let her go and she told the other officers

8 to let her go, you said she was trying to

9 bite me and the other officers. Were the

10 other officers holding her head?

11 A. I don't know. I don't remember.

12 Q. Well, you were holding her head.

13 A. Yes.

14 Q. Was someone helping you?

15 A. No.

16 Q. So let me try it again. Were the

17 other officers holding her head?

18 A. No.

19 Q. Okay. So what were they holding?

20 A. One might have been holding her

21 leg, and I believe someone was on the side of

22 her trying to hold her arm.

23 Q. Okay. Were they on both sides of

1  T.H.?
2      A.  I don't remember.
3      Q.  But you believe there was at least
4  one officer on the side trying to hold her
5  arm.
6      A.  Yes.
7      Q.  And you think one was holding her
8  legs.
9      A.  Yes.  At that point, yes.
10     Q.  At that point, was Morris there?
11     A.  I don't believe so.
12     Q.  At what point did Morris show up?
13     A.  It was seconds after that.
14     Q.  Seconds?
15     A.  Seconds, I believe.
16     Q.  So he shows up.  And what's the
17 first thing Morris does?
18     A.  If I remember right, he comes up
19 and he's telling her to stop and if she
20 doesn't stop, she's going to be Tased.  I
21 think it was, you need to calm down and
22 stop.
23     Q.  Did he use some profanity?

1      A.  I don't remember.
2      Q.  How is it you remember Ti█ using
3  profanity, but you don't remember whether or
4  not Morris used profanity?
5          MS. CHANDLER:  Object to the form.
6
7      Q.  You can answer.
8      A.  Because it was me, and I was
9  holding her head slightly to begin with like
10 I told you.  And --
11     Q.  Well, at that point, you had
12 grabbed her head when Morris showed up,
13 right?
14         MS. CHANDLER:  Object to the
15 form.
16
17     A.  Yes.
18     Q.  Those were your words that you
19 wrote right here.  I then grabbed the
20 female's head, right?
21     A.  Yes.
22     Q.  Okay.  So when Morris showed up,
23 you believe he said something to the effect

1  of you need to calm down; is that right?
2      A.  Yes.
3      Q.  And to that response, she kept
4  fighting officers and then stated to Sergeant
5  Morris, yeah, go ahead and Tase me, mother
6  fucker.  That's what you recall her saying
7  when Morris showed up.
8      A.  Correct.
9      Q.  And what happened immediately after
10 Ti█ told Morris to go ahead and Tase me,
11 mother fucker?
12     A.  I witnessed Sergeant Morris Tase
13 her.
14     Q.  Did he do it very quickly?
15     A.  I don't remember.
16     Q.  Well, was he wearing his Taser on
17 his utility belt, or did he already have it
18 in his hand?
19     A.  I can't remember.
20     Q.  You don't remember where he took
21 the Taser from?
22     A.  I don't remember if it was in his
23 hand when he walked up, if it was in his

1  Taser holster.  I don't remember.
2      Q.  But Morris had the Taser.  And he
3  drive stunned the female subject, which we
4  know to be Ti█ right?
5      A.  Yes.
6      Q.  Did you have time to tell Morris,
7  hey, she just had two seizures?
8      A.  I don't believe so at that point.
9      Q.  Did you have time to tell Morris
10 between the first Tase and the second Tase
11 that you had witnessed her having two
12 seizures, one on the floor and one in the
13 chair?
14     A.  They were engaged in conversation.
15 It was really loud around me, so I didn't
16 have time.
17     Q.  Well, it was loud enough for you to
18 hear Ti█ call you, as you say, mother
19 fuckers.
20     A.  Because I was right beside her
21 mouth, her head.  I'm looking down at her
22 head.  She is right there beside me.
23     Q.  And where was Morris?

1  A.  Up there by her feet.  Down there
2  by her feet standing above her.
3  Q.  Okay.  So you're saying it was so
4  loud that you could not hear the conversation
5  that Morris was having with T█████ even though
6  she's only about five feet tall.
7  MR. HOWARD:  Object to the form.
8
9  A.  The whole conversation, no.  I
10  heard parts of it.
11  Q.  And you heard Morris tell her that
12  she needed to calm down or he's going to Tase
13  her.
14  A.  I heard that part.
15  Q.  And when you heard Morris say that,
16  did you say, hey, no, wait, don't Tase her?
17  Did you try to stop him from Tasing her?
18  A.  No.  She immediately answered for
19  me.  She immediately answered, go ahead and
20  Tase me, mother fucker, or something like
21  that.
22  Q.  Yeah.  You got it right.  You have
23  it in quotes.  So when you quote something,

1  typically that means that's exactly what I
2  heard.
3  A.  Correct.
4  Q.  And so that's exactly what you
5  heard?
6  A.  Yes.
7  Q.  Now, I don't see anything by
8  Sergeant Morris, what he told T████.  I don't
9  see anything in quotes.  Did you quote
10  anything Sergeant Morris said?
11  A.  No.
12  Q.  But you heard bits and pieces of
13  what he said, right?
14  A.  Correct.
15  Q.  But you didn't think to quote any
16  of that?
17  A.  No.
18  Q.  And when you typed this statement,
19  you wanted it to be as thorough and accurate
20  as possible, right?
21  A.  Absolutely.
22  Q.  Now, Sergeant Morris then advised
23  the female subject, which we know to be T.H.,

1  that if she would stop fighting, he would not
2  Tase her anymore.  Do you remember that?
3  A.  Say it again.
4  Q.  It says, Sergeant Morris then
5  advised the -- wait.  Let me find it again.
6  A.  Yes.  That's correct.
7  Q.  All right.  And when he said I
8  won't Tase you, you heard Sergeant Morris say
9  that, right?
10  A.  Correct.
11  Q.  When you heard Sergeant Morris say
12  that, you didn't say, hey, certainly don't
13  Tase her anymore.  She's having a medical
14  emergency.
15  A.  No.  She immediately answered.  I
16  didn't have time.  She immediately spoke, and
17  I didn't have time.
18  Q.  What did she say?
19  A.  Fuck you, pig.
20  Q.  Now, fuck you, pig, is it a crime
21  to say that?
22  A.  That could be a crime, depending on
23  where you're at.

1  Q.  Well, in Rainbow City, Alabama on
2  January 16, 2015, was it a crime?
3  A.  That could be disorderly conduct,
4  yes, it could be.
5  Q.  Does it rise to the level of the
6  use of a Taser?
7  MS. CHANDLER:  Object to the form.
8
9  A.  Not in my opinion.
10  Q.  What about in the opinion of the
11  Rainbow City Police Department use of force
12  policy?
13  MS. CHANDLER:  Object to the form.
14  MR. HOWARD:  Object to the form.
15  MR. STUBBS:  Object to the form.
16
17  Q.  You can answer.
18  MS. CHANDLER:  To the extent you
19  know.
20
21  Q.  Yes, certainly to the extent you
22  know, I would love for you to answer that.
23  A.  I have no idea.

Page 145

1    Q.  All right.  Did you ever think to
2  say, you should not be Tasing someone, in my
3  opinion, just for saying fuck you, pig?
4    A.  I mean, we weren't sitting at a
5  table like me and you are talking.
6    Q.  Right.
7    A.  It's hostile all over the place.
8  People are coming in and out.  She and
9  Sergeant Morris are speaking to each other.
10  I don't think I really had time to intervene
11  in their conversation they were having.
12    Q.  And I've heard that more than once
13  that it was chaotic and hostile.  Did any
14  Rainbow City police officer ever secure the
15  area?  Was it that hostile that the area
16  needed to be secured?
17    MS. CHANDLER:  Object to the form.
18
19    Q.  You can answer.  In your opinion.
20    A.  In my opinion, I was just trying to
21  take care of -- I was trying to tend to
22  her.
23    Q.  And why were you trying to tend to

Page 146

1  her?  Is it because you thought she was
2  having a medical condition?
3    MS. CHANDLER:  Object to the form.
4
5    Q.  You can answer.
6    A.  At the beginning, yes.
7    Q.  Okay.  But what about after he
8  Tased her the second time?
9    A.  From the time that I first came in
10  contact with her --
11    Q.  Yes, sir.
12    A.  -- until the point we're up to
13  now --
14    Q.  Yes, sir.
15    A.  -- my concentration and my job --
16  not job.  My objective was her and nothing
17  else.  I wasn't thinking about manning the
18  doors or getting people in and out.  She was
19  my objective at that point.
20    Q.  If I say tunnel vision, would that
21  be an accurate description of what you had?
22    A.  Yes.
23    Q.  You were focused on the situation

Page 147

1  in front of you, which was T.H., and what was
2  happening with her; is that correct?
3    A.  Correct.
4    Q.  And everything else that was
5  happening around you was just kind of
6  background noise, if you will.
7    A.  I don't even know if I heard
8  anything.
9    Q.  That's fair.  That's fair.  Now,
10  when George Morris Tased T██ the second
11  time, he was standing, correct?  Before he
12  Tased her.
13    A.  I believe he had to bend over.
14    Q.  Right.  So in that period of time,
15  George Morris is standing up, right?  Is that
16  right?  He is standing like this
17  (indicating).
18    A.  Correct.
19    Q.  And he is standing over T██?
20    A.  Yes.
21    Q.  Okay.  And she's lying on the
22  floor; is that right?
23    A.  Yes.

