FILED
2017 May-11 PM 08:29
U.S. DISTRICT COURT
N.D. OF ALABAMA

Page 1

1 IN THE UNITED STATES DISTRICT COURT

2 FOR THE NORTHERN DISTRICT OF ALABAMA

3 MIDDLE DIVISION

4

5

6 CASE NUMBER: 4:15-cv-1152-VEH

7

8

9 MICHELLE LEE HELM,

10 Plaintiff,

11

12 vs.

13

14 RAINBOW CITY, ALABAMA, et al.,

15 Defendants.

16

17

18

19 DEPOSITION OF GEORGE MORRIS

20 DATE TAKEN: May 19, 2016

21

22

23

Page 2

1 In accordance with Rule 5(d) of The

2 Alabama Rules of Civil Procedure, as amended,

3 effective May 15, 1988, I Beth C. Word, am

4 hereby delivering to Mr. H. Gregory Harp the

5 original transcript of the oral testimony

6 taken on the 19th day of May 2016, along with

7 exhibits.

8

9 Please be advised that this is the

10 same and not retained by the Court Reporter,

11 nor filed with the Court.

12

13

14

15 S T I P U L A T I O N S

16 IT IS STIPULATED AND AGREED by and

17 between the parties through their counsel,

18 that the deposition of GEORGE MORRIS may be

19 taken before Beth C. Word, Commissioner, at

20 the Law Office of Clark Hall, 750 Forrest

21 Avenue, Gadsden, Alabama, on the 19th day of

22 May 2016.

23

Page 3

1 IT IS FURTHER STIPULATED AND AGREED

2 that the signature to and the reading of the

3 deposition by the witness is waived, the

4 deposition to have the same force and effect

5 as if full compliance had been had with all

6 laws and rules of Court relating to the

7 taking of depositions.

8

9 IT IS FURTHER STIPULATED AND AGREED

10 that it shall not be necessary for any

11 objections to be made by counsel to any

12 questions except as to form or leading

13 questions, and that counsel for the parties

14 may make objections and assign grounds at the

15 time of the trial, or at the time said

16 deposition is offered in evidence, or prior

17 thereto.

18

19 IT IS FURTHER STIPULATED AND AGREED

20 that the notice of filing of the deposition

21 by the Commissioner is waived.

22

23

Page 4

1 APPEARANCES

2

3 FOR THE PLAINTIFF:

4

5 GREGORY HARP, LLC

6 BY: Mr. H. Gregory Harp and

7 Mr. Moses Stone

8 ADDRESS: 459 Main Street

9 Suite 101-266

10 Trussville, Alabama 35173

11 (205) 544-3132

12

13

14 FOR THE DEFENDANT:

15

16 FORD, HOWARD & CORNETT, P.C.

17 BY: Mr. H. Edward Howard

18 ADDRESS: 140 South Ninth Street

19 Gadsden, Alabama 35901

20 (256) 546-5432

21

22

23

Page 5

1   STUBBS, SILLS & FRYE, P.C.
2   BY: Mr. C. David Stubbs
3   ADDRESS: 1724 South Quintard Avenue
4   Anniston, Alabama 36201
5   (256) 835-5050
6
7
8   F&B LAW FIRM, P.C.
9   BY: Ms. Allison B. Chandler
10   ADDRESS: 213 Greene Street
11   Huntsville, Alabama 35801
12   (256) 536-0095
13
14
15
16
17
18
19
20
21
22
23       INDEX

Page 6

1
2 EXAMINATION BY:       PAGE NUMBER:
3 Mr. Harp       8
4
5
6
7 EXHIBITS:
8 PX- 1 - Statement of Kimbrough   40
9 PX- 2 - Statement of Morris   42
10 PX- 3 - Statement of Gilliland   42
11 PX- 4 - Morris Use of Force Form   73
12 PX- 5 - Amended Complaint   110
13 PX- 6 - Taser Information   123
14 PX- 7 - Photo   127
15 PX- 8 - Photo   128
16 PX- 9 - Photo   128
17 PX-10 - Photo   129
18 PX-11 - Answers to Interrogatories   131
19
20
21
22
23

Page 7

1   I, BETH C. WORD, a Court Reporter of
2 Gadsden, Alabama, acting as Commissioner,
3 certify that on this date, as provided by the
4 Alabama Rules of Civil Procedure and the
5 foregoing stipulation of counsel, there came
6 before me at the Law Office of Clark Hall,
7 750 Forrest Avenue, Gadsden, Alabama,
8 beginning at 2:30 p.m., GEORGE MORRIS,
9 witness in the above cause, for oral
10 examination, whereupon the following
11 proceedings were had:
12
13   THE COURT REPORTER: Usual
14 stipulations?
15   MR. HARP: Yes.
16   MS. CHANDLER: Yes.
17   MR. STUBBS: Yes.
18   MR. HOWARD: Yes.
19
20   GEORGE MORRIS,
21 being first duly sworn, was
22 examined and testified as follows:
23   EXAMINATION BY MR. HARP:

Page 8

1   Q. All right. Would you state your
2 full name for the record, please?
3   A. It's George Henry Morris, Junior.
4   Q. Okay. Mr. Morris, my name is Greg
5 Harp and I represent Michelle Helm and her
6 minor daughter, T.H., along with Moses Stone.
7 Have you ever given a deposition before?
8   A. Yes.
9   Q. And when did you give that
10 deposition?
11   A. It's been several years ago. I
12 worked for Gadsden police at the time. I
13 can't remember the year. It's probably been
14 ten years ago or more than ten years ago.
15 Maybe twelve, thirteen.
16   Q. Okay. Given the lapse of time, I'm
17 just going to go over a couple of ground
18 rules that we generally have in a deposition.
19 The first thing is, you're doing really great
20 about answering the questions out loud
21 because the court reporter has to take down
22 what we're saying.
23   She cannot take down head nods, so

1 if you would, just respond verbally. Anytime
2 you need to take a break, let me know and
3 we'll take a break. And if you don't
4 understand a question that I ask, please do
5 not answer the question. Just ask me to
6 rephrase it, and I will be happy to do that.
7 Okay?
8    A.  Okay.
9    Q.  Because if you answer that
10 question, then I'm going to assume that you
11 understood the question that I asked.
12    A.  Okay.
13    Q.  And you understand that you're
14 under oath here just like you would be if we
15 were inside a courtroom?
16    A.  Yes.
17    Q.  All right. You said that you gave
18 a deposition when you worked for the Gadsden
19 police.
20    A.  Yes.
21    Q.  Tell me what that case was about.
22    A.  It was a case brought on by Jerry
23 Travis Yates. He accused myself and Scott

1 Farris and Clark Hopper of excessive force.
2    Q.  And about what year was that?
3    A.  I'm going to say '93 is when the
4 incident happened, but it went on for
5 years.
6    Q.  Did he sue you around '94, '95,
7 somewhere around there?
8    A.  Somewhere around there.
9    Q.  And you said it went on for
10 years?
11    A.  Yeah. I will be specific. It was
12 a domestic situation. He had left. We
13 arrested him. He fought. He claims we broke
14 his leg. We had a trial that went on for
15 three days in Etowah County court.
16       It was all misdemeanor charges. He
17 was convicted on everything. He actually
18 went to prison. And then he was acting as
19 his own attorney. So he was suing us from
20 prison. And, you know, he would send us
21 something every six months, and we would have
22 to respond to whatever he asked us and send
23 it back.

1    Q.  Okay. And did he take your
2 deposition?
3    A.  No. He actually died in prison.
4 And I believe his mother picked up the
5 case.
6    Q.  His estate picked up the case.
7    A.  Yes.
8    Q.  And then she probably hired an
9 attorney.
10    A.  Yes.
11    Q.  And then that attorney took your
12 deposition?
13    A.  Yes.
14    Q.  Do you recall the name of the
15 attorney that took your deposition?
16    A.  No, I do not. It was actually at
17 Cliff Callis' office in Rainbow City. And
18 they were from Birmingham.
19    Q.  Now, what was the outcome of that
20 case?
21    A.  They settled with him.
22    Q.  When you say they, do you mean --
23    A.  The City of Gadsden settled with

1 them.
2    Q.  Did you settle?
3    A.  No.
4    Q.  Did you win at trial?
5    A.  Yes.
6    Q.  You won at trial.
7    A.  Yes.
8    Q.  So there was a trial?
9    A.  As far as a civil case goes?
10    Q.  Yes.
11    A.  No. There wasn't a trial. Do I
12 need to be more specific here?
13    Q.  Well, I just need to know whether
14 you had to pay any money.
15    A.  I didn't have to pay any money.
16 They gave him ten thousand dollars to get rid
17 of them, the family. And that's what they
18 got. And they gave us a letter stating that
19 we did nothing wrong, but they weren't going
20 to keep pursuing this for years. And so they
21 paid him ten thousand dollars.
22    Q.  Okay. So you did settle with him.
23    A.  They settled, the City.

1      Q.   So you don't consider that to be a
2  settlement on your behalf?
3      A.   On my behalf.
4          MR. STUBBS:  And for the record, he
5  may not have been the officer that --
6          THE WITNESS:  I was never accused
7  of excessive force.  The other two officers
8  were.  I was the arresting officer.
9
10     Q.   So what were you sued for?
11     A.   I was involved in the arrest, but I
12 never struck him.  I never did anything other
13 than arrest him.
14     Q.   Okay.  Were you let out of the case
15 before they settled?
16     A.   No.  I was the arresting officer.
17     Q.   And his name was Jerry Yates?
18     A.   Jerry Travis Yates.
19     Q.   Okay.  Any other depositions that
20 you've given?
21     A.   Yes, workers' comp.
22     Q.   Workers' comp?
23     A.   I forgot all about that one.  I'm

1  sorry.
2      Q.   That's okay.  And I assume you had
3  a claim?
4      A.   Yes.
5      Q.   And where were you working when you
6  made --
7      A.   I was at Rainbow City.  I actually
8  forgot about that one.  I'm sorry.
9      Q.   That's okay.  So you had a workers'
10 comp claim.
11     A.   Yes.
12     Q.   And you were working for the
13 Rainbow City Police Department.
14     A.   Yes, I was.
15     Q.   What year was that?
16     A.   2011 was the incident.
17     Q.   What was the injury?
18     A.   I got T-boned in my police car.
19     Q.   And as a result of that, you filed
20 a workers' comp claim?
21     A.   Yes.
22     Q.   And you had to give a deposition?
23     A.   Yes.

1      Q.   Do you recall who represented you
2  in your workers' comp claim?
3      A.   Thomas Davis.
4      Q.   And were you given workers' comp as
5  a result of your injury?
6      A.   Yes.
7      Q.   Now, when did you work for the
8  Gadsden Police Department, what years?
9      A.   1992 to 2003.
10     Q.   And prior to working for the
11 Gadsden Police Department, what job, if any,
12 did you have?
13     A.   I actually worked at Ohatchee
14 Police Department.
15     Q.   What years did you work at
16 Ohatchee?
17     A.   November of '91 until June of '92.
18     Q.   Have you worked for any other
19 police departments besides Ohatchee, Gadsden
20 and Rainbow City?
21     A.   The Lincoln Police Department.
22     Q.   When did you work for the Lincoln
23 Police Department?

1      A.   From 2003 until 2005.  It might
2  have been 2006.  I'm sorry.
3      Q.   Okay.  Any other departments that
4  you've worked for?
5      A.   Rainbow City.
6      Q.   Rainbow City.  And that was in 2006
7  you started there?
8      A.   2007.
9      Q.   2007.  What did you do between 2006
10 and 2007?
11     A.   I actually took a break.
12     Q.   What's the highest rank you held at
13 Ohatchee Police Department?
14     A.   Just a patrolman.
15     Q.   What's the highest rank you held at
16 the Gadsden Police Department?
17     A.   Detective.
18     Q.   Did you also work as a patrolman at
19 the Gadsden Police Department?
20     A.   Yes.
21     Q.   What's the highest rank you've held
22 at the Rainbow City Police Department?
23     A.   Lieutenant.

Q.   What's the highest rank you held at the Lincoln Police Department?

A.   Captain.

Q.   Did you have any other ranks at the Lincoln Police Department outside of Captain?

A.   Lieutenant.

Q.   Lieutenant.  And have you been a patrolman in Rainbow City?

A.   Yes.

Q.   And then you became a Sergeant?

A.   Yes, sir.

Q.   And you became Lieutenant --

A.   Yes.

Q.   -- this year?

A.   Last year, December.

Q.   December of last year?

A.   Yes.

Q.   How long did you work as a Sergeant at Rainbow City?

A.   I'm guessing six years.  Five, six years.

Q.   So from about --

A.   2010 to 2015.

Q.   Okay.  And then from 2007 to 2010, were you a patrolman?

A.   Yes, sir.

Q.   Okay.  Did you ever have any complaints against you while working at the Ohatchee Police Department for excessive force?

A.   No.

Q.   Did you ever have any complaints against you while working at the Lincoln Police Department for excessive force?

A.   No.

Q.   Did you ever have any complaints against you outside of the one we talked about for excessive force while working at the Gadsden Police Department?

A.   No.

Q.   And is the Jerry Yates lawsuit the only time you've been sued for excessive force?

A.   Yes.

Q.   Have you been sued for anything

else?

A.   No.

Q.   Have you had any complaints lodged against you at all at the Rainbow City Police Department?

A.   No, sir.

Q.   Did you have to take an exam to become a Lieutenant for the Rainbow City Police Department?

A.   No, sir.

Q.   Did you have to take an exam to become Sergeant at the Rainbow City Police Department?

A.   Yes.

Q.   And is that the Sergeant's exam?  Is that what it's called?

A.   Yes, sir.

Q.   And you took that prior to 2010 or in 2010?

A.   It could have been 2009 maybe, 2010.  I'm not sure.

Q.   Who is your current immediate supervisor at the Rainbow City Police

Department?

A.   Chief Jonathan Horton.  Can I go back?

Q.   Sure.

A.   Deputy Chief, but he's acting Chief right now.

Q.   And how long has Deputy Chief Horton been the acting Chief?

A.   A month and a half.

Q.   And who was the Chief prior to Deputy Chief Horton?

A.   Chief Greg Carroll.

Q.   Did Greg Carroll retire?

A.   Greg Carroll is on administrative leave.

Q.   Do you know why Greg Carroll is on administrative leave?

A.   No, sir.

Q.   How were you made aware that Greg Carroll was placed on administrative leave?

A.   The officer that actually asked him to go home and took his badge and gun told me.

1  Q.  Who was that?
2  A.  Lieutenant Scott Holderfield.
3  Q.  Did he tell you why?
4  A.  No.
5  Q.  Have you testified in court
6 before?
7  A.  Yes, sir.
8  Q.  When was that?
9  A.  In municipal court, probably a few
10 months ago.
11  Q.  And that's because you've arrested
12 someone and their trial date is coming up?
13  A.  It was contesting a speeding
14 ticket.
15  Q.  Okay.  What vehicle are you issued
16 by the Rainbow City Police Department?
17  A.  It's a 2013 Dodge Charger.
18  Q.  Is that the vehicle that you were
19 issued in 2015?  Did you have that vehicle in
20 2015?
21  A.  Yes.
22  Q.  Did you have that vehicle in
23 January of 2015?

