FILED

2017 May-11 PM 08:29
U.S. DISTRICT COURT
N.D. OF ALABAMA

Page 1

1   IN THE UNITED STATES DISTRICT COURT

2   FOR THE NORTHERN DISTRICT OF ALABAMA

3         MIDDLE DIVISION

4

5

6   CASE NUMBER: 4:15-cv-1152-VEH

7

8

9   MICHELLE LEE HELM,

10       Plaintiff,

11

12   vs.

13

14   RAINBOW CITY, ALABAMA, et al.,

15       Defendants.

16

17

18

19      DEPOSITION OF GREG CARROLL

20      DATE TAKEN: May 18, 2016

21

22

23

Page 2

1       In accordance with Rule 5(d) of The

2   Alabama Rules of Civil Procedure, as amended,

3   effective May 15, 1988, I Beth C. Word, am

4   hereby delivering to Mr. H. Gregory Harp the

5   original transcript of the oral testimony

6   taken on the 18th day of May 2016, along with

7   exhibits.

8

9       Please be advised that this is the

10   same and not retained by the Court Reporter,

11   nor filed with the Court.

12

13

14

15      S T I P U L A T I O N S

16      IT IS STIPULATED AND AGREED by and

17   between the parties through their counsel,

18   that the deposition of GREG CARROLL may be

19   taken before Beth C. Word, Commissioner, at

20   the Law Office of Clark Hall, 750 Forrest

21   Avenue, Gadsden, Alabama, on the 18th day of

22   May 2016.

23

Page 3

1       IT IS FURTHER STIPULATED AND AGREED

2   that the signature and to the reading of the

3   deposition by the witness is waived, the

4   deposition to have the same force and effect

5   as if full compliance had been had with all

6   laws and rules of Court relating to the

7   taking of depositions.

8

9       IT IS FURTHER STIPULATED AND AGREED

10   that it shall not be necessary for any

11   objections to be made by counsel to any

12   questions except as to form or leading

13   questions, and that counsel for the parties

14   may make objections and assign grounds at the

15   time of the trial, or at the time said

16   deposition is offered in evidence, or prior

17   thereto.

18

19       IT IS FURTHER STIPULATED AND AGREED

20   that the notice of filing of the deposition

21   by the Commissioner is waived.

22

23

Page 4

1       APPEARANCES

2

3   FOR THE PLAINTIFF:

4

5       GREGORY HARP, LLC

6       BY: Mr. H. Gregory Harp

7       ADDRESS: 459 Main Street

8       Suite 101-266

9       Trussville, Alabama 35173

10       (205) 544-3132

11

12

13   FOR THE DEFENDANT:

14

15       FORD, HOWARD & CORNETT, P.C.

16       BY: Mr. H. Edward Howard

17       ADDRESS: 140 South Ninth Street

18       Gadsden, Alabama 35901

19       (256) 546-5432

20

21

22

23

Page 5

1   STUBBS, SILLS & FRYE, P.C.
2   BY:  Mr. C. David Stubbs
3   ADDRESS:  1724 South Quintard Avenue
4   Anniston, Alabama 36201
5   (256) 835-5050
6
7
8   F&B LAW FIRM, P.C.
9   BY:  Ms. Allison B. Chandler
10  ADDRESS:  213 Greene Street
11  Huntsville, Alabama 35801
12  (256) 536-0095
13
14
15  ALSO PRESENT:
16      John Bryant
17
18
19
20
21
22
23          INDEX

Page 6

1
2   EXAMINATION BY:          PAGE NUMBER:
3   Mr. Harp                8
4
5
6
7   EXHIBITS:
8   PX- 1 - Notice of Deposition       19
9   PX- 2 - Amended Complaint          20
10  PX- 3 - Answers to Interrogatories  21
11  PX- 4 - Screenshot of Video        41
12  PX- 5 - Use of Force Form          76
13  PX- 6 - Photo                      81
14  PX- 7 - Statement of Gilliland     88
15  PX- 8 - Statement of Morris        99
16  PX- 9 - Statement of Fazekas       118
17  PX-10 - Synopsis Use of Force Form 143
18  PX-11 - Morgan Use of Force Form   146
19
20
21
22
23      I, BETH C. WORD, a Court Reporter of

Page 7

1   Gadsden, Alabama, acting as Commissioner,
2   certify that on this date, as provided by the
3   Alabama Rules of Civil Procedure and the
4   foregoing stipulation of counsel, there came
5   before me at the Law Office of Clark Hall,
6   750 Forrest Avenue, Gadsden, Alabama,
7   beginning at 9:00 a.m., GREG CARROLL, witness
8   in the above cause, for oral examination,
9   whereupon the following proceedings were had:
10
11
12      THE COURT REPORTER:  Usual
13  stipulations?
14      MR. HARP:  Yes.
15      MS. CHANDLER:  Yes.
16      MR. STUBBS:  Yes.
17      MR. HOWARD:  Yes.
18
19      GREG CARROLL,
20      being first duly sworn, was
21      examined and testified as follows:
22
23      EXAMINATION BY MR. HARP:

Page 8

1       Q.  Mr. Carroll, my name is Greg Harp.
2   And I am the attorney of record for Michelle
3   Helm and her minor daughter that we're going
4   to try to identify by her initials today.  So
5   if I say T.H., can we have an understanding
6   that I am referring to the minor daughter of
7   Michelle Helm?
8       A.  That will be fine.
9       Q.  Okay.  Would you state your full
10  name for the record?
11      A.  It's Gregory Mark Carroll.
12      Q.  And where do you reside,
13  Mr. Carroll?
14      A.  590 Rolling Hills Road, Gadsden,
15  Alabama.
16      Q.  How long have you resided at that
17  address?
18      A.  About five years.
19      Q.  Prior to residing at 590 Rolling
20  Hills Drive, where did you -- is it Drive or
21  Road?
22      A.  590 Rolling Hills Road.
23      Q.  Road.

1  A.  Yes, sir.
2  Q.  Prior to residing at that address,
3  where did you live?
4  A.  276 Allegheny Drive, Rainbow City.
5  A-l-l-e-g-h-e-n-y.  It took me thirty years
6  to learn how to spell that.
7  Q.  And how long did you live at that
8  address?
9  A.  Thirty-one, thirty-two years.
10  Q.  Are you married?
11  A.  Yes.
12  Q.  What is your wife's name?
13  A.  Joyce Brenda Carroll.
14  Q.  Is Ms. Carroll employed?
15  A.  Yes.
16  Q.  Where does she work?
17  A.  Gadsden State.
18  Q.  Is that Gadsden State Community
19  College?
20  A.  Yes, sir.
21  Q.  Harvard on the hill?
22  A.  Yeah.  That's it.
23  Q.  And what is her job there?

1  A.  She works with the dorms.  She's
2  over the dorms for the foreign students and
3  stuff.
4  Q.  Do you have any adult children --
5  and when I say adult, I mean children over
6  the age of nineteen.
7  A.  Yes.  I have two of my own, and she
8  has two.
9  Q.  Could you give me their names,
10  please?
11  A.  My son's name is Gregory Adam
12  Carroll.
13  Q.  And how old is Gregory Adam?
14  A.  He is thirty-one.
15  Q.  Is he employed?
16  A.  Yes.
17  Q.  Do you know where he is employed?
18  A.  I knew you were going to ask that.
19  It's in Anniston, but I couldn't tell you the
20  name.  I don't know.
21  Q.  Have you ever given a deposition
22  before?
23  A.  No.

1  Q.  And I failed to do this before I
2  lunged into a series of background questions,
3  but the court reporter, as you know, is
4  taking down everything that we're saying.
5  A.  Right.
6  Q.  And these depositions are taken in
7  such a way, and my rule always is, if I ask a
8  question that you do not understand or that
9  is confusing to you in any way, just stop and
10  ask me to rephrase the question, and I will
11  do that.  Okay?
12  A.  Okay.
13  Q.  Because if you answer that
14  question, I'm going to assume that you
15  understood the question in the manner that it
16  was asked.  Okay?
17  A.  Correct.
18  Q.  And I'll be happy to rephrase and
19  try to make the question as understandable as
20  possible.  Okay?
21  A.  Okay.
22  Q.  Anytime you need to take a break,
23  let me know.  This is your deposition, and

1  we'll take a break anytime you need to.
2  A.  Thank you.
3  Q.  Now, you said you have two sons; is
4  that correct?
5  A.  No.  I have one son and one
6  daughter.
7  Q.  One daughter.  And what's your
8  daughter's name?
9  A.  Her name is Leigh Stevens
10  Carroll.
11  Q.  And how old is she?
12  A.  She is twenty-five.
13  Q.  Is she employed?
14  A.  Yes.  She's employed with Ruby
15  Tuesday.
16  Q.  Ruby Tuesday.  Is that the one on
17  Rainbow Drive?
18  A.  No.  It's the one in Hoover.
19  Q.  In Hoover?
20  A.  Uh-huh (affirmative response).
21  Q.  And you said your wife had two
22  children of her own?
23  A.  Yes.

1    Q.   Your stepchildren?

2    A.   Yes.

3    Q.   And what are their names?

4    A.   Brittney Lloyd.

5    Q.   And how old is Brittney?

6    A.   Brittney is twenty-seven.

7    Q.   Is she employed?

8    A.   Yes.

9    Q.   Where is she employed?

10   A.   American Eagle.

11   Q.   What city is that?

12   A.   Gadsden, there at the mall.

13   Q.   Does Gregory Carroll, does he live

14 in Gadsden or Anniston?

15   A.   No.  He lives in Rainbow City.

16   Q.   Rainbow City?

17   A.   Yes.  The same address, 276

18 Allegheny.

19   Q.   Okay.  So Gregory lives with you

20 and your wife.

21   A.   No.

22   Q.   Oh, I'm sorry.  He lives in your

23 old home.

1    A.   Right.

2    Q.   All right.  And Leigh, where does

3 she live?

4    A.   She lives in Hoover.  She bought a

5 condo there in Hoover, but I don't know the

6 address.

7    Q.   That's fine.  And Brittney, where

8 does she live?

9    A.   She lives in Gadsden, in North

10 Gadsden.  I can't remember the street.  It's

11 about half a mile from my house.

12   Q.   And the second child of Joyce is

13 who?

14   A.   That's going to be Melissa

15 Shortnacy.

16   Q.   Spell that last name for me.

17   A.   S-h-o-r-t-n-a-c-y.

18   Q.   How old is she?

19   A.   She is twenty-four.

20   Q.   And where does she reside?

21   A.   560 Rolling Hills Road, Gadsden,

22 Alabama.

23   Q.   So she lives down the street from

1 you.

2    A.   She lives next door to us.

3    Q.   Does she work?

4    A.   Yes.

5    Q.   Where does she work?

6    A.   Vision America on Rainbow Drive.

7    Q.   Are you employed?

8    A.   Yes, sir.

9    Q.   Where are you employed?

10   A.   City of Rainbow City.

11   Q.   How long have you been employed by

12 Rainbow City?

13   A.   About twenty-three and a half

14 years.

15   Q.   Have you been employed by the

16 Rainbow City Police Department those entire

17 twenty-three and a half years?

18   A.   Yes.

19   Q.   Did you start out working as a

20 patrol officer for Rainbow City?

21   A.   Yes.

22   Q.   How long did you work as a patrol

23 officer for Rainbow City?

1    A.   About six years.

2    Q.   And what year did you start working

3 for Rainbow City, if that was twenty-three

4 and a half years ago?

5    A.   4-1 of '93.

6    Q.   1993?

7    A.   Uh-huh (affirmative response).

8    Q.   So in about 1999, 2000, you changed

9 job titles?

10   A.   Yes.

11   Q.   What did you become?

12   A.   Detective.

13   Q.   How long did you work as a

14 detective for Rainbow City?

15   A.   I believe until August of 2012.

16   Q.   During the time that you were a

17 detective for Rainbow City, was the Chief of

18 Police Allen Ragan?

19   A.   Uh-huh (affirmative response).

20   Q.   Is Allen Ragan still with the City

21 of Rainbow City?

22   A.   No.  He no longer works there.

23   Q.   Does he still work for the tire

1  store?

2   A.  Yeah, B and C.

3   Q.  B and C?

4   A.  Uh-huh (affirmative response).

5   Q.  Have you had any conversations at

6  all with Allen Ragan about this lawsuit?

7   A.  Not to my knowledge.

8   Q.  Have you had any conversations at

9  all with Gregory Adam Carroll about this

10  lawsuit outside the presence of either your

11  wife or your attorney?

12   A.  No.

13   Q.  Have you had any conversations at

14  all with Leigh Carroll about this lawsuit

15  outside the presence of your wife or

16  attorney?

17   A.  No.

18   Q.  Have you had any conversations with

19  Brittney Lloyd about this lawsuit outside the

20  presence of your wife or attorney?

21   A.  No.

22   Q.  Have you had any conversations with

23  Melissa Shortnacy about this lawsuit?

1   A.  No.

2   Q.  Outside of your attorney, have you

3  had any conversations with anyone about this

4  lawsuit?

5   A.  Not other than the ones that's

6  involved.

7   Q.  And when you say the ones that are

8  involved, who are you referring to?

9   A.  That would be George Morris.

10   Q.  Anyone else?

11   A.  Justin Gilliland.

12   Q.  Anyone else?

13   A.  Not that I can recall.

14   Q.  Have you had any conversations with

15  John Bryant outside the presence of your

16  attorney about this lawsuit?

17   A.  No.

18   Q.  Can you tell me who, if anyone, is

19  the Deputy Chief of Rainbow City?

20   A.  They don't have one.

21   Q.  Let me show you what I'm going to

22  mark as Plaintiff's Exhibit Number 1 to your

23  deposition.  And since you have never given a

1  deposition before, everytime I mark

2  something, I'm going to slide it to your

3  attorney so he can look at it first.

4   A.  Okay.

5

6    (Plaintiff's Exhibit Number 1 was

7  marked for identification and same is

8  attached hereto.)

9

10   Q.  Have you ever seen that document

11  before today?

12   A.  No, I don't think I have.

13   Q.  Have you ever been told that there

14  will be a position of Deputy Chief created

15  for Rainbow City?

16   A.  Yes.  Well, I say yes.  Probably a

17  couple of months ago, they were going to

18  create a Deputy Chief position.

19   Q.  And you received notice of that a

20  couple of months ago?

21   A.  Yeah, when the Council was talking

22  about it.

23   Q.  Could that have been as far back as

1  February of 2016?

2   A.  Yeah.  Yeah, it could have.

3   Q.  Okay.  I'm going to show you what I

4  will mark as Plaintiff's Exhibit Number 2 to

5  your deposition.  And by way of further

6  identification, it is the amended complaint

7  that was filed on September 10, 2015 in this

8  matter.

9

10    (Plaintiff's Exhibit Number 2 was

11  marked for identification and same is

12  attached hereto.)

13

14   A.  (Witness reviewing document.)

15   Q.  Have you ever seen a copy of that

16  amended complaint that we marked as

17  Plaintiff's Exhibit 2 before?

18   A.  I don't recall.

19   Q.  You don't recall whether or not you

20  have seen it or you don't recall seeing it?

21   A.  I don't recall seeing it.

22   Q.  Are you aware that in the amended

23  complaint, there are allegations made by

1 Michelle Helm and T.H. against you?
2      A.  Is this the same thing that was
3 sent to us a few months ago?
4      Q.  Possibly.  I'm not sure how you got
5 it.  That was filed electronically online, so
6 I can't say that that's the same thing that
7 was sent to you.
8      MR. HOWARD:  Well, I guess it's
9 probably fair to say it's probably not the
10 one that you were served with by process.
11      MR. HARP:  That is fair to say.
12
13      A.  I guess I would have to answer no
14 to that then.
15
16      (Plaintiff's Exhibit Number 3 was
17 marked for identification and same is
18 attached hereto.)
19
20      Q.  Okay.  I'm going to show you what I
21 have marked as Plaintiff's Exhibit Number 3
22 to your deposition.  And by way of further
23 identification, it is the answer to first

1 amended complaint by Defendants Rainbow City,
2 Carroll, Fazekas and Morris.
3      A.  (Witness reviewing document.)
4      Q.  Have you had a chance to look at
5 Plaintiff's Exhibit Number 3, Mr. Carroll?
6      A.  Yes.
7      Q.  Is that a document that you have
8 seen before today?
9      A.  No.  I think I've seen this one,
10 but I don't think I have seen this one
11 (indicating).
12      Q.  And when you say you have seen this
13 one, to what are you referring?
14      A.  I think I have a copy of this one.
15      Q.  And that is Plaintiff's Exhibit
16 Number 2?
17      A.  Number 2, yes.
18      Q.  Which is the amended complaint.
19      MR. HOWARD:  Yes, first amended
20 complaint.
21
22      Q.  I will represent to you that
23 Plaintiff's Exhibit Number 2 is the first

1 amended complaint.  And if I understand your
2 testimony correctly, you have not seen a copy
3 of Plaintiff's Exhibit Number 3 before today;
4 is that right?
5      A.  I think I have got a copy of this.
6 This is the one I don't think that I have
7 seen.
8      Q.  Okay.  Now, let me back up.  So now
9 you believe you have seen a copy and you have
10 a copy of Plaintiff's Exhibit Number 3, which
11 is the answers to the first amended
12 complaint, correct?
13      A.  I think so.
14      Q.  And now you think that maybe you do
15 not have a copy and you have not seen a copy
16 of Plaintiff's Exhibit Number 2; is that
17 right?
18      A.  I'm going to say correct.
19      Q.  Now, after you worked as a
20 detective for Rainbow City, what was your
21 next job title?
22      A.  Detective Sergeant.
23      Q.  What years did you work as a

1 Detective Sergeant for Rainbow City?
2      A.  I can just solely guess.
3      Q.  One thing that I failed to tell you
4 as part of my little spill is I don't want
5 you to guess.  I just want to know what you
6 remember.  If you don't remember, that's
7 fine.
8      A.  Okay.  I don't remember.
9      Q.  And I'm sure your lawyer probably
10 doesn't want you to guess either, so just
11 tell me what you remember.  Okay?
12      A.  Okay.  I don't remember.
13      Q.  Okay.  After your job as Detective
14 Sergeant, what was the next job title you
15 held?
16      A.  Lieutenant Detective.
17      Q.  And what is the difference between
18 a Detective Sergeant and a Lieutenant
19 Detective at the Rainbow City Police
20 Department?
21      A.  About a dollar fifty.
22      Q.  Is that the only difference?
23      A.  Same job.

1    Q.   Job duties are the same?
2    A.   Yeah.
3    Q.   Did you have a car as a Detective
4  Sergeant?
5    A.   Yes.
6    Q.   In fact, you and Captain Ragan
7  actually went down south to look for you a
8  car to drive around in at one point, right?
9    A.   We went to Montgomery to the
10  surplus down there.
11    Q.   Right.  And you got you a car to
12  drive around in when you became a detective;
13  is that right?
14    A.   Yes.
15    Q.   Okay.  And you had the car when you
16  were a Lieutenant Detective.
17    A.   Uh-huh (affirmative response).
18    Q.   Did you supervise any officers as a
19  Lieutenant Detective?
20    A.   I only had one.
21    Q.   And who was that?
22    A.   That would be Chase Jenkins.
23    Q.   Chase Jenkins?

1    A.   Uh-huh (affirmative response).
2    Q.   Is Mr. Jenkins still employed by
3  the Rainbow City Police Department?
4    A.   He is not.
5    Q.   And when you supervised Chase
6  Jenkins, what was his job title?
7    A.   Detective Sergeant.
8    Q.   To your knowledge, has Mr. Jenkins
9  tried to apply for reinstatement with the
10  Rainbow City Police Department since he was
11  terminated?
12    A.   Yes.
13    Q.   And was he allowed to return to the
14  Rainbow City Police Department?
15    A.   It hasn't come to court yet.
16    Q.   After your job as a Lieutenant
17  Detective, what was your next job title at
18  Rainbow City?
19    A.   Captain of investigation.
20    Q.   Captain of investigation?
21    A.   Yeah.
22    Q.   And as Captain of investigation for
23  Rainbow City Police Department, did you

1  supervise employees?
2    A.   Just one.  And that would be Chase
3  Jenkins.  No.  Let me back up.
4    Q.   Okay.
5    A.   We did have two more.  They have
6  quit.  Gerry Lyons and Brian Rush.
7    Q.   Thank you for that.  What was your
8  next job title, if any, after you were
9  Captain of investigations for the Rainbow
10  City Police Department?
11    A.   That would be Chief.
12    Q.   Chief of police?
13    A.   Yes.
14    Q.   And when did you become Chief of
15  police for the Rainbow City Police
16  Department?
17    A.   August of 2012.
18    Q.   And when you became Chief of police
19  for the Rainbow City Police Department, did
20  you assume any supervisory authority over any
21  other Rainbow City Police Department police
22  officers?
23    A.   Yes.  I was over everybody.

1    Q.   Everybody.
2    A.   Yeah.
3    Q.   And that would include the
4  uniformed patrol officers?
5    A.   Uh-huh (affirmative response).
6    Q.   Is that a yes?
7    A.   Yes.  I'm sorry.
8    Q.   That's okay.  I didn't tell you
9  that too.  You have to say yes or no.
10    A.   Yes.  Yes.
11    Q.   So that would include, you would
12  supervise the uniformed patrol officers.
13    A.   Correct.  Yes.
14    Q.   You would also supervise the
15  detectives?
16    A.   I had a little say-so with the
17  detectives, but Captain Jenkins ran the
18  investigation unit when I left and took over
19  as Chief.
20    Q.   But ultimately, the detectives in
21  the Rainbow City Police Department would
22  answer to you as Chief of police, correct?
23    A.   Yes.

