## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## MIDDLE DIVISION

| | | |
|---|---|---|
| **MICHELLE LEE HELM, individually**<br>**and as Guardian and next friend of**<br>**T.D.H., a minor child,** | ] ] ] ] | |
| **Plaintiffs,** | ] ] | **4:15-cv-01152-ACA** |
| **v.** | ] ] ] | |
| **RAINBOW CITY, ALABAMA, et al.,** | ] ] | |
| **Defendants.** | ] | |

## <u>MEMORANDUM OPINION</u>

On the evening of January 16, 2015, Rainbow City police officers James Fazekas, George Morris, Justin Gilliland, and Timothy Kimbrough were involved in the tasing of Michelle Lee Helm ("Ms. Helm") and her minor daughter, T.D.H., while T.D.H. was having a grand mal seizure. Ms. Helm, on behalf of herself and her daughter, filed this suit under 42 U.S.C. § 1983, alleging that the four police officers, the City of Rainbow City, Alabama (the "City"), the City's police chief, Greg Carroll, and a number of fictitious defendants violated their constitutional rights.

Specifically, Ms. Helm and T.D.H. assert the following claims:

(1) Officer Fazekas used excessive force against Ms. Helm ("Count One");

(2) Office Fazekas failed to intervene in the use of excessive force against Ms. Helm and T.D.H. ("Counts Two and Three");

(3) Officer Morris used excessive force against T.D.H. ("Count Five");

(4) Officer Gilliland failed to intervene in the use of excessive force against Ms. Helm and T.D.H. ("Counts Six and Eight");

(5) Officer Kimbrough failed to intervene in the use of excessive force against Ms. Helm and T.D.H. ("Counts Ten and Eleven");

(6) Chief Carroll failed to intervene in the use of excessive force against Ms. Helm and T.D.H. ("Counts Twelve and Thirteen");

(7) Chief Carroll and the City failed to appropriately train and supervise the City's police officers ("Counts Fourteen and Fifteen");

(8) Officer Fazekas falsely imprisoned or falsely arrested Ms. Helm ("Count Twenty-One"); and

(9) Officer Morris falsely imprisoned or falsely arrested T.D.H. ("Count Twenty-Two").

(Doc. 26 at 25–31, 33–39, 40–42, 44–56, 62–65).

The case comes before the court on three motions for summary judgment: one jointly filed by Chief Carroll and Officers Fazekas, Kimbrough, and Morris; one filed by Officer Gilliland; and one filed by the City. (Docs. 83, 87, 89). The court **WILL GRANT** the City's motion for summary judgment and **WILL ENTER SUMMARY JUDGMENT** in favor of the City and against Ms. Helm and T.D.H. on Count Fifteen, because they have not presented any evidence that the City has a policy or custom of officers using excessive force or that it has failed to adequately train its officers.

The court **WILL GRANT IN PART** and **WILL DENY IN PART** the two remaining motions for summary judgment filed by the individual officers. The

court **WILL DENY** the motion for summary judgment on Counts One and Two because disputes of material fact exist about whether Officer Fazekas is entitled to qualified immunity on the claims that he used excessive force and failed to intervene in the use of excessive force against Ms. Helm. The court **WILL ENTER SUMMARY JUDGMENT** in favor of Officer Fazekas and against T.D.H. on Count Three because the undisputed facts show that he did not have an opportunity to intervene in the use of force against her.

The court **WILL DENY** the motion for summary judgment on Count Five because genuine disputes of fact exist about whether Officer Morris is entitled to qualified immunity. The court **WILL ENTER SUMMARY JUDGMENT** in favor of Officer Gilliland and against Ms. Helm on Count Six; in favor of Officer Kimbrough and against Helm on Count Ten; and in favor of Chief Carroll and against Helm on Count Thirteen, because the undisputed evidence is that those officers had no opportunity to intervene in the uses of force at issue on those counts. The court **WILL DENY** the motion for summary judgment on Counts Eight and Eleven because genuine disputes of material fact exist about whether Officer Gilliland and Officer Kimbrough could have intervened before the use of force against T.D.H.

Count Twelve relates to Chief Carroll's alleged failure to intervene in three separate tasings of T.D.H. The court **WILL DENY** the motion for summary

judgment as to the first tasing because genuine disputes of material fact exist about whether Chief Carroll could have intervened in that use of force, but the court **WILL GRANT** the motion and **WILL ENTER SUMMARY JUDGMENT** in favor of Chief Carroll and against T.D.H. as to the second and third tasings because the undisputed evidence is that he did not have an opportunity to intervene before those uses of force. The court **WILL GRANT** the motion and **WILL ENTER SUMMARY JUDGMENT** in favor of Chief Carroll and against Plaintiffs on Counts Fourteen because they did not establish a causal connection between Chief Carroll's actions and any constitutional deprivations.

Finally, the court **WILL GRANT** summary judgment in favor of Officer Fazekas and against Ms. Helm on Count Twenty-One because she has presented no evidence that he was involved in the decision to arrest or restrain her. As for Count Twenty-Two, to the extent T.D.H. has asserted a false arrest claim against Officer Morris, the court **WILL GRANT** summary judgment in his favor because she has not presented any evidence that she was arrested. But the court **WILL DENY** him summary judgment on the false imprisonment claim because disputes of fact exist about whether Officer Morris assisted in restraining her.

## I.    FACTS

On a motion for summary judgment, the court "draw[s] all inferences and review[s] all evidence in the light most favorable to the non-moving party."

*Hamilton v. Southland Christian Sch., Inc.*, 680 F.3d 1316, 1318 (11th Cir. 2012) (quotation marks omitted). The court will describe the facts in that light, noting that "facts, as accepted at the summary judgment stage of the proceedings, may not be the actual facts of the case." *Oliver v. Fiorino*, 586 F.3d 898, 901 (11th Cir. 2009) (quotation marks omitted). That is especially true in a case like this, where not only do the opposing parties disagree on what happened, but the witnesses on behalf of the plaintiffs also disagree in irreconcilable ways about what happened.

The facts on which everyone agrees are few and far between. First, everyone agrees that this case involves three applications of a Taser in "drive stun mode" on T.D.H. and one application of a Taser in "drive stun mode" on Ms. Helm. (Doc. 26 at 9 ¶ 33, 11 ¶¶ 44–45). Drive stun mode is used as a pain compliance weapon. (Doc. 95-3 at 29) (citing *Hoyt v. Cooks,* 672 F.3d 972, 976 n.5 (11th Cir. 2012)). In drive stun mode, the Taser probes do not enter the individual's body. (Doc. 95-3 at 28–29). Instead, the weapon is pressed against a person's body and pulling the trigger releases an electric current. (*Id.* at 29). The electric current causes a burning sensation but does not disrupt muscle control. (*Id.*). In this way, drive stun tasing is a lesser use of force than the more common type of tasing, in which electro-muscular disrupter probes enter the body, overriding the central nervous system and making muscle control impossible. (*Id.*).