Page 148

1    Q.  And you are at her head holding her
2  head, right?
3    A.  Yes.  And he's in front of me like
4  you.
5    Q.  So you're looking up at George
6  Morris; is that right?
7    A.  Every few seconds, I look up and
8  I'll see him.
9    Q.  So every few seconds, you're
10  looking up and you see George Morris.  Did
11  you see him start to bend over to Tase her
12  again?
13    A.  Yes.
14    Q.  And in that period of time that you
15  saw him starting to bend over to Tase her
16  again, did you know he was about to Tase
17  her?
18    A.  I didn't know if he was going to
19  Tase her or not.
20    Q.  Did you think he was?
21    MR. HOWARD:  Object to the form.
22
23    Q.  And I'm talking about the second

Page 149

1 time. Did you think he was going to Tase her
2 after she said, fuck you, pig?
3   A. I didn't know whether he was going
4 to. I mean, I had no idea. I mean, he could
5 have got halfway down there and stopped. I
6 have no idea.
7   Q. When he started toward her, did you
8 ever say, hey, don't Tase her?
9   A. I don't think there was time.
10   Q. Do you think he should have Tased
11 her? In your opinion, as a Rainbow City
12 police officer who has been APOST certified
13 for six years, should George Morris have
14 Tased Tiara the second time for saying fuck
15 you, pig?
16   A. I can't make that decision for
17 him.
18   Q. Would you have Tased her?
19     MS. CHANDLER: Object to the
20 form.
21
22   A. I'm not in that position.
23   Q. I'm asking if you were in the same

Page 150

1 position he was, which you were there that
2 night, so you know what position he was in.
3 He wasn't in danger because you testified
4 about that earlier, correct?
5     MS. CHANDLER: Object to the form.
6
7   Q. Is that correct?
8   A. I do not know if I would have Tased
9 her.
10   Q. Do you think you would have?
11     MR. HOWARD: Object to the form.
12     MS. CHANDLER: Object to the form.
13     MR. STUBBS: Object to the form.
14
15   A. I would just have to be in that
16 situation.
17   Q. Okay. Well, based upon what you
18 observed, as a reasonable officer on the
19 scene, was it necessary for George Morris to
20 Tase Tiara the first time?
21     MS. CHANDLER: Object to the form.
22     MR. STUBBS: Object to the form.
23

Page 151

1   Q. You can answer.
2   A. I'm not George Morris.
3   Q. I said based on what you observed
4 as a reasonable officer on the scene on
5 January 16, 2015, was it necessary for George
6 Morris to Tase T███ the first time?
7     MS. CHANDLER: Object to the form.
8
9   Q. You can answer.
10     MS. CHANDLER: To the extent that
11 it calls for a legal conclusion.
12     MR. HARP: It doesn't call for a
13 legal conclusion. It calls for the opinion
14 of a reasonable officer on the scene.
15
16   A. Every officer's action is
17 different. I can't tell you what I would
18 have done in that position. I wasn't in it.
19   Q. Do you consider yourself to be a
20 reasonable and prudent officer?
21   A. I do.
22   Q. So do you consider George Morris to
23 be a reasonable and prudent officer?

Page 152

1   A. I don't really think much about
2 him.
3   Q. Tell me what you mean by that.
4   A. I don't worry about anybody else
5 but myself. I mean, I'm not saying worry. I
6 don't really -- I mean, I don't think of
7 other people. I just worry about myself.
8   Q. Okay. After George Morris Tased
9 T.H. the second time, that's when you felt
10 the bump in the back, correct?
11   A. Yes.
12   Q. And when you felt that bump in the
13 back, you turned around. Did you get up off
14 the floor, or did you just turn your head?
15   A. I believe I just turned my head at
16 that point.
17   Q. You turned your head and you saw an
18 older female with long hair, right?
19   A. Correct.
20   Q. And you couldn't see her face,
21 right?
22   A. I could not.
23   Q. But then you turned to Jimmy

Page 153

1  Fazekas and you yell for him to get the older
2  female off your back.  At the point that you
3  yelled to Fazekas to get the older female off
4  your back, was the older female actually on
5  your back?
6      A.  Let me explain that.  She was kind
7  of like hovering over my back, like over me.
8  And the only thing going through my mind at
9  that time was, hey, I've got a gun.  Somebody
10  is on my back.  I don't know what they want.
11  And --
12      Q.  But there had been people passing
13  back and forth the entire time, right?
14      A.  They weren't on my back.
15      Q.  Well, she was just hovering, right?
16  You said hovering.
17      A.  No, sorry, not hovering.
18      Q.  Was she physically clamped on to
19  your back?
20      A.  Physically trying to move me out of
21  the way.
22      Q.  And you were wearing a shirt very
23  similar to the one you have on today,

Page 154

1  right?
2      A.  Correct.
3      Q.  And did you have anything on your
4  back to identify that you were a police
5  officer?
6      A.  A pair of handcuffs.
7      Q.  That's it?
8      A.  Yes.
9      Q.  Okay.  And when you yelled for
10  Fazekas to get this older female out of your
11  back, what did he do?  He tried to grab ahold
12  of the female's arm and pull her out of the
13  way?
14      A.  Correct.
15      Q.  And then you saw Fazekas was unable
16  to get ahold of the older female and move her
17  away from the situation, so then you let go
18  of T.H.'s head, right?
19      A.  Correct.
20      Q.  And that was the first time since
21  you typed earlier, I grabbed the female's
22  head and placed her into a rear neck
23  restraint hold that you had let go of Tiara's

Page 155

1  head, correct?
2      A.  Correct.
3      Q.  So from the time that you typed, I
4  placed her into a rear neck restraint hold
5  until you noticed that Fazekas could not get
6  ahold of the older female's arm, you had T.H.
7  in a rear neck restraint hold; is that
8  right?
9      A.  Correct.
10      Q.  And then you immediately told the
11  older female subject that she needed to move
12  away from the officers.  Now, you have an
13  apostrophe "s" there.  Is that just a typo,
14  or is that an incomplete thought?
15      A.  That meant --
16      Q.  Get away from the officers.
17      A.  Yes.
18      Q.  So that apostrophe "s" shouldn't be
19  there.
20      A.  No.  Right.
21      Q.  All right.  So she should just move
22  away from the officers and let us attend to
23  the younger female.  So what happened?

Page 156

1      A.  The older female, as I wrote,
2  refused to get away from the situation and
3  began yelling let me go.
4      Q.  Okay.  You then got behind her and
5  grabbed her under the armpits, right?
6      A.  I did.
7      Q.  You pulled her backwards out of the
8  front hall and escorted her to the front of
9  the building, right?
10      A.  I did.
11      Q.  And we're talking about a distance
12  of about four feet, right?
13      A.  From here to him (indicating).
14      Q.  All right.  About seven feet; is
15  that right?
16      A.  Uh-huh (affirmative response).
17  Well, not even that long.  I'm sorry.
18      Q.  Well, two, four, six, eight, ten.
19  That's ten feet from you to Mr. Howard at the
20  end of the table.
21      A.  Okay.
22      Q.  So ten feet?
23      A.  From me to him (indicating).

1    Q.   To Mr. Stone?
2    A.   Yes.
3    Q.   All right.  So about six feet.
4    A.   Yes.
5    Q.   Okay.  So you dragged her backwards
6 about six feet.  And we're talking about the
7 older female, right?
8    A.   Correct.
9    Q.   You get her outside.  Had the older
10 female been Tased at that point?
11    A.   I have no idea.
12    Q.   Well, do you know who Tased the
13 older female?
14    A.   I still don't know to this day who
15 Tased the older female.
16    Q.   You don't?
17    A.   I have no idea.
18    Q.   Okay.  Well, let's do it this way.
19 When you got her to the front of the
20 building, you looked at Gary Morgan, right?
21    A.   Uh-huh (affirmative response).
22    Q.   And he was helping you escort the
23 older female outside the building, right?

1    A.   Correct.
2    Q.   And then you carried her to the
3 front bricks that were just outside Center
4 Stage Concert Hall, right?
5    A.   Correct.
6    Q.   And then you told Officer Morgan to
7 cuff the older female and detain her for the
8 moment; is that right?
9    A.   Correct.
10    Q.   At no time did I, Detective
11 Gilliland, place the older female under
12 arrest; is that right?
13    A.   Correct.  At that point, she was
14 just being detained.
15    Q.   And why was that important for you
16 to write?
17    A.   I wanted to make sure it was clear
18 that at no point did I arrest this woman.  I
19 was just detaining her for safety.
20    Q.   Okay.  As soon as I seen that
21 Officer Morgan had placed the older female in
22 cuffs, you went back inside, right?
23    A.   Correct.

1    Q.   At the time that you went back
2 inside, Officer Morgan had placed the older
3 female in cuffs; is that right?
4    A.   Correct.
5    Q.   Then you went back inside.
6    A.   Correct.
7    Q.   At the time that Officer Morgan
8 placed the older female in cuffs, you went
9 back inside to help with T.H., right?
10    A.   Correct.
11    Q.   So your interaction with Officer
12 Morgan and the older female consisted of you
13 taking the older female outside and then
14 telling Officer Morgan to cuff the older
15 female, right?
16    A.   Correct.
17    Q.   Between the time that you got the
18 older female outside and the time that you
19 saw Officer Morgan put handcuffs on the older
20 female, did you see Officer Morgan Tase the
21 older female?
22    A.   Not at all.
23    Q.   Between the time that the older

1 female was grabbed under the armpits by you
2 inside the front entrance to the time that
3 you saw Officer Morgan cuff the older female,
4 did you see Officer Morgan Tase the older
5 female?
6    A.   Can I pause for a minute?
7    Q.   Sure.
8    A.   This is dispatch.  I need to get
9 it.
10    Q.   Sure.
11
12       (Whereupon, a brief recess was
13       taken.)
14
15    Q.   Okay.  Just so I'm clear, you saw
16 Officer Morgan place the older female in
17 cuffs; is that correct?
18    A.   Correct.
19    Q.   And you had control of the older
20 female from the time she left the front
21 entrance of Center Stage to the time Officer
22 Morgan placed her in cuffs, correct?
23       MS. CHANDLER:  Object to the

1 form.

2

3    A.   There is a set of bricks out there
4 in front of the concert venue.  When I got to
5 the set of blocks -- I was pulling her out,
6 but when I got to the rocks, I believe
7 Officer Morgan helped me lay the older female
8 over like this while we both got her hands
9 and put them behind her back.  And at that
10 point, I said cuff her.
11    Q.   Cuff her.  And what did that mean
12 to you when you told Officer Morgan to cuff
13 her?
14    A.   Cuff her until we get this
15 situation resolved for safety.
16    Q.   Well, so you didn't consider the
17 older female to be under arrest.
18    A.   Not me, no.
19    Q.   Did you consider her to be
20 detained?
21    A.   Yes.  We detain people all the time
22 and don't arrest them.
23    Q.   And when you detain them, they are

1 technically in police custody at that point,
2 right?
3    A.   Correct.
4    Q.   When those handcuffs go on you
5 behind your back, you are in custody,
6 right?
7    A.   For officer's safety, yes.
8    Q.   For officer's safety.
9    A.   Yes.
10    Q.   And the reason you put them in
11 handcuffs is because the officer is
12 considered safe at that point, right?  Their
13 hands are bound behind their back; is that
14 right?
15      MS. CHANDLER:  Object to the form.
16
17    Q.   When you handcuffed the older
18 female, her hands were behind her back.
19    A.   We're more safe than we was five
20 seconds ago.
21    Q.   Sure.  And when you cuffed the
22 older female -- or when Officer Morgan cuffed
23 the older female, he cuffed her hands behind

1 her back, right?
2    A.   Correct.
3    Q.   And you didn't see Officer Morgan
4 Tase the older female from the time that you
5 put her into the detainment of Officer
6 Morgan, did you?
7    A.   Not once.
8    Q.   Okay.  Are you aware that Officer
9 Morgan is the one that Tased the older
10 female?
11    A.   I was told that just by rumor.
12    Q.   Okay.  Because I thought you said
13 to this day, you don't know who Tased her.
14    A.   I've heard rumors.
15    Q.   What rumors have you heard?
16    A.   That Officer Morgan Tased her, but
17 I didn't know the truth.  I mean, I hear
18 rumors all the time.
19    Q.   When you heard that rumor, did you
20 say, well, that can't be true because she was
21 in handcuffs when I left her with Morgan?
22    A.   I don't discuss anything with
23 anybody.