1  A.  Yes.
2  Q.  Were you working security at Center
3 Stage on January 16, 2015?
4  A.  Yes, I was.
5  Q.  Can you tell me how you came to be
6 working security at Center Stage on January
7 16, 2015?
8  A.  Chief Greg Carroll told me I would
9 be working security.
10  Q.  When you say Chief Greg Carroll
11 told you you would be working security, did
12 he ask you to work security?
13  A.  He ordered me in my shift.
14  Q.  He ordered you to?
15  A.  Yes.
16  Q.  Tell me how that happened.
17  A.  He said they needed six officers.
18 I would be there and my shift would be there.
19 That was our off weekend.
20  Q.  Were you paid overtime?
21  A.  No.  We were paid through Center
22 Stage.
23  Q.  So your testimony is that Chief

1 Greg Carroll -- at that time, he was the
2 Chief of Police for Rainbow City, right?
3  A.  Yes.
4  Q.  He ordered you to work security at
5 Center Stage.
6  A.  Yes.
7  Q.  But you were not paid overtime.
8  A.  No, sir.
9  Q.  But you were paid through Center
10 Stage.
11  A.  Yes.
12  Q.  How were you paid, in cash or
13 check?
14  A.  Cash.
15  Q.  Who paid you?
16  A.  Jeremy.
17  Q.  Who is Jeremy?
18  A.  I believe he was the concert
19 promoter.
20  Q.  Did you report that cash that you
21 were paid by Jeremy to Rainbow City?
22  A.  No, I did not.
23  Q.  Are you required to?

1  A.  I don't believe so.
2  Q.  Did you object to having to work a
3 security detail on your off day?
4  A.  I did not raise a big stink about
5 it.  I knew they were short of officers.  And
6 basically, it wasn't like, I'm ordering you
7 right now to be over there.  It was like, we
8 need you to work over there.  I didn't want
9 to, but I did.  And my guys did too.
10  Q.  Did you feel like you had to
11 because it was the Chief telling you?
12  A.  Yes.
13  Q.  How many guys were on your shift?
14  A.  Two other officers.
15  Q.  Who were they?
16  A.  Camp Yancey and Tim Kimbrough.
17  Q.  And is it true that on any given
18 shift currently in Rainbow City, there is
19 going to be three officers?
20  A.  Yes, sir, or usually two officers
21 and a --
22  Q.  Shift supervisor, right?
23  A.  Yes, sir.

Page 25

1    Q.   And on the night of January 16,
2  2015, John Bryant was the shift supervisor,
3  correct?
4    A.   Yes, sir.
5    Q.   And do you know the names of the
6  two officers who were his officers?
7    A.   Jamichael Bonner and Austin Garmon.
8    Q.   Do you know who Gary Morgan is?
9    A.   Yes, sir.
10   Q.   Who is Gary Morgan?
11   A.   He was an officer that used to work
12 for the Rainbow City Police Department.
13   Q.   Do you know what shift Gary Morgan
14 worked?
15   A.   I believe he worked day shift.  And
16 I'm not sure, but Nick Gaskin, Sergeant
17 Gaskin may have been his supervisor at the
18 time.
19   Q.   Nick Gaskin?
20   A.   Gaskin, G-a-s-k-i-n.
21   Q.   Is it possible that his supervisor
22 would have been Mr. Spurling?
23   A.   Quite possibly.

Page 26

1    Q.   Okay.  So you are at Center Stage.
2  When you got to Center Stage, how did you
3  know what area of Center Stage to work?
4    A.   I believe Jeremy told the Chief
5  where he wanted people.  And I actually took
6  the front upstairs overhang.
7    Q.   Now, this Jeremy, does he work for
8  the City?
9    A.   No, sir.
10   Q.   Do you know why Jeremy was
11 instructing the Chief on where to put his
12 personnel?
13   A.   I have no clue.
14   Q.   Did you have any thoughts on
15 that?
16   A.   No, sir.
17   Q.   How much were you paid to work
18 security at Center Stage on the night of
19 January 16, 2015?
20   A.   I believe it was twenty-five
21 dollars an hour cash.  And we worked five
22 hours.  So it was a hundred and twenty-five
23 dollars.

Page 27

1    Q.   A hundred and twenty-five
2  dollars?
3    A.   Yes, sir.
4    Q.   Now, had you worked security at
5  Center Stage before --
6    A.   Yes.
7    Q.   -- prior to January 16, 2015?
8    A.   Yes.
9    Q.   Has it always been twenty-five
10 dollars an hour?
11   A.   I can't remember.
12   Q.   Have you been paid each time you
13 worked security at Center Stage?
14   A.   Yes.
15   Q.   How do you report that on your
16 taxes?
17   A.   I didn't report it.
18   Q.   Were you issued a Taser by the
19 Rainbow City Police Department?
20   A.   Yes.
21   Q.   When were you first issued a
22 Taser?
23   A.   I'm thinking it was in 2007 when I

Page 28

1  was hired.
2    Q.   When you were issued the Taser in
3  2007, did you receive any type of classes on
4  the proper use of the Taser from Rainbow
5  City?
6    A.   Yes.
7    Q.   Who taught that class?
8    A.   Captain Chase Jenkins.
9    Q.   Chase Jenkins, is he employed with
10 the Rainbow City Police Department?
11   A.   No, sir.
12   Q.   Was he employed with the Rainbow
13 City Police Department in 2007?
14   A.   Yes.
15   Q.   Do you know why he is no longer
16 employed with the Rainbow City Police
17 Department?
18   A.   He resigned from the police
19 department.
20   Q.   Do you know why he resigned?
21   A.   No, sir.
22   Q.   Did he resign, or did he get
23 fired?

Page 29

1   A.   He resigned.
2   Q.   When is the last time you spoke to
3 Chase Jenkins?
4   A.   Probably December of 2015.
5   Q.   December of 2015.  Was that before
6 or after he resigned from the police force?
7   A.   That was before.
8   Q.   Who is the current Captain at the
9 Rainbow City Police Department?
10   A.   We do not have one.
11   Q.   So you don't have a Chief and you
12 don't have a Captain?
13      MR. STUBBS:  Object to the form.
14
15   A.   No, sir.
16   Q.   Is that right?  You don't have a
17 Chief?
18   A.   We have a Chief.
19   Q.   Well, you have an acting Chief.
20   A.   Well, acting Chief.  Deputy Chief.
21   Q.   All right.  So you don't have a
22 Chief; is that right?
23      MR. STUBBS:  Object to the form.

Page 30

1
2   Q.   You can answer.
3   A.   We assume he's our Chief.
4   Q.   You assume he's your Chief.
5   A.   Yes, sir.
6   Q.   And you don't have a Captain,
7 correct?
8   A.   No, sir.
9   Q.   How many Lieutenants do you have?
10   A.   There is two Lieutenants.
11   Q.   And you became a Lieutenant in
12 December of 2015, right?
13   A.   Yes.
14   Q.   Who is the other Lieutenant?
15   A.   Lieutenant Scott Holderfield.
16   Q.   And how long has he been a
17 Lieutenant?
18   A.   He got promoted the same day as me.
19   Q.   In 2015?
20   A.   Yes, sir.
21   Q.   So were you two replacing someone
22 who had left the force?
23   A.   No, sir.

Page 31

1   Q.   There were no Lieutenants at that
2 point?
3   A.   No, sir.
4   Q.   Was there a position available for
5 Lieutenant within the Rainbow City Police
6 Department?
7   A.   Yes.
8   Q.   And they were just unfilled?
9   A.   They were just unfilled.
10   Q.   How long had those positions been
11 unfilled?
12   A.   Since I've been there.
13   Q.   Which was 2007, correct?
14   A.   Correct.
15   Q.   So since 2007, there have not been
16 Lieutenants in the --
17   A.   No.  Let me back this up.  We did
18 have a Lieutenant and a Captain.  And when
19 they retired, they never filled those
20 positions.  It's been a while since we've had
21 Lieutenants.  It was like all Sergeants, a
22 Captain and a Chief.
23   Q.   Well, you had a Captain because

Page 32

1 Jenkins didn't retire, he resigned.
2   A.   He resigned.
3   Q.   So Jenkins became Captain at some
4 point, right?
5   A.   When he got promoted to Captain, we
6 had a Chief and a Captain and all Sergeants.
7   Q.   All Sergeants.
8   A.   Yes, sir.
9   Q.   And you were a Sergeant at that
10 time?
11   A.   Yes.
12   Q.   Holderfield was a Sergeant at that
13 time?
14   A.   Yes.
15   Q.   Braswell was a Sergeant at that
16 time?
17   A.   No.
18   Q.   No, he wasn't?
19   A.   No.
20   Q.   Is he a Sergeant now?
21   A.   Yes, he is.
22   Q.   Has everyone been promoted in the
23 Rainbow City Police Department within the

1 last year?

2    A. No.

3    Q. Well, Gilliland has been promoted

4 to Detective within the last year, right?

5    A. I think he was a Detective prior to

6 that.

7    Q. Okay. Well, Yancey has been

8 promoted within the last year.

9    A. He's moved up to investigations.

10    Q. And Yancey has only been on the

11 police force for three years, right?

12    A. Almost five, I believe.

13    Q. All right. And you've been

14 promoted within the last year.

15    A. Yes.

16    Q. And Holderfield has been promoted

17 within the last year.

18    A. Yes.

19    Q. And this Deputy Chief, did he come

20 from the outside?

21    A. Yes.

22    Q. So he came in fresh, right?

23    A. Yes.

1    Q. Have there been any meetings in the

2 Rainbow City Police Department in which it

3 was said, hey, we're about to revamp this

4 police department?

5    A. No, sir.

6    Q. Has anyone talked about changing

7 the culture within the Rainbow City Police

8 Department to you?

9    A. I don't understand the question.

10    Q. Well, has anyone said that there

11 are problems within the Rainbow City Police

12 Department that we need to fix?

13    A. To me?

14    Q. Yes, sir.

15    A. No, sir.

16    Q. Has anyone said that in a meeting

17 in which you attended?

18    A. No, sir.

19    Q. Have you heard from anyone else

20 that they were told that there were problems

21 within the Rainbow City Police Department?

22    A. No, sir.

23    Q. Do you have issued to you an SOP

1 manual?

2    A. Yes, sir.

3    Q. Where do you keep your SOP manual?

4    A. It's in my desk at work.

5    Q. At work?

6    A. Yes, sir.

7    Q. Do you have issued to you the

8 policy on the use of force for the Rainbow

9 City Police Department?

10    A. Yes.

11    Q. And where is it kept?

12    A. In the SOP manual.

13    Q. In the SOP manual. So it's part of

14 the manual.

15    A. It's part of the manual.

16    Q. When is the last time you reviewed

17 the use of force policy for the Rainbow City

18 Police Department?

19    A. I'm going to say probably six

20 months ago.

21    Q. Six months ago?

22    A. Yes, sir.

23    Q. And what led you to review the use

1 of force policy six months ago?

2    A. When my squad came in, my officers

3 came in, we would read a policy.

4    Q. You would read a policy?

5    A. Out of the SOP.

6    Q. Did you just pick a policy?

7    A. It would just depend, whether it be

8 pursuits -- and that was use of force. And

9 we would go over it. And I would ask them

10 questions about it and then explain our

11 policy to them.

12    Q. Is there a part of the use of force

13 policy for Rainbow City that relates to the

14 use of a Taser weapon?

15    A. I don't know if it specifically

16 says Taser or if it says -- I don't believe

17 it specifically says Taser. I think it comes

18 after verbal commands and soft empty hands.

19    Q. What comes after verbal commands

20 and soft empty hands?

21    A. You can Taser somebody if they're

22 not complying with your verbal commands.

23    Q. But that comes after verbal

1 commands, right?

2    A.  Yes.

3    Q.  And that comes after soft empty

4 hands, right?

5    A.  No, that's prior to.  That falls

6 right under soft empty hands.

7    Q.  So you can Taser someone before you

8 use soft empty hands on them?

9    A.  Well, we call that soft empty

10 hands, hard empty hands.  Hard empty hands

11 would be having a baton --

12    Q.  Or a Taser.

13    A.  I think it falls under soft.  I

14 don't have the policy in front of me, but I'm

15 almost positive it falls under after verbal

16 commands.

17    Q.  You're the police officer, so I

18 just want to be sure I'm clear on this.  Hard

19 empty hands means -- what are you saying,

20 hard empty hands?

21    A.  Striking somebody with a baton.

22    Q.  With a baton.  All right.  And then

23 what's after that?

1    A.  Would be deadly force.

2    Q.  Okay.  So you're saying you think

3 the Taser comes before soft empty hands?

4    A.  No.  The Taser falls under soft

5 empty hands.

6    Q.  Oh, you're saying it falls under --

7    A.  It's part of soft empty hands.

8    Q.  Okay.  I understand what you're

9 saying now.  Okay.  So when you say not

10 complying with commands, are you referring to

11 suspects not complying with commands?

12    A.  Yes.

13    Q.  And you understand you've been sued

14 in this case, correct?

15    A.  Yes.

16    Q.  And you understand you've been sued

17 by Michelle Helm on behalf of her minor

18 daughter because you allegedly Tased T.H. two

19 times at Center Stage on January 16, 2015.

20    A.  That's incorrect.

21    Q.  What's incorrect about that?

22    A.  I Tased her one time.

23    Q.  Well, tell me how that happened.

1    A.  How did I Tase her?

2    Q.  Yes.

3    A.  There was people out in the

4 entryway of Center Stage.  I came up, and she

5 was on the ground kicking officers,

6 screaming, thrashing around.  I gave her the

7 command to stop it.  You need to stop right

8 now.

9       I grabbed her leg, I believe, after

10 she kicked one of my officers, Tim Kimbrough.

11 She was bucking up, thrashing, trying to pull

12 away.  And I gave her a command that she

13 needed to settle down or I was going to Tase

14 her.  And she told me to Tase me, mother

15 fucker.

16    Q.  And did you comply?

17       MR. STUBBS:  Object to the form.

18

19    Q.  You can answer.

20    A.  I dry stunned her for about two

21 seconds, two to three seconds one time.

22    Q.  Are you aware that Officer Justin

23 Gilliland -- was he present when you drive

1 stunned her?

2    A.  Yes.

3    Q.  And you said you were holding her

4 leg?