Page 29

1  Q. And would you also supervise the
2 shift supervisors?
3  A. Yes.
4  Q. And those would be Sergeants within
5 the Rainbow City Police Department,
6 correct?
7  A. Yes.
8  Q. How many Sergeants in January of
9 2015 were there in the Rainbow City Police
10 Department?
11  A. Six.
12  Q. Can you name those for me,
13 please?
14  A. Tommy Spurling.
15  Q. Is he still employed by the Rainbow
16 City Police Department?
17  A. Yes. John Bryant.
18  Q. And that's Mr. Bryant that's
19 sitting here today in your deposition?
20  A. Yes.
21  Q. Are you aware that Mr. Bryant is
22 one of your co-defendants in this
23 litigation?

Page 30

1  A. Yes.
2  Q. Okay. And the other Sergeants in
3 January of 2015?
4  A. George Morris.
5  Q. Okay.
6  A. Scott Holderfield.
7  Q. Is Mr. Holderfield still employed
8 by the Rainbow City Police Department?
9  A. Yes.
10  Q. Okay.
11  A. Nick Gaskin.
12  Q. Is Mr. Gaskin still employed by the
13 Rainbow City Police Department?
14  A. Yes.
15  Q. Okay.
16  A. And Phil Braswell.
17  Q. Is that Phillip Braswell?
18  A. Yes.
19  Q. Is he still employed by the Rainbow
20 City Police Department?
21  A. Yes.
22  Q. Are all of these gentlemen that you
23 have just identified still Sergeants for the

Page 31

1 Rainbow City Police Department today?
2  A. No. Two of them have been promoted
3 to Lieutenant.
4  Q. And who are those two?
5  A. That would be Scott Holderfield and
6 George Morris.
7  Q. So George Morris has been promoted
8 to a Lieutenant for the Rainbow City Police
9 Department?
10  A. Yes.
11  Q. When was George Morris promoted to
12 Lieutenant?
13  A. Six or seven months ago.
14  Q. Is there a test that Sergeants must
15 take and pass in order to be promoted to
16 Lieutenant for the Rainbow City Police
17 Department?
18  A. No.
19  Q. How does one go about being
20 promoted from Sergeant to Lieutenant in the
21 Rainbow City Police Department?
22  A. In our case, they go before the
23 Council and interviews are done. And once

Page 32

1 the interviews are over with, then the
2 decision is made on who is going to get
3 promoted.
4  Q. Who determines which Sergeants go
5 before the Council in order to seek promotion
6 to Lieutenant?
7  A. All Sergeants that has two years
8 experience on the job are eligible to sign up
9 for the Lieutenant job.
10  Q. Two years?
11  A. Yes.
12  Q. Is that two years as a Sergeant or
13 two years of police experience?
14  A. No. Two years as a Sergeant.
15  Q. Do you attend any church in the
16 Etowah County area?
17  A. Yes.
18  Q. What church do you attend?
19  A. Goodyear Heights.
20  Q. Do you hold any type of board or
21 officer position in that church?
22  A. No.
23  Q. And I don't mean this derogatory,

1 but would you consider yourself to be just a
2 member of that church, or do you have any
3 leadership responsibility at all?
4     A. No. I have no leadership
5 responsibility.
6     Q. Do you know Jeremy Reeves?
7     A. Yes.
8     Q. How do you know Jeremy Reeves?
9     A. He was over Center Stages. And
10 he's the one that would call whenever they
11 needed security.
12     Q. When you say he was over Center
13 Stages, could you elaborate on that?
14     A. Well, he was like a manager
15 maybe.
16     Q. And you said he would call whenever
17 they needed security. Who would he call?
18     A. He would call me.
19     Q. Call you, personally?
20     A. Uh-huh (affirmative response).
21     Q. And when Jeremy Reeves would call
22 you personally and tell you that he needed
23 security at Center Stage, what would you then

1 do?
2     A. I would line it up.
3     Q. And when you say you would line it
4 up, what do you mean?
5     A. Well, if he said he needed two
6 officers, then I would supply him with two
7 officers. If he needed four officers, I
8 would supply him with four officers.
9     Q. When you say you would supply him,
10 I guess I don't understand. Are these
11 officers being paid by Jeremy Reeves?
12     A. Yes.
13     Q. Now, when you would supply
14 officers -- strike that. On January 16,
15 2015, were officers that you supplied to
16 Jeremy Reeves present at Center Stage?
17     A. Yes.
18     Q. How many officers at Center Stage
19 on January 16, 2015 were there because you
20 supplied them or lined it up?
21     A. Six or seven.
22     Q. Of the six or seven officers that
23 you say were at Center Stage on January 16,

1 2015, can you identify those officers?
2     A. I believe I can.
3     Q. Okay. Would you do that, go ahead
4 and list those officers?
5     A. George Morris, Justin Gilliland,
6 Jimmy Fazekas, Gary Morgan, Timothy
7 Kimbrough, myself and Camp Yancey.
8     Q. Camp?
9     A. Yeah, C-a-m-p.
10     Q. On January 16, 2015, George Morris
11 was a Sergeant for the Rainbow City Police
12 Department, correct?
13     A. Correct.
14     Q. On January 16, 2015 at Center Stage
15 while working security, was George Morris
16 wearing a Rainbow City police uniform?
17     A. He was wearing not like a Class A
18 uniform like the officers wear on patrol, but
19 he was wearing a golf shirt with the badge on
20 it, khaki pants, belt badge.
21     Q. On January 16, 2015 while working
22 security at Center Stage, was Timothy
23 Kimbrough wearing a Class A uniform?

1     A. I think he was, yes.
2     Q. And when we say Class A uniform,
3 we're referring to what most people would
4 identify a police officer in. And that's
5 usually a navy uniform, correct?
6     A. Correct. Yes.
7     Q. And do the pants have a stripe on
8 them?
9     A. No.
10     Q. So they're just plain navy pants?
11     A. Yes.
12     Q. With a navy shirt?
13     A. Yes.
14     Q. And in January, would that have
15 been the short sleeve shirt or the long
16 sleeve shirt?
17     A. That's up to them. If they want to
18 wear a long sleeve, they can. If they want
19 to wear a short sleeve, they can.
20     Q. And he would have been wearing a
21 badge, correct?
22     A. Yes.
23     Q. His utility belt?

1  A.  Yes.
2  Q.  Including a weapon?
3  A.  Yes.
4  Q.  And including a Taser?
5  A.  Correct.
6  Q.  On January 16, 2015 while working
7 security at Center Stage, was Gary Morgan
8 wearing a Class A uniform?
9  A.  Correct.
10  Q.  On January 16, 2015 while working
11 security at Center Stage, was Camp Yancey
12 wearing a Class A uniform?
13  A.  No.
14  Q.  On January 16, 2015 at Center
15 Stage, do you recall any Rainbow City police
16 officers being present at any time at Center
17 Stage who were on duty?
18      MR. HOWARD:  Are you talking about
19 his knowledge or he saw and heard there?
20      MR. HARP:  No.  Does he recall
21 personally.
22
23  A.  Not until after everything started

1 happening.
2  Q.  When you say not until everything
3 started happening, what are you referring
4 to?
5  A.  Well, when whatever you want to
6 call it, the fight or whatever.  You know,
7 when everything was taking place, then I
8 think the officers started coming in then
9 because I think there was a call put out for
10 some assistance.  And some of my guys came.
11  Q.  Do you recall who or which of your
12 guys came when this call for assistance was
13 put out?
14  A.  John Bryant came.  And I think --
15 no, I can't say that.  I'm trying to think of
16 his name.  Hang on a minute.  Can I ask John?
17      MR. HOWARD:  No, you can't.  I'm
18 sorry.
19
20  A.  Well, okay.  I don't know.
21  Q.  I just need to know what you
22 recall.  If you don't remember his name,
23 that's fine.  Just tell me that.

1  A.  Okay.
2  Q.  You don't remember the other
3 officer --
4  A.  No.
5  Q.  -- that you were trying to think
6 of?
7  A.  No.
8  Q.  You don't recall his name,
9 correct?
10  A.  No.
11  Q.  But you know that John Bryant came
12 after the call was put out for assistance.
13  A.  Yes.
14  Q.  Do you know who made that call for
15 assistance?
16  A.  I don't remember.
17  Q.  Do you know how the call for
18 assistance was made?
19  A.  No.
20  Q.  How do you know that a call for
21 assistance was made?
22  A.  Because the guys showed up.  I
23 mean, they normally don't just come in there,

1 you know, when a concert is going on.
2  Q.  And you don't recall who made the
3 call for assistance.
4  A.  No, I do not.
5  Q.  And you don't recall how it was
6 made.
7  A.  I'm sure it was made over the
8 radio.
9  Q.  Over the radio.
10  A.  Yeah.
11  Q.  So when Rainbow City police
12 officers are working off duty as security,
13 are they carrying radios?
14  A.  Yes.
15  Q.  And who issues those radios to the
16 officers?
17  A.  The City.
18  Q.  And when you say the City, you're
19 referring to Rainbow City?
20  A.  Yes.
21  Q.  Were you carrying a radio on the
22 night of January 16, 2015?
23  A.  No, I wasn't.

1   Q.   What were you wearing on the night
2 of January 16, 2015?
3   A.   A golf shirt and badge with my
4 name, khaki pants. It was a navy blue shirt
5 with the khaki pants, my side arm with a belt
6 badge.
7   Q.   Was your shirt short sleeve or long
8 sleeve?
9   A.   Short sleeve.
10
11       (Plaintiff's Exhibit Number 4 was
12 marked for identification and same is
13 attached hereto.)
14
15   Q.   Okay. I'm going to show you what I
16 have marked as Plaintiff's Exhibit Number 4
17 to your deposition. And I will represent to
18 you that this is a screenshot from a video
19 that was produced to us by Rainbow City. Do
20 you recognize anyone in that photograph?
21   A.   That's possibly me right there
22 (indicating).
23   Q.   When you say that's possibly me,

1 where are you indicating?
2   A.   Right here (indicating).
3   Q.   And that's the person standing up
4 in the doorway of that building?
5   A.   Yeah.
6   Q.   Do you recognize the location that
7 that video was taken at?
8   A.   Yes.
9   Q.   Where was that video taken?
10   A.   Center Stages at the front doors.
11   Q.   Now, in that photograph, if that's
12 possibly you, you're wearing a long sleeve.
13   A.   No. That's a jacket.
14   Q.   That's a jacket?
15   A.   Yeah.
16   Q.   And you were wearing a golf shirt
17 under that?
18   A.   Yes.
19   Q.   And what color was that golf
20 shirt?
21   A.   I believe navy blue.
22   Q.   Did it have the badge?
23   A.   Yeah. It had the sewed-on badge in

1 the front.
2   Q.   How long before the concert that
3 occurred on January 16, 2015 did Jeremy
4 Reeves call you and ask you to line up
5 security?
6   A.   Probably a week and a half, two
7 weeks.
8   Q.   And did Jeremy Reeves call you on
9 your cell phone?
10   A.   Yes.
11   Q.   And when he called you and told you
12 that he needed security over at Center Stage
13 for January 16, 2015, who determined the
14 number of officers that would serve as off
15 duty security that night?
16   A.   He does.
17   Q.   He does. Jeremy Reeves does.
18   A.   Yes.
19   Q.   And were any of the off duty police
20 officers who were wearing their Class A
21 uniform equipped with body cameras that
22 night?
23   A.   Yes.

1   Q.   Which officers were wearing body
2 cameras on the night of January 16, 2015 at
3 Center Stage?
4   A.   Kimbrough, Morris.
5   Q.   Anyone else?
6   A.   Gary Morgan.
7   Q.   Anyone else?
8   A.   John Bryant.
9   Q.   Well, let me make sure we clarify
10 this. I hope my question was, was anyone who
11 was working security wearing the cameras who
12 were wearing Class As --
13   A.   Okay.
14   Q.   And your earlier testimony is,
15 Sergeant Bryant was not working security that
16 night, correct?
17   A.   That's correct. That's correct.
18   Q.   So Kimbrough, Morris, Morgan.
19 Anyone else that you recall wearing body
20 cameras that night working security?
21   A.   Not that I recall.
22   Q.   And what is the policy as it
23 relates to the use of the body cameras for

1 police officers for Rainbow City?
2    A. We buy them. They wear them.
3 They're supposed to turn them on like on a
4 traffic stop. If something is going on, they
5 are supposed to click it and turn it on.
6    Q. And when you say something going
7 on, would that include a situation in which a
8 call has gone out for assistance?
9    A. Yes.
10    Q. So when a call went out for
11 assistance to bring in on duty Rainbow City
12 police officers, those police officers
13 wearing body cameras were supposed to turn on
14 their body camera at that point?
15    A. Yes.
16    MR. HOWARD: Back up. I want to
17 object to the form. Which officers?
18    MR. HARP: Wait, wait, wait. Now,
19 you're Ed, right?
20    MR. HOWARD: Yes.
21    MR. HARP: But you represent
22 Rainbow City, so he's not your client.
23    MR. HOWARD: Yeah. And he's not

1 here as a City representative, right? He's
2 not a 30(b)(6) representative.
3    MR. HARP: He's here as the Chief
4 of Police, so I want to know what his
5 knowledge is about body cameras.
6    MR. HOWARD: Well, this brings us
7 to a particular point. If he's not a
8 30(b)(6) rep and you haven't noticed him that
9 way, then you're right, I don't. And I'll be
10 quiet as long as we understand, you know,
11 when we get into --
12    MR. HARP: I just want to know what
13 his knowledge is as Greg Carroll, sitting
14 here today.
15    MR. HOWARD: Let me just tell you
16 why I objected, and then I'll shut up.
17    MR. HARP: Okay.
18    MR. HOWARD: Which officers are you
19 talking about? You've got on duty and off
20 duty.
21    MR. HARP: I'm talking about any
22 officer who was wearing a body camera.
23    MR. HOWARD: Okay. Have at it, and

1 I'll be quiet.
2
3    Q. (By Mr. Harp) So my question
4 was -- well, let me ask this question. Have
5 you, personally, viewed any footage from
6 Officer Kimbrough's body camera that was --
7    A. No.
8    Q. -- taken on January 16, 2015?
9    A. No.
10    Q. Do you know if any footage from
11 Officer Kimbrough's body camera exists from
12 January 16, 2015?
13    A. I have no knowledge.
14    Q. As the Chief of Police, do you have
15 the knowledge as to how the body camera
16 footage is preserved?
17    A. Yes.
18    Q. Tell me what your knowledge is
19 about how the body camera footage is
20 preserved.
21    A. What I know about the body cameras,
22 which is not very much, but when the officers
23 come in at the end of their shift, they take

1 their body cams off if they've had any
2 recordings on traffic stops. And there is
3 like a big charger unit, I guess, but it's
4 not a charger unit.
5    Q. Yes, sir.
6    A. But you place the camera inside
7 that. And anything that's on that camera is
8 downloaded into that system. All right.
9 From that part -- we pay a company mega bucks
10 to store this stuff.
11    Q. What's the name of that company?
12    A. I don't know. I couldn't tell you.
13    Q. Is that company local? Here in
14 Etowah County?
15    A. No, it's not. And let me back up.
16 Those cameras are called Taser. They are
17 Taser cameras. So it's probably the Taser
18 company, if I'm not mistaken. The Taser
19 company would have that.
20    Q. Are you familiar with a company
21 named Taser International?
22    A. Yeah.
23    Q. Is that the Taser company you're

1 talking about?

2      A.   It probably is, yes.

3      Q.   Have you viewed footage from any

4 police officer for Rainbow City wearing a

5 body camera on the night of January 16,

6 2015?

7      A.   No.

8      Q.   Now, let me make sure I understand.

9 I'm not just limiting that to those working

10 security.  I'm talking about any body camera

11 footage.

12      A.   Right.

13      Q.   Have you viewed any body camera

14 footage from January 16, 2015?

15      A.   (Witness shakes head negatively.)

16      Q.   Is that a no?

17      A.   No.

18      Q.   Have you requested to see any body

19 camera footage from January 16, 2015?

20      A.   I have not.

21      Q.   On January 17, 2015, do you recall

22 receiving a telephone call from Aaron Helm?

23      A.   I don't recall.

1      Q.   Do you know who Aaron Helm is?

2      A.   No.

3      Q.   Do you recall telling anyone on

4 January 17, 2015 as a result of a complaint

5 made by telephone that the Rainbow City

6 Police Department would get to the bottom of

7 what happened on January 16, 2015?

8      A.   I don't remember that, no.

9      Q.   When you as Chief of Police receive

10 a call in your office at Rainbow City Police

11 Department, is there a log that is kept of

12 incoming calls?

13      A.   No.

14      Q.   Chief, are you on any medication

15 today that would impair your ability to

16 recall?

17      A.   I don't know, but I take a lot.

18      Q.   What medications do you take?

19      A.   I knew you were going to ask that.

20 I take about eighteen pills a day.

21      Q.   Now, let the record reflect that

22 you are handing me a document.  And it is

23 titled at the top, list of medications taken

1 by Gregory M. Carroll; is that correct?

2      A.   That's correct.  And that's not an

3 updated list.

4      Q.   Okay.  So the first medication

5 you have listed on here is Furosemide; is

6 that right?

7      A.   Yeah.

8      Q.   Can you tell me what you take this

9 medication for?  And excuse my reach, but I'm

10 just going to point to this medication.  Do

11 you know what that medication is taken for?

12      A.   Well, I can tell you some, and

13 some, I can't.  Most of it is for my heart.

14 I've had open heart surgery.

15      Q.   Okay.

16      A.   And I'm a diabetic.  Some of this

17 medication is for diabetes.  What's not

18 listed on here for diabetes, there is another

19 pill that I take for it.  Plus, I take four

20 shots a day.

21      Q.   What is that pill?

22      A.   I couldn't tell you.  I'm sorry.

23      Q.   That's okay.  Does any of this

1 medication that's listed here -- and there

2 are one, two, three, four, five, six, seven,

3 eight, nine, ten, eleven, twelve medications

4 listed here.  Does any of that medication

5 impair your ability, your mental capacity at

6 all?

7      A.   The only one that is -- this one

8 right here (indicating).

9      Q.   And you're pointing to the one

10 that's spelled --

11      A.   It's Neurontin.

12      Q.   Neurontin?

13      A.   Neurontin.

14      Q.   And the name that's listed here,

15 I'm going to spell that.

16 G-a-b-a-p-e-n-t-i-n; is that right?

17      A.   That's right.

18      Q.   And you take that three times a

19 day?

20      A.   Yeah.

21      Q.   Have you taken it this morning?

22      A.   I take one in the morning, which is

23 four hundred milligrams.  And then at night,

Page 53

1 I take twenty-eight hundred milligrams.
2    Q.   You take how many milligrams?
3    A.   Twenty-eight hundred.
4    Q.   Well, now, Mr. Carroll, the dosage
5 under that medication says eight hundred
6 milligrams.
7    A.   Right.
8    Q.   Three times a day.
9    A.   But the other one that's not listed
10 on here is the other Neurontin that I take,
11 which is four hundred.  I take four hundred
12 in the morning and four hundred at night,
13 plus those right there.
14    Q.   Have you taken that medication this
15 morning?
16    A.   I've taken all of that medication
17 right there except for the eight hundred.  I
18 take that at night.  And the only other one I
19 take is the four hundred milligrams of
20 Neurontin.
21    Q.   Do you feel like sitting here today
22 in your deposition you are able to give me as
23 accurate answers as you possibly can?

Page 54

1    A.   I will do the best I can.
2    Q.   Okay.  Are you aware that the
3 Rainbow City, City Council had a special
4 meeting on May 5th, 2016, an emergency
5 meeting?
6    A.   Yes.
7    Q.   And are you aware that there was a
8 motion made to place you on administrative
9 leave at that meeting?
10    A.   Yes.
11    Q.   And how were you made aware of
12 that?
13    A.   A couple of officers come down
14 there and told me.
15    Q.   Which officers came and told you
16 that?
17    A.   Scott Holderfield and Nick Gaskin.
18    Q.   Do you know why you were placed on
19 administrative leave?
20    A.   No.
21    Q.   Have you inquired with anyone at
22 Rainbow City why you were placed on
23 administrative leave?

Page 55

1    A.   Talked to the Mayor.
2    Q.   And did the Mayor tell you why you
3 were placed on administrative leave?
4    A.   He said he didn't know.
5    Q.   The Mayor said he didn't know?
6    A.   Yeah.
7    Q.   Are you aware that the Mayor was at
8 that emergency Council meeting on May 5th,
9 2016?
10    A.   I sure am.
11    Q.   Have you talked to anyone else to
12 try to find out why you were placed on
13 administrative leave?
14    A.   Not there.
15    Q.   Not there?
16    A.   Right.
17    Q.   Who else have you talked to to try
18 to find out?
19    A.   My attorney.
20    Q.   And obviously, you probably know
21 this, but I don't want to or need to know
22 anything that you have discussed with your
23 attorney.