Second, everyone agrees that T.D.H. suffers from a seizure disorder. Her seizures typically cause her arms and legs to flail about and saliva to run from her mouth. (Doc. 101-8 at 1 ¶ 6; Doc. 101-5 at 23). On "waking" from a grand mal seizure, T.D.H. does not know where she is and it takes a minute to get her bearings. (Doc. 101-4 at 14).

Third, everyone agrees that on January 16, 2015, T.D.H. and her sister, D.H., went to a concert in Rainbow City, Alabama. At the end of the concert T.D.H. had a grand mal seizure. As a crowd began to gather, D.H. knelt beside T.D.H. and held T.D.H.'s head—a procedure D.H. had been instructed to perform whenever T.D.H. had a seizure. (Doc. 101-8 at 2 ¶¶ 9–10).

Several Rainbow City police officers, including Defendants James Fazekas, George Morris, Justin Gilliland, and Timothy Kimbrough, were providing security for the concert that night.[1] (Doc. 101-3 at 9). Officer Gilliland was the first officer to reach T.D.H. (Doc. 101-8 at 2 ¶¶ 11–12). D.H. told Officer Gilliland that T.D.H. was having a seizure and needed help. (*Id.* at 2 ¶ 13). Officer Gilliland then held T.D.H.'s head so that she would not slam it into the ground or injure herself. (Doc. 101-1 at 21; Doc. 91-24 at 2; Doc. 91-25 at 3).

As Officer Gilliland held T.D.H.'s head, Officer Fazekas arrived and tried to move the crowd back. (Doc. 91-24 at 2; Doc. 91-25 at 3). Officer Gilliland told

---

[1] The parties do not dispute that when officers do off-duty security work, they are acting in their capacity as Rainbow City police officers. (Doc. 101-2 at 39).

Officer Fazekas that T.D.H. was having a seizure and they "needed to make sure she did not harm herself."  (Doc. 91-24 at 2–3; Doc. 101-1 at 18).  Eventually, someone picked T.D.H. up, carried her to the lobby of the concert facility, and placed her in a chair.  (Doc. 101-8 at 2 ¶ 14; Doc. 91-24 at 3; Doc. 91-25 at 3; Doc. 91-26 at 2).  D.H., Officer Gilliland, and Officer Fazekas followed behind.

The parties' agreement on the facts ends here and they present sharply conflicting evidence about what followed.  There is no video evidence of any of the tasings at issue,[2] so the court is left with only witness testimony.  The defendants' recollections largely match each other, but differ from the recollections of T.D.H., D.H., and Ms. Helm.  Meanwhile, T.D.H., D.H., and Ms. Helm recall the events differently from each other, save their unanimous memory that neither T.D.H. nor Ms. Helm did anything wrong.  Yet no evidence conclusively establishes which of the multiple versions is correct, and at the summary judgment stage "the [court's] function is not . . . to weigh the evidence."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986); *Holifield v. Reno*, 115 F.3d 1555, 1561 (11th Cir. 1997) (holding that on a motion for summary judgment, "[t]he court may not weigh evidence to resolve a factual dispute").  Thus, for purposes of this

---

[2] There is body camera footage starting when the medics arrived.  (Doc. 91-12; Doc. 91-13).  Taken in the light most favorable to the plaintiffs, this footage must be from *after* the officers tased T.D.H. and Ms. Helm because D.H. stated in her declaration that "[t]here were no medics around when [T.D.H.] and my mother were tased.  [They] all showed up after [T.D.H.] and my mother had already been tased."  (Doc. 101-8 at 6 ¶ 46).

motion, the court must set out the version most favorable to T.D.H. and Ms. Helm if any evidence supports it.

**A. The Use of Force on T.D.H.**

Once in the lobby, T.D.H. stopped seizing and asked D.H. what had happened. (Doc. 101-8 at 3 ¶ 16). D.H. told T.D.H. that she had a seizure and was in the lobby. (*Id.* at 3 ¶ 17). By that time, other officers—including the City's Chief of Police, Greg Carroll—were present and assisting T.D.H. (*Id.* at 3 ¶ 16; Doc. 91-6 at 18; Doc. 91-25 at 3). Officer Gilliland directed the other officers to call the paramedics. (Doc. 91-24 at 3).

About a minute after she stopped seizing, T.D.H. began having another seizure and fell onto the floor. (Doc. 101-8 at 3 ¶ 18; Doc. 91-25 at 3; Doc. 91-24 at 3). D.H. told Officer Gilliland that T.D.H. was having another seizure (doc. 101-8 at 3 ¶ 18), and he in turn told the other officers that she was having another seizure and they needed to make sure that she did not hurt herself. (*Id.* at 3 ¶ 18; Doc. 91-24 at 3; Doc. 83-3 at 19). All of the officers, including Officer Gilliland, Officer Fazekas, Officer Kimbrough, and Chief Carroll, restrained T.D.H. to protect her from injury. (Doc. 91-21 at 2; Doc. 91-25 at 3; Doc. 91-26 at 2; Doc. 101-3 at 52). Officer Fazekas then left T.D.H. and went to open the doors to give T.D.H. fresh air. (Doc. 83-2 at 18).

About two minutes after T.D.H. started having her second seizure, Officer Morris arrived in the lobby. (Doc. 101-8 at 3 ¶ 20). Officer Gilliland told Officer Morris that T.D.H. was having a seizure and required medical attention. (*Id.* at 3 ¶ 21). Standing at T.D.H.'s feet, Officer Morris began yelling at T.D.H. that if she did not calm down he would tase her. (*Id.* at 3–4 ¶¶ 22, 24). Officer Gilliland heard Officer Morris make the threat. (Doc. 101-1 at 17). Officer Morris then took out his Taser, waved it in front of T.D.H. and repeated his threat to tase her. (Doc. 101-8 at 4 ¶ 27; *see also* Doc. 101-1 at 17).

None of the officers present stopped Officer Morris (doc. 101-2 at 12, 26; doc. 101-8 at 4 ¶ 26; doc. 101-1 at 16–17), and he followed through on his threat, tasing the immobilized T.D.H. using "drive stun" mode.[3] (Doc. 101-2 at 10; Doc. 101-3 at 21; Doc. 101-8 at 4 ¶¶ 25, 29, 30). Chief Carroll, concerned that the paramedics were taking too long and not knowing if T.D.H.'s seizure was drug or alcohol related, walked away after the tasing to find out where the paramedics were. (Doc. 101-3 at 22).