1    Q.   But did you think that in your
2 head?  Did you ever think, how in the world
3 could Morgan have Tased her because she was
4 in handcuffs?
5      MR. HOWARD:  Object to the form.
6
7    A.   I don't remember.
8    Q.   You don't remember thinking that?
9    A.   I don't remember.  What I'm saying
10 is, I don't remember what I thought when I
11 heard that.
12    Q.   Does it puzzle you that she was
13 Tased by Morgan, and when you left her with
14 Morgan, she was in handcuffs?
15      MS. CHANDLER:  Object to the form.
16
17    A.   Now, what are you saying?
18    Q.   Is it weird to you that she was
19 Tased by Officer Morgan, but when you left
20 her with Officer Morgan, her hands were
21 behind her back and she was in handcuffs?
22      MS. CHANDLER:  Object to the form.
23

Page 165

1  Q.  You can answer.
2  A.  I had no idea she was Tased.
3  Q.  Right.  But now that you know.
4  A.  Is this true?
5  Q.  Is it true?  I'm not making it up.
6  A.  I mean, what I'm asking is, I don't
7 know.
8  Q.  Well, I'll tell you what we'll do,
9 because it's really not fair to ask you
10 questions that you don't have any proof of.
11  A.  Okay.
12  Q.  So I'm going to show you what I
13 will mark as Plaintiff's Exhibit Number 5 to
14 your deposition.  And by way of further
15 identification, that is the officer's use of
16 force form report that is filled out by Gary
17 Morgan.
18
19      (Plaintiff's Exhibit Number 5 was
20 marked for identification and same is
21 attached hereto.)
22
23  Q.  I'll let you take a look at that

Page 166

1 and then I'll ask you some questions about
2 it.
3  A.  (Witness reviewing document.)
4  Q.  Have you ever seen this document
5 before?  And not this document, but a copy of
6 this document that we have marked as
7 Plaintiff's Exhibit Number 5.
8  A.  I've never seen this document.
9  Q.  Do you know what this document
10 is?
11  A.  Yes.  I've heard of a use of force
12 report, but I've never seen one.
13  Q.  You've never seen one before?  Have
14 you ever used force during your years at the
15 Rainbow City Police Department?
16  A.  I've never had to fill out one of
17 these since working there.
18  Q.  That's a different answer to a
19 different question.  My question was, have
20 you ever used force during your time at the
21 Rainbow City Police Department?
22  A.  Define force.
23  Q.  Well, you define force for me

Page 167

1 because you're the police officer.
2  A.  Force to me would be using a Taser,
3 using a gun, using a baton.
4  Q.  Chemical agent?
5  A.  Pepper spray.
6  Q.  Right.
7  A.  If you're asking that, I've never
8 sprayed anyone.
9  Q.  What about hard hands?
10  A.  I've taken someone to the ground
11 before.
12  Q.  Did you fill out a use of force
13 report?
14  A.  No.  I was just cuffing them.
15  Q.  Is there a policy at the Rainbow
16 City Police Department that if you go to hard
17 hands, you have to fill out a use of force
18 form report?
19  A.  I'm not sure.
20  Q.  You're not sure?
21  A.  I'm not sure.  I've never had to
22 fill one out.
23  Q.  All right.  So you know what this

Page 168

1 form is though, right?
2  A.  I've heard of this form.
3  Q.  But you've never seen one.
4  A.  I've never seen one.
5  Q.  This is the first time you've ever
6 seen a use of force form for the Rainbow City
7 Police Department.
8  A.  That is the first time in my life
9 I've ever seen this document.
10  Q.  Okay.  And not this filled out
11 document, but just the form in general.
12  A.  Right.
13  Q.  Do you know who Gary L. Morgan
14 is?
15  A.  I do.
16  Q.  Who is Gary L. Morgan?
17  A.  Gary L. Morgan is a former patrol
18 officer at the Rainbow City Police
19 Department.
20  Q.  Do you know why he is a former
21 officer at the Rainbow City Police
22 Department?
23  A.  I do not.  Rumors.

Page 169

1  Q.  What rumors have you heard?
2  A.  He had a bad attitude problem,
3  showing up late to work.
4      MR. HARP:  Okay.  Let's go off the
5  record for a second.
6
7      (Whereupon, a brief recess was
8       taken.)
9
10  Q.  Okay.  We're back on the record,
11  Mr. Gilliland.  We were visiting about the
12  officer use of force form report that was
13  filled out by Gary Morgan.  And we were
14  talking about what the rumors were you had
15  heard concerning his departure from the
16  Rainbow City Police Department.  And two of
17  the things you mentioned were, you heard he
18  had a bad attitude and he was always coming
19  in to work late; is that right?
20  A.  Just a general bad employee.
21  Q.  Okay.  And you would agree with me
22  that as a police officer, it's not good to be
23  a bad employee, right?

Page 170

1      MR. HOWARD:  Object to the form.
2
3  Q.  You can answer.
4  A.  I've seen guys with a bad attitude
5  be awesome cops.
6  Q.  Have you seen guys with bad
7  attitudes be bad cops?
8  A.  Define bad.
9  Q.  Well, I'm not sure.  I guess that's
10  a moving target.  So I'm not sure that I can.
11  Let me ask you this.  This report, if you
12  turn to the next page, have you ever seen
13  the signature of Chief Carroll, Greg
14  Carroll?
15  A.  Yes, I have.
16  Q.  Down at the bottom where it says
17  reviewed by Chief of Police, do you recognize
18  that signature?
19  A.  Slightly.  I notice the M.  He
20  writes the M spaced out.
21  Q.  Okay.  All right.
22  A.  Who does this say the Sergeant is?
23  Q.  Well, that's an interesting thing.

Page 171

1  That says that the shift supervisor is
2  Sergeant Spurling.  According to Sergeant
3  John Bryant, he says that that is the
4  signature of Sergeant Spurling.  Do you know
5  Sergeant Spurling?
6  A.  I do.
7  Q.  Is Sergeant Spurling a shift
8  supervisor?  Would he have been a shift
9  supervisor on January 16, 2015?
10  A.  I'm not sure.
11  Q.  Okay.  Now, do you see where it
12  says the synopsis of events?
13  A.  Yes, I do.
14  Q.  Officers were rendering aid to a
15  female when the female became combative.  The
16  female's mother, Michelle Helm, became
17  combative toward officers.  Officers told
18  Helm to get back and calm down.  Helm would
19  not comply and was Tased and arrested.  Do
20  you see that?
21  A.  I do.
22  Q.  Now, if this report as it says was
23  completed by Gary Morgan, does that comport

Page 172

1  with your recollection of how Michelle Helm
2  came to be arrested that night?
3      MS. CHANDLER:  Object to the form.
4
5  Q.  That night, being January 16, 2015.
6  A.  I've got a problem with some of the
7  wording.
8  Q.  What words do you have a problem
9  with?
10  A.  Combative.
11  Q.  What is your problem?
12  A.  Myself, I've got different meanings
13  for combative.  Combative is trying to hit me
14  in the face.
15  Q.  And was Michelle Helm ever trying
16  to hit you in the face?
17  A.  Not me.
18  Q.  Was she trying to hit anyone that
19  you saw in the face?
20  A.  I never saw anybody else.  Just me.
21  Q.  Did she ever try to hit you in the
22  face?
23  A.  No.

Page 173

1  Q. And when you took her outside and
2 she met Officer Morgan and you and he put her
3 hands behind her back, did she ever try to
4 hit Officer Morgan in the face?
5  A. I don't think she had a chance
6 to.
7  Q. Because you took her outside and
8 put her in handcuffs, right?
9  A. Correct.
10  Q. So the answer to the question, did
11 she try to hit Officer Morgan in the face,
12 would be what?
13  MS. CHANDLER: Object to the form.
14
15  A. Not to my knowledge.
16  Q. What other words do you have a
17 problem with in Officer Morgan's synopsis?
18  A. I had no idea that this was T.H.'s
19 mother. I don't know if he knows them
20 personally, but I don't know -- and he may
21 know them because I've heard rumors that a
22 lot of people around Rainbow City know them.
23  So not with him, but he put the

Page 174

1 female's mother, Michelle Helm. I had no
2 idea that that was her mother. I don't know
3 if he knew that was her mother or not.
4  Q. Okay. Any other things you have a
5 problem with?
6  A. Not a problem with, but he wrote,
7 Helm would not comply and was Tased and
8 arrested. I never saw any of that.
9  Q. Okay. Now, you took Michelle Helm
10 outside to Morgan, right?
11  A. I took the older female outside.
12  Q. That we now know to be -- if I
13 represent to you that that older female was
14 Michelle Helm --
15  A. If that's true.
16  Q. -- then you took her outside,
17 right?
18  A. If that's true.
19  Q. If that's true.
20  A. Yes, if that was Michelle Helm.
21  Q. If the same person that you put
22 your arms under her armpits and took her
23 backwards outside to Officer Morgan was

Page 175

1 Michelle Helm, you took her outside to
2 Morgan, right?
3  A. Yes.
4  Q. And if the same person that you
5 took outside to Morgan and turned around and
6 put her hands behind her back and he put her
7 handcuffs on was Michelle Helm, that all
8 happened outside, right?
9  A. Correct.
10  Q. So earlier you testified that from
11 the time you took her outside to the time she
12 was placed in handcuffs, you did not see
13 Morgan Tase Michelle Helm, right, or the
14 older female, if that was Michelle Helm?
15  A. I did not.
16  Q. So when an officer puts a person in
17 handcuffs -- let me back up to even before
18 that. Michelle Helm was arrested, right,
19 according to Morgan's report?
20  A. This is something that I heard -- I
21 had no idea a woman was arrested until later
22 on, not even that night. I didn't know she
23 was arrested.