5    A.  When she kicked Officer Kimbrough,

6 I grabbed her leg.

7    Q.  Have you read a statement from

8 Officer Kimbrough?

9    A.  No, Sir.

10    Q.  I'm going to show you what I will

11 mark as Plaintiff's Exhibit Number 1 to your

12 deposition.  And each time I do this, I will

13 slide it across the table to show your

14 Counsel.

15

16       (Plaintiff's Exhibit Number 1 was

17 marked for identification and same is

18 attached hereto.)

19

20    A.  (Witness reviewing document.)

21    Q.  Did you have a chance to read

22 that?

23    A.  Yes, I did.

Q.   Okay.  Do you know who Jimmy
Fazekas is?
A.   Yes, I do.
Q.   Who is that?
A.   A former employee of the Rainbow
City Police Department.
Q.   What was his rank?
A.   Patrolman, I believe, or Detective.
Q.   Do you know?
A.   I'm not sure.  I think he might
have been a Detective at that time.
Q.   Was he present when you drive
stunned T.H.?  And when I say T.H., I'm
referring to the minor daughter of Michelle
Helm, the Plaintiff in this case.
A.   I honestly don't know.
Q.   Now, have you read the statement of
Justin Gilliland?
A.   No, Sir.
Q.   I'm going to show you what I will
mark as Plaintiff's Exhibit Number 2 to your
deposition, which is the statement of Justin
Gilliland concerning the events that occurred

on the night of January 16, 2015.

     (Plaintiff's Exhibit Number 2 was
marked for identification and same is
attached hereto.)

A.   (Witness reviewing document.)
Q.   Oh, let me have that back.  That's
actually got a marking on it.  I think I've
got another one here.  Okay.  I'm going to
show you an exhibit that was previously
marked in the deposition of Justin Gilliland.
And it was marked as Plaintiff's Exhibit
Number 3 in Justin Gilliland's deposition.

     (Plaintiff's Exhibit Number 3 was
marked for identification and same is
attached hereto.)

A.   (Witness reviewing document.)
Q.   Have you had a chance to read it?
A.   Yes.
Q.   So is it correct that today is the

first time you have seen a copy of that
statement?
A.   Yes, sir.
Q.   And are there things in that
statement that you disagree with?
A.   Yes.
Q.   And what do you disagree with in
the statement?
A.   I disagree with the fact that he
said I Tased her twice.
Q.   I guess you're talking about on
page two when he says, I then witnessed
Sergeant Morris drive stun the female again.
A.   Yes.
Q.   So you think when he wrote this
statement, he was incorrect about that.
A.   Yes, he was.
Q.   And you never saw the statement so
you didn't have an opportunity to tell him,
hey, I think you got that wrong; is that
right?
A.   I would not have said that.
Q.   What would you have said?

A.   We never talked about this.  I
don't know what I would have said.
Q.   If I tell you that he testified
under oath today that he saw you Tase T.H.,
the minor, twice, what do you say to that?
A.   He's misspoken.  That's all I can
say.
Q.   So you think he was confused when
he wrote this statement back in January of
2015?
     MR. STUBBS:  Object to the form.
     MS. CHANDLER:  Object to the form.

Q.   You can answer.
A.   I don't know if he was confused or
maybe he thought he saw something, but what
he saw was incorrect.
Q.   And according to when this was
dated, 1-22-15, that would be --
A.   A year and a half?  A year and five
months maybe?
Q.   Well, I mean, 1-22-15 would be a
few days after the date of the incident,

1 right?
2    A.  Oh, yes.
3    Q.  So you believe that Detective
4 Gilliland is wrong when he says that he
5 witnessed you Tase T.H. twice.
6    A.  I know he's wrong.
7    Q.  You say you did it once.
8    A.  I did it once.
9    Q.  Was the Chief standing there
10 telling you not to Tase her?
11    A.  No.
12    Q.  Was the Chief there at all?
13    A.  Yes.
14    Q.  Was Gilliland there?
15    A.  Yes.
16    Q.  Are you Sure?
17    A.  I'm positive.
18    Q.  Would it surprise you to learn that
19 the Chief of Police testified yesterday that
20 when he saw you Tase T.H., Gilliland wasn't
21 there?
22       MR. STUBBS:  Object to the form.
23

1    A.  Yes.
2    Q.  Would it surprise you to learn that
3 when Gilliland testified today that he saw
4 you Tase T.H. twice, the Chief wasn't there?
5       MR. STUBBS:  Object to the form.
6       MS. CHANDLER:  Object to the form.
7
8    A.  Yes.
9    Q.  So you're saying that both
10 Gilliland and Carroll were present when you
11 drive stunned T.H.
12    A.  Yes.  To the best of my
13 recollection, he was there, Gilliland.  The
14 Chief was there, and Officer Kimbrough was
15 there and a bunch of other people.
16    Q.  Were those people police officers?
17    A.  Fazekas was there for a moment.
18 And then they had something going on outside.
19    Q.  Was Fazekas there when you drive
20 stunned T.H.?
21    A.  I honestly don't know.  Fazekas was
22 not down on the ground trying to restrain
23 her.  He was above.

1    Q.  He was standing up?
2    A.  He was standing up.
3    Q.  Where were you?
4    A.  I was towards her left front leg.
5    Q.  Standing or kneeling?
6    A.  I was standing initially.
7    Q.  Initially.  At some point, you
8 kneeled?
9    A.  Yes.
10    Q.  When?
11    A.  When she was kicking Officer
12 Kimbrough.
13    Q.  Was she kicking Officer Kimbrough?
14    A.  She did kick Officer Kimbrough.
15    Q.  Did he put that in his report that
16 we marked?
17    A.  No, he didn't.
18    Q.  Are you sure she kicked Officer
19 Kimbrough?
20    A.  To the best of my recollection, she
21 did kick Officer Kimbrough.
22    Q.  But that's not saying you're sure.
23 That's to the best of your recollection.  My

1 question is, are you sure she kicked Officer
2 Kimbrough?
3    A.  I believe she did.
4    Q.  But he didn't put it in his report,
5 did he?
6    A.  No, he didn't.
7    Q.  So when did you kneel?
8    A.  When I saw that, when she kicked
9 him.  And I told her she needed to settle
10 down or I was going to Tase her.
11    Q.  How many times did you tell her to
12 settle down?
13    A.  I can't honestly remember.  It
14 could have been once.  It could have been
15 three.  I don't know.
16    Q.  Where were you just prior to coming
17 up on T.H. on the ground?
18    A.  I was out in the crowd.
19    Q.  When you came up on T.H. out of the
20 crowd, did they tell you that she was having
21 seizures?
22    A.  No, sir.
23    Q.  Did you know that?

1    A.   No.
2    Q.   Would you have Tased her if you had
3 known that?
4    A.   Based on what I saw?
5    Q.   Yeah.
6    A.   Yes.  I would have Tased her.
7    Q.   Okay.  So your testimony is, you
8 did not know she was having seizures.  But
9 based upon what you saw, even if you had
10 known she was having seizures, you would have
11 still Tased her?
12    A.   Based on what I know?
13    Q.   No.  Based upon what you saw and
14 then Tased her.
15    A.   What I saw, I saw an out of control
16 female.
17    Q.   Do you know why she was out of
18 control?
19    A.   I have no idea.  She could have
20 been under the influence of drugs, alcohol or
21 both.
22    Q.   But she wasn't.
23       MR. STUBBS:  Object to the form.

1
2    A.   I don't know.
3    Q.   And you didn't know what was wrong
4 with her, right?
5    A.   I'm not a doctor.
6    Q.   You just pulled out your Taser and
7 drive stunned her; is that right?
8       MR. STUBBS:  Object to the form.
9
10    A.   It didn't happen like that.
11    Q.   Well, did you pull out your Taser?
12    A.   I did pull out my Taser.
13    Q.   Did you drive stun her?
14    A.   I warned her to settle down and
15 quit fighting, spitting and biting.
16    Q.   Okay.  You just pulled out your
17 Taser and warned her you would Tase her --
18    A.   Yes.
19    Q.   -- and then Tased her.
20    A.   Yes, I did.
21    Q.   Without finding out -- did you ever
22 ask, why are you guys holding her down, what
23 did she do?

1    A.   Unfortunately, police officers, we
2 make split second decisions.  And I stand by
3 my decision to dry stun her.
4    Q.   What about the second time you dry
5 stunned her?
6    A.   I didn't dry stun her a second
7 time.
8    Q.   According to Detective Gilliland,
9 you did.
10       MR. STUBBS:  Object to the form.
11
12    A.   He's misspoken.
13    Q.   Did he misspeak under oath today if
14 he said that?
15    A.   He must have.
16    Q.   What is your relationship like with
17 Detective Gilliland?
18    A.   He's a friend of mine.
19    Q.   Have you discussed the incident at
20 Center Stage at all?
21    A.   No, sir.
22    Q.   So you're telling me he's a friend
23 of yours, but you haven't discussed this with

1 Detective Gilliland at all.
2    A.   This is not -- until right now --
3 it's important right now, but as far as all
4 the other stuff going on, we still have jobs
5 to do.  And this is a long time ago that this
6 happened.
7    Q.   Well, I mean after it happened.  I
8 don't mean are you still discussing it today.
9 I mean --
10    A.   Well, after it happened, there was
11 so many things going on that night, I don't
12 think we even discussed her.  We put numerous
13 people in jail.  It was going on all around
14 us.
15    Q.   You put four people in jail.
16    A.   Was it four?
17    Q.   It was.
18    A.   I thought it was more.
19    Q.   Okay.  So the answer to my question
20 is, no, you haven't discussed it with
21 Detective Gilliland.
22    A.   No, sir.
23    Q.   Let me show you what we marked as

1  Plaintiff's Exhibit Number 2 to your
2  deposition.  And Exhibit 3 is going to be the
3  exhibit from Detective Gilliland's deposition
4  today.  And I will ask you if you recognize
5  that document.
6      A.  (Witness reviewing document.)  It's
7  my statement.
8      Q.  And when did you write that
9  statement?
10     A.  On January 21st of 2015 at
11  2:00 o'clock.
12     Q.  Why did you write this statement?
13     A.  I was told to write a statement.
14     Q.  Who told you to write a
15  statement?
16     A.  I believe it was Chief Greg
17  Carroll, or it could have been Captain Chase
18  Jenkins.  It was one or the other.  I'm not
19  sure.
20     Q.  Did you write a statement about any
21  of the arrests you made on January 16,
22  2015?
23     A.  I didn't make any arrests.

1      Q.  Did you break up any fights?
2      A.  Yes.
3      Q.  Did you write a statement about
4  that?
5      A.  We didn't arrest anybody.
6      Q.  Did you arrest T.H.?
7      A.  No.
8      Q.  So why did you write a statement
9  about T.H.?
10     A.  I was told to.
11     Q.  Did you ask why?
12     A.  I assume this was coming, or
13  somebody knew that it was coming.
14     Q.  You assumed you were going to get
15  sued?
16     A.  We were going to get sued.
17     Q.  Why would you assume you were going
18  to get sued?
19     A.  They were asking me to write a
20  statement, so something was coming out of it.
21  I'm not sure.
22     Q.  And you said this was Chase Jenkins
23  that asked you to do this?

1      A.  It was either him or the Chief.
2      Q.  Well, I will represent to you that
3  the Chief said he hasn't asked anybody to
4  write a statement.  So could it have been
5  Chase Jenkins?
6          MR. STUBBS:  Object to the form.
7
8      A.  I can't answer that.
9      Q.  So you don't remember who asked you
10 to write a statement.
11     A.  I can't remember.  No, sir.
12     Q.  After you wrote the statement, who
13 did you give it to?
14     A.  Chase Jenkins.
15     Q.  Okay.  You gave the original to
16 Chase Jenkins?
17     A.  Yes.
18     Q.  Now, the second full paragraph, you
19 write, Helms appeared to be having some type
20 of a seizure, and several officers were
21 holding her arms and legs to keep her from
22 flopping around on the ground and possibly
23 hurting herself.  Is that your handwriting?

1      A.  Yes.
2      Q.  Did you write that?
3      A.  Yes.
4      Q.  So earlier when you testified she
5  could have been on drugs or something, that's
6  not what you thought on January 21st, 2015,
7  is it?
8      A.  It doesn't appear to be.
9      Q.  It appears that you thought she was
10 having a seizure that night, doesn't it?
11     A.  She was having something wrong with
12 her.  I put that she was possibly having a
13 seizure.
14     Q.  Okay.  And you put that the
15 officers were holding her arms and legs to
16 keep her from flopping around on the ground,
17 right?
18     A.  Yes.
19     Q.  Were officers holding her arms?
20     A.  I believe so, yes.
21     Q.  Were officers holding her legs?
22     A.  Appears to be, yes.
23     Q.  And why were they holding her arms

1  and legs according to what you wrote?

2      A.  To keep her from flopping around on

3  the ground and possibly hurting herself.

4      Q.  Okay.  I want you to turn to the

5  second page.  No.  Actually, I want to go

6  back.  In parentheses on the seventh line,

7  you have, open paren, T█████ H███s, close

8  paren.  Do you see that?  Seven lines down,

9  middle of the page.

10     A.  Yes.

11     Q.  How did you know the name of the

12 person you Tased on January 21st, 2015?

13     A.  I was told that was her name.

14     Q.  Who told you that?

15     A.  Maybe Sergeant Bryant, John

16 Bryant.

17     Q.  Well, was Sergeant Bryant there

18 when you Tased her?

19     A.  No.

20     Q.  Then how did it come up between you

21 and Sergeant Bryant that the person you Tased

22 was named T████ H████?

23     A.  He had told me he had had calls on

1  them before.  I had never dealt with them

2  before in my life, the family, but they had,

3  the other officers had.  And he was familiar

4  with her.

5      Q.  But why was it a subject of

6  conversation is what I'm asking?  You

7  indicated earlier that there was so much

8  going on that you guys didn't really talk

9  about it.

10     A.  Well, we didn't talk that night.

11     Q.  Well, when did you talk?

12     A.  We talked after the fact, probably

13 Monday.

14     Q.  Monday.  That would have been the

15 19th.

16     A.  Or it could have been this day.  I

17 just can't remember.  You know, he's a friend

18 of mine.  I speak to him.

19     Q.  Who?

20     A.  John Bryant.

21     Q.  So what were you guys talking about

22 that related --

23     A.  We were just talking about what a

1  crazy time that was out there.

2      Q.  Well, how did Ti██ H███ come up?

3      A.  He told me she was a juvenile.  I

4  didn't know she was a juvenile at the time

5  and I had argued the fact.

6      Q.  Why did he tell you she was a

7  juvenile?

8          MR. STUBBS:  Object to the form.

9

10     A.  Because I said we should have put

11 her in jail that night.  She should have went

12 to jail.  And he said she's a juvenile.  She

13 couldn't have gone to jail.

14     Q.  After he told you she was a

15 juvenile, did you feel bad about Tasing her?