Page 56

1    A.   Right.
2    Q.   Did you speak to Anita Bedwell at
3 all?
4    A.   No.
5    Q.   Do you know who that is?
6    A.   Yeah.
7    Q.   Who is Anita Bedwell?
8    A.   She is Mayor pro tem on the
9 Council.
10    Q.   Do you know who Bobby --
11    A.   McCartney.
12    Q.   -- McCartney is?
13    A.   Right.
14    Q.   Who is he?
15    A.   He is just one of the Council
16 people.
17    Q.   Do you know who Tim Ramsey is?
18    A.   He's Council.
19    Q.   Larry Keenum?
20    A.   Council.
21    Q.   Rick Hill?
22    A.   Council.
23    Q.   And so you haven't spoken to any of

Page 57

¹ those names --
² A. No.
³ Q. -- I just gave to you about why you
⁴ were placed on administrative leave?
⁵ A. No.
⁶ Q. And the Mayor told you he didn't
⁷ know why you were placed on administrative
⁸ leave.
⁹ A. Yes.
¹⁰ Q. Now, when the officers came down
¹¹ and notified you that you were placed on
¹² administrative leave, what did you do next?
¹³ A. Turned over my badge and gun.
¹⁴ Q. Were you instructed or asked to
¹⁵ turn over your badge and gun?
¹⁶ A. Yes. I was asked to hand it
¹⁷ over.
¹⁸ Q. And who asked you to hand over your
¹⁹ badge and gun?
²⁰ A. Scott Holderfield.
²¹ Q. Mr. Holderfield was promoted to
²² Lieutenant; is that right?
²³ A. Yes. Correct.

Page 58

¹ Q. So is he still to your knowledge a
² Lieutenant?
³ A. Yes.
⁴ Q. Do you know who is acting as Chief
⁵ of Police for Rainbow City while you are on
⁶ administrative leave?
⁷ A. Jonathan Horton.
⁸ Q. Was Jonathan Horton employed by
⁹ Rainbow City prior to you being placed on
¹⁰ administrative leave?
¹¹ A. Yes.
¹² Q. What was Jonathan Horton's position
¹³ prior to you being placed on administrative
¹⁴ leave?
¹⁵ A. Deputy Chief.
¹⁶ Q. Now, earlier when I asked you if
¹⁷ there was a Deputy Chief for Rainbow City,
¹⁸ you said we don't have one.
¹⁹ A. Well, we didn't, but we do now.
²⁰ And I could have misunderstood it, but I
²¹ didn't know exactly when you were talking
²² about, is there a Deputy Chief.
²³ Q. Okay. So your testimony is, under

Page 59

¹ your belief, there is not a Deputy Chief now
² because he is acting as Chief of Police.
³ A. Correct.
⁴ Q. But prior to Jonathan Horton acting
⁵ as Chief of Police after you were placed on
⁶ administrative leave, was he the Deputy
⁷ Chief?
⁸ A. Yes. Correct.
⁹ Q. To your knowledge, was anyone else
¹⁰ who was employed by the Rainbow City Police
¹¹ Department placed on administrative leave?
¹² A. No.
¹³ Q. Are you APOST certified?
¹⁴ A. Yes.
¹⁵ Q. And when did you first become APOST
¹⁶ certified?
¹⁷ A. 1990.
¹⁸ Q. When is the last time you have
¹⁹ attended any APOST training?
²⁰ A. Well, does that mean my executive
²¹ hours as a Chief or --
²² Q. That's well said. There is a
²³ difference between APOST training for a

Page 60

¹ patrol officer and APOST training for a
² Chief, correct?
³ A. Correct.
⁴ Q. The executive training for the
⁵ Chief deals more with the administrative
⁶ side, correct?
⁷ A. Correct.
⁸ Q. And in your executive training
⁹ since you have been Chief of Police for
¹⁰ Rainbow City, have you had any APOST training
¹¹ on the use of Tasers?
¹² A. When we first got the Tasers, I
¹³ went through the --
¹⁴ Q. You went through the Taser
¹⁵ training?
¹⁶ A. Yes.
¹⁷ Q. And what year was that?
¹⁸ A. I don't know.
¹⁹ Q. When you went through the Taser
²⁰ training, where did you go to attend the
²¹ Taser training?
²² A. It was there at the Rainbow City
²³ Hall.

Page 61

1  Q.  And who did the Taser training?
2  Who was the instructor?
3  A.  Chase Jenkins.
4  Q.  Chase Jenkins?
5  A.  Uh-huh (affirmative response).
6  Q.  And Mr. Jenkins no longer works for
7  the Rainbow City Police Department,
8  correct?
9  A.  That's correct.
10  Q.  How is it that Chase Jenkins was
11  the instructor related to Taser training for
12  Rainbow City?
13  A.  He went to an instructor's class so
14  he would be certified to teach it.
15  Q.  Now, you said when we first got the
16  Tasers, and when you say we, I assume you
17  mean the Rainbow City Police Department?
18  A.  Yes.
19  Q.  That's when you went through Taser
20  training?
21  A.  Yes.
22  Q.  Have you been through a Taser
23  training class since Rainbow City purchased

Page 62

1  Tasers for the police department?
2  A.  Not since the initial class.
3  Q.  As Chief of Police, do you have any
4  knowledge concerning how often the patrol
5  officers are sent to Taser training?
6  A.  Well, all the officers that carry a
7  Taser has been certified through the City.
8  Q.  Certified through the City?
9  A.  Right.  I don't think we have sent
10  anybody outside the City.  The instructors
11  have done that.
12  Q.  Okay.  Were you Chief of Police in
13  August of 2013?
14  A.  Correct.
15  Q.  Do you recall John Bryant attending
16  a Taser instructor re-certification course in
17  Gadsden in 2013?
18  A.  I mean, he could have, but I don't
19  recall.
20  Q.  Can you tell me whether or not
21  Lamont Tucker still works for the Rainbow
22  City Police Department?
23  A.  He does not.

Page 63

1  Q.  Do you know where Lamont Tucker is
2  today?  And I don't mean today as in this
3  day.  I mean do you know where he is
4  generally?
5  A.  I think he still works for
6  Attalla.
7  Q.  So Lamont Tucker actually went to
8  the Attalla Police Department; is that
9  correct?
10  A.  That's correct.
11  Q.  Since January 16, 2015, to your
12  knowledge, did the Rainbow City Police
13  Department conduct any investigation
14  regarding the incident that happened at
15  Center Stage?
16  A.  We didn't go into an investigation
17  on it because we didn't feel the need in it.
18  Q.  And who made that decision?
19  A.  Myself and Chase Jenkins.
20  Q.  Yourself and who?
21  A.  Chase Jenkins.
22  Q.  In January of 2015, what was Chase
23  Jenkins' job title?

Page 64

1  A.  He was a Captain.
2  Q.  And in the hierarchy of the Rainbow
3  City Police Department, in January of 2016,
4  would he have been the next person under
5  you?
6  A.  Correct.
7  Q.  Was there more than one Captain at
8  Rainbow City in January of 2016?
9  A.  No.  He was the only one.
10  Q.  So you and Chase Jenkins made the
11  determination that there was no need to
12  investigate what happened at Center Stage?
13  A.  We looked at everything.  And we
14  talked to the guys about what happened, and
15  that's probably about the extent of it.
16  Q.  Well, you didn't look at
17  everything, right, because you didn't view
18  any body camera footage.
19  A.  No.
20  Q.  Right?
21  A.  Right.
22  Q.  What guys did you talk to?
23  A.  We talked to everybody that was

1 present.  Gary Morgan, Morris, Gilliland.
2    Q.  Fazekas?
3    A.  Fazekas.
4    Q.  Did you talk to Kimbrough?
5    A.  I talked to Kimbrough, John Bryant,
6 Camp Yancey.
7    Q.  Anyone else you talked to?
8    A.  Not that I recall.
9    Q.  Okay.  When you talked to Gary
10 Morgan -- strike that.  Does the Rainbow City
11 Police Department have an internal affairs
12 investigation department?
13    A.  That would usually fall under
14 Captain Jenkins.
15    Q.  So in January of 2016, Chase
16 Jenkins made up the entirety of Rainbow
17 City's internal affairs department?
18    A.  Pretty much, yes.
19    Q.  When you talked to Gary Morgan
20 about the events that occurred on January 16,
21 2015 at Center Stage, were you and Chase
22 Jenkins present?
23    A.  I do not think Chase was there at

1 the time.
2    Q.  Did you have Gary Morgan write any
3 type of statement concerning what happened on
4 the night of January 16, 2015?
5    A.  I don't believe he wrote a
6 statement.
7    Q.  Have you ever seen a statement from
8 Gary Morgan regarding the events of January
9 16, 2015?
10    A.  Huh-uh (indicating no).
11    Q.  Is that a no?
12    A.  That's a no.  I'm sorry.
13    Q.  Have you ever seen a use of force
14 statement that was filled out -- that may
15 have been filled out by Gary Morgan related
16 to the events that occurred on January 16,
17 2015?
18    A.  Yes.
19    Q.  When did you first see a use of
20 force statement completed by Gary Morgan
21 related to the events that occurred on
22 January 16, 2015?
23    A.  I don't recall the exact date.

1    Q.  Can you give me a time frame as to
2 how soon after January 16, 2015 you may have
3 seen that statement?
4    A.  It was probably on a Monday
5 following the incident.
6    Q.  The Monday following the
7 incident?
8    A.  A Monday or Tuesday.
9    Q.  Have you ever seen a use of force
10 statement completed by George Morris
11 regarding use of force on January 16, 2015?
12    A.  Yes.
13    Q.  Have you ever seen any type of
14 written statement from Justin Gilliland
15 regarding the events that occurred at Center
16 Stage on January 16, 2015?
17    A.  I don't recall.
18    Q.  Have you ever seen a statement
19 authored by James or Jimmy Fazekas regarding
20 the events that occurred on January 16,
21 2015?
22    A.  I don't recall.
23    Q.  Have you ever seen a statement

1 authored by Timothy Kimbrough regarding the
2 events that occurred at Center Stage on
3 January 16, 2015?
4    A.  I don't recall.
5    Q.  Have you ever seen a statement
6 authored by John Bryant regarding the events
7 that occurred at Center Stage on January 16,
8 2015?
9    A.  I don't recall.
10    Q.  To your knowledge, did Camp Yancey
11 fill out a statement regarding the events
12 that occurred at Center Stage on January 16,
13 2015?
14    A.  I don't recall.
15    Q.  Did you speak to Camp Yancey
16 about -- or you told me you spoke to Camp
17 Yancey.
18    A.  Yeah.  We talked, but I don't
19 remember if he filled out a statement or
20 not.
21    Q.  When you say we talked, who was
22 present when you spoke to Camp Yancey about
23 the events that occurred at Center Stage on

1 January 16, 2015?

2    A.  I don't remember who all was

3 present.  It was talking like there was two

4 or three of us standing there and we were

5 discussing it.

6    Q.  So it's fair to say, this wasn't

7 any type of formal --

8    A.  No.

9    Q.  -- interview with Camp Yancey.

10    A.  No.

11    Q.  Would that be true for all of the

12 people that you spoke to about the events?

13    A.  Probably, yes.

14       MR. HARP:  All right.  Do you want

15 to take a break?

16       THE WITNESS:  Sure.

17

18       (Whereupon, a brief recess was

19        taken.)

20

21    Q.  Okay.  Mr. Carroll, we're back on

22 the record after a short break.  What was

23 your last day -- I understand you are still

1 employed by the Rainbow City Police

2 Department, but what day did you actually go

3 on administrative leave?

4    A.  Thursday before last.

5    Q.  Thursday before last?

6    A.  Yeah.  I think that's it.

7    Q.  To your knowledge, does Gary Morgan

8 still work for the Rainbow City Police

9 Department?

10    A.  He does not, no.

11    Q.  Do you know why Gary Morgan left

12 working for the Rainbow City Police

13 Department?

14    A.  He resigned.

15    Q.  Do you know why Gary Morgan

16 resigned from the Rainbow City Police

17 Department?

18    A.  I think he felt like he was not

19 going anywhere and that it was in his best

20 interest.

21    Q.  Did you have a conversation with

22 Gary Morgan about why he was resigning from

23 the Rainbow City Police Department?

1    A.  Yes.

2    Q.  And in that conversation, did the

3 subject of this lawsuit come up?

4    A.  Quite possibly, yes.

5    Q.  What was the substance of the

6 conversation related to this lawsuit that you

7 had with Gary Morgan?

8    A.  That, I don't recall, because we

9 talked about several things.

10    Q.  Do you recall whether or not Gary

11 Morgan expressed concern that he would be

12 named as a Defendant in this lawsuit?

13    A.  Yes.

14    Q.  Yes, he expressed that concern?

15    A.  Yes.

16    Q.  And what, if anything, did you say

17 to Gary Morgan in response to him expressing

18 concern that he would be named as a Defendant

19 in this lawsuit?

20    A.  I don't recall what I said.

21    Q.  Did Gary Morgan tell you that this

22 lawsuit and the possibility of being sued was

23 one of the reasons he was leaving the Rainbow

1 City Police Department?

2    A.  No.

3    Q.  Did Gary Morgan tell you that he

4 had concerns about the manner in which police

5 officers within the Rainbow City Police

6 Department conducted themselves?

7    A.  No.

8    Q.  Besides this lawsuit that you're

9 currently involved in, have you ever been

10 named as a Defendant in a lawsuit before?

11    A.  No.

12    Q.  Since you have been Chief of Police

13 for Rainbow City, has Rainbow City ever been

14 sued by anyone for excessive force to your

15 knowledge?

16    A.  No.

17    Q.  Since you have been Chief of Police

18 for Rainbow City, has Rainbow City been sued

19 for any acts related to the conduct of its

20 police officers?

21    A.  Not that I recall.

22    Q.  Do you recall a lawsuit being filed

23 when a Rainbow City police officer shot and

Page 73

1 killed a person in his front yard?
2     A. I don't remember a lawsuit, no.
3     Q. You don't remember there being a
4 lawsuit about that?
5     A. No.
6     Q. Now, you told me that on January
7 16, 2015 -- or in January of 2015, at least,
8 the persons who would have investigated
9 incidents such as as the one that occurred at
10 Center Stage would have been limited to you
11 and Chase Jenkins, correct?
12     A. Correct.
13     Q. Does Rainbow City Police Department
14 have a written use of force policy?
15     A. Yes.
16     Q. Where is that kept?
17     A. It's in the SOP manual.
18     Q. Does Rainbow City Police Department
19 have a policy specific to the use of force of
20 Tasers?
21     A. I think that's included in the use
22 of force.
23     Q. It's included in the general use of

Page 74

1 force policy?
2     A. Yes, I believe.
3     Q. Is the SOP manual issued to all
4 Rainbow City Police Department employees?
5     A. Yes.
6     Q. Can you tell me, based on your
7 knowledge, the last time the use of force
8 policy for the Rainbow City Police Department
9 as found in its SOP manual was updated?
10     A. I don't recall.
11     Q. Has it been within the last five
12 years?
13     A. I don't recall.
14     Q. You have been employed by Rainbow
15 City since 1999, correct?
16     A. Right.
17     Q. Were you issued an SOP manual when
18 you first became an employee?
19     A. Yes.
20     Q. When is the last time that you
21 received an update to your SOP manual?
22     A. Probably, I want to say, there was
23 an update done under the Ragan administration

Page 75

1 when Ragan was Chief there.
2     Q. Ronald Reagan?
3     A. No. I'm sorry.
4     Q. Oh, you mean Allen Ragan.
5     A. Allen Ragan.
6     Q. All right. And that would have
7 been prior to you becoming Chief --
8     A. In 2012.
9     Q. 2012. Now, that was a question
10 about a general update to the SOP manual.
11     A. Right.
12     Q. When is the last time you recall
13 there being an update to the use of force
14 policy contained in the SOP manual?
15     A. I don't recall.
16     Q. Who would be responsible for
17 ensuring that the most current information on
18 use of force was contained in the SOP
19 manual?
20     A. That would have been Chase Jenkins.
21     Q. Chase Jenkins was a Captain then,
22 correct?
23     A. That's correct.

Page 76

1     Q. And he was a Captain in January of
2 2016; is that right?
3     A. I'm not sure on that.
4     Q. Okay.
5     MR. HOWARD: Did you say 2016?
6     MR. HARP: I'm sorry, 2015.
7
8     A. 2015. Yes, he was.
9     Q. Okay. Let me show you what I'm
10 going to mark as Plaintiff's Exhibit Number
11 5. And I will represent to you that this is
12 the Rainbow City Police Department's use of
13 force form report that was emailed to me by
14 Mr. Howard's office. And it relates to
15 George H. Morris.
16
17     (Plaintiff's Exhibit Number 5 was
18 marked for identification and same is
19 attached hereto.)
20
21     A. (Witness reviewing document.)
22     Q. Do you recognize that document?
23     A. Yes.

Page 77

1    Q.   Have you ever seen that document
2  before?
3    A.   Yes.
4    Q.   Turn to page two of that document.
5  Do you see down at the bottom where it says
6  reviewed by Chief of Police?
7    A.   Yes.
8    Q.   Do you recognize that signature?
9    A.   Yes.
10    Q.   And whose signature is that?
11    A.   That's mine.
12    Q.   Did you date it?
13    A.   Yes.
14    Q.   And you dated it 1-19-15,
15  correct?
16    A.   Yes.
17    Q.   When you reviewed this document,
18  which is the use of force form for Rainbow
19  City Police Department, what were you
20  reviewing it for?
21    A.   Well, it's always got to meet my
22  approval and to be sure that it was done
23  correctly.  And, of course, the immediate

Page 78

1  supervisor signs off on it first after he
2  reviews it.  And then he brings it to me, and
3  I look over it.  And then I sign off on it.
4    Q.   Okay.  Do you see the signature of
5  an immediate supervisor on this document?
6    A.   Yes.
7    Q.   And are you referring to where it
8  says C. Jenkins?
9    A.   Yes.
10    Q.   Now, do you recognize Chase
11  Jenkins' signature when you see it?
12    A.   Yeah.
13    Q.   Is that the way Chase Jenkins signs
14  documents?
15    A.   I don't recall, but I mean --
16    Q.   Were you present when George Morris
17  filled this document out?
18    A.   No.
19    Q.   Do you know if Mr. Morris actually
20  filled this document out?
21    A.   No.
22    Q.   You don't know who actually filled
23  this document out, correct?

Page 79

1    A.   I would say George Morris did.
2    Q.   But you don't know that, correct?
3    A.   Right.  Correct.
4    Q.   Now, the document does have some
5  errors though, correct?  If you go back to
6  the first page, do you see Taser, slash,
7  firearm serial number?
8    A.   Yes.
9    Q.   That's not actually a serial number
10  there, is it?
11    A.   No.
12    Q.   That's actually the model number of
13  a Taser, correct?
14    A.   Yes.
15    Q.   That is the X-26, which is the
16  Taser that's carried by the Rainbow City
17  Police Department officers, correct?
18    A.   Correct.
19    Q.   Did you have any conversation with
20  George Morris about this use of force form
21  and report that was filled out?
22    A.   No.
23    Q.   How did you verify the information

Page 80

1  to be accurate?
2    A.   Well, the way I verified that it
3  was accurate was the fact that I was there.
4    Q.   The fact that you were there?
5    A.   Yes.
6    Q.   So you believe that everything that
7  George Morris has on this use of force form
8  report is accurate because you were there.
9    A.   Yes.
10    Q.   Did you witness George Morris Taser
11  T.H.?
12    A.   Yes, I did.
13    Q.   How many times did you witness
14  George Morris Taser T.H.?
15    A.   One time.
16    Q.   Okay.  To your knowledge, has any
17  other police officer said that there was more
18  than one Taser -- that T.H. was Tasered more
19  than one time?
20    A.   No.
21    Q.   No?
22    A.   No.  I was there when George Morris
23  Tasered her one time, probably a second, two

Page 81

1 at the most on a dry stun.

2     Q. Okay. And when he Tasered her that

3 one time that you saw, was she being held

4 down?

5     A. Yes.

6     Q. And who was she being held down

7 by?

8     A. Kimbrough was on her legs. I don't

9 know. There was some Center Stage workers

10 that were holding her shoulders down.

11     Q. So while T.H. was being Tasered,

12 drive stunned by George Morris, Center Stage

13 workers who were not police officers was

14 holding her down.

15     A. Yes. There was one back there by

16 her head. And he was trying to hold her head

17 steady because she had been hitting it on the

18 concrete.

19

20     (Plaintiff's Exhibit Number 6 was

21 marked for identification and same is

22 attached hereto.)

23

Page 82

1     Q. Okay. Let me show you what I've

2 marked as Plaintiff's Exhibit Number 6 to

3 your deposition. Do you recognize that scene

4 that's depicted in that photograph?

5     A. Yes.

6     Q. What do you recognize that scene to

7 be that's depicted in that photograph?

8     A. That's the medics that were working

9 on her that started an IV, I think, or made

10 an attempt to start an IV.

11     Q. If you look at the photograph on

12 the right-hand side, do you see the line

13 that's hanging down on the side of that

14 photograph?

15     A. Yes.

16     Q. Have you seen an IV line before?

17     A. Yes.

18     Q. Would you recognize one if you saw

19 it in a photograph?

20     A. Well, it looks like one.

21     Q. Okay. And where does it look like

22 that IV line is going?

23     A. To her arm.

Page 83

1     Q. Do you see the white material on

2 her arm?