Shortly after the first tasing, Officer Morris told T.D.H. that he was going to tase her again if she didn't stop fighting. (Doc. 101-8 at 5 ¶ 37). Officer Gilliland,

---

[3] The timing of events is difficult to discern. D.H. insists her sister was actively seizing when Officer Morris arrived in the lobby (doc. 101-8 at 4 ¶¶ 27–29), but T.D.H. testified that she was awake and felt the tasing, meaning she was not in the midst of a seizure at that time (doc. 101-4 at 19–20, 51). For their part, the officers insist that T.D.H. was not only conscious (doc. 101-1 at 17; doc. 91-23 at 3), but verbally abusive and physically combative (doc. 101-1 at 17; doc. 101-3 at 52). D.H. testified that T.D.H. never kicked, spit at, or tried to bite any police officer while the officers were restraining her. (Doc. 101-8 at 6 ¶¶ 42–44).

who heard the threat, did not believe that T.D.H. was any threat to Officer Morris. (Doc. 101-1 at 22–23). It is unclear whether T.D.H. herself heard Officer Morris' threat. She testified that she did not (doc. 101-4 at 21), but her sister testified that T.D.H. screamed "what's going on? Please let me go" (doc. 101-8 at 5 ¶ 37). Either way, Officer Morris again followed through on his threat and tased T.D.H. twice more in quick succession. (*Id.* at 6 ¶¶ 40–41; Doc. 101-4 at 83). All told, Officer Morris tased T.D.H. in the chest three times. And all three tases occurred while police officers were holding T.D.H. down. (Doc. 101-1 at 18, 23; Doc. 101-8 at 6 ¶ 41). After the third tasing, T.D.H. blacked out. (Doc. 101-4 at 21). She regained consciousness on a gurney (*id.* at 67), and was later transported to a hospital (*see id.* at 25). She was never arrested or charged with any crime. (Doc. 101-2 at 28).

It is undisputed that T.D.H. was not a flight risk at the time Officer Morris tased her. (Doc. 101-2 at 33). It is also undisputed that T.D.H. was not a threat to Officer Morris or, for that matter, to anyone else. (Doc. 101-1 at 23; Doc. 101-2 at 16, 37). Officer Morris testified that he decided to tase T.D.H. in order to get her to comply with his commands and to calm down. (Doc. 101-2 at 37).

## B. The Use of Force on Ms. Helm

The same evening, Ms. Helm received a phone call informing her that T.D.H. was having a seizure. After she received the call, Ms. Helm immediately

got into her car and drove to the concert venue, still dressed in her pajamas and slippers. (Doc. 101-5 at 28; Doc. 101-8 at 5 ¶ 32). When she arrived, she saw T.D.H. seizing (doc. 101-5 at 28), with a "crowd of officers" on top of her holding down her legs, arms, middle section, and neck (*id.* at 28–29).

While still outside the venue, Ms. Helm began moving toward her daughter, yelling "that's my daughter, she's having a seiz—" (Doc. 101-5 at 29; Doc. 101-8 at 5 ¶¶ 33–34). Before she could complete the sentence, an unidentified officer approached Helm from behind and "knocked [her] to the ground" without warning.[4] (Doc. 101-5 at 33). While on the ground, another officer pulled Ms. Helm's arms behind her back, handcuffed her, and pushed her face into the ground. (*Id.* at 29; Doc. 101-8 at 5 ¶¶ 34, 36; Doc. 101-11 at 2 ¶ 6). Ms. Helm never made it to the venue's entrance. (Doc. 101-5 at 32; Doc. 101-11 at 1 ¶¶ 4–5; Doc. 101-8 at 5–6 ¶¶ 33, 47).

The officer that handcuffed Ms. Helm and pushed her face to the ground was later identified as Officer Morgan, who is not a party to this lawsuit. While

---

[4] At Ms. Helm's deposition, she clearly and unambiguously testified that she could not see the officer who knocked her on the ground and restrained her. (Doc. 101-5 at 33). In a later declaration, she contradicted her deposition testimony and attested that Officer Fazekas knocked her to the ground. (Doc.101-11 at 1 ¶ 4). Ms. Helm does not explain this contradiction. The court finds that Ms. Helm's declaration is a sham affidavit. *See Rollins v. TechSouth, Inc.*, 833 F.2d 1525, 1530 (11th Cir. 1987) ("[A] party cannot give clear answers to unambiguous questions in a deposition and thereafter raise an issue of material fact in a contradictory affidavit that fails to explain the contradiction."). Accordingly, the court will disregard Ms. Helm's testimony that Officer Fazekas was the officer who "knocked [her] to the ground." (Doc. 101-5 at 33).

Ms. Helm was still handcuffed and on the ground (doc. 101-8 at 6 ¶ 40; doc. 101-5 at 58), Officer Morgan took out his Taser and told Ms. Helm, "I'm going to tase you" (doc. 101-8 at 5 ¶ 38, doc. 91-25 at 3). Officer Morgan then tased Ms. Helm in her lower back, causing Ms. Helm to urinate on herself. (Doc. 101-5 at 30; Doc. 101-8 at 6 ¶ 40). D.H. testified that none of the other officers tried to stop Officer Morgan from tasing Ms. Helm.[5] (Doc. 101-8 at 5 ¶ 39).

After Officer Morgan tased Ms. Helm, Ms. Helm was carried to the police car. (Doc. 101-5 at 33). Ms. Helm was later arrested for disorderly conduct and taken to the Etowah County Jail. (*Id.* at 34). The City ultimately dismissed the charge against her.

## II.   DISCUSSION

As set out above, Ms. Helm and T.D.H. asserted a variety of claims against the officers involved in the tasings as well as the City itself. Essentially, they seek to hold the individual defendants liable for either using or failing to intervene in the use of excessive force; Chief Carroll and the City liable for failing to adequately train and supervise the officers; and Officers Fazekas and Morris liable for false imprisonment and false arrest. Defendants move for summary judgment on all counts.

_____

[5] Officer Gilliland objects to this evidence as hearsay to the extent it "relies on nonverbal conduct intended as an assertion or statement." (Doc. 111 at 12 ¶ 164). The objection is overruled because the officers not stopping Officer Morris does not qualify as a statement. *See* Fed. R. Evid. 801(a) ("'Statement' means a person's oral assertion, written assertion, or nonverbal conduct, *if the person intended it as an assertion*.") (emphasis added).