Page 176

1  Q. Did you observe Michelle Helm do
2 anything that rose to the level of being
3 arrested?
4  A. The obstruction part inside the
5 venue.
6  Q. Okay. But she wasn't arrested for
7 obstruction, was she?
8  MS. CHANDLER: Object to the form.
9
10  Q. You can answer.
11  A. She was not.
12  Q. Okay. And that's the only thing
13 you observed that could have rose to the
14 level of arrest, right, was the obstruction
15 part?
16  A. Correct.
17  Q. And that's a pretty serious charge,
18 obstruction of justice, right?
19  MS. CHANDLER: Object to the form.
20
21  Q. Do you know?
22  A. What is that, a misdemeanor?
23  Q. Now, you're the police officer.

Page 177

1　A.　That's a misdemeanor.  I mean, it's
2　not a felony.
3　Q.　Now, with a misdemeanor, does the
4　officer have to observe the act to be
5　arrested for a misdemeanor?
6　　　MR. HOWARD:  Object to the form.
7
8　Q.　You can answer.
9　A.　If I'm going to arrest somebody for
10　obstruction, I'm going to want to see it
11　myself.
12　Q.　Okay.  What about disturbance of
13　the peace?
14　A.　We're told to have thicker skin
15　than that.
16　Q.　What does that mean?
17　A.　Are you talking about loud music or
18　something like that?
19　Q.　Or cussing.
20　A.　I really myself, personally --
21　Q.　The truth of the matter is, you
22　really would make a judgment call and
23　probably not arrest someone for disturbance

Page 178

1　of the peace, right?
2　A.　Correct.  I don't think I've ever
3　arrested for that.
4　Q.　What about disorderly conduct?
5　A.　I've arrested for that before.
6　Q.　And when you arrest for disorderly
7　conduct, do you have to actually witness the
8　disorderly conduct in order to effect the
9　arrest?
10　A.　I'm not going to make an arrest for
11　disorderly conduct unless I see it.
12　Q.　Okay.  Now, Michelle Helm, are you
13　aware that that's what she was arrested for,
14　disorderly conduct?
15　A.　I was not.
16　Q.　Are you aware that she was arrested
17　by Gary Morgan for disorderly conduct?
18　A.　I was not.
19　Q.　When you took Michelle Helm outside
20　and she was placed in the cuffs by Morgan,
21　did you tell Morgan what she had done
22　inside?
23　A.　I did not.

Page 179

1　Q.　Do you have any knowledge as to how
2　Morgan would have known that Michelle Helm
3　became combative toward officers, as he said
4　in his synopsis, inside?
5　A.　Unless he was around inside and I
6　didn't see him.  I don't know.
7　Q.　But you didn't see him inside.
8　A.　No.  I mean, he could have been in
9　there.  I don't remember seeing him or the
10　other officers holding the legs.
11　Q.　How many officers?
12　A.　Like Morris and the officers --
13　Q.　You said four officers holding the
14　legs.
15　A.　No.  I said or the other officers.
16　Q.　Oh, the other officers.  I'm sorry.
17　I thought you said four officers.
18　A.　Yeah, the other officers.
19　Q.　Okay.
20　A.　Basically all I remember seeing is
21　like the uniforms and microphones.  I can't
22　remember faces.
23　Q.　All right.  But it says, Helm was

Page 180

1　told to get back and calm down.  Helm would
2　not comply and was Tased and arrested.  Was
3　Michelle Helm, or the older female, Tased
4　inside the concert hall?
5　　　MS. CHANDLER:  Object to the form.
6　Q.　You can answer.
7　A.　I have no idea.  The older female?
8　Q.　Yes.  The female that you saw --
9　A.　I never saw her get Tased.
10　Q.　You never saw Michelle Helm get
11　Tased.
12　A.　Michelle?  We're not talking about
13　T.H., right?
14　Q.　No.  We're talking about Michelle.
15　A.　I never saw the older female that I
16　carried outside get Tased.
17　Q.　But you did see her get put into
18　handcuffs, correct?
19　A.　I was walking away while Officer
20　Morgan was attempting to put her in
21　handcuffs.  I said cuff her, and then I'm
22　gone.
23　Q.　And did he take his cuffs out?

1    A. I believe so.

2    Q. Did you see him take his cuffs

3 out?

4    A. I don't remember.

5    Q. But you did say cuff her.

6    A. I did.

7    Q. Okay. And then you walked away.

8    A. Ran away.

9    Q. Ran away. And at some point after

10 you said cuff her to the point that Officer

11 Morgan filled out this use of force form, she

12 was Tased and arrested; is that right?

13    MS. CHANDLER: Object to the form.

14    MR. STUBBS: Object to the form.

15    MR. HOWARD: Object to the form.

16

17    Q. According to what he says.

18    A. If that's what you've got written

19 down right there, I guess that's what he

20 said.

21    Q. I don't have it written down.

22    A. I mean, if that is what he stated.

23 I can't tell you what he did, but if he wrote

1 this down, then that's his statement.

2    Q. Okay. After an officer places a

3 person into handcuffs, is that person

4 considered -- or should those cuffs come off?

5    MS. CHANDLER: Object to the form.

6

7    A. They can.

8    Q. And if they come off, can they be

9 put back on?

10    A. Absolutely.

11    Q. Okay. So at some point after you

12 ran away back to the inside, according to

13 Officer Morgan, Michelle Helm was Tased and

14 arrested, correct?

15    A. According to Officer Morgan, yes.

16    Q. And the last thing you told Officer

17 Morgan was cuff her.

18    A. Correct.

19    Q. And the last thing you remember

20 about the situation with Officer Morgan and

21 the older female was him attempting to cuff

22 her, correct?

23    A. Beginning to cuff her.

1    Q. Beginning to cuff her. So he was

2 actually beginning the process of cuffing

3 her.

4    A. Yes.

5    Q. How far had he gotten into the

6 process that you can remember?

7    A. I believe the last thing I remember

8 him doing was actually reaching around his

9 back -- or the front. And actually, I think

10 I remember hearing a pop where the leather

11 comes off --

12    Q. The pouch.

13    A. Yeah, the pouch. And I ran off.

14    Q. Because you were going back inside

15 to do what?

16    A. Help.

17    Q. With?

18    A. Who knows at that point.

19    Q. Well, you say you went back inside

20 to help officers with the younger female. Go

21 back to your statement.

22    A. Okay.

23    Q. The last sentence, the last line --

1    A. Yes. I'm sorry, yes. Going back

2 to help officers with the female.

3    Q. Okay. Then you heard, oh, my God,

4 they've got an officer surrounded at the

5 front of the building, right?

6    A. I believe when I arrived back in

7 the building before I even had the chance to

8 assess the situation with her, somebody said,

9 oh, my God, they have an officer surrounded

10 at the front of the building.

11    Q. And then if we fast forward down to

12 the fifth line from the bottom of that

13 paragraph, you said, Sergeant George Morris

14 came up to me and told me that the black male

15 I had cuffed did not start the fight and the

16 black male was just defending himself. Do

17 you remember that happening?

18    A. I do.

19    Q. Have you seen body cam footage of

20 this very exchange between you and Morris?

21    A. I don't believe so.

22    Q. And you don't recall whether or not

23 you downloaded footage from Morris' body cam

Page 185

1  or not, do you?
2      A.  I don't remember.  I might have at
3  the time when I was downloading it, but I
4  don't remember now.
5      Q.  Okay.  Now, I'm going to show you
6  what I will mark as Plaintiff's Exhibit
7  Number 6 to your deposition.
8
9          (Plaintiff's Exhibit Number 6 was
10  marked for identification and same is
11  attached hereto.)
12
13      Q.  Okay.  Do you see that
14  photograph?
15      A.  Yes.
16      Q.  Do you see the person at the head
17  of that female's body that's laying on the
18  ground?
19      A.  I can't see the person's head,
20  but --
21      Q.  Can you see a blue plaid shirt?
22      A.  The individual standing over her?
23      Q.  Which one are you talking about?

Page 186

1      A.  This one right here (indicating)?
2      Q.  Yes.  Now, do you think that person
3  is standing or kneeling?
4      A.  It looks like kneeling.
5      Q.  Okay.  And can you see that
6  person's hands?
7      A.  Yes.
8      Q.  And where is that person's hands?
9      A.  It looks like on the person's left
10  arm, at the crack of their arm where the
11  elbow bends.  And the other one is right here
12  below their chin.
13      Q.  Now, you say below their chin.  I
14  want you to look closely.  Do you see that
15  white object in that hand?
16      A.  Yes.
17      Q.  Does that appear to be a piece of
18  gauze to you?
19      A.  I have no idea.
20      Q.  But that is something in that hand.
21      A.  Absolutely.
22      Q.  Okay.
23      A.  Or on the person's chin or

Page 187

1  something like that.
2      Q.  Near the chin and mouth area,
3  right?
4      A.  Yes.
5      Q.  But that's not you, correct?
6      A.  No.  That's not me.
7      Q.  Okay.  So that's a different person
8  that -- well, I'll represent to you that this
9  is T.H., the female that's laying on the
10  ground.
11      A.  Okay.  Right now?
12      Q.  Yes.
13      A.  Okay.
14      Q.  If I represent to you that that's
15  T.H., that's a different person at the head
16  of T.H., right?  That's not you.
17      A.  That's not me.
18      Q.  Okay.  Was that person at T.H.'s
19  head during the time that you were there?
20      A.  I have no idea.
21      Q.  You don't remember whether or not
22  there was another person right beside you
23  holding T.H.'s head?