16     A.  No.

17     Q.  Do you feel bad today about Tasing

18 her?

19     A.  No.

20     Q.  Okay.  Turn with me to the second

21 page of your statement.  Do you see where it

22 says the woman was told to get back and

23 refused to do so and the officer grabbed the

1  woman who was hysterical and had to forcibly

2  remove her.  At this time, Ti██ He███ came

3  out of her seizure and started trying to

4  attack officers who were trying to help her.

5  Do you see that?

6      A.  Yes, I do.

7      Q.  So there you say she is coming out

8  of a seizure, correct?

9      A.  I did.

10     Q.  And when you wrote that, is that

11 what you believed?

12     A.  No.

13     Q.  So you wrote a lie?

14     A.  It wasn't a lie, but I mean, she

15 appeared to be having a seizure, but I think

16 she was faking the seizure.

17     Q.  Well, how much experience do you

18 have with people faking seizures?

19     A.  I've seen people have seizures.

20     Q.  Have you seen people faking them?

21     A.  No.

22     Q.  Then how would you know the

23 difference?

Page 61

1   A.  Well, her actions -- her actions
2  that night.  Anybody else I've seen have
3  seizures, they come out of the seizure
4  confused, dazed, lethargic, drained.  She
5  didn't.  She came out fighting, cussing,
6  ready to kill.
7   Q.  So that's why you think she was
8  faking.
9   A.  Yes.
10  Q.  Did she try to kill you?
11  A.  No.  She didn't try to kill me, but
12  she probably would have if she could have.
13  Q.  Did she ever lay a hand on you?
14  A.  No.
15  Q.  Did you ever feel threatened by
16  her?
17  A.  No.
18  Q.  But you Tased her.
19  A.  Yes.
20  Q.  And according to Detective
21  Gilliland, you Tased her twice.
22  A.  He misspoke.
23  Q.  Well, he didn't misspeak.  He was

Page 62

1  pretty clear on what he said.
2      MR. STUBBS:  Object to the form.
3
4   A.  We can solve this real quick.
5   Q.  Well, let's do that.  How can we
6  solve it?
7   A.  There is signature marks that a
8  Taser makes when you drive stun somebody.
9   Q.  Absolutely.
10  A.  If there is four of them, then I
11  Tased her twice.  If there is two of them, I
12  Tased her once.
13  Q.  Okay.  Let's see if we can solve
14  this.  What do those marks look like, by the
15  way?
16  A.  Little red, maybe possibly like a
17  mosquito bite.
18  Q.  Does it look something like that?
19  A.  It looks like two red marks.
20  Q.  I see four.  You see two?
21  A.  I see two.
22  Q.  I see four.  I guess it's up for a
23  jury to determine.

Page 63

1   A.  Sure.
2   Q.  But those would be the marks that a
3  Taser would make, right?
4   A.  I can't honestly say if that's them
5  or not because there is not a scale here to
6  tell me how far the prongs were.
7   Q.  Well, we'll have it scaled up by
8  trial.  We can revisit it then.
9   A.  Okay.
10  Q.  But your testimony is that when you
11  are Tased, it leaves two little red marks.
12  A.  Yes.
13  Q.  And it's more visible on a
14  Caucasian than it would be on an African
15  American obviously.
16  A.  Yes.
17  Q.  Where did you Tase T.H.?
18  A.  In the abdomen right here.
19  Q.  Where are those marks?
20  A.  Right here.
21  Q.  Is that the same indication that
22  you made when I asked you where you Tased
23  her?

Page 64

1   A.  Yes.
2   Q.  All right.  Thank you.  Let's go
3  back to your statement.  Now, in your
4  statement, you say she appeared to be coming
5  out of a seizure, but you think that she was
6  faking that, but you wrote it anyway, right?
7  Is that right?
8   A.  Yes.
9   Q.  Did you write in your statement,
10  but I think she was faking?
11  A.  No, I did not.
12  Q.  Did you tell John Bryant you
13  thought she was faking?
14  A.  I can't remember if I told him.  I
15  may have told the Chief.
16  Q.  Well, if I represent to you that
17  the Chief says he hasn't spoken to you about
18  this, does that help your recollection?
19  A.  I think it may have been that night
20  with the way she was acting when she came out
21  of it.  I may have said, you know, she's
22  faking, best actress I've ever seen.  I may
23  have said something like that.

1    Q.   Were you wearing a body camera that
2 night?
3    A.   Yes.
4    Q.   Was it recording?
5    A.   Yes.
6    Q.   Have you seen the footage from that
7 body camera?
8    A.   No, I haven't.
9    Q.   Have you looked at the footage
10 online?
11    A.   No, sir.
12    Q.   Are you familiar with evidence dot
13 com?
14    A.   Yes.
15    Q.   Are you an administrator for
16 evidence dot com?
17    A.   Yes.
18    Q.   Have you logged on to look at that
19 footage?
20    A.   No.
21    Q.   Have you asked anyone to pull that
22 footage?
23    A.   No.  Oh, wait.  Can I back up?

1    Q.   Yes.
2    A.   I asked Detective Gilliland to pull
3 the footage, which I never watched the
4 footage.  Just to give me the date and the
5 time.
6    Q.   Why did you do that?
7    A.   Because the use of force statement
8 that I wrote that Monday following this
9 incident, they couldn't find it.  They didn't
10 have it.
11    Q.   Let me stop you right there because
12 I've got a use of force statement from you.
13 Is there another use of force statement?
14    A.   There was an original.
15    Q.   Where is that use of force
16 statement?
17    A.   I have no idea.
18    Q.   Who did you give it to?
19    A.   Captain Chase Jenkins, along with
20 my statement.
21    Q.   And when you asked for it again,
22 they couldn't find it?
23    A.   Well, I don't know what happened to

1 it.  They just said they didn't have it.
2        MR. HARP:  Ed, you actually
3 produced it to me.  Do you know where the
4 original use of force statement is that he
5 did?
6        MR. HOWARD:  You mean a different
7 one from 1-21-15?
8        MR. HARP:  Yes, sir.
9        MR. HOWARD:  No.  This is the only
10 one I have.
11        MR. HARP:  Did you know that there
12 was one?
13        MR. HOWARD:  No, not until George
14 just said there was one I did or couldn't
15 find or something like that.  But no, to my
16 knowledge, there is one statement from George
17 Morris that has been given to me.
18        MR. HARP:  To your knowledge, but
19 he says there is two statements because you
20 did an original statement.
21
22    Q.   When did you do that statement?
23    A.   I believe it was at the time I did

1 the statement here.
2    Q.   On 1-21?
3    A.   Yes.
4    Q.   I'm sorry.  Your use of force
5 statement was sent to me by email yesterday.
6 Bear with me just one second.
7    A.   Okay.
8    Q.   Now, you think you did the original
9 use of force statement on 1-21?
10    A.   It might have been that Monday when
11 I came back to work.  I'm not sure.
12    Q.   Would that have been the 19th?
13    A.   Possibly.
14    Q.   No, it would have been the 18th.
15 So Tuesday would have been the 19th.  Could
16 it have been on Tuesday?
17    A.   It could have been.
18        MR. HOWARD:  I think the 19th was
19 Monday?
20        MR. HARP:  The 19th was Monday?
21        MR. HOWARD:  Well, one of these
22 statements says Friday night, January 16.
23        MR. HARP:  You're right.  That's

Page 69

1　right.  Thank you.
2
3　　　Q.   Who was your immediate supervisor
4　the night of the concert?
5　　　A.   Chase Jenkins.
6　　　Q.   But he wasn't present, right?
7　　　A.   No, sir.
8　　　Q.   And you didn't have a shift
9　supervisor because you were a Sergeant,
10　right?
11　　　A.   Yes.
12　　　Q.   Now, I've got a use of force form
13　that was completed on 1-16 -- no, I'm sorry.
14　That's the date of the incident.  On
15　1-19-2015.  Now, that's the one that was
16　given to us, but you're saying there is
17　another use of force form that they couldn't
18　find?
19　　　A.   The original.  The original use of
20　force form, I'm not sure who called or they
21　made a note.  I want to say it was Ed Howard.
22　They couldn't find the original.  It was
23　misplaced.  And I asked the Chief if I could

Page 70

1　do another one.
2　　　Q.   And did you do it?
3　　　A.   Yes.
4　　　Q.   When?  That would have been
5　recently, right?
6　　　A.   Recently.
7　　　Q.   Where is that form?
8　　　A.   I don't know.
9　　　MR. HARP:  Ed, what I have is the
10　original --
11　　　MR. HOWARD:  I'll tell you exactly
12　what happened.  In looking through documents,
13　I realized that there was one use of force
14　form from Gary Morgan.  And one of the
15　reasons I was delayed in giving you documents
16　was because that was one of the things I
17　wanted to double check because there should
18　have been another one.
19　　　So I called the clerk at Rainbow
20　City and said I'm looking for this.  It seems
21　like there ought to be one.  And then what I
22　sent to you got sent over to me.  So I don't
23　know what date is on --

Page 71

1　　　MR. HARP:  What you sent to me is
2　dated 1-19.  The Chief signed this on
3　1-19-2015, but he said he did one recently in
4　response to a request from you for a use of
5　force form, which means there should be one
6　dated 2016, correct?
7　　　THE WITNESS:  I guess, yes.
8
9　　　Q.   Well, I mean, the Chief could not
10　have read a statement from you that you did
11　in the last two or three months back in 2015,
12　not to get into the laws of physics or time
13　travel or the space time continuum, but there
14　is no way the Chief signed a document last
15　year that you did last month.
16　　　A.   Yes.
17　　　Q.   So where is the use of force form
18　that you did last month?
19　　　A.   I gave it to our clerk.
20　　　Q.   And that is --
21　　　A.   Vicki Robinson.
22　　　Q.   Vicki Robinson.  And you gave that
23　form to her in response to a request --

Page 72

1　　　A.   Yes.
2　　　Q.   -- from an attorney.
3　　　A.   Yes.
4　　　Q.   Or from someone.
5　　　A.   From someone.
6　　　Q.   And who made the request to you?
7　Was it Chief Carroll?
8　　　A.   No.  I believe I had a note from an
9　attorney.
10　　　MR. HOWARD:  Well, a note from
11　Vicki.
12　　　THE WITNESS:  From where you called
13　and said where was the use of force.  And I
14　said, well, I don't know.  I don't know what
15　happened to it.  Captain Chase Jenkins had it
16　in his box.
17
18　　　Q.   Who signed off on that use of force
19　form?
20　　　A.   The original or the second one?
21　　　Q.   The second one.
22　　　A.   Chief Greg Carroll did.  I don't
23　know who signed off on the original.  I

1  filled it out and put it in the box.
2       MR. HARP:  Well, the original I've
3  got, but I'm going to have to print another
4  copy unless one of you guys have a copy of
5  it.
6       MR. HOWARD:  I've got one sitting
7  on my desk, but I don't think I have one
8  right here in front of me.
9       MR. HARP:  I've got it.  I'll get
10 her to print it out.  Let's take a break.
11
12       (Whereupon, a brief recess was
13        taken.)
14
15     Q.  Okay.  We're back on the record.
16 And I'm going to show you what I will mark as
17 Plaintiff's Exhibit Number 4 to your
18 deposition.  And I'll ask you if you've ever
19 seen that document before.
20
21       (Plaintiff's Exhibit Number 4 was
22 marked for identification and same is
23 attached hereto.)

1
2     A.  (Witness reviewing document.)  Yes,
3  I have.
4     Q.  When is the first time you have
5  seen a copy of this document?
6     A.  I saw it when I did the original,
7  Monday the 19th.
8     Q.  So this is the original use of
9  force form?
10    A.  No, sir.  This is another one that
11 I made because they couldn't find the other
12 one.  What happened is, somebody called and
13 said they couldn't find the original.
14    Q.  But that happened this year,
15 right?
16    A.  Yes.
17    Q.  And then you did another use of
18 force form.
19    A.  Yes.  I did this one.
20    Q.  Turn with me to the second page of
21 this document.  Do you see that signature by
22 Greg Carroll?
23    A.  Yes.

1     Q.  What is the date out there?
2     A.  It's 1-19-15.
3     Q.  Now, is this the first use of force
4  form or the second use of force form?
5     A.  To be honest with you, I'm not sure
6  if this is the first one or the second one.
7     Q.  In any event, there is two.
8     A.  There is two.  I did another one
9  because I couldn't find the original.
10 Captain Jenkins, any use of force you turned
11 in to him.  And when this was going on, he
12 had been resigned from the police department.
13 And they cleaned out his office.
14    Q.  Not on 1-19-2015.
15    A.  No, sir.  This is after the fact.
16 And I had asked if it would be okay if I just
17 did another one.
18    Q.  So this has to be the first one.
19    A.  I don't know if this is the first
20 one or the second one.
21    Q.  Well, who do you have as the
22 immediate supervisor?
23    A.  Chase Jenkins.  At that time, he

1  was, at that time.
2     Q.  Did you write his name on the
3  second one you did?
4     A.  Yes.
5     Q.  So you tried to recreate the first
6  one.
7     A.  I tried to recreate the first one
8  with the second one.  I wasn't trying to be
9  sneaky or anything.  They just couldn't find
10 it.
11    Q.  So this could be the second one or
12 it could be the first one.
13    A.  Yes, sir.  I'm not sure.
14    Q.  But if it's the second one and
15 Chief Carroll has put a date that's not
16 correct; is that right?
17    A.  If it's the second one, correct.
18    Q.  Because he's backdated it to the
19 19th of 2015 in January; is that right?
20    A.  Yes.
21    Q.  If it's the second one.
22    A.  If it is.
23    Q.  Now, if this is the first one, then

Page 77

1 that date may be correct; is that right?

2    A. Yes, sir.

3    Q. All right. Now, whichever one this

4 is, is that your handwriting on the form?

5    A. Yes, it is.

6    Q. Do you see where it says Taser,

7 firearm, model type, the first page?

8    A. Yes.

9    Q. Can you tell me why you didn't fill

10 that in?

11    A. Oversight. I don't know why. I

12 really don't.

13    Q. Where you have Taser, firearm

14 serial number, you put X-26 there.

15    A. X-26 Taser.

16    Q. Is that the serial number?

17    A. No, sir, it isn't.

18    Q. That's the model number, correct?

19    A. Yes, it is.

20    Q. So that's actually what should

21 appear in Taser, firearm model and type.

22    A. That's correct.

23    Q. Did anyone review this document to

Page 78

1 say, hey, you have to correct that?

2    A. No, sir.

3    Q. Well, you see on the back where it

4 says reviewed by police Chief. Do you know

5 whether or not he actually reviewed it?

6    A. I honestly can't speak for him. I

7 don't know.

8    Q. All right. Let's go to the bottom

9 of page one.