3     A. Yes.

4     Q. What does that appear to be to you?

5     A. It looks like tape.

6     Q. Okay. Now, do you see the person

7 in the blue and white plaid shirt?

8     A. Yes.

9     Q. Do you identify that as a Rainbow

10 City Police Department officer?

11     A. No.

12     Q. Do you identify that as a Rainbow

13 City Police Department off duty officer?

14     A. No.

15     Q. Do you know who that person holding

16 down T.H. in this photograph is?

17     MR. STUBBS: Object to the form.

18 Go ahead.

19

20     A. No.

21     Q. Were you present at the time that

22 person in the blue plaid shirt was at the

23 head of T.H. while she was lying on the

Page 84

1 ground?

2     A. No.

3     Q. You were not present when this --

4     A. Not at this particular time. I

5 remember walking by, and I remember the

6 medics working on her.

7     Q. You remember walking by?

8     A. Yeah.

9     Q. You didn't stop?

10     A. No.

11     Q. Was this before or after you

12 witnessed George Morris Taser her?

13     A. This would be before.

14     Q. So before George Morris Tasered

15 T.H., she had an IV line in her, correct?

16     A. Before he Tasered her, she had an

17 IV line?

18     Q. Yes. You said this photograph

19 would represent before George Morris Tasered

20 her, correct?

21     A. No. I'm sorry. This is after he

22 Tasered her.

23     Q. You think this photograph was taken

1 after George Morris Tasered T.H.
2   A.  Yeah.
3   Q.  Is that a yes?
4   A.  Yes.
5   Q.  And you remember walking by this
6 particular scene, correct?
7   A.  I just remember seeing her on the
8 ground.  And I remember seeing the medics
9 working on her.  Now, this particular scene
10 right here, I can't tell you yes on that.
11   Q.  Okay.  Well, were the medics
12 working on T.H. before she was tased by
13 George Morris?
14   A.  No.
15   Q.  So the medics worked on T.H. after
16 she was tased.
17   A.  Correct.
18   Q.  And after you saw George Morris
19 Taser T.H., which you say happened one
20 time --
21   A.  Right.
22   Q.  -- what did you do?
23   A.  If I'm not mistaken, that's when I

1 walked away and made a phone call.
2   Q.  Who did you call?
3   A.  City Hall.
4   Q.  Why did you call City Hall?
5   A.  To find out where the medics were
6 at because I felt like it was taking longer
7 than necessary and they was needed.
8   Q.  Why did you feel like you needed
9 the medics?
10   A.  Well, obviously, she was having a
11 problem, you know.  And it could have been
12 drugs, alcohol.  It could have been
13 anything.
14   Q.  Well, are you aware that T.H.'s
15 sister had told Rainbow City police officers
16 prior to her being tased that she was having
17 a medical emergency?
18     MS. CHANDLER:  Object to the form.
19
20   A.  No.
21   Q.  Have you ever heard that before?
22   A.  Yeah.  I've heard it.
23   Q.  Who did you hear that from?

1   A.  I think just talk from the other
2 officers.
3   Q.  So you heard other officers say
4 that T.H.'s little sister told the Rainbow
5 City police officers that --
6   A.  This was after the fact.  This was
7 after.
8   Q.  Right.  That's what I want to know,
9 what you heard after the fact from these
10 Rainbow City police officers.
11   A.  Right.
12   Q.  So let me ask that question again
13 just so we're clear.  Remember my rule.  If
14 you don't understand a question --
15   A.  Sure.
16   Q.  -- don't start answering it.
17 Okay?
18   A.  Okay.
19   Q.  Because I'm going to assume that
20 you understood it.
21   A.  Right.
22   Q.  So my question is, after this event
23 occurred on January 16, 2015, did you hear

1 Rainbow City police officers discussing the
2 fact that T.H.'s little sister had told them
3 that she was having a medical emergency?
4   A.  I don't recall that, no.
5   Q.  Okay.  I'm going to show you what I
6 will mark as Plaintiff's Exhibit Number 7 to
7 your deposition.  And by way of further
8 identification, it is a statement of Justin
9 Gilliland.
10
11     (Plaintiff's Exhibit Number 7 was
12 marked for identification and same is
13 attached hereto.)
14
15   A.  (Witness reviewing document.)
16   Q.  Just let me know when you're ready,
17 and we'll talk about it.
18   A.  Okay.
19   Q.  Now, Mr. Carroll, after you saw
20 George Morris use his Taser on T.H. the first
21 time, how long did you remain in that area?
22   A.  Probably three or four minutes.
23   Q.  Are you aware that T.H. was

1  eventually strapped to a gurney on the night
2  of January 16, 2015?
3      A.  Yes.
4      Q.  Were you still present in that area
5  at the time that T.H. was strapped to the
6  gurney?
7      A.  I had walked from inside the
8  concert hall back out to the front of the
9  building when they were loading her up and
10  taking her out.
11      Q.  You had a chance to read Justin
12  Gilliland's statement, correct?
13      A.  Correct.
14      Q.  And your testimony earlier this
15  morning was that you had never seen a
16  statement from Justin Gilliland, correct?
17      A.  I said I don't recall.
18      Q.  Well, does seeing that document
19  refresh your recollection as to whether or
20  not you have seen it before today?
21      A.  Not really, no.
22      Q.  So you still don't recall whether
23  or not you have seen this document before?

1      A.  No.
2      Q.  You had a chance to look over it
3  before I started asking you questions about
4  it.  Did you read the portion of Justin
5  Gilliland's statement in which he says that
6  T.H. was tased -- and sometimes I'm going to
7  say tased and sometimes Tasered, but you
8  understand --
9      A.  Yes.
10      Q.  Did you read the portion of his
11  statement where he said that T.H. was Tasered
12  by George Morris twice?
13      A.  I did.
14      Q.  Okay.  Do you have any reason to
15  dispute that?
16      A.  Well, I can't say because I didn't
17  see the second Taser.
18      Q.  Well, Justin Gilliland is a
19  Detective at the Rainbow City Police
20  Department, correct?
21      A.  Correct.
22      Q.  And were you the Chief of Police
23  when Justin Gilliland became Detective for

1  the Rainbow City Police Department?
2      A.  Correct.
3      Q.  Did you promote Justin Gilliland to
4  Detective?
5      A.  Correct.
6      Q.  Did you feel that he was competent
7  to be a Detective?
8      A.  Yes.
9      Q.  Well, is there some hesitancy in
10  your answer about that question?
11      A.  Well, he had never been a Detective
12  before, so I have a department full of young
13  men that has not got Detective experience.
14  And so we had to put somebody upstairs to
15  work the cases and so we picked Justin.
16      Q.  Why?
17      A.  Well, we picked him.  He was
18  probably one of the more seniored officers.
19  And he had road experience, so we felt like
20  he might work out.
21      Q.  And has he worked out?
22      A.  He has done a fair job, yes.
23      Q.  A fair job?

1      A.  Yes.
2      Q.  Have there been times when Justin
3  Gilliland's work as a Detective was not up to
4  your standards?
5      A.  No.  I mean, when you've just got
6  two people up there, and you've got dozens of
7  cases coming in, those people are limited
8  because you can't just stay on one case for a
9  real long time.  You've got to move on
10  because they just stack up on you.  When you
11  ain't got but two people, you're going to get
12  behind.
13      Q.  Okay.  Do you have any reason to
14  believe that Justin Gilliland was wrong when
15  he said that George Morris Tasered T.H. two
16  times?
17      A.  Right.  I don't have any reason to
18  dispute it.  I can only say that I was
19  present when the first one happened.
20      Q.  So you're not disputing that it
21  happened.  You're just saying you didn't see
22  it happen.
23      A.  Correct.

1   Q.   So if Mr. Gilliland says he saw it
2   happen, you would have no reason to dispute
3   that.
4         MR. STUBBS:  Object to the form.
5
6   A.   I can't call him a liar.
7   Q.   Well, you can if you want to.
8   A.   Well, I'm not going to do that.
9   Q.   Okay.  So do you think he is
10  mistaken?
11  A.   Well, if he said it happened, then
12  I have no reason to believe that it didn't
13  happen.
14  Q.   All right.  Let's go back to the
15  use of force form that was filled out by
16  Sergeant Morris at that time.  It's right
17  here, Plaintiff's Exhibit Number 5.
18  A.   Okay.
19  Q.   Now, if you look at the second
20  page, there is a diagram of a male figure.
21  And the instructions are to place an "X"
22  indicating where contact occurred.  Do you
23  see that?

1   A.   Yes.
2   Q.   And do you see the handwriting
3   that's written out beside the male figure
4   where it says, open paren, number one, close
5   paren, drive stun approximately two
6   seconds?
7   A.   Yeah.  I see the one that says,
8   drive stun approximately two seconds.
9   Q.   But do you know whose handwriting
10  that is?
11  A.   No.
12  Q.   So you don't know who wrote that.
13  A.   No.
14  Q.   Do you see any "Xs" on that male
15  figure that would indicate where the contact
16  occurred?
17  A.   Well, it looks like the contact
18  occurred on the chest area.
19  Q.   How many "Xs" do you see?
20  A.   I see one.
21  Q.   Do you see two?
22  A.   No.
23  Q.   Okay.  And over there in the

1   handwritten notes, it says, open paren, one,
2   close paren, drive stun approximately two
3   seconds, right?
4   A.   Yeah.
5   Q.   So on Sergeant Morris' use of force
6   report, there is no indication by him that he
7   actually Tasered T.H. more than one time, is
8   there?
9   A.   No.
10  Q.   In fact, he says he did it one
11  time.
12  A.   Correct.
13  Q.   But then we have a Detective for
14  the Rainbow City Police Department that says
15  he personally observed Sergeant Morris do it
16  two times.
17        MR. STUBBS:  Object to the form.
18
19  Q.   Is that right?
20  A.   That's correct.
21  Q.   So what do you as Chief of Police
22  do in a situation where you have reviewed the
23  use of force form and it says he stunned her

1   one time, and then you have Justin
2   Gilliland's report where it says he stunned
3   her at least two times?
4         MS. CHANDLER:  Object to the form.
5         MR. STUBBS:  Object to the form.
6
7   A.   Well, I see this, but I don't
8   remember seeing the statement that Gilliland
9   wrote.
10  Q.   And there was never an
11  investigation done into the use of force by
12  Morris on the minor, was there?
13  A.   No.
14  Q.   Does Rainbow City Police Department
15  have a policy in place to investigate
16  incidences where use of force occurs on a
17  minor?
18  A.   No.
19  Q.   So there is nothing in the SOP
20  about that?
21  A.   Not that I recall.
22  Q.   Does Rainbow City have a policy in
23  place in the SOP or anywhere else regarding

1 the use of force on someone who is having a
2 medical condition?
3        MR. STUBBS: I want to enter a
4 standard objection to the extent that he is
5 being asked as --
6        MR. HARP: I'm asking what his
7 knowledge is as Chief of Police of Rainbow
8 City.
9        MR. STUBBS: I still maintain the
10 objection as to any policy statements for
11 this witness, but I understand your question.
12    Q.  Do you understand my question?
13    A.  No.  I will ask you to repeat it.
14    Q.  Okay.  I will ask it again.  To
15 your knowledge, your personal knowledge, does
16 Rainbow City Police Department have a policy
17 in place regarding the use of force on people
18 having medical emergencies?
19    A.  Not to my knowledge.
20    Q.  And you went through Taser training
21 that was offered by Chase Jenkins, correct?
22    A.  Correct.
23    Q.  And that was back when Rainbow City

1 first purchased Tasers for the police
2 department, right?
3    A.  Correct.
4    Q.  Have you gone through any
5 subsequent Taser training since you went
6 through that training with Chase Jenkins you
7 testified about earlier?
8    A.  I have not.
9    Q.  How often do the officers at
10 Rainbow City Police Department have to go
11 through Taser training?
12    A.  Once you've been Taser trained,
13 that's usually it.  We haven't had a
14 re-certification.
15    Q.  There is no re-certification
16 process?
17    A.  No, not to my knowledge.
18    Q.  Okay.  I'm going to show you what I
19 will mark as Plaintiff's Exhibit Number 8 to
20 your deposition.  And I will ask you if
21 you've ever seen that document before.
22
23        (Plaintiff's Exhibit Number 8 was

1 marked for identification and same is
2 attached hereto.)
3
4    A.  (Witness reviewing document.)
5    Q.  Have you ever seen that document
6 before today, a copy of that document?
7    A.  No.
8    Q.  You have to speak up just a little
9 bit.
10    A.  No.
11    Q.  Do you know what this document
12 is?
13    A.  It's a statement from Lieutenant
14 Morris about what happened with her.
15    Q.  And the date of this document is
16 1-21-2015, correct?
17    A.  Correct.
18    Q.  So he would not have been
19 Lieutenant Morris on 1-21-2015, correct?
20    A.  Correct.
21    Q.  He would have been Sergeant Morris.
22    A.  Correct.
23    Q.  And do you know why this statement

1 was written?
2    A.  To document what he done.
3    Q.  Yes.  Do you know who told him to
4 document what he did?
5    A.  I'm sure that Chase Jenkins did.
6    Q.  Do you know why Chase Jenkins would
7 have told him to document what he did on
8 1-21-2015?
9    A.  Most incidents like that, you know,
10 he handled, so yeah.
11    Q.  When you say most incidents like
12 that, is that not the first time there has
13 been an incident like that while you were
14 Chief of Police at Rainbow City?
15    A.  That's the first like this, yes.
16    Q.  This is the first time that a minor
17 has been Tasered?
18    A.  No.  I think minors have been tased
19 before, but I don't recall when.
20    Q.  Since you have been Chief of
21 Police?
22    A.  I don't recall.
23    Q.  So it's your testimony sitting here

Page 101

1 today that this tasing incident with T.H. is
2 not the first incident for the Rainbow City
3 Police Department where minors have been
4 Tasered?
5    A. I don't recall.
6    Q. Well, earlier you said minors have
7 been tased before.
8    A. I'm saying it's a possibility
9 that they have. I just don't remember.
10    Q. Is there a written policy about at
11 what age a Taser can be used on a person?
12    A. No. I don't think the policy
13 says.
14    Q. When you personally went through
15 Taser training that was conducted by Chase
16 Jenkins, was there any instruction given
17 about not using a Taser on a minor?
18    A. No.
19    Q. Okay. And this statement that I
20 just showed you, which is Plaintiff's Exhibit
21 Number 8, it's your testimony you have never
22 seen it before today; is that correct?
23    A. That's correct.

Page 102

1    Q. And you had a chance to read it,
2 right?
3    A. Yes.
4    Q. Okay. Do you recognize the
5 signature at the bottom right-hand corner of
6 that document?
7    A. No.
8    Q. You don't know whose signature that
9 is?
10    A. Well, I'm assuming that that is
11 George Morris.
12    Q. Well, I don't want you to assume.
13    A. I'm sorry.
14    Q. I'm not getting on to you. I just
15 don't want to get you in trouble, so if you
16 don't know, just tell me I don't know.
17    A. Well, I can't read it, so I would
18 have to say I don't know.
19    Q. All right. Well, if you look back
20 on the first page, do you see, I'm going to
21 call it the second paragraph where it starts
22 with Helm?
23    A. Yes.

Page 103

1    Q. Can you read that into the record,
2 please?
3    A. Helms appeared to be having some
4 type of a seizure and several officers were
5 holding her arms and legs to keep her from
6 flopping around on the ground and possibly
7 hurting herself.
8    Q. Okay. Now, prior to that, is there
9 any mention in this document about her being
10 Tasered?
11    A. No.
12    Q. Okay. If you go with me to the
13 second page of this document, I'm going to go
14 one, two, three, four, five lines down. And
15 it starts with Ti  a. And I will represent
16 to you that T   is misspelled. Do you see
17 that?
18    A. Correct. Yes.
19    Q. Okay. Could you read that starting
20 at that line?
21    A. T   He   came out of her seizure
22 and started trying to attack officers that
23 were trying to help her screaming you mother

Page 104

1 fuckers. Ms. Helms was out of control and
2 officers were trying to get her to calm down
3 and to let the medics come and check her.
4 Helms refused all commands and continued to
5 cuss and break free of officers.
6    Q. Okay. Let me stop you right there.
7    A. Okay.
8    Q. So were you present during this
9 narrative? When this occurred at Center
10 Stage, were you present? Did you witness
11 that behavior?
12    A. I witnessed the behavior.
13    Q. Okay. Was T.H. being held down at
14 that time?
15    A. When I came out into the room, she
16 was being held down by maybe three people.
17    Q. Who were those people?
18    A. Timothy Kimbrough, a Center Stage
19 worker was at her head, and Sergeant Morris
20 was by her side.
21    Q. So you had two Rainbow City police
22 officers. And they are grown men, correct?
23    A. Correct.

Page 105

Q. And then you had a Center Stage employee at her head, correct?

A. Correct.

Q. And they were all holding her down.

A. Correct.

Q. And according to this document that you've never seen before, and I understand that, but according to this document that says this is the statement of George Morris, he indicates that she appeared to be having a seizure, correct?

A. Correct.

Q. And he also indicates that at some point, she started to come out of her seizure, correct?

A. Correct.

Q. Did you ever observe Ms. Helm appear to be having a seizure?

A. No.

Q. So even though George Morris says that she appeared to be having a seizure, and even though Justin Gilliland in his statement says she appeared to be having a seizure,

Page 106

your testimony is you didn't observe that.

MR. STUBBS: Object to the form.

A. I did not observe the part where -- I've never seen anybody with a seizure before, so I can't tell you that. But I can say that when I came out into the room, she was flopping and she was cussing everybody out.

Q. Okay. And so because you've never seen anyone have a seizure before, you don't know how a person reacts when that occurs, do you?

A. No.

Q. You don't know what bodily functions happen, do you?

A. No.

Q. And you don't know what verbal manifestations may occur, do you?

A. I don't understand that question.

Q. You don't know what a person might say while they are having a seizure.

A. No. No.

Page 107

Q. Now, do you see anything in this statement up and to the point that you've read out loud into the record where she has been Tasered by George Morris?

A. Not to the part that I read. Once you get on down, yes.

Q. In reading this document, do you see anywhere in the document where George Morris says he tased her more than one time?

A. No.

Q. And you said you had some general conversations with George Morris. Did he ever tell you that he tased her more than one time?

A. Never, no.

Q. And that's an important thing to know, right?

A. Sure.

MS. CHANDLER: Object to the form.

Q. Is that right?

A. Yeah.

Page 108

Q. And that's an important thing to put on the use of force form, correct?

A. Correct.

Q. And what is the purpose of filling out a use of force report?

A. It just shows what you've done with the Taser. I mean, if you discharge that Taser and you tase somebody, then that's just a requirement that we have at the City.

Q. Right. And when you're drive stunning someone, is there any way to take someone's Taser and actually know how many times it was used?

A. Those Tasers are designed that I think each time you use it, I think it has a memory or something in there that you can hook up to. And it will tell you how many times you've used it.

Q. Did you ever undertake an investigation into how many times T.H. was Tasered on that night?

A. No.

Q. After you were named as a Defendant

1  in this lawsuit and the allegations were made
2  that she was Tasered three times, at that
3  point, did you as Chief of Police undertake
4  an investigation to find out whether or not
5  there was three?
6      A.  No.
7      Q.  Did you care?
8      A.  Well, I mean, I was concerned, but
9  the only thing that I could tell you is that
10 the man says that he just used it one time.
11 And I wasn't there to see it other than that
12 one time.  That's all I could do.
13     Q.  So tell me in your opinion, because
14 you were there and you witnessed the alleged
15 behavior of T.H., tell me how she was a
16 danger to George Morris.
17     A.  I don't think as much of a danger
18 as her hurting herself and being out of
19 control.
20     Q.  So tell me in your opinion as a
21 police officer who has had Taser training how
22 her being Tasered was going to help her stay
23 in control.

1      A.  It's just my opinion, but I think
2  by a quick dry stun, sometimes will make
3  somebody calm down a little bit because they
4  don't want to get hit again with it.
5      Q.  Even if they're having a seizure?
6      A.  We don't know if she was having a
7  seizure.
8      Q.  Well, let's assume that she was.
9  Do you think it was proper for him to Taser
10 her?
11         MR. HOWARD:  Object to the form.
12         MR. STUBBS:  Object to the form.
13         MS. CHANDLER:  Object to the form.
14
15     A.  Well, I don't know that she was
16 having a seizure, so --
17     Q.  Well, let's assume that she was.
18     A.  Okay.
19     Q.  And if we assume that she was
20 having a seizure, do you think it was proper
21 for George Morris to take a Taser and drive
22 stun a seventeen-year-old girl?
23         MR. STUBBS:  Object to the form.