In deciding a motion for summary judgment, the court must determine whether, accepting the evidence in the light most favorable to the non-moving party, the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *see also Hamilton v. Southland Christian School, Inc.*, 680 F.3d 1316, 1318 (11th Cir. 2012). The City contends that it is entitled to judgment on the only claim against it because Ms. Helm and T.D.H. have not presented any evidence that it has not adequately trained its officers.

The other defendants—all of whom are City police officers—assert the defense of qualified immunity as to the excessive force and failure to intervene claims. Finally, Officers Morris and Fazekas assert that they are entitled to summary judgment on the plaintiffs' claims of false imprisonment or false arrest because the plaintiffs have not presented any evidence that the officers falsely imprisoned them.

## A.    Failure to Train[6]

### i.    The City

In their sole count against the City, T.D.H. and Ms. Helm allege that the City "permitt[ed], encourag[ed], tolerat[ed] and knowingly acquiesc[ed] to an official pattern, practice or custom of its police officers violating the constitutional rights

---

[6] Ms. Helm labelled her claims against the City and Chief Carroll as "Failure to Supervise." (*See* Doc. 26 at 50, 52). The allegations include both a failure to train and supervise. (*Id*. at 51 ¶ 286, 52 ¶ 294). However, the evidence and argument address only an alleged failure to train.

of the public, including Plaintiff Helm's [sic] and T.D.H.'s [sic] through the use of unnecessary excessive force upon ordinary citizens." (Doc. 26 at 52 ¶ 295). They further allege that the City failed to train or "supervise and prevent the [ ] officers from violating [their] rights." (*Id.* at 53 ¶ 298). The City contends that it cannot be liable unless Ms. Helm and T.D.H. prove that the alleged failure to train or supervise is a policy or custom that caused the officers to violate plaintiffs' constitutional rights, a burden they have not carried. (Doc. 88 at 28–29) (citing *Gold v. City of Miami*, 151 F.3d 1346, 1350 (11th Cir. 1998)). The City is correct.

The United States Supreme Court has imposed strict limitations on municipal liability. *Gold*, 151 F.3d at 1350. A city cannot be liable under § 1983 through the doctrine of respondeat superior. *Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658, 691 (1978). Instead, to hold a city liable for the actions of its officers, a plaintiff must show that the city had a custom or policy of excessive force or inadequate training or supervision. *Gold*, 151 F.3d at 1350–51.

"A municipality's culpability for a deprivation of rights is at its most tenuous where a claim turns on a failure to train." *Connick v. Thompson*, 563 U.S. 51, 61 (2011) (citing *Oklahoma City v. Tuttle,* 47 U.S. 808, 822–823 (1985)). To establish municipal liability, Helm must prove that the City's failure to train was "not simply negligent, but was taken with 'deliberate indifference' as to its known or obvious consequences." *See Bd. of County Comm'rs v. Brown*, 520 U.S. 397,

398 (1997) (citing *Canton v. Harris*, 489 U.S. 378, 388 (1989)). To survive summary judgment on that claim, the plaintiffs must present some evidence that "the municipality knew of a need to train or supervise in a particular area and the municipality made a deliberate choice not to take any action." *Knight through Kerr v. Miami-Dade Cty.*, 856 F.3d 795, 820 (11th Cir. 2017) (quotation marks omitted). They can do that in two ways.

The first approach requires evidence that the City was aware that a pattern of violations existed but failed to provide adequate training. *Lewis v. City of W. Palm Beach, Fla.*, 561 F.3d 1288, 1293 (11th Cir. 2009). Plaintiffs' amended complaint alleges that the City had a policy or custom of using excessive force but Plaintiffs do not defend the allegation at summary judgment. And for good reason. There is no evidence of a widespread practice of using excessive force. There is also no evidence that City police officers have been involved in *any* other constitutional violations, much less evidence of a *pattern* of constitutional violations. In the absence of such evidence, Plaintiffs cannot establish that the City's policymaking officials knew about the use of excessive force and failed to stop it. As a result, Plaintiffs must resort to the second approach.

The second approach permits the plaintiffs to establish that the likelihood of a constitutional violation is so high that the City was on notice of the need for training *and* that the City failed to provide that training. *Lewis*, 561 F.3d at 1351–

52.  They contend that they have done so because Officer Gilliland last saw the City's written use of force policy five years before this incident (doc. 102 at 33–34), and because the police department failed to enforce its stated policy of conducting annual training dedicated to the appropriate use of force (*id.* at 35).

Ms. Helm and T.D.H.'s arguments are unpersuasive. The evidence establishes that the City *did* train its officers on the use of Tasers.  Although Ms. Helm and T.D.H. quarrel with the failure to recertify all officers on an annual basis, they do not point to any deficiency in the training that the officers did receive.  They have failed to show that any additional training or changes to the training that the officers received would have been of any benefit.  And although Ms. Helm and T.D.H. argue that additional training would have brought the officers up to date on then-recent developments in the law, they have not shown that the law regarding the use of force on restrained and unresisting people has changed since the officers were first trained. T.D.H. and Ms. Helm cannot establish that the failure to mandate annual training in the use of a Taser amounted to deliberate indifference.

The court **WILL GRANT** the City's motion for summary judgment and **WILL ENTER SUMMARY JUDGMENT** in favor of the City and against T.D.H. and Ms. Helm on Count Fifteen.

### ii.     Chief Carroll

Count Fourteen alleges that Chief Carroll failed to train the City's police force.  (Doc. 26 at 51 ¶ 286).  Chief Carroll contends that he cannot be held liable for his subordinates' constitutional violations unless Ms. Helm and T.D.H. prove a causal connection between his actions and the deprivation.  (Doc. 84 at 40).  To make this showing, they must show that Chief Carroll directly participated in the unconstitutional conduct or that a causal connection exists between the supervisor's actions and the constitutional violation.  *Keith v. DeKalb County, Ga.,* 749 F.3d 1034, 1047–48 (11th Cir. 2014).  Ms. Helm and T.D.H. do not allege that Chief Carroll directly participated in the unconstitutional conduct, so to prevail on the claim, they have to prove a causal connection exists.

A causal connection can be established through a history of widespread abuse that would put a responsible supervisor on notice of the need to correct the alleged deprivation or through the existence of the supervisor's custom or policy which results in deliberate indifference.  *See Keith*, 749 F.3d at 1048.  The plaintiffs did not respond to Chief Carroll's motion for summary judgment on Count Fourteen.  And, as stated in Section II(A), *supra*, the evidence in this case does not establish a history of widespread abuse sufficient to put anyone on notice of the need to correct the alleged deprivation.  Nor is there any evidence that Chief Carroll had a custom or policy that recklessly disregarded the risk of a violation.