Page 188

1      A.  I don't remember.  I was
2  concentrating on her.
3      Q.  When you went back inside, you made
4  your way to the front of Center Stage.  And
5  when you arrived, the paramedics was placing
6  the young female onto the stretcher; is that
7  right?  I'm sorry.  It's the last full
8  paragraph, the first sentence.
9      A.  Yes.
10      Q.  So when you arrived, the paramedics
11  was placing the young female onto the
12  stretcher.
13      A.  Correct.
14      Q.  Was she bound by the feet?
15      A.  I don't remember, but I believe
16  that they were putting the pads over her to
17  keep her on -- you know, the straps to keep
18  her -- I mean, they do that with everybody,
19  put the straps across the stretcher so they
20  won't fall off.
21      Q.  Did you see her feet being bound?
22      A.  I don't remember.
23      Q.  Did you see any straps going around

Page 189

1 her wrists?
2    A.  I don't remember that.
3    Q.  But you did see her being wheeled
4 out, right?
5    A.  I did.  I do remember her being
6 strapped down.  And we'll get to that in a
7 minute or when you want to.
8    Q.  When you say strapped down, what do
9 you mean?
10    A.  Like by the original straps.  Like
11 when you lay somebody on one of those --
12    Q.  That actually goes on a gurney?
13    A.  Yes.
14    Q.  I understand what you're saying.
15 Okay.  After T.H. was Tased the first time,
16 was her shirt -- do you see that photograph
17 in Plaintiff's Exhibit Number 6?  Do you
18 recall her midriff being exposed before she
19 was Tased the first time?
20    A.  I don't remember.
21    Q.  You don't remember?
22    A.  I don't remember.
23    Q.  At the time she was Tased the

Page 190

1 second time, do you recall her shirt being
2 pulled up like that?
3    A.  I don't remember.
4    Q.  After she was Tased the first time,
5 do you recall there being any marks left on
6 her body?
7    A.  I don't remember.  I don't think I
8 looked.
9    Q.  When a person is drive stunned by
10 an X-26 Taser, does it leave a mark?
11    A.  I've seen photos.  I've never Tased
12 with one, but I think it leaves a mark.
13    Q.  What kind of mark?
14    A.  From what I've seen from photos and
15 from other officers doing it, I believe it
16 leaves like two dots that's separated.  I may
17 be wrong though.
18    Q.  Well, let me show you this.  I'll
19 show you what I'm going to mark as
20 Plaintiff's Exhibit Number 7 to your
21 deposition.
22
23

Page 191

1        (Plaintiff's Exhibit Number 7 was
2 marked for identification and same is
3 attached hereto.)
4
5    A.  Something like that, yeah.
6    Q.  Something very similar to that?
7    A.  Something like that, yeah.
8    Q.  All right.  How many different X-26
9 marks do you see on that photograph?
10    A.  I've looked at very few of these.
11 And I know girls wear tight clothes sometimes
12 like a bra or something.  This may could have
13 been a bra.  I'm not a Taser expert, but if
14 you're saying this is a Taser mark -- is it?
15    Q.  Well, does it look like one to
16 you?
17    A.  It could be.  It could be marks to
18 where, I mean, you had a bicycle wreck or
19 somebody stuck a cigarette there.
20    Q.  How far apart are the prongs on an
21 X-26 when you drive stun?  Do you know?
22    A.  Yeah.  This is not going to shoot
23 you.  When I push this button, nothing is

Page 192

1 going to happen.  Hang on.  It's resetting.
2 That's how much I use this thing.  Can you
3 tell I've never used this?
4    Q.  Kind of.  Let's do it this way.
5    A.  Yeah.  I'm out of juice.
6    Q.  That's okay.  Just take that ruler
7 and measure it across.  Just lay that ruler
8 across those prongs.
9    A.  I would say four inches.
10    Q.  All right.  And when you drive stun
11 someone --
12        MR. HOWARD:  Excuse me.
13        MR. STONE:  That's not four inches.
14        MR. HOWARD:  That can't possibly be
15 four inches.
16        THE WITNESS:  Oh, I'm sorry.  I did
17 centimeters.  I'm sorry.  I didn't do inches.
18
19    Q.  Is it more like two inches?
20    A.  Let me see in inches.  I measured
21 wrong.  It is more like an inch and a half.
22    Q.  Okay.  So the prongs are an inch
23 and a half across.  So when you drive stun

Page 193

1 someone, if it leaves a mark, those two dots
2 that are left on the body are going to be
3 about an inch and a half apart; is that
4 right?
5     A. I don't know. I mean, I'm not
6 sure. I really don't know.
7     Q. That's fair. Now I'm going to show
8 you what I will mark as Plaintiff's Exhibit
9 Number 8.
10
11     (Plaintiff's Exhibit Number 8 was
12 marked for identification and same is
13 attached hereto.)
14
15     Q. And I'll ask you if you've ever
16 seen this document before. And by way of
17 further identification, that is the --
18     A. I believe that was in that binder
19 that I was telling you about when I first got
20 it. It could have been.
21     Q. Okay. That is the Taser Handheld
22 CEW, warnings, instructions and information
23 for law enforcement.

Page 194

1     A. That could have been in that binder
2 that I received.
3     Q. Now, the binder that you're talking
4 about is the Taser International binder,
5 right?
6     A. It was the binder that I was given
7 when I received the Taser from Chase Jenkins.
8     Q. And when was that? What year was
9 that?
10     A. 2010.
11     Q. Okay. I'm going to represent to
12 you that this is not the document that was in
13 that binder because this document is from
14 2013.
15     A. Okay. I don't think I've ever seen
16 this one then.
17     Q. Okay. I want you to look down in
18 the middle of the page, and in bold letters,
19 do you see where it says immediately
20 distribute this document to all Taser CEW
21 users? Do you see that?
22     A. I'm lost.
23     Q. Do you mind if I point?

Page 195

1     A. Go ahead.
2     Q. Excuse my reach.
3     A. Go ahead.
4     Q. Do you see that right there?
5 Immediately distribute this document to all
6 Taser CEW users. Now, that would be you,
7 right? You're a Taser user, right?
8     A. Correct.
9     Q. Okay. And before that, it says,
10 these warnings and instructions are effective
11 when?
12     A. March the 1st, 2013.
13     Q. And supersede all prior revisions
14 and relevant training bulletins. Immediately
15 distribute this document to all Taser CEW
16 users. The most current warnings are also
17 available online at www dot Taser dot com.
18 And your testimony is that you've never
19 received any document on the use of your
20 Taser since 2000 when?
21     A. '13. We get a lot of documents put
22 in our mailbox. And to be honest, if it
23 doesn't have me on a court date, I shred it.

Page 196

1 I may have received this, but I don't
2 remember.
3     Q. Okay. So you may have received
4 this document and just shredded it?
5     A. Correct.
6     Q. Okay. I want you to turn to the
7 second page. Okay?
8     A. Okay.
9     Q. It says physiologic and metabolic
10 effects. And you've never seen this,
11 right?
12     A. I can't remember seeing this.
13     Q. Okay. And it says, CEW use causes
14 physiologic and/or metabolic effects that may
15 increase the risk of death or serious injury.
16 These effects include changes in blood
17 chemistry, blood pressure, respiration, heart
18 rate and rhythm and adrenaline and stress
19 hormones, among others.
20     In human studies of electrical
21 discharge from a single CEW of up to fifteen
22 seconds, the effects on acid/base balance,
23 creatine kinase, electrolytes, stress

Page 197

1 hormones and vital signs were comparable to
2 or less than changes expected from physical
3 exertion similar to struggling, resistance,
4 fighting, fleeing or from the application of
5 some other force tools or techniques. Now,
6 did I read that correctly?
7      A. You did.
8      Q. What does that mean to you as a
9 user of the Taser?
10        MR. HOWARD: Object to the form.
11
12      Q. You can answer.
13      A. If I'm just sitting here reading
14 this, it's telling you, if I'm correct, once
15 you're being Tased, it could change your
16 blood chemistry, blood pressure, respiration,
17 your heart rate and rhythm. I mean, you're
18 getting Tased. Adrenaline, stress hormones,
19 the fifteen seconds. It gives more
20 medical -- what do you call that?
21      Q. Would you agree that it says
22 that --
23      A. To me that's basically saying, I

Page 198

1 mean, somebody who is Tased is going to go
2 through a --
3      Q. In the APOST training, were you
4 taught about the fight or flight mentality
5 that a person could --
6      A. I remember hearing that term. I
7 don't remember what that means.
8      Q. Okay. And in reading this first
9 paragraph, do you understand that Taser is
10 saying that -- and this is to be distributed
11 to law enforcement users of the Taser. And
12 Taser is telling you that a person that is
13 Tased for sometimes up to fifteen seconds can
14 struggle, can resist, can fight, can flee.
15 Do you understand that that's what that's
16 saying?
17        MS. CHANDLER: Object to the form.
18        MR. HOWARD: Object to the form.
19        MR. STUBBS: Object to the form.
20
21      A. Yeah. I mean --
22      Q. Are you reading the same thing I'm
23 reading?

Page 199

1      A. Say it again.
2      Q. Okay. When you read this, do you
3 read this and understand it to mean that in
4 some instances, someone who is Tased can
5 exhibit symptoms such as struggling,
6 resistance, fighting, fleeing?
7      A. I believe that's what I'm
8 understanding.
9      Q. Okay. And again, this is an update
10 to the document that you would have received
11 when you were first certified for the Taser,
12 right?
13      A. That's what you're telling me and
14 that's what I'm reading, yes.
15      Q. Okay. Well, this is dated March
16 1st, 2013. And you were certified on that
17 Taser prior to that time, right?
18      A. Correct.
19      Q. Okay. Turn with me to the third
20 page of this document. Are you there?
21      A. I'm there.
22      Q. Do you see that third warning box
23 where it says secondary injury?

Page 200

1      A. Yes.
2      Q. All right. Underneath there, do
3 you see where it says loss of control
4 associated with CEW use can have several
5 causes? Do you see that?
6      A. Yeah. I see what you're talking
7 about.
8      Q. And what's the first cause that's
9 listed?
10      A. A seizure.
11      Q. Okay. Officer Gilliland, have you
12 discussed this lawsuit with Jimmy Fazekas?
13      A. Not in detail.
14      Q. Well, what detail have you
15 discussed with Jimmy Fazekas?
16      A. When do you think this will go to
17 court. I mean, do you think it will go to
18 court. How long. I've never been in
19 something like this. How long do you think
20 it will be before we'll actually start going
21 to have to see somebody about this, but never
22 nothing in detail.
23      Q. Okay. When you say that, is it

1 fair to say the conversations you had with
2 Jimmy Fazekas about this lawsuit is before
3 you retained a lawyer?
4     A.  Yes.
5     Q.  Do you know what constitutional
6 rights are?
7     A.  Somewhat.
8     Q.  Do you believe that George Morris
9 violated T.H.'s constitutional rights on
10 January 16, 2015?
11         MR. HOWARD:  Object to the form.
12         MR. STUBBS:  Object to the form.
13         MS. CHANDLER:  Object to the form.
14
15     Q.  You can answer.
16     A.  I don't know.  That's not me.  I
17 mean, I'm going back to what you're saying.
18 I'm not him.  I wasn't put in that situation.
19 I don't know.  I would only be able to answer
20 that if that was me in that position.
21     Q.  All right.  If it were you in that
22 position, would you have Tased T.H. the first
23 time?

1     A.  It wasn't.
2     Q.  If it were, would you have Tased
3 her?
4     A.  I don't know what I would have
5 done.
6     Q.  If it were you, would you have
7 Tased T.H. the second time?
8     A.  I don't know what I would have
9 done.
10     Q.  If it were you, would you have
11 Tased Michelle Helm, or the older female,
12 that you escorted out of the building?
13         MS. CHANDLER:  Object to the form.
14
15     A.  I don't know.
16     Q.  Have you ever seen any policies or
17 procedures for the Rainbow City Police
18 Department that would have given you guidance
19 or instruction on what you would have done
20 that night?
21         MS. CHANDLER:  Object to the form.
22
23     A.  I don't believe so.