10    A. Okay.

11    Q. It says name of suspect, T█████

12 Helm. Is that your handwriting?

13    A. Yes.

14    Q. Why was she a suspect?

15    A. Because she was Tasered.

16    Q. So she became a suspect after she

17 was Tasered?

18    A. Because she was the one that was

19 Tasered, she was put down as a suspect.

20    Q. Okay. But she had not committed a

21 crime at the time she was Tasered, right?

22    A. She had committed a crime. She was

23 disorderly.

Page 79

1    Q. Is that a crime?

2    A. Yes.

3    Q. So you believe she had committed a

4 crime.

5    A. Yes.

6    Q. Was she arrested?

7    A. No, she wasn't.

8    Q. Was she charged?

9    A. No, she was not.

10    Q. Was she ever handcuffed?

11    A. I don't believe so.

12    Q. She committed a crime in front of

13 police officers, but she was never

14 handcuffed, charged or arrested.

15    A. Correct.

16    Q. But she was Tasered.

17    A. She was.

18    Q. On the back page, on page two, do

19 you see where it says, describe any other

20 means attempted to control the suspect or

21 subjects. Do you see that?

22    A. Yes.

23    Q. You said, subjects, plural, and I

Page 80

1 think you meant subject, right?

2    A. Subject.

3    Q. Arms and legs were physically held

4 down.

5    A. That's correct.

6    Q. Was that during the Tasing?

7    A. Yes.

8    Q. So at the time that you Tased T█████

9 Helm, according to you one time, her arms and

10 legs were physically held down.

11    A. Yes.

12    Q. Did someone have her head?

13    A. I can't recall.

14    Q. Do you recall Detective Gilliland

15 holding her head?

16    A. I recall him up at the front

17 towards her head. I don't know if he had her

18 shoulders, arms or whatnot. She was bucking

19 around, thrashing, trying to kick.

20    Q. She wasn't kicking or thrashing,

21 was she, because her arms and legs were

22 physically held down?

23    A. She was still bucking up, her body,

1 shaking her head.

2 Q. Could she have been seizing?

3 A. Not at that time, she wasn't.

4 Q. How do you know?

5 A. Based on all the curse words and

6 the acknowledging us coming out of her mouth.

7 Q. That's all you're basing it on?

8 A. Based on her actions. It didn't

9 appear to be anybody seizing. It appeared to

10 be somebody fighting and wanting to fight.

11 Q. Okay. Up above that, were

12 controls, holds employed, yes, no. If yes,

13 what type of holds were used. And you didn't

14 circle yes or no, but you put, officers held

15 suspect by arms and legs. Do you see that?

16 A. I see it, yes. Yes, I do.

17 Q. All right. Up above that, describe

18 the suspect's demeanor after force was used

19 or displayed. The suspect was out of

20 control. She was screaming, fighting and had

21 to be held down forcibly to keep her from

22 hitting officers. Is that what you wrote?

23 A. I did.

1 Q. But she was actually held down

2 before she was Tased, right?

3 A. Yes.

4 Q. And she was being held down while

5 you Tased her, right?

6 A. Yes.

7 Q. Was Taser or force used against the

8 suspect satisfactorily stop the suspect's

9 aggressions, and you put no.

10 A. No.

11 Q. Well, what stopped it?

12 A. It had no effect on her.

13 Q. No, no. I said, what stopped her

14 alleged aggression if you Tasered her?

15 A. She continued. She continued when

16 the medics got there. It was ongoing,

17 non-stop.

18 Q. But did you ever arrest her?

19 A. No. She had to go to the

20 hospital.

21 Q. Well, you've heard of suspects

22 being arrested in the hospital, haven't

23 you?

1 A. Yes, I have.

2 Q. You've heard of suspects being

3 arrested in the hospital, and as soon as

4 they're better, they're transported to the

5 Etowah County Detention Center.

6 A. That's correct.

7 Q. Why didn't that happen to T.H.?

8 A. That's an oversight. I have no

9 idea why that didn't happen.

10 Q. Well, you were a Sergeant there, so

11 whose oversight was it?

12 A. I guess it was mine.

13 Q. So you feel like she should have

14 been arrested on top of everything else.

15 A. Yes, sir.

16 Q. Even after you Tased her --

17 A. Yes.

18 Q. -- according to you, once,

19 according to Detective Gilliland twice, you

20 feel like she should have been thrown in

21 jail.

22 A. She should have been.

23 Q. Even though she was a juvenile.

1 A. Even though she was a juvenile.

2 Q. Do you have any remorse at all

3 about what you did?

4 A. No, sir. No.

5 Q. Do you have kids?

6 A. Yes, I do.

7 Q. Would you ever what your child

8 laying on the ground being held down and

9 Tased?

10 A. Yes, if he acted like that. If he

11 acted like that like she was acting, Tase

12 him. If he ever acted like that, I would

13 Tase him, like she was acting that night,

14 yes.

15 Q. You would Tase your own son?

16 A. I sure would if he acted like this

17 young lady did, no doubt.

18 Q. How old is your son?

19 A. He's nineteen.

20 Q. Would you Tase him when he was

21 seventeen if he acted like that?

22 A. You're dang right.

23 Q. Would you Tase him when he was

Page 85

1 fifteen if he acted like that?
2     A.  If he acted like that, yeah.
3     Q.  Would you Tase him if he was ten
4 and he acted like that?
5     A.  No, no.  There is a --
6     Q.  So is the cutoff at about twelve or
7 thirteen?
8         MR. STUBBS:  Object to the form.
9
10     A.  You know, even a fifteen year old
11 can hurt you.
12     Q.  Well, did she hurt anybody that
13 night?
14     A.  She didn't hurt anybody because we
15 didn't let her hurt anybody.
16     Q.  Did she hurt anybody that night?
17     A.  No.
18     Q.  You said we didn't let her hurt
19 anybody.  You were the only one Tasing,
20 right?
21     A.  I'm the only one that Tased her.
22     Q.  So what did the other officers do
23 to prevent --

Page 86

1     A.  They had to forcibly hold her
2 down.
3     Q.  So if the Taser didn't have any
4 effect on her, according to your use of force
5 form --
6     A.  Yes.
7     Q.  -- but the other officers held her
8 down, is that what stopped the alleged
9 aggression?
10     A.  Counselor --
11     Q.  Mr. Morris.
12     A.  -- after I Tased her, they had
13 another fight.  I went back out into the
14 crowd to assist them.
15     Q.  And you understand, Detective
16 Gilliland says that's not what happened.
17         MR. STUBBS:  Object to the form.
18
19     A.  That's fine.  I know what happened.
20     Q.  Well, he apparently does too.
21         MR. STUBBS:  Object to the form.
22         MS. CHANDLER:  Object to the form.
23         MR. HARP:  So you're objecting to

Page 87

1 your client knowing what happened?
2         MS. CHANDLER:  I'm objecting to you
3 testifying as opposed to asking him
4 questions.
5         MR. HARP:  I'm not testifying.  I'm
6 telling him what Detective Gilliland says,
7 which is in his statement.
8         MS. CHANDLER:  All I'm objecting to
9 is statements made and that aren't questions
10 to the witness.
11         MR. HARP:  Okay.  He's not your
12 witness.
13         THE WITNESS:  She was even acting
14 out when I came back.  The medics had to put
15 a mask over her to keep her from spitting on
16 them and biting them.  So she never stopped
17 her aggression from what I could see.
18         Now, when I went back out in the
19 crowd, did she stop, I don't know.  I'm going
20 to assume she didn't because when I came
21 back, she was still acting out.
22
23     Q.  Go back with me to your written

Page 88

1 statement here.
2     A.  Okay.
3     Q.  At what point did your body camera
4 start recording?
5     A.  Right before I Tased her.
6     Q.  Right before you Tased her.
7     A.  Yes.  I came up when all this was
8 going on, and I hit my button twice.  But I
9 wasn't letting it go the whole time, my
10 camera.
11     Q.  And you were not on shift that
12 night.
13     A.  No, sir.
14     Q.  And you didn't come back to work
15 until Monday.
16     A.  Yes.
17     Q.  So what happened to your body
18 camera from that night until Monday?
19     A.  It probably sat on my dresser at
20 home.
21     Q.  And at some point, did you take
22 your body camera into the police station and
23 download the video?

1   A.  Yes.  Or upload the video.

2   Q.  Upload the video.

3   A.  Yes.

4   Q.  And how did you do that?

5   A.  There is a docking station in the

6 squad room.  And we just put them in there.

7 And it takes, I don't know, thirty, forty

8 minutes to download them.

9   Q.  Was there anything else on your

10 body camera from the night of January 16,

11 2015 besides when you started recording right

12 before you Tased her?

13   A.  I'm not sure.

14   Q.  Well, did you use it that night?

15   A.  I did, but I'm not sure.  I never

16 reviewed the video.

17   Q.  Well, did you use it when you went

18 to break up the fight?

19   A.  I really can't remember.

20   MR. HARP:  Ed, do you know where

21 his footage is?  He said he turned it on

22 right before he Tased her.  We don't have

23 that footage.

1   MR. HOWARD:  I am uncertain that we

2 have it also.  What I know is what Justin

3 Gilliland testified to today.  That's all I

4 know.

5   MR. HARP:  He says he downloaded

6 all the footage.  But he just testified that

7 he had --

8   MR. HOWARD:  I know, but what I

9 know is what Gilliland testified to today.

10 That's my source of information.  I don't

11 have any magic --

12   MR. HARP:  I hear you.  I hear you.

13   MR. HOWARD:  They don't let me near

14 the computer system.

15

16   Q.  If you wanted to get your footage

17 from the night of January 16, 2015, what

18 would you do?

19   A.  I would have to call Justin

20 Gilliland and have him log on to that

21 evidence dot com.

22   Q.  Well, you're an administrator.

23   A.  They don't have a password for me

1 or anything.  I don't know how to get on

2 it.

3   Q.  Well, now, that's not what Justin

4 Gilliland -- well, I'm not going to run the

5 risk of drawing an objection as to

6 testifying, but are you sure you've never

7 been on evidence dot com?

8   A.  I've been on it after he let me on

9 it.  And he pulled videos that I had to

10 review that were possible complaints against

11 officers.  And he pulled them up for me and

12 saved them on my computer.

13   Q.  Did you ask him to make you an

14 administrator?

15   A.  Yes.

16   Q.  Did he do that?

17   A.  Yes.

18   Q.  Did he give you a password at that

19 time?

20   A.  No.

21   Q.  Well, what good is being an

22 administrator if you don't have a password?

23   A.  Well, I'm supposed to have a

1 password, but nobody knows what it is, and

2 I'm not sure what it was.  I don't know what

3 it is.

4   Q.  How would you find out?

5   A.  I don't know.  It's an imperfect

6 system.  I cannot go on there and watch a

7 video without Justin getting me on there and

8 pulling the video up for me and saving that

9 and go back and review it.  And I've done

10 that twice, I believe, since I became an

11 administrator.

12   Q.  What were the purposes of you doing

13 it when you did do it?

14   A.  Complaints on officers.

15   Q.  When your Taser needs recharging,

16 how do you recharge it?

17   A.  You put batteries in it.

18   Q.  Do you ever hook your Taser up to a

19 USB port?

20   A.  No, sir.

21   Q.  Have you ever downloaded data from

22 your Taser?

23   A.  No, sir.

1    Q.   Were you ever shown how to do
2  that?
3    A.   The Taser I have, it doesn't have a
4  camera.
5    Q.   No, data.  Not video, data.
6    A.   Oh, data.  If I was, I can't
7  remember.  It's been a while.
8    Q.   Were you aware that you could do
9  that?
10    A.   Actually, no.
11    Q.   You were not taught in training
12  that you could hook that Taser up
13  and find out when it was fired and how long
14  the duration of the charge was?
15    A.   No, sir.
16    Q.   And the Taser that you have now was
17  the same Taser that you had in January of
18  2015; is that right?
19    A.   Yes.
20    Q.   Has it been altered in any way?
21    A.   No, sir.
22    Q.   Has it been dropped or damaged in
23  any way?

1    A.   No, sir.
2    Q.   And you wear it on your duty
3  belt?
4    A.   Yes.
5    Q.   And you wear it in a Taser
6  holster?
7    A.   Yes.
8    Q.   How many times did you warn Ti██
9  Helm, or T.H., that you would Tase her before
10  you Tased her?
11    A.   To be honest with you, I can't
12  remember.  I know I warned her once and it
13  could have been a couple times.  I told her
14  she needed to settle down or she would be
15  Tased.
16    Q.   Do you recall the exact words that
17  you used?
18    A.   Young lady, you better settle down
19  or I'm going to Tase you.
20    Q.   You said that to her?
21    A.   Yes.
22    Q.   You said young lady?
23    A.   I'm almost positive I did.

1    Q.   And you may have said it again?
2    A.   I may have, or you need to settle
3  down or I'm going to Tase you.
4    Q.   Okay.  And then what happened?
5    A.   And I took the Taser, deployed it
6  for two to three seconds.
7    Q.   Was the Taser already in your
8  hand?
9    A.   I don't believe so.  I can't
10  remember.
11    Q.   Let's go back to page two of your
12  report.  I'm a little over halfway down.
13  Based on Ms. Helm's out of control behavior,
14  I took my Taser out and removed the cartridge
15  and told her several times to calm down and
16  comply with the officers command or I would
17  dry stun her with my Taser.  She told me,
18  Tase me, mother fucker, at which time, I dry
19  stunned her for approximately three seconds
20  in the abdomen area; is that right?
21    A.   That's correct.
22    Q.   So in your statement that you wrote
23  on 1-21-2015, you say that you told her

1  several times she needed to calm down; is
2  that right?
3    A.   Yes.
4    Q.   So this was not a split second
5  decision you made to Tase her, was it?
6    A.   No, sir.
7    Q.   I mean, it was deliberate because
8  you said if you don't calm down, I'm going to
9  Tase you, right?
10        MR. STUBBS:  Object to the form.
11
12    Q.   Is that right?
13    A.   That's correct.
14    Q.   So this is not something where all
15  of a sudden, an event happened and you
16  thought I've got to Tase her.  You gave her a
17  chance to calm down before you Tased her.
18    A.   Yes.
19    Q.   Were you there when the officers
20  took Ms. Helm, or T.H., out of the lobby of
21  Center Stage?
22    A.   No, sir.
23    Q.   You had left?

Page 97

1  A. When are you talking about?

2  Q. You had left the area when the
3  paramedics took her to the ambulance?

4  A. I was out there later when they
5  were actually treating her.

6  Q. Right. Were you there when they
7  took her away to the hospital?

8  A. I just can't remember.

9  Q. Now, at the time that you Tased
10  T.H., was your hand on her at that point?

11  A. I don't believe so.

12  Q. So you were just holding the Taser
13  to her abdomen area?

14  A. Yes.

15  MR. STUBBS: Object to the form.

16

17  Q. And then in order to employ the
18  Taser, is there a trigger that you have to
19  squeeze?

20  A. Yes.

21  Q. So you squeezed that trigger?

22  A. Yes.

23  Q. And you did it for about three

Page 98

1  seconds?