1         MS. CHANDLER:  Same objection.
2
3      A.  If she was having a seizure --
4      Q.  Yes.
5      A.  -- which we don't know, but if she
6  was having a seizure, no.
7      Q.  All right.  If George Morris had
8  been told that she was having a seizure,
9  should George Morris as a police officer err
10 on the side of caution and not Taser that
11 seventeen-year-old girl?
12         MR. STUBBS:  Object to the form.
13         MR. HOWARD:  Object to the form.
14         MS. CHANDLER:  Object to the form.
15
16     Q.  You can answer.
17     A.  That would depend on, you know, who
18 told him.  If there was a doctor standing
19 there saying she's having a seizure, then
20 yeah, I can understand, don't Taser.  But
21 there was no doctor there.  That's hearsay.
22 So we didn't know.
23     Q.  Well, Detective Gilliland was

1  present, right?
2      A.  Yes.
3      Q.  And Detective Gilliland, you have
4  his statement in front of you.  And I
5  understand that you don't recall seeing it
6  before, but let's get it back out and take a
7  look at it and see what he says.
8      A.  All right.
9      Q.  We're going to go to the last
10 paragraph.  And then we're going to go to, do
11 you see the number one hundred?  We're on the
12 first page, the last paragraph.  Do you see
13 the number one hundred?
14     A.  I do.
15     Q.  Now, go down one line from that.
16 And do you see the word floor?
17     A.  Yes.
18     Q.  Now, we're going to start at that
19 sentence right there.  And this is the
20 statement of Justin Gilliland.  Could you
21 read what you see there?
22     A.  The female appeared to be having a
23 seizure.  I always heard that when someone is

Page 113

1 having a seizure, you're supposed to hold
2 their head and body to make sure they do not
3 harm themselves. I immediately went to the
4 subject and began holding her head, making
5 sure that she did not slam it up and down off
6 the cement floor.
7 Q. All right. Let me stop you right
8 there. Were you present when Justin
9 Gilliland was doing these things?
10 A. No.
11 Q. Okay. Keep reading, please.
12 A. As I was holding the female's head,
13 Detective Fazekas finally made his way down
14 to me. I immediately stated that the female
15 was having a seizure and that we needed to
16 make sure she did not harm herself.
17 Q. Okay. Let me stop you right there.
18 A. Okay.
19 Q. Were you present when Detective
20 Fazekas came up?
21 A. No.
22 Q. So when you got there, was Justin
23 Gilliland there at T.H. lying on the --

Page 114

1 A. I did not see him there, no.
2 Q. Did you ever see Detective Fazekas
3 there?
4 A. No.
5 Q. But you did see George Morris use
6 his Taser on T.H.
7 A. Yes.
8 Q. And you understand from reading
9 this statement that Justin Gilliland says he
10 was there holding Ti    down --
11 A. I understand.
12 Q. -- when George Morris used his
13 Taser.
14 A. Right.
15 MS. CHANDLER: Object to the form.
16 MR. STUBBS: Object to the form.
17 MR. HOWARD: Object to the form.
18
19 Q. Do you have any explanation as to
20 why you didn't see Justin Gilliland there?
21 A. Because of the way she was flopping
22 around and carrying on, screaming and
23 cussing. I remember Kimbrough and George

Page 115

1 Morris.
2 Q. That's the only two people you
3 remember.
4 A. Yeah.
5 Q. And you don't remember Detective
6 Gilliland being there at any time that George
7 Morris used his Taser on T.H., correct?
8 A. Correct.
9 Q. And Justin Gilliland, you
10 understand in his statement says he saw
11 George Morris Taser T.H. twice.
12 A. Correct.
13 MR. STUBBS: Object to the form.
14
15 Q. Is that correct?
16 A. That's correct.
17 Q. So is it possible that George
18 Morris Tasered T.H. three times and you only
19 saw one of the three Tasers?
20 MR. STUBBS: Object to the form.
21 MR. HOWARD: Object to the form.
22
23 Q. You can answer.

Page 116

1 A. I saw it one time, and that's all I
2 seen.
3 Q. Right. You saw it one time.
4 A. Correct.
5 Q. And you didn't see Justin Gilliland
6 there when you saw it, right?
7 A. Right.
8 Q. Justin Gilliland saw it how many
9 times, according to his statement?
10 A. According to his statement, I think
11 twice.
12 Q. Okay. Who decides how much --
13 strike that. Who decided how much the off
14 duty officers would be paid for their
15 security work at Center Stage on January 16,
16 2015?
17 A. We set a price.
18 Q. Who set the price?
19 A. We do, the City. I mean, the
20 police department.
21 Q. Okay. So the Rainbow City Police
22 Department sets the price as to how much off
23 duty officers will be paid for security.

1    A.  Correct.

2    Q.  And what is that price?

3    A.  Twenty-five dollars an hour.

4    Q.  And how many hours were you at

5 Center Stage on January 16, 2015?

6    A.  I don't recall.  I mean, I could

7 estimate if that's what you want.

8    Q.  Well, yeah.  Give me an estimate.

9    A.  I'm going to say probably five to

10 six hours.

11    Q.  Now, if you go back to Detective

12 Gilliland's statement, he says that when he

13 got to Center Stage, Chief Greg Carroll

14 advised me that I would be working at the

15 front of the stairs that led to the VIP

16 section.  This area was near the stage.  And

17 that's in the second full paragraph, the

18 second sentence.  Do you see that?

19    A.  Yes.

20    Q.  Do you recall that happening?

21    A.  Yes.

22    Q.  So you recall instructing Detective

23 Gilliland where he would be working that

1 night at Center Stage.

2    A.  Correct.

3    Q.  That night, being January 16, 2015;

4 is that right?

5    A.  Right.  Correct.

6    Q.  Do you recall telling Detective

7 Fazekas where he would be stationed?

8    A.  I don't recall.

9    Q.  Okay.  Let me show you what I'm

10 going to mark as Plaintiff's Exhibit Number 9

11 to your deposition.

12

13        (Plaintiff's Exhibit Number 9 was

14 marked for identification and same is

15 attached hereto.)

16

17    Q.  This is Fazekas' statement.

18    A.  (Witness reviewing document.)

19 Okay.

20    Q.  Is that a document that you have

21 seen before today, Mr. Carroll?

22    A.  No.

23    Q.  Do you know what that document

1 is?

2    A.  It's a statement of Jimmy Fazekas.

3    Q.  Do you know why Jimmy Fazekas was

4 making this statement?

5    A.  To make sure that we knew what went

6 on with him and what he did while he was

7 there.

8    Q.  Do you know what date Mr. Fazekas

9 made this statement?

10    A.  I do not.

11    Q.  Do you know who Mr. Fazekas gave

12 this statement to?

13    A.  I'm going to assume Chase Jenkins.

14    Q.  And you and Chase Jenkins,

15 according to your earlier testimony, would be

16 considered, to the extent that there is one,

17 the internal affairs department at the

18 Rainbow City Police Department, correct?

19    A.  Correct.

20    Q.  Did Chase Jenkins ever discuss the

21 fact that Jimmy Fazekas gave him a statement

22 with you?

23    A.  I don't recall.

1    Q.  So he could have.  You just don't

2 recall.

3    A.  Yes.

4    Q.  Okay.  If you would, look at that

5 statement.  The first line, on January 16,

6 2015, I, Detective Jimmy Fazekas, was

7 assigned by Chief Carroll to work an off duty

8 concert at Center Stage in Rainbow City,

9 Alabama; is that correct?

10    A.  That's correct.

11    Q.  When did you first notify Fazekas

12 that he would be working security at Center

13 Stage?

14    A.  I'm assuming that it was probably

15 about three or four days beforehand.  This is

16 strictly volunteer also.

17    Q.  And you anticipated my next

18 question.  Fazekas used the word assigned,

19 but is it mandatory, or is it volunteer?

20    A.  No.  It's all volunteer.

21    Q.  Are you in charge of the off duty

22 security officers?

23    A.  Yes.

Page 121

1    Q.   And how did you become in charge of
2  rounding up Rainbow City police officers to
3  work off duty security?
4    A.   It just gets handed down to you
5  when you become Chief.  I mean, the Chief has
6  always done that.
7    Q.   The Chief has always done that for
8  Rainbow City.
9    A.   Yeah.
10   Q.   Do you know whether or not Rainbow
11 City is aware that its police officers were
12 working off duty on January 16, 2015?
13   A.   Who are you talking about being
14 aware?
15   Q.   Anyone in the City of Rainbow City
16 besides the police department.
17   A.   Well, we don't advertise it.  I
18 mean, I don't understand the question.
19   Q.   The question is, did you have the
20 blessing of Rainbow City to have its officers
21 working off duty?
22     MR. HOWARD:  Object to the form.
23

Page 122

1    A.   Oh, yeah.
2    Q.   Yes?
3    A.   Yes.
4    Q.   Who would have known at Rainbow
5  City that its officers were working off duty?
6    A.   Usually the Mayor, you know.  I
7  mean --
8    Q.   Who was the Mayor in January of
9  2015?
10   A.   Terry John Calhoun.
11   Q.   John Calhoun?
12   A.   Yeah.
13   Q.   Okay.  Anyone else for Rainbow City
14 know that its officers were working off duty
15 security?
16   A.   Not that I'm aware of.
17   Q.   Did Rainbow City require its
18 officers to carry any type of liability
19 coverage for working off duty?
20   A.   We always tell the people that we
21 work for that they have to have some
22 liability insurance for us.
23   Q.   And Jeremy Reeves, did you tell

Page 123

1  that to him?
2    A.   Yes.
3    Q.   Did they provide you proof of that
4  liability insurance?
5    A.   No.
6    Q.   They don't?
7    A.   They haven't.
8    Q.   Have you ever seen proof that your
9  off duty officers that you're sending to
10 Center Stage would be covered by liability
11 insurance?
12   A.   When Center Stage first opened up,
13 there was several owners to the company
14 there.  And Michelle Garbe was over, I guess,
15 the manager type.  The same thing that Jeremy
16 took over when Michelle left.
17     And it was a standing thing, you
18 know, with her that Center Stage was carrying
19 a liability insurance policy for the
20 officers.  And then Jeremy was made aware of
21 it with us, the same thing.  And he said it
22 was handled.
23   Q.   Since the time you've been Chief

Page 124

1  and since the time Center Stage has opened,
2  how many times has Rainbow City police
3  officers worked security for Center Stage?
4    A.   Since Center Stage has been open?
5    Q.   Yes, sir.
6    A.   A dozen times.
7    Q.   Other than these incidents that
8  have made the basis of this lawsuit, have
9  there been any other times in which Rainbow
10 City police officers have had to use force on
11 patrons of Center Stage?
12   A.   I don't recall the use of force
13 with a Taser.  I think there has been a
14 couple of times where we've had to make some
15 arrests on people that was intoxicated, but
16 nothing more than just putting the cuffs on
17 them and leading them out.
18   Q.   So to your knowledge, are there any
19 use of force forms filled out since you've
20 been Chief of Police related to use of force
21 on Center Stage patrons besides the two that
22 we see here today?
23   A.   Those are the only two that I can

1 recall.
2    Q.  Now, when the off duty police
3 officers were paid, they were paid how?
4    A.  Cash.
5    Q.  And do these off duty police
6 officers have to report that to the City?
7    A.  No.
8    Q.  So your testimony is, Jeremy Reeves
9 would call you and tell you that he's going
10 to need security at Center Stage, correct?
11    A.  That's correct.
12    Q.  And then you would ask for
13 volunteers from the Rainbow City Police
14 Department.
15    A.  That's correct.
16    Q.  Did you ask for volunteers outside
17 of the Rainbow City Police Department?
18    A.  No.
19    Q.  Why did you ask for volunteers
20 within the Rainbow City Police Department?
21    A.  Because it's within our city
22 limits.
23    Q.  At Center Stage on January 16,

1 2015, were there police officers from other
2 municipalities present?
3    A.  Not that I can recall.
4    Q.  You don't recall any police
5 officers from the City of Southside being
6 present?
7    A.  I don't recall.
8    Q.  Do you recall any officers from the
9 City of Gadsden being present?
10    A.  No.
11    Q.  No, you don't recall, or no, they
12 weren't there?
13    A.  I don't recall.
14    Q.  So they could have been there.  You
15 just don't recall.
16    A.  I didn't see any.
17    Q.  So if there is video of Gadsden
18 police cars there at Center Stage --
19    A.  Right.
20    Q.  -- you wouldn't have any knowledge
21 about that.
22    A.  No.
23    Q.  And you haven't seen any body cam

1 footage from any police officers who were
2 present that night that this happened,
3 correct?
4    A.  That's correct.
5    Q.  All right.  Do you recall having a
6 conversation with Gary Morgan back at the
7 police station after the incident occurred at
8 Center Stage?  Do you recall having a
9 conversation with Gary Morgan about what had
10 transpired at Center Stage?
11    A.  Not after it happened, no.
12    Q.  I'm going to show you what was
13 produced to us by Rainbow City.  Okay?
14    A.  Okay.
15    Q.  And I guess the best way to
16 identify this for you guys would be, the
17 video that's entitled, Assist Roberts Arrest.
18 And I'm going to ask you to take a look at
19 this.  And I'm going to represent to you that
20 in this video that some of the audio is cut
21 out.  Do you recall that scene at the Rainbow
22 City Police Department on the night of
23 January 16, 2015?

1    A.  Not that I recall.
2
3       (Viewing video.)
4
5    Q.  Let me stop it right there.  Do you
6 recognize that voice that said how old are
7 you?
8    A.  No.
9    Q.  You don't?
10    A.  No.
11    Q.  Do you recognize that person?
12    A.  Yes.
13    Q.  Who is that?
14    A.  That's Richard Roberts.
15    Q.  Okay.  Let me stop it right there.
16 Do you hear that Officer Roberts says this is
17 the first time I've ever pepper sprayed
18 somebody?
19    A.  Yeah.
20    Q.  Is a use of force form required if
21 pepper spray is used?
22    A.  It's a level of what you can use.
23    Q.  Would an officer have to fill out a

Page 129

1  use of force form?
2      A.  On pepper spray?
3      Q.  Yes, sir.  And I will make it
4  easier for you.  If you look at the document
5  that we marked as Plaintiff's Exhibit Number
6  5, that's a Rainbow City use of force form,
7  correct?
8      A.  That's correct.
9      Q.  And do you see the first box that
10  says check all that apply, and it says
11  chemical agent?
12      A.  Yes.
13      Q.  Would you consider what he calls
14  pepper spray to be a chemical agent?
15      A.  Yes.
16      Q.  Do you know if Officer Roberts
17  filled out a use of force form for the use of
18  that pepper spray?
19      A.  I don't recall.
20      Q.  Okay.  Let's keep watching this.
21
22          (Viewing video.)
23

Page 130

1      Q.  Okay.  Did you hear that voice
2  where he says, shit, they can film whatever
3  they want?
4      A.  Yeah.
5      Q.  Do you know whose voice that was?
6      A.  No.
7      Q.  You don't know whose voice that
8  was?  You don't recognize it?
9      A.  No.
10
11          (Viewing video.)
12
13      Q.  Let me stop it right there.  Do you
14  hear that officer that said she flipped out?
15  She was probably first of the month.
16      MR. HOWARD:  Did you say in the
17  question, there was an officer?
18
19      Q.  Well, did you hear someone on that
20  video say, she flipped out?  It was probably
21  first of the month.
22      A.  No.  I don't think I heard that.
23  You can back it up.

Page 131

1      Q.  And you haven't seen this video
2  before, right?
3      A.  No.
4      Q.  Okay.  We're going to keep watching
5  through it.
6      A.  Okay.
7
8          (Viewing video.)
9
10      Q.  Let me stop it right there.  That's
11  you, correct?
12      A.  That's correct.
13      Q.  So you were present when all of
14  this was going on.
15      A.  Obviously so.
16      Q.  Does that refresh your recollection
17  as to having a conversation with Gary Morgan
18  about what happened at Center Stage?
19      A.  No.
20
21          (Viewing video.)
22
23      Q.  All right.  Do you recognize that

Page 132

1  officer?
2      A.  Yes.
3      Q.  Who is that?
4      A.  That's Camp Yancey.
5      Q.  Okay.  Can you tell me what you
6  meant when you told whoever this officer is
7  wearing this body camera not to worry about
8  putting him on the time sheet?
9      A.  I don't remember it, no.
10      Q.  You don't know what you meant when
11  you said that?
12      A.  No.
13
14          (Viewing video.)
15
16      Q.  Okay.  In Rainbow City, is an off
17  duty police officer allowed to make an
18  arrest?
19      A.  Yes.
20      Q.  And why is that?
21      A.  Well, he's a police officer
22  twenty-four, seven.
23      Q.  Because he is APOST certified in

Page 133

1 the State of Alabama, correct?
2      A.  Correct.
3      Q.  Now, when he makes an arrest and he
4 is off duty, is he making that arrest on
5 behalf of whom, if he's inside the
6 jurisdiction of Rainbow City?
7          MR. HOWARD:  Object to the form.
8
9      A.  Well, it would be a Rainbow City
10 arrest.
11     Q.  Okay.  And if he makes an arrest
12 inside of Rainbow City, even if he's off
13 duty, would he still fill out an incident
14 report?
15     A.  He should.
16     Q.  Okay.  And that incident report is
17 filled out on behalf of Rainbow City,
18 correct?
19         MR. HOWARD:  Object to the form.
20
21     A.  Correct.
22     Q.  So the actions of that officer
23 making an arrest is made on behalf of Rainbow

Page 134

1 City, right?
2      A.  Right.
3          MR. HOWARD:  Object to the form.
4
5      Q.  Is that right?
6      A.  Right.
7      Q.  To preserve and keep the peace in
8 Rainbow City?
9      A.  Correct.
10     Q.  And that's your ultimate goal is to
11 protect and serve as a police officer, right?
12     A.  Right.
13         MR. HOWARD:  Object to the form.
14
15     Q.  So if an officer conducts something
16 that is unconstitutional off duty while
17 wearing a Rainbow City police officer
18 uniform, would that also be under the
19 guidance of being a Rainbow City police
20 officer?
21         MR. HOWARD:  Object to the form.
22         MR. STUBBS:  Object to the form.
23

Page 135

1      A.  I don't know if I quite understand
2 that.
3      Q.  You said that Officer Kimbrough was
4 wearing his uniform, correct?
5      A.  Correct.
6      Q.  And he was off duty; is that
7 right?
8      A.  That's correct.
9      Q.  And Officer Morgan was wearing his
10 uniform, and he was off duty, correct?
11     A.  That's correct.
12     Q.  Are you aware that Officer Morgan
13 Tasered Michelle Helm on the night of January
14 16, 2015?
15     A.  Not until after it was all over
16 with.
17     Q.  What do you mean not until after it
18 was all over with?
19     A.  Well, when we started to leave out
20 and everything, you know, we started talking
21 and he told me she had been Tased and
22 arrested.
23     Q.  Did you see Michelle Helm at Center

Page 136

1 Stage?
2      A.  No.
3      Q.  You didn't see her near T.H. at
4 Center Stage?
5      A.  No.
6      Q.  You didn't see her being Tasered at
7 Center Stage?
8      A.  No.
9      Q.  Did all of that happen after you
10 had left that area?
11     A.  The part of her being arrested did.
12 I had done walked away.
13     Q.  So you had walked away by the time
14 she had been arrested.
15     A.  Yeah.
16     Q.  And you had walked away by the time
17 she had been Tasered, correct?
18     A.  No.  I didn't see her get Tased or
19 anything like that, but when I got up from
20 being where T.H. was at and walked away was
21 when that happened.
22     Q.  So it did happen after you walked
23 away.

Page 137

1    A.  Yeah.

2    Q.  So you didn't see it.

3    A.  No.

4    Q.  Okay.  Let me get you to go back to
5 Detective Fazekas' statement.  Do you still
6 have it?

7    A.  Yeah.

8    Q.  You never saw Detective Fazekas in
9 the area where T.H. was, right?

10    A.  No.

11    Q.  So you didn't see Detective Fazekas
12 get, as he says, knocked back off his feet by
13 Michelle Helm, did you?

14    A.  No.

15    Q.  How tall is Detective Fazekas?  And
16 he's not really Detective Fazekas anymore, is
17 he?

18    A.  No.  He's no longer employed with
19 us.

20    Q.  Okay.  So how tall is Jimmy
21 Fazekas?

22    A.  Probably about six two, six one.

23    Q.  And just estimating, how much does

Page 138

1 he weigh?

2    A.  A hundred and ninety pounds.

3    Q.  Do you know how tall Michelle Helm
4 is?

5    A.  No.

6    Q.  Have you ever seen the arrest
7 report for Michelle Helm?

8    A.  No.

9    Q.  Are you aware that Michelle Helm
10 was arrested that night?

11    A.  Yes.  Yes.

12    Q.  And you never saw Detective Fazekas
13 on the ground after being knocked down by
14 Michelle Helm, right?

15    A.  No.

16    Q.  And you didn't see Gary Morgan Tase
17 Michelle Helm, correct?

18    A.  No.  That's correct.

19    Q.  So you don't have any testimony as
20 to what happened during that occurrence,
21 right?

22    A.  I don't think I understand your
23 question.

Page 139

1    Q.  You don't have any knowledge about
2 what transpired between Gary Morgan and
3 Michelle Helm.

4    A.  No.

5    Q.  You don't have any knowledge about
6 what, if anything, transpired between Jimmy
7 Fazekas and Michelle Helm, do you?

8    A.  No.

9    Q.  Did you ever undertake to find out
10 why Michelle Helm was arrested that night?

11    A.  Yes.

12    Q.  Who did you ask?

13    A.  Gary Morgan.

14    Q.  And what did he tell you?

15    A.  He told me that she was disorderly
16 and that she was trying to get inside.  And
17 they told her on numerous occasions to stay
18 outside.  And at that point, when she started
19 resisting everybody, he said that's when he
20 Tased her.