In the absence of any such evidence, Chief Carroll is entitled to summary judgment on Count Fourteen and the court **WILL GRANT** the motion for summary judgment in his favor.

### B. The Individual Defendants (Qualified Immunity)

In Counts One, Two, Three, Five, Six, Eight, Ten, Eleven, Twelve, and Thirteen, Ms. Helm and T.D.H. assert claims of excessive force and failure to intervene against Officer Fazekas, Officer Morris, Officer Gilliland, Officer Kimbrough, and Chief Carroll. Those defendants now seek summary judgment on the basis that they are entitled to qualified immunity from those claims.

"Qualified immunity protects government officials performing discretionary functions from suits in their individual capacities unless their conduct violates clearly established statutory or constitutional rights of which a reasonable person would have known." *Shaw v. City of Selma*, 884 F.3d 1093, 1098 (11th Cir. 2018). Everyone agrees that the defendants were performing discretionary functions, so the plaintiffs bear the burden of showing that each officer's conduct violated a constitutional right *and* that the right was clearly established at the time of the conduct. *Lee v. Ferraro*, 284 F.3d 1188, 1194 (11th Cir. 2002). To determine whether a right was clearly established, the court looks to binding decisions of the Supreme Court of the United States, the Court of Appeals for the Eleventh Circuit,

and the Supreme Court of Alabama. *Glasscox v. City of Argo*, 903 F.3d 1207, 1217 (11th Cir. 2018).

In qualified immunity cases, the court "must determine whether the right was clearly established such that a reasonable official would understand that what he is doing violates that right." *Coffin v. Brandau*, 642 F.3d 999, 1013 (11th Cir. 2011) (citations omitted). "[I]f case law, in factual terms, has not staked out a bright line, qualified immunity almost always protects the defendant." *Priester v. City of Riviera Beach, Fla.,* 208 F.3d 919, 926 (11th Cir. 2000) (quotation marks omitted). One exception to this principle is where the defendant's conduct "is so plainly unnecessary and disproportionate that no reasonable officer could have thought that this amount of force was legal under the circumstances." *Oliver v. Fiorino*, 586 F.3d 898, 908 (11th Cir. 2009).

The court will first address the claims that Officer Fazekas and Officer Morris used excessive force, followed by the claims that Officer Fazekas, Officer Gilliland, Officer Kimbrough, and Chief Carroll failed to intervene in the use of excessive force.

### i. Excessive Force

In Count One, Ms. Helm asserts that Officer Fazekas used excessive force against her by knocking her to the floor and directing that she be tased while

restrained.[7] (Doc. 26 at 26–27 ¶¶ 130, 132, 136). In Count Five, T.D.H. asserts that Officer Morris used excessive force by tasing her three times while she was in the midst of a seizure and despite the fact she was neither a flight risk nor a threat. (*Id.* at 35 ¶¶ 177–78).

This court "analyze[s] a claim of excessive force under the Fourth Amendment's objective reasonableness standard." *Oliver*, 586 F.3d at 905 (quotation marks omitted). That means that, taking the facts in the light most favorable to the plaintiffs, the court must determine whether the use of force was "objectively reasonable . . . from the perspective of a reasonable officer on the scene." *Id.* (alteration in original) (quotation marks omitted).

The court considers several factors in determining whether a use of force was objectively reasonable. These factors include "(1) the need for the application of force; (2) the relationship between the need and the amount of force used; [and] (3) the extent of the injury inflicted." *Mobley v. Palm Beach County Sheriff Dept.*, 783 F.3d 1347, 1353 (11th Cir. 2015). The court must examine the facts without the benefit of hindsight and from the perspective of a reasonable officer. *Jean-Baptiste v. Gutierrez*, 627 F.3d 816, 821 (11th Cir. 2010).

---

[7] In moving for summary judgment, Officer Fazekas alleges that Ms. Helm improperly conflated her false imprisonment claim with an excessive force claim. (Doc. 84 at 45). Although each claim turns on the same evidence and underlying facts, the court does not agree that Ms. Helm's false imprisonment claim is actually a claim of excessive force.

### a. T.D.H.'s claim

Officer Morris contends that the use of force was not excessive because T.D.H. was belligerent, combative, and noncompliant with directives to calm down. But those are not the facts binding the court at this stage in the proceedings because T.D.H., the non-movant, has presented evidence to the contrary. T.D.H. has presented evidence that she was in the midst of a seizure, that the officers knew she was in the midst of a seizure, that she was restrained by four grown men, that she was not belligerent, and that she was not a threat to anyone. In other words, T.D.H. has presented evidence that a reasonable officer at the scene would have seen a teenage girl lying on the ground, restrained by four police officers, in the midst of what the officer knew was a grand mal seizure. No reasonable officer in that situation would believe the use of a Taser against T.D.H. was necessary. *See, e.g.*, *Oliver*, 586 F.3d at 908; *see also Saunders v. Duke*, 766 F.3d 1262 (11th Cir. 2014) (gratuitous use of force on a compliant individual is excessive); *Hadley v. Gutierrez*, 526 F.3d 1324 (11th Cir. 2008) (same); *Galvez v. Bruce*, 552 F.3d 1238 (11th Cir. 2008) (same). Indeed, the officers concede that using a Taser on a person who is not resisting arrest constitutes excessive force. (Doc. 84 at 31).

Of course, a jury may disbelieve the plaintiffs' evidence and may find the evidence proffered by the defendants more credible, but this court may not make that sort of credibility determination at this stage. *Anderson*, 477 U.S. at 255;

*Johnson v. Breeden,* 280 F.3d 1308, 1317 (11th Cir. 2002). At this stage, T.D.H. has met her initial burden of creating a genuine dispute of material fact about whether Officer Morris violated her constitutional rights.

But even if a jury found facts establishing that Officer Morris violated T.D.H.'s constitutional right to be free from the use of excessive force, qualified immunity would protect him from suit if the right was not clearly established at the time of his conduct. A review of the case law reveals that there is no legal precedent involving facts that exactly fit the facts of this case. T.D.H. suggests that *Oliver* controls (doc. 100 at 42), but that assertion ignores critical differences in the degree of force and the number of times that force was applied in that case compared to this case. *See Oliver*, 586 F.3d at 908 (holding that prong tasering a person who is not suspected of a crime "at least eight and as many as eleven or twelve times over a two-minute span" until the person is "limp," "immobilized," and "writhing in pain" is plainly unconstitutional).