1     Q.  Have you read the statement of
2 George Morris?
3     A.  I have not.
4     Q.  So you're not aware that George
5 Morris in his statement that he made on
6 Rainbow City forms states that he only Tased
7 T.H. once?
8     A.  I have not read that.
9     Q.  Have you seen George Morris' use of
10 force report in which he states that he only
11 Tased T.H. once?
12     A.  I have not.
13     Q.  If George Morris wrote that he only
14 Tased T.H. one time, would that be different
15 than what you observed that night?
16     A.  It would.
17     Q.  If George Morris put in his use of
18 force report form that he only Tased T.H. one
19 time, would that be different than what you
20 saw him do that night?
21     A.  Yes.
22     Q.  I'm going to show you what I will
23 mark as Plaintiff's Exhibit Number 9.

1
2     (Plaintiff's Exhibit Number 9 was
3 marked for identification and same is
4 attached hereto.)
5
6     A.  (Witness reviewing document.)
7     Q.  Have you ever seen this document
8 before today?
9     A.  I have not.
10     Q.  Okay.  Turn with me to page two of
11 three, if you would.  All right.  Now,
12 earlier I had a conversation with you, and I
13 asked you whether or not Morris was holding
14 his Taser before he Tased T.H. the first time
15 or did he have to take it out.  Do you
16 remember that?
17     A.  I remember that.
18     Q.  Okay.  Go down with me to the
19 eighth line from the bottom where it starts
20 with the word based.  Do you see that?
21     A.  Yes.
22     Q.  All right.  It says, based on
23 Ms. Helm's out of control behavior, I took my

1 Taser out and removed the cartridge and told
2 her several times to calm down and comply
3 with officers' commands or I would dry stun
4 her with my Taser. Did I read that
5 correctly?
6     A. You did.
7     Q. Okay. So according to Morris'
8 statement, he told T.H. several times to calm
9 down or I will dry stun you, right?
10    A. That's what he's got written
11 here.
12    Q. And he says he took his cartridge
13 out. Do you know what he means when he says
14 I took my cartridge out?
15    A. Yeah. I believe he's referring to
16 taking this part off the Taser so you can't
17 shoot anybody with the prongs.
18    Q. And when you say this part, you're
19 talking about the prongs that are packed into
20 this cartridge, right?
21    A. Yes.
22    Q. And the way that you remove those,
23 there is two indentions on each side and you

1 squeeze those in and the cartridge pops off;
2 is that right?
3     A. I think these little doors open
4 right here. What are you talking about?
5     Q. I mean to take the cartilage off
6 your X-26.
7     A. Oh, yeah. There is two little
8 circles on the sides and you squeeze --
9     Q. You squeeze those in and it pops
10 off, right?
11    A. Right.
12    Q. Okay. And then you can use the
13 drive stun. I say drive. He said dry. You
14 can get Tased either way, so it doesn't
15 matter.
16    A. Yeah.
17    Q. But do you recall him telling her
18 several times to calm down?
19    A. The only part I can remember is
20 after the first time he Tased her.
21    Q. Okay. So you remember him telling
22 her to calm down several times after the
23 first time; is that right?

1     A. Yes.
2     Q. But if you look at his statement,
3 he's telling her that after the first time,
4 right?
5     A. Before the first time or after?
6     Q. Before the first time.
7     A. That's what he's got written, yes.
8     Q. But that's not how you remember it,
9 is it?
10    A. I don't remember.
11    Q. Okay. He says that the dry stun
12 had little -- and I'm on page three now -- or
13 no effect on Ms. Helm, and I had to leave the
14 front to go into the concert for another
15 fight.
16        Now, after the first Tase by George
17 Morris on T.H., did he leave and go to the
18 concert hall for another fight?
19    A. Now, what did you say?
20    Q. After George Morris Tased T.H. the
21 first time, do you remember him leaving to go
22 break up a fight, or do you remember him
23 staying there and Tasing her again?

1     A. I don't remember him going to a
2 fight.
3     Q. You remember him still being there
4 with T.H., right?
5     A. Yes.
6     Q. And then subsequently Tasing her
7 again.
8     A. Yes.
9     Q. And then he says, I returned later
10 and fire medics were attempting to help
11 Ms. Helm and she continued cussing the
12 firemen and ambulance personnel. Were fire
13 medics present when you were there?
14        MS. CHANDLER: Object to the form.
15
16    Q. When you were there with T.H., or
17 were they there when you came back in from
18 escorting the older female outside?
19    A. I can't remember if they were there
20 when I came back from escorting the older
21 female outside or after I had got back from
22 the fight at the front of the concert
23 venue.

Page 209

1    Q.  But you didn't see medics near T.H.
2 until after Morris had Tased her the second
3 time; is that right?  It would have been at
4 some point after that that you saw medics
5 tending to T.H., right?
6    A.  They could have been.  I'm not
7 sure.
8    Q.  Well, they weren't working on her
9 head because you had her in a rear neck hold,
10 correct?
11    A.  Right.  Yeah.
12    Q.  So we know they weren't near her
13 head.
14    A.  Right.
15    Q.  Did you see them near her feet?
16    A.  I did not.
17    Q.  So did you see them on either side
18 of her?
19    A.  I can't remember.  There was people
20 on the side, but I don't know if it was
21 paramedics or not.
22    Q.  Did you ever see an IV line go into
23 T.H.'s arm?

Page 210

1    A.  Not while I was holding her head.
2    Q.  Okay.  So I guess my question is,
3 the events that George Morris remembers in
4 his City of Rainbow City letterhead
5 statement, they're different than the way you
6 remember those events as it relates to T.H.
7 being Tased by Morris, aren't they?
8    A.  Seems to be that way.
9    Q.  Now, I want to show you what I'm
10 going to mark as Plaintiff's Exhibit Number
11 10 to your deposition.
12
13    (Plaintiff's Exhibit Number 10 was
14 marked for identification and same is
15 attached hereto.)
16
17    Q.  And I'll represent to you that by
18 way of further identification, this is the
19 Rainbow City Police Department shift
20 supervisor synopsis use of force form.  Is
21 that a document you have ever seen before?
22    A.  I've never seen this.
23    Q.  Do you know what it is?

Page 211

1    A.  By reading the title up there, I've
2 got a clue what it is.
3    Q.  Okay.  All right.  I'm going to
4 represent to you that Officer Bryant told me
5 that this is a form that he filled out based
6 upon his conversation with Gary Morgan about
7 Morgan's use of force as it related to who
8 you knew as the older female that we know to
9 be Michelle Helm.  Okay?
10    A.  Okay.
11    Q.  Now, I know you haven't had a
12 chance to read the whole thing, but do you
13 see this block paragraph here in the middle?
14    A.  Yes.
15    Q.  Okay.  There is a sentence that
16 says he said.  Do you see that?
17    A.  He said the drive stun?
18    Q.  No.  He said he and Officer
19 Gilliland.  You're on the right line, but I
20 want to go to that next --
21    A.  Yes.
22    Q.  He said he and Officer Gilliland
23 escorted Michelle out of the building and

Page 212

1 restrained her.  Did Morgan help you escort
2 the older female out of the building, or did
3 you escort the older female out of the
4 building to Morgan?
5    A.  I believe Morgan was walking beside
6 me.  I don't know if he had her legs or
7 what.
8    Q.  Okay.  He said during the time she
9 was being escorted, she was resisting and
10 thrashing around.  Now, that's not the way
11 you told me, is it?
12    MS. CHANDLER:  Object to the form.
13
14    Q.  You can answer.
15    A.  I don't remember.
16    Q.  You don't remember what you told
17 me?
18    A.  Well, I remember having her under
19 the arms pulling her out like I told you, but
20 I don't remember -- it was loud.
21    Q.  Well, loud notwithstanding, he says
22 that she was resisting and thrashing around.
23 And earlier we talked about how Michelle

Page 213

1 Helm, or the older female as you knew her,
2 was acting when you escorted her out of that
3 building. And you said she wasn't being
4 combative or thrashing around. Do you
5 remember testifying --
6     MS. CHANDLER: Object to the form.
7
8     A. I remember saying she wasn't being
9 combative. She wasn't trying to hit me in
10 the face, but I do think I remember her being
11 like, you know, let me go, like moving
12 around. That's not combative to me. Trying
13 to get loose is what I call it.
14     Q. All right. Once Helm was
15 restrained, she was transported to the Etowah
16 County jail. Do you see that?
17     A. I do.
18     Q. Now, there is no mention of
19 Michelle Helm being Tased from the time that
20 you and Morgan escorted her outside and
21 restrained her until the time she was taken
22 to the jail, is there?
23     A. Not on this document.

Page 214

1     Q. But if you go back up above that,
2 he says she became combative after he
3 attempted to escort her. He said he
4 attempted to drive stun Michelle with his
5 Taser.
6     He said the drive stun contact was
7 a short cycle because as Michelle moved, her
8 leg knocked the Taser out of his hand. He
9 said the drive stun was applied in the middle
10 area of her back. He said he and Officer
11 Gilliland escorted Michelle out of the
12 building and restrained her.
13     Now, do you read this to be Officer
14 Morgan telling Officer Bryant that that
15 Tasing happened inside the building?
16     A. Tell me where to start again.
17     Q. Okay. We'll start right here. Do
18 you see where it says he said Tiara became
19 more irate? It's about the middle of that
20 block.
21     A. He said Tiara became more irate
22 after she saw her mother. Morgan said he
23 told Michelle to move back in an attempt to

Page 215

1 diffuse the situation.
2     Q. Okay. Stop right there. Do you
3 remember that happening?
4     A. I don't remember.
5     Q. Keep reading, please.
6     A. Okay. Morgan said he told Michelle
7 to move back in an attempt to diffuse the
8 situation. Morgan said Michelle told him,
9 fuck you, that's my daughter.
10     Q. Stop right there. Do you remember
11 that happening?
12     A. I do not.
13     Q. And the older female that we now
14 know to be Michelle Helm was actually, as you
15 said, hovering over your back, right?
16     MR. HOWARD: Object to the form.
17     MR. STUBBS: Object to the form.
18     MS. CHANDLER: Object to the form.
19
20     A. I don't remember that.
21     Q. You don't remember her --
22     A. I mean, I don't remember -- I mean,
23 I don't --

Page 216

1     Q. Let's talk about that. You don't
2 remember Morgan being inside, right?
3     A. I don't remember.
4     Q. You don't remember Michelle Helm
5 telling Morgan, fuck you, that's my daughter.
6     A. If she did, I didn't hear it.
7     Q. Okay. Keep reading, please.
8     A. Okay. Morgan said he grabbed
9 Michelle by her left arm in an attempt to
10 escort her out.
11     Q. All right. Let me stop you right
12 there. Do you remember Morgan grabbing
13 Michelle by her left arm in an attempt to
14 escort her out?
15     A. I don't recall.
16     Q. In fact, in your statement, you say
17 it was Fazekas who attempted to grab Michelle
18 Helm by the left arm, right?
19     A. Yes.
20     Q. Okay. But you didn't say anything
21 about Morgan attempting to grab Michelle by
22 the left arm, right?
23     A. He may have. I didn't see it.