2  A. Yes.

3  Q. I'm going to show you a piece of
4  video, and I need you to tell me whether or
5  not to your recollection this was taken from
6  the vantage point of your body camera.

7

8  (Viewing video.)

9

10  Q. Do you see that hand on that leg?

11  A. Yes.

12  Q. Do you know whose hand that is?

13  A. No, sir.

14  Q. Okay. Were you ever holding T
15  where you were situated at that angle?

16  A. Me?

17  Q. Yes.

18  A. No.

19  Q. You testified earlier that at some
20  point, you placed your hand on her. Where
21  were you standing when you did that?

22  A. Is that her right or left leg?

23  Q. I'm not sure.

Page 99

1

2  (Viewing video.)

3

4  A. It would have been on her left leg.

5  Q. Her left leg?

6  A. Yes.

7  Q. Now, were you present when T.H. was
8  gagged?

9  A. No, sir.

10  Q. Were you present when the officer
11  told her that she would be gagged?

12  A. I don't recall that.

13  Q. So you had left at that point.

14  A. Yes.

15  Q. Was T.H. wearing shoes at the point
16  you Tased her?

17  A. I don't remember.

18  Q. You don't remember?

19  A. No.

20  Q. Now, when you Tased her in the
21  abdomen, were you already kneeling?

22  A. I believe so. Yes, I believe I was
23  kneeling.

Page 100

1  Q. And did you turn on your body
2  camera before you kneeled down?

3  A. I can't remember.

4  Q. But you are sure that you turned
5  your body camera on before she was Tased.

6  A. It was on. I just had to hit the
7  button twice to make sure it was recording.
8  I thought it was recording. I don't know,
9  but it beeps. You know, it's a loud beep to
10  let you know it's recording, but there was so
11  much commotion and stuff, you can't hear
12  anything.

13  Q. Is there a visual clue to let you
14  know it's recording?

15  A. No, sir, not that I know of. It's
16  flashing red, but where it's situated, it's
17  kind of hard to -- it's not blinding you or
18  anything.

19  Q. Right. But it was kind of dark in
20  that area, right?

21  A. It was the foyer, so there was
22  lights out there.

23  Q. Were there civilians around when

1  all of this was happening on the 16th?

2      A.  There was a crowd out there.

3      Q.  Did anyone try to move the crowd

4  back?

5      A.  I think several people were telling

6  them to get back into the concert.

7      Q.  Several people or several officers?

8      A.  Several officers, or I don't know

9  who was yelling it.  I may have yelled it.

10      Q.  So if there was a crowd standing

11  around watching, did you ever hear anyone

12  say, don't do that, or you shouldn't Tase

13  her?

14      A.  I don't recall.  I don't

15  remember.

16      Q.  Did Officer Kimbrough ever tell you

17  when you told T.H. that if she didn't calm

18  down, you were going to Tase her, did Officer

19  Kimbrough tell you not to do that?

20      A.  No.

21      Q.  When you told T.H. to calm down or

22  you were going to Tase her, did Detective

23  Gilliland tell you not to do that?

1      A.  No.

2      Q.  When you told T.H. that you were

3  going to Tase her, before you Tased her, did

4  Chief Carroll tell you not to Tase her?

5      A.  No.

6      Q.  Did Chief Carroll ever say anything

7  to you during this entire incident?

8          MR. STUBBS:  Object to the form.

9

10      A.  To me?

11      Q.  To you.

12      A.  While this was going on?

13      Q.  Yes.  While you guys were around

14  T.H. and she was being held down, did you

15  have any conversation at all with Chief

16  Carroll?

17      A.  I don't believe so.

18      Q.  During the time that he was Chief

19  of Police, was he a very hands-on Chief?

20          MR. HOWARD:  Object to the form.

21

22      A.  I don't understand what you mean by

23  hands on.

1      Q.  Did he take an active role in being

2  the Chief of Police, or did he kind of defer

3  to Captains and Lieutenants?

4      A.  I can't speculate on that.

5      Q.  I don't want you to speculate.  I

6  want you to tell me what you observed from

7  working with him.

8      A.  Well, you've got to remember now,

9  when this was all going on, I worked third

10  shift, so I never saw him.  I just recently

11  when I got promoted went to day shift.  So

12  prior to that, I was a night shift guy.  I

13  worked 6:00 p.m. to 6:00 a.m.  Nobody is

14  there.

15      Q.  So who is in charge during that

16  time?

17      A.  I am.  I was.

18      Q.  So at night during the time you

19  were a Sergeant, you would be the one in

20  charge?

21      A.  Yes.

22      Q.  Because you had the seniority?

23      A.  Because I was in charge of the

1  shift.  Whatever went on in the City from

2  6:00 p.m. to 6:00 a.m., I was responsible

3  for.  Now, if something major happened, I

4  would call the Chief or the Captain.

5      Q.  So on January 16, 2015, it was at

6  night when this happened, right?

7      A.  Yes.

8      Q.  So who was in charge of the police

9  officers in Rainbow City during that time?

10      A.  John Bryant.

11      Q.  Okay.  But the Chief is the Chief

12  twenty-four hours a day, correct?

13      A.  That's correct.

14      Q.  Are you APOST certified?

15      A.  Yes.

16      Q.  When did you get your APOST

17  certification?

18      A.  May of 1992, I believe is when I

19  graduated.

20      Q.  Do you have to do continuing

21  education?

22      A.  Yes.

23      Q.  And how many hours?

1    A.   Twelve hours a year.

2    Q.   And what did you do last year to

3 accomplish those twelve hours?

4    A.   I'm trying to think.  I went to

5 Mobile for a training.

6    Q.   Did you receive any instruction on

7 the use of Tasers at that training?

8    A.   I'm sure it had nothing to do with

9 Tasers.

10   Q.   Was it an executive level

11 training?

12   A.   I'm trying to think what that was.

13 It was like street survival for cops, street

14 survival school or training.  And it was

15 taught by a retired Chicago police officer.

16 We go to different classes and schools to get

17 CEUs.  I probably did some training around

18 City Hall.  I'm not sure.

19   Q.   Training around City Hall?

20   A.   Well, they had somebody come in and

21 teach a class and you get four hours or eight

22 hours.

23   Q.   When is the last time you received

1 any training on the use of a Taser?

2    A.   It would have been when I was

3 issued one.

4    Q.   And when was that?

5    A.   2007.

6    Q.   So from 2007 up until today,

7 you have not received any training on the use

8 of Tasers.

9    A.   Not to my knowledge.

10   Q.   All right.  If you would, walk me

11 through the levels of force that a police

12 officer would employ or could employ to

13 resolve a situation, starting from the least

14 harmful all the way up to deadly force.

15   A.   The officer's presence would be the

16 first one.  And then verbal commands.  And

17 then soft empty, hard.  And I believe deadly

18 force is there right after that.  I may be

19 wrong.

20   Q.   Does the Rainbow City Police

21 Department have a policy dealing with

22 juvenile suspects?  A written policy.

23   A.   Not to my knowledge.

1    Q.   As a Rainbow City police officer,

2 have you encountered juveniles?

3    A.   Yes.

4    Q.   Outside of T.H.?

5    A.   Yes.

6    Q.   Have you had to arrest juveniles?

7    A.   Yes.

8    Q.   What did you rely upon as policy

9 when you had to arrest those juveniles?

10   A.   Based on what they were doing,

11 determine whether we would call somebody from

12 juvenile probation and possibly put them in

13 Coosa Valley Detention in Anniston.  If it's

14 a minor infraction, we call the parents and

15 take them to City Hall and do a juvenile

16 release form.

17   Q.   Have you ever interrogated a

18 juvenile?

19   A.   Yes.

20   Q.   What is the Rainbow City policy on

21 interrogating juvenile suspects?

22   A.   Before you interrogate a juvenile,

23 the parents must be present if they wish to

1 have their parents there.  That's actually in

2 the rights waiver, if they wish their parents

3 to be there.  And also, obviously, right to

4 an attorney.

5    Q.   Did you see Michelle Helm being

6 Tased on the night of January 16, 2015?

7    A.   No, sir.

8    Q.   Did you see Michelle Helm be

9 handcuffed on the night of January 16,

10 2015?

11   A.   No, sir.

12   Q.   Do you know who the woman was that

13 you wrote in your statement was told to get

14 back and refused to do so?

15   A.   I believe it was T.H.'s mother,

16 Michelle Helm.

17   Q.   And then officer grabbed the woman

18 who was hysterical and had to forcibly remove

19 her.  Is that the same person you're talking

20 about?

21   A.   Yes.

22   Q.   And you didn't see her being Tased

23 at that time, right?

Page 109

1    A.   No, sir.
2    Q.   Do you know what officer removed
3 her?
4    A.   I thought it was Jimmy Fazekas or
5 Gary Morgan maybe.
6    Q.   Could it have been Justin
7 Gilliland?
8    A.   I don't remember him doing that.  I
9 remember him holding the juvenile, but I
10 don't remember him going out to take the
11 mother.
12   Q.   You don't?
13   A.   No.
14   Q.   So you're not saying it wasn't him.
15 You're just saying you don't remember it.
16   A.   I don't remember that, no.
17   Q.   Okay.  I'm going to show you what I
18 will mark as Plaintiff's Exhibit Number 5 to
19 your deposition, which is the first amended
20 complaint that was filed September 10th,
21 2015.
22
23        (Plaintiff's Exhibit Number 5 was

Page 110

1 marked for identification and same is
2 attached hereto.)
3
4    A.   (Witness reviewing document.)
5    Q.   And just let me know when you're
6 ready.
7    A.   I'm ready.
8    Q.   Have you ever seen a copy of that
9 document that we marked as Plaintiff's
10 Exhibit Number 5 before today?
11   A.   Yes.
12   Q.   When did you first see a copy of
13 that document?
14   A.   I can't remember the date.  It's
15 been several months ago.
16   Q.   But you understand that's the
17 amended complaint that was filed in this
18 case, right?
19   A.   Yes.
20   Q.   And you filed an answer to that
21 amended complaint; is that right?
22   A.   Excuse me?
23   Q.   You filed an answer to that amended

Page 111

1 complaint.  Do you know what an answer is?
2    A.   No, sir.
3    Q.   Okay.  Let me just make sure I have
4 something correct.  At some point on the
5 night of January 16, 2015, you, yourself
6 holding T.H. down or was assisting in holding
7 her down.
8    A.   I believe so.
9    Q.   Do you recall T.H. ever saying let
10 me go?
11   A.   Yes.
12   Q.   At the time that T.H. said let me
13 go, had T.H. committed any crime in your
14 mind?
15   A.   Yes.
16   Q.   What's that crime?
17   A.   Disorderly conduct.
18   Q.   Was she ever arrested for that?
19   A.   No, she wasn't.
20   Q.   Was she ever charged with that?
21   A.   No, she wasn't.
22   Q.   And she was never handcuffed.
23   A.   No, sir.

Page 112

1    Q.   Why didn't you handcuff her?
2    A.   Because we were waiting for the
3 medics to come treat her.
4    Q.   Okay.  Why didn't you handcuff her
5 after the medics treated her?
6    A.   Oversight.  She should have been
7 handcuffed.
8    Q.   Well, why wasn't she arrested?
9    A.   Another oversight on our parts.
10   Q.   On whose part?
11   A.   My part.
12   Q.   Anyone else's part?  Chief Carroll
13 was there, right?
14   A.   Yes.
15   Q.   He didn't arrest her, did he?
16   A.   No, he didn't.
17   Q.   Justin Gilliland was there,
18 right?
19   A.   Yes.
20   Q.   He didn't arrest her, did he?
21   A.   She wasn't arrested.
22   Q.   Okay.  And Kimbrough didn't arrest
23 her because she wasn't arrested, right?

Page 113

1  A.  She wasn't arrested.

2  Q.  So you claim that she's committed
3 this crime that you believe she should have
4 been handcuffed and arrested for and Tased
5 for, but no one else Tased her, right?  Only
6 you.

7  MR. STUBBS:  Object to the form.

8

9  Q.  Is that right?

10  A.  Only me.

11  Q.  And no one arrested her, right?

12  A.  That's correct.

13  Q.  Now, when a person is being
14 disorderly, do they have to be arrested at
15 that time, or could they be arrested at a
16 later date?

17  A.  Usually if you witness somebody
18 being disorderly, you arrest them at that
19 time, but you could actually get a warrant on
20 someone.

21  Q.  Did you go get a warrant for T.H.?

22  A.  No, I did not.

23  Q.  Did any of the other officers who

Page 114

1 were present and witnessed what you claim was
2 outrageous behavior go get a warrant for
3 T.H.?

4  A.  Not that I'm aware of.

5  Q.  At the time that she was first
6 being held down when she came out of her
7 seizure, had she committed a crime?

8  MR. STUBBS:  Object to the form.

9

10  Q.  You can answer.

11  A.  Not that I know of.

12  Q.  So was there any reason to continue
13 to hold her down?

14  A.  When she came out of her seizure,
15 it was like flipping a switch.  She went from
16 a split second to screaming, out of control,
17 hysterical, swearing, bucking, thrashing
18 individual.

19  Q.  And that was after she came out of
20 her seizure.

21  A.  Just that quick.

22  Q.  After she came out of her seizure.

23  A.  I guess out of her seizure or

Page 115

1 alleged seizure.

2  Q.  Well, did you write alleged in your
3 report?

4  A.  No.

5  Q.  And you used the word twice.

6  A.  Yes, I did.

7  Q.  Did you use the adjective alleged
8 in front of seizure either time?

9  A.  No, sir, I didn't.

10  Q.  Okay.  And you wrote that report on
11 1-21-2015, right?

12  A.  That's correct.

13  Q.  So only now are you calling it an
14 alleged.

15  MR. STUBBS:  Object to the form.

16

17  Q.  Is that right?

18  MR. STUBBS:  Object to the form.

19

20  Q.  Is that right?

21  A.  No.

22  Q.  Well, did you call it alleged
23 before?

Page 116

1  A.  No, not on that statement, I
2 didn't.

3  Q.  Well, let's look at your use of
4 force form.  Do you have it in front of you?

5  A.  Okay.

6  Q.  Do you have it?

7  A.  Yes, I do.

8  Q.  Do you see it?

9  A.  Yes, I do.

10  Q.  Can you read it?

11  A.  Yes, I can.

12  Q.  Do you see the word alleged?

13  A.  No, I don't.

14  Q.  So you didn't call it alleged in
15 the use of force form.  And you didn't call
16 it alleged in your statement.  Only now are
17 you calling it alleged, correct?