21    Q.  Did he tell you that she was
22 already on her knees when he Tased her?

23    A.  I don't know.

Page 140

1    Q.  You don't know whether he told you
2 that?

3    A.  No.  I don't know.  That part
4 wasn't discussed.

5    Q.  My question was, did he tell you
6 that she was already on her knees when he
7 Tased her?

8    A.  No.  No.

9    MR. HARP:  Okay.  We can take a
10 break for lunch now.

11

12    (Whereupon, a lunch recess was
13    taken.)

14

15    Q.  Okay.  We're back on the record,
16 Mr. Carroll, after a break for lunch.  You
17 know Michelle Garbe, right?

18    A.  Right.

19    Q.  G-a-r-b-e?

20    A.  Correct.

21    Q.  And at the time that you started
22 sending off duty police officers out to
23 Center Stage, she was the person that you

Page 141

1 were in contact with?
2  A. Yes.
3  Q. Did she approach you about sending
4 officers out there, or did you approach
5 her?
6  A. She approached me when they first
7 opened up, you know, when they started
8 talking about security and wanted to know if
9 we would work the security out there and I
10 told her we would.
11  Q. Okay. And when she approached you,
12 did you approach anyone within Rainbow City
13 about that being okay? And when I say that
14 being okay, I mean sending officers out to do
15 security for Center Stage.
16  A. Well, the only person I think I
17 remember even talking to would be the Mayor.
18  Q. And who was the Mayor at that time?
19  A. Terry John Calhoun.
20  Q. And what year was that?
21  A. I can't remember when Center Stage
22 was opened up.
23  Q. But it was at the time that it was

Page 142

1 opened up?
2  A. Yes.
3  Q. How soon after it was open did she
4 approach you?
5  A. I'm going to say a couple of weeks
6 maybe.
7  Q. And when you talked to Mayor
8 Calhoun about Rainbow City police officers
9 doing the security work out there, did he
10 indicate that he would need to run that by
11 the City Council or anyone like that?
12  A. No.
13  Q. Did he give you his blessing to do
14 that?
15  A. Yeah.
16  Q. Did you believe at that time that
17 you had the blessings of the City to work off
18 duty at Center Stage?
19  A. Correct. Yes.
20  Q. Now, I'm going to show you what I
21 will mark as Plaintiff's Exhibit Number 10.
22 And I will represent to you that this was
23 produced to us. And by way of further

Page 143

1 identification, this is the shift supervisor
2 synopsis use of force form for Rainbow City
3 Police Department.
4
5  (Plaintiff's Exhibit Number 10 was
6 marked for identification and same is
7 attached hereto.)
8
9  A. (Witness reviewing document.)
10  Q. Are you familiar with this
11 document?
12  A. No.
13  Q. Have you ever seen this document
14 before?
15  A. No.
16  Q. Do you know what this type of form
17 is?
18  A. Yes.
19  Q. What is it?
20  A. It's just a use of force for the
21 shift supervisor to fill out.
22  Q. Have you ever worked as a shift
23 supervisor for the Rainbow City Police

Page 144

1 Department?
2  A. On patrol?
3  Q. Yes, sir.
4  A. No.
5  Q. Now, do you know who Sergeant J.
6 Bryant is?
7  A. Yes.
8  Q. Who is Sergeant J. Bryant?
9  A. This gentleman right down here.
10  Q. And that's John Bryant who is
11 sitting here in your deposition today?
12  A. That's correct.
13  Q. Now, he has the officer involved in
14 the use of force incident as Gary Morgan,
15 right?
16  A. Right.
17  Q. Now, is this a form that is filled
18 out by Sergeant Bryant?
19  A. Yes.
20  Q. So we have the place of occurrence
21 at Center Stage, correct?
22  A. Correct.
23  Q. 1-16-2015?

Page 145

1  A.  Uh-huh (affirmative response).
2  Q.  And then there is a synopsis here.
3  And in parens, it says, open paren, give a
4  detailed synopsis of -- I assume that's
5  supposed to be events, but it's spelled
6  e-v-e-n-y-s, leading to the officer's use of
7  force based on reporting facts.  And then
8  close paren, events, colon.
9      Now, you said you haven't seen this
10  document before today, correct?
11  A.  Not this one, no.
12  Q.  But you were aware that Officer
13  Morgan filled out a use of force form,
14  right?
15  A.  Yes.
16  Q.  Okay.  I'm going to go ahead and
17  show you what I will mark as Plaintiff's
18  Exhibit Number 11 to your deposition, which
19  is Rainbow City Police Department Officer's
20  Use of Force Form, slash, Report for Gary
21  Morgan.
22
23      (Plaintiff's Exhibit Number 11 was

Page 146

1  marked for identification and same is
2  attached hereto.)
3
4  A.  (Witness reviewing document.)
5  Okay.
6  Q.  Are you ready?
7  A.  Yes.
8  Q.  Okay.  Do you recognize this
9  document that we marked as Plaintiff's
10  Exhibit Number 11?
11  A.  Yes.
12  Q.  Have you seen a copy of this
13  document that is Plaintiff's Exhibit Number
14  11 prior to today?
15  A.  Yes.
16  Q.  When is the first time you saw a
17  copy of this document that is Plaintiff's
18  Exhibit Number 11?
19  A.  At some point after the incident at
20  Center Stage.
21  Q.  How long after the incident at
22  Center Stage was it before you saw a copy of
23  Plaintiff's Exhibit Number 11?

Page 147

1  A.  I would say probably three or four
2  days.
3  Q.  And we know that Gary Morgan is, or
4  was at that time, around January of 2015, was
5  an employee of the Rainbow City Police
6  Department, right?
7  A.  Correct.
8  Q.  And he worked patrol?
9  A.  Correct.
10  Q.  And he worked first shift; is that
11  right?
12  A.  Correct.
13  Q.  In January of 2015, what hours did
14  first shift encompass?
15  A.  6:00 a. to 6:00 p.
16  Q.  6:00 a.m. to 6:00 p.m.
17  A.  Yes.
18  Q.  And what time did the incident that
19  occurred at Center Stage involving Michelle
20  Helm occur?
21  A.  I don't know.
22  Q.  You were present that night,
23  right?

Page 148

1  A.  Yeah.  I mean, I can speculate, but
2  giving you the exact time, I don't know.
3  Q.  That's fair.  Now, the immediate
4  supervisor on this use of force form that is
5  marked as Plaintiff's Exhibit Number 11 is T.
6  Spurling; is that correct?
7  A.  That's correct.
8  Q.  Is that Tommy Spurling?
9  A.  Yes.
10  Q.  Shift supervisor, J. Bryant.  Is
11  that John Bryant?
12  A.  Yes.
13  Q.  And the Taser model used is the
14  X-26.  And that's what's listed; is that
15  right?
16  A.  Yes.
17  Q.  Now, do all of the officers --
18  strike that.  In January of 2015, did all of
19  the officers assigned Tasers carry the
20  X-26?
21  A.  Yes.
22  Q.  Are there any other models of
23  Tasers used by the officers at Rainbow City

1 Police Department?

2    A.   No.

3    Q.   Does every officer employed by the

4 Rainbow City Police Department carry the

5 X-26?

6    A.   Yes.

7    Q.   Does that include the Detectives?

8    A.   They are assigned an X-26 also.

9    Q.   To your knowledge, did Justin

10 Gilliland have a Taser on January 16, 2015?

11    A.   I don't recall.

12    Q.   To your knowledge, did Jimmy

13 Fazekas have a Taser on his person on January

14 16, 2015?

15    A.   I don't recall.

16    Q.   And Gary Morgan, I think you

17 testified earlier, he was in his Class A

18 uniform, correct?

19    A.   Correct.

20    Q.   Which would be what I would call a

21 patrol uniform.

22    A.   Yes, sir.

23    Q.   Do you know how long Gary Morgan

1 had been employed by the Rainbow City Police

2 Department as of January 16, 2015?

3    A.   Probably not quite a year.

4    Q.   Do you know whether or not Gary

5 Morgan has received any training from the

6 Rainbow City Police Department regarding the

7 Rainbow City Police Department's use of force

8 policy?

9    A.   Yes.

10    Q.   Do you know who provided that

11 training to Gary Morgan?

12    A.   Scott Holderfield.

13    Q.   Do you know when Gary Morgan

14 received training from Scott Holderfield on

15 the use of force policy at the Rainbow City

16 Police Department?

17    A.   It would be done probably either

18 right after he got out of the academy or

19 right before he went to the academy.

20    Q.   Let me ask you this question.  Turn

21 with me to page two.  Okay?

22    A.   Okay.

23    Q.   Now, you see the diagram of the

1 male figure right there.  And it says place

2 an "X" indicating where contact occurred.  Do

3 you see that?

4    A.   Yes.

5    Q.   And do you see an "X" on either one

6 of these?

7    A.   No, I don't.

8    Q.   Do you see the circle in the middle

9 of the back on the second figure?

10    A.   Yes, sir.

11    Q.   Do you know what the significance

12 of that circle in the middle of the back

13 is?

14    A.   Well, obviously, he just put the

15 circle where he Tased her at instead of

16 putting an "X".

17    Q.   Okay.  And you didn't see Gary

18 Morgan actually Tase Michelle Helm, did

19 you?

20    A.   No.

21    Q.   Based on your knowledge of the use

22 of a Taser on an individual, should a Taser

23 be used in someone's back?

1    A.   Sometimes you have to use it

2 wherever you can.  I mean, in a case probably

3 like this, if she was being non-compliant and

4 everything, you know, yeah, you would.

5    Q.   Okay.  Go back with me to

6 Plaintiff's Exhibit Number 10, if you would.

7    A.   Yes, sir.

8    Q.   Now, I'm reading under where it

9 says events, colon.  It says, Officer Morgan

10 was working an off duty security detail at a

11 concert at Center Stage.  Morgan, along with

12 other officers and medics, were rendering aid

13 to a female later discovered to be Ti

14 Helm.  Open paren, juvenile, close paren.

15         And then it says, from the

16 information given.  Do you know when you're

17 filling out one of these forms, as Chief of

18 Police, have you seen one of these forms that

19 has been filled out before?

20    A.   Are you speaking about this form

21 here?

22    Q.   The shift supervisor synopsis.

23    A.   I have seen the form.  I have not

Page 153

1 seen one completed before.
2    Q. You've never seen one of these use
3 of force forms filled out before?
4    A. Not like this. Like this, yes
5 (indicating).
6    Q. Well, when you say not like this,
7 just for the record, you're pointing to
8 what's marked as Plaintiff's Exhibit Number
9 11, right?
10    A. Correct.
11    Q. And you've never seen one of those
12 forms filled out before; is that right?
13    A. On Number 10?
14    Q. I'm sorry. Number 10, yes, sir.
15    A. Yeah.
16    Q. So you've never seen one of those
17 forms filled out before?
18    A. No, sir.
19    Q. During the time that you were Chief
20 of Police for Rainbow City, I think your
21 testimony earlier was that there had been
22 other uses of force by Rainbow City police
23 officers, right?

Page 154

1    A. Yes.
2    Q. Now, when those other instances of
3 use of force occurred, this form would have
4 been filled out by the shift supervisor,
5 correct?
6    A. Yes.
7    Q. Now, turn with me over to the
8 second page of Plaintiff's Exhibit Number 10.
9 Do you see where it says force policy to your
10 subordinate? And then there is a yes. Do
11 you see that?
12    A. Yes.
13    Q. And then date of annual oral
14 presentation of use of force police. And I'm
15 betting that's supposed to be policy. Do you
16 see that?
17    A. Yes.
18    Q. Does the Rainbow City Police
19 Department have annual presentations on use
20 of force?
21    A. No.
22    Q. So there are no annual oral
23 presentations on the use of force by the

Page 155

1 Rainbow City Police Department, correct?
2    A. Not to my knowledge.
3    Q. Okay. Now, do you see where it
4 says signature of shift supervisor, Sergeant
5 John Bryant?
6    A. Uh-huh (affirmative response).
7    Q. Do you recognize that signature?
8    A. Yes.
9    Q. Whose signature is that?
10    A. John Bryant.
11    Q. Okay. Going back up to the date of
12 annual oral presentation for use of force
13 police -- and we're going to say (sic)
14 because we think that's supposed to be
15 policy. Is there an answer out there on the
16 other side of that colon? Is there a date
17 listed?
18    A. No.
19    Q. Okay. Now, underneath Sergeant
20 Bryant's signature, open paren, as the shift
21 supervisor, I have reviewed and presented the
22 Rainbow City Police Department's use of force
23 to the subordinate. Do you see that?

Page 156

1    A. I do, yes.
2    Q. Now, underneath that, it says
3 reviewed by the Chief of Police, open paren,
4 signature, close paren, colon. Do you see
5 that?
6    A. Yes.
7    Q. Is there a signature out there?
8    A. No.
9    Q. Should there be a signature out
10 there?
11    A. Yes.
12    Q. Whose signature should be out
13 there?
14    A. It should be the police Chief's.
15    Q. And who was the police Chief on
16 January 16, 2015?
17    A. That would be me.
18    Q. And you didn't sign this use of
19 force form, right?
20    A. No.
21    Q. But according to the form, it
22 requires your signature, right?
23    A. Uh-huh (affirmative response).

1  Q.  Is that a yes?
2  A.  Yes.
3  Q.  And according to your earlier
4  testimony, you've never seen this form
5  before, correct?
6      MR. STUBBS:  Object to the form.
7
8  Q.  Is that correct?
9  A.  That's correct, yeah.
10  Q.  Now, go back with me to Plaintiff's
11  Exhibit Number 11.  Now, should this form be
12  filled out in its entirety when it's filled
13  out by a Rainbow City Police Department
14  officer?
15  A.  Yes.
16  Q.  Do you see parts of this form
17  that's not filled out?  And when I say this
18  form, I'm referring to Plaintiff's Exhibit
19  Number 11.
20  A.  The only thing that I see here is
21  other involved officers.
22  Q.  Right.  There is no other involved
23  officers listed on this form, correct?

1  A.  Correct.
2  Q.  And would you agree that as Chief
3  of Police, that would be information that you
4  would want to know if you were reviewing the
5  use of force form, right?
6  A.  Correct.
7  Q.  And just so we're clear, did you
8  review this form after it was completed by
9  Officer Morgan?
10  A.  Yes.
11  Q.  Did you inquire with Officer Morgan
12  as to why that part was left blank?
13  A.  I did not.  That was an oversight.
14  Q.  On whose part?
15  A.  That would be on mine.
16  Q.  Okay.  Go down with me to where it
17  says Taser, slash, firearm model, slash type.
18  Do you see that?
19  A.  Yes.
20  Q.  Now, underneath that, there is a
21  section just for Taser use only, right?
22  A.  Yes.
23  Q.  Okay.  And the first thing it asks

1  is dart probe contact, yes or no.  And that's
2  not filled out, is it?
3  A.  No.
4  Q.  But it should be, correct?
5  A.  Yeah, it should be.
6  Q.  And that's so that you know whether
7  or not a probe was used or if it was a drive
8  stun, right?
9  A.  Correct.
10  Q.  And that would be critical
11  information to know.
12  A.  Correct.
13  Q.  Now, the next question is
14  approximate distance.  And then there is a
15  blank there, right?  Do you see that?
16  A.  I'm looking for it.
17  Q.  It's right under dart probe
18  contact, yes or no.
19  A.  Oh, dart probe contact?
20  Q.  Right.  And then underneath that,
21  do you see where it says approx?
22  A.  Yes.
23  Q.  And there is a blank there to be

1  filled in, right?
2  A.  Yes.
3  Q.  And it's left blank, correct?
4  A.  Correct.
5  Q.  And that's something that should be
6  filled in if a probe was used, right?
7  A.  Correct.
8  Q.  And we don't know whether or not a
9  probe was used because the dart probe contact
10  is not answered yes or no, right?
11  A.  Correct.
12  Q.  Now, the next one under that is
13  distance between probes.  And someone fills
14  that in with zero, right?
15  A.  Correct.
16  Q.  Now, go over with me to the next
17  column where it starts with number of
18  cartridges fired at the top.
19  A.  Correct.
20  Q.  And it says zero.
21  A.  Correct.
22  Q.  And then there is drive stun
23  contact, yes or no.  And Officer Morgan, or

Page 161

1  someone, has circled yes there, right?
2      A.  Right.
3      Q.  And did the darts penetrate the
4  skin, yes or no, is left blank, right?
5      A.  Correct.
6      Q.  You would agree that that's
7  critical information to know when you're
8  reviewing this use of force form, correct?
9      A.  That's correct.
10     Q.  And why would that be critical
11 information to know?
12     A.  Just nice to know.  I mean, you
13 want to know if they drive stunned or if they
14 used the darts.
15     Q.  Okay.  Did the application cause
16 injury, yes or no, and circled is no,
17 right?
18     A.  Yes.  That's correct.
19     Q.  Now, jump down with me to where
20 there is a series of questions under that
21 double line that says was suspect struck with
22 baton.  Do you see that?
23     A.  Yes.

Page 162

1      Q.  And he has no circled, right?
2      A.  Right.
3      Q.  Nature of call or incident was a
4  disturbance, right?
5      A.  Correct.
6      Q.  And Ms. Helm was charged apparently
7  with disorderly conduct.
8      A.  Correct.
9      Q.  And as the Chief of Police for the
10 Rainbow City Police Department, in your
11 experience, what would a person have to do to
12 rise to the level of disorderly conduct?
13     A.  Cursing, biting, would be the two
14 main things.
15     Q.  And in your experience as a police
16 officer, would cursing place an officer in
17 threat of immediate danger?
18     A.  No.
19     Q.  Was the suspect arrested, yes or
20 no.  It's checked yes -- circled yes.  Was
21 the suspect admitted to the hospital, it's
22 circled no; is that right?
23     A.  That's correct.

Page 163

1      Q.  Was the suspect under the influence
2  of alcohol or drugs.  And what does he have
3  circled?
4      A.  No.
5      Q.  So Officer Morgan, according to the
6  way he filled out the use of force form, did
7  not believe that Ms. Helm was under the
8  influence of alcohol or drugs, correct?
9      A.  Correct.
10     Q.  The next question is, was an
11 officer, volunteer or citizen injured, and
12 what's circled there?
13     A.  No.
14     Q.  So according to Officer Morgan,
15 Ms. Helm didn't injure anyone on January 16,
16 2015, right?
17     A.  Correct.
18     Q.  And then if you go down further, it
19 says, the name of the suspect is Michelle
20 Helm J; is that right?
21     A.  Yes.
22     Q.  Fifty-year-old female?
23     A.  Uh-huh (affirmative response).

Page 164

1      Q.  Is that right?
2      A.  That's correct.
3      Q.  Five feet, four inches tall; is
4  that right?
5      A.  Yes.
6      Q.  Weighing a hundred and twenty-five
7  pounds.
8      A.  Yes.
9      Q.  And based upon your experience as a
10 police officer, would you consider a five
11 foot four, a hundred and twenty-five pound
12 female who is cursing someone to be a threat
13 to a police officer?
14     MR. STUBBS:  Object to the form.
15     MR. HOWARD:  Object to the form.
16
17     Q.  You can answer.  If she didn't have
18 a weapon?
19     A.  Yeah.
20     Q.  And how so?
21     A.  I've had my butt whooped by one.
22     Q.  By a five foot four, a hundred and
23 twenty-five pound female?