But even if *Oliver* is not directly on point, there are numerous other cases involving a wide range of force that uniformly hold "that a police officer violates the Fourth Amendment, and is denied qualified immunity, if he or she uses gratuitous and excessive force against [an individual] who is under control, not resisting, and obeying commands." *Saunders v. Duke*, 766 F.3d 1262, 1265 (11th Cir. 2014). In this case, T.D.H. was not accused of any crime, did not pose any

threat, and (according to her) was not belligerent or aggressive. What's more, T.D.H. could not have tried to flee or evade arrest because she was already restrained by four officers while in the midst of what they knew was a grand mal seizure. Given the facts currently before the court, no reasonable officer could believe the use of force on a compliant, peaceable individual suffering a medical emergency is reasonable, so at this stage Officer Morris is not entitled to qualified immunity from T.D.H.'s excessive force claim.

### b.    Ms. Helm's claim

Like Officer Morris, Officer Fazekas argues the force used on Ms. Helm was not excessive because she was belligerent, combative, and noncompliant. But again, those are not the facts binding the court at this stage of the proceedings. At this point, the court must take the facts in the light most favorable to Ms. Helm. In that light, she had barely arrived at the scene and was attempting to explain who she was when an officer knocked her off her feet, handcuffed her, and tased her without notice and for no reason. She had not been accused of a crime, she did not pose a threat, and she had not been acting belligerent or aggressive. No reasonable officer faced with those actions would have believed it necessary to knock her down, handcuff her, and tase her.

But the court will nevertheless grant summary judgment in favor of Officer Fazekas, because Ms. Helm has not presented any evidence that he was involved in

knocking her down, handcuffing her, and tasing her.  (*See* Section I(B) at 11 n.4).

Accordingly, Officer Fazekas is entitled to summary judgment on Ms. Helm's

claim of excessive force.

The court **WILL DENY** the motion for summary judgment on Count One

and **WILL GRANT** the motion for summary judgment on Count Five.

>    ii.    Failure to Intervene

In Counts Two, Three, Six, Eight, Ten, Eleven, Twelve, and Thirteen,

Ms. Helm and T.D.H. assert claims that Officer Kimbrough, Officer Gilliland,

Officer Fazekas, and Chief Carroll failed to intervene in the uses of force by

Officers Morris and Morgan.

The Eleventh Circuit has long held that "an officer can be liable for failing

to intervene when another officer uses excessive force." *Priester,* 208 F.3d at 924;

*see also Byrd v. Clark*, 783 F.2d 1002, 1007 (11th Cir. 1986).  But the Eleventh

Circuit has just as long held that "[t]his liability . . . only arises when the officer is

in a position to intervene and fails to do so." *Priester*, 208 F.3d at 924; *see also*

*Ensley v. Soper,* 142 F.3d 1402, 1407 (11th Cir. 1998).  Accordingly, to lift the

protection of qualified immunity from the officers, T.D.H. and Ms. Helm must

present evidence that each officer was in a position to intervene but failed to do so.

The court will address each officer separately.

### a.    Officer Gilliland

In Count Six, Ms. Helm asserted a failure to intervene claim against Officer Gilliland, and in Count Eight, T.D.H. asserted a failure to intervene claim against him.  Ms. Helm has not presented any evidence that Officer Gilliland was in a position to intervene in the use of force against her, and as a result Officer Gilliland is entitled to qualified immunity as to Count Six.  But T.D.H. has presented evidence that, taken in the light most favorable to her, demonstrates Officer Gilliland could have intervened before Officer Morris tased her, so he is not entitled to qualified immunity from Count Eight.

First, the court will address Ms. Helm's claim.  In opposing Officer Gilliland's motion for summary judgment, Ms. Helm alleges without any evidentiary support that Officer Gilliland "was present when Plaintiff Helm was tased . . . ."  (Doc. 103 at 37).  This conclusory statement is not supported by the facts. The undisputed evidence shows that when Officer Morgan tased Ms. Helm, Officer Gilliland was in the venue's lobby, still holding T.D.H.'s head to prevent her from injuring herself.  (Doc. 101-8 at 3 ¶¶ 19, 21; Doc. 101-1 at 39).  According to Ms. Helm, she never made it inside the lobby, where Officer Gilliland was located.  (Doc. 101-11 at 1 ¶ 5).  Given this testimony, Officer Gilliland could not have been present when Ms. Helm was tased.  Accordingly, he had no opportunity to intervene in the use of force against Ms. Helm, and she

cannot establish a constitutional violation. He is entitled to summary judgment on Count Six, and the court **WILL GRANT** summary judgment in his favor on that count.

Next, the court will address T.D.H.'s claim. The evidence, taken in the light most favorable to T.D.H., shows that Officer Gilliland was physically present and holding her head when Officer Morris tased her. D.H. swears that before the first tasing, Officer Morris warned T.D.H. twice that he would tase her if she didn't calm down. (Doc. 101-8 at 3–4 ¶¶ 22, 24, 27–29). Officer Gilliland testified that he heard Officer Morris make both threats. (Doc. 101-1 at 17). In moving for summary judgment, Officer Gilliland argues that he did not have the opportunity to prevent the tasings because he was busy restraining a combative, belligerent T.D.H. (Doc. 111 at 19). But taking the facts in the light most favorable to T.D.H., she was not belligerent or combative; she was having what he knew to be a grand mal seizure while restrained by multiple police officers.

If a jury believes T.D.H.'s version of events, then Officer Gilliland would have had the time and opportunity to intervene before Officer Morris used his Taser the first time because he would not be distracted by T.D.H.'s belligerence and combativeness. Thus, his failure to intervene was a constitutional violation. *See Priester*, 208 F.3d at 924. And because the underlying constitutional violation was clearly established, so was Officer Gilliland's failure to intervene. *See id.* At

this stage, the court cannot find that Officer Gilliland is entitled to qualified immunity from the claim that he failed to intervene in the use of excessive force against T.D.H., so the court **WILL DENY** him summary judgment on Count Eight.

### b. *Officer Kimbrough*

In Count Ten, Ms. Helm asserts a failure to intervene claim against Officer Kimbrough, and in Count Eleven, T.D.H. asserts a failure to intervene claim against him.

Taken in the light most favorable to Ms. Helm, Officer Kimbrough was holding T.D.H. down in the lobby while Officer Morris tased her and while Officer Morgan tased Ms. Helm outside of Center Stages. (Doc. 83-1 at 27; Doc. 83-4 at 38–39, 145; Doc. 91-26 at 2). Accordingly, Ms. Helm's claim against Officer Kimbrough fails for the same reason her claim against Officer Gilliland failed— she has not presented any evidence that he had an opportunity to intervene in the use of force against her. *See Priester*, 208 F.3d at 924. Accordingly, the court **WILL GRANT** summary judgment in favor of Officer Kimbrough and against Ms. Helm on Count Ten.