Page 217

1    Q.   Okay.  Keep reading, please.
2    A.   He said she became combative after
3 he attempted to escort her out.
4    Q.   Do you remember that happening
5 inside the entrance of Center Stage?
6    A.   I would have to know his definition
7 of combative.  I mean, she was like not
8 wanting to go.
9    Q.   Do you remember Morgan attempting
10 to escort the older female out of Center
11 Stage?
12    A.   I didn't see that.
13    Q.   In fact, you, in your statement
14 wrote, that you put your arms under her
15 armpits and you were the one that escorted
16 her out of Center Stage, right?
17    A.   Correct.
18    Q.   Okay.  Keep reading, please.
19    A.   He said he attempted to drive stun
20 Michelle with his Taser.
21    Q.   Okay.  Do you remember that?
22    A.   I didn't see that.
23    Q.   That's something you would remember

Page 218

1 if you saw it, right?
2         MS. CHANDLER:  Object to the form.
3         MR. HOWARD:  Object to the form.
4         MR. STUBBS:  Object to the form.
5
6    Q.   You can answer.  Would you remember
7 someone drive stunning the older female if
8 you had seen it?
9    A.   If I would have seen it, yes.
10    Q.   You remembered Morris drive
11 stunning T.H. twice, right?
12    A.   Yes, I did.
13    Q.   Okay.  Keep reading, please.
14    A.   He said the drive stun contact was
15 a short cycle because as Michelle moved her
16 leg, it knocked the Taser out of his hand.
17    Q.   And you don't remember that because
18 you don't remember Morgan drive stunning
19 Michelle inside the building, do you?
20         MS. CHANDLER:  Object to the form.
21
22    Q.   You don't remember seeing Morgan
23 Tase Michelle Helm at all, do you?

Page 219

1         MS. CHANDLER:  Object to the form.
2
3    Q.   You can answer.
4    A.   If it happened, I didn't see it.
5    Q.   Okay.  Keep reading, please.
6    A.   He said the drive stun was applied
7 in the middle area of her back.
8    Q.   Okay.  Do you recall Gary Morgan
9 using the drive stun Taser technique on
10 Michelle Helm before she was escorted out of
11 Center Stage?
12    A.   I didn't see it if he did.
13    Q.   Okay.  Keep reading, please.
14    A.   He said he and Officer Gilliland
15 escorted Michelle out of the building and
16 restrained her.
17    Q.   And did you assist Gary Morgan in
18 restraining Michelle Helm?
19    A.   We both -- I mean, I had her under
20 the arms, and I think he was beside me in
21 case she got away or something.
22    Q.   Did she try to run?
23    A.   No.  She was wiggling though trying

Page 220

1 to get loose.
2    Q.   Okay.  But did she try to run?
3    A.   She couldn't.
4    Q.   How do you know she was trying to
5 get loose?
6    A.   Because I had her under the arms,
7 and the whole time --
8    Q.   Does that mean she was trying to
9 get loose, or does that mean she was
10 wiggling?  You don't know what her mental --
11    A.   She was trying to get away from me.
12    Q.   Okay.  That's your belief.
13    A.   That's my belief.
14    Q.   All right.  Keep reading, please.
15    A.   He said during the time she was
16 being escorted, she was resisting and
17 thrashing around.
18    Q.   Now, you would agree with me that
19 thrashing around is different than wiggling,
20 right?
21    A.   Some people say thrashing.  I don't
22 really know what he defines thrashing as.
23    Q.   Okay.  Well, we'll visit with him

Page 221

1  about that. All right. Keep reading,
2  please.
3      A. Once Helm was restrained, she was
4  transported to the Etowah County jail.
5      Q. And you don't know if that happened
6  or not.
7      A. I have no idea if that happened.
8      Q. In fact, you didn't even know she
9  had been arrested, right?
10     A. I did not.
11     Q. You had not been asked to fill out
12 any witness statement related to the arrest
13 of Michelle Helm, had you?
14     A. I had not.
15     Q. In fact, you didn't know she had
16 been arrested until this lawsuit came about,
17 did you?
18     A. Correct.
19     Q. Did you ever see Greg Carroll, then
20 Chief Carroll, around T.H.
21     A. I don't remember.
22     Q. You don't remember if you saw
23 him?

Page 222

1      A. I don't remember if I saw him.
2      Q. Did anyone assist you in preparing
3  your statement that we marked as an exhibit
4  in this case?
5      A. Absolutely not.
6      Q. All right. Let's go back to your
7  statement.
8      A. Okay.
9      Q. Do you see the first paragraph
10 there?
11     A. Yes.
12     Q. Can you read that, please?
13     A. I, Detective Gilliland, want it to
14 be known that I am writing this statement
15 knowing that I am fully protected by the
16 Garrity Rights.
17     Q. And what are the Garrity Rights?
18     A. When all this started coming out in
19 the paper, I talked to my wife at home. And
20 I was like, I've never been in something like
21 this. I mean, should I even call an
22 attorney, because I kept hearing the rumors
23 that people were going to sue on Facebook and

Page 223

1  the Gadsden Times, comments in the Gadsden
2  Times. So I contacted an attorney from the
3  PBA, which I was at that time a member of.
4  And he advised me --
5      MS. CHANDLER: Let me stop you
6  right there. You don't testify to anything
7  that attorney told you.
8
9      Q. I don't want to know what he told
10 you. That's confidential. I just wanted to
11 know how you knew what the Garrity Rights
12 were.
13     A. An attorney advised me.
14     Q. And you made that call before you
15 wrote this statement, obviously.
16     A. Yes, I did.
17     Q. All right. The next time you got
18 to work after all of this happened at Center
19 Stage --
20     A. Was that concert on a Saturday?
21     Q. I believe it was. And I think it
22 bled over to like Sunday morning.
23     A. I would have went back to work

Page 224

1  Monday.
2      Q. When you got to work Monday, who,
3  if anyone, did you discuss what happened at
4  Center Stage?
5      A. The next thing I remember talking
6  to someone about it was when Greg Carroll
7  came up to me and said I need all the video
8  on Center Stage.
9      Q. And that would have been how soon
10 after that concert?
11     A. I don't know if it was that day or
12 days later, but that was the first time I had
13 had contact about it.
14     Q. Did he tell you that he had
15 received a call from T.H.'s brother about
16 what happened to her down there?
17     A. He didn't tell me that.
18     Q. You said you read some comments on
19 Facebook.
20     A. Yes.
21     Q. What type of comments did you
22 read?
23     A. Mostly negative comments towards

1 the police department. Fucking pigs Tased
2 little girl down at concert Saturday night.
3 Then there is people commenting on it. Yeah,
4 they abuse their authority all the time.
5 Just stuff you see on the news everyday.
6     Q. And were these posts in your
7 timeline --
8     A. How was I reading --
9     Q. -- or was someone sending these to
10 you?
11     A. I believe my wife had -- someone
12 was sending her texts because they had heard
13 about it. And they were friends with
14 somebody else. And I think they copied and
15 pasted it and sent it to my wife. And then
16 she sent it to me by text message.
17     Q. What's your wife's name?
18     A. Emily Gilliland.
19     Q. Is she employed?
20     A. She is.
21     Q. Where is she employed?
22     A. Saint Vincent's ER in Birmingham.
23     Q. And you said you received those by

1 text?
2     A. I believe so. I can't remember.
3     Q. But they came from your wife, or
4 did they come from someone else?
5     A. I believe they came from my wife.
6 I'm pretty sure.
7     Q. Okay. Did you see anything on your
8 Facebook concerning what happened at Center
9 Stage on January 16, 2015?
10     A. To be honest, I don't think I had a
11 Facebook at that time.
12     Q. You have one now, right?
13     A. Yes, I do.
14     Q. Have you discussed this case with
15 anyone via Facebook?
16     A. No, not at all.
17     Q. How are you identified on Facebook,
18 just Justin Gilliland?
19     A. Justin Gilliland.
20     Q. Have you exchanged text messages
21 with anyone about anything related to this
22 lawsuit outside of your wife?
23     A. No.

1     Q. Has anyone from Rainbow City ever
2 asked you to give an official statement
3 regarding what happened at Center Stage?
4     A. They've asked me about it, but I've
5 told them I can't talk about it.
6     Q. Who?
7     A. Just people. I mean, I worked at
8 the Chocolate Festival.
9     Q. No, no. I'm sorry. When I say
10 Rainbow City, I mean anyone --
11     A. Like politically?
12     Q. Yes, that works for the City of
13 Rainbow City.
14     A. No. I don't believe so.
15     Q. Have you ever had any discussions
16 with the mayor or the city council about
17 it?
18     A. No. Just the public.
19     Q. Okay. And when you drafted this
20 statement, did you just do this
21 voluntarily?
22     A. If I can remember -- we write
23 statements on every --

1     Q. Everything that happens.
2     A. Everything that happens. So I
3 believe I just said, hey, there was an
4 incident down there. I might want to write
5 down what happened just to cover -- put my
6 ducks in a row. So I believe it was
7 voluntary.
8     Q. Did you give a copy of this
9 statement to anyone outside of your attorney?
10     A. I may have given a copy of it to
11 Chief Carroll.
12     Q. Did Chief Carroll or Chase Jenkins
13 ever tell you, hey, we're investigating and
14 looking into this?
15     A. I remember talking to Chase Jenkins
16 one time. And he told me that he had heard
17 that the victim's mother was bad-mouthing
18 police on the internet.
19     Q. He heard that the victim's mother
20 was what?
21     A. Bad-mouthing police on the
22 internet.
23     Q. Did he use the word victim?