18  MR. STUBBS:  Object to the form.

19

20  Q.  Is that correct?

21  A.  Correct.

22  Q.  And you've been sued now,
23 correct?

Page 117

1   A.  Correct.
2   Q.  You had not been sued at the time
3 that you filled out the use of force form,
4 had you?
5   A.  That's correct.
6   Q.  And you had not been sued at the
7 time that you filled out your statement, had
8 you?
9   A.  That's correct.
10  Q.  Have you ever Tased anyone prior to
11 January 16, 2015?
12  A.  Yes.
13  Q.  How many times?
14  A.  One.
15  Q.  When was that?
16  A.  That was five, six years ago.
17  Q.  While you were employed by the
18 Rainbow City Police Department?
19  A.  Yes.
20  Q.  Tell me about the events that led
21 to that Tasing.
22  A.  We had a call over at the Conoco
23 Station about somebody trying to pass a

Page 118

1 stolen check.  And when we got there -- I
2 believe we had just got computers in our cars
3 where we could actually run people.
4       And I grabbed the female's driver's
5 license and ran it.  It came back an entirely
6 different person.  Same person, different
7 picture.  They had altered the driver's
8 license and put her picture trying to cash
9 this stolen check.
10      And so at that time, we were going
11 to try to identify everybody that was in the
12 store and in the vehicle that went up there.
13 And there was a man in the bathroom.
14  Q.  You were going to try to do what?
15  A.  Identify everybody that was in that
16 vehicle that was in there.
17  Q.  Okay.
18  A.  And the officer went in there to
19 get him, knocked on the door, and he came out
20 swinging, fighting, running.  He was a wanted
21 felon.
22  Q.  Did you know that at the time?
23  A.  No, we didn't.  He knocked an

Page 119

1 officer down in the Conoco.  He went outside.
2 Somebody shot him with a Taser.  He ran.  He
3 went down and got right back up.  I shot him
4 with my Taser, and he pulled the prongs out
5 and ran, car jacked a car.  And then it was
6 like a three day man hunt and we finally got
7 him.
8   Q.  So in that instance, he had
9 assaulted an officer.
10  A.  Yes.
11  Q.  And although you didn't know he was
12 a wanted felon -- you said wanted or
13 convicted?
14  A.  Wanted, convicted.  I think he was
15 both.
16  Q.  Well, there is a difference.
17  A.  I think he had been convicted, been
18 to prison and out.  And then he had done
19 another crime, and he was wanted for that.
20  Q.  But you guys didn't know that at
21 the time, right?
22  A.  No, we didn't.
23  Q.  And is that the only time you've

Page 120

1 ever Tased someone besides T.H.?
2   A.  Using a Taser?
3   Q.  Is there another way to Tase
4 someone?
5   A.  Well, we had at Gadsden hand-held
6 Tasers.
7   Q.  You mean a cattle prod?
8   A.  No, no.  It was hand-held.  And it
9 was years ago.  Gadsden bought them.  And the
10 prongs were farther apart, but you couldn't
11 shoot a cartridge.  So it had to be something
12 like up close to Tase somebody.
13  Q.  Like a drive stun.
14  A.  Like a drive stun.  We had those.
15 And I had used that before previously.
16  Q.  Who was that used on?
17  A.  To be honest with you, I can't
18 remember.
19  Q.  Did you have to fill out a use of
20 force report?
21  A.  Yes.
22  Q.  And when you discharged the Taser
23 over at the Conoco Station, as a member of

1 the Rainbow City Police Department, did you
2 fill out a use of force report?
3    A.  I'm sure I did.
4    Q.  Well, did you?
5    A.  I'm sure I did.  That's our policy.
6    Q.  And you used your prongs that time,
7 right?
8    A.  Right.
9    Q.  Was it the X-26?
10    A.  The X-26.
11    Q.  Did the confetti come out?
12    A.  The confetti?
13    Q.  Yes.
14    A.  Are you talking about the strings,
15 the prongs?
16    Q.  No, sir, the anti-felon confetti.
17    A.  Anti what?
18    Q.  Felon confetti.  F-e-l-o-n.
19    A.  I'm not familiar with that.
20    Q.  Okay.  Do you have to buy
21 cartridges for your Taser on a regular basis,
22 or are those provided?
23    A.  They're provided for us.

1    Q.  And how often are they changed out
2 if you've only used yours once in the last
3 five years?
4    A.  I haven't changed it out.  I still
5 have the same cartridge.
6    Q.  You do?
7    A.  I believe, yes.
8    Q.  Have you received any updated
9 material from Taser International through the
10 Rainbow City Police Department?
11    A.  I'm not sure.  I can't remember.  I
12 get a lot of stuff.
13    Q.  Do you shred it?
14    A.  No.
15    Q.  So when you get it, you keep it?
16    A.  If I get anything, directives or
17 anything like that, I put it in my desk or in
18 a file.
19    Q.  Do you read it?
20    A.  Yes, most of the time.
21    Q.  Let me show you this document that
22 we will mark as Plaintiff's Exhibit Number 6
23 to your deposition.  And I'll ask you if

1 you've ever seen that document before.
2
3       (Plaintiff's Exhibit Number 6 was
4 marked for identification and same is
5 attached hereto.)
6
7    A.  (Witness reviewing document.)  To
8 be honest with you, I'm not sure if I've seen
9 this before or not.
10    Q.  Do you know what it is?
11    A.  It looks like a warning from Taser.
12    Q.  Well, it's titled, Taser hand-held
13 CEW.  Do you know what a CEW is?
14    A.  No, sir.
15    Q.  It's Conductive Electrical Weapon,
16 which is the Taser.
17    A.  Okay.
18    Q.  So this is a Taser CEW warnings,
19 instructions and information for law
20 enforcement.  So this is important safety and
21 health information, right?
22    A.  Yes.
23    Q.  Do you see that?

1    A.  Yes.
2    Q.  All right.  Do you see the third
3 full paragraph that starts with these
4 warnings and instructions?
5    A.  Yes, sir.
6    Q.  It says these warnings and
7 instructions are effective March 1st, 2013,
8 which would have been two years and ten
9 months prior to January of 2015; is that
10 right?
11    A.  Yes.
12    Q.  And they supercede all prior
13 revisions and relevant training bulletins.
14 Immediately distribute this document to all
15 Taser CEW users.  The most current warnings
16 are also available online at www dot Taser
17 dot com.  And your testimony is, you don't
18 recall receiving this document; is that
19 right?
20    A.  I don't remember.
21    Q.  If you received it, would you still
22 have it?
23    A.  I would.

1  Q.  If you received it, would you have
2  read it?
3  A.  Quite possibly.  To be honest with
4  you, maybe, maybe not.  I don't know.  I'm
5  not familiar with that document.
6  Q.  Okay.  And if you've never seen it,
7  that's fine.  I just thought that since it
8  said distribute to anybody who uses the Taser
9  that you would have seen it.
10  MR. STUBBS:  Object to the form.
11
12  Q.  And you are still issued a Taser,
13  right?
14  A.  Yes, sir.
15  MR. HARP:  Okay.  Let's take a
16  short break.
17
18  (Whereupon, a brief recess was
19  taken.)
20
21  Q.  Mr. Morris, we're back on the
22  record.  After you Tased T.H., you said you
23  left and went to break up a fight; is that

1  right?
2  A.  Yes.
3  Q.  Did any officer go with you?
4  A.  I don't recall.  I think maybe
5  Officer Roberts, or he may have been the one
6  fighting.
7  Q.  He was the one fighting?
8  A.  Or was in a fight, yeah.  Officer
9  Roberts or Camp Yancey, one or the other.
10  Q.  Is that Richard Roberts?
11  A.  Yes.
12  Q.  Is that the same Richard Roberts
13  that shot the gentleman over in Rainbow City?
14  A.  Yes.
15  Q.  And that was last year, right?  And
16  there is a lawsuit filed about that?
17  A.  I don't know.
18  Q.  You don't know?
19  A.  I don't know.
20  MR. HOWARD:  Greg, do you want a
21  true answer as to that lawsuit?
22  MR. HARP:  Well, I know the answer.
23  I just wanted to see if he knew.

1  MR. HOWARD:  Okay.  That wasn't
2  yours, was it?
3  MR. HARP:  No, sir.
4
5  Q.  All right.  I'm going to show you
6  what I'm going to mark as Plaintiff's Exhibit
7  Number 7 to your deposition.
8
9  (Plaintiff's Exhibit Number 7 was
10  marked for identification and same is
11  attached hereto.)
12
13  Q.  It's a photograph of a gentleman.
14  Do you recognize that gentleman?
15  A.  Jimmy Fazekas.
16  Q.  Okay.  Was he present when you
17  Tased T.H.?
18  A.  I'm not sure.
19  Q.  Okay.  I'm going to show you what
20  I'm going to mark as Plaintiff's Exhibit
21  Number 8 to your deposition.
22
23  (Plaintiff's Exhibit Number 8 was

1  marked for identification and same is
2  attached hereto.)
3
4  Q.  Do you recognize the gentleman in
5  that photograph?
6  A.  Chief Greg Carroll.
7  Q.  Was he present when you Tased T.H.?
8  A.  Yes.
9  Q.  Let me show you what I'm going to
10  mark as Plaintiff's Exhibit Number 9 to your
11  deposition.
12
13  (Plaintiff's Exhibit Number 9 was
14  marked for identification and same is
15  attached hereto.)
16
17  Q.  Do you recognize the person in that
18  photograph?
19  A.  I'm not sure who that is.
20  Q.  You're not sure who that is?
21  A.  No.
22  Q.  Did you get a good look at the
23  person you Tased on the night of January 16,

Page 129

1  2015?
2      A.  Yes.
3      Q.  Is that the person you Tased on
4  January 16, 2015?
5      A.  I believe so.
6      Q.  You believe so?
7      A.  I believe so.  I'm not a hundred
8  percent sure.
9      Q.  Let me show you what I'm going to
10 mark as Plaintiff's Exhibit Number 10 to your
11 deposition.
12
13      (Plaintiff's Exhibit Number 10 was
14 marked for identification and same is
15 attached hereto.)
16
17     Q.  Does that scene look familiar to
18 you?
19     A.  Yes.
20     Q.  What does that scene look like to
21 you?
22     A.  It looks like somebody being held
23 down.

Page 130

1      Q.  Do you recognize who that is being
2  held down?
3      A.  I assume it's the juvenile, T.H.
4      Q.  All right.  I don't want you to
5  assume.  Do you know who that is?
6      A.  I believe that's the juvenile, T.H.
7      Q.  Does that appear to be the clothing
8  that T.H. was wearing on the night of January
9  16, 2015?
10     A.  I don't remember her clothing.
11     Q.  What about that scene depicted in
12 that photograph, which is Plaintiff's Exhibit
13 Number 10 leads you to believe that that's
14 T.H.?
15     A.  It looks like it was Center Stage,
16 I guess.  It looks like people are holding
17 her down.  I'm assuming that's her.
18     Q.  I'm going to show you what I will
19 mark as Plaintiff's Exhibit Number 11 to your
20 deposition and ask you if you have seen this
21 document before today?  It's the answer to
22 the first amended complaint by Defendants,
23 Rainbow City, Carroll, Fazekas and Morris.

Page 131

1  Will you take a look at that?
2
3      (Plaintiff's Exhibit Number 11 was
4  marked for identification and same is
5  attached hereto.)
6
7      A.  (Witness reviewing document.)  I
8  don't remember seeing this.
9      Q.  Okay.  If you would, go to the
10 complaint that's filed in this case.  We
11 marked it as an exhibit earlier.  And turn
12 with me to page thirty-six of your complaint.
13     A.  Okay.
14     Q.  At the time that you Tased T.H.,
15 understanding that you say you only Tased her
16 once, at the time that you Tased T.H. on
17 January 16, 2015, was it absolutely necessary
18 for you to Tase T.H.?
19     A.  Yes.
20     Q.  At the time that you Tased T.H. on
21 January 16, 2015, was T.H. being restrained
22 by other police officers?
23     A.  They were attempting to restrain

Page 132

1  her.
2      Q.  Were her legs being held down?
3      A.  I believe so.
4      Q.  Were her arms being held down?
5      A.  Yes.
6      Q.  Could she run away if she had
7  wanted to?
8      A.  Not right then.
9      Q.  And that's before you Tased her,
10 correct?
11     A.  Yes.
12     Q.  And when you Tased her, you did
13 that in the presence of other Rainbow City
14 police officers, correct?
15     A.  Yes.
16     Q.  And you said you don't have any
17 remorse whatsoever about Tasing T.H. that
18 night, right?
19     A.  None.
20     Q.  Even though her arms were held
21 down, you still don't have any remorse.
22     A.  No.
23     Q.  You don't care that you Tased her.

1      MR. STUBBS:  Object to the form.

2

3      Q.  You can answer.

4      A.  You're asking if I care, but based

5  on her actions, no, there is no remorse.

6      Q.  No remorse whatsoever.

7      A.  With her actions, no.

8      Q.  You're just completely indifferent

9  to it.

10      MR. HOWARD:  Object to the form.

11

12      A.  I didn't say I was indifferent.

13      Q.  Well, do you have a strong feeling

14  about it?

15      A.  If she would have acted right and

16  listened to the commands and behaved, she

17  wouldn't have been Tased.

18      Q.  You Tased her because she wouldn't

19  listen to commands; is that right?

20      MR. STUBBS:  Object to the form.

21

22      Q.  Is your testimony if she had acted

23  right and listened to the commands and

1  behaved, she wouldn't have been Tased?

2      A.  That's correct.

3      Q.  How did you feel about being called

4  a stupid mother fucker by T.H.?  Did it

5  matter to you?

6      A.  Indifferent.

7      Q.  Indifferent.  How did you feel

8  about being called a pig by T.H.?  Did it

9  matter to you?

10      A.  No, sir.

11      Q.  Well, if it didn't matter to you

12  that she called you a stupid mother fucker

13  and it didn't matter to you that she called

14  you a pig, why did you Tase her?

15      A.  Because of her actions.

16      Q.  But her actions were --

17      A.  Her actions were --

18      Q.  -- cursing.

19      A.  -- bucking, trying to get away,

20  trying to rip away from the officers.

21      Q.  But she had not committed a crime.

22      A.  She was committing a crime at the

23  time.

1      Q.  What was the crime?

2      A.  Disorderly conduct.

3      Q.  Which consisted of what?

4      A.  Yelling, cussing, swearing,

5  offending people.

6      Q.  You think yelling is a crime?

7      A.  Swearing is in public.

8      Q.  You think swearing in public is a

9  crime?

10      A.  It is.

11      Q.  You think on January 16, 2015,

12  swearing in public was a crime.

13      A.  Yes.

14      Q.  In any setting?

15      A.  If it offends people.  If it

16  offends people, it's a crime.