Page 165

1    A.  Uh-huh (affirmative response).
2    Q.  Okay.  But Ms. Helm, it doesn't say
3 she beat up a police officer, right?
4    A.  No.
5    Q.  Is that right?
6    A.  That's right.
7    Q.  On his statement, if you turn to
8 the second page, it says, she became
9 combative.  Do you see that down at the
10 bottom of the synopsis of events?
11    A.  Yes.
12    Q.  It says, officers were rendering
13 aid to a female when the female became
14 combative.  The female's mother, Michelle
15 Helm, became combative towards officers.
16 Officers told Helm to get back and calm down.
17 Helm would not comply and was Tased and
18 arrested.  Did I read that correctly?
19    A.  Yes.
20    Q.  Does it say in what manner Ms. Helm
21 became combative?
22    A.  No.
23    Q.  All right.  Go back to the synopsis

Page 166

1 that was done by the shift supervisor.
2 Okay?
3    A.  Okay.
4    Q.  Now, understanding you've never
5 seen this document before, I do want you to
6 go down to about middleways.  Do you see out
7 on the left-hand column where the word
8 daughter is and there is an exclamation point
9 and quotation mark?
10    A.  Yes.
11    Q.  All right.  We're going to back up.
12 And if you would, read that sentence where it
13 starts with he said, T
14    A.  He said Ti  became more irate
15 after she saw her mother.  Morgan said he
16 told Michelle to move back in an attempt to
17 diffuse the situation.
18       Morgan said Michelle told him, fuck
19 you.  That's my daughter.  Morgan said he
20 grabbed Michelle by her left arm in an
21 attempt to escort her out.
22    Q.  Okay.  Let me stop you right there.
23 Prior to Morgan grabbing Michelle Helm's left

Page 167

1 arm, is there any indication that Michelle
2 Helm was combative toward Morgan?
3    A.  No.
4    Q.  Prior to Morgan grabbing Michelle
5 Helm, isn't it true that according to John
6 Bryant's synopsis of what Officer Morgan told
7 him, his only interaction with Michelle Helm
8 had been her saying, fuck you, that's my
9 daughter; is that right?
10       MR. STUBBS:  Object to the form.
11
12    A.  Correct.
13    Q.  So in your experience as a police
14 officer, is the fact that a lady says to
15 someone, fuck you, that's my daughter, does
16 that rise to the level of being Tased?
17    A.  No.
18    Q.  Now, Officer Morgan then says -- if
19 you keep reading after he says he grabbed her
20 left arm in an attempt to escort her out,
21 what does he say then?
22    A.  He says she became combative after
23 he attempted to escort her.  He said he

Page 168

1 attempted to drive stun Michelle with the
2 Taser.
3    Q.  Okay.  Stop right there for me.
4    A.  Okay.
5    Q.  It says he said she became
6 combative after he attempted to escort her.
7 Does it say that she hit him?
8    A.  No.
9    Q.  Does it say that she kicked him?
10    A.  No.
11    Q.  Does it say that she used a weapon
12 on him?
13    A.  No.
14    Q.  It simply says she became
15 combative, correct?
16    A.  Correct.
17    Q.  Do you consider someone who when
18 you instruct them to do something and they
19 use curse words toward you, would you
20 consider that to be combative?
21    A.  No.
22       MR. HOWARD:  Object to the form.
23

1     Q. Tell me what you would consider a
2 combative suspect to be.
3       MR. HOWARD: Object to the form.
4
5     A. It could be anywhere from passive
6 resistance to pushing you. I mean, pushing
7 you back or anything like that, I would
8 consider that.
9     Q. And when you say a passive
10 resistance, explain to me what you mean when
11 you say passive resistance.
12     A. Well, I go to grab somebody's arm,
13 and they pull away. That's passive
14 resistance.
15     Q. If you grab my arm, and you
16 actually grab my arm, and I just kind of do
17 like that (indicating), would you consider
18 that to be passive resistance?
19     A. That's passive resistance.
20     Q. If Officer Morgan grabbed Michelle
21 Helm's arm on the night of January 16, 2015
22 and she just sort of pulled away, but didn't
23 actually break his grip, would you consider

1 that to be passive resistance?
2       MR. STUBBS: Object to the form.
3
4     Q. You can answer.
5     A. Yes.
6     Q. Would you consider that to rise to
7 the level of needing to be Tased?
8     A. No.
9     Q. But when we read the synopsis given
10 by Officer Bryant based upon what Officer
11 Morgan told him in order to fill out the
12 shift supervisor use of force form, there is
13 no indication between the time that he says
14 she became combative and the time that he
15 attempted to drive stun her that she actually
16 made any attempt to flea the scene, is
17 there?
18     A. Well, the way I read it, if you go
19 back up here, he said a drive stun was
20 applied in the middle area of the back. He
21 said he and Officer Gilliland escorted
22 Michelle out of the building and restrained
23 her. He said during the time that she was

1 being escorted, she was resisting and
2 thrashing around.
3     Q. But that was after she had been
4 Tased, correct?
5     A. Well, it's according to how you
6 look at it.
7     Q. Well, look at the way it's written
8 here.
9     A. Okay.
10     Q. Because the way that it's written
11 here, I'm going to read this to you and you
12 tell me if I've read it correctly. Okay?
13     A. Okay.
14     Q. He said that she became combative
15 after he attempted to escort her. He said he
16 attempted to drive stun Michelle with his
17 Taser. He said the drive stun contact was a
18 short cycle because Michelle moved her leg
19 and knocked the Taser out of his hand.
20       He said the drive stun was applied
21 in the middle area of the back. He said he
22 and Officer Gilliland escorted Michelle out
23 of the building and restrained her. He said

1 during the time she was being escorted, she
2 was resisting and thrashing around. Once
3 Helm was restrained, she was transported to
4 the Etowah County jail. Did I read that
5 correctly?
6     A. Yeah.
7     Q. Now, in reading that, Officer
8 Morgan talks about the drive stun before he
9 talks about being escorted out of the
10 building and resisting and thrashing around,
11 correct?
12     A. Correct.
13     Q. Are you aware whether or not there
14 is body cam footage of Michelle Helm being
15 escorted out of Center Stage on the night of
16 January 16, 2015?
17     A. I'm not aware of it, no.
18     Q. Because you haven't seen any body
19 cam footage.
20     A. No.
21     Q. All right. And again, I think the
22 horse is sufficiently beaten, but this is a
23 form that if it is completed, should be

1 signed by you, correct?

2     A. Correct.

3     Q. And this form was not signed by

4 you.

5     A. No.

6     Q. And you had not laid eyes on this

7 form prior to me showing it to you today,

8 correct?

9     A. No.

10     Q. Is that right?

11     A. Yes. Correct.

12     Q. So if I understand your testimony,

13 and you correct me if I'm wrong, there are no

14 annual presentations on use of force given to

15 police officers in the Rainbow City Police

16 Department; is that correct?

17     A. Not to my knowledge.

18     Q. And you would know if those

19 occurred, correct, because you're the Chief

20 of Police?

21     A. Yes.

22     MR. STUBBS: Object to the form.

23     MR. HOWARD: Object to the form.

1

2     Q. As a matter of fact, as Chief of

3 Police, that would be something that you

4 would direct, correct?

5     A. Absolutely.

6     Q. And you haven't directed any since

7 you have been Chief of Police; is that

8 right?

9     A. No.

10     Q. No, that's not right, or no, you

11 haven't?

12     A. No, I haven't.

13     Q. I asked a bad question, but you

14 understood what I meant; is that right?

15     A. Yes. Correct.

16     Q. After you saw George Morris Tase

17 T.H. at Center Stage on January 16, 2015, did

18 you observe any marks on her body?

19     MR. STUBBS: Object to the form.

20

21     Q. On her body that were made from the

22 Taser.

23     A. No.

1     Q. Have you seen any photographs that

2 depict Ti    after she had been Tased which

3 showed Taser marks?

4     A. No.

5     Q. When you went through the Taser

6 training that was conducted by Chase Jenkins,

7 were you, yourself Tased?

8     A. Yes.

9     Q. And so you've been Tased before,

10 correct?

11     A. Correct.

12     Q. Was a probe used, or was it a drive

13 stun?

14     A. It was probes.

15     Q. And so is there a difference in the

16 effect from a probe versus a drive stun?

17     A. You get hit with a drive stun, I

18 mean, it's bad.

19     Q. It hurts a little worse than a

20 probe, correct?

21     A. To me, it does.

22     Q. In fact, it hurts a lot worse,

23 right?

1     MR. HOWARD: Object to the form.

2

3     A. I would say so.

4     Q. And you would say so because

5 you have personal experience from being

6 Tasered yourself, right?

7     A. Exactly, yes.

8     Q. You've been Tasered with a probe.

9     A. Yes.

10     Q. And was that during that same

11 training?

12     A. What, the probes?

13     Q. Yes, sir.

14     A. Yeah.

15     Q. During that training, were you

16 Tasered with the probes and the drive stun?

17     A. No, just with the probes.

18     Q. Okay. When were you Tasered by

19 drive stun?

20     A. I don't think I've ever been drive

21 stunned.

22     Q. So what is it that you have

23 experienced that would lead you to believe

1 that the drive stun hurts worse than the
2 probe?
3     A.  Well, I don't have the experience
4 on the drive stun, but from experience being
5 hit with the probes, I don't want to ever get
6 hit with it again.
7     Q.  You would agree that being Tasered
8 is not a pleasurable experience.
9     A.  No, it's not.
10     Q.  And you would agree that as an
11 adult healthy male, you did not enjoy the
12 experience of being Tasered, correct?
13     A.  Correct.
14     Q.  Would you ever want your child to
15 be Tasered?
16     MR. HOWARD:  Object to the form.
17
18     Q.  You can answer.
19     A.  Well, yeah.  I've got one child I
20 wish, yeah.
21     Q.  Tell me about that.
22     A.  What?
23     Q.  Tell me about that.

1     A.  She's mean.
2     Q.  How old is she?
3     A.  Twenty-five.
4     Q.  Would you have wanted her to get
5 Tasered when she was seventeen?
6     A.  I ain't going to lie, yeah.
7     Q.  I'm going to need a minute.
8     A.  I mean, I'm sorry, you know.
9     Q.  I don't want you to be sorry.  I
10 just want you to tell me the truth.  Do you
11 see a problem with a --
12     A.  I see where you're going.
13     Q.  Do you see a problem with a
14 juvenile being Tasered?
15     MR. HOWARD:  Object to the form.
16     MR. STUBBS:  Object to the form.
17
18     A.  No.  I don't see a problem with a
19 juvenile being Tasered.
20     Q.  You don't?
21     A.  I mean -- well --
22     Q.  Go ahead and finish your answer.
23     A.  No.

1     Q.  You don't want to finish?
2     A.  No.
3     Q.  Okay.  Well, on the night of
4 January 16, 2015, did you know prior to him
5 actually Tasering T.H. that George Morris was
6 going to Taser her?
7     A.  Yeah.  When he made the comment.
8     Q.  When he made what comment?
9     A.  He said, you know, if you don't
10 quit thrashing around and doing all this, I'm
11 going to Taser you.
12     Q.  At any point after he said that and
13 prior to him Tasing her, did you say, no, you
14 can't do that, she's a juvenile?
15     A.  No.
16     Q.  At any point prior to George Morris
17 saying, I'm going to Taser you and him
18 actually Tasering T.H., did you ever tell
19 George Morris, you can't do that, she's
20 having a medical emergency?
21     A.  No.
22     Q.  At any point prior to George Morris
23 Tasering T.H. the one time that you saw him

1 Taser her, did any police officer for Rainbow
2 City who was there say you should not do
3 that?
4     MS. CHANDLER:  Object to the form.
5
6     A.  No.
7     Q.  Did any police officer who was
8 present on January 16, 2015 try to stop
9 George Morris from Tasing T.H.?
10     A.  No.
11     Q.  Did any one of them say anything
12 after he Tased her?
13     A.  No.
14     Q.  After he Tasered her, what, if
15 anything, did you do?
16     A.  I stood there for just a second,
17 and then I got up and walked out.
18     Q.  When you say I got up, where were
19 you?
20     A.  Well, I was kind of behind George
21 on my knees standing there, you know.  And I
22 had made comments to her, you know, about --
23     Q.  Well, you said two things.  You

Page 181

1 said I was on my knees standing there. So
2 were you on your knees, or were you standing?
3     A. I'm going to say I was standing
4 there.
5     Q. Well, I don't want you to say it
6 unless it's true. Were you standing?
7     A. Yeah. I was standing.
8     Q. Okay. So you were standing behind
9 George Morris.
10     A. Yes.
11     Q. And so you could see everything
12 that was going on?
13     A. Well, I couldn't see the exact
14 Tasing going on, but you could hear it when
15 it started doing its little cycle, the
16 clicking.
17     Q. How long did it cycle?
18     A. That one there was probably no more
19 than two seconds.
20     Q. You said that one there. Did you
21 hear another one?
22     A. No.
23     Q. So from your experience -- strike

Page 182

1 that. Do you, yourself carry a Taser?
2     A. No.
3     Q. Have you ever carried a Taser?
4     A. Yes, I have.
5     Q. Have you ever used your Taser on
6 anyone? Even in training?
7     A. I have in training.
8     Q. Let's break it down like that.
9 Have you used your Taser on another
10 individual in training?
11     A. Yes.
12     Q. When was that?
13     A. It's been several years ago.
14     Q. Well, was it the Chase Jenkins
15 training?
16     A. No. Well, yes. All new hires,
17 when they come in, we put them through the OC
18 spray, sometimes the baton, the Taser. And
19 when they are being trained to be able to
20 carry the Taser, they have to be Tased.
21     Q. So every new hire that comes
22 through the Rainbow City Police Department
23 has to be Tased.

Page 183

1     A. If they're going to carry a Taser.
2     Q. And they have to go through the
3 chemical agent training, correct?
4     A. Yes.
5     Q. And what does that consist of?
6     A. Taking an OC spray, pepper spray,
7 and take them out to the fire bay. And you
8 spray them. It takes just a second to take
9 effect.
10     There will be another guy over here
11 that will have like a pad, a big square pad.
12 And the guy that got Tased is supposed to
13 take a stick, which is flexible. It doesn't
14 hurt you. But his job is to be able to,
15 after being sprayed, to fight the person
16 back.
17     Q. And what is the purpose of that? I
18 guess I'm just trying to understand why
19 you're Tasing all new hires.
20     A. I think that's pretty much with
21 every department.
22     Q. What is the purpose behind Tasing
23 them?

Page 184

1     A. It gives you the effect to know
2 what it does to you.
3     Q. And why is it important for a new
4 hire to know what a Taser does to someone who
5 is being Tased?
6     A. That was just the way it was wrote
7 up. That's the way they do it.
8     Q. Who is they?
9     A. The people that does it, the
10 instructors.
11     Q. All right. So when were you
12 Tasered last?
13     A. That, I can't tell you. I don't
14 know. I mean, it's been a long time ago.
15 Several years.
16     Q. Now, you said you were standing
17 behind George Morris, correct?
18     A. Correct.
19     Q. Was he standing or kneeling when he
20 Tasered T.H.?
21     A. He was kneeling.
22     Q. Where was he at in relation to her
23 body?

Page 185

1    A.  If she's laying down and you're
2  standing over her and you're looking at her,
3  he would have been on the left-hand side of
4  her body.
5    Q.  Okay.  And I think we marked this
6  photograph earlier, so if you would, take a
7  look at Plaintiff's Exhibit Number 6 again.
8  You said that you were standing behind George
9  Morris.  And if she's laying down, he was to
10  her left; is that right?
11    A.  He would have been on this side
12  right here (indicating).
13    Q.  And in that photograph, do you see
14  an officer to the left of T.H.?
15    A.  Yes.
16    Q.  And how do you know that's an
17  officer?
18    A.  Well, there again, I'm going to
19  have to assume because you've got the walkie
20  talkie like what we carry that nobody else
21  has and then appears to be wearing a uniform.
22    Q.  Do you know who that officer is?
23    A.  No.

Page 186

1    Q.  You can't tell from that
2  photograph, can you?
3    A.  No.
4    Q.  And if I understood your testimony
5  earlier, and there was a little confusion,
6  you don't believe you were present at the
7  time this screen capture was made, do you?
8    A.  I don't believe I was.
9    Q.  Okay.  Have you spoken with Jimmy
10  Fazekas about this lawsuit?
11    A.  I don't think I have.  Jimmy has
12  been gone for a while.
13    Q.  He left in December of 2015,
14  correct?
15    A.  I think so.
16    Q.  And do you know when Officer Morgan
17  left, Gary Morgan?
18    A.  No, I don't.
19    Q.  You don't?
20    A.  No.
21    Q.  Now, Officer Kimbrough, was he
22  present at the time that Sergeant Morris
23  Tased T.H.?

Page 187

1    A.  I believe he was.
2    Q.  Okay.  Were you present when the
3  medics strapped T.H. to a gurney?
4    A.  I was not present at the time they
5  strapped her, but when they were taking her
6  out and they had her strapped on there, I
7  seen that.
8    Q.  You saw that?
9    A.  Yes.
10    Q.  At the time they took Ti    out of
11  Center Stage, were any other Rainbow City
12  police officers present?
13    A.  I don't recall.
14    Q.  Do you recall what the mood was
15  of -- or you don't recall if any other
16  officers were still present?
17    A.  I mean, there were officers there,
18  but you mean were they present --
19    Q.  Near T.H.  Within five feet of T.H.
20    A.  I don't recall.
21    Q.  Do you recall what the overall mood
22  was of the officers after T.H. was Tased?
23      MS. CHANDLER:  Object to the form.

Page 188

1      MR. STUBBS:  Object to the form.
2      MR. HOWARD:  Object to the form.
3
4    Q.  Was there laughter and joking?
5    A.  No.
6    Q.  There wasn't?
7    A.  No.  Not about that, no.
8    Q.  Did anyone laugh or make fun of
9  T.H.?
10    A.  Not that I'm aware of.
11    Q.  If a Rainbow City police officer
12  had laughed and made fun of T.H. after she
13  had been Tased and strapped to a gurney,
14  would you consider that to be outside of the
15  way that a Rainbow City police officer should
16  act?
17      MS. CHANDLER:  Object to the form.
18      MR. STUBBS:  Object to the form.
19      MR. HOWARD:  Object to the form.
20
21    A.  It would be unprofessional.
22    Q.  It would be unprofessional?
23    A.  I would think so.

Page 189

1  Q.  Now, you said that you have not had
2  any conversations with Camp Yancey about this
3  incident?
4  A.  Not that I can recall.
5  Q.  Okay.  I'm going to play you
6  another video clip.  And again, the copies
7  that I received, the audio cuts in and out.
8  And hopefully, we can get a better copy.
9  MR. HOWARD:  And while we're on
10 that, it appears to me that the audio starts
11 thirty seconds after the video starts.  I
12 don't know why.
13 MR. HARP:  That may very well be
14 true.
15 MR. HOWARD:  Mr. Gilliland dealt
16 with a lot of this.  You may want to ask him
17 that, but I finally figured out what you're
18 talking about.  It just comes in thirty
19 seconds after the video starts.
20
21 (Viewing video.)
22
23 Q.  Do you recognize that officer back

Page 190

1  there (indicating)?  And if you don't, that's
2  fine.
3  A.  Well, it kind of looks like Officer
4  Kimbrough.
5  Q.  Officer Kimbrough?
6  A.  It looks like it.  I wouldn't swear
7  to it.
8  Q.  Okay.
9
10 (Viewing video.)
11
12 Q.  Now, are you present at this
13 point?
14 A.  I'm not sure.
15
16 (Viewing video.)
17
18 Q.  Now, there she is on the stretcher.
19 And they've said she spit at them, and she is
20 laying on the stretcher.  Are you present at
21 that point?
22 A.  I don't recall if I'm present or
23 not.

Page 191

1  Q.  Okay.  Do you see that gentleman
2  right there in the plaid shirt with the
3  baseball cap on?  Can you see him?
4  A.  Yes.
5  Q.  Do you know who that is?
6  A.  No.
7  Q.  Have you ever seen Jeremy Reeves?
8  A.  Yes.
9  Q.  Would you know him if you saw
10 him?
11 A.  Yeah, but I can't tell out of that
12 picture there.
13
14 (Viewing video.)
15
16 Q.  Now, you heard the person say over
17 her mouth and nose, correct?
18 A.  Uh-huh (affirmative response).
19 Q.  Now, was that voice coming from
20 whomever was wearing the body cam?
21 A.  Could be, yeah.
22 Q.  Do you know whose voice that is?
23 A.  It sounds like Sergeant Morris.

Page 192

1  Q.  Sergeant Morris?
2  A.  That's who it sounds like.
3
4  (Viewing video.)
5
6  Q.  The various officers in their
7  report has described a chaotic scene, but
8  while you were present and at the point that
9  Ti    was being Tased by Officer Morris, were
10 there just civilians milling around like they
11 are in that video?
12 MR. HOWARD:  Object to the form.
13
14 A.  You have civilians over here.
15 Q.  Yes, sir.
16 A.  I don't know if you had any back
17 over here, but there was two or three
18 gentlemen over there.  I don't know what they
19 was waiting on, but yeah, they were there.
20 Q.  And do you know why they were
21 allowed to have conversations with Ti
22 after she had been put on the stretcher?
23 A.  Well, not that I know of.

Page 193

1     Q. Should the officers have allowed
2 the civilians who were just standing in the
3 lobby of Center Stage to be interacting with
4 T    at that point?
5       MR. STUBBS: Object to the form.
6       MR. HOWARD: Object to the form.
7       MS. CHANDLER: Object to the form.
8
9     Q. You can answer.
10     A. Well, I don't see any officers in
11 that area right there.
12     Q. Well, we know that there is one
13 because there is a body camera running.
14     A. Yeah. Right.
15     Q. So we know there is one officer
16 there, right?
17     A. Right.
18     Q. We know that there is another
19 officer standing in the door that could or
20 could not be Officer Kimbrough, right?
21     A. Yeah.
22     Q. So we know there is two there,
23 right?

Page 194

1     A. Right.
2     Q. So now I'm back to my original
3 question. Should they have allowed those
4 civilians to interact with Ti    ?
5     A. Well, that was a decision that they
6 had to make, and they made the decision to
7 let them talk, you know.
8     Q. And in your mind, that's okay?
9     A. Well, I would have probably
10 preferred them not to, but that's the
11 decision they made.
12     Q. When you say I would have preferred
13 them not to, is there an official policy
14 about that?
15     A. No.
16     Q. So was Ti    considered under
17 arrest at that point?
18     A. No.
19     Q. Was T    ever charged with any
20 crime?
21     A. No.
22     Q. Are you sure about that?
23     A. I'm pretty sure.

Page 195

1     Q. Was there ever an incident report
2 that was written up charging her with a
3 crime?
4     A. I don't recall that.
5     Q. Okay.
6
7     (Viewing video.)
8
9     Q. Let me stop it right there. Can
10 you see that guy there now? And I'm talking
11 about that guy in the checkered shirt.
12     A. Yeah.
13     Q. Let me just ask you this way just
14 to get to the meat on the bone. Was Jeremy
15 Reeves standing in the area when Ti    was
16 Tased by George Morris?
17     A. I do not know, no.
18     Q. Did you have any conversation with
19 Jeremy Reeves at Center Stage on Janaury 16,
20 2015?
21     A. Yes.
22     Q. And what did you have a
23 conversation with Jeremy Reeves about?