Likewise, T.D.H.'s claim against Officer Kimbrough survives for the same reason her claim against Officer Gilliland survived.[8]  Officer Kimbrough alleges that he did not have the opportunity to intervene because T.D.H. was "bucking up, thrashing, trying to pull away."  (Doc. 84 at 36).  There is evidence placing these material facts in dispute.  Taking the facts in the light most favorable to T.D.H., she was not "biting and kicking" or otherwise "resisting the police" (doc. 101-11 at 2 ¶¶ 9, 12), and therefore there was nothing to distract Officer Kimbrough from intervening on her behalf.  And because, taken in the light most favorable to T.D.H., the underlying use of excessive force was a clearly established constitutional violation, so was his failure to intervene, meaning that at this stage, he is not entitled to qualified immunity.  *See Priester*, 208 F.3d at 924.  The court **WILL DENY** the motion for summary judgment on Count Eleven.

### c.    *Chief Carroll*

In Count Twelve, T.D.H. asserts a failure to intervene claim against Chief Carroll, and in Count Thirteen, Ms. Helm asserts a failure to intervene claim against him.

Chief Carroll is entitled to qualified immunity from Ms. Helm's claim against him.  The undisputed evidence in the case establishes that he was in no

---

[8] Officer Kimbrough also argues that he cannot be liable for failing to intervene because Officer Morris's tasing of T.D.H. was constitutional or, in the alternative, the unconstitutionality of Officer Morris's conduct was not clearly established.  As noted above, these arguments fail.

position to intervene because he did not witness any part of the use of force against her. (Doc. 84 at 37; Doc. 100 at 46). Accordingly, the court **WILL GRANT** the motion for summary judgment in Chief Carroll's favor and against Ms. Helm on Count Thirteen.

Chief Carroll is entitled to qualified immunity for only part of T.D.H.'s claim against him. The evidence taken in the light most favorable to T.D.H. shows that Chief Carroll was present when Officer Morris first threatened to tase her and when Officer Morris in fact first tased her. (Doc. 101-2 at 12). Accordingly, T.D.H. has presented sufficient evidence from which a jury could find that Chief Carroll violated her clearly established constitutional right to be free from the use of excessive force. At this stage, qualified immunity does not protect him from that part of T.D.H.'s claim.

But the undisputed evidence is that immediately after the first tasing, Chief Carroll walked away to find paramedics. T.D.H. has presented no evidence that he heard Officer Morris' threat to tase her a second time or that he was even aware of the second or third tasing. Accordingly, he could not have intervened in those uses of force. Chief Carroll is entitled to qualified immunity from Count Eight to the extent that count relates to the second and third tasing of T.D.H. Accordingly, the court **WILL GRANT IN PART** and **WILL DENY IN PART** the motion for summary judgment on Count Twelve.

#### d.     Officer Fazekas

In Count Two, Ms. Helm asserts a failure to intervene claim against Officer Fazekas, and in Count Three, T.D.H. asserts a failure to intervene claim against him.

Ms. Helm contends that Officer Fazekas failed to intervene in Officer Morgan's use of the Taser on her.  (Doc. 100 at 60).  Officer Fazekas argues *only* that Officer Morgan's use of the Taser against "an actively-resisting Helm" did not violate clearly established law, entitling him to qualified immunity from the claim that he failed to intervene in that use of force.  (Doc. 84 at 24).[9]  Accordingly, to decide whether Officer Fazekas is entitled to qualified immunity from the failure to intervene claim, this court must decide whether Officer Morgan used excessive force when he tased Ms. Helm.

Officer Fazekas describes Ms. Helm as "hostile, belligerent, and uncooperative" and "active and [offering] vigorous resistance."  (*Id.* at 19).  Although a jury may accept his characterization of the events, at this stage the court may not do so.  In the light most favorable to Ms. Helm, she did not disobey any police command, did not commit—nor was she even suspected of committing—any crime, and was handcuffed and face down on the ground when

---

[9] In his initial brief, Officer Fazekas makes no argument that he was not in a position to intervene in the use of force against Ms. Helm.  He cursorily addresses the issue in his reply brief.  (*See* doc. 106 at 39).  However, "[a]rguments raised for the first time in a reply brief are not properly before a reviewing court."  *Herring v. Sec'y, Dep't of Corr.*, 397 F.3d 1338, 1342 (11th Cir. 2005) (citations and quotation marks omitted).

Officer Morgan tased her without warning. Such conduct was clearly established as unconstitutional in 2014. *Saunders*, 766 F.3d at 1265. Accordingly, Officer Fazekas' only argument in favor of qualified immunity from Count Two fails, and the court **WILL DENY** him summary judgment on that ground.

However, Officer Fazekas is entitled to qualified immunity from Count Three, which is *T.D.H.'s* claim for failure to intervene. In opposing summary judgment, T.D.H. cites Officer Gilliland's testimony that he believed that Officer Fazekas was present when Officer Morris tased T.D.H. and, based on that testimony alone, summarily concludes that Officer Fazekas was "able to intervene." (Doc. 100 at 56) (citing Doc. 101-1 at 18). But there is no evidence that Officer Fazekas saw the tasing or was within voice contact of Officer Morris at the time of the tasing. *Cf. Priester*, 208 F.3d at 925. Officer Morris testified that Officer Fazekas was not on the ground restraining T.D.H. (Doc. 101-2 at 12). In fact, the evidence suggests that Officer Fazekas left T.D.H. in order to open the venue's front doors and give T.D.H. some fresh air. (Doc. 83-2 at 18–19). Because T.D.H. has not presented evidence that Officer Fazekas had an opportunity to intervene, he is entitled to summary judgment on Count Three.

### C. The Individual Defendants (Counts Twenty-One and Twenty-Two)

The only claims remaining to be addressed are Count Twenty-One and Count Twenty-Two. (*See* Doc. 36 at 62–63). In Count Twenty-One of the

amended complaint, Ms. Helm asserts that Officer Fazekas "falsely imprisoned" her by knocking her to the ground, handcuffing her, and ordering another officer to tase her, without probable cause and in violation of her "Fourth Amendment right from unlawful seizure [sic]." (Doc. 26 at 62 ¶¶ 319, 321). In Count Twenty-Two, T.D.H. asserts that Officer Morris "falsely imprisoned" her by assisting the other officers in restraining her, violating her "constitutional right to be free from illegal seizure." (*Id.* at 63–64 ¶¶ 325, 340; Doc. 100 at 61).

"A false imprisonment claim under section 1983 is based on the protection of the Fourteenth Amendment against deprivations of liberty without due process of law." *Ortega v. Christian*, 85 F.3d 1521, 1526 (11th Cir. 1996). To assert a federal false imprisonment claim, a plaintiff must show both the elements of a common law claim for false imprisonment and a due process violation under the Fourteenth Amendment. *Campbell v. Johnson,* 586 F.3d 835, 840 (11th Cir. 2009). Under Alabama law, "[f]alse imprisonment consists of the unlawful detention of the person of another for any length of time whereby he is deprived of his personal liberty." *Crown Cent. Petroleum Corp. v. Williams*, 679 So. 2d 651, 653 (Ala. 1996). "Any exercise of force, or the express or implied threat of force, by which in fact the other person is deprived of his liberty, compelled to remain where he does not wish to remain, or to go where he does not wish to go, is an imprisonment." *Id.* Because Officers Fazekas and Morris argue only that

Ms. Helm and T.D.H. have not satisfied the elements of an Alabama common law claim for false imprisonment, the court will not address the due process component of a federal false imprisonment claim.[10] (*See* Doc. 84 at 44–46).

Officer Fazekas contends that even if *someone* violated Ms. Helm's rights, he cannot be liable for that violation because *he* "did not affect the arrest of Helm." (Doc. 84 at 45). Rather, "[*Officer*] *Gilliland* ultimately grabbed Helm, escorted her to the front of the building, and directed *Morgan* (who is not a party to this lawsuit) to cuff and detain Helm." (*Id.* at 45) (emphasis in original). The court agrees. Ms. Helm failed to present any evidence that Officer Fazekas was in any way involved in this arrest. There is simply no evidence that Officer Fazekas assisted or even observed Ms. Helm being handcuffed and detained. In the absence of any evidence that Officer Fazekas played any part in the decision to arrest her, or was able to intercede to prevent the arrest, this claim fails. *Crown Cent. Petroleum Corp.*, 679 So. 2d at 654 (stating that for an officer who does not actually effect an imprisonment to be liable, he must be "involved with or related to the act . . . as

---

[10] Defendants say that it is unclear whether the plaintiffs are asserting federal or state law claims and ask that, if the court finds the claims are federal in nature, the court grant them the opportunity for "additional briefing opportunities as may be necessary." (Doc. 84 at 44 n.84). The court does not agree that the state or federal nature of the claims is confusing: both counts assert violations of the federal Constitution. (Doc. 26 at 62–64) Moreover, any "confusion" could have been brought to the court's attention earlier through a motion for a more definite statement. If Defendants believed that the claims could be construed as state or federal claims, they should have addressed both alternatives in their summary judgment briefs, instead of addressing only one and asking for an opportunity to brief the claims further if the court rejected the first argument.

[an] instigator[ ] or participant[ ]"). Accordingly, the court **WILL ENTER SUMMARY JUDGMENT** for Officer Fazekas on Count Twenty-One of the amended complaint.

For his part, Officer Morris contends that he cannot be liable for falsely imprisoning T.D.H. because he did not arrest her. (Doc. 84 at 46). But although a plaintiff can bring a false imprisonment claim based on detention pursuant to a false arrest, *see Ortega v. Christian*, 85 F.3d 1521, 1526 (11th Cir. 1996), a false imprisonment claim does not *require* a false arrest. The question under Alabama law is whether the defendant deprived the plaintiff of her liberty for any period of time. *See Crown Cent. Petrolouem Corp.*, 679 So. 2d at 653; *Dolgencorp, Inc. v. Pounders*, 912 So. 2d 523, 528 (Ala. Civ. App. 2005) ("One who instigates or participates in the unlawful confinement of another is subject to liability to the other for false imprisonment.") (citing Restatement (Second) of Torts § 45A (1965)).

T.D.H. has presented evidence that, while several officers held her down, Officer Morris repeatedly tased her to get her to comply with his commands to calm down. As a result, he participated in the confinement of T.D.H. *See Crown Cent. Petroleum Corp.*, 679 So. 2d at 653 ("Any exercise of force, or the express or implied threat of force, by which in fact the other person is deprived of his liberty, compelled to remain where he does not wish to remain, or to go where he

does not wish to go, is an imprisonment."). Officer Morris is not entitled to summary judgment on Count Twenty-Two.

## III. CONCLUSION

The court **WILL GRANT** the City's motion for summary judgment and **WILL ENTER SUMMARY JUDGMENT** in favor of the City and against Ms. Helm and T.D.H. on Count Fifteen. (Doc. 87).

The court **WILL GRANT IN PART** and **WILL DENY IN PART** the motion for summary judgment filed by Chief Carroll, Officer Fazekas, Officer Kimbrough, and Officer Morris. (Doc. 83). The court **WILL DENY** the motion on Counts One, Two and Eleven. The court **WILL GRANT** the motion and **WILL ENTER SUMMARY JUDGMENT** in favor of Officer Fazekas and against T.D.H. on Count Three. The court **WILL DENY** the motion on Count Five. The court **WILL GRANT** the motion and **WILL ENTER SUMMARY JUDGMENT** in favor of Officer Kimbrough and against Ms. Helm on Count Ten. The court **WILL DENY** the motion for summary judgment on Count Twelve as to the first tasing of T.D.H., but **WILL GRANT** the motion and **WILL ENTER SUMMARY JUDGMENT** in favor of Chief Carroll and against T.D.H. on Count Twelve as to the second and third tasings. The court **WILL GRANT** the motion and **WILL ENTER SUMMARY JUDGMENT** in favor of Chief Carroll and against Ms. Helm on Count Thirteen and against T.D.H. and Ms. Helm on Count

Fourteen. The court **WILL GRANT** the motion and **WILL ENTER SUMMARY JUDGMENT** in favor of Officer Fazekas and against Ms. Helm on Count Twenty-One. The court **WILL DENY** the motion for summary judgment on Count Twenty-Two.

The court **WILL GRANT IN PART** and **WILL DENY IN PART** the motion for summary judgment filed by Officer Gilliland. (Doc. 89). The court **WILL GRANT** the motion and **WILL ENTER SUMMARY JUDGMENT** in favor of Officer Gilliland and against Ms. Helm on Count Six. The court **WILL DENY** the motion on Count Eight.

Counts One, Two, Five, Eight, Eleven, and Twenty-Two, and part of Count Twelve, will proceed to trial.

**DONE** and **ORDERED** this March 25, 2019.

_____
**ANNEMARIE CARNEY AXON**
UNITED STATES DISTRICT JUDGE