Page 229

1  A. I don't recall.
2  Q. Or is that your word?
3  A. I believe he said that little
4  girl's mom.
5  Q. So victim is your word. Do you
6  think T.H. was a victim of anything on the
7  night of January 16, 2015?
8  A. Can I think about that for a
9  second?
10  Q. Sure.
11  A. If she was a victim, that's hard to
12  answer. I mean, I've got yes and no for
13  that.
14  Q. Tell me the yes part.
15  A. Let me -- no, I don't think she was
16  a victim.
17  Q. Why not?
18  MR. HOWARD: Object to the form.
19
20  Q. You can answer.
21  A. This is an opinion.
22  Q. Sure.
23  A. I believe she went to a concert,

Page 230

1  acted inappropriately, and police officers
2  did their job. And this is where we're at.
3  Q. So you believe she was wrong for
4  going to the concert.
5  A. I believe she was wrong the way she
6  acted at the concert.
7  Q. Do you think she was wrong when she
8  was lying on the floor of the concert hall
9  seizing?
10  A. That's something she can't help.
11  Q. Do you think she was wrong when she
12  was sitting in the chair having seizures?
13  A. No. After she got out of the
14  chair, yes.
15  Q. Well, she didn't get out of the
16  chair --
17  A. I mean after she woke up out of the
18  apparent seizure (indicating).
19  Q. Well, now, let the record reflect
20  that you're using air quotes.
21  A. Okay. I'm not a doctor. I mean
22  all I can do is assume what a seizure was --
23  Q. On the night of January 16, 2015

Page 231

1  when you were at the concert, you assumed she
2  was having a seizure, right?
3  A. At the beginning, yes.
4  Q. Well, on two different occasions.
5  A. Yeah, yeah.
6  Q. So what changed your mind?
7  A. About what?
8  Q. That you thought she was having a
9  seizure when she was on the floor --
10  A. When she came out of the seizure,
11  the way she was acting, I've never seen -- I
12  mean, I worked at a hospital seven years.
13  I've never seen anybody come out of a seizure
14  and actually know where they're at to be
15  cussing that way.
16  Q. What did you do at the hospital
17  that you worked at?
18  A. I was a tech. And I was going to
19  school to be a nurse and worked in the
20  emergency room.
21  Q. Did you finish nursing school?
22  A. No.
23  Q. And you were a tech in

Page 232

1  the emergency room.
2  A. Emergency room.
3  Q. And what was your job duty as a
4  tech in the emergency room?
5  A. Blood pressures, EKGs, taking
6  blood, transporting people.
7  Q. It wasn't to diagnose seizures
8  though.
9  A. Correct.
10  Q. And it wasn't to treat seizures,
11  right?
12  A. Correct.
13  Q. And during your nursing school, did
14  you take courses on people that were having
15  seizures and how to deal with them and what
16  to expect?
17  A. I did not.
18  Q. So your only knowledge about how
19  people act when they're coming out of a
20  seizure is limited to what you saw in the
21  hospital, right?
22  A. Past episodes.
23  Q. And those episodes were in the

Page 233

1 hospital, right?
2     A.  Correct.
3     Q.  And did every person who came out
4 of one of those come out and act the same
5 way?
6     A.  I've never seen anybody come out of
7 a seizure and act like she did when she came
8 out of a seizure.
9     Q.  I understand that, but my question
10 was, did everyone who came out of the ones
11 that you have observed act the same way?
12     A.  Most of the time.
13     Q.  But not all the time.
14     A.  It's been so long since I've worked
15 there, but most everybody has come out of a
16 seizure that I've witnessed come out the same
17 way.
18     Q.  Did they all come out that way?
19     A.  I don't remember every --
20     Q.  Exactly.
21     A.  I mean, I can't remember every
22 little seizure that I've witnessed, but from
23 what I can remember, every seizure I ever

Page 234

1 saw, those people came out the same way, yes.
2     Q.  So you think that she was faking
3 that seizure in the concert hall?
4         MR. HOWARD:  Object to the form.
5
6     A.  I don't think she was faking a
7 seizure.  I believe when she came out, she
8 became angry.
9     Q.  And when she came out, what's the
10 first thing she said?
11     A.  I would have to go back and read my
12 statement, but I remember --
13     Q.  It's there in front of you.  And
14 I'll help you out.  She said, let me go, you
15 stupid mother fuckers.  Did you let her go?
16     A.  Anybody who is calling --
17     Q.  Did you let her go?
18     A.  Anybody who is calling me a mother
19 fucker, I'm not letting go because that
20 person could be harmful to me.
21     Q.  But you didn't think she was
22 harmful to you.
23     A.  I'm not letting anybody go who is

Page 235

1 calling me a mother fucker.
2     Q.  So you're not letting her go
3 because she called you a mother fucker, not
4 because you thought she was harmful.
5     A.  No.  I'm not letting her go because
6 she was being violent and I don't want
7 anybody to get hurt.
8     Q.  Oh, so now you thought she was a
9 threat, because this is the first I'm hearing
10 of this.  And we were almost finished, but
11 now I think we're going to need to strap in.
12 So now you're saying you thought she was
13 being violent?
14         MS. CHANDLER:  Object to the form.
15
16     Q.  You can answer.
17     A.  I thought she was being disruptive.
18     Q.  Is that a crime?  Is that her fault
19 she was being held down by Rainbow City
20 police officers?
21         MR. STUBBS:  Object to the form.
22         MR. HOWARD:  Object to the form.
23         MS. CHANDLER:  Object to the form.

Page 236

1
2     Q.  You can answer.
3     A.  What I mean by disruptive --
4     Q.  No.  Please answer the question.
5     A.  Okay.  Go ahead.
6     Q.  Was it her fault she was being held
7 down on the floor by Rainbow City police
8 officers?
9         MR. HOWARD:  Object to the form.
10
11     Q.  You can answer.
12     A.  At some point, yes.
13     Q.  At what point?
14     A.  When she became angry and began
15 cussing police officers.
16     Q.  Was that before or after she told
17 you to let her go?
18     A.  Say it again.
19     Q.  Was it before or after she told you
20 to let her go?
21     A.  That she what?
22     Q.  Became disruptive.
23     A.  This was after she came out of the

Page 237

1 seizure.
2    Q.   Which one?
3    A.   After the first one.
4    Q.   Had she committed a crime when she
5 came out of the first seizure?
6    A.   No, she hadn't.
7    Q.   Was there any reason you should not
8 have let her go?
9    A.   Yes.
10    Q.   She had not committed a crime.
11    A.   She don't have to commit a crime
12 for us to not feel safe.
13    Q.   Why didn't you feel safe?  What did
14 you think she was going to do?
15    A.   Biting, spitting, kicking.  I don't
16 know if she's got HIV.
17    Q.   If you had let her go, do you think
18 she would have bitten you?
19    A.   Absolutely.
20    Q.   You think she would have bitten
21 you --
22    A.   Absolutely.
23    Q.   -- when her only request to you was

Page 238

1 let me go, you stupid mother fucker.
2    A.   From my point of view, let me go
3 meant let me go so I can harm you.  That's
4 what I believe.
5    Q.   That's what you believe.
6    A.   That's what I believe.  I see it
7 everyday.
8    Q.   And do you see people Tased
9 everyday?
10    A.   No.
11    Q.   Did you Tase the guy that pushed
12 you in the chest?
13    A.   No, I didn't.
14    Q.   Did you think he meant to harm you
15 when he pushed you in the chest?
16    A.   No.
17    Q.   So you think a seventeen-year-old
18 girl that you had seen have two seizures
19 meant to harm you, but not the guy with whom
20 you broke a fight up in the middle of a
21 concert hall, at a rap concert, who pushed
22 you in the chest did not mean to harm you.
23    MS. CHANDLER:  Object to the form.

Page 239

1
2    Q.   You can answer.
3    A.   I believe that guy did not know
4 what was going on at that point and wanted to
5 get a subject away from him.
6    Q.   But you believe that the lady who
7 was coming out of a seizure knew what was
8 going on and intentionally wanted to hurt
9 you.
10    A.   Because she was directing it
11 towards officers --
12    Q.   I'm sorry, a seventeen-year-old
13 girl --
14    A.   Absolutely.
15    Q.   -- who you knew to be a teenager
16 because you previously knew her from being a
17 school resource officer, right?
18    A.   I don't look at age when I've got a
19 situation like that.  I look at protecting
20 myself and others.
21    Q.   When you went outside to break up
22 the fight and you cuffed --
23    A.   I wasn't outside.  I was inside.

Page 240

1    Q.   When you were inside and you broke
2 up the fight and Sergeant Morris came up to
3 you and told you that the black male that you
4 had cuffed did not start the fight and he was
5 just defending himself, did you think that
6 black male meant to hurt you?
7    A.   Absolutely not.
8    Q.   Were you afraid when you went to
9 break up the fight?
10    A.   You should always be a little
11 afraid when you go to break up a fight.
12    Q.   Were you more afraid of going to
13 break up a fight between two grown men than
14 you were of that seventeen-year-old girl
15 having medical problems lying on the floor?
16    MS. CHANDLER:  Object to the form.
17    MR. STUBBS:  Object to the form.
18    MR. HOWARD:  Object to the form.
19
20    Q.   You can answer.
21    A.   Every situation is different.
22    Q.   But that wasn't my question.
23    A.   What's your question?

Page 241

1    Q.  Were you more afraid of a
2  seventeen-year-old girl lying on the floor
3  with medical problems than you were of the
4  guys that you went to break the fight up?
5         MR. STUBBS:  Object to the form.
6         MS. CHANDLER:  Object to the form.
7         MR. HOWARD:  Object to the form.
8
9    A.   After looking back at both of those
10  situations, I was more afraid of the girl.
11         MR. HARP:  All right.  That's all I
12  have.
13         MR. HOWARD:  No questions here.
14         MR. STUBBS:  No questions.
15         MS. CHANDLER:  I don't have any
16  questions.
17         MR. HARP:  You're finished,
18  Mr. Gilliland.  I appreciate it.
19
20         FURTHER DEPONENT SAITH NOT
21         ENDING TIME:  1:45 p.m.
22
23         CERTIFICATE

Page 242

1
2  STATE OF ALABAMA
3  ETOWAH COUNTY
4
5       I hereby certify that the above and
6  foregoing deposition was taken down by me in
7  stenotype and the questions and answers
8  thereto were transcribed by means of
9  computer-aided transcription, and that the
10  foregoing represents a true and correct
11  transcript of the testimony given by said
12  witness upon said hearing.
13       I further certify that I am neither of
14  counsel, nor of kin to the parties to the
15  action, nor am I in anywise interested in the
16  result of said cause.
17
18         /s/Beth Word
19         BETH WORD
20         ACCR #:  376
21         EXPIRES: 9/30/2016
22
23