17      Q.  You were at a rap concert.

18      A.  Yes.

19      Q.  For Kevin Gates.

20      A.  Yes.

21      Q.  A gentleman whose entire catalog is

22  filled with nothing but profanity.  Did that

23  offend you?

1      A.  I didn't listen to it.

2      Q.  Did it offend you?

3      A.  It didn't offend me.  I didn't

4  listen to it.  I don't know what he was

5  saying.

6      Q.  Well, what's the difference between

7  Kevin Gates cussing on stage and T.H. cussing

8  while being held down by police officers?

9  Other than her words were directed to you.

10  What is the difference?

11      A.  They were directed at everyone.

12      Q.  At whom?

13      A.  Other people, officers, patrons.

14      Q.  You would agree that she probably

15  wasn't telling the patrons standing around to

16  let her go, you stupid mother fuckers.

17      A.  I would agree with that.

18      Q.  Okay.  So that wasn't directed to a

19  patron, right?

20      A.  Not at that time.

21      Q.  And that wasn't directed to any

22  officer that wasn't holding her, right?

23      A.  I can't speculate on that.

Page 137

1  Q.  So who was let me go, you stupid
2  mother fuckers directed to?
3      MR. STUBBS:  Object to the form.
4
5  Q.  You can answer.
6  A.  I assume it was the officers.
7  Q.  Who were holding her down,
8  correct?
9  A.  Yes.
10  Q.  So other than cussing and bucking
11  around, was there anything else that you
12  observed T.H. doing that you felt warranted
13  her being Tased?
14  A.  No.
15  Q.  So T.H. was Tased by you for
16  cussing and bucking around while being held
17  down by officers.
18  A.  Yes.
19  Q.  And do you know why the officers
20  were holding her down?
21  A.  She was trying to fight.
22  Q.  Do you know why Detective Gilliland
23  says he first started holding T.H. down?

Page 138

1  A.  I think he said she was having a
2  seizure, a medical problem.
3  Q.  Right.  And he didn't want her to
4  hurt herself.  Do you know why Officer
5  Kimbrough says he was holding her down?
6  A.  I believe he said it was seizures.
7  Q.  And he was holding her because he
8  didn't want her to hurt herself, correct?
9  A.  Yes.
10  Q.  So if the officers holding her down
11  were holding her down, according to their
12  statements, because they didn't want her to
13  hurt herself, once she said let me go,
14  whether she said let me go you stupid mother
15  fuckers or please let me go or whatever,
16  don't you agree as a reasonable officer on
17  the scene, they should have let her go?
18      MR. STUBBS:  Object to the form.
19
20  Q.  You can answer.
21  A.  No.
22  Q.  Well, she hadn't committed a crime.
23  A.  If they would have let her go, it

Page 139

1  would have been a fight.
2  Q.  You don't know that though, do you?
3  You don't know that, do you?  Are you
4  psychic?
5  A.  No, I'm not.  Based on her actions
6  though, it was going to be a fight.
7  Q.  You don't know that though, do you?
8  You don't know that, do you?
9  A.  No, I don't.
10  Q.  And you didn't know whether or not
11  she would fight someone when they let her go
12  at the time you Tased her, did you?
13  A.  No.
14  Q.  And, in fact, she couldn't have
15  fought anyone at the time that you Tased her
16  because her arms and legs were being held
17  down by police officers, correct?
18      MR. STUBBS:  Object to the form.
19
20  Q.  You can answer.
21  A.  Yes.
22  Q.  And at the time that you Tased her,
23  at least one of the times, Detective

Page 140

1  Gilliland says he was holding her neck in a
2  rear choke hold.
3      MR. STUBBS:  Object to the form.
4      MS. CHANDLER:  Object to the form.
5
6  Q.  You can answer.
7  A.  I don't recall that.
8  Q.  You don't recall that.  Pick up his
9  statement.
10  A.  I read his statement, but I don't
11  recall him holding her in a choke hold.
12  Q.  Okay.  How do you recall him
13  holding her?
14  A.  I thought he was holding down on
15  her shoulders or up around her head.  My
16  focus wasn't on him or the other officers.
17  It was on her.  She was bucking around,
18  trying to get loose, trying to fight.
19  Q.  How do you know she was trying to
20  fight?
21  A.  Based on her actions.  Based on
22  years of experience of dealing with people.
23  She was out of control.  She was violent.

Page 141

1    Q.  But why was she out of control?
2    A.  I have no idea.
3    Q.  Shouldn't you have found out before
4  you Tased her?
5        MR. STUBBS:  Object to the form.
6
7    Q.  You can answer.
8    A.  I couldn't interview her.
9    Q.  Well, you could.  She was a captive
10  audience.  They had her arms and legs pinned
11  down, right?
12        MR. STUBBS:  Object to the form.
13
14    Q.  Is that right?
15    A.  She wasn't a compliant subject.
16  There was nothing you were going to tell her
17  to make her stop.
18    Q.  Did you try?
19    A.  I told her to settle down.
20    Q.  Or?
21    A.  I would Tase you.
22    Q.  So you didn't try to make her stop.
23  You gave her a threat that you would Tase

Page 142

1  her, correct?
2        MR. STUBBS:  Object to the form.
3
4    A.  Yes, I did.  I told her.  Yes, I
5  told her I would Tase her.
6    Q.  And she had just come out of a
7  seizure, according to what you wrote in your
8  report; is that right?
9    A.  Yes.
10    Q.  And according to what you put on
11  your use of force report --
12    A.  Yes.
13    Q.  -- she had just come out of a
14  seizure.
15    A.  Yes.
16    Q.  And when she came out of that
17  seizure, she was being held down by police
18  officers by her arms and legs on her back,
19  correct?
20    A.  Yes.
21    Q.  And how long after she came out of
22  her seizure was it before you Tased her?
23    A.  Several minutes.

Page 143

1    Q.  Several minutes.
2    A.  I believe.
3    Q.  So she was held down by her arms
4  and legs several minutes while she was
5  yelling let me go, you stupid mother fuckers,
6  and at the expiration of several minutes, you
7  Tased her.
8        MR. STUBBS:  Object to the form.
9
10    Q.  Is that right?
11    A.  Yes.
12    Q.  And none of the officers ever let
13  her go.
14    A.  Not to my knowledge.
15    Q.  She never ran away; is that
16  right?
17    A.  Not that I'm aware of.
18    Q.  And none of the officers were
19  injured; is that right?
20    A.  I don't believe so.
21    Q.  Well, have you seen any injury
22  reports on any officers --
23    A.  No, sir.

Page 144

1    Q.  -- that were caused by T.H.?
2    A.  No, sir.
3    Q.  And she wasn't arrested, correct?
4    A.  That's correct.
5    Q.  She wasn't put in handcuffs; is
6  that correct?
7    A.  That's correct.
8    Q.  She wasn't charged with an offense.
9    A.  That's correct.
10    Q.  The only thing that happened to her
11  that night is she had a seizure, she was held
12  down by police officers and you Tased her.
13        MR. STUBBS:  Object to the form.
14
15    Q.  Is that right?
16    A.  The way you phrased it, that's
17  right.
18    Q.  Okay.  Phrase it for me the way you
19  would phrase it.
20    A.  I mean, if you saw what I saw and
21  witnessed what I saw and her actions is the
22  reason she got Tased.
23    Q.  And that reason is?

1    A.  She was out of control.
2    Q.  But she wasn't moving her arms
3 because they were held down.
4    A.  She was trying to move her arms.
5    Q.  But she wasn't moving her arms
6 because they were held down, right?
7    A.  That's correct.
8    Q.  And she wasn't moving her legs
9 because they were held down, right?
10    A.  That's correct.
11    Q.  She wasn't moving her head because
12 Detective Gilliland said in his statement
13 that he was holding her head, right?
14       MR. STUBBS:  Object to the form.
15
16    A.  Correct.
17    Q.  So what part of her body was
18 moving?
19    A.  From her chest, hips, bucking,
20 thrashing.
21    Q.  Have you ever heard of anyone being
22 injured by being hit by someone's chest?
23    A.  Not that I recall.

1    Q.  Have you ever heard of anyone being
2 injured by being hit by someone's hips?
3    A.  Not that I recall.
4    Q.  Have you ever heard of anyone being
5 injured by being hit by someone's pelvis?
6    A.  Not that I can recall right now.
7    Q.  So what part of Ti███'s body that
8 was moving and bucking and thrashing as you
9 described was a threat to you?
10    A.  We were trying to get her to comply
11 with our orders and to calm down.  And she
12 flatly refused to.  And I dry stunned her two
13 seconds.  It had no effect, none.
14    Q.  Okay.  I'm going to move to strike
15 that as non-responsive to my question.  My
16 question was, what part of Ti███'s body that
17 was moving and bucking and thrashing as you
18 described was a threat to you?
19    A.  None.
20    Q.  What part of Ti███'s body that was
21 moving and bucking and thrashing as you
22 described was a threat to Chief Carroll?
23    A.  None.

1    Q.  What part of Ti███'s body that was
2 moving and bucking and thrashing as you
3 described was a threat to Officer
4 Gilliland?
5    A.  None.
6    Q.  What part of Ti███'s body that was
7 moving and bucking and thrashing as you
8 described was a threat to Officer
9 Kimbrough?
10    A.  None.
11    Q.  What part of T███ body that was
12 moving and bucking and thrashing as you
13 described was a threat to the general
14 public?
15    A.  None.
16    Q.  Then why did you Tase T██n?
17    A.  To get her to comply with my
18 commands to settle down, calm down.
19    Q.  That's the only reason.
20    A.  That's the reason.
21    Q.  Not because she was a threat to
22 you, right?
23    A.  Not at that time, she wasn't a

1 threat.
2    Q.  At the time you Tased her.
3    A.  Yes.
4    Q.  You didn't Tase her because she was
5 a threat to you.
6    A.  She could have easily became a
7 threat.
8    Q.  You didn't Tase her because she was
9 a threat to you, correct?
10    A.  Correct.
11    Q.  You didn't Tase her because she was
12 a threat to the general public, correct?
13    A.  I didn't know that at that time.
14    Q.  At the time you Tased her, she was
15 being held down, correct?
16    A.  She was being held down.
17    Q.  She wasn't a threat to the general
18 public at that time, was she?
19    A.  That's correct, at that time.
20    Q.  And you didn't Tase her because she
21 was a threat to any police officer there.
22    A.  I did.  She kicked Officer
23 Kimbrough.

Page 149

1     Q.   Which is not in his statement.  And
2 it's not in your statement either.  That's
3 curious.  I wanted to ask you about that.
4 Why didn't you put that in your statement?
5     A.   I don't know.
6     Q.   Why didn't you put that on the use
7 of force form?
8     A.   I don't know.
9     Q.   The first time that's come out is
10 after you've been sued that she kicked
11 Officer Kimbrough, correct?
12     MR. STUBBS:  Object to the form.
13
14     Q.   Is that right?
15     A.   That's right.
16     Q.   And the only person that mentions
17 that she kicked Officer Kimbrough is you
18 today in this deposition.
19     A.   Okay.
20     MR. STUBBS:  Object to the form.
21
22     Q.   Is that right?
23     A.   I'm not sure.

Page 150

1     Q.   Well, you've got the statements in
2 front of you.
3     A.   I see their statements.
4     Q.   Did Justin Gilliland say that she
5 kicked Officer Kimbrough?
6     A.   I don't believe so.
7     Q.   Did Officer Kimbrough say that he
8 got kicked by T.H.?
9     A.   I don't believe so.
10     Q.   Okay.  So the only person that has
11 said that Officer Kimbrough was kicked, to
12 your knowledge, is you.
13     MR. STUBBS:  Object to the form.
14
15     Q.   Is that right?
16     A.   Right.
17     Q.   Now, did you Tase her before or
18 after she kicked Officer Kimbrough?
19     A.   After.
20     Q.   Now, which leg did she kick Officer
21 Kimbrough with?
22     A.   I'm not sure.
23     Q.   Who was holding her leg that let

Page 151

1 her go so that she could kick Officer
2 Kimbrough?
3     A.   I don't know if her leg broke free
4 when he was holding her.  She was twisting
5 sideways, bucking and fighting.  I'm not sure
6 which leg.
7     Q.   Do you understand why that's not
8 really plausible, Mr. Morris?
9     MR. STUBBS:  Object to the form.
10
11     Q.   It's your testimony sitting here
12 today that a grown man who is a trained
13 police officer, APOST certified, could not
14 hold down a seventeen-year-old girl.  Is that
15 your testimony?
16     MR. STUBBS:  Object to the form.
17
18     A.   No.  That's not my testimony.
19     Q.   Well, what is your testimony?
20     A.   My testimony is she was kicking.
21 She was out of control, bucking, thrashing,
22 trying to get up, trying to fight.
23     Q.   How was she kicking if her legs

Page 152

1 were being held down?
2     A.   I think her leg got loose and she
3 kicked him.
4     Q.   So you're saying that a grown man
5 could not hold the legs of a
6 seventeen-year-old girl who is a police
7 officer trained, presumably APOST certified,
8 could not hold down the legs of a
9 seventeen-year-old girl that had just come
10 out of a seizure.  That's your testimony.
11     MR. STUBBS:  Object to the form.
12
13     Q.   You can answer.
14     A.   Yes.
15     Q.   Do you believe that on the night of
16 January 16, 2015, you were acting under the
17 color of State law?  Do you know what that
18 means?
19     MR. STUBBS:  Object to the form.
20
21     A.   Acting in my capacity as a police
22 officer?
23     Q.   Yes.

1  A.  Yes.

2  Q.  Do you believe that you were acting

3 in your capacity as a police officer for

4 Rainbow City, Alabama?

5  A.  Yes.

6  Q.  Has anyone told you anything to the

7 contrary?

8  A.  No, sir.

9  MR. HARP:  That's all I have.  I

10 may have some follow-up depending on what

11 these others have to ask you.

12  MR. STUBBS:  No questions.

13  MS. CHANDLER:  No questions.

14  MR. HOWARD:  No questions.

15  MR. HARP:  All right.  Thank you

16 for your time.

17

18

19

20  FURTHER DEPONENT SAITH NOT

21  ENDING TIME:  5:30 p.m.

22

23  CERTIFICATE

1

2 STATE OF ALABAMA

3 ETOWAH COUNTY

4

5  I hereby certify that the above and

6 foregoing deposition was taken down by me in

7 stenotype and the questions and answers

8 thereto were transcribed by means of

9 computer-aided transcription, and that the

10 foregoing represents a true and correct

11 transcript of the testimony given by said

12 witness upon said hearing.

13  I further certify that I am neither of

14 counsel, nor of kin to the parties to the

15 action, nor am I in anywise interested in the

16 result of said cause.

17

18  /s/Beth Word

19  BETH WORD

20  ACCR #:  376

21  EXPIRES: 9/30/2016

22

23