Page 196

1     A. We were just talking, I mean,
2 normal talk.
3     Q. Did you have any conversation with
4 Jeremy Reeves after George Morris Tasered
5 Ti      m?
6     A. I don't recall.
7     Q. You don't recall?
8     A. I don't recall.
9     Q. Okay.
10
11     (Viewing video.)
12
13     Q. Now, someone is asking Ti    while
14 she is strapped to a stretcher if she wanted
15 him to let him loose on her. Do you have any
16 idea what that's about?
17     A. What now?
18     Q. Let me back it up for you and let
19 you listen to it again.
20
21     (Viewing video.)
22
23     Q. The question was, do you want me to

Page 197

1 let her loose on you.
2    A. I don't know what that's about.
3    Q. Okay. Did anyone ever tell you
4 that that type of conversation was happening
5 after she had been Tased by Officer Morris?
6      MR. STUBBS: Object to the form.
7
8    A. No.
9    Q. Did anyone ever tell you or alert
10 you as Chief of Police that hey, after she
11 was placed on a stretcher, civilians were
12 allowed to laugh and joke at her?
13      MR. HOWARD: Object to the form.
14      MR. STUBBS: Object to the form.
15
16    Q. You can answer.
17    A. No.
18
19      (Viewing video.)
20
21    Q. Now, the question there from the
22 person wearing the body cam was, are y'all
23 carrying her to Brice. To your knowledge,

Page 198

1 what is Brice, if you know?
2    A. Brice I think is what used to be a
3 mental hospital in Tuscaloosa.
4    Q. That was a place that they would
5 take patients with mental problems,
6 correct?
7    A. Correct.
8    Q. Do you know why that officer
9 wearing a body cam was asking the paramedics
10 if they were taking her to Brice?
11    A. No.
12    Q. Was there anything that you saw
13 during the time that you were in the area
14 where T    was which would indicate that she
15 needed to be sent to Brice?
16    A. No.
17    Q. Did any officer for Rainbow City
18 accompany the paramedics to the hospital?
19    A. I think so. I think they escorted
20 or they followed the ambulance over there, I
21 think. I couldn't tell you for sure.
22    Q. Who would be able to tell me
23 that?

Page 199

1    A. That, I don't know.
2    Q. Where would that be in any of the
3 use of force forms?
4    A. It wouldn't be in the use of force
5 forms.
6    Q. Where would that be in any of the
7 documentation generated by the Rainbow City
8 Police Department related to this incident?
9    A. It probably wouldn't be.
10
11      (Viewing video.)
12
13    Q. Do you see this officer right
14 here?
15    A. Yeah.
16    Q. Who is that? Let me back it up for
17 you.
18    A. Back it up.
19
20      (Viewing video.)
21
22    A. That's Officer Kimbrough.
23    Q. And he's laughing and joking. Do

Page 200

1 you know what he's laughing and joking about?
2      MR. STUBBS: Object to the form.
3
4    A. No.
5    Q. Okay. That concludes that. So we
6 know that there were officers present after
7 she was placed on a stretcher, correct?
8    A. Correct.
9    Q. And you don't recall whether or not
10 you were there or not.
11    A. No.
12    Q. Okay. Do you recall her being
13 placed on a stretcher?
14    A. I did not witness her being placed
15 on a stretcher.
16    Q. Did you witness her being wheeled
17 out?
18    A. I think once they got outside with
19 her or something, I might have seen it
20 then.
21    Q. Once they got outside with her?
22    A. Yeah.
23    Q. So is it fair to say that you never

Page 201

1  intervened to try to stop George Morris from
2  Tasing T     Helm?
3      A.  No.
4      Q.  Is that correct?
5      A.  That's correct.
6      Q.  Are you familiar as Chief of Police
7  with the rights that someone is afforded when
8  they are dealing with the police and being
9  seized?  Do you know what a seizure under the
10 Fourth Amendment means?
11     A.  No.
12     Q.  Are you familiar with the Fourth
13 Amendment at all?
14     A.  Yeah.  Are you talking about --
15     Q.  If someone is in police custody.
16     A.  Okay.  Yeah.
17     Q.  And what do you consider being in
18 police custody?
19     A.  Being in police custody, I would
20 say you've been handcuffed.  You've been
21 placed in a police car.
22     Q.  So would the fact that T.H., if she
23 felt that she was not free to leave that area

Page 202

1  on January 16, 2015 because she was being
2  held down by police officers, would you
3  consider that to be in custody?
4      MR. STUBBS:  Object to the form.
5      MR. HOWARD:  Object to the form.
6
7      A.  Well, it could be.
8      Q.  Did Ti       ask for the police
9  officers to let her go when she was being
10 held down?
11     A.  I don't recall.
12     Q.  You don't recall whether or not she
13 ever said let me go?
14     A.  No.  I just recall the language
15 that was coming out of her mouth.
16     Q.  Okay.  Well, if you recall the
17 language, that would have been part of the
18 language, correct, let me go?
19     A.  Yeah.  But I didn't hear that.
20     Q.  So you recall the bad stuff.  You
21 just don't recall whether or not she said let
22 me go.
23     A.  I just didn't hear it.

Page 203

1      MR. HOWARD:  Object to the form.
2      MS. CHANDLER:  Object to the form.
3      MR. STUBBS:  Object to the form.
4
5      Q.  Is that right?
6      A.  No.  I just heard the bad stuff.
7      Q.  If you had wanted to, could
8  you have stopped George Morris from Tasing
9  T
10     MR. HOWARD:  Object to the form.
11
12     A.  I could have requested him not to
13 do it.
14     Q.  And you didn't do that, did you?
15     A.  No, I did not.
16     Q.  As a matter of fact, as the Chief
17 of Police for Rainbow City Police Department,
18 you had a duty to stop him if you thought
19 Ti      's constitutional rights were being
20 violated, correct?
21     MR. STUBBS:  Object to the form.
22     MR. HOWARD:  Object to the form.
23

Page 204

1      A.  Did I have a --
2      Q.  You had a duty to stop that officer
3  from violating --
4      A.  If I felt that he was doing
5  something wrong, yes.
6      Q.  And you would also have that duty
7  whether you were a patrol officer or a Chief
8  of Police, correct?
9      MR. HOWARD:  Object to the form.
10
11     A.  Yeah.  Yes.
12     Q.  I mean, a patrol officer for the
13 Rainbow City Police Department has a duty to
14 ensure that other officers are not violating
15 someone's constitutional rights, correct?
16     A.  That's correct.
17     MS. CHANDLER:  Object to the form.
18     MR. HOWARD:  Object to the form.
19     MR. STUBBS:  Object to the form.
20
21     Q.  And they also have a duty to
22 intervene; is that correct?
23     A.  That's correct.

Page 205

1       MR. HOWARD:  Object to the form.

2

3       Q.  That's correct?

4       A.  Yes.

5       Q.  And you say you never saw Michelle

6  Helm being Tasered.

7       A.  No, I did not.

8       Q.  Did you see her at all that

9  night?

10      A.  I don't think I ever saw her.

11      Q.  You don't think you ever saw

12  Michelle Helm?

13      A.  No.

14      Q.  So you would not have seen Michelle

15  Helm jump on Officer Fazekas' back?

16      A.  No.

17      Q.  You would not have seen Michelle

18  Helm knock Officer Fazekas to the ground?

19      A.  No.

20      Q.  As the Chief of Police for Rainbow

21  City, are you ever truly off duty?

22      A.  No.

23      Q.  You're always on duty, correct?

Page 206

1       A.  Correct.

2       Q.  And as the Chief of Police for

3  Rainbow City, you are a representative of

4  Rainbow City, correct?

5       A.  Correct.

6       MR. HOWARD:  Object to the form.

7

8       Q.  You are the highest law enforcement

9  officer in the City of Rainbow City,

10  correct?

11      A.  Correct.

12      Q.  And all of the police officers in

13  Rainbow City, whether on duty or off duty, if

14  they are performing police actions, they fall

15  under your control, correct?

16      A.  That's correct.

17      MR. STUBBS:  Object to the form.

18

19      Q.  And I asked you this at the

20  beginning of the deposition, and you didn't

21  have a recollection of it, but sitting here

22  today as we've talked about things, do you

23  have now any better recollection as to

Page 207

1  whether or not you received a call from Aaron

2  Helm after this incident?

3       A.  I don't recollect that, no.

4       Q.  How long do you believe that T.H.

5  was held on the ground while you were

6  present?

7       A.  A couple of minutes.

8       Q.  A couple of minutes?

9       A.  Probably a couple of minutes.  Two

10  or three minutes.  While I was there?

11      Q.  Yes, sir.

12      A.  Yes.

13      Q.  Did you ever move in to assist the

14  officers who were holding T.H. on the

15  ground?

16      A.  I did.

17      Q.  Tell me how you assisted those

18  officers.

19      A.  She was thrashing, and she was

20  kicking Officer Kimbrough who was trying to

21  hold both feet down.  And I stepped over

22  there, and I placed my hands on her left foot

23  and held her foot for just probably thirty

Page 208

1  seconds.

2       Q.  So you were holding her left foot.

3       A.  Yes.

4       Q.  And who was holding her right

5  foot?

6       A.  Officer Kimbrough.

7       Q.  Who, if anyone, was holding her

8  arms?

9       A.  Officer Morris was on the same side

10  that I was on at one point, and he was on her

11  left arm.

12      Q.  Who was on her right arm?

13      A.  I don't remember.

14      Q.  Who was holding her head?

15      A.  The one that I remember seeing

16  holding her head was one of the workers at

17  Center Stage.

18      Q.  And so your testimony is, you never

19  saw Justin Gilliland holding her head.

20      A.  No, I did not.

21      Q.  So if he put in his statement that

22  he was holding her head, that doesn't

23  necessarily comply with what you recall,

1 correct?
2  A.  Correct.
3  Q.  And how confident are you in what
4 your recollection is about those events?
5  A.  Well, I'm fairly confident.
6  Q.  Now, you were involved in
7 restraining T.H.  Why didn't you fill out a
8 statement?
9  A.  I just didn't.
10  Q.  Did Chase Jenkins ever ask you to
11 fill out a statement?
12  A.  No.
13  Q.  Did he ever ask you what happened
14 that night?
15  A.  We discussed it.
16  Q.  And what was the context of you
17 discussing what happened?
18  A.  He just asked me what happened, and
19 I told him.
20  Q.  Did he tell you, well, you probably
21 need to reduce that to writing?
22  A.  No.
23  Q.  Did you tell Chase Jenkins about

1 the same things that you've told me today?
2 Was there any variation in what you told
3 Chase Jenkins?
4  A.  No, I don't think so.
5  Q.  Did you tell Chase Jenkins that you
6 recall seeing Detective Gilliland holding
7 T.H.'s head?
8  A.  No.
9  Q.  Did you tell Chase Jenkins that you
10 recall Jimmy Fazekas being present?
11  A.  No.
12  Q.  What is the policy at Rainbow City
13 on taking statements from all the officers
14 involved in an incident such as the one that
15 happened at Center Stage?
16  A.  I don't believe there is a
17 policy.
18  Q.  There is no written policy
19 regarding --
20  A.  Not that I'm aware of, no.
21  Q.  Is there a formal policy about
22 reporting the use of force other than these
23 use of force forms that we have seen today?

1  A.  Not that I'm aware of.
2  Q.  Do you know how long the use of
3 force form that was filled out by Officer
4 Morgan, do you know how long that form has
5 been in existence at the Rainbow City Police
6 Department?
7  A.  The one that he filled out?
8  Q.  Yes, sir.
9  A.  It's probably been there since a
10 few days after the incident.
11  Q.  No.  I'm sorry.  Not the one that
12 he filled out, but the form like the blank
13 form that he would have filled in.
14  A.  Oh, that's been there for several
15 years.
16  Q.  Can you tell me why there is two
17 different forms that -- I'm sorry.  Strike
18 that.  Can you tell me how long the statement
19 form that Officer Morris filled out has been
20 around?  And I'm going to show you what I'm
21 talking about.  It's the form that is marked
22 as Plaintiff's Exhibit Number 8.  How long
23 has that form been around?

1  A.  This form right here (indicating)?
2  Q.  Yes, sir.
3  A.  Fifteen years maybe.
4  Q.  And what is the purpose of that
5 form?
6  A.  In case somebody comes in to
7 complain about something, you've got that
8 form available.  And it's also like a
9 statement form for the police officer for the
10 general public, if they want to come in and
11 fill out something.
12  And it's something that
13 investigation uses when they've got people
14 upstairs, you know, that they want to make an
15 arrest, and they want an admission of guilt
16 or whatever you want to call it.  They will
17 fill out a form explaining what they've done.
18  Q.  Can you tell me why Sergeant Morris
19 wrote his statement on that form as opposed
20 to Officer Fazekas, whose form appears to
21 just be typed on a word processor?
22  A.  It's just something he must have
23 chose to do.

Page 213

1  Q.  Well, does the officer have the
2 choice in how they provide their form when it
3 relates to the use of force?
4  A.  Well, the use of -- you're talking
5 about this use of force form?
6  Q.  No, sir.  I'm sorry.  That's well
7 said.  What I'm trying to find out is why
8 Officer Fazekas did not use the City of
9 Rainbow City form to write his statement on.
10  A.  I assume he just chose not to.
11  Q.  Is he the one that gets that
12 choice?
13  A.  Yeah, if that's what he wants to
14 do.  As long as he puts out a statement.
15  Q.  So the Rainbow City police officers
16 are just allowed to decide how and in what
17 manner they write their statement out?
18   MS. CHANDLER:  Object to the form.
19   MR. STUBBS:  Object to the form.
20   MR. HOWARD:  Object to the form.
21
22  A.  If that's what they want to choose
23 to do, I had no problem with it.

Page 214

1  Q.  Is there an official policy on how
2 to write a statement?
3  A.  No.
4  Q.  And that's true for any officer at
5 Rainbow City?
6  A.  True.
7  Q.  And the use of force policy is kept
8 in the SOP manual?
9  A.  Yes.
10  Q.  And is every new officer issued an
11 SOP manual?
12  A.  Correct.
13  Q.  How thick is the SOP manual?
14  A.  It's probably about like that right
15 there (indicating).
16  Q.  And you're indicating about four
17 inches thick?
18  A.  Probably.
19  Q.  And that includes every standard
20 operating procedure that the Rainbow City
21 Police Department has?
22  A.  Yes.
23  Q.  And that would include everything

Page 215

1 from keeping the patrol car clean, uniforms,
2 haircuts; is that right?
3  A.  Yes.  I know it does on the
4 haircuts and clean shaven.  And I'm assuming
5 that the cars are in there too.
6  Q.  And you indicated that the SOP
7 manual is about four inches thick.  How many
8 pages of that SOP is comprised of the use of
9 force policy?
10  A.  I don't remember.  I would just
11 have to look at it and see.
12  Q.  Does the SOP manual contain
13 policies for Rainbow City police officers
14 dealing with juvenile suspects?
15  A.  I don't recall.
16  Q.  What would be the reason for a
17 Rainbow City police officer to fill out an
18 arrest report?
19  A.  I'm not sure I understand that.
20  Q.  Sure.  If a Rainbow City police
21 officer fills out an arrest report, what does
22 that mean to you as the Chief of Police?
23 Does that mean someone has been arrested?

Page 216

1  A.  Yes.  Yes.
2  Q.  Do you know whether or not Michelle
3 Helm was actually ever prosecuted for
4 disorderly conduct?
5  A.  I don't think she was.
6  Q.  To your knowledge, were the charges
7 dropped?
8  A.  I think so.
9  Q.  Do you have any recollection or
10 were you contacted at all about the charges
11 against Michelle Helm being dropped?
12  A.  No.
13  Q.  Have you spoken to the Mayor of
14 Rainbow City about this case?
15  A.  If I have, it's been a while.
16  Q.  Have you been given any indication
17 as to how long you are going to remain on
18 administrative leave?
19  A.  No, I haven't.
20  Q.  Do you plan on filing any type of
21 grievance against Rainbow City regarding you
22 being placed on administrative leave?
23   MR. STUBBS:  Object to the form.

Page 217

1    MR. HOWARD:  Object to the form.
2
3    Q.  You can answer.
4    A.  If they will leave me alone for the
5  next twelve weeks, I will retire.
6    Q.  You plan to retire in twelve
7  weeks?
8    A.  Yeah.
9    Q.  How many years will that give you?
10    A.  Well, with my Stress Bill time and
11  everything, close to thirty years.
12    Q.  Have you ever seen a person that's
13  actually been Tasered?  Have you ever seen
14  the marks that are left by a drive stun?
15    A.  Not on a drive stun.
16    Q.  But you have on probes?
17    A.  Yes.
18    Q.  I may have asked you this, and if I
19  did, I apologize.  Have you had any
20  conversation with Jeremy Reeves about this
21  lawsuit?
22    A.  The only conversation was I think
23  when we got our paperwork.  We didn't

Page 218

1  particularly discuss it.  It was just hey,
2  we're getting sued, and that was it.
3    Q.  Did you call him, or did he call
4  you?  How did that conversation come about?
5    A.  I think he called me.
6    Q.  And when he called you, what did he
7  say?
8    A.  He asked me if I had heard
9  anything.  And I told him, I said, yeah, we
10  got the paperwork where we're being sued.
11    Q.  Now, why was he calling to ask you
12  if you had heard anything?
13    A.  I don't know.
14    Q.  Do you know how Jeremy Reeves knew
15  that you had been sued?
16    A.  No.
17    Q.  Do you know Jamin Palmer?
18    A.  Who?
19    Q.  J-a-m-i-n, Palmer.
20    A.  No.
21    Q.  How about Mitch Ramsey?
22    A.  I know Mitch Ramsey.
23    Q.  Does he work for the Rainbow City

Page 219

1  paramedics?
2    A.  Yeah, the fire department.
3    Q.  And was he present that night?
4    A.  Yes.
5    Q.  Do you know who Phillip Braswell
6  is?  Is that Phil Braswell?
7    A.  Yes.
8    Q.  Was he present that night?  And
9  that night being January 16, 2015.
10    A.  I don't remember.
11    Q.  Do you recall seeing a Confidential
12  Juvenile Alabama Uniform Incident and Offense
13  Report filled out by Phil Braswell?
14    A.  No.
15    Q.  Do you know what a Confidential
16  Juvenile Alabama Uniform Incident and Offense
17  Report is?
18    A.  I don't think I've ever seen one.
19    Q.  As the Chief of Police for Rainbow
20  City, you have never seen a juvenile incident
21  report?
22    A.  I've seen the juvenile reports.  I
23  don't think it had that long of letters on

Page 220

1  it.
2    Q.  When you got to work the day -- did
3  you go to work the next day after this
4  incident?
5    A.  No.  I think that would have been
6  on a Saturday.
7    Q.  So the next day that you would have
8  been at work would have been that following
9  Monday, correct?
10    A.  That's correct.
11    Q.  Prior to the interaction with T.H.
12  at Center Stage, had you been familiar with
13  her?
14    A.  Not personally.
15    Q.  When you say not personally, what
16  do you mean?
17    A.  Well, our Department had answered
18  calls at their house in the past.
19    Q.  So the Helm family was someone who
20  was familiar to the Rainbow City Police
21  Department.
22    A.  That's correct.
23    Q.  I want you to look at this document

Page 221

1  and tell me if you have ever seen it before.
2  Did you tell me you knew David Divine?
3      A.  Yeah.  I know David Divine.
4      Q.  Are you aware that he is listed as
5  a victim of assault in the third that was
6  allegedly committed by T.H.?
7      A.  Not that I'm aware of.
8      Q.  Can you tell me what assault in the
9  third is, what crimes that encompasses?
10      MR. HOWARD:  Object to the form.
11
12      A.  Assault in the third is not
13  considered like a major thing.  It could be
14  maybe if I punched you in the face and caused
15  you to have a black eye or swelling or busted
16  your nose, that would fall under assault in
17  the third, where right under that would be
18  harassment, like just push or shove.
19      Q.  Would spitting be assault in the
20  third?
21      MR. HOWARD:  Object to the form.
22
23      A.  Yeah.  It could be.

Page 222

1      MR. HARP:  All right.  Mr. Carroll,
2  that's all I have for you right now.  Some of
3  these other lawyers may have questions for
4  you.  And then I may have follow-up,
5  depending on their questions.
6      MS. CHANDLER:  I don't have
7  anything.
8      MR. HOWARD:  Nothing.
9      MR. STUBBS:  No questions.
10      MR. HARP:  All right.  Thank you
11  for your time.
12
13
14
15
16
17      FURTHER DEPONENT SAITH NOT
18      ENDING TIME:  2:45 p.m.
19
20
21
22
23

Page 223

1              CERTIFICATE
2
3  STATE OF ALABAMA
4  ETOWAH COUNTY
5
6      I hereby certify that the above and
7  foregoing deposition was taken down by me in
8  stenotype and the questions and answers
9  thereto were transcribed by means of
10  computer-aided transcription, and that the
11  foregoing represents a true and correct
12  transcript of the testimony given by said
13  witness upon said hearing.
14      I further certify that I am neither of
15  counsel, nor of kin to the parties to the
16  action, nor am I in anywise interested in the
17  result of said cause.
18
19      /s/Beth Word
20      BETH WORD
21      ACCR #:  376
22      EXPIRES: 9/30/2